196FTEV1                    Trial

1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK
     ------------------------------x
3
     TEVA PHARMACEUTICALS USA,
4    INC., TEVA PHARMACEUTICALS
     INDUSTRIES LTD., TEVA
5    NEUROSCIENCE, INC. and YEDA
     RESEARCH AND DEVELOPMENT CO.
6    LTD.,

7              Plaintiffs,

8         v.                          08-CV-7611 (BSJ)

9    SANDOZ, INC., SANDOZ
     INTERNATIONAL GMBH, NOVARTIS
10   AG, and MOMENTA
     PHARMACEUTICALS, INC.,
11
               Defendants.
12
     ------------------------------x
13   TEVA PHARMACEUTICALS USA,
     INC., TEVA PHARMACEUTICALS
14   INDUSTRIES LTD., TEVA
     NEUROSCIENCE, INC. and YEDA
15   RESEARCH AND DEVELOPMENT CO.
     LTD.,
16
               Plaintiffs,
17
          v.                          09-CV-8824 (BSJ)
18
     MYLAN PHARMACEUTICALS INC.,
19   MYLAN INC., NATCO PHARMA LTD.,

20             Defendants.            Non-Jury Trial
     ------------------------------x
21
                                      New York, N.Y.
22                                    September 7, 2011
                                      9:30 a.m.
23
     Before:
24
                    HON. BARBARA S. JONES,
25
                                      District Judge

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

196FTEV1                    Trial

1                              APPEARANCES

2    KENYON & KENYON
          Attorneys for Plaintiffs
3    BY:  ELIZABETH J. HOLLAND, ESQ.
          WILLIAM G. JAMES, II, ESQ.
4         CAROLYN A. BLESSING, ESQ.

5    GOODWIN PROCTER, LLP
          Attorneys for Plaintiffs
6    BY:  DAVID M. HASHMALL, ESQ.
          JOHN T. BENNETT, ESQ.
7         NICHOLAS K. MITROKOSTAS, ESQ.

8

9    MORRISON & FOERSTER LLP
          Attorneys for Defendants
     BY:  DAVID C. DOYLE, ESQ.
10        KAREN L. HAGBERG, ESQ.
          ERIC M. ACKER, ESQ.
11

12   PERKINS COIE LLP
          Attorneys for Defendants
     BY:  JOHN S. SKILTON, ESQ.
13        DAVID L. ANSTAETT, ESQ.
          SHANNON M. BLOODWORTH, ESQ.
14        DAVID JONES, ESQ.

15   ALSO PRESENT:  CORT CHASE, Litigation Support

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          (In open court)

3          THE COURT:  Good morning.  All right, I have some

4    rulings for you this morning, and then I guess we can proceed

5    with openings.  Let me start with what we discussed first I

6    think the last time we were together, which is Mylan's

7    application that Teva be ordered to produce Mr. Konfino.  I'm

8    denying that.  I've read the cases, particularly, I don't know

9    how to pronounce the name, Minvea (ph).  It just doesn't stand

10   for the proposition that defendant is claiming it does.  The

11   judge didn't order the experts to show up for trial in the

12   first instance, he basically said you can bring them or you can

13   suffer an adverse inference.  More importantly, it just doesn't

14   stand for the proposition that if there is an agreement of the

15   type that we have in this case, that there's any obligation on

16   the part of the patent holder in this case, Teva, to produce

17   the inventor for trial.  Teva as a party who controls

18   Mr. Konfino is certainly obligated to produce him for

19   deposition.  They have done that.  I think that's the extent of

20   their obligation.

21          All right.

22          MS. BLOODWORTH:  Your Honor, if I may be heard after

23   that as well.

24          THE COURT:  I have read several letters, Ms.

25   Bloodworth.  What else is there to say?

1          MS. BLOODWORTH:  To clarify your rulings, plaintiffs

2     have also designated Mr. Konfino's deposition transcript.  We

3     believe it should be admissible under Rule 804, because if

4     plaintiff had requested him to come here to trial, he testified

5     in his deposition he would appear, and he's also added his

6     contract doesn't make clear if he's actually obligated to

7     Kenyon that he would appear.

8          THE COURT:  I'm not sure that's not the same argument

9     that you've been making.  He's not within the subpoena power of

10     this Court.  Under that circumstance, his deposition testimony

11     should be admissible.  Mr. Hashmall?

12          MR. HASHMALL:  Just one point of clarification.  We

13     did not designate his deposition testimony, we counter

14     designated it in response to the designation made by Sandoz.

15          THE COURT:  I see.  So Sandoz is intending to offer

16     it.

17          MR. HASHMALL:  That's correct, and we did counter

18     designate.

19          THE COURT:  All right.  Teva's move to prevent Sandoz

20     from presenting its obviousness defense, I'm denying that

21     motion.  Look, I read the interrogatory responses, and they

22     certainly weren't as specific or as clear as they could have

23     been.  However, they're clearly intending to identify

24     obviousness as a defense in view of the '550 patent as a basis

25     for invalidating the patents in suit.  And I think I've read

1    some of Dr. Rice's testimony in addition to reading the quotes

2    in Sandoz' letters, and certainly some of those facts were

3    relevant to an obviousness analysis.  And I don't believe Teva

4    will suffer any prejudice from Sandoz' presentation of its

5    obviousness defense.  It's highlighted as serving the same

6    defense.

7          Lastly, Mylan has made a motion in limine to preclude

8    Teva from offering evidence of unexpected results over the

9    course of prior art and I guess that having read it, the crux

10   of the motion is that Teva's evidence is insufficient to

11   establish unexpected results to overcome a prima facie case of

12   obviousness.  I don't know.  I can't make that finding now

13   through an in limine motion, I'm going to hear the evidence.

14   After I do, then I can determine that particular question.

15         All right.  Those are the three motions that I wanted

16   to give you my rulings on.

17         Lastly, just in terms of scheduling, I read your

18   letter.  If the trial extends beyond September 23, because of

19   the Jewish holidays, Rosh Hashana and my own availability, the

20   trial will resume the week of October 3.  I understand that's

21   good for all the parties, is that right?

22         Is there any other housekeeping matter before we go

23   forward?

24         MS. BLOODWORTH:  Yes, your Honor.  We have one more.

25   We had submitted a pro hac vice application for David Jones, my

196FTEV1                    Trial

1   colleague from the Madison office and there's been no

2   objection.  I spoke with plaintiff's counsel and Sandoz counsel

3   this morning and we request that be granted.

4              THE COURT:  All right, I'll grant it right now.

5              MS. BLOODWORTH:  Thank you.

6              THE COURT:  Was it David Jones?

7              MR. JONES:  Yes, your Honor.

8              THE COURT:  Opening statements, then.

9              MR. DOYLE:  Your Honor, if I could make one very brief

10  statement for the record?

11             THE COURT:  Sure, go ahead.

12             MR. DOYLE:  Just relating to the claim construction

13  order.  For the record, your Honor, Sandoz' objection to the

14  Court's claim construction needs to be noted and I'm noting it

15  now and Sandoz does maintain that the claim constructions that

16  it advocated are the correct claim constructions and I wanted

17  to of course indicate Sandoz will apply the Court's claim

18  constructions throughout the trial and we do ask the Court to

19  consider all the evidence once it had heard all the evidence in

20  connection with claim construction issues that are relevant to

21  its ultimate findings of fact and conclusions of law.

22             Thank you, your Honor.

23             THE COURT:  All right.  Thank you, Mr. Doyle.

24  Ms. Holland, are you going to begin?

25             MS. HOLLAND:  Yes.  Thank you, your Honor.

1      Good morning.  Sandoz' and Mylan's defenses have been

2  a moving target since the beginning of this case.  At first

3  Sandoz said its best defense was indefiniteness.  In fact, it

4  said it was such a strong defense that the case could be

5  disposed of on summary judgment.  When Sandoz' motion for

6  summary judgment on indefiniteness was denied then inequitable

7  conduct became its best defense and Mylan asked for an early

8  trial on that issue.

9      THE COURT:  Ms. Holland, I'm going to ask you to slow

10  down a bit before the reporter does.

11      MS. HOLLAND:  I'll move closer.

12      THE COURT:  Okay, thank you.

13      MS. HOLLAND:  So what remains here for trial, your

14  Honor, are essentially defendant's third tier defenses.  So

15  what are we left with here?  On infringement what remains after

16  the Court's claim construction is Mylan's argument that it

17  doesn't infringe because its product isn't copolymer-1 and as

18  your Honor knows after three years of litigation Sandoz for the

19  first time two weeks ago decided that its product also wasn't

20  copolymer-1.

21      On invalidity, defendants can't even agree among

22  themselves what their defenses should be.  Mylan says that the

23  claims are anticipated and obvious over the '550 patent.

24  Sandoz doesn't make any kind of anticipation argument and it's

25  obviousness argument was not even fleshed out until two weeks

1    ago.  Sandoz, on the other hand, continues to argue here that

2    the claims are indefinite because the patents in suit don't

3    have the specific calibration standards that Teva used in its

4    laboratory to do its SEC analysis and apparently Sandoz is no

5    longer asserting that the conditions aren't stated would be a

6    basis for indefiniteness.  But Mylan in any event is no longer

7    presenting this defense at all.

8         Both defendants say that the inventor, Mr. Konfino,

9    had a best mode for removing an impurity or minimizing an

10   impurity called bromotyrosine and that this best mode didn't

11   appear in the patent, but, again, defendants can't even agree

12   on what Mr. Konfino's best mode was and the evidence is going

13   to show that their best mode arguments are actually

14   inconsistent with each other.

15        In any event, whatever their best mode is it's not

16   anything that has to do with Mr. Konfino as we have here.  Was

17   a manufacturing specification.  It has to do with the

18   commercial product.  Mr. Konfino was a bench chemist working in

19   his laboratory.  He didn't set any kind of specification for

20   bromotyrosine.  You're also not going to hear a single expert

21   get up on the stand and say this bromotyrosine impurity has any

22   effect on efficacy, or on safety of copolymer-1.  It just

23   doesn't make any difference in the product.

24        What I'd like to do for the next couple of minutes is

25   just to focus in on a couple of these defenses in a little more

1    detail.  Let me start first with infringement.  As I said

2    earlier, based on the Court's claim construction defendants

3    aren't contesting that their products meet almost all of the

4    limitations of the asserted claims, including the average

5    molecular weight limitations.  Since defendants, your Honor,

6    have refused to enter into a stipulation on this, we're going

7    to be spending the next couple of days presenting evidence that

8    shows that the Sandoz product and Mylan product meet each and

9    every limitation of the asserted claims.  So the only

10   non-infringement defense that Mylan continues to press here is

11   that its product isn't copolymer-1 because it doesn't have the

12   right molar ratio.  The fact that this is a completely

13   litigation-driven argument, your Honor, becomes very evident

14   when we look at what Mylan told the FDA in its FDA filings

15   outside the context of this litigation.  So what we have here,

16   your Honor, is from Mylan's ANDA and as you can see the formal

17   name for its actual ingredient is called glatiramer acetate,

18   that's the active ingredient in Copaxone as well, but Mylan

19   told the FDA that another name for the active ingredient is

20   copolymer-1.

21        And what's really important to focus in on here, your

22   Honor, is at the bottom where it shows the average molar

23   fractions.  The average molar fractions represent the

24   percentages of the four amino acids in the product and this is

25   the information you use to get to the molar ratios.  These are

 1  the exact same molar fractions that you're going to hear Mylan

 2  tell you mean that its product is not copolymer-1.  But when it

 3  spoke to the FDA, Mylan said these very same molar fractions,

 4  this very same product is copolymer-1.  Now, remember, your

 5  honor, Sandoz never even made this argument until two weeks

 6  ago.  For the first two years of this litigation Sandoz

 7  acknowledged as it had to that its product was copolymer-1 and

 8  if we look again at how Sandoz characterized its product

 9  outside the context of this litigation we'll see why it never

10  asserted it wasn't copolymer-1.

11          This is from a 2005 internal report from Momenta, and

12  Momenta is Sandoz' partner in its generic product.  As you can

13  see here again, what Momenta and Sandoz are saying is the

14  active ingredient in its product is copolymer-1 and again shows

15  the molar fractions, the percentages of these of these four

16  amino acids in its product.  These are the same molar fractions

17  you're going to be hearing about during the course of this

18  case.  These are the same molar fractions, your Honor, that

19  appeared in the July 2011 briefing book that we discussed at

20  the pretrial conference.  So what this shows, your Honor, is

21  that Sandoz understood that these molar fractions, molar ratios

22  of its product meant that its product was copolymer-1 and as I

23  said at the pretrial conference, bringing this up at the last

24  minute based on this July 2011 briefing book, it was just a

25  pretext to get this defense into the case.

1          Now, your Honor, we've been discussing this term molar

2     ratio at a lot of the pretrial conferences, so I think we

3     should spend some time discussing exactly what that is and why

4     the Mylan and Sandoz products meet the molar ratios of the

5     claims.

6          So just to go back for a minute, copolymer-1 is a

7     mixture, of polypeptides, different chains of different lengths

8     but all these chains contain these four amino acids that are

9     listed here; alanine, glutamic acid, lysine and tyrosine.  In

10    any copolymer-1 mixture those are going to be the four amino

11    acids that appear in the polypeptide chain, a chain of

12    different lengths, different sequences, but those are the four

13    that appear.

14         When we talk about the molar ratio, what we mean are

15    the ratios of these four amino acids in the mixture, and molar

16    ratio refers to the ratio of moles, which is just a unit of

17    measurement that chemists use, but it's the relevant proportion

18    of these four amino acids in the mixture.  So when the claim

19    requires a molar ratio of approximately 6:2:5:1, what it means

20    is that any copolymer-1 mixture is going to have these four

21    amino acids in approximately this relative proportion to each

22    other, six alanine to two glutamic acid to five lysine to one

23    tyrosine, and that's going to be any copolymer-1 mixture,

24    approximately that ratio.

25         Now, I think the best way to illustrate this is to

1   think about a single polypeptide chain in the copolymer-1

2   mixture and what I have here on the screen is a chain of 14

3   amino acids and that's probably the most convenient way to look

4   at this, because the molar ratio is 6:2:5:1, and if you add

5   that up it comes out to 14.  So for illustrative purposes it's

6   easier to look at it this way.  So in this chain of 14 amino

7   acids, six of the 14 would be alanine, so that's approximately

8   43 percent; two of the 14 would be glutamic acid, approximately

9   14 percent; five of the 14 would be lysine, approximately

10  36 percent; and one of the 14 would be tyrosine, approximately

11  7 percent.  So really, your Honor, this is the crux here of the

12  molar ratio and what it means.

13          If you look at a sample, the question we're asking

14  here for molar ratio is does this sample have approximately 43

15  percent alanine, 14 percent glutamic acid, 36 percent lysine

16  and 2 percent tyrosine.  That would go for any copolymer-1

17  mixture any length of chain.

18          So you can apply the same thing to a chain, for

19  example, of 70 amino acids, and the reason I chose 70 here,

20  your Honor, is because that would be the length of chain of

21  amino acids for a copolymer-1 polypeptide that was about 7.5

22  kilodaltons, kind of in the middle of the five to nine

23  kilodalton range.  If you think about an average length of

24  chain of a polypeptide in copolymer-1 it would be 30 out of 70

25  or 43 percent alanine, 10 out of 70 or 10 percent glutamic

1    acid, 25 out of 70 or 36 percent lysine and five out of 70 or

2    approximately 7 percent tyrosine.  That's the fundamental

3    concept.

4           We have to determine the ratios or the proportion of

5    these four amino acids as part of the total copolymer-1

6    mixture.  So let's apply this now to the Mylan and Sandoz

7    products.

8           So let's talk about Mylan first.  Your Honor, I showed

9    you those molar fractions in the ANDA and this comes out of

10   Mylan's ANDA.  These are the molar fractions Mylan tells the

11   FDA it has in its product; .427 alanine, .144 glutamic acid,

12   .336 lysine, and .092 tyrosine.  If you express those as

13   percentages, as I did on the previous slides, it's

14   approximately 43 percent alanine, 14 percent glutamic acid,

15   34 percent lysine and 9 percent tyrosine.  That's what Mylan's

16   product is.  When you compare that to exactly 6:2:5:1 that I

17   showed on the slide earlier, you see the alanine/glutamic acid

18   spot on exact same percentages.  The only difference is in

19   lysine, the tyrosine.  2 percent less lysine, 2 percent more

20   tyrosine.  Your Honor, this is well within what any of the

21   experts in this case, 2 percent or 4 percent total would say

22   falls within approximately 6:2:5:1.

23          And it's the same thing for the Sandoz product, your

24   Honor.  The molar fractions that I have here on the screen come

25   from the July 2011 briefing book.  But we see the same thing.

1    Alanine/glutamic acid, same percentages as exactly 6:2:5:1.

2    Only difference is 2 percent less lysine 2 percent more

3    tyrosine, again well within what any expert or anyone in

4    skilled in the art would consider to be approximately 6:2:5:1.

5            And if you just think about this again in the context

6    of what are we actually talking about, what does this 2 percent

7    actually mean in a copolymer-1 polypeptide, let's go back to

8    the 70 amino acid polypeptide we discussed earlier.  And this

9    2 percent difference in lysine and tyrosine, your Honor, in a

10   70 amino acid chain, an average chain, would amount to one more

11   tyrosine out of 70 amino acids and one less lysine, your Honor.

12   That's it.  That's the difference between the products of Mylan

13   and Sandoz and exactly 6:2:5:1.  This is what defendants say

14   makes their product not copolymer-1.

15           I want to talk for a moment about an argument that

16   Mylan makes.  They say you have to do a mathematical

17   manipulation called normalizing to tyrosine before you compare

18   their molar ratios to 6:2:5:1.  You see on the screen

19   normalizing means essentially fixing the values of one of the

20   amino acids and comparing the other three to the fixed values

21   so you're not looking any more at the percentage of the total

22   mixture, you're looking at the percentages of, in the case of

23   tyrosine, for example, alanine, glutamic acid and lysine a

24   compared to tyrosine, so the numbers come out a little

25   different for that reason.

1          First of all, your Honor, there's nothing whatsoever

2     in the patent about normalizing for tyrosine.  It's not there

3     at all.  But what's really important is that normalizing the

4     tyrosine is really just a different way of displaying these

5     molar fraction percentages.  It doesn't change the conclusion

6     of the percentages of each of these four amino acids in the

7     copolymer-1 position.  So, for example, if you look at product

8     normalized to tyrosine, you'll see that the total scale on the

9     bottom is 10.86.  So if you add up the 4.64, 1.57, 3.65 and 1,

10    you get to 10.86.

11         Before we were looking at it on a scale of 14, now

12    it's 10.86.  But if you take the percentages of each of those

13    amino acids out of 10.86, your Honor, you see it's the exact

14    same percentages we saw earlier.  Normalizing to tyrosine, it

15    cant's change what's actually in the mixture.  It's just a

16    different way of looking at the numbers.  And if you normalize

17    to tyrosine and look at it on the same scale you get the same

18    answer.  The only difference is in the lysine and tyrosine,

19    that 2 percent.

20         Now, Mylan normalizes to tyrosine because if you look

21    at the numbers it makes it look like it's the biggest

22    difference in numbers from 6:2:5:1, but you can actually

23    normalize any of the formula because all it means is the fixing

24    of the values.  Again, your Honor, if you do the math you'll

25    see they're all on a different scale if you normalize, but if

1    you do the percentages based on the right scale for each of

2    these normalized numbers you get the same answer.  Any way you

3    look at it, your Honor, the percentages of the four amino acids

4    in the mixture, the only difference from exactly 6:2:5:1 for

5    the products in this case is this small 2 percent difference in

6    lysine and tyrosine.

7            I want to turn next to Sandoz products that the

8    patents are indefinite or not enabled because again they don't

9    disclose the exact calibration standards that Teva used in its

10   laboratory to conduct this analysis.  And this, of course, is

11   the same issue that Sandoz and Mylan raised in their summary

12   judgment motions and, again, Mylan isn't even making this

13   argument anymore.  But there's nothing new here, your Honor.

14   According to its pretrial brief what Sandoz is going to be

15   arguing is the same thing it argued before, that it had a lot

16   of trouble developing a generic Copaxone product and this

17   somehow indicates the patent wasn't enabled.  But what is at

18   issue here, your Honor, is whether a person of ordinary skill

19   in the art can figure out whether a sample of copolymer-1 fell

20   within the weight limitations.  That's it.  Mylan and Sandoz

21   are not making this argument anymore.  They actually had no

22   trouble figuring out how to determine the molecular weight of

23   the copolymer 1 sample.

24           This is from a document that Mylan submitted to the

25   FDA in responses to Teva's submissions and what Mylan said to

1   the FDA was there are testing methods, testing systems that you

2   can use to determine the average molecular weight ranges of a

3   copolymer-1 sample and that these could be easily employed for

4   any generic version of Copaxone.  So Mylan understood that it's

5   not hard to determine the average molecular weight of a

6   copolymer-1 sample.  These are easy testing methods that could

7   be input for any generic version of Copaxone.  In fact, your

8   Honor, Mylan actually used universal calibration, which is a

9   technique that Sandoz says can't be used to figure out

10  accurately the molecular weight of copolymer-1, but Mylan did

11  use universal calibrations and submitted the results to the

12  FDA.

13          You're also not going to hear at trial from defendants

14  or Sandoz expert Dr. Svek.  Now, you may recall Dr. Svek from

15  the claim construction stage, your Honor.  He was Sandoz'

16  expert at the claim construction stage, but he wasn't invited

17  by Sandoz to come to trial here.  And if you look at what he

18  said at his deposition it's not hard to figure out why you

19  won't be seeing him live.  This is from Dr. Svek's October 2009

20  deposition.  This is part of the designated deposition

21  testimony in this case.  Dr. Svek was asked in his deposition,

22  "In 1994 if someone has given you a sample of copolymer-1 would

23  you have been able to determine whether it had a molecular

24  weight between 5,000 and 9,000" -- it should say daltons it

25  says kilodaltons.

1          And he said, "Probably yes, yes."  Exactly the

2   opposite of what Sandoz is going to be arguing to the Court

3   here during this trial.

4          It's also important to understand that what Sandoz and

5   Momenta have to do to establish for FDA purposes that their

6   generic product is the same as Copaxone is an entirely

7   different analysis than what we're doing here in this courtroom

8   because what is important here only is whether a person of

9   ordinary skill in the art would be able to determine whether a

10  copolymer-1 sample fell within the molecular weight limitations

11  of the claims.

12          Now, I have a slide I want to use, your Honor, but I

13  think it's only going to come out on our private screens

14  because I understand there's a confidentiality issue.

15          THE COURT:  Okay.

16          MS. HOLLAND:  For patent purposes your Honor, and the

17  argument that Sandoz is making here, that the molecular weight

18  limitation is enabled, a person with ordinary skill in the art

19  could figure out whether it meets that limitation.  But what we

20  have here on the right, your Honor, is a listing of only some

21  of the tests that Sandoz had to do in order to get its ANDA on

22  file.  They had to perform dozens and dozens of analyses of all

23  different kinds of characteristics of its product and compare

24  them to Copaxone, all different kinds of parameters that had

25  nothing to do with molecular weight.  They did have to do a

1   molecular weight determination, but that was a very small

2   fraction of what had to be done by Sandoz in order to develop

3   its generic Copaxone products so evidence of what Sandoz had to

4   do to try to develop a generic Copaxone product doesn't have

5   any relevance to whether or not a person of ordinary skill in

6   1994 would have been able to determine whether a copolymer-1

7   sample fell within the molecular weight limitations.

8           Just as the final point, your Honor, the primary prior

9   art references that are going to be referred to that were

10  relied on here by defendants for their anticipation and

11  obviousness arguments are the '550 patent and the 620 EP

12  publication.  Both of those references were thoroughly

13  considered by the Patent Office over years and years of

14  prosecution and the Patent Office decided that the patent

15  claims were not obvious, they were not anticipated for either

16  of those references.  So as the federal circuit has told us in

17  that kind of situation defendant's burden here is even higher

18  than it ordinarily would be.  And, your Honor, the evidence is

19  going to show there's no reason for the Court to come to any

20  different conclusion than the one that was reached by the

21  Patent Office.

22          In sum, your Honor, the evidence is going to show that

23  the Mylan and Sandoz products here are of course copolymer-1

24  and they meet all the other claim limitations and defendant

25  will not be able to meet their burden by proving by clear and

1    convincing evidence that any of the patent claims asserted here

2    are invalid.  Thank you.

3            THE COURT:  Thank you, Ms. Holland.  Ms. Bloodworth?

4            MS. BLOODWORTH:  Yes, your Honor.  Thank you, your

5    Honor.  The court reporter is ready?  My name is Shannon

6    Bloodworth and I'm going to speak on behalf of the Mylar

7    codefendants.  What I'm going to spend my time focusing on is a

8    critical point of distinction between Copaxone and the Weizmann

9    copolymer-1.  Simply put, Mylan will show that the copolymer-1

10   that is described in the patents in suit, is not the

11   copolymer-1 product that Teva disclosed to the FDA for approval

12   to market as Copaxone and is not the same as Mylan's product.

13   Rather, the patents in suit cover an old composition of

14   copolymer-1 dating back to the early 1970's.  To be sure, Teva

15   alleges that the patents in suit disclose copolymer-1 having a

16   slightly lower molecular weight than the old copolymer-1, but

17   the composition of the old copolymer-1 disclosed in the patents

18   in suit in the 1970's are the same, and they share essentially

19   the same molar ratio.

20           This ratio in the '808 patent, as you heard

21   Ms. Holland say is approximately 6:2:5:1.  What this means is

22   there's a chemical composition of copolymer-1 where there are

23   six alanines for every two glutamic acids for every five

24   lysines for every one tyrosine.  As I'll explain, this 6:2:5:1

25   ratio differs substantially from the ratios in Copaxone and in

1    Mylan's proposed glatiramer acetate product, and this

2    substantial difference in the molar ratio is why Mylan's patent

3    does not infringe on the patents in suit.

4            So why is there a difference?  The patents in suit

5    disclose a process for making copolymer-1 that result in a

6    thick and unwanted amino acid called bromotyrosine.  By

7    contrast, Copaxone, in Teva's own words, is significantly

8    improved.

9            In the summer of 1989, a Teva scientist by the name of

10   Mr. Eliezer Konfino identified bromotyrosine.  And Mr. Konfino

11   determined that bromotyrosine is formed during the second step

12   in the copolymer-1 synthesis, when the free bromine present

13   during the HBr or hydrobromic acid in acidic acid solutions

14   bonds with approximately 30 percent of the tyrosine amino acids

15   in the copolymer-1 polypeptide chains.  So the free bromine is

16   present in HBr acidic acid solution, bind with tyrosine

17   approximately 30 percent of the time to form bromotyrosine.

18   This doesn't happen one time with one 70 amino acid polypeptide

19   chains.  There are millions of chains in copolymer-1.  This

20   bond irreversibly converts those tyrosines to bromotyrosine,

21   the fifth amino acid.

22           So Mr. Konfino experimented to find a way to prevent

23   bromotyrosine from forming during copolymer-1 synthesis.  His

24   solution uses a chemical called phenol to scavenge the free

25   bromine in the HBr acidic acid solution to prevent the

1    formation of bromotyrosine.  So the phenol is used with the

2    solution and it will bond with the bromines so they are no

3    longer free to bond with the tyrosines in the copolymer-1

4    chain.  The result, a form of copolymer-1 largely free of

5    bromotyrosine and without about 30 percent more tyrosine than

6    that found in the old form of copolymer-1.

7            Now, there's a 30 percent, about 30 percent more

8    tyrosine because almost none of it is converted to

9    bromotyrosine thanks to the use of phenol.  The new form, the

10   free of bromotyrosine form, is what is marketed as Copaxone.

11   It has a molar ratio of 4.5 alanine to 1.5 glutamic acid to 3.6

12   lysine for every one tyrosine.  Now, the Copaxone molar ratio

13   is not approximately 6:2:5:1 just disclosed in the patents in

14   suit and that's because is more tyrosine in Copaxone than in

15   the old form of copolymer-1.  And because there is more

16   tyrosine, the other three amino acids are reduced.  That's the

17   essence of a ratio.  They're different compositions and they

18   have different molar ratios.

19           Mylan, like Teva, uses phenol to produce its

20   glatiramer acetate.  Consequently, Mylan's product like

21   Copaxone, is substantially free of bromotyrosine and has a

22   molar ratio of approximately 4.6 alanine, 1.6 glutamic acid,

23   3.7 lysine for every one tyrosine.  And you will hear testimony

24   from Mylan's expert, Dr. Steven Kent, who will explain that the

25   Mylan molar ratio is not approximately 6:2:5:1.  The Mylan

1   product has a fundamentally different composition than the

2   copolymer-1 claimed in the patents in suit, and this means that

3   the Mylan product does not infringe any of the patents in suit

4   which all define copolymer-1 as having a ratio of approximately

5   6:2:5:1.

6          Now, as you heard a little bit in the beginning in the

7   opening from Ms. Holland, Teva will try to downplay the

8   importance of this new form of copolymer-1 or Copaxone,and

9   Mr. Konfino's process for making it, but the science and Teva's

10  documents tell a very different story.  For example, an

11  internal document apparently used phenol to rid copolymer-1 of

12  the bromotyrosine is a, quote, a major improvement in the

13  production process, and Mr. Konfino himself declared the use of

14  phenol to be the, quote, most convenient process for

15  synthesizing low bromotyrosine cop-1.  Indeed, the virtue of

16  Mr. Konfino's discovery was quickly recognized by Teva and by

17  December 1989 Mr. Konfino's boss, Dr. Lenol approved a new Teva

18  manufacturing protocol that incorporated Mr. Konfino's phenol

19  process.  And later when Teva applied for an approval to market

20  Copaxone, Teva disclosed this improved form of copolymer-1 and

21  the use of phenol for making it in a confidential submission to

22  the FDA.  To this day Teva makes the improved form of

23  copolymer-1, manufactured using phenol and sells it as

24  Copaxone.

25         Now, the evidence will further show that prior to this

1   litigation when plaintiffs calculated the molar ratio Copaxone,

2   they did so in the same manner that Dr. Kent will explain.  For

3   instance, Yeda, Teva's partner and coplaintiff in this case

4   obtained the '287 patent in 2004.  This patent is not asserted

5   here, your Honor, but it is known as the Gad patent under the

6   first named inventor Dr. Gad.  In this patent it claims or it

7   describes the molar fractions of glatiramer acetate to be .427

8   alanine, .141 for glutamic acid, .337 for lysine and .098 for

9   tyrosine.  The molar fractions are the underlying data used to

10  calculate the molar ratios, and the Gad patent also defines the

11  molar ratio for glatiramer acetate as approximately 4.6 to 1.5

12  to 3.6 to 1.  If there's no material difference in

13  approximately 6:2:5:1 to the molar ratio recorded in the Gad

14  patent for glatiramer acetate, then why here is it reported as

15  approximately 6:2:5:1?  The answer is because they are

16  different.  They describe very different copolymer-1

17  compositions.

18       And, interestingly, Dr. Gad also calculated the molar

19  ratio in the same way that Dr. Kent did.  Dr. Gad divided by

20  the least abundant amino molar fraction, tyrosine, and he

21  divided across the four amino acids and you get the molar ratio

22  of 4.6 to 1.5 to 3.6 to 1.  The result is a molar ratio

23  indistinguishable from Mylan's and Copaxone's molar ratio.

24       Now, according to Ms. Holland, Mylan has erred in the

25  way we calculated the molar ratio.  But as we just saw in the

1    Gad patent, Mylan's calculations of the molar ratio are the

2    same way that Yeda reported the molar ratios in the Gad patent.

3    But even using Teva's expert method to calculate the molar

4    ratio where you add up 6:2:5:1 and multiply by 14, you'll still

5    see a 30 percent, about 30 percent difference in the tyrosines.

6    I don't have Ms. Holland's slides, but you'll recall that one

7    of the numbers was 1.29 for tyrosine, one was a 1.33, I

8    believe, that's about a 30 percent difference between 1.  And

9    Teva's expert gets rid of this extra tyrosine by rounding it

10   down to one.  As Dr. Kent will explain, rounding has no place

11   in a field characterized by precision, particularly when doing

12   so obscures an approximately 30 percent difference between the

13   old copolymer-1 and the composition known as Copaxone.

14          Interestingly enough, Teva did also eventually patent

15   its phenol process in 2009, in the '072 patent or also what we

16   call the Dolitzky patent after the first named inventor.  Teva

17   has also not asserted this patent in this litigation.  But the

18   Dolitzky patent is important for two reasons.  First, it shows

19   that Teva believed the use of phenol to obtain low

20   bromotyrosine cop-1 was an improvement worthy of additional

21   patent protection.  Secondly, the '072 patent has approximately

22   the same molar fractions that were reported in the Gad patent

23   and he used the same normalization calculation as did Mylan, as

24   did the Gad patent.  You'll see that the molar ratios are once

25   again substantially different.

1          So again, we'll see the molar ratio in the Dolitzky

2    patent of Teva's, the Gad patent in Yeda and the normalization

3    calculations are all substantially different and much different

4    than the approximately 6:2:5:1 in the patents.

5          But Copaxone which was made using the phenol to

6    eliminate or substantially reduce the presence of bromotyrosine

7    is not described in the patents.  In fact, neither phenol nor

8    bromotyrosine is mentioned at all anywhere in the patents in

9    suit.  In the patents in suit Teva omitted the impact that the

10   use of phenol had on the molar ratio of Copaxone choosing

11   instead to report the old copolymer-1 ratio of 6:2:5:1.  Teva

12   has to prove today by a preponderance of the evidence that

13   Mylan's glatiramer acetate is what is claimed in the patents in

14   suit.  It's not enough to say Mylan's glatiramer acetate was

15   the same as Copaxone.  It's not the proper legal comparison.

16   So the comparison that must be made, therefore, is between

17   Mylan's proposed glatiramer acetate product and the claims of

18   the patents in suit.  All that's required is approximately

19   6:2:5:1, and when this comparison is made it is claimed that

20   the Mylan product, like Copaxone made with phenol to reduce

21   bromotyrosine simply does not fall within the ratio disclosed

22   in the patents.

23         Finally, in the invalidity portion of the trial the

24   evidence will show that Teva failed to disclose its use of

25   phenol to achieve low bromotyrosine cop-1.  The evidence will

1   show, particularly through the testimony of Dr. Alan Zeiger

2   that nothing was added by the '808 patent to the process of

3   what was invented at the Weizmann Institute and claimed in 1974

4   in the '550 patent.  All Teva did was disclose and use obvious

5   steps pertaining to the art to purify the Weizmann copolymer-1

6   to a molecular weight that still overlapped with the '550

7   patent.  In short, Dr. Zeiger will explain that Teva simply

8   patented an old process with only obviousness modifications.

9            Thank you, your Honor.

10           THE COURT:  Thank you Ms. Bloodworth.  Mr. Doyle.

11           MR. DOYLE:  Your Honor, Ms. Hagberg will be presenting

12   the opening for Sandoz.

13           THE COURT:  All right.

14           MR. HAGBERG:  Your Honor, my first challenge is

15   getting to the podium.

16           MS. HOLLAND:  Your Honor, is this the same thing

17   that's on the screen?

18           MR. HAGBERG:  We'll be moving back and forth.  There

19   isn't any other space in the courtroom.

20           THE COURT:  I think maybe you can move it back.  I'll

21   be able to see and counsel can stand there.

22           MR. HAGBERG:  Good morning, your Honor.  I think this

23   is the first time I've spoken here in this case.  As Mr. Doyle

24   said, I'm Karen Hagberg.  I'm from the New York office of

25   Morrison Foster.

1          Your Honor, I'm going to be focusing on enablement

2   here today, which contrary to what Ms. Holland said it's

3   neither a new defense nor is it by any means a third tier

4   defense of Sandoz and Momenta.  As your Honor knows from the

5   inequitable conduct portion of this trial, the path of this

6   dispute to the courtroom this morning has been a very, very

7   long one, and as Dr. Arnon testified, that path started about

8   40 years ago and that's why we have this time line, your Honor,

9   is just to show how long it took for Teva to get to the

10  position that it's at today.

11          Dr. Arnon's work started 40 years ago at the Weizmann

12  Institute when they first formulated and began experimenting

13  with copolymer-1.  That work resulted in the '550 patent which

14  we have up there on the time line and the application was filed

15  in 1971 and the patent issued in 1974.  And at the time of that

16  filing, what did Teva represent?  It noted that copolymers

17  according to the present invention are easily prepared by

18  conventional procedures.  20 years later in 1994, the next date

19  on the time line, in its first filing related to the patents

20  that are at suit here, Teva repeated basically the same

21  representation that it told the Patent Office in 1971.

22  Copolymer-1, according to the present invention, may be

23  prepared by methods known in the art.  For example, the process

24  disclosed in the '550 patent.  In other words, what Teva has

25  consistently told the Patent Office over the last 30 years is

1    that copolymer-1 is prepared merely by following methods known

2    in the art, but these statements in the '550 patent and present

3    in all the patents that are at issue here today contrast

4    dramatically with the testimony of Dr. Pinchasi that you heard

5    in July.

6            In July Dr. Pinchasi could not have been clearer.  One

7    of the two strategies that Teva depended on in order to avoid

8    competition from generic producers of copolymer-1 was the

9    difficulty that Teva had experienced in producing its product,

10   and she basically said that we realized very quickly when we

11   started to experiment with the substance that it's absolutely

12   not a simple product and it's not easily reproducible, so we

13   felt this by itself is going to constitute a relatively high

14   level of entrance for generic companies.

15           The evidence in this case will confirm that that was

16   indeed the strategy that Teva followed, and that Dr. Pinchasi's

17   July testimony in this regard is absolutely correct.  The

18   evidence will show that Teva itself spent many, many difficult

19   years experimenting and learning how to measure the molecular

20   weight of copolymer-1.  And the evidence will also show that

21   Teva kept critical aspects of the knowledge that it gained over

22   all those years to itself.  Teva did not, as the law requires,

23   disclose in its patent how one skilled in the art could

24   determine the copolymer-1 that it was producing had the same

25   molecular weight as is required by the patent claims.  And I

1    put the enablement statute up here just to make clear that

2    what's required of the patent holder is that the specification

3    must contain a written description of the invention in such

4    clear, concise and exact terms as to enable any person skilled

5    in the art to make and use the same, and the evidence will show

6    that exactly is what Teva did not do.

7            Now, as your Honor knows, enablement speaks to the

8    person of ordinary skill in the art at the time of filing of

9    the patent application, which here is 1995, and there's been

10   some dispute about what would be known and what wouldn't be

11   known, but in this case, your Honor doesn't have to decide

12   enablement just based on what experts are saying in 2011 about

13   what persons of skill in the art would know or would have done

14   in 1994.  Sandoz will present evidence of what the scientists

15   at the Weizmann Institute and at Teva did and knew in the dozen

16   years leading up to the 1998 disclosure of the standards that

17   they finally decided on after their many, many years of

18   experimentation.

19           There can be no dispute that these scientists were at

20   least persons of ordinary skill in the art at the relevant time

21   period.  There can also be no dispute that contrary to Ms.

22   Holland's argument today that it was easy, that it took these

23   scientists years of experimentation between 1986 and 1998 to

24   determine how to accurately and reproducibly measure the

25   molecular weight of copolymer-1.  And if I may, your Honor, we

1    have a second time line that's just focused on the molecular

2    weight aspects of the development of copolymer-1.  So we start

3    with 1986, and in those days Teva is using the method that the

4    Weizmann Institute had been using.  As Dr. Arnon confirmed in

5    her testimony in July the method is ultracentrifugation and the

6    resulting measurement is weight average molecular weight.  By

7    1987 Teva had switched to size exclusion chromatography, what

8    is referred as SEC, actually your Honor, just because I found

9    this interesting, I don't know whether you've ever seen it this

10   is actually the Superose 12 SEC tube that is used to measure

11   and that is talked about in the patent.  And by the way, this

12   is really all that the patent discloses is the column and its

13   filled with the Superose beads.  There's nothing in the patent

14   about the disclosure of the standards that Teva chose in 1994

15   and 1995 to calibrate that column.

16             So throughout 1987 and 1988, Teva has difficulty

17   picking the standards to provide an accurate molecular weight

18   measurement for copolymer-1.  First it attempts to use

19   commercially available globular protein standards, but then it

20   learns that SEC with these standards produce molecular weight

21   measurements that are vastly higher than the weight

22   measurements that were provided by other techniques that they

23   could provide.  In fact as Teva's test results show, the

24   measurements were at least four to six times higher than

25   molecular weights determined by viscosity and

1  ultracentrifugation.

2       So in 1988 Teva uses another set of commercially

3  available standards, polyethylene glycol, to calibrate the

4  columns for the molecular weight analysis and they subsequently

5  abandon that approach as well.

6       Later that same year in 1988, Teva's consultant

7  attempts to determine absolute molecular weight of copolymer-1

8  using a technique called osmometry, and they're expecting to

9  see a value of 7,000 daltons based on prior characterizations.

10 But what do they get?  The osmometry result is only 638 daltons

11 which is more than tenfold less than the value that they had

12 obtained by other methods in tests on the same copolymer-1

13 batch.

14      Now, still within this 1987-1998 time frame, Teva

15 begins to experiment with the use of copolymer-1 self standards

16 and it applies a set of calculations to correlate the molecular

17 weight from viscometry with results from SEC.  It continues

18 with this viscometry correlation procedure until 1992 when it

19 sets forth a new protocol for its molecular weight calibration.

20 The new calibration uses as standards which are referred to in

21 markers in the Teva documents, Teva's own batches of

22 copolymer-1 whose molecular weights have been characterized by

23 yet another method, moles.  The evidence will show in 1994 Teva

24 continues to measure molecular weight with this proprietary

25 molecular weight cell standard.  Then in 1995 the FDA steps in

1   and it requests that Teva again tries to use commercially

2   available SEC standards, and the FDA does so as stated in this

3   document from Teva's own files that they want to insure that

4   the molecular weight calibrations can be performed in any

5   laboratory not relying on a single source for markers, and

6   again, markers refers to standards.

7        And Teva does try, it tries to find a commercially

8   available standard, but then it gives up and it reconfirms that

9   the use of commercially available markers to generate

10  calibration curves that accurately reflect the molecular weight

11  of copolymer-1 is not feasible.

12       By now we're up to November of 1995, by the way.  So

13  then what does Teva do?  In early 1996, it returns to its

14  earlier position that the best markers for calibration of the

15  SEC columns are copolymer-1 batches with a known molecular

16  weight, in other words we're back to self standards.  In 1996

17  Teva is also attempting to determine the molecular weight of

18  copolymer-1 by another method, multitop, which is a type of

19  spectrometry.  That molecular weight results in far lower than

20  even the broad range of values that were determined by the

21  three other methods for the very same sample.

22       So what do they conclude?  They conclude that the

23  differences are due to the experimental bias of the technique

24  and how data are calculated and presented, and they say

25  themselves, therefore, it should be explicitly stated by which

1    analytical method the molecular weight data were obtained.  In

2    1998 Teva reports to the FDA again that it's changing its

3    analytical method for determining molecular weight and it

4    switches its calibration standards from self standards, which

5    the FDA wasn't in favor of, to synthetic peptide standards,

6    which finally addresses the FDA concerns over the validity of

7    self standards as calibration standards.  And, by the way,

8    those peptide standards are the basis of the Gad patent which

9    issued starting in 2003 and which Teva has asserted in a

10   separate lawsuit pending before your Honor.  So despite all of

11   this experimentation over so many years Teva did not disclose

12   its preferred standards.  In fact, it didn't disclose any

13   standards for that matter in the patents that are in suit in

14   this case.

15         The evidence will show that Teva's answers in '94-'95

16   to the difficulty of measuring copolymer-1's molecular weight,

17   the use of self standards, creates an insoluble problem for

18   persons of skill in the art.  Because even assuming that

19   persons skilled in the art eventually could develop copolymer-1

20   self standards, the lack of agreement among the methods for

21   independently determining the molecular weight of those

22   standards, it would preclude a person skilled in the art from

23   developing the same calibration curve developed by Teva to

24   produce the copolymer-1 that's claimed in the patents.  And why

25   is that?  As your Honor will hear over the course of the trial,

1    the methods for producing and characterizing Teva's self

2    standards are not disclosed in the patents, and persons of

3    skill in the art would not know which method to choose to

4    characterize molecular weights of their own self standards.

5         As I discussed a few minutes ago, different methods

6    can give very different results and Teva knew that its use of

7    self standards and the way to measure those standards should be

8    explicitly stated.  You'll also hear testimony from Sandoz and

9    Momenta as well regarding problems they encountered in trying

10   to arrive at molecular weight characteristics that are

11   described in the commercially packaged Copaxone materials.

12        So I'd like to return to a point that I started with

13   and that is from Dr. Pinchasi's testimony from the prior trial.

14   Teva's strategy to keep competitors out was to rely on the

15   difficulty of producing copolymer-1 and that difficulty you can

16   see from the time line in how long it took them to get there.

17   Teva has aggressively implemented that strategy to preclude

18   generic competition including, as the evidence will show, by

19   failing to disclose sufficiently enabling data in its patents

20   and that strategy continues today.  Between 2008 and 2010 Teva

21   filed three citizen petitions with the FDA seeking to prevent

22   FDA approval of the Sandoz ANDA and in its three petitions Teva

23   has told the FDA what you'll hear from Sandoz' experts during

24   the trial, that copolymer-1 is so complex that knowing you have

25   the same molecular weight distribution in separate copolymer-1

1   comparisons is essential.

2               (Continued next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. HAGBERG:  As Teva tried to persuade the FDA even

2    the most minor changes in manufacturing will produce a new

3    molecular entity with a significantly different potency and

4    safety and efficacy policy.

5          The evidence at this trial will prove conclusively

6    that a person of skill in the art must know the SEC standards

7    to have any confidence that it is producing co-polymer-1 having

8    the same molecular weight as what Teva claims it invented.  And

9    that is the information that is missing from the patents.

10   Without that entablement, each of the patents is rendered

11   invalid.

12         Thank you for your time this morning, your Honor, and

13   to allow me to emphasize an area of the evidence that Sandoz

14   and Momenta believe will be very critical to this case

15         THE COURT:  Thank you, Ms. Hagberg.

16         All right.  I don't think -- do I have a list of

17   witnesses yet?

18         MS. HOLLAND:  Yes, your Honor I believe we did send

19   one, a list of witnesses.  Do we have one -- we can get you a

20   copy of that, your Honor.

21         THE COURT:  Okay, I'm sure it came in.  We just didn't

22   see it.

23         MS. HOLLAND:  Yeah, we'll find one.

24         THE COURT:  All right.  Then are you ready to proceed?

25         MS. HOLLAND:  Yes.  Mr. Hashmall is going to be

1    presenting our first witness.

2            THE COURT:  Mr. Hashmall.

3            MR. HASHMALL:  Good morning, your Honor.  Plaintiffs

4    would call as our first witness Mr. John Congleton.

5     JOHN CONGLETON,

6         called as a witness by the plaintiff,

7         having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. HASHMALL:

10           THE COURT:  Take your seat, and spell your last

11   name -- state your full name and spell your last name for the

12   record.

13           THE WITNESS:  John Congleton, C-O-N-G-L-E-T-O-N.

14           MR. HASHMALL:  May I proceed, your Honor?

15           THE COURT:  You may proceed.

16           MR. HASHMALL:  Thank you.

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  Mr. Congleton, could you please introduce yourself to the

20   Court?

21   A.  Yes.  My name is John Congleton.  I'm senior vice-president

22   and general manager for Teva Neuroscience.

23   Q.  Could you tell us a little bit about Teva Neuroscience, its

24   business?

25   A.  Yes.  Teva Neuroscience is focused on the commercialization

 1    of Copaxone, as well Azilect for Teva in the United States.

 2    Q.  Where is Teva Neuroscience located?

 3    A.  It's located in Kansas City, Missouri.

 4    Q.  Approximately, how many people does Teva Neuroscience

 5    currently employ?

 6    A.  Approximately 600.

 7    Q.  When was Teva Neuroscience founded?

 8    A.  Teva Neuroscience was founded in 1995.

 9    Q.  Now, what is the relationship between Teva Neuroscience and

10    the plaintiff in this action, Teva Pharmaceutical Industries?

11    A.  Teva Neuroscience is a subsidiary of Teva Pharmaceutical

12    Industries.

13    Q.  And you know when Teva Pharmaceutical Industries was

14    founded?

15    A.  In 1901.

16    Q.  You mentioned that Teva Neuroscience is in the business of

17    selling Teva's branded products, is that correct?

18    A.  Yes.

19    Q.  Does Teva also sell, Teva Pharmaceuticals also sell generic

20    products?

21    A.  Yes, it does.

22    Q.  Do you know overall for Teva's business approximately how

23    much of its sales derives from generic products and how much

24    derives from branded products?

25    A.  Approximately 70 percent is from generics, and

1    approximately 30 percent is from brand pharmaceuticals.

2    Q.  Now, you testified that you currently, you are currently

3    senior vice-president and general manager of Teva Neuroscience.

4    Could you briefly describe for the Court what your

5    responsibilities are in that position?

6    A.  Yes.  I'm accountable for the sales and profits of the

7    products that Teva Neuroscience commercializes, Copaxone and

8    Azilect.

9    Q.  Approximately, how many people report to you currently,

10   Mr. Congleton?

11   A.  Approximately 450.

12   Q.  And how long have you been employed by Teva Neuroscience?

13   A.  A little over 15 years.

14   Q.  Could you briefly describe your educational and

15   professional background prior to you joining Teva Neuroscience?

16   A.  Yes.  I have a bachelors degree in marketing from Kansas

17   State University, started off in field sales in pharmaceuticals

18   developmental roles, field sales manager position prior to

19   joining Teva Neuroscience.

20   Q.  Could you tell us a little bit about your employment prior

21   to joining Teva Neuroscience?

22   A.  That's the pharmaceutical sales rep, developmental role,

23   human resource in field base sales manager.

24   Q.  Do you have any degree in chemistry or biology?

25   A.  No, I do not.

1    Q.  Now, since joining Teva Neuroscience, what positions have

2    you held at the company?

3    A.  I have been a field sales manager, a product manager and a

4    marketing department, the product director for Copaxone,

5    general manager for our Canadian Division of Teva Neuroscience,

6    as well as my current position, general manager for the United

7    States division.

8    Q.  Prior to you taking on your current position, could you

9    just generally describe what your responsibilities have been

10   with respect to Copaxone?

11   A.  Yes.  I started off as a product manager prelaunch

12   preparing that product, and moved into the director of

13   marketing for Copaxone as well.

14   Q.  And do you continue to have responsibilities currently with

15   respect to Copaxone?

16   A.  Yes.  It's under my span of control.

17   Q.  Could you just generally describe for the Court what those

18   responsibilities include?

19   A.  Generally it's around the development and approval of our

20   work plan, the budget, the resources we apply against the

21   product, as well as strategic oversight.

22   Q.  Now, you mentioned that in addition to Copaxone, Teva

23   Neuroscience also sells markets, a product known as Azilect?

24   Could you just briefly describe for the Court what Azilect is?

25   A.  Yes.  Azilect is a medication indicated for the treatment

1   both early, as well as ajunctive for ideopathic Parkinson's

2   disease.

3   Q.  Now, do you have a binder in front of you, Mr. Congleton

4   with some documents in it?

5   A.  Yes, I do.

6   Q.  If you could, sir, just turn to the first tab, it's labeled

7   as PTX 697.  Do you see that?

8   A.  Yes, I do.

9   Q.  And have you seen this document before?

10  A.  Yes, I have.

11  Q.  What is it?

12  A.  It is the prescribing information for Copaxone.

13  Q.  Is this sometimes referred to as a product insert?

14  A.  Yes.

15  Q.  Is it also known as a drug label?

16  A.  Yes, it is.

17  Q.  Now, was this drug label for Copaxone approved by the Food

18  and Drug Administration?

19  A.  Yes, it was.

20  Q.  Is this a document that was created and maintained by Teva

21  in the ordinary course of its business?

22  A.  Yes, it was.

23          MR. HASHMALL:  Your Honor, plaintiffs move PTX-697

24  into evidence.

25          MR. JONES:  No objection, your Honor.

 1            MR. DOYLE:  No objection.

 2            THE COURT:  All right, admitted.

 3            (Plaintiff's Exhibit PTX-697 received in evidence)

 4   Q.  Mr. Congleton, what is the purpose of the product insert,

 5   which is PTX-697?

 6   A.  It's to describe the use, the efficacy, safety, ability of

 7   the medicine.

 8   Q.  Now, if you could look at the top column on the first page

 9   of 697.  There's a heading there called "indications and

10   usage," do you see that?

11   A.  Yes, I do.

12   Q.  All right.  What does this tell the person who is reading

13   this label?

14   A.  It would tell the physician how to use Copaxone and what

15   patient it would be indicated for.

16   Q.  And for what conditions is Copaxone indicated?

17   A.  Copaxone is indicated for the reduction of frequent or --

18   reduction of the frequency of relapses in patients with

19   relapsing-remitting form of Multiple Sclerosis, as well as for

20   clinically isolated syndrome with one relapse and MRI

21   indicative of MS.

22   Q.  Now, below that there is a section entitled dosage forms

23   "dosage form and strength," do you see that?

24   A.  Yes, I do.

25   Q.  Does this tell the physician in what form Copaxone is sold?

1    A.  It does.

2    Q.  And in what form is it sold?

3    A.  It's sold in prefilled syringes with one milliliter of

4    sterile water, as well as 20 milligrams of glatiramer acetate.

5    Q.  Now, and just above that there's a section entitled "dosage

6    and administration," do you see that?

7    A.  Yes, I do.

8    Q.  And does this tell the physician how Copaxone is to be

9    administered?

10   A.  It does.

11   Q.  And how is Copaxone to be administered?

12   A.  It's to be administered with a daily injection of the

13   prefilled syringe with the 20 milligrams of Copaxone.

14   Q.  Now, do you know, Mr. Congleton, when Copaxone was first

15   approved for sale in the United States?

16   A.  Copaxone was approved in December of 1996.

17   Q.  And do you know, sir, when Copaxone was first offered for

18   sale in the United States by Teva?

19   A.  Yes, I do.

20   Q.  And when was that?

21   A.  April 2nd of 1997.

22   Q.  Now, in April of 1997, you were employed by Teva

23   Neuroscience?

24   A.  That's correct.

25   Q.  And how large was Teva Neuroscience marketing department in

1    April of 1997?

2    A.  It was two people.

3    Q.  And who were those two people, Mr. Congleton?

4    A.  I was the product manager, and I had a boss who was the

5    head of our marketing department named John Asler.

6    Q.  And was there a sales force at Teva Neuroscience at that

7    time?

8    A.  Yes, there was.

9    Q.  And how large was that sales farce in April of 1997?

10   A.  In April of 1997, we had 32 sales associates.

11   Q.  Now, at the time that Copaxone was launched in April of

12   1997, were there any other MS drugs on the market?

13   A.  Yes, there were.

14   Q.  And what were those drugs?

15   A.  There was Avonex as well as Betaseron, both interferons.

16   Q.  And Copaxone is not an interferon, correct?

17   A.  That's correct.

18   Q.  How are interferons, just generally, Mr. Congleton, how are

19   interferons different from Copaxone?

20   A.  They're a different class of drugs with a different mode of

21   action.  They have common traits, but Copaxone is in a

22   different class onto itself with a different mode of action.

23   Q.  All right.  And now you mentioned these two drugs, Avonex

24   and Betaseron.  How long had they been on the market?

25   A.  Betaseron was launched in the United States in 1993, and

1   Avonex was launched in the United States in 1996.

2   Q.  Now, are you familiar with the indicated uses for those two

3   drugs?

4   A.  Yes, I am.

5   Q.  And what are they indicated for?

6   A.  They're also indicated for the reduction of relapses in

7   relapse-remitting Multiple sclerosis.

8   Q.  And are you familiar with how those two drugs are to be

9   administered?

10  A.  Yes, I am.

11  Q.  And how are those products administered?

12  A.  Avonex is a once weekly intramuscular injection, and

13  Betaseron is an every other day subcutaneous injection.

14  Q.  Now, at the time that -- in April 1997 when Teva first

15  started selling Copaxone, did Teva Neuroscience develop a

16  launch plan for Copaxone?

17  A.  Yes, we did.

18  Q.  And could you just generally tell the court what a launch

19  plan is?

20  A.  A launch plan is your effort to really raise the awareness

21  of your molecule, help physicians and patients understand how

22  to initiate utilization of that, as well as maintain it.  So

23  it's a communication plan that introduces your product to the

24  appropriate audiences.

25  Q.  Were you involved in developing the launch plan for

1    Copaxone?

2    A.  Yes, I was.

3    Q.  So could you tell the Court, generally, what was that

4    launch plan for Copaxone in April of 1997?

5    A.  In April of 1997, it was still early in the treatment of

6    MS, so our focus was on raising the importance of treating the

7    disease, getting patients to begin that therapy, then to convey

8    the benefits that Copaxone could provide patients from an

9    efficacy and safety standpoint.  We utilized our sales

10   representatives, we utilized non-sales representative activity,

11   such as direct mail, conventions, journal advertising.

12   Q.  Now, you mention there were these two interferon drug

13   products that are marketed at that time.  How did Teva position

14   itself with respect to those two interferon products?

15   A.  Really as the non-interferon.  We had a different mode of

16   action.  The efficacy we felt was comparable.  A better safety

17   tolerability standpoint due to what the experience had been

18   with physicians with interferon.  So as a different mode of

19   action and a different clinical profile.

20   Q.  Were there any challenges that Teva faced when it first

21   started selling Copaxone?

22   A.  Yes, there were.

23   Q.  And could you just tell us, generally, what those

24   challenges were?

25   A.  There were several.  The first would be, again MS therapies

1   were new to both physicians and patients, so it was the need

2   for treating MS was a challenge.

3           The fact that the interferons were in the marketplace

4   anywhere from four to about a year earlier than us, and had

5   gained traction as an approach to treat MS.  And then, frankly,

6   the fact that we were a daily injectable versus less frequently

7   administered medications.

8   Q.  Do you recall, approximately, what the U.S. sales were for

9   Copaxone in 1997?

10  A.  Yes.

11  Q.  And what were those sales?

12  A.  $25 million dollars.

13  Q.  Now, since Copaxone was launched in 1997, have other MS

14  drugs come on to the market?

15  A.  Yes.

16  Q.  And what currently approved drugs does Teva consider to be

17  competitors of Copaxone?

18  A.  Current first line competitors would be Avonex and

19  Betaseron, as well Extavia and Rebif, all four of those being

20  interferons.

21  Q.  Now, you mentioned first line treatment.  What do you mean

22  by "first line treatment"?

23  A.  First line treatment would be a therapy that a physician

24  would, in all likelihood, use for a newly diagnosed patient or

25  a patient that is beginning to investigate the utilization of

1   therapy to manage their MS.

2   Q.  Now, the four competitor drugs that you have identified,

3   are those all administered by injection?

4   A.  Yes, they are.

5   Q.  And with what frequency are those four drugs administered?

6   A.  The Avonex, as I've said, is a weekly intramuscular.  The

7   other interferons are either every other day or three times a

8   week, subcutaneously.

9   Q.  So Copaxone is still the only drug that requires

10  administration daily?

11  A.  That's correct.

12  Q.  Now, just very generally, how has Teva's sales fared since

13  it was -- its first year it was launched in 1997?

14  A.  It's fared very well.  We have, over the course of time,

15  grown from the third entrant into the market place into the

16  therapy of choice almost by a factor of two currently.  It

17  built over time.  Copaxone has a unique profile, unique mode of

18  action.  The experience that physicians gain, they saw the

19  benefit that their patients were deriving.  As that knowledge

20  accumulated, that experience accumulated, the utilization of

21  Copaxone grew.

22        And then in 2005 with the introduction or the data

23  from to head-to-head trials against interferons, it really

24  continued to accelerate Copaxone's growth.  Because those

25  trials showed that Copaxone was of equal efficacacy to the

1   interferons, and that was contrary to the perception that was

2   in the marketplace prior to that.

3   Q.  Now, as part of your responsibilities with respect to the

4   marketing and sales of Copaxone, do you keep track of patient

5   loyalty?

6   A.  Yes, we do.

7   Q.  Just tell the Court, what is patient loyalty?

8   A.  Loyalty in the context of pharmaceuticals really focuses on

9   compliance, non-adherence.  And compliance is over a given

10  month, does patient take the drug as indicated, in Copaxone's

11  case, are they injecting daily over those 30 days.  Adherence

12  is more of a longer term frame.  It's over a given year how

13  well the patient stayed on that therapy, so that they can

14  derive the benefits intended.

15  Q.  Do you know approximately what percentage of patients

16  started on Copaxone stay with the drug?

17  A.  Yeah, our adherence figures are approximately 85 percent at

18  the end of the first year.

19  Q.  Could you just give us a ballpark about how many patients

20  are currently using Copaxone?

21  A.  Approximately 100,000 at this point in time are benefiting

22  from Copaxone.

23  Q.  And as part of its services, does Teva Neuroscience offer

24  any patients support programs with respect to Copaxone?

25  A.  Yes, we do.

1   Q.  Is there a name for that program?

2   A.  Yes.  It's called Shared Solutions.

3   Q.  So, and could you describe for the Court what Shared

4   Solutions is?

5   A.  Shared Solutions is a free service that we offer to all

6   people with MS.

7         Prior to launching the drug in 1997, we were obviously

8   getting to know the MS marketplace, the needs of those

9   patients.  And it was clear that beyond just therapy, MS

10  patients had emotional, psychological issues they needed to

11  manage.

12        We felt it was important to create a program, our

13  service that would help manage those barriers so the patient

14  could go -- could be as successful as possible with the

15  medication Copaxone.  So we created the service.  We made it

16  available for all people with MS.  They could have access to

17  nurses, to educational materials.  If the patient was going to

18  begin Copaxone, then they -- a door opened to other service

19  they had access to, such as reimbursement support, injection

20  training, free auto-ject advice, access to the nurse, as well

21  as other educational materials.  And it has been a benefit to

22  patients only not taking Copaxone, but obviously those taking

23  Copaxone to help them be successful with the molecule.

24  Q.  Patient does not have to be actually using Copaxone to have

25  access to Teva's services?

1   A.   That's correct.

2   Q.   And I'm sorry, does Teva charge the patients for these

3   services?

4   A.   No, we do not.

5   Q.   I'd like to just talk to you a little bit, Mr. Congleton,

6   about the details regarding Teva's promotion of Copaxone.

7   Could you describe for the Court what Teva's promotional

8   strategy is for Copaxone?

9   A.   It's really focused on, again, building the awareness of

10  the need to treat MS, then convey the unique properties of

11  Copaxone and the benefits that a physician's patient can derive

12  from utilizing Copaxone to manage their Multiple sclerosis.

13  Q.   And who is the principal audience for Teva's promotional

14  efforts relating to Copaxone?

15  A.   Predominantly physicians, neurologists specifically, as

16  well as MS patients.

17  Q.   And what methods does Teva use to promote Copaxone?

18  A.   We utilize our sales force, as well as non-sales force

19  activities, such as conferences, journal ads, the website,

20  direct mail.

21  Q.   Are you familiar with the term of "detailing"?

22  A.   Yes, I am.

23  Q.   Could you just explain to the court what detailing means?

24  A.   Detailing is when our field base sales associates go into

25  physicians' offices and talk to them about Copaxone and how it

1    can benefit their patients who have MS.

2    Q.  All right.  Does Teva do any direct consumer advertising

3    such as TV ads or radio ads with respect to Copaxone?

4    A.  No, we do not.

5    Q.  Now, in your binder, Mr. Congleton, could you turn to the

6    document that's labeled PTX 908?  What is PTX -- 908?

7    A.  Sorry.  It's a copy of a sales aid that we would give to

8    our sales associates.

9    Q.  Do you know what year this document was created?

10   A.  I believe it's 2007.

11   Q.  And was 908 prepared under your supervision?

12   A.  Yes, it was.

13   Q.  And was this document prepared in the ordinary course of

14   Teva's business?

15   A.  Yes, it was.

16           MR. HASHMALL:  Your Honor, plaintiffs offer PTX-908 in

17   evidence.

18           MR. JONES:  No objection, your Honor.

19           MR. DOYLE:  Your Honor, Sandoz doesn't have an

20   objection to the admission of the document for the purpose

21   which I think it is being proffered, which is to indicate what

22   Teva tells the MS community about Copaxone.  But we do object

23   to it being accepted for the truth of any matter asserted

24   therein, because it's a sales aid, and there is no foundation,

25   and there is no support for any of the actual information

1   contained in this document provided by this witness.

2              THE COURT:  All right.  I'll admit it.

3              (Plaintiff's Exhibit PTX-908 received in evidence)

4              MR. HASHMALL:   Thank you, your Honor.

5   Q.  And the next question, your Honor, is, for what purpose was

6   PTX-908 created, Mr. Congleton?

7   A.  It is the primary tool that our sales representatives

8   utilize when detailing a physician to convey the benefits of

9   Copaxone.

10  Q.  And could you just tell us a bit how the sales

11  representative uses this aid?

12  A.  They would set up appointments with physicians, over the

13  course of ten to 15 minute conversation use this as a

14  supportive document to share with them data that has been

15  published and generated on Copaxone, to talk about its

16  efficacy, as well as safety.

17  Q.  All right.  If you could, Mr. Congleton, turn to the pages

18  that is Bates numbers on the bottom, if you could turn to the

19  page that has the last three digits of 909 and 910?

20  A.  Okay.

21  Q.  We have that up on the screen.  This is a chart.  What data

22  is presented in this clarity, Mr. Congleton?

23  A.  This is looking at the main efficacy end points that

24  neurologists focus on when managing MS, and specifically it's

25  looking at the effect that Copaxone has on these efficacy end

1    points over a sustained period of time.

2    Q.  And so how would a salesperson at Teva use this information

3    with the doctor when he's being, he or she is meeting with the

4    doctor?

5    A.  This is one of the most important points for physicians is

6    how does your product affect the patient over the long term.

7    So a sales representative would share with the physician what

8    they can expect to see as a response in their patients to the

9    use of Copaxone in managing the disease over time.

10   Q.  And if you could, sir, turn to page with the last three

11   digits of 912?

12   A.  Okay.

13   Q.  Do you have this, Mr. Congleton?

14   A.  I do.

15   Q.  All right.  What is described on this page?

16   A.  This is describing the pivotal trial, as well as the

17   extended version of that trial.  In this particular case it's

18   through ten years.  This is the -- one of the unique aspects

19   about Copaxone is it is prospectively followed long term to

20   ensure that the effect is not only immediate, but also

21   sustained in offering benefit to a neurologist's patient.

22   Q.  If you could turn, Mr. Congleton, to the page that has the

23   last three digits 3915?

24   A.  Okay.

25   Q.  And what's described on this page, Mr. Congleton?

1   A.   Again, this is additional efficacy information.  It shows

2   that not only is Copaxone effect sustained, but it also shows

3   that it is immediate within the first three months you see a

4   separation of the drug's effect to placebo.

5   Q.   Now, does Teva train its sales staff on how to use this

6   document, PTX-908?

7   A.   Yes, we do.

8   Q.   Could you turn, sir, to the document that's labeled as

9   PTX-909 in your binder.

10  A.   Okay.

11  Q.   Do you recognize this document?

12  A.   I do.

13  Q.   And what is this document?

14  A.   This is a sales aid training tool.  It's internal use only.

15  We provide it to our sales representatives in conjunction with

16  the sales aid we just reviewed.

17  Q.   And do you know what year this document was created?

18  A.   In 2007.

19  Q.   And was this created under your supervision?

20  A.   Yes it was.

21  Q.   Was this in document created in the ordinary course of

22  Teva's business?

23  A.   Yes, it was.

24          MR. HASHMALL:  Your Honor, we offer PTX-909 in

25  evidence.

1          MR. JONES:  No objection, your Honor.

2          MR. DOYLE:  No objection for the purpose being --

3          THE COURT:  Purpose understanding.

4          MR. DOYLE:  Yes, your Honor.

5          THE COURT:  All right, admitted.

6          (Plaintiff's Exhibit PTX-909 received in evidence)

7          MR. HASHMALL:  Thank you, your Honor.

8   Q.  If you could turn to the page that's has the last three

9   digits of 350.  Could you describe what type of information is

10  on this page, Mr. Congleton?

11  A.  This is background information for sales associates to help

12  them understand the graphic within that sales aid.

13  Q.  And is this document used to instruct them in how to use

14  the document that we had previously looked at?

15  A.  Yes.  It's a teaching aid.

16  Q.  All right.  Now on the top of that page you see there is a

17  paragraph that's labeled direction; see that?

18  A.  Yes, I do.

19  Q.  What is the purpose of this paragraph?

20  A.  It's to give the sales representative a sense for what the

21  intents of this graphic is, the point that needs to be conveyed

22  to the physician.

23  Q.  All right.  And then to the left on that page there is a

24  section there entitled message musts.  Do you see that?

25  A.  Yes, I do.

1    Q.  What are message musts?

2    A.  There is a lot of data obviously within this graphic, and

3    this is a way that we help the sales representative highlight

4    what are the key points that we'd like them to convey to the

5    physicians.

6    Q.  Now, PTX-908 and 909, are these typical of the types of

7    sales aids and manuals that are distributed and used by Teva

8    sales force?

9    A.  Yes, they are.

10   Q.  Now, you start -- Teva Neuroscience started selling in

11   1997, started selling Copaxone.  Has the promotional message

12   for Copaxone changed since its introduction in 1997 until

13   today?

14   A.  It's evolved over time, but the core message has remained

15   relatively constant; and that is, a unique mode of action that

16   elicits a unique clinical profile that provides a sustained

17   long term efficacacy in a safe and tolerable manner.

18   Q.  Do you know what the approximate sales in the United States

19   of Copaxone were for Teva in 2010?

20   A.  Yes.  In the United States approximately 2.25 billion.

21   Q.  And do you know approximately how much sales have been told

22   for Teva since introduction of the product in 1997?

23   A.  Lifetime it's been over $10 billion.

24   Q.  Thank you, Mr. Congleton.

25          MR. HASHMALL:  No further questions, your Honor.

197ZTEV2                          Congleton - direct

1          THE COURT:  Cross-examination?

2          MR. JONES:  May I begin?

3          THE COURT:  Yes.

4    CROSS EXAMINATION

5    BY MR. JONES:

6    Q.   Thank you, your Honor.  Good morning, Mr. Congleton.

7    A.   Good morning.

8    Q.   Now, I think I heard, as you ended your testimony, you

9    talked about how your sales force has stressed this unique mode

10   of action of Copaxone; is that accurate?

11   A.   That's correct.

12   Q.   That's been a consistent sales strategy for Teva to talk

13   about this unique mode of action of Copaxone; is that correct?

14   A.   That's correct.

15   Q.   Now, it's true, though, right, that the mechanism by which

16   Copaxone works is not fully understood, right?

17   A.   That's correct.

18   Q.   In fact, no one really knows how Copaxone works, right?

19   A.   That's correct.

20   Q.   Now, you talked about, you talked about sales figures.  Let

21   me try and put it on a per patient level, and we can use an

22   exhibit to help us get there.

23          Could I please have up 1981, PTX-1981.

24          Showing you, sir, if you go -- you've got a witness

25   binder, you can look in the screen or you can look in the

1   witness binder, for DTX-1981.  I'll represent to you and you

2   can tell by the -- if you have the document yourself, you can

3   see there is a Teva Bates number on it, but I'll represent to

4   you that DTX-1981 is an excerpt from a spread sheet produced by

5   Teva in this action.  Do you recognize the information in

6   DTX-1981, sir?

7   A.  I do.

8   Q.  All right.  And you see that this is reported sales

9   information as of January 5, 2010, sir?

10  A.  Yes.

11          MR. JONES:  All right, move admission of DTX-1981,

12  your Honor.

13          MR. HASHMALL:  No objection, your Honor.

14          THE COURT:  All right, admitted.

15          (Defendant's Exhibit DTX-981 received in evidence)

16  Q.  Just again, I think you talked about other methods or

17  medications used for treating Multiple sclerosis.  And we see

18  those other medications listed on DTX 1981, correct?

19  A.  Yes, we do.

20  Q.  All right.  And then about the one, two, three, four, the

21  fifth medication is listed as Copaxone, correct?

22  A.  That's correct.

23  Q.  And if you go over to average wholesale price, we see that

24  the average wholesale price for Copaxone is listed as $3,303,

25  correct?

197ZTEV2                    Congleton - cross

1    A.   That's correct.

2    Q.   So per year when you put that up per year, a patient is

3    going to be charged $40,187 at least as of January 5, 2010, is

4    that correct?

5    A.   That's presuming they take 365 injections in a given year

6    yes.

7    Q.   And that's how it's prescribed, correct, you take a daily

8    injection?

9    A.   It's how it's prescribed, yes.

10   Q.   Right.  And you assumed your patients are going to be in

11   compliance with their there medication, correct?

12   A.   We try to help them with that, but we know the realities

13   are they are not completely 100 percent compliant.

14   Q.   So assuming, though, a compliant patient, a patient who

15   wants to control their MS, which I think you'd agree most

16   patients want to do is controlling their MS, correct?

17   A.   That's their goal.

18   Q.   Then they're going to be as, at least as of January 5,

19   2010, they're looking at $40,187 over the course of a year,

20   correct?

21   A.   If a hundred percent compliant, yes.

22   Q.   Right.  And that in fact when you look at the other drugs,

23   Copaxone for yearly cost to the patient is the most expensive

24   of the MS treatments, correct?

25            MR. HASHMALL:  Objection, your Honor.  I think the box

197ZTEV2                    Congleton - cross

1    is obscuring the number on the bottom.

2    Q.   Okay.

3              MR. HASHMALL:  So I think if you --

4    A.   It would be secondary to Tysabri.

5    Q.   But it's certainly more expensive than Avonex, correct?

6    A.   Yes.

7    Q.   Betaseron, correct?

8    A.   Yes.

9    Q.   Extavia, correct?

10   A.   Yes.

11   Q.   And Rebif, right?

12   A.   Yes.

13   Q.   All right.  Now, we've been looking at prices for

14   January 5, 2010.  Let's go to an exhibit and look to see what's

15   happened with prices.  If I could have up DTX-2022.

16             DTX-2022 -- and again, sir, you have that in your

17   binder.  2022 is the SEC form 20-F, the annual report submitted

18   by Teva Pharmaceutical for the year ended 2010.  Have you ever

19   seen form 20-F before, sir?

20   A.   Yes I have.

21   Q.   Right?

22             MR. JONES:  Move admission of DTX-2022, your Honor.

23             MR. HASHMALL:  No objection, your Honor.

24             THE COURT:  All right, admitted.

25             (Defendant's Exhibit DTX-2022 received in evidence)

1   Q.  Thank you.  Just so we can have some context about

2   Copaxone.  If you go to page six.  Unfortunately, this is not

3   Bates numbered, but we'll use the organic page number of the

4   exhibits.  Page six of DTX-2022.  Here we go.  If you look at

5   the 4th paragraph, it's the paragraph under the italicized

6   portion, if I could have that blown up.  Then the second

7   sentence of that paragraph.  Thank you, Nick.  If I could have

8   the second sentence of the paragraph highlighted.  No, one

9   before that.  There you go.  Thank you.

10          Now, Teva's statement to the SEC indicates that

11  Copaxone is -- contributes disproportionately to your profits

12  and your cash flows; is that correct?

13  A.  It has significant impact on Teva's cash flows, yes.

14  Q.  Well, it contributes disproportionately.  That's at least

15  what Teva told the SEC, correct?

16  A.  That's what that does say, yes.

17  Q.  And that's as of 2010.  But in fact Copaxone has

18  contributed disproportionately to your profits and cash flows

19  for more than just 2010, correct?

20  A.  It has continued to grow and add value to Teva, yes.

21  Q.  That's right.

22          If we could move on in DTX-2022, if you go to page 60,

23  60, and if you could pull out paragraph one, two, three, fourth

24  paragraph, the one that begins U.S. and market Copaxone sales.

25  Thank you.

1          What I'm trying to get a sense, sir, is what's

2   happened to prices.  Remember we saw that spread sheet showing

3   prices as of January 2010.  We're trying to get a sense of

4   what's happened to prices from January 2010 until present, all

5   right.  Prices have increased, correct?

6   A.  Yes, they have.

7   Q.  In fact according to what Teva told the SEC, you had two

8   price increases in 2010, correct?  If you look at that second

9   sentence?

10  A.  That's correct.

11  Q.  Each of 9.9 percent, right?

12  A.  That's correct.

13  Q.  And then you had a -- so that's a total of what, about

14  almost 20 percent sales price increase?

15  A.  19.8, yes.

16  Q.  Yeah.  Any reason to doubt the accuracy of that price

17  increase reported to the SEC?

18  A.  No, there would be no reason.

19  Q.  Now, it also -- this discloses a second price increase that

20  occurred I think in January 2011, if you look at the next

21  sentence.  So on top of the nearly 20 percent increase that

22  we -- that's reported that occurred in 2010, in January 2011

23  you had an additional 14.9 percent increase in the sales price

24  for Copaxone, correct?

25  A.  That's correct.

1    Q.  So since January of 2010, Teva has increased prices for

2    Copaxone by about 39 percent, right?

3    A.  That's correct.  We've also seen the volume continue to

4    grow, as well as the share grow, as it is the leading choice in

5    treating MS.

6    Q.  There is not much competitive pressure on you, is there

7    A.  There's constant competitive pressure.

8    Q.  All right, there's constant competitive pressure.  Let me

9    understand something.  The rate of inflation for 2010 was about

10   1.5 percent, right?

11   A.  I don't have that handy.

12   Q.  Well, did you get any push back on raising prices by

13   40 percent?  Did you get push back from your management saying,

14   don't increase prices by 40 percent, inflation is only running

15   about 1.5, push back from your management, sir?

16   A.  We factor a lot of different things as we analyze our

17   pricing actions.

18   Q.  Do you agree, though, that after analyzing all those

19   factors, including any competition that you say is out there,

20   you agree that price has increased significantly for patients

21   just over the course of a year, correct; 40 percent?

22   A.  Prices have changed over time, as well as pressures within

23   the co-pay system, the reimbursement.  Lot of factors go into

24   that, yes.

25   Q.  Teva turn a profit on Copaxone in 2010?

197ZTEV2                          Congleton - cross

1    A.  Yes, we did.

2    Q.  2009 profit?

3    A.  Yes, we did.

4    Q.  When is the first year Copaxone became profitable for Teva?

5    A.  I don't have that information.

6    Q.  Well, you know about 2010, 2009.  2008, was it profitable?

7    A.  2008 was -- I -- honestly I focus on the U.S. portion of

8    that, and I don't see the roll up on a global basis for

9    Copaxone specifically.

10   Q.  Now, you talked a little bit about marketing, and in fact

11   you showed a label.  I want to ask you some questions about the

12   information that Teva supplies to doctors and patients in its

13   marketing activities.  Are you familiar with the term

14   "informational marketing"?

15   A.  Yes.

16   Q.  Would you agree that Teva engage in informational marketing

17   with regard to Copaxone?

18   A.  Yes, I would.

19   Q.  With informational marketing, what you're basically trying

20   to do is you're doing your best to inform doctors and patients

21   about the benefits of Copaxone, correct?

22   A.  As well as the importance of therapy in general in managing

23   MS.

24   Q.  Right.  So talking about the benefits, the importance of

25   the therapy, and you're trying to give them your best

197ZTEV2                        Congleton - cross

1   information about the risks of Copaxone, correct?

2   A.   That's our responsibility both efficacacy and the safety of

3   the product, yes.

4   Q.   You take that responsibility seriously, correct?

5   A.   Yes, we do.

6   Q.   If you know about a risk that your product might pose to

7   the public, you're going to tell them about it, right?

8   A.   Within our mandate, yes.

9   Q.   Now, starting -- you said that you've been with the -- with

10  Copaxone since I think its launch back in 19 -- well, you said

11  it got approval to launch in 1996 with Copaxone; is that

12  correct?

13  A.   Approved in '96, yes.

14  Q.   And then but your sales were April of 1997 were first

15  sales?

16  A.   That's correct, in the United States.

17  Q.   In the U.S., that's correct, sir.

18          Now, when you first had permission from the FDA to

19  launch Copaxone, that was at an approved average molecular

20  weight of 4.7 to 11 kilodalts, correct?

21  A.   To be honest, I don't have that information right in front

22  of me.

23  Q.   Right.  Well, let's pull up DTX-1073, then.

24          1073, sir, is a December 20, 1996 approval letter from

25  the FDA to Teva; you agree?

 1  A.  Yes, I can.

 2          MR. JONES:  Move admission of DTX-1073, your Honor.

 3          MR. HASHMALL:  No objection, your Honor.

 4          THE COURT:  All right, admitted.

 5          (Defendant's Exhibit DTX-1073 received in evidence)

 6  Q.  Thank you.  If we look at DTX-1073 again, this would be the

 7  approval letter from the FDA to Teva saying that you folks had

 8  approval to market and sell Copaxone, correct?

 9  A.  That's correct.

10  Q.  And this exhibit does have Bates numbers.  If we go to

11  TEV104078.  Just look for the 78 at the bottom.

12  A.  I'm there.

13  Q.  Great.  If you would -- thank you very much.  Actually, if

14  you just focus right on that first paragraph, great.  Thank

15  you.

16          So what we see here depicted on 104078 of DTX-1073 is

17  actually the label approved by the FDA for Teva to use with

18  Copaxone, correct?

19  A.  That's correct.

20  Q.  And if you look at -- this label tells us a couple of

21  things, right?  First it tells us what the average molar

22  fraction is for Copaxone, correct?

23  A.  It's says the average molecular weight of Copaxone, yes.

24  Q.  Well, let's actually -- if you go right --

25  A.  There's the fraction; yes, you're correct.

1   Q.  Were you in the courtroom for the opening statements?

2   A.  Yes, I was.

3   Q.  So you have heard the discussion about molar fractions,

4   correct?

5   A.  I did hear.

6   Q.  And it's your understanding, right, that Teva reports

7   accurately it's average molar fraction when it includes that

8   information on its Copaxone label, correct?

9   A.  Yes.

10  Q.  And then after that we were getting to this average

11  molecular weight issue, if you highlight the next sentence,

12  Nick.

13          This reports that Teva is authorized to sell Copaxone

14  with an average molecular weight of 4.7 to 11 kilodaltons,

15  correct?

16  A.  According to the label, yes.

17  Q.  Right.  And what I've done is, I know it's 4,700 daltons,

18  but my mouth gets tired, so I'm just going to talk about

19  kilodaltons, you understand that 4,700 daltons is the same as

20  4.7 kilodaltons, right?

21  A.  Correct.  I'll refer to the dalton portion, though.

22  Q.  Great.  And, in fact, Teva went on the market when you made

23  that first sale in April of 2007, and/or April of 1997, Teva

24  went on the market with a Copaxone with an average molecular

25  weight 4.7 to 11 kilodaltons, correct?

1              MR. HASHMALL:  Objection, your Honor.  What's in the

2    label -- there was extensive testimony at the prior trial about

3    what the manufacturing specifications and what the actually

4    went to market with, and I don't think there is any foundation

5    that this witness knows the answer to that question.  It's

6    going well beyond the scope of what he was testifying about on

7    direct.

8              THE COURT:  I can read the label.  I don't know that

9    this witness is able to testify to this.

10   Q.  All right.  Well, did you provide promotional information

11   and labeling information to patients and doctors about the

12   average molecular weight of Copaxone?

13   A.  We provided prescribing information to physicians and

14   patients, yes.

15   Q.  Did you know the average molecular weight of Copaxone that

16   you were selling to the public and to doctors?

17   A.  I was aware of the label, but it's not my field of

18   expertise.  I focus on conveying the benefits of the product to

19   physicians and patients.

20   Q.  And you have no reason to believe that the Copaxone that

21   you sold was outside the range of 4.7 to 11 kilodaltons, right?

22   You have no reason to believe it was outside that average

23   molecular weight?

24   A.  I don't have any information about that.

25   Q.  Okay.  Now, I want to look at another label.  Let's look at

1    Exhibit PTX-695, all right.  I'm showing you PTX-695, a label

2    for Copaxen.  Go to the last page of the exhibit.  You'll see

3    that it has a revision date of January of 2002.  So having

4    looked at PTX 695, do you recognize this as a label for

5    Copaxone as of January 2002, sir?

6    A.  Yes.

7             MR. JONES:  Move admission of PTX-695?

8             MR. HASHMALL:  No objection, your Honor.

9             THE COURT:  All right, it's admitted.

10            (Defendant's Exhibit PTX-695 received in evidence)

11   Q.  Now, when we go to the first page of PTX-695, just that

12   first paragraph -- thank you, Nick -- again we see a report and

13   this is actually the label that patient and a doctor would see

14   with their Copaxone that they purchased as of 2002, correct?

15   A.  That's correct.

16   Q.  All right.  So the patient would see again these molecular

17   fractions, right?

18   A.  That's correct.

19   Q.  And they would see that the average molecular weight of the

20   product is from 4.7 to 11 kilodaltons, right?

21   A.  That's correct.

22   Q.  Now, and I encourage you if you need to to go ahead and

23   look at the binder version of 695, but if you need to -- but

24   you would you agree that in this 2002 label, regarding the 4.7

25   to 11 KDA Copaxone, there is no discussion about that product

1   being toxic in the rat basophilic leukemia in vitro assay,

2   right?

3   A.  No, there's not.

4   Q.  Okay.  There's no mention of 4.7 to 11 KDA Copaxone being

5   toxic in the in vivo mouse assay, right?

6           MR. HASHMALL:  Your Honor, I would object to this.  I

7   think, unless there is some other purpose here, I'm not able to

8   certain -- it seems like we're going back to issues that were

9   tried fully in July, and this is obviously the wrong witness to

10  be questioned about this.

11          THE COURT:  Well, I mean if there's no objection to

12  these documents going in, you can make these arguments.  I

13  don't think we need to labor through this with this witness.

14          MR. JONES:  And I'll get right to the point with it

15  then.

16  Q.  If, to your knowledge, sir, the 4.7 to level KDA Copaxone,

17  that Teva marketed, that drug is not toxic, correct?

18          MR. HASHMALL:  Object.

19          THE COURT:  I'm going to sustain the objection.  This

20  is the wrong witness.

21  Q.  Did you --

22          THE COURT:  I like you, don't get me wrong, but you're

23  the wrong witness on this one.

24  Q.  Right.

25          THE COURT:  Okay.

1    Q.  I'll ask --

2              THE COURT:  Let's move along, Mr. Jones.

3              MR. JONES:  Yes, your Honor.

4    Q.  I'll simply ask, what you told doctors and patients?

5              THE COURT:  That's not relevant.

6              MR. JONES:  Just so that I'm clear, your Honor, is it

7    your preference, because I don't want to try the Court's

8    patience on this, you're right, this is something that we can

9    develop in argument, I do -- I was going to plan on asking him

10   what Teva told the public in regard to toxicity for various

11   weight ranges of Copaxone?

12             THE COURT:  I'm assuming you can -- it's all in here.

13   Would there be any difference in the materials that they --

14   what was in the label, the materials?  I doubt it.  I think

15   that's your point, right?

16             MR. JONES:  Precisely, your Honor, just simply

17   establishing that there was no mention of toxicity to the

18   public of 4.7 to 11 or five to nine, no mention to the public

19   that 5 to nine was any less toxic than 4.7 to 11.  That's the

20   point.

21             MR. HASHMALL:  Your Honor, they can argue obviously

22   what they want from the label, but --

23             THE COURT:  Right, I'm just trying to shorten this up.

24             MR. HASHMALL:  I know.  But I have a concern that the

25   issue -- I don't see how this goes to any issue, other than the

1    issue that we tried in July, but maybe we can have that

2    discussion later.  But I'm hoping we're not going to start

3    getting the same argument that we heard in July about

4    differences between what they told.

5              THE COURT:  I'm not worried right now about who is

6    arguing what.  I just want to get our witness taken care of.

7              MR. JONES:  With that, your Honor, thank you for your

8    guidance.  I'll excuse -- thank you.

9              THE COURT:  All right, good enough.

10             THE WITNESS:  Thank you.

11             MR. DOYLE:  Your Honor, I have one question.  Could I

12   just ask it from here?

13             THE COURT:  Please, that would be great.

14             MR. DOYLE:  Yes, your Honor.

15   CROSS EXAMINATION

16             MR. DOYLE:  I'd like to know, Mr. Congleton, in any of

17   its Copaxone marketing materials, does Teva state that the side

18   effect profile of co-polymer-1 is associated in any way with

19   its molecular weight?

20   A.  With it's what?  I'm sorry.

21   Q.  Its molecular weight?

22   A.  We share in our communications with patients beyond the

23   efficacy and how to utilize the drug is the adverse effects

24   that are within our product insert that are most frequent and

25   that physicians and patients need to be aware of.

197ZTEV2                          Congleton - cross

1    Q.  My question is a little more specific, which is in its

2    marketing materials, is there any relationship drawn by Teva

3    between that side effect profile and molecular weight of

4    Copaxone?

5    A.  There is not.

6                MR. DOYLE:  Thank you.

7                THE COURT:  Any redirect?

8                MR. HASHMALL:  No, your Honor.

9                THE COURT:  All right, thank you very much.  You may

10   step down.  You're excused.

11               We'll take a ten minute break.  And who is your next

12   witness.

13               MR. HASHMALL:  Next witness will be Dr. Lisak.

14               MS. HOLLAND:  Your Honor, I have the list --

15               (Recess)

16               (In open court)

17               THE COURT:  Please be seated everybody.  Call your

18   next witness.

19               MR. HASHMALL:  Your Honor, Mr. John Bennett is going

20   to be putting on our next witness.

21               THE COURT:  All right, Mr. Bennett.

22               MR. BENNETT:  Good morning.  The plaintiffs call Dr.

23   Robert P. Lisak.

24    ROBERT P. LISAK,

25        called as a witness by the plaintiff,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. BENNETT:

4          THE COURT:  You can be seated, sir.  Thank you.

5          THE WITNESS:  Thank you.

6          MR. BENNETT:  Your Honor, before we begin, Dr. Lisak

7     is our practicing physician expert, and you may remember from

8     the pretrial conference that the parties have agreed that the

9     practicing physician experts may appear once to accommodate

10    their patient schedules.  So Dr. Lisak is going to be providing

11    some testimony today related to the validity issues,

12    specifically secondary considerations of non-obviousness called

13    long felt need and the failure of others that typically would

14    be rebuttal testimony in this type of case.

15         THE COURT:  All right.

16         MS. HOLLAND:  In addition to some infringement

17    testimony.

18         THE COURT:  So, I'm going to hear everything I'll ever

19    need to hear from Dr. Lisak.

20         MR. BENNETT:  That's right.

21         THE COURT:  That's everybody's understanding?  All

22    right, then you're wide open.  Go ahead.

23         MR. BENNETT:  Thank you.

24    Q.  Dr. Lisak, would you please introduce yourself to the

25    Court?

1    A.   Robert P. Lisak.

2    Q.   Where do you live, sir?

3    A.   Bloomfield Hills, Michigan, which is a suburb of Detroit.

4    Q.   Are you currently employed?

5    A.   Yes, I am.

6    Q.   Where are you employed, sir?

7    A.   I'm employed at Wayne State University and the Wayne State

8    University Physicians Group.

9    Q.   What is your position at Wayne State, sir?

10   A.   I'm the Chairman of Neurology and also Professor of

11   Neurology and Professor of Immunology and Microbiology.

12   Q.   What are your responsibilities as the Chair of Neurology

13   and Professor at Wayne State?

14   A.   As Chair, I'm the administrative head of the department so

15   I'm responsible for quality issues, teaching, oversight of

16   research finances, things like that, administrative.

17            As professor, I'm responsible for participating in the

18   various teaching programs for the department.

19   Q.   How big is the neurology department at Wayne State?

20   A.   The full-time faculty is 35 members, but that doesn't count

21   residents, fellows, secretaries, technicians and the

22   laboratories, and so for the overall, probably over 100.

23   Q.   In addition to your academic role, do you hold any other

24   employment, sir?

25   A.   I'm the chief of neurology at Harper University Hospital.

1   Q.  What are your responsibilities as the chief of neurology at

2   Harper University Hospital?

3   A.  I'm responsible for oversight of quality of care by all of

4   the neurologists in the department of neurology, as well

5   oversight of the residents and fellows at the hospital, as well

6   as administrative duties for the hospital, medical

7   administrative.

8   Q.  Can you give us a sense of how big the neurology practice

9   is at Harper University Hospital?

10  A.  We have 30 full-time neurologists in the department of

11  neurology in the practice group, and there are another three or

12  four private practice neurologists, plus we have 21 neurology

13  residents, plus various fellows.

14  Q.  Do you treat multiple sclerosis patients at Harper

15  University Hospital?

16  A.  Yes, we do.

17  Q.  About how big, how many MS patients do you treat there,

18  sir?

19  A.  Well, the Multiple sclerosis clinic, which is run by the

20  University Practice Group, Harper Department of Neurology, has

21  about 3500 to 4,000 patients at any one time that we are

22  following.

23  Q.  Do you treat MS patients yourself?

24  A.  Yes, I do.

25  Q.  About how many patients do you have in your care?

1   A.  My own personal would be about 500 patients at any one

2   time.

3   Q.  How long have you been treating MS patients?

4   A.  Since 1972.

5   Q.  Okay.  Over the course of your career, about how many MS

6   patients have you evaluated, sir?

7   A.  Evaluated and treated, I would estimate 4500 to 5,000.

8   Q.  Stepping back to your academic role, would you share with

9   us what courses you teach?

10  A.  I teach in the second year medical school student course on

11  neurology.  I teach third year students who take neurology

12  rotation at the University Hospital.  I teach fourth year

13  students on electives, those are usually students who are

14  thinking about a career in neurology.  And then I'm also

15  involved in teaching of the neurology residents, as well as

16  specialty fellows, including the Multiple sclerosis fellows.

17  Q.  Are you involved in any other type of teaching role?

18  A.  Yes, both at Wayne State nationally and internationally I

19  do what's called continuing medical education, CME.  And that

20  is, those are courses for already practicing physicians who

21  wish to keep up, need to keep up in certain areas of practice.

22  And I tend to be lecturing on multiple sclerosis and other

23  autoimmune disease of the nervous system.

24  Q.  Do you conduct research in your academic role?

25  A.  Yes, I do.

1   Q.  Has any of that research been published?

2   A.  Yes, it has.

3   Q.  Can you give us a sense for how much of your research has

4   been published?

5   A.  Peer reviewed, original observations, probably around 220

6   papers.  Then there are reviews and chapters and editorials and

7   so forth.

8   Q.  Does any of this work relate to multiple sclerosis?

9   A.  A large percentage of it does.

10  Q.  Were you retained as an expert in this case, sir?

11  A.  Yes, I was.

12  Q.  Who retained you?

13  A.  Counsel for Teva.

14  Q.  What you were asked to do?

15  A.  I was asked to give a brief overview of the disease

16  multiple sclerosis and its treatments.

17          I was asked to give an opinion on whether Copaxone met

18  long felt needs in the treatment of multiple sclerosis.

19          I was asked to give an opinion of whether there had

20  been other attempts to find successful treatments that had

21  failed for multiple sclerosis, and then whether I thought there

22  were infringements on certain of the patents that I see or that

23  are involved in this lawsuit.

24  Q.  Thank you.  In general, what are your opinions on these

25  topics, sir?

1   A.  I think Copaxone met a long felt need.  I think there are

2   many examples of failed therapy attempts, development therapies

3   that failed, and that there are clear conflicts or with

4   material that I've reviewed with related to the patents in this

5   suit.

6   Q.  Dr. Lisak, could you please describe your educational

7   background for the Court?

8   A.  Yes.  I received my undergraduate degree at University of

9   College of New York University cume laude, highest honors in

10   history.  My M.D. degree was from the College of Physicians and

11   Surgeons of Columbia University.

12   Q.  What did you do after you received your medical degree?

13   A.  I did a postgraduate year, one which is commonly called

14   internship, and I did that at Montefiore Hospital in the Bronx.

15   Q.  What did you do after you completed your internship there?

16   A.  I did two years of research at the National Institutes of

17   Mental Health in Bethesda, multiple sclerosis related research.

18   Q.  And after the NIH, what did you do next?

19   A.  I came back and did another year of internal medicine at

20   Bronx Municipal Hospital Center, Albert Einstein College of

21   Medicine, and then I did a three year residency in the

22   neurology at the hospital of the University of Pennsylvania.

23   And during my last year I was also a trainee in allergy and

24   immunology.

25   Q.  Okay.  When did you complete your residency at the

1   University of Pennsylvania?

2   A.   End of every June of 1972.

3   Q.   What did you do next?

4   A.   I joined the faculty of the Department of Neurology at

5   University of Pennsylvania, and the staff of the hospital of

6   the University of Pennsylvania.

7   Q.   What was your role at the hospital?

8   A.   I was attending neurologist, and I also was the director of

9   the multiple sclerosis clinic.

10  Q.   How long were you the director of the MS clinic there?

11  A.   From 1972 through 1986.

12  Q.   Can you generally describe what your role was as the

13  director of the clinic?

14  A.   As director of the clinic, my role was to, in addition to

15  seeing patients myself, was responsible for quality, for

16  supervision of residents who rotated in the clinic, and

17  coordination with other attending neurologists who also saw

18  patients in the clinic.

19  Q.   About how many patients were under your care there, sir?

20  A.   Again about, with multiple sclerosis, about 500 at any

21  time.

22  Q.   Did you teach while you were at the University of

23  Pennsylvania?

24  A.   Yes, I did.

25  Q.   What did you teach there?

1   A.   I taught neurology again to 2nd, 3rd and 4th year students,

2   neurology residents and fellows who were subspecializing in

3   multiple sclerosis.

4   Q.   When did you join Wayne State, sir?

5   A.   In 1987.

6   Q.   What position did you assume when you joined Wayne State?

7   A.   Professor of Neurology and Chairman of the Department of

8   Neurology, as well as I mentioned, Professor of Immunology and

9   Microbiology.

10  Q.   Okay.  How long have you been in that position, sir?

11  A.   I'm in my 25th year.

12  Q.   Are you involved in any academic or medical journals from

13  your field of work?

14  A.   Yes, I am.

15  Q.   Could you describe that involvement, sir?

16  A.   I'm the editor in chief of the Journal of Neurological

17  Sciences, which is the journal of the world federation of

18  neurology.  I'm also member of the editorial board for neuro

19  immunology of the, of a journal called Clinical

20  Neuropharmacology.

21  Q.   Just briefly, when you say clinical Neuropharmacology, what

22  does what that mean?

23  A.   That journal publishes articles related to research in

24  therapy of neurologic diseases.

25  Q.   Thank you.  Have you served on any other editorial boards

1   on in the past, sir?

2   A.  Yes, I have.

3   Q.  Could you describe that for us?

4   A.  Journaled called neurology, which is the journal of the

5   Academy of Neurology, the Anals of Neurology, Journal of Neuro

6   Immunology, Muscle and Nerve, and the Journal of the Peripheral

7   Nervous System.

8   Q.  Thank you.  Have you provided any lectures in the field,

9   sir?

10  A.  Yes, I do.

11  Q.  Could you describe that for us?

12  A.  I lecture, in addition to Wayne State, at other hospitals

13  and universities, and invited talks at meetings in the United

14  States and abroad.

15  Q.  Have you been involved in any clinical research, sir?

16  A.  Yes, I have.

17  Q.  Could you describe that for us?

18  A.  I've been involved in studies of patients with multiple

19  sclerosis and other neurologic diseases, including clinical

20  studies, including clinical trials.

21  Q.  Are you involved in any professional associations?

22  A.  Yes, I am.

23  Q.  Could you describe that for us, sir?

24  A.  I'm a member of the American -- I'm a fellow of the

25  American Academy of Neurology, active now honorary member of

1     the American Neurologic Association, Society of Neuroscience,

2     several others.

3     Q.  Have you received any awards during your career?

4     A.  Yes, I have.

5     Q.  Could you describe those for us?

6     A.  I was a full ride scholar in United Kingdom, I won

7     something called a doctor's award from Myasthenia gravis

8     foundation of America, which is given to one physician a year

9     for clinical and/or research accomplishments.  I was elected an

10    honorary member of the American Neurologic Association, and I

11    was elected a fellow by distinction of the Royal College of

12    Physicians of London.

13    Q.  Just briefly, what is Myasthenia gravis, which you --

14    A.  Myasthenia gravis is another autoimmune disease of the

15    nervous system.  It affects where the nerve meets the muscle,

16    so-called neuro muscular junction.

17    Q.  Have you received any awards of late, sir?

18    A.  Yes, I have.

19    Q.  Could you describe that for us?

20    A.  I just received a life time achievement award from the

21    Consortium of Multiple Sclerosis Centers.

22    Q.  What is the consortium of MS Centers?

23    A.  It's an organization of centers that are involved in the

24    treatment of patients with multiple sclerosis, as well as

25    research with patients with multiple sclerosis.

197ZTEV2                    Lisak - direct

1   Q.  Could you give us a little more color on that, the awards

2   that you received from the consortium, sir?

3   A.  They give one a year to a neurologist or neuro scientist or

4   someone involved in care or and/or research in multiple

5   sclerosis.  So I deem it a high honor.

6   Q.  Dr. Lisak, I'd like you to turn to the tab labeled PTX-419

7   in your binder.

8   A.  I have it.

9   Q.  Do you recognize this document?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  It's a copy of my, sorry, curriculum vitae, and my

13  bibliography.

14          MR. BENNETT:  Plaintiffs move for the admission of

15  PTX-419, your Honor?

16          MS. BLOODWORTH:  No objection.

17          THE COURT:  Admitted.

18          (Plaintiff's Exhibit PTX-419 received in evidence)

19          MR. DOYLE:  Your Honor, no objection as long as we're

20  give the same opportunity with our experts.

21          THE COURT:  I think that's probably right.

22          MR. DOYLE:  Thank you, your Honor.

23          THE COURT:  Okay.

24          MR. BENNETT:  Your Honor, plaintiffs offer Dr. Lisak

25  as an expert regarding multiple sclerosis and the treatment of

1    MS?

2              THE COURT:  Any objection or voir dire requested?

3              MR. DOYLE:  No, your Honor.

4              MS. BLOODWORTH:  None, your Honor.

5              THE COURT:  All right.  I will accept Dr. Lisak as an

6    expert.  Go ahead.

7              MR. BENNETT:  Thank you.

8    Q.  Dr. Lisak, in general, what is multiple sclerosis?

9    A.  Multiple sclerosis is an inflammatory demyelinating disease

10   of the central nervous system, which means brain and spinal

11   cord, and it involves inflammation affecting the brain and the

12   spinal cord and causes demyelination.

13   Q.  What systems within the body are involved?

14   A.  So the central nervous system, which is considered to be

15   the brain and the spinal cord.

16   Q.  What systems are involved in causing the disease, sir?

17   A.  Ah, it appears to be due to an attack by the immune system,

18   inflammatory autoimmune cells.

19   Q.  Okay.  You mentioned that it's a demyelinating disease,

20   right?

21   A.  Yes, I did.

22   Q.  What does that mean?

23   A.  The nervous system, the actual wiring, if you will, the

24   axons which come out of the neurons, may have an insulation

25   around them.  The insulation is a part of the tissue itself,

1    and it's called myelin and it serves as insulation for the

2    actual wires, so to speak.

3    Q.   What does the disease do to myelins, sir?

4    A.   It destroys it.

5    Q.   What is the practical impact of that, briefly?

6    A.   The practical impact is that those nerves bodies that no

7    longer have insulation do not function normally, and sometimes

8    at all; and secondarily those, axons and neurons themselves may

9    undergo degeneration and die and, therefore, you have permanent

10   loss of function of those particular cells.

11   Q.   Why is the disease called multiple sclerosis?

12   A.   Sclerosis is because at the end of the inflammation and

13   demyelination you get scarring.  So sclerosis means scars, and

14   multiple because there are many of them, so multiple sclerosis

15   is the name for that reason.

16   Q.   When was MS first recognized as a disease?

17   A.   It was first recognized as a distinct entity back in the

18   1860's by a French neurologist named Sharko.

19   Q.   Thank you.  Have you helped prepare some slides that help

20   explain the disease course associated with MS?

21   A.   Yes, I have.

22              MR. BENNETT:  Your Honor, with your permission I'd

23   like Dr. Lisak to step down from the stand?

24              THE COURT:  Sure, Doctor.  Go ahead.

25              THE WITNESS:  Thank you, your Honor.  If I do this, I

1    think it will pick up.  Thank you.

2              THE COURT:  That should work.

3              THE WITNESS:  Thank you.

4    Q.  Dr. Lisak, I'm looking at slide number two.  Just explain

5    to us what we're seeing?

6    A.  As I said, this would be a neuron, think of it is as

7    analogy of the battery generator.  This is the outgrowth of the

8    neuron, the axon, which allows it to connect to the next neuron

9    in the sequences.  And we call this a synapse.  If you look at

10   the blown up area, this is the axon.  So think of that as the

11   platinum or the copper wire, and then think of this myelin

12   sheet wrapped around it as the equivalent of plastic or rubber

13   insulation, and this allows this particular axon to transmit

14   signals to the next neuron and allows it to do it efficiently.

15   Q.  You've got a depiction of the nervous system?

16   A.  Yeah, this is --

17   Q.  How does the graphic appear at top relate to that?

18   A.  So as we're discussing multiple sclerosis, this would be

19   the brain and the spinal cord.  This would be what we would be

20   worried about in MS, occurs in the brain and the spinal cord.

21   Some of the rest of this is the peripheral nerves, which are

22   not involved in multiple sclerosis.  It's a central nervous

23   system disease, brain and spinal cord.

24   Q.  Let's move onto slide number three.  And again, could you

25   explain what we're seeing here, Dr. Lisak?

1   A.  So what you're seeing here is cells autoimmune cells and

2   other immune cells, inflammatory cells, get cross out of the

3   blood into the brain and spinal cord, and for reasons that are

4   not fully understood, they attack the myelin as if it was

5   somebody else's myelin; thus, we use the term autoimmune

6   disease.  That leads to degeneration of the myelin, and leads

7   to areas of the axon that are we would call bear; that is, they

8   have no insulation.  That means that at this point this axon

9   cannot function efficiently or normally.  Same would be over

10  here.  And then this is multiple of course, it's multiple

11  sclerosis.

12  Q.  Move to the next slide number four.  And what are we

13  looking at here?

14  A.  Again, as I mentioned a little earlier.  Now, if you look

15  at a blowup over here, you've lost myelin, you just have some

16  fragments.  And now the bare axon not only doesn't work well,

17  but the same inflammatory immune cells can now directly or by

18  secreting various materials, further damage the system by

19  damaging the axon, which is lost its myelin protection.

20  Q.  Let's move on to the next slide number five.  What do we

21  see here?

22  A.  And as a consequence of the lack of insulation and other

23  factors that myelin helps the axon with, now the axon itself

24  starts to fragment and disintegrate and die.  That, therefore,

25  means that this neuron really cannot communicate effectively

1    with anything that it's connected to even with the neuron that

2    might be connecting over here.  So it becomes basically non-

3    functional and, essentially, doesn't work.

4    Q.  And now slide number six, Dr. Lisak, what do we see here?

5    A.  So when that happens you now have what we call dying back,

6    so the neuron body itself, the generator of the battery dies.

7    This cell, by not getting signal, eventually becomes

8    dysfunctional and may die.  Ultimately, the ability of the

9    brain and spinal cord to send messages out through the

10   peripheral nerves to the muscles and other organs and to

11   communicate within itself is lost.

12   Q.  Thanks.  Dr. Lisak, if you like to return to the stand for

13   a moment?

14   A.  Yes.

15   Q.  What happens when nerve cells die, Dr. Lisak?

16   A.  Well, when they die, whatever function -- excuse me.

17   Whatever function that particular nerve cell was in charge of

18   involved with, no longer works and you get neurologic symptoms

19   as a consequence.

20   Q.  What are some of the practical effects of this disease

21   course on a patient?

22   A.  Well, it results in the patients having a lot of different

23   neurologic symptoms at various times, severity, and if it

24   continues to progress, you can get, and you do get permanent

25   disability, and that leads to a patient being handicapped and

1   impaired, disabled.

2   Q.  Have you prepared a slide that describes some of the

3   symptoms and outcomes of MS?

4   A.  Yes, I have.

5   Q.  Let's put that up on the screen, slide number seven.

6           Dr. Lisak, again, describe some of these symptoms,

7   sir?

8   A.  These are some of the symptoms of multiple sclerosis;

9   blurring of vision or double vision, either one, or both; loss

10  of balance, and poor coordination; speech may become slurred;

11  patients may develop tremors, numbness where they don't feel

12  things well; extreme fatigue out of proportion to anything

13  they're doing.  It can affect the ability to concentrate,

14  memory and other, what we call cognitive functions; sexual

15  dysfunction; impaired physical mobility; dysfunction of the

16  bladder and bowel, sometimes actual loss of ability to control

17  the bladder or bowel, paralysis, blindness, and in a small

18  percentage of patients, death from complications of multiple

19  sclerosis.

20  Q.  Is this a complete list of the symptoms?

21  A.  No, it is not.

22  Q.  Have you witnessed these symptoms in your own patients,

23  sir?

24  A.  Yes, I have.

25  Q.  What is the impact of this disease on patient's day-to-day

1  life?

2  A.  Well, it affects their ability to do many different things.

3  So you can't read, you can't walk, you can't walk well, you

4  can't communicate, you can't remember things, you can't feel

5  things.  Fatigue is a major problem.  People who even have

6  relatively mild physical disability can't work.  They're very

7  heat sensitive with minor changes in ambient or body

8  temperature heat.  Patients can't control their own bladder or

9  bowel.  These are major problems.

10 Q.  When does MS typically strike?

11 A.  The majority of patients are affected between ages 20 and

12 40.

13 Q.  What is the practical impact of the disease striking at

14 that early age?

15 A.  Well, that's the age in which people are beginning their

16 careers, finishing school, raising a family.  So it's at the

17 so-called peak or prime of life and development of life of an

18 adult.

19              (Continued on next page)

20

21

22

23

24

25

BY MR. BENNETT:

Q.   Does MS affect women and men equally, sir?

A.   No, it does not.

Q.   Could you explain that for us?

A.   Women are affected at least three times as often as men.

Q.   Do we know why that is?

A.   We have theories about hormonal control of the immune
system, but no single definitive answer as yet.

Q.   Are there different forms of multiple sclerosis?

A.   Yes, there are.

Q.   What are the different forms?

A.   Relapsing remitting multiple sclerosis, secondary
progressive multiple sclerosis, primary progressing multiple
sclerosis and the rarer form we call, for lack of a better
term, progressive relapsing multiple sclerosis.

Q.   If you could just briefly describe for us those different
types of MS?

A.   Certainly.  Relapsing remitting multiple sclerosis,
patients have onset over hours to days or a week or two of new
neurologic symptoms referable to the brain or spinal cord which
will progress for a while, then stabilize and at the beginning
of the disease often improve, although not always back to
baseline and with repeated episodes which may be the same
symptoms or some of these other symptoms that I have on the
screen, it becomes more and more deficit, there's more and more

1    residual damage.  So that's what we call relapsing remitting

2    multiple sclerosis.

3           Secondary progressive multiple sclerosis by definition

4    is someone who had at one point relapsing remitting multiple

5    sclerosis and now have become gradually or sometimes rapidly

6    getting worse without any of these individual finite episodes

7    being obviously superimposed that you can tell clinically.

8    Primary progressive multiple sclerosis, the patients never

9    really have relapses that we can identify, but just progress so

10   they act like secondary progressive, yet they've never had any

11   obvious clinical relapses.

12          The last form is quite rare and it's sort of, most of

13   us treat it and I was on the committee that did this

14   classification, consider it really a form of secondary

15   progressive MS, but it's about less than 5 percent of the

16   patients present with this last form.

17   Q.   What is the most common form of the disease?

18   A.   85 percent of the patients with multiple sclerosis present

19   as relapsing remitting multiple sclerosis.

20   Q.   Briefly, what is a relapse?

21   A.   Relapse is an appearance of new neurologic symptoms or the

22   worsening of current symptoms or reappearance of symptoms that

23   have cleared over a relatively short period of time that

24   continues to worsen up to a point, then stabilizes and may or

25   may not improve.

1    Q.   Is there any way to predict when these relapses occur?

2    A.   There's no definite way of predicting when they may occur.

3    Q.   Again, what is the impact of that on a patient?

4    A.   The impact is it's pretty difficult to live that way and to

5    plan your life not knowing if tomorrow you might have a relapse

6    from which you may or may not get better, how long it might

7    last and it's at a time when people are not retired, they're in

8    their prime of life and family, work and so forth.  So it's

9    like a hanging sword, basically.

10   Q.   How do you diagnosis relapsing remitting MS?

11   A.   It's based on neurologic history, neurologic examination

12   and then we use the magnetic resonance imaging, so-called MRI,

13   along with laboratory tests and spinal fluid in some cases to

14   establish that it's relapsing remitting multiple sclerosis and

15   rule out other potential diagnoses.

16   Q.   When you perform this MRI analysis is there a particular

17   part of the body that you focus on?

18   A.   Yes, we focus on the brain and the spinal cord.

19   Q.   Again, have you helped prepare a slide that explains how

20   the MRI scan helps the diagnosis?

21   A.   Yes, I have.

22        MR. BENNETT:  Again, your Honor, with your permission

23   I'd like to have Dr. Lisak stand down.

24        THE COURT:  Sure.  You may step down.

25   Q.   Dr. Lisak, I have slide number 8, could you just explain

1    what we're seeing here?

2    A.   Sure.  So on this, on my left, over here, is the MRI scan

3    of a normal, the brain of a normal individual.  This is the

4    area where the white matter, the myelin is concentrated, this

5    is the normal spinal fluid here.  That's the normal situation.

6    On this side, I have, actually it's from a chapter of mine in a

7    book that I edited, and you can see here that these lesions,

8    these areas are abnormal.  They're not supposed to be there,

9    it's supposed to be clean.  And these represent areas of

10   inflammation, of demyelination and the scarring, sclerosis, so

11   multiple sclerosis.

12   Q.   What do those lesions do to a patient, sir?

13   A.   These lesions, in varying combinations give you all of the

14   symptoms.  So several of these might interfere with the ability

15   to think or process information because the circuits aren't

16   working right.  Some of these might be responsible for weakness

17   or balance problems as an example, and this is only one cut

18   through the brain.  If you could make multiple cuts it would

19   show many more lesions.

20   Q.   Thanks, Dr. Lisak.  Return to the stand.

21        Dr. Lisak, is there a cure for MS?

22   A.   No, there is not.

23   Q.   As a neurologist, how do you treat relapsing remitting

24   multiple sclerosis?

25   A.   We treat symptoms and then we administer medications, drugs

1  that alter the natural course of the disease, so-called

2  disease-modifying therapies, DMT's.

3  Q.   Briefly what is a disease-modifying therapy?

4  A.   It's a therapy that's been shown in clinical trials that

5  reduces some end point that is efficacious, that is something

6  you pick as an important thing that shows that drug will modify

7  that particular outcome in patients with multiple sclerosis.

8  Q.   What disease-modifying therapies are currently approved by

9  the FDA?

10 A.   There are the so-called front line or first line, which are

11 the interferons and Copaxone.  There are the second line

12 therapies, Novantrone and Tysabri, and there is a recently

13 introduced oral form and I think it's too soon to say how that

14 is going to be used.

15 Q.   So which of these treatments do physicians typically

16 prescribe first?

17 A.   The first line therapies, Copaxone and the interferons.

18 Q.   We heard a bit from Mr. Congleton about the first line

19 therapies, but could you explain briefly what that is?

20 A.   That's the therapies that you start with because they're

21 proven to be efficacious.  They have a reasonable side effect

22 profile; some toxicities for some of them but nothing usually

23 life-threatening, and they are reasonably well tolerated by the

24 patients, so that would be a first line, front line therapy.

25 Q.   Are there second line treatments?

197FTEV3                          Lisak - direct

1    A.  Yes, as I mentioned, there are.

2    Q.  What is a second line treatment?

3    A.  Second line is also, it could be, is a drug or a treatment

4    that's effective, is safe enough that it was approved by the

5    FDA, but some of those tolerability and especially safety

6    issues are such that you wouldn't start, most people would not

7    start with those first.  They would see if a patient responded

8    to one of the first line therapies for at least for a while.

9    Q.  Okay.  Now, you mentioned a drug being effective, but what

10   do you mean when you say the word "effective"?

11   A.  Well, there's a few definitions.  One would be in a

12   clinical trial and that's what the FDA takes, so going forward

13   as I understand it, you tell the FDA what you think the end

14   points would be; reduction of the relapses, less disability,

15   whatever you think are important, you pick important ones that

16   you and the FDA agree on and that would be efficacious.

17          As a physician practicing, it's also what you see in

18   your own practice, that is, patients who were put on the

19   medications seem to be doing well, better than they've been

20   doing before they were put on the medication.  That would be as

21   a practical physician's mind, so they overlap a little bit, but

22   the latter is not as clearly defined as the FDA's.

23   Q.  You also mentioned safety and tolerability.  Could you

24   explain what you mean by those terms?

25   A.  Safety means does the drug in question for MS or any other