199FTEV1                    Trial

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ------------------------------x

    TEVA PHARMACEUTICALS USA,
4   INC., TEVA PHARMACEUTICALS
    INDUSTRIES LTD., TEVA
5   NEUROSCIENCE, INC. and YEDA
    RESEARCH AND DEVELOPMENT CO.
6   LTD.,

7               Plaintiffs,

8          v.                        08-CV-7611 (BSJ)

9   SANDOZ, INC., SANDOZ
    INTERNATIONAL GMBH, NOVARTIS
10  AG, and MOMENTA
    PHARMACEUTICALS, INC.,

11
                Defendants.
12
    ------------------------------x
13  TEVA PHARMACEUTICALS USA,
    INC., TEVA PHARMACEUTICALS
14  INDUSTRIES LTD., TEVA
    NEUROSCIENCE, INC. and YEDA
15  RESEARCH AND DEVELOPMENT CO.
    LTD.,
16
                Plaintiffs,
17
           v.                        09-CV-8824 (BSJ)
18
    MYLAN PHARMACEUTICALS INC.,
19  MYLAN INC., NATCO PHARMA LTD.,

20              Defendants.          Non-Jury Trial
    ------------------------------x
21
                                     New York, N.Y.
22                                   September 9, 2011
                                     9:40 a.m.
23
    Before:
24
                    HON. BARBARA S. JONES,
25
                                     District Judge

199FTEV1                     Trial

199FTEV1                    Trial

1                          APPEARANCES

2    KENYON & KENYON
          Attorneys for Plaintiffs
3    BY:  ELIZABETH J. HOLLAND, ESQ.
          WILLIAM G. JAMES, II, ESQ.
4         CAROLYN A. BLESSING, ESQ.

5    GOODWIN PROCTER, LLP
          Attorneys for Plaintiffs
6    BY:  DAVID M. HASHMALL, ESQ.
          JOHN T. BENNETT, ESQ.
7         NICHOLAS K. MITROKOSTAS, ESQ.

8

9    MORRISON & FOERSTER LLP
          Attorneys for Defendants
     BY:  DAVID C. DOYLE, ESQ.
10        KAREN L. HAGBERG, ESQ.
          ERIC M. ACKER, ESQ.
11        ANDERS T. AANNESTAD

12   PERKINS COIE LLP
          Attorneys for Defendants
13   BY:  JOHN S. SKILTON, ESQ.
          DAVID L. ANSTAETT, ESQ.
14        SHANNON M. BLOODWORTH, ESQ.
          DAVID JONES, ESQ.
15
     ALSO PRESENT:  CORT CHASE, Litigation Support
16

17

18

19

20

21

22

23

24

25

1          (Trial resumed; in open court)

2          MR. WIESEN:   Good morning, your Honor.  Before we

3    proceed with Dr. Gokel I believe Mr. James has some logistical

4    things he wants to address.

5          MR. JAMES:  As we said yesterday there were a couple

6    of things we wanted to follow up on in the Grant examination.

7    We wanted to mark Dr. Grant's calculations for the molar

8    fraction analyses for the Sandoz' products as PTX 931 and 932

9    and for the Mylan products Plaintiffs Trial Exhibits 933 and

10   934 and I'll hand those up in just a moment.

11         THE COURT:  Okay.  For the record, PTX 931 is slide 33

12   from yesterday's examination, PTX 932 is slide 40, PTX 933 was

13   slide 46 and PTX 934 was slide 50.  In addition to that, as we

14   discussed yesterday, we had the agreement between the parties

15   with respect to the redacted exhibits.

16         THE COURT:  Yes.

17         MR. JAMES:  So I'm going to hand up the redacted

18   copies of PTX 300, that will be PTX 300R, PTX 312R, PTX 313R,

19   PTX 318R and PTX 325R and PTX 330R.  And then finally

20   Mr. Wiesen mentioned to you I believe on the first day of trial

21   that we had a stipulation between the parties with respect to

22   pharmaceutical composition and pharmaceutically acceptable

23   excipient and I'll hand those up to your Honor now.  We have

24   handwritten exhibit numbers on them.  We'll hand up stamped

25   copies in a while.  For the Teva v. Mylan action will be PTX

1    935, that stipulation we'll mark as PTX 935 and Teva v. Sandoz

2    matter we'll mark at PTX 936.  Thank you, your Honor.

3            THE COURT:  All right, thank you.  There was no

4    objection to the admission, at least I didn't hear one, of the

5    various exhibits which were slides, so they're admitted.  I had

6    actually thought a couple of them were admitted yesterday.

7    Maybe the offer was made, but I didn't announce it.

8            MS. BLOODWORTH:  Your Honor, I think that's right.  We

9    were just handed the stamped copies, I think that's the only

10   difference is that the stickers, the PTX numbers were added to

11   the slides that were admitted.

12           (Plaintiff's Exhibits PTX 931 through 936

13    received in evidence)

14           (Plaintiff's Exhibits PTX 300R, PTX 312R, PTX 313R,

15   PTX 318R and PTX 325R and PTX 330R received in evidence)

16           THE COURT:  Okay, that's great.  Go ahead.

17           MR. WIESEN:  And, your Honor, before the questioning

18   begins just a little bit of housekeeping from yesterday's, the

19   beginning of Dr. Gokel's examination.  I'm told I failed to

20   offer PTX 270.  PTX 294 I thought had been admitted but it was

21   a different version of the certificate of analysis so I wanted

22   to offer that and PTX 558, all of which we discussed with

23   Dr. Gokel yesterday, so plaintiffs would offer those into

24   evidence as well.

25           THE COURT:  What was the last one?

199FTEV1                    Trial

1          MR. WIESEN:  558.

2          THE COURT:  Any objections?

3          MR. ANSTAETT:  No objection, your Honor.

4          THE COURT:  All right, they're admitted.

5          (Plaintiff's Exhibits PTX 270, PTX 294, PTX 558

6     received in evidence)

7     GEORGE GOKEL,

8          called as a witness by the Plaintiff,

9          having been previously duly sworn, testified as follows:

10    DIRECT EXAMINATION

11    BY MR. WIESEN:

12    Q.  Good morning, Dr. Gokel.

13    A.  Good morning, Dr. Wiesen.

14    Q.  I just want to go back for one minute to one of the slides

15    we had at the end of the day yesterday to put up slide 79, just

16    make sure it's clear on the record where a couple of the

17    numbers on this slide came from.  You recall we were discussing

18    the different scales that you could use for a comparison of, to

19    calculate molar ratios.  Do you recall that testimony?

20    A.  Yes, I do.

21    Q.  And in the first pie chart you have here on slide 79, you

22    have a total scale of 14.  Do you see that?

23    A.  Yes, I do.

24    Q.  Where did the 14 come from?

25    A.  The patent specifies a ratio of 6:2:5:1 approximately.  And

1    if you sum six plus two plus five plus one it sums to 14.

2    Q.   And on the middle pie chart you have a total scale of 10.8.

3    Where did that come from?

4    A.   That's a calculation that was done by Mylan in which they

5    did some mathematical manipulations on some of their numbers

6    and then we summed those numbers to the scale of 10.8.

7    Q.   And so is that the sum of the molar ratio that Dr. Kent

8    calculates when he does what he calls normalizing the tyrosine?

9    A.   Yes, he normalizes the tyrosine to 1 and then adjusts the

10   percentages of the others by the same factor and now the total

11   of those numbers sums to 10.8 rather than 14.

12   Q.   And just one more time, how would a person of ordinary

13   skill in the art then compare the molar ratio that Dr. Kent has

14   on a scale of 10.8 to the molar ratio of 6:2:5:1 on a scale of

15   14?

16   A.   Well, we have to compare it on a scale that's the same, so

17   if we multiply 10.8 by a factor that gives us 14, I think

18   that's about 1.3, we could compare them directly on a scale of

19   14.

20   Q.   Okay.  Thank you, Dr. Gokel.  I want to turn, then, to

21   Sandoz' product and whether it is copolymer-1 as the Court has

22   construed the term.  Sir, are you aware of whether Sandoz

23   Momenta have ever referred to their proposed product as

24   copolymer-1?

25   A.   Yes, I am.

1   Q.  If you could turn to PTX 141 in your binder, please?  I

2   believe we looked at this document yesterday.  Do you recall

3   it?

4   A.  Yes, I do.

5   Q.  If you could turn to MMT391607?

6   A.  Yes, I have it.

7   Q.  Does Momenta refer to their proposed product at copolymer-1

8   in this overview?

9   A.  Yes, they do.  In the section they call nomenclature, they

10  use the term copolymer-1.

11  Q.  What other terms do they use under nomenclature?

12  A.  They use the term glatiramer acetate, which is the top of

13  this list of four names.  They use the trademark name of

14  Copaxone, copolymer-1, as we mentioned, and what's called a

15  Chemical Abstracts Service registry number.  And this is the

16  number given here.  It's a way of indexing known chemical

17  compounds that the American Chemical Society does.

18  Q.  And if you could just read into the record what molar

19  fraction does Momenta have reported here for copolymer-1?

20  A.  For glutamic acid, alanine, tyrosine and lysine, the

21  numbers are .141, .427, .095 and .338.

22  Q.  Thank you, sir.  I want to run through as we did yesterday

23  with Mylan's for the Court's construction of copolymer-1 and

24  just ask about those terms.  Do you have the next slide?

25          Sir, do you have an opinion whether Sandoz and

1   Momenta's proposed product in their ANDA is synthesized by

2   polimyerization of suitably protected amino acid

3   carboxyanhydrides?

4   A.  Yes, I believe that it is.

5   Q.  What is the basis for that opinion.

6   A.  The basis is the discussion I offered yesterday in which we

7   showed that carboxyanhydrides was the activated form of these

8   protected amino acids.

9   Q.  Sir, do you have an opinion whether Sandoz and Momenta's

10  proposed ANDA product has a mixture of polypeptides?

11  A.  Yes, I do.

12  Q.  What is your opinion?

13  A.  I believe it to be a mixture of polypeptides.

14  Q.  What's the basis for that opinion, sir?

15  A.  The basis of that is the synthetic sequence that we went

16  through yesterday.

17  Q.  Sir, do you believe that Sandoz and Momenta's proposed

18  product is nonuniform with respect to molecular weight and

19  sequence?

20  A.  Yes, I do.

21  Q.  What's the basis for that opinion?

22  A.  The testimony of Dr. Grant.

23  Q.  Sir, do you have an opinion whether Sandoz Momenta's

24  proposed product is composed of alanine, glutamic acid, lysine

25  and tyrosine?

1    A.  Yes, I do.

2    Q.  What's your opinion, sir?

3    A.  Their starting materials are clearly stated in their

4    synthetic scheme as using these four amino acids.

5    Q.  And what's the basis for that opinion?

6    A.  Their synthetic schemes clearly show that these four amino

7    acids are present in their starting materials and as a result

8    of the reaction that's conducted, they must be present in the

9    product.

10   Q.  Finally, sir, do you have an opinion whether Sandoz and

11   Momenta's proposed product is in a molar ratio of approximately

12   6:2:5:1?

13   A.  Yes, I do.

14   Q.  And what's your opinion?

15   A.  My opinion is it is in the ratio of approximately 6:2:5:1.

16   Q.  All right, well, let's turn in a little more detail as

17   well, hopefully we can go fairly quickly through the molar

18   ratio analysis on Sandoz' proposed product.  I want to look

19   first at Sandoz' original ANDA filing.  If you could turn to

20   PTX 219 in your binder.  You should have 219-R.

21           MR. WIESEN:  This is another redacted document, your

22   Honor.

23   A.  Yes, I have it.

24   Q.  If you turn to SDZ2024.

25   A.  Yes, I have it.  Oh, I'm sorry, I'm on 2004.

1    Q.  2024.

2    A.  2024, yes, I have it.

3    Q.  What section of the ANDA is that?

4    A.  This is Section 3.2.S.3.1.3.3.2.  It's titled amino acid

5    composition of building blocks by RPHPLC, or reverse phase PLC.

6    Q.  Is this a document you analyzed in rendering your opinions

7    in this case?

8    A.  Yes, it is.

9           MR. WIESEN:  Plaintiffs would offer PTX 219 into

10   evidence, your Honor.

11          MR. DOYLE:  No objection.

12          THE COURT:  Admitted.

13          (Plaintiff's Exhibit PTX 219 received in evidence)

14   Q.  If you look at the next page, 2025, and look at tables 26

15   and 27 and we actually pulled them out on slide 81 if you want

16   so you can again focus on the slide.  What's reported in table

17   26?

18   A.  Table 6 is a summary of amino acid composition of the

19   building blocks or the amino acid subunits of glatiramer

20   acetate.

21   Q.  We've highlighted one lot, 077K7277.  Do you see that?

22   A.  Yes, I do.

23   Q.  Do you understand that to be one of the lots of Sandoz'

24   proposed drug substance?

25   A.  Yes, I do.

1  Q.  Have you analyzed the molar ratio of that particular lot?

2  A.  Yes, I have.

3  Q.  Could we have the next slide, please?  Could you explain

4  what's in the first four columns of this slide?

5  A.  Yes.  I've done exactly the same kind of analysis that I

6  did before for the four amino acids shown in the first column

7  with the abbreviations that we're using here, the ratio 6:2:5:1

8  which sums to 14 as shown in the first numerical column.  That

9  is then scaled to 1 simply by dividing by 14, and that gives us

10  the values that are shown in the second numerical column and

11  then in lot 34, the numbers that are on page 2025 that we've

12  been talking about are presented and they are summed to 1.

13         Then in the --

14  Q.  Before you go on to the next column, sir, would a person of

15  ordinary skill in the art consider the mole fractions scaled to

16  1 for 6:2:5:1 on this lot on slide 90 of Sandoz' proposed ANDA

17  product to be approximately the same?

18  A.  Could you repeat the question, please?

19  Q.  Sure.  Would a person of ordinary skill in the art consider

20  the mole fraction for this lot of Sandoz' proposed product to

21  be approximately the same as the mole fraction for 6:2:5:1?

22  A.  I believe they would.

23  Q.  How else could you compare the molar ratio of Sandoz'

24  product to 6:2:5:1?

25  A.  The way that I would do it, I believe, since the '808

1    patent family says use the values 6:2:5:1 to do this analysis

2    is that I would simply multiply by 14 each value so that I get

3    on the same scale and then I would compare the first numerical

4    column with the fifth numerical column and that's, the first

5    column has just been repeated here, and you can see that the

6    ratios are 6:2:5:1 to one significant figure.

7    Q.   And, sir, in your opinion would a person of ordinary skill

8    in the art -- well, let me phrase it differently.  Do you have

9    an opinion whether this lot of Sandoz' proposed product is in a

10   molar ratio of approximately 6:2:5:1?

11   A.   Yes, I believe that it is.

12   Q.   Thank you.  And have you prepared another stack chart to

13   show this comparison?

14   A.   Yes, I have.

15   Q.   What do we have on slide 91?

16   A.   This is just another way to represent the same information

17   that I showed you before.  If we compare it on a scale of 1,

18   which is as I've said before perfectly legitimate, we can see

19   the proportions are similar, but it's more difficult to see

20   even with this pull-out.  So if we compare it by multiplying by

21   14, we can see that there is a very close relationship of these

22   materials to each other.

23   Q.   Thank you, sir.  If we could have the next slide.  We've

24   put back up tables 26 and 27 from PTX 219 page SDZ2025 and

25   we've highlighted three additional batches, 087K7253, CT0743

1   and CT0750.  Have you conducted a similar analysis for these

2   other three batches contained in Sandoz' original ANDA?

3   A.  Yes, I have.

4   Q.  And do you have an opinion whether these three additional

5   batches have a molar ratio of approximately 6:2:5:1?

6   A.  Yes.  I believe them to meet that limitation.

7   Q.  Thank you, sir.  I want to turn, now, to PTX 913 in your

8   binder.  I believe this is another document that we have a

9   redacted version of, is that right, Mr. Chase?

10  A.  Mine is redacted.

11  Q.  If you turn to page 28 of the document.

12          MR. WIESEN:  Your Honor, if I could just have one

13  moment to consult with counsel about confidentiality?

14          THE COURT:  Okay.

15          (Pause)

16          MR. WIESEN:  Thank you, your Honor.

17          THE COURT:  Okay.  The doctor and I were just

18  discussing the use of his screen.  All right, go ahead.

19  Q.  Are you familiar with PTX 913?  You reviewed the document a

20  minute ago.

21  A.  Yes, I'm sorry, I just missed my focus for a moment.  Yes,

22  I have reviewed it.

23          MR. WIESEN:  The defendants offer PTX 913, or

24  plaintiffs offer PTX 913, your Honor.

25          MR. DOYLE:  No objection, your Honor.

1            THE COURT:  Admitted.

2            (Plaintiff's Exhibit PTX 913 received in evidence)

3   Q.  And you're aware these are some FDA meeting background

4   materials that were provided by Sandoz and Momenta to the FDA?

5   A.  That's my understanding.

6   Q.  If we look at table six, the column process 1.1.0 amino

7   acid composition.  Do you see that column?

8   A.  Yes, I see it.

9   Q.  And have you analyzed whether these numbers are in a ratio

10  of approximately 6:2:5:1 for this batch lot 051M7282?

11  A.  Yes, I have.

12  Q.  Could we have the next slide, please?  And if you could

13  just first read into the record what the reported mole fraction

14  is for lot 051M7282 in the FDA meeting background materials?

15  A.  Yes.  For alanine it's .427, for glutamic acid it's .136,

16  for lysine it's .344 and for tyrosine it's 0.93 -- sorry,

17  0.093.

18  Q.  Thank you, sir.  And would a person of ordinary skill in

19  the art consider the mole fraction for this lot to be

20  approximately the same as the mole fraction of 6:2:5:1?

21  A.  Yes, I believe so.

22  Q.  If A person of ordinary skill in the art wanted to compare

23  the molar ratio of this lot on the same scale as 6:2:5:1, what

24  would they do?

25  A.  Well, exactly as before, we would multiply by the factor of

1   14, since this is already on unity and that would give us four

2   numbers that we could compare with the values in the '808

3   patent and they turn out to be 5.98 compared to 6, 1.90

4   compared to 2 and so on.

5   Q.  And, sir, in your opinion, is the molar ratio of Sandoz'

6   new lot 051M7282 at a molar ratio of approximately 6:2:5:1?

7   A.  Yes.

8   Q.  And very quickly, have you created another stack chart to

9   visually illustrate this?

10  A.  Yes.

11  Q.  Could we have the next slide, please?

12  A.  I've simply done the same thing here.  I've expressed the

13  data on a scale of unity or 1.  I've used a blowout to show

14  they can be compared that way, but it's less informative than

15  if we compared them on the larger stack lot scale, scale of 14,

16  but all of these give the same information.

17  Q.  If we could actually go back to the prior slide for a

18  minute, Mr. Chase.  I just want to ask a couple of questions

19  about the numbers on this slide, Dr. Gokel.  Looking at the

20  bottom right-hand corner, on a scale of 14, you have 1.30 for

21  tyrosine and then 1 for the molar ratio of approximately

22  6:2:5:1.  Do you see that?

23  A.  Yes, I do.

24  Q.  Would a person of ordinary skill in the art just compare

25  the 1 to the 1.30 in doing an analysis of whether the molar

1  ratios were approximately the same?

2  A.  No, a person of skill in the art would understand that

3  these numbers are significant figures, that have rounding

4  ranges and would say this is rounded to five -- sorry, to one

5  significant figure, this 5.98 rounds to 6, so 6 compares to 6,

6  2 compares to 2, 5 compares to 5 and 1 compares to 1.  In

7  significant figures they're identical.

8  Q.  And in the overall mixture of this lot, what's the

9  difference in tyrosine between lot 051M7282 and exactly

10 6:2:5:1?

11 A.  Well, the number exactly 6:2:5:1 for tyrosine calculates on

12 a mole fraction scale of 0.7, here it's 0.9.  So there's

13 2 percent difference between them or we can say they vary,

14 8 percent minus one percent.  You could express it however you

15 want.  Those are the actual numbers.

16 Q.  Thank you, sir.  I want to turn away from molar fractions

17 now and talk about one other limitation, that's predetermined

18 by test reaction.  Are you familiar with that limitation?

19 A.  Yes, I am.

20 Q.  Could we have slide 98?  Slide 98 has the Court's

21 construction which is determined beforehand by a reaction

22 carried out to determine results of varying reaction

23 conditions.  Have you analyzed and applied this construction to

24 Sandoz' and Mylan's proposed processes?

25 A.  Yes, I have.

1   Q.  And do you have an opinion whether Sandoz and Mylan's

2   proposed synthetic processes contain a time and temperature

3   predetermined by a test reaction?

4   A.  Yes, I have, I believe they both do.

5   Q.  Let's turn to Sandoz first if we could have the next slide.

6   We just put up here a representative claim.  And your Honor,

7   just to be clear for the record, only some of the claims that

8   are asserted in this case contain this limitation, I think it's

9   eight of the claims, but we'll run through it.  And, Dr. Gokel,

10  if you could just read into the record what we've taken, what

11  we've highlighted from claim 1 of PTX, 3 which is the '898

12  patent, so we have the context for this limitation.

13  A.  Said reaction takes place for a time and at a temperature

14  predetermined by test reaction.

15  Q.  And the reaction that's being referred to here is the HBr

16  acetic acid step that results in debenzylation and cleavage or

17  depolymerization, is that correct?

18  A.  Yes, that's correct.

19  Q.  I want to start first with Sandoz' original ANDA.  If you

20  could turn to PTX 214.

21  A.  I'm there.

22  Q.  I want to talk -- first off, do you recognize this

23  document, sir?

24      MR. WIESEN:  I believe this is another -- sorry, your

25  Honor, this is another document that has a redacted version.

1   You should have the full version in your binder, your Honor.  I

2   think the witness has the redacted version.

3   A.  I do.

4   Q.  Did you review the full version of PTX 214 in rendering

5   your opinions in this case?

6   A.  Yes, I did.

7           MR. WIESEN:  Plaintiffs offer PTX 214 into evidence,

8   your Honor.

9           MR. DOYLE:  No objection.

10          THE COURT:  Admitted.

11          (Plaintiff's Exhibit  PTX 214 received in evidence)

12  Q.  Then if you could turn, sir, to page SDZ186.  If we could

13  pull out the first full paragraph.  I have this paragraph up on

14  the screen as well, Dr. Gokel.

15  A.  Yes, I see it.

16  Q.  If you could just read this paragraph into the record,

17  please.

18  A.  If the time for depolymerization is insufficient or

19  prolonged, the molecular weight of the polymeric mixture may

20  not meet the label claim of 5,000 to 9,000 daltons.  As a

21  result, a large scale profile or engineering run was performed

22  during which samples were taken at different time-points.

23  These step 2 time-point aliquots were transferred to glatiramer

24  acetate to allow for a more accurate assessment of the time of

25  depolymerization at the larger scale.  This knowledge was then

1   applied to the production batches.

2   Q.  What is your understanding of what this paragraph

3   describes, sir?

4   A.  When a chemist is faced with a challenge of doing a

5   reaction, he or she needs to know how long it will take and

6   what will be the effect of it.  So people do small scale or

7   test reactions at different times, temperatures, concentrations

8   and so on, to get an understanding of the overall reaction

9   profile.  Once they determine what the appropriate conditions

10  are, then they follow those.

11  Q.  And does this paragraph indicate that Sandoz and Momenta

12  experimented with various times and temperatures for the step 2

13  depolymerization deprotection step?

14  A.  Yes, this indicates they had an understanding of that and

15  that they were performing these reactions.

16  Q.  Based on this description, do you have an opinion whether

17  the Sandoz original ANDA process had a time and temperature

18  predetermined by test reaction as construed by the Court?

19  A.  Yes, the time and temperature were understood or determined

20  by these reactions.  It would be the time and temperature that

21  successfully led to the product they wished.

22  Q.  And would these reactions be test reactions as the Court

23  construed the term?

24  A.  Yes, they would.

25  Q.  Thank you, sir.  I want to turn back, then, to the FDA

1    meeting background materials, PTX 913.

2    A.  I have it.

3    Q.  First I want to turn to page 36.

4    A.  I'm sorry?

5    Q.  36.  And again, we can pull it up on the screen as well.

6    On page 36, do you see Section 3.3.3, modifications to step 2,

7    depolymerization deprotection?

8    A.  Yes, I see it.

9    Q.  And there's another synthetic process diagram, do you see

10   that?

11   A.  Yes, I do.

12   Q.  In your opinion, is that substantially similar to the

13   process we ran through earlier?

14   A.  Yes, it is.

15   Q.  And just to set the context, this is the step in which the

16   HBr acetic acid is used for the deprotection and

17   depolymerization, is that right?

18   A.  That's correct.

19   Q.  If you turn to page 38 of the FDA meeting background

20   material?  The number for the section gets a little longer,

21   3.3.3.3.  Do you see that?

22   A.  Yes, I do.

23   Q.  Generally, sir, what does this section describe?

24   A.  This is a description of a methodology in which viscosity

25   measurement is going to be used to determine when to stop the

1    reaction.

2    Q.  And when you refer to the reaction, which reaction are you

3    talking about?

4    A.  This is the reaction in which the diprotected peptides are

5    deprotected at glutamic acid and cleaved or depolymerized.

6    It's the treatment with HBr treated acid.

7    Q.  What is viscosity sir?

8    A.  Viscocity is a property of a solution.  It is roughly  its

9    fluidity and you could think about a nonviscous solution being

10   something like gasoline and you could think of a viscous

11   solution as honey.

12   Q.  Have you looked at some documents concerning how Momenta

13   and Sandoz developed this viscosity test?

14   A.  Yes, I have.

15   Q.  Turn to PTX 914 in your binder.

16   A.  I have it.

17   Q.  What is this document, sir?  Could we have the first page,

18   please?

19   A.  The title at the top of the page is -- oh, I'm sorry.  I

20   went to the 951 page.  The title is the same, though.  The

21   title for page 949 is glatiramer acetate viscosity IPC end

22   point determination for step 2 depolymerization and I

23   understand IPC to be their abbreviation for in process control.

24   Q.  Did you analyze this document in rendering your opinions in

25   this case?

1  A.  I did.

2           MR. WIESEN:  Plaintiffs offer PTX 914 into evidence,

3  your Honor.

4           THE COURT:  Any objection, Mr. Doyle?

5           MR. DOYLE:  Just, your Honor, not to the document.

6  This is one oversight, I believe, with regard to redaction

7  that's on page 160953.

8           THE COURT:  Is that going to be the subject of a

9  slide?

10          MR. WIESEN:  It was something we had intended to put

11 up.  In the redacted documents that were provided by Sandoz

12 Momenta, I don't believe they redacted this page.

13          MR. DOYLE:  This was, we redacted --

14          THE COURT:  Is it coming up?  Do you want to confer on

15 it now?

16          MR. WIESEN:  It's coming up momentarily, so I think it

17 makes sense to confer now if we could have a moment.

18          THE COURT:  Why don't you do that?

19          MR. DOYLE:  Thank you, your Honor.

20          (Pause)

21          MS. BLOODWORTH:  Your Honor, while we're waiting could

22 we address one housekeeping issue?

23          THE COURT:  Okay.  Looks like there are plenty of

24 other lawyers who are not engaged.

25          MS. BLOODWORTH:  I believe Mr. Wiesen moved in PTX

 1  294.  It's actually PTX 294R, it's a redacted version of PTX

 2  294.

 3          THE COURT:  Any document that's the redacted version,

 4  the only thing that will be made public will be the redacted

 5  version.

 6          MS. BLOODWORTH:  Thank you, your Honor.

 7          THE COURT:  Are we all set?

 8          MR. WIESEN:  We are all set.  When we get to that page

 9  we'll shift from the public screen to the private screen, so

10  just you and counsel will be able to see the particular page

11  that Mr.  --

12          MR. DOYLE:  Yes, and we appreciate counsel's

13  accommodation on this, and we'll submit a new redacted copy for

14  the public record, your Honor.  Apologize for the oversight.

15          THE COURT:  All right.  And I expect you'll make sure

16  this happens, counsel.  What document is it, again, or what

17  page?

18          MR. WIESEN:  PTX914.  The page that I think raises the

19  concern is 1630952.

20          MR. DOYLE:  And also 955 I believe may have the same

21  concern.  I don't know whether you're going to use that one or

22  not.

23          MR. WIESEN:  We apologize.

24          THE COURT:  They'll just be on the private screens.

25  All right, thank you, go ahead.

199FTEV1                    Gokel - direct

1          MR. WIESEN:  And, your Honor, I assume with that the

2     document is admitted into evidence.

3          THE COURT:  Yes it's admitted.

4          MR. DOYLE:  No objection.

5          (Plaintiff's Exhibit PTX 914 received in evidence)

6          THE COURT:  Go ahead.

7     Q.  Does this report, Dr. Gokel, set forth the ways in which

8     Sandoz now monitors a step 2 depolymerization reaction?

9     A.  Yes, it does.

10    Q.  If you could turn to page 1630951, Section 4.

11    A.  Yes, I have it.

12    Q.  What's described here?

13    A.  It is the methodology for conducting the step 2 reaction,

14    that is to say, that is to say the cleavage and deprotection

15    step and it's going to use viscosity, which they describe as a

16    macroscopic parameter to monitor the progress of the reaction.

17    Q.  If we could look two sentences from the end.  How does

18    Sandoz indicate it's going to determine the end point of this

19    reaction with this monitoring method?

20    A.  The sentence states:  The end point is defined as the

21    viscosity at the specified temperature correlating to

22    glatiramer acetate drug substance with a molar mass MP of

23    approximately 7300 daltons by SEC MALS analysis (TP300) Molar

24    mass is defined as MP, which is the average molar mass at the

25    peak of the SEC distribution.

1    Q.  Has Sandoz and Momenta studied whether there's a

2    relationship between the time of the reaction and the

3    viscosity?

4    A.  Yes, they have.

5    Q.  What have they concluded?

6    A.  They have concluded that the reaction mixture that

7    ultimately will lead to the appropriate molecular weight after

8    additional steps has a certain viscosity that they can tabulate

9    at different temperatures, so there is a correspondence between

10   the temperature at which the reaction is conducted, the

11   viscosity that is observed at the time the molecular weight is

12   reached and after additional reactions, then the final product

13   will be obtained with the appropriate molecular weight if the

14   reaction is stopped at that time corresponding to that

15   viscosity.  Was that clear?

16   Q.  Maybe we'll look at the tables in a minute and see if we

17   can show that.  Could we keep that up?  One more question

18   before we move on.  Does this indicate whether under this

19   process Sandoz and Momenta would have a predetermined molecular

20   weight profile, a target weight that they're aiming for?

21   A.  Yes.

22   Q.  What would that target weight be?

23   A.  Well, they specify here that they want to reach 7300

24   daltons.

25   Q.  If we could go to the private monitors, Mr. Chase.  If we

1    could turn to 1630953, table 1.  What does table 19 in this

2    report show and if you could, Dr. Gokel, try and avoid using

3    the particular numbers and describe things in a more general

4    way.

5    A.  Okay.

6            THE COURT:  Good luck, Doctor.

7            THE WITNESS:  Thank you.

8    A.  This is a table that has two columns.  It's okay to say

9    that, right?

10   Q.  It is okay to say that?

11   A.  It has two columns.  The first column is titled batch

12   temperatures and it is a range of temperatures, it is a range

13   of temperatures in two tenths of a degree increments, and in

14   the second column, there is a list of viscosities, the

15   abbreviation for which is centipoise, and that's abbreviated CP

16   and each of the temperatures in these two tenths of a degree

17   increment is then correlated with a range of viscosity values,

18   and the idea here is that if the reaction were being run at

19   temperature X, the reaction would be run until viscosity Y in

20   column B was observed and at that time the reaction would be

21   stopped because they know that at that time they have a product

22   that ultimately can be converted into the desired 7300 dalton

23   material.

24   Q.  And if we look back at page 1630952, the bottom part under

25   viscosity end point determination?

1   A.  30952, yes, I have it.

2   Q.  Under 5.0, methods, under viscosity end point

3   determination, do you see that?

4   A.  Yes.

5   Q.  And does that provide the general description you've just

6   given?

7   A.  Yes.  Am I allowed to read this?  Do you want me to read

8   it?  I don't know what to do.

9   Q.  I think the exhibit is in the record, so we can just leave

10  it at that.

11  A.  Okay.

12          MR. DOYLE:  If I could just -- excuse me.  I don't

13  want to interrupt the witness.

14          THE WITNESS:  You can interrupt.  I don't know what to

15  do.

16          MR. DOYLE:  If counsel is going to refer and put 954

17  up, which is a graph, would you put that on the private screen

18  too, please?

19          THE COURT:  I think at the moment we're just reading

20  this one section and that's okay, right?

21          MR. DOYLE:  Yes, your Honor.

22          THE COURT:  Okay.  Go ahead, Doctor.

23  A.  So may I read it out loud?

24  Q.  Could you read this paragraph into the record, please?

25  A.  Yes.  It says viscosity -- oh, viscosity end point

1    determination.  The depolymerization viscosity will decrease

2    over time and will fluctuate with temperature changes.

3            One, monitor the reaction viscosity and batch

4    temperature from the viscometer.  Two, when the batch reaches

5    the viscometer in column B, see table 1 at the corresponding

6    batch temperature in column A, the batch is ready to quench

7    into water.  Promptly begin transferring the depolymerization

8    solution into water.

9    Q.  And does this indicate to you that Sandoz Momenta

10   determined, as we saw in detail in table 1, a relationship

11   between time and viscosity and then used that to determine the

12   end point for step 2?

13   A.  Yes.  The table tells the -- the table shows the

14   temperature and the viscosity, but the viscosity corresponds to

15   a time when the reaction should stop because that is the

16   viscosity of the solution that will ultimately lead to the

17   desired molecular weight product.

18   Q.  Thank you, Dr. Gokel.  Is this the only model that Sandoz

19   and Momenta discuss in this report?

20   A.  No, it is not.

21   Q.  Is there a backup model as well?

22   A.  Yes, there's a backup model.

23   Q.  And if you turn to 1630954, and if we could put that I

24   guess on the private monitors, Mr. Chase?  Does this page

25   describe the backup process?

1   A.  Yes, it does.

2   Q.  And if we could highlight -- Mr. Doyle, is it okay to read

3   the text into the record?

4            MR. DOYLE:  The text is fine, if we could just have,

5   this is on the private screen now.  Yes.  The text is fine.

6   Q.  Does the first paragraph on this page, sir, indicate that

7   this is the backup model that's going to be used?

8   A.  Yes.  Am I allowed to read text?

9   Q.  You can read text, yes.

10  A.  Yes, it says in the event of the viscometer equipment

11  failure or the inability to obtain accurate viscosity readings,

12  the reaction end point may be determined using the alternative

13  method described below.

14  Q.  What is the alternative method that's described?

15  A.  It is simply the time and temperature relationship for the

16  reaction of HBr acetic acid that will depolymerize and

17  deprotect the first protected intermediate.

18  Q.  And if we turn to table 2 on the private screen on 1630955,

19  what's generally described in this table?  The next page,

20  please, Mr. Chase, the table, not the graph.  Thank you.

21  A.  This table is the complement of the one that we looked at a

22  moment ago.  In the left hand column, again, is a column of

23  temperatures, I won't specify the range, but they are the same

24  temperatures as before, and they are in increments of two

25  tenths of a degree as before.  This time instead of being

1  paired with the viscosities, they are being paired with the

2  number of hours that would indicate the end point of the step 2

3  reaction.

4  Q.  Dr. Gokel, in your opinion if Sandoz used the first process

5  using the viscometer as described in this report, would they

6  have a predetermined time and temperature as the Court has

7  construed the terms?

8  A.  Yes, they would.

9  Q.  And if Sandoz used the second model with the time and

10  temperature table, would Sandoz have a predetermined time and

11  temperature as determined by the Court?

12  A.  Yes, they would.

13  Q.  And if Sandoz used the process that had the primary

14  viscometer model and the backup time temperature model, would

15  they have a predetermined time and temperature as construed by

16  the Court?

17  A.  Yes, they would.

18  Q.  Have you looked at some documents about how Sandoz

19  constructed these models?

20  A.  Yes, I have.

21  Q.  Did they use test reactions, sir, as the Court has

22  construed the term?

23  A.  Yes, they did.

24  Q.  Could you turn to PTX 923 in your notebook?  And there's a

25  923R for this as well, your Honor.  I think we've got all the

199FTEV1                          Gokel - direct

1   redactions down on this one.

2          THE COURT:  Okay.

3   Q.  Do you recognize PTX 923, Dr. Gokel?

4   A.  Yes, I do.  It's a laboratory notebook from Momenta.

5          MR. WIESEN:  Your Honor, plaintiffs offer PTX 923 into

6   evidence.

7          MR. DOYLE:  No objection, your Honor.

8          THE COURT:  Admitted.

9          (Plaintiff's Exhibit PTX 923 received in evidence)

10  Q.  If you could turn to MMP01694006.  If you pull out the top

11  part, it's still not going to be very legible, but -- and this

12  is the redacted page.  Dr. Gokel, could you just briefly

13  describe what this page shows?

14  A.  Yes.  This is a notebook page that is a summary of a number

15  of different reactions that were run.  Reaction samples were

16  taken at different times and different temperatures in order to

17  create the viscosity profile that was shown in table A and of

18  course, sorry, in table 1, and of course it also gives us the

19  time numbers that are present in table 2.

20  Q.  So although it's difficult to see if we look along the

21  colored boxes on the left-hand side, do these represent

22  experiments at different times and temperatures?

23  A.  Yes, they do.  The colored portion on the left sort of says

24  what, and then time and the ultimate molecular weight are shown

25  in the next two columns.

1  Q.  And without getting into the details, do these represent in

2  your opinion the test reaction that Sandoz and Momenta ran to

3  build the models we just looked at?

4  A.  Yes, I believe that's what they are.

5  Q.  And if you could turn just to one other page, 1691407 in

6  this notebook.

7  A.  1694107?

8  Q.  Yes, sir.

9  A.  I have it.

10              (Continued next page)

1    BY MR. WIESEN:

2    Q.  Yes, sir.

3    A.  I have it.

4    Q.  And does this table simply show using the data on the prior

5    page to generate the models using a computer program?

6    A.  That's my understanding.

7    Q.  Sir, based on your analysis of Sandoz's and Momenta's

8    documents, have they used test reactions to predetermine the

9    time and temperature of the step-two depolymerization step?

10   A.  Yes, they have.

11   Q.  Thank you.  I want to turn very quickly to whether Mylan

12   has time and temperature predetermined by test reaction.

13              MS. BLOODWORTH:  Your Honor, if I may interrupt just

14   one moment.  I think we might be served by a five minute break

15   for reason to talk about some of the confidentiality issues

16   that we think is a lot easier to Dr. Gokel, if we do.

17              THE COURT:  Okay.  Five minutes.

18              MR. WIESEN:  Thank you, your Honor.

19              (Recess)

20              (Pages 440 to 443 are filed under seal by order of the

21   Court)

22

23

24

25

1           (In open court)

2           THE LAW CLERK:  All rise

3           THE COURT:  Please be seated.

4           Go ahead, Mr. Wiesen.

5           MR. WIESEN:  Thank you, your Honor.

6    Q.  Turning to Mylan's process, Dr. Gokel, do you have an

7    opinion as to whether Mylan's proposed process in their ANDA

8    would meet the predetermined, the time and temperature

9    predetermined by a test reaction limitation?

10   A.  Yes, I do.

11   Q.  What is your opinion, sir?

12   A.  I believe that it does.

13   Q.  If you could turn to PTX-321 in your binder.

14          MR. WIESEN:  And, your Honor, it may make sense to

15   just leave these pages on the private screens in case the

16   particular details are contained somewhere within a list of

17   numbers.

18          THE COURT:  That's fine.

19   Q.  Do you recognize this document as a portion of Mylan's ANDA

20   that you reviewed, sir?

21   A.  Yes, I do.

22          MR. WIESEN:  And there is, there will be, if there is

23   not yet, an redacted version of the document as well, your

24   Honor.

25          THE COURT:  Okay.

1          MR. WIESEN:  We'd offer PTX-321 in evidence.

2          MR. ANSTAETT:  No objection, your Honor.

3          THE COURT:  All right, admitted.

4          (Plaintiff's Exhibit PTX-321 received in evidence)

5     Q.  If you could turn, sir, to page MYL-645.

6     A.  Yes, I have it.

7     Q.  And if you could read into the record the title of this

8     page?

9     A.  The title of the page?

10    Q.  Of the -- highlight that title lower down.

11         If you could just read the first title into the

12    record, please?

13    A.  Yes.  The title is "Effect of debenzylation reaction time

14    and temperature on the molecular weight."

15    Q.  And do you have an understanding, sir, what's described on

16    pages MYL-645, 646 and 647?

17    A.  Yes.  For any given chemical reaction -- and this one

18    refers to the debenzylation and depolymerization step with HBr

19    acetic acid, for any given chemical reaction, one needs to know

20    how long it takes at a particular temperature to get the

21    desired result.  And so these are studies to determine that.

22    Q.  And if we look at the method section on MYL-645, what

23    attribute is being altered in this experiment?

24    A.  On the third line at the very end it specifies a particular

25    time and hours.  Can I say that time or --

1   Q.  Don't.

2   A.  Okay, particular.

3   Q.  Avoid saying the actual times and temperatures, please.

4   A.  Okay, I understand.  Particular time.

5         And the reaction was then conducted at a variety of

6   temperatures over a certain range that's specified here, and

7   then the products were obtained and analyzed.

8         And from that information, they know how long to --

9   they know at what temperature to run the reaction if they're

10  going to run it for 17 hours.

11  Q.  And if you turn to MYL-648, sir?

12  A.  Yes, I have it.

13  Q.  What is the experiment described here, generally?

14  A.  This is the debenzylation reaction time on the molecular

15  weight.

16  Q.  And if we look at the third line under method, what

17  attribute is being altered or experimented with?

18  A.  Yes.  This is, this is the same kind of information that we

19  saw before, except here the time is held constant and the

20  number of hours is varied, because --

21  Q.  And, sir, you said the time is held constant and the number

22  of hours is varied.  Is that what you meant?

23  A.  H'mm.  No.  Sorry.  The temperature is held constant at a

24  particular value, and then the time is varied because the

25  success of a reaction has as variables both time and

1    temperature.

2    Q.  And do you have an understanding, sir, whether Mylan used,

3    Mylan and Natco used these experiments to set the time and

4    temperature for their step-two debenzylation deprotection

5    reaction?

6    A.  That's my understanding, yes.

7    Q.  And based on these experiments, do you have an opinion

8    whether their time and temperature are predetermined by test

9    reaction?

10   A.  Yes, based on these experiments, they have determined both

11   time and temperature.

12          MR. WIESEN:  And, your Honor, we can point out later

13   in which document the particular time and temperature are

14   stated.  It's actually PTX-321, on MYL-262, but we'll, subject

15   to the stipulation, we don't need to ask Dr. Gokel any

16   questions concerning that.

17          THE COURT:  All right.  Fine.

18   Q.  Thank you, Dr. Gokel.  Just one other set of questions, I

19   believe.

20          I want to focus for a minute now on the limitations of

21   the claims in the patents-in-suit.

22          Dr. Gokel, you were in attendance at trial when Dr.

23   Lisak and Grant testified earlier this week, is that right?

24   A.  I was.

25   Q.  And you have an understanding as to which claims of the

199ztev2b                    Gokel - direct

1    patents-in-suit plaintiffs are asserting against the Sandoz and

2    Mylan defendants?

3    A.  Yes, I do.

4    Q.  Based on your analysis and hearing the other testimony in

5    the case, have you formed opinions as to whether Sandoz's

6    proposed generic product and the process for making it meet the

7    limitations of the asserted claims of the patents-in-suit?

8    A.  Yes, I have formed such a conclusion.

9    Q.  And what are your opinions, sir?

10   A.  I believe the limitations of the asserted claims are met.

11   Q.  And have you formed opinions as to whether Mylan and

12   Natco's proposed generic glatiramer acetate and the process for

13   making it meet the limitations of the asserted claims in the

14   patents-in-suit?

15   A.  Yes, I believe it does.

16   Q.  Thank you.  If we can have slide 101, please.

17          Dr. Gokel, we've put up on the screen the limitations

18   from U.S. patent number 5,800,808.  I want to ask your opinions

19   and the basis for the various limitations on whether they're

20   met.

21          Do you have an opinion, sir, whether Sandoz and

22   Mylan's proposed ANDA products and ANDAs meet the limitations

23   of method of manufacturing co-polymer-1 comprising reacted

24   protected copolymer-1, with hydrobromic acid to form

25   trifluoroacetyl co-polymer-1, treating said trifluoroacetyl

1  co-polymer-1 with aqueous piperidine solution to form

2  co-polymer-1, and purifying said co-polymer-1?

3  A.  Yes.

4  Q.  And what's the basis for that opinion, sir?

5  A.  The basis is all of the discussion that I've just been

6  through yesterday afternoon and today in my direct testimony.

7  Q.  And do you also have an opinion, sir, whether the resulting

8  product would be to result in copolymer-1 having a molecular

9  weight of about five to nine kilodaltons?

10 A.  Yes.  Dr. Grant so testified.

11 Q.  And based on that, sir, do you have an opinion whether

12 Sandoz and Momenta's proposed ANDA products and ANDAs would

13 infringe claim one of the 5,800,808 patent?

14 A.  Yes, I believe it would.

15 Q.  Do you have next slide please?  Turning then to U.S. patent

16 number 5,981,589, do you have an opinion whether Sandoz and

17 Momenta's ANDAs and proposed products would meet the limitation

18 of co-polymer-1 having a molecular weight of about five to nine

19 kilodaltons?

20 A.  Based on Dr. Grant's testimony, yes.

21 Q.  And do you have an opinion, sir, whether that co-polymer-1

22 is made by a process comprising systems of reacting protected

23 co-polymer-1 with hydrobromic acid to form trifluoroacetyl

24 co-polymer-1, treating said trifluoroacetyl co-polymer-1 with

25 aqueous piperidine solution to form co-polymer-1, and purifying

1   said co-polymer-1 to result in co-polymer-1?

2   A.  Yes, I do.

3   Q.  And what's the basis for those opinions, sir?

4   A.  I've been through each of those steps, and I believe them

5   to infringe.

6   Q.  And do you have an opinion whether, after those

7   limitations, the resulting product would be having a molecular

8   weight of about five to nine kilodaltons?

9   A.  Yes.  Based on Dr. Grant's testimony, I believe so.

10  Q.  Do you have an opinion, sir, then whether Sandoz and

11  Momenta and Mylan and Natco proposed ANDA and ANDA products

12  would infringe claim one of the '589 patent?

13  A.  Yes, I believe it would -- they would.

14  Q.  The next slide, please.  Turning to U.S. patent number

15  6,048,898, do you have an opinion whether Sandoz and Momenta

16  proposed ANDAs and proposed ANDA products would meet the

17  limitation of methods of manufacturing co-polymer-1 of a

18  predetermined molecular weight profile comprising the steps of

19  selecting a predetermined molecular weight profile, reacting

20  protected co-polymer-1 with hydrobromic acid to form

21  trifluoroacetyl co-polymer-1, having the predetermined molecular

22  weight profile, wherein said reaction takes place for a time

23  and at a temperature predetermined by test reaction, and

24  treating said trifluoroacetyl co-polymer-1 having the

25  predetermined molecular weight profile with aqueous piperidine

1  solution to form co-polymer-1, having the predetermined

2  molecular weight profile?

3  A.  Yes.

4  Q.  What's your opinion, sir?

5  A.  My opinion is that both Sandoz and Mylan meet that claim

6  limitation.

7  Q.  And, sir, just to make sure the record is clear, I may have

8  misspoken and said Sandoz Momenta and Sandoz and Mylan

9  sometimes.  Do you have an opinion whether both ANDAs meet the

10  claim limitations and asserted claims we've reviewed so far?

11  A.  Yes, I do.

12  Q.  And what's your opinion?

13  A.  My opinion is that Sandoz and Mylan both meet those

14  limitations.

15  Q.  Thank you.  If we go to claim two of the '898 patent.  Do

16  you have an opinion, sir, whether Sandoz and Mylan's proposed

17  ANDAs and ANDA products meet the limitation of the method of

18  claim one, wherein said protected co-polymer-1 is reacted with

19  hydrobromic acid for about ten to 50 hours at a temperature of

20  about 20 to 28 degrees Celsius?

21  A.  Yes.

22  Q.  And what's the basis for that, sir?

23  A.  I went through the reaction sequences and it showed this.

24  Q.  And looking at claim three of the '898 patent focusing only

25  on Mylan's ANDA and not on Sandoz's ANDA, do you have an

opinion whether the method of claim two, wherein said protected

co-polymer-1 is reacted with hydrobromic acid for about 17

hours at a temperature of about 26 degrees Celsius, is that by

Mylan's proposed ANDA and ANDA product?

A.  Yes, I do.

Q.  And what is your opinion, sir?

A.  My opinion is that it meets this limitation, although we

didn't actually say the numbers.

          MR. WIESEN:  And, your Honor, just to be clear, the

last one is actually now met by the stipulation that was

entered.

          THE COURT:  All right.

Q.  If we go to the next slide, please, U.S. patent number

6,054,430.  Dr. Gokel, do you have an opinion whether the

asserted claims in these patents are met by Sandoz and Mylan's

ANDAs?

A.  Yes, I do.

Q.  Do you have an opinion, sir, or what's your opinion, sir,

concerning whether Sandoz and Mylan's ANDAs meet the limitation

co-polymer-1 having over 75 percent of its molar fraction

within the molecular weight range from about two kilodaltons to

about 20 kilodaltons?

A.  My opinion is that both Sandoz and Mylan infringed, based

on Dr. Grant's testimony.

Q.  Do you have an opinion, sir, whether that co-polymer-1 is

1    prepared by a process comprising the steps of reactive

2    protected co-polymer-1 with hydrobromic acid to form

3    trifluoroacetyl co-polymer-1, having over -- I'll stop there for

4    the moment.  Do you have an opinion concerning those

5    limitations, sir?

6    A.   Yes.  That's the reaction sequence.

7    Q.   And is that based on your analysis?

8    A.   That's based on my analysis of their documents.

9    Q.   And would that co-polymer-1 be one having over 75 percent

10   of its molar fraction within the molecular weight range from

11   about two kilodaltons to about 20 kilodaltons?

12   A.   According to Dr. Grant's testimony, yes.

13   Q.   And would it be one, wherein said reaction takes place for

14   a time at a temperature predetermined by test reaction and

15   treating said trifluoroacetyl co-polymer-1?

16   A.   Yes, it would.

17   Q.   Do you have an opinion that those are Mylan and -- Mylan

18   and Sandoz ANDAs meet those limitations based on what, sir?

19   A.   My opinion that those claim limitations are met by the ANDA

20   product is based on my analysis of their synthetic sequences.

21   Q.   Do you have an opinion whether those products would be

22   having over 75 percent of its molar fraction within the

23   molecular weight range from about two kilodaltons to about 20

24   kilodaltons?

25   A.   Based on Dr. Grant's testimony, yes.

1   Q.  And do you, finally, have an opinion on claim one, sir,

2   whether that process would be with aqueous piperidine solution

3   to form co-polymer-1?

4   A.  Yes, both Sandoz and Mylan use aqueous piperidine in that

5   step.

6   Q.  And would the resulting product be one having over

7   75 percent of its molar fraction within the molecular weight

8   range from about two kilodaltons to about 20 kilodaltons?

9   A.  According to Dr. Grant's testimony, yes.

10  Q.  And, sir, finally, then do you have an opinion whether

11  claim one of the 430 would be infringed by Sandoz and Mylan's

12  proposed ANDA products and ANDAs?

13  A.  Yes, I do.

14  Q.  And what's your opinion?

15  A.  My opinion is that both infringe.

16  Q.  Turn to claim two of the '430 patent.  Do you have an

17  opinion, sir, whether the co-polymer-1 of claim one, wherein

18  said protected copolymer-1 also reacted with hydrobromic acid

19  for about ten to 50 hours at a temperature of about 20 to

20  28 degrees Celsius is met by Sandoz and Mylan's proposed ANDA

21  and ANDA products?

22  A.  Yes, I do.  And that's based on my analysis of the

23  synthetic documents.

24  Q.  And focusing on claim three, in looking only at Mylan's

25  ANDA, do you have an opinion whether it meets the limitation

1    copolymer-1 of claim one, wherein said protected copolymer-1 is

2    reacted with hydrobromic acid for about 17 hours at a

3    temperature of about 26 degrees Celsius?

4    A.   Yes, I do.

5    Q.   And what's your opinion?

6    A.   I believe that claim limitation is met by Mylan.

7    Q.   And, sir, do you have an opinion, sir, whether Mylan's

8    proposed ANDA meets asserted claims one, two and three of the

9    '430 patent?

10   A.   Yes, I do.  I believe they do.

11   Q.   And do you have an opinion whether Sandoz's proposed ANDA

12   meets claims one and two of the '430 patent?

13   A.   Yes, I believe they do.

14   Q.   Go to the next slide.  Another long claim.

15         Look at claim one of 6,342,476.  Do you have an

16   opinion, sir, whether Sandoz and Mylan's proposed ANDA and ANDA

17   products would meet the limitation, a method for treating

18   Multiple sclerosis, comprising administering to a subject in

19   need thereof, pharmaceutically effective amount?

20   A.   According to Dr. Lisak's testimony, yes.

21   Q.   And would those limitation be met?

22   A.   Yes, they would.

23   Q.   Do you have an opinion, sir, whether Sandoz and Mylan's

24   proposed ANDA and ANDA products would meet the limitation of a

25   copolymer-1 fraction, wherein said fraction contains less than

1   5 percent of species of copolymer-1 having a molecular weight

2   of over 40 kilodaltons, and wherein over 75 percent of said

3   copolymer-1 in said fraction is within a molecular weight range

4   of about two kilodaltons to about 20 kilodaltons?

5   A.  Yes, I do.

6   Q.  What's your basis -- what is your opinion, sir?

7   A.  My opinion is that this limitation is met.  The copolymer

8   fraction is certainly there, and according to Dr. Grant's

9   testimony, it is distributed in the molecular weight as

10  indicated here.

11  Q.  And that's for both ANDAs?

12  A.  Yes, it is.

13  Q.  Thank you.  Do you have an opinion, sir, whether the

14  limitations were in said copolymer-1 fractions prepared by a

15  process comprising the steps of reacting protected copolymer-1

16  with hydrobromic acid to form trifluoracetyl copolymer-1 are

17  met?

18  A.  Yes, I do.

19  Q.  And what is your opinion, sir?

20  A.  I believe those limitations are met.

21  Q.  And what is that based on?

22  A.  That's based on my analysis of their synthetic documents.

23  Q.  And do you have an opinion whether Sandoz and Mylan's

24  proposed ANDAs meet the limitation having over 75 percent of

25  its molar fraction within the molecular weight range from about

1  two kilodaltons to about 20 kilodaltons?

2  A.  According to, and based on Dr. Grant's testimony, yes.

3  Q.  Do you have an opinion, sir, whether the limitations

4  wherein said reaction takes place for a time and at a

5  temperature predetermined by test reaction and treating said

6  trifluoracetyl co-polymer-1 are met by Sandoz and Mylan's ANDA

7  and ANDA products?

8  A.  Yes, I believe they're met, and I showed examples in the

9  synthetic testimony that I gave.

10 Q.  And do you believe the limitation having over 75 percent of

11 it molar fraction within the molecular weight range from about

12 two kilodaltons to about 20 kilodaltons is met, sir?

13 A.  Based on Dr. Grant's testimony, I do.

14 Q.  And what is your opinion?

15 A.  My opinion is that that claim limitation is met.

16 Q.  Do you an opinion whether the limitation with aqueous

17 piperidine solution to form copolymer-1 is met?

18 A.  Yes, I do.  Both Sandoz and Mylan use aqueous piperidine.

19 Q.  And finally on claim one of the '466, do you have an

20 opinion whether Mylan and Sandoz's proposed ANDA products would

21 meet the limitation having over 75 percent of its molar

22 fraction within the molecular weight range from about two

23 kilodaltons to about 20 kilodaltons?

24 A.  Yes.  According to Dr. Grant's testimony, I believe this

25 claim limitation is met.

Q.  Based on this analysis, sir, do you have an opinion whether
Sandoz and Mylan's proposed ANDA and ANDA products meet claim
one of the '476 patent?

A.  Yes, I believe they do.

Q.  Go to the next slide, please.  Looking at claim one of U.S.
patent number 6,362,161, sir.  Do you have an opinion whether
Sandoz and Mylan's proposed ANDAs meet the following
limitations, composition for the treatment of must multiple
sclerosis, comprising a pharmaceutically effective amount?

A.  According to Dr. Lisak's testimony, they do.

Q.  Do you have an opinion, sir, whether they meet the
limitation of co-polymer-1 fraction, wherein said fraction
contains less than 5 percent of species of copolymer-1 having a
molecular weight of over 40 kilodaltons, and wherein over
75 percent of said co-polymer-1 in said fraction is within a
molecular weight range of about two kilodaltons to about 20
kilodaltons?

A.  Yes, I do.

Q.  What is your opinion, sir?

A.  That they have a co-polymer-1 fraction I demonstrated in my
synthetic discussion, and the molecular weight information is
based on Dr. Grant's testimony.

Q.  Do you have an opinion, sir, whether Sandoz and Mylan's
proposed ANDA and ANDA products meet limitations wherein said
co-polymer-1 fraction is prepared by a process comprising the

1    steps of reacting protected copolymer-1 with hydrobromic acid

2    to form trifluoracetyl co-polymer-1?

3    A.   Yes, I do.

4    Q.   What is?

5    A.   I showed experiment sequences that demonstrated that.

6    Q.   Do you have an opinion, sir, whether Sandoz and Mylan's

7    proposed ANDA and ANDA products meet the limitation having over

8    75 percent of its molar fraction within the molecular weight

9    range from about two kilodaltons to about 20 kilodaltons?

10   A.   Based on Dr. Grant's testimony, I believe that limitation

11   is met.

12   Q.   And do you have an opinion, sir, whether Sandoz and Mylan's

13   proposed ANDA and ANDA products meet the limitation wherein

14   said reaction takes place for a time and at a temperature

15   predetermined by test reaction and treating said trifluoracetyl

16   copolymer-1?

17   A.   Yes.  I just discussed the time and temperature

18   predetermination a few minutes ago.

19   Q.   And do you have an opinion that those limitations are met

20   by Sandoz and Mylan's ANDA and ANDA products?

21   A.   Yes, I do.  And my opinion is that they are met.

22   Q.   Do you have an opinion whether the limitation having over

23   75 percent of its molar fraction within the molecular weight

24   range from about two kilodaltons to about 20 kilodaltons is

25   met?

1  A.  According to Dr. Grant's testimony, yes.

2  Q.  And do you have an opinion, sir, whether limitation with

3  aqueous piperidine solution to form copolymer-1 is met?

4  A.  Yes.  I showed that both Sandoz and Mylan approaches use

5  aqueous piperidine in their deprotection step.

6  Q.  Finally, I think the last limitation is actually the same

7  as the 12 lines from there.

8       Do you have an opinion about whether Sandoz and

9  Mylan's proposed ANDA and ANDA products meet the limitation

10 having over 75 percent of its molar fraction within the

11 molecular weight range from about two kilodaltons to about 20

12 kilodaltons?

13 A.  According to Dr. Grant's testimony, yes.

14 Q.  And, sir, based on this analysis, do you have an opinion

15 whether claim one of the 161 patent is met by Sandoz and

16 Mylan's proposed ANDA and ANDA products?

17 A.  Yes.  My opinion is that the limitations of claim one are

18 met by both Sandoz and Mylan.

19 Q.  Go to the next slide, please.  Turning to the '847 patent,

20 sir.  Looking at claim one.  Do you have an opinion whether

21 Sandoz and Mylan's proposed ANDA and ANDA products meet the

22 limitation copolymer-1 having a molecular weight of about four

23 to about nine kilodaltons?

24 A.  According to Dr. Grant's testimony, yes.

25 Q.  So those limitations are met, sir?

1   A.   Yes, I believe those limitations are met according to Dr.

2   Grant's testimony.

3   Q.   Are the limitations made by a process comprising treating

4   trifluoracetyl copolymer-1 with aqueous piperidine to form a

5   solution of copolymer-1 and purifying copolymer-1, thereby

6   producing copolymer-1, met by Mylan and Sandoz proposed ANDA

7   and ANDA products?

8   A.   Yes.  I went through both of their sequences and showed

9   that those limitations are met by both Sandoz and Mylan.

10  Q.   And is the limitation in claim one of the '847 having a

11  molecular weight of about four to about nine kilodaltons met by

12  Sandoz and Mylan's proposed ANDA and ANDA products?

13  A.   According to the testimony of Dr. Grant, that limitation is

14  met by both Sandoz and Mylan.

15  Q.   Turn to claim six of the '847, do you have an opinion

16  whether limitations of this claim are met?

17  A.   Yes, I do.

18  Q.   What is your opinion?

19  A.   My opinion is that the claim limitations are met.

20  Q.   Turning specifically to the claim.  Do you have an opinion,

21  sir, whether Mylan and ANDA -- Mylan and Sandoz proposed ANDA

22  and ANDA products meet the limitations copolymer-1 made by the

23  process of claim one, wherein the process further comprises

24  adding acetic acid subsequent to the treating step?

25  A.   Yes, I believe that claim limitation is met by both, and we

1    showed portions of their batch records indicating the use of

2    acetic acid in each case.

3    Q.   Based on this analysis, sir, do you have an opinion whether

4    claims one and six of the '847 patent are infringed by Sandoz

5    and Mylan's proposed ANDA and ANDA products?

6    A.   Yes, I do.  I believe all of the limitations are met for

7    both claims by both defendants.

8    Q.   Turning to U.S. patent number 6,939,539.  Do you have an

9    opinion whether the asserted claims of these patents are met

10   sir?

11   A.   Yes, I do.

12   Q.   What is your opinion?

13   A.   My opinion is that these claims are met by both Sandoz,

14   these claim limitations are met by both Sandoz and Mylan.

15   Q.   And turning specifically to the limitations of the '539

16   patent, claim one.  Do you have an opinion whether Sandoz and

17   Mylan's ANDA and ANDA products would meet the limitations

18   copolymer-1 composition comprising a mixture of polypeptides,

19   composed of glutamic acid, lysine, alanine and tyrosine?

20   A.   Yes, I do.

21   Q.   What is your opinion?

22   A.   I believe that the product, the co-polymer-1 composition

23   and in both cases Sandoz and Mylan meets this claim limitation

24   of having those four amino acids.

25   Q.   Do you have an opinion or, sorry, let me start again.  Do

1   you have an opinion whether the limitation wherein the mixture

2   has an average molecular weight of about four to about nine

3   kilodaltons is met, sir?

4   A.  I do.  According to Grant's, to Dr. Grant's testimony, it

5   is, by both defendants.

6   Q.  Do you have an opinion, sir, whether the limitation wherein

7   the mixture of polypeptides is non-uniform with respect to

8   molecular weight and sequence, is met by Mylan and Sandoz's

9   proposed ANDA and ANDA products?

10  A.  Yes, I believe that limitation is met as I demonstrated in

11  the synthetic sequences.

12  Q.  Finally, for claim one, do you have an opinion whether the

13  limitation and wherein the composition is suitable for treating

14  Multiple sclerosis is met by Sandoz and Mylan's proposed ANDA

15  and ANDA products?

16  A.  According to Dr. Lisak's testimony, this limit is met by

17  both Sandoz and Mylan.

18  Q.  Turning to pendent claim eight of the '539 patent, do you

19  have an opinion whether the composition of claim one -- whether

20  this claim is met, sir?

21  A.  Yes, I do.

22  Q.  What's your opinion?

23  A.  My opinion is that it is met by both defendants.

24  Q.  Turning specifically to the limitation, the limitations of

25  the composition of claim one, wherein less than 2.5 percent of

1    the polypeptides of the mixture on a molar fraction basis have

2    a molecular weight of over 40 kilodaltons met by Mylan and

3    Sandoz's proposed ANDA and ANDA products?

4    A.   Yes.  The composition is as described above, and that

5    limitation is met.  According to Dr. Grant's testimony, the

6    molecular weight limitations are also met by both defendants.

7    Q.   Turning to claim nine.  Are the limitation, the composition

8    of claim eight, wherein over 75 percent of the polypeptides of

9    the mixture, on a molar fraction basis, have a molecular weight

10   in a range of about two kilodaltons to about 20 kilodaltons,

11   met by Sandoz and Mylan's proposed ANDA and ANDA products?

12   A.   Yes, the composition is as I described before, and

13   according to Dr. Grant's testimony, this molecular weight

14   limitation is met as well by both defendants.

15   Q.   Turning to claim ten.  Are the limitations, the composition

16   of claim nine, wherein the mixture has an average molecular

17   weight of 6.25 to 8.4 kilodaltons, in your opinion, met by

18   Sandoz and Mylan's proposed ANDA and ANDA products?

19   A.   According to Dr. Grant's testimony, both claim limitations

20   are met by both defendants.

21   Q.   Turning to claim 12.  Are the limitation pharmaceutical

22   composition comprising of a dose therapeutically effective to

23   treat Multiple sclerosis of a copolymer-1 composition, met by

24   the Sandoz and Mylan ANDA and ANDA products?

25   A.   It is a pharmaceutical composition.  I suppose that's

199ztev2b                    Gokel - direct

1    agreed.

2             The therapeutically effective dose, I believe, is met,

3    according to Dr. Lisak's testimony, and it is a copolymer-1

4    composition as I demonstrated by the synthetic sequences, so I

5    believe all the limitations are met.

6    Q.  If we actually turn to the next slide, we're going to

7    continue with claim 12 of the '539 patent.

8             MR. WIESEN:  We're almost done, your Honor.

9    Q.  Are the limitations, wherein the copolymer-1 composition

10   comprises a mixture of polypeptides, composed of glutamic acid,

11   lysine, alanine and tyrosine, met by the proposed ANDA and ANDA

12   products of Sandoz and Mylan?

13   A.  Yes.  The copolymer-1 composition I showed by the

14   experimental documents is as defined here, and the limitations

15   are therefore met by both Sandoz and Mylan.

16   Q.  And is the limitation, wherein the mixture has an average

17   molecular weight of about four to about nine kilodaltons, met

18   by the proposed ANDA and ANDA products of Mylan and Sandoz?

19   A.  According to Dr. Grant's testimony, it is.

20   Q.  Finally on claim 12, are the limitations wherein the

21   mixture of polypeptides is non-uniform with respect to

22   molecular weight and sequence and a pharmaceutically acceptable

23   recipient, met by the proposed ANDAs of Sandoz and Mylan?

24   A.  Yes.  The polypeptides being non-uniform with respect to

25   molecular weight in sequence is something that I demonstrated

1    in the synthetic analyses, and both Sandoz and Mylan meet that

2    limitation.

3    Q.   Turning to claim 23 of the '539 patent.  Is the limitation

4    a method for treating a patient suffering from Multiple

5    sclerosis comprising administering to a patient in need thereof

6    the pharmaceutical composition of claim 12, met by Sandoz and

7    Mylan's proposed ANDA and ANDA products?

8    A.   According to Dr. Lisak,'s testimony, it is for both of the

9    defendants.

10   Q.   Turning to claim 30, the limitation a method of treating a

11   patient suffering from Multiple sclerosis comprising

12   administering to a patient in need thereof, met by the proposed

13   ANDA and ANDA products?

14   A.   According to Dr. Lisak's testimony, both defendants meet

15   that limitation.

16   Q.   And the last limitations, the pharmaceutical composition of

17   claim 19, and we've included that because claim 19 is not

18   actually asserted, so let my read that into the record as well.

19         The pharmaceutical composition of claim 12, wherein

20   less than 2.5 percent of the polypeptides of the mixture on a

21   molar fraction basis have a molecular weight of over 40

22   kilodaltons, are those limitations met by the proposed ANDA and

23   ANDA products of Mylan and Sandoz?

24   A.   Yes.  According to Dr. Grant's testimony, they are.

25   Q.   Turning to claim 31.  Are the limitations a method for

treating a patient suffering from Multiple sclerosis comprising

administering to a patient in need thereof, met by the proposed

ANDA and ANDA products of Sandoz and Mylan?

A.   Yes.   Dr. Lisak testified that those limitations were met

by both defendants.

Q.   Turning to the last limitation of claim 31, which is the

pharmaceutical composition of claim 20, which we've also

included, and it reads.   The pharmaceutical composition of

claim 19, wherein over 75 percent of the polypeptides of the

mixture on a molar fraction basis have a molecular weight in a

range of about two kilodaltons to about 20 kilodaltons, are

those limitations melt, in your opinion, sir, by Sandoz and

Mylan's proposed ANDA and ANDA products?

A.   They are met by Sandoz and Mylan, according to Dr. Grant's

testimony.

Q.   Based on this analysis, sir, do you have an opinion whether

the asserted claims of the '539 patent are met by Sandoz and

Mylan's proposed ANDA and ANDA products?

A.   Yes.   I believe the asserted claims of the '539 patent are

met by both defendants.

Q.   We have the next slide, please, and I believe this is the

last asserted patent, 7,199,098.

        Do you have an opinion, sir, whether Sandoz and Mylan

proposed ANDAs meet the limitations copolymer-1 composition

comprising a mixture of copolymers of alanine, glutamic acid,

1    lysine and tyrosine, the copolymer-1 species in the mixture

2    being non-uniform with respect to molecular weight and

3    sequence?

4    A.   Yes, I described their synthetic documents, and that from

5    those I conclude that those limitations are met by both

6    defendants.

7    Q.   Do you have an opinion, sir, whether the limitations

8    wherein over 75 percent of the copolymers in the mixture on a

9    molar fraction basis have a molecular weight in the range of

10   two kilodaltons to 20 kilodaltons, and less than 5 percent of

11   the copolymers have a molecular weight above 40 kilodaltons, is

12   met?

13   A.   According to Dr. Grant's testimony, both defendants meet

14   this limitation.

15   Q.   Finally, do you have an opinion whether the limitation,

16   wherein the composition is suitable for treating Multiple

17   sclerosis is met by Sandoz and Mylan's proposed ANDA and ANDA

18   products?

19   A.   According to Dr. Lisak's testimony, both defendants did

20   meet this limitation.

21   Q.   Turning to pendent claim eight of the '098 patent, do you

22   have an opinion, sir, whether the limitations, the composition

23   of claim one, wherein less than 2.5 percent of the copolymers

24   in the mixture have a molecular weight above 40 kilodaltons?

25   A.   Yes.  I described the composition of claim one, and Dr.

199ztev2b                    Gokel - direct

1    Grant testified that the other claim limitation was met by both

2    defendants.

3    Q.  And so, sir, do you have an opinion whether claims one and

4    eight of the '098 patent are infringed by Sandoz and Mylan's

5    proposed ANDA and ANDA products?

6    A.  Yes.  It's my opinion that both claim one and claim eight

7    of the '098 patent are infringed by both defendants.

8           MR. WIESEN:  And, your Honor, originally we had

9    asserted claim 19 of the '098 patent in the final pretrial

10   order.  We simply since identified to the defendants that we're

11   no longer asserting that claim, so it's not included here.

12          THE COURT:  Thank you.

13   Q.  Thank you, Dr. Gokel.

14          MR. WIESEN:  I have no further questions.

15          THE COURT:  All right.

16          MR. JONES:  May I approach, your Honor, to provide

17   some documents?

18          THE COURT:  Sure.

19          MR. JONES:  Thank you.

20   CROSS EXAMINATION

21   BY MR. ANSTAETT:

22          MR. ANSTAETT:  Your Honor, may I proceed?

23          THE COURT:  Yes.

24          MR. ANSTAETT:  Thank you.

25   Q.  Good morning, Dr. Gokel.

1   A.  Good morning.

2   Q.  I want to try to orient you to all the information you have

3   up there in front of you.  You still have your direct

4   examination binder, correct?

5   A.  Yes, I do.

6   Q.  And you've been given a cross-examination binder I believe

7   as well.  It's a bit smaller.  You see that?

8   A.  This one?

9   Q.  Should have your name on it.  It says cross-examination?

10  A.  In says expert reports and deposition transcripts.

11  Q.  That's correct.  I've given you a binder with your expert

12  reports from the Mylan case, as well as your deposition

13  transcript from that case.

14  A.  I seem to have everything.

15  Q.  All right.  And the last one is, you also have a copy of

16  Dr. Kent's expert report, his second expert report.  Do you see

17  that?

18  A.  I see it.

19  Q.  All right.  Doctor, please turn to PTX-499 in your

20  cross-examination binder, please.  And the PTX exhibits are in

21  the back of the cross-examination binder, so that's P as in

22  plaintiff.

23  A.  Yes, I have it.

24  Q.  All right.  If you look at page two of the exhibit, please.

25  And you've reviewed this article, haven't you, Doctor?

1    A.  Yes.

2    Q.  Mr. Wiesen talked about it with you in your direct

3    examination?

4    A.  Yes.

5    Q.  And this is the 1971 article that was published by the

6    Weizmann Institute Scientists first reported a discovery of

7    copolymer-1, correct?

8    A.  That's correct.

9    Q.  All right, it's from 1971?

10   A.  That's correct.

11   Q.  And so if I call this the Teitelbaum 1971 article, you'll

12   know what I'm talking about?

13   A.  Yes.

14   Q.  All right, I want you to look at table one, please.

15   A.  Yes I see it.

16   Q.  That table reports, the molar ratio of two batches of

17   copolymer-1, correct?

18   A.  Yes, it does.

19   Q.  Could you read the molar ratios for each of those batches,

20   please?

21   A.  Yes.  Batch one for the amino acids alanine, glutamic acid,

22   lysine and tyrosine, respectively it's 6.0:1.9:4.7:1.0.  And

23   for batch two, the same amino acids in the same order, show the

24   value 6.7:2.1:4.2:1.0.

25   Q.  All right.  So in batch one, for every 1.0 tyrosines, there

199ztev2b                    Gokel  - cross

1    are 6.0 alanines, 1.9 glutamic acids, and 4.7 lysines; is that

2    correct?

3    A.   That's the proportion of them that's present.

4    Q.   All right.  And the ratios for both batch one and batch two

5    there show a tyrosine content of 1.0, correct?

6    A.   That's correct.

7    Q.   Doctor, let me ask you to turn to DTX1335 in the

8    cross-examination binder?

9    A.   13?

10   Q.   1335?

11   A.   I have it.

12                  (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. ANSTAETT:

2    Q.  All right.  And you're familiar with the journal Nature?

3    A.  Yes.

4    Q.  That's a reputable journal in your field, correct?

5    A.  It's a what?

6    Q.  A reputable journal in your field, correct?

7    A.  It's reputable, yes.

8    Q.  Turn to the third page of the exhibit, I think it's 564 if

9    you look at the page numbers?

10   A.  I have 564.

11   Q.  Do you see at the bottom entitled protection against EAE?

12   A.  Yes.  It's actually spelled out.

13   Q.  Correct.  And this is one of the articles that you reviewed

14   in preparing your expert reports in this case, correct?

15   A.  I believe so.  If it's in my list of documents, I certainly

16   did.

17   Q.  Okay.  It is in your list of documents.  If you'd like to

18   check, I can point you to where that is.

19   A.  I believe you.  It's just that I don't have memorized all

20   the things that I reviewed.

21   Q.  Of course.  And so if I ask you if you've reviewed

22   something, you can let me know.

23          MR. ANSTAETT:  At this point, your Honor, I would move

24   admission of DTX 1335.

25          THE COURT:  Any objection?

1          MR. WIESEN:  No objection your Honor.

2          THE COURT:  All right, admitted.

3          (Defendant's Exhibit DTX 1335 received in evidence)

4   Q.   Would you turn to the last page of the exhibit please?  Do

5   you see the authors listed there including Drs. Titelbaum,

6   Arnon and Sela of the Weizmann Institute?

7   A.   I see that.

8   Q.   And Drs. Titelbaum Arnon and Sela are also three of the

9   four of the the inventors of all the patents here, correct?

10  A.   I believe that's correct.

11  Q.   Do you see that was submitted in 1972?

12          (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Doctor, I'm going to ask you a couple of questions that you

2    already answered before, just so the record is complete, make

3    sure we have the transcript.

4            You saw that this publication was submitted in 1972,

5    correct?

6    A.  Yes.

7    Q.  All right.  I'm going to ask you to again turn back one

8    page to page number 565, and look at the top of the page and

9    the first column.  And do you see that the authors are

10   describing a molar ratio for copolymer-1?

11   A.  Yes.

12   Q.  Molar ratio they describe is 6.0 to 1.9 to 4.7 to 1.0

13   correct?

14   A.  That's correct.

15   Q.  And that's the molar ratio, same molar ratio as batch one

16   in the Teitelbaum 1971 paper, correct?

17   A.  Yes, that's batch one.

18   Q.  All right.

19   A.  1971 paper, yes.

20   Q.  And here the authors mention only the molar ratio of

21   Teitelbaum batch one, correct?

22   A.  As far as I can see, without rereading the whole paper, I

23   believe that's what it says.

24   Q.  All right.  And the authors did not round the molar ratio

25   here to whole numbers, did they, Doctor?

1    A.  They present the numbers with single decimal point.

2    Q.  But two significant figures?

3    A.  Yes.

4    Q.  Please turn to DTX-1325 in your binder?

5    A.  DTX-1325?

6    Q.  D, as in defendant, yes, 1325?

7    A.  1325.  I have it.

8    Q.  All right.  Doctor, you see this is a publication from

9    1980?

10   A.  Yes.

11   Q.  It's in the transaction of the American Neurological

12   Association?

13   A.  Yes.

14   Q.  And, again, this is an article that you reviewed in

15   preparing your expert reports, correct, Doctor?

16   A.  I have seen it, yes.

17          MR. ANSTAETT:  All right, your Honor, I move admission

18   of DTX-1325?

19          MR. WIESEN:  No objection.

20          THE COURT:  Admitted.

21          (Defendant's Exhibit 1325 received in evidence)

22   Q.  Doctor, please turn to the third page of the exhibit, I

23   think it's page 348 if you're looking at the page numbers?

24   A.  I have it.

25   Q.  All right.  Here again you recognize the name of the

1    Weizmann scientists, Teitelbaum, Arnon and Sela, correct?

2    A.  Yes, I do.

3    Q.  All right and just beneath, just beneath their names, this

4    article again describes the molar ratio for copolymer-1 as 6.0

5    to 1.9 to 4.7 to 1.0, correct?

6    A.  Yes.  Again, that's the batch one from the 1971 paper.

7    Q.  All right.  And there is no report for batch two molar

8    ration in this paper, correct?

9    A.  Without reading it carefully, I could only say that that's

10   the only one I see.

11   Q.  All right.  And this molar ratio is not rounded to whole

12   numbers either, is it, Doctor?

13   A.  That's correct.

14   Q.  All right.  Please turn to DTX-1109 in your binder.

15   Doctor, we're looking at DTX-1109?

16   A.  Yes.

17   Q.  All right.  And this is a paper from the Journal

18   Immunological Review, is that correct?

19   A.  Yes.

20   Q.  And that's a paper that you reviewed in preparing your

21   expert reports, correct, Doctor?

22   A.  I believe so.

23        MR. ANSTAETT:  All right, your Honor, I move admission

24   of DTX-1109?

25        MR. WIESEN:  No objection, your Honor.

199ZTEV3A                    Gokel - cross

1                THE COURT:  Admitted.

2                (Defendant's Exhibit 1109 received in evidence)

3    Q.  And, Doctor, you recognize the name of the author on this

4    paper, a Dr. Arnon.

5    A.  Yes, I do.

6    Q.  She's on of the inventors on one of the patents-in-suit?

7    A.  Yes.

8    Q.  Scientist from the Weizmann Institute?

9    A.  Yes.

10   Q.  And this is a publication from 1981, correct?

11   A.  That's correct.

12   Q.  Turn to the page with the Bates number TEV-00030079,

13   please.

14   A.  I have it.

15   Q.  And do you see the heading, expressive activity of the

16   synthetic copolymers?

17   A.  Yes, I do.

18   Q.  And would you agree with me that in this paper, Dr. Arnon

19   reports that most of our work has been carried out on

20   co-polymer-1 in a molar ratio of 6.0 to 1.9 to 4.7 to 1.0?

21   A.  I would agree, I would agree that that's what this states.

22   Q.  All right.  And again that's the batch one molar ratio from

23   Teitelbaum 1971, correct?

24   A.  Yes, that's correct.

25   Q.  All right.  Doctor, please turn to DTX-1110 in your binder.

1   A.  I have it, DTX-1110.

2   Q.  Correct?

3   A.  Yes.

4   Q.  And this is an article on which Doctors Teitelbaum, Arnon

5   and Sela are also named as authors, correct?

6   A.  That's correct.

7   Q.  And if you look at the second page of at the bottom you'll

8   see that is a paper from 1982?

9   A.  Yes, I see that.

10  Q.  And it was published in Annals of Neurology?

11  A.  Yes.  Yes, that's correct.

12  Q.  And, Doctor, this was one of the articles you reviewed in

13  preparing your reports, correct?

14  A.  I believe.

15          MR. ANSTAETT:  All right, your Honor, I move admission

16  of DTX-1110?

17          MR. WIESEN:  No objection, your Honor.

18          THE COURT:  Admitted.

19          (Defendant's Exhibit 1110 received in evidence)

20  Q.  All right.  Doctor, please look at the first page, it's the

21  one with the Bates number ending in 166.  And do you see the

22  paragraph entitled "Materials and methods"?

23  A.  Yes, I see it.

24  Q.  All right.  And, again, this reports a molar ratio for

25  co-polymer-1?

1   A.  Yes, it does.

2   Q.  And that's the same 6.0 to 1.9 to 4.7 to 1.0 molar ratio as

3   in Teitelbaum batch one, correct?

4   A.  Yes, that's correct.

5   Q.  All right.  Doctor, please turn to PTX-31 in your binder.

6         MR. ANSTAETT:  And for the record, your Honor, this is

7   an exhibit that was entered into evidence in the July trial

8   during Doctor Arnon's direct examination?

9         THE COURT:  All right, it's admitted.

10  Q.  Are you there, Doctor?

11  A.  I am.

12  Q.  All right.  Please turn to the second page of the exhibit.

13  And you reviewed this article, correct?

14  A.  I believe so.

15  Q.  And this is an article that was published in 1987, correct?

16  A.  Yes.

17  Q.  And it reports the results of a pilot trial overseen by Dr.

18  Murray Bornstein in which co-polymer-1 was administered to

19  patients, correct?

20  A.  That's my understanding.

21  Q.  All right.  And you're aware that before Teva became

22  involved with co-polymer-1, it was the Weizmann Institute and

23  subcontractor Weizmann called Bio-Yeda that manufactured

24  co-polymer-1, right?

25  A.  I don't know the exact relationship of the companies and

1    the researchers.

2    Q.  So you don't know whether they were subcontractor, is that

3    what you're saying?

4    A.  Yes, I know that -- I know that Weizmann Institute people

5    Yeda and Teva were involved, but I don't know what their

6    relation was.

7    Q.  Okay.  Well, look at page 409 of the article, please,

8    Doctor.  It's the third page of the article.  And if you look

9    at the first column under preparation and characterization of

10   co-polymer-1; do you see that?

11   A.  Yes, I see it.

12   Q.  It says, cop-1 was first prepared by the Weizmann Institute

13   of Science, Rehovot, Israel, and later by the Bio-Yeda Company

14   in Rehovot, correct?

15   A.  Yes, I see that.

16   Q.  All right.  If you turn to page number 411 of PTX-31,

17   please.  And if you look at the second full paragraph at the

18   top of the first column.  Would you agree with me that the

19   Bornstein paper reports that patients in this clinical trial

20   were treated with co-polymer-1 supplied by the Weizmann

21   Institute or with co-polymer-1 supplied by Bio-Yeda?

22   A.  I would agree that that's what it says, here.

23   Q.  All right.  And please turn to page 408.  And the Bornstein

24   1987 paper reports a molar ratio for co-polymer-1 of 6.0 to 1.9

25   to 4.7, to 1.0, correct?

1  A.  That's what it says here.

2  Q.  All right.  Now, Doctor, please turn to PTX-597 in your

3  binder.

4       MR. ANSTAETT:  And, your Honor, this is an exhibit

5  that was admitted in the direct examination of Dr. Lisak.

6       THE COURT:  All right.

7  Q.  You were here for Dr. Lisak's testimony, correct, Doctor?

8  A.  Yes, I was.

9  Q.  Doctor, please turn to page three of PTX-597.  And at the

10  bottom of the page, do you see the date July 1995?

11  A.  I'm sorry, page three do you mean?

12  Q.  The third page of the exhibit?

13  A.  Oh, okay.  And what was the question, please?

14  Q.  Do you see the date July 1995 at the bottom of the page?

15  A.  I do.

16  Q.  All right.  This is from the Journal of Neurology?

17  A.  Yes.

18  Q.  And this article relates to a later clinical trial of

19  co-polymer-1, correct?

20  A.  That's my understanding.

21  Q.  And again this is the Johnson paper that Dr. Lisak

22  discussed in his direct examination?

23  A.  I believe that's so.

24  Q.  All right.  And if you look at the bottom of the first page

25  of the article, just following the abstract, do you see the

1  second sentence identifying Copaxone is the medication the

2  patients in the trial were treated with?

3  A.  Yes, I do.

4  Q.  All right.  And you recognize Copaxone as Teva's trade name

5  for co-polymer-1?

6  A.  Yes.

7  Q.  All right, please turn to page 1270 of that article.  If

8  you look at the second full paragraph.  Are you there?

9  A.  I'm sorry, what page?

10  Q.  I want you to look at page 1270?

11  A.  1270.  I have it.

12  Q.  All right.  And you're looking at the second full

13  paragraph?

14  A.  Conduct of the study?

15  Q.  No, the study medication.  And if it helps, it's up on the

16  screen.

17  A.  Yes, I have it.

18  Q.  All right.  And you agree with me that the medication in

19  this study was supplied by Teva, correct?

20  A.  It's stated here that the study medication was supplied by

21  Teva Pharmaceuticals.

22  Q.  All right.  Now, turn one page back, please, to page 1269

23  of the article?

24  A.  Yes.

25  Q.  And if you look at the first full paragraph on that page?

1   A.   Yes.

2   Q.   And the Johnson trial reports that the molar ratio for the

3   co-polymer-1 composition used in this clinical trial was 4.2 to

4   1.4 to 3.4 to 1.0, correct?

5   A.   That's what's written here.

6   Q.   And that's a different molar ratio than was reported in the

7   previous papers we looked at, correct?

8   A.   It's different from the molar ratios we've been quoting.

9   Q.   And this molar ratio tells you that for every 1.0

10  tyrosines, there are 4.2 alanines, 1.4 glutamic acids, and 3.4

11  lysines, correct?

12  A.   Yes, that's correct.

13  Q.   And that's a different molar ratio, for example, than the

14  molar ratio that was reported in the Bornstein 1987 paper,

15  isn't it?

16  A.   Numerically, it's a different molar ratio.

17  Q.   All right.  And we agree that the Bornstein 1971

18  copolymer-1 was manufactured by either the Weizmann Institute

19  for by Yeda, right?

20  A.   I believe we did agree that.

21  Q.   All right.  And we also agreed that the Johnson 1995

22  co-polymer-1 was manufactured by Teva?

23  A.   I believe so.

24  Q.   All right.

25  A.   It was supplied by Teva, I believe it said.

1  Q.  All right.  Now, Doctor, do you have any reason to doubt

2  the accuracy of the molar ratio reported in the Johnson paper

3  for co-polymer-1?

4  A.  I have no reason to doubt it or accept it.  It says what it

5  says.

6  Q.  All right.  Now, Dr. Kent is Mylan's expert; you know that,

7  right?

8  A.  Yes.

9  Q.  And he submitted a -- he submitted a second expert report

10  in this case, correct, that you reviewed?

11  A.  Yes.

12  Q.  And Dr. Kent calculated the molar ratio of Copaxone to be

13  4.5 to 1.5 to 3.6 to 1.0, correct?

14  A.  Could you show me where that is?

15  Q.  Sure.  You've got Dr. Kent's report up there, and if you

16  turn to pages 13 to 14, and it's paragraph 43, you can look in

17  table five, I believe you could see in table -- are you at

18  table five?

19  A.  I am.

20  Q.  And do you see where it says Copaxone molar ratio

21  calculated?

22  A.  Yes, I do.

23  Q.  And so Dr. Kent calculated the molar ratio for Copaxone as

24  for every 1.0 tyrosines, there were 4.5 alanines, 1.5 glutamic

25  acids and 3.6 lysines, correct?

486

199ZTEV3A              Gokel - cross

1   A.  Just a moment.  Could you repeat the question, please?

2   Q.  Sure.  Dr. Kent calculated the molar ratio for Copaxone in

3   which there was for every one tyrosine, 4.5 alanines, 1.5

4   glutamic acids and 3.6 lysines, correct?

5   A.  Yes, that's correct.

6   Q.  All right.  And the molar ratio reported for Copaxone in

7   the Johnson paper is very close to the mole ratio that Dr. Kent

8   calculated for Copaxone, correct?

9   A.  The mole ratio that's presented in the neurology paper is

10  close to that, yes.

11  Q.  All right.  Doctor, please turn to DTX-1999 in your binder?

12  A.  DTX-1999?

13  Q.  Correct.  And, Doctor, do you recognize the name of the

14  first author on this publication?

15  A.  Ruth Arnon, I do.

16  Q.  That's one of the inventors on the patents-in-suit?

17  A.  Yes.

18  Q.  And this is a paper that was published in the proceedings

19  of the National Academy Of Sciences or NAS, correct?

20  A.  That's correct.

21  Q.  And that's a reputable journal in your field, isn't it,

22  Doctor?

23  A.  Yes, it is.

24  Q.  And do you see that the article was published in October of

25  2004?

1    A.  I see that.

2    Q.  And if you look at the first sentence of the abstract, do

3    you see that refers to Copaxone?

4    A.  I see the Copaxone is written there, yes.

5    Q.  All right.  And if you could look at the first paragraph

6    after the abstract, and I want to focus your attention on the

7    fourth sentence in that paragraph.  And here Dr. Arnon is

8    reporting molar ratio for glatiramer acetate of 4.2 to 3.4 to

9    1.4 to 1.0, correct?

10   A.  That's correct.

11   Q.  And if we state that ratio in the same order as in the

12   Johnson paper, put the amino acids in the same order, that

13   would be a molar ratio of 4.2 alanines to 1.4 glutamic acids to

14   3.4 lysines for every 1.O. tyrosines, correct?

15   A.  That's my understanding.

16            MR. ANSTAETT:  And, your Honor, I move admission of

17   DTX-1999.

18            MR. WIESEN:  No objection, although I'm not sure there

19   is any evidence of Dr. Gokel has ever seen this document.

20            THE COURT:  Okay.  It's admitted.

21            (Defendant's Exhibit 1999 received in evidence)

22            THE COURT:  I'm sorry, where did you see the molar

23   ratio?

24            MR. ANSTAETT:  Yes, your Honor.

25            THE COURT:  What page was that?

199ZTEV3A                    Gokel - cross

1          MR. ANSTAETT:  It is on the first page, I believe, and

2     it's the first paragraph after the abstract.  And, Nick, maybe

3     we can bring that up a little bit larger?

4          THE COURT:  It's right on the first paragraph.  I see

5     it.  Thanks.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

199FTEV3B                    Gokel - cross

1   Q.  Now, Doctor, in every publication that we've looked at so

2   far that reports molecular weight for copolymer-1 or Copaxone,

3   the tyrosine ratio has always been reported as 1.0, would you

4   agree with that?

5   A.  As we've looked at it, it has been.

6   Q.  In your expert report you calculated the mole percentages

7   of Teva's Copaxone, correct?

8   A.  Yes.

9   Q.  And I want you to look at page 21 of your reply expert

10  report in the Mylan case.  You should have your expert reports

11  up there in a binder.

12  A.  Reply expert report?

13  Q.  Yes, sir.  I want to focus your attention on page 21 and in

14  particular on table seven.

15  A.  Yes.

16  Q.  Now, in this table you identified the mole percentages of

17  the amino acids in the composition with a molar ratio of

18  exactly 6:2:5:1, do you see that?

19  A.  Yes, sir.

20  Q.  And the mole for tyrosine in that composition the molar

21  ratio was 7 percent, is that correct?

22  A.  That's correct.

23  Q.  And you also identified the molar percentage of the amino

24  acids in Copaxone in the last column correct?

25  A.  That's correct.

1    Q.  And the mole percent for tyrosine in the Copaxone is

2    9.5 percent?

3    A.  That's correct.

4    Q.  Now, in relative terms, Copaxone contains 35 percent more

5    tyrosine than a copolymer-1 composition with the molar ratio of

6    exactly 6:2:5:1, correct?

7    A.  That's not how I see it.

8    Q.  Well, do you know how to calculate the relative difference

9    between two numbers?

10   A.  I certainly know how to calculate the relevant difference

11   between two numbers.

12   Q.  All right and the relative difference between the

13   77 percent -- well, let me ask you this:  Those numbers reflect

14   in terms of a relative difference, a 35 percent difference in

15   the tyrosine content of Copaxone as compared to a copolymer-1

16   composition with the molar ratio of exactly 6:2:5:1, correct?

17   A.  No.

18   Q.  All right.  Doctor, your deposition transcript is in that

19   same binder you're looking at.

20   A.  Okay.

21   Q.  And you remember your deposition back in January of 2010?

22   A.  I remember that you took my deposition.

23   Q.  I think it was January 2011.

24          MR. WIESEN:  I'm sorry, your Honor, I need a moment to

25   find my copy of the transcript.

1    Q.  Are you there, Doctor?

2    A.  Yes.

3    Q.  I'm going to ask you to turn to page 72.

4              MR. WIESEN:  And, your Honor, I'd ask that counsel

5    identify the page and line number before reading it into the

6    record so we can all analyze whether it's proper impeachment.

7    A.  I think you gave me the deposition transcript, but I can't

8    find it.

9              MR. ANSTAETT:  Do you have the binder with Dr. Gokel's

10   expert reports in there?

11             THE COURT:  Is it in there?

12             MR. ANSTAETT:  The last half of that should be.

13             THE COURT:  I see.  Thank you.  Do you have a page and

14   the line for us?

15             MR. ANSTAETT:  Yes, your Honor.  Page 72, starting at

16   line 17 and running through page 73, line 12.

17             May I proceed, your Honor?

18             THE COURT:  Yes.

19   Q.  You remember at your deposition I asked you to calculate

20   the relative difference between the tyrosine content in

21   Copaxone and the tyrosine content in a copolymer-1 composition

22   with a molar ratio of exactly 6:2:5:1, correct?

23   A.  Well, I remember that you asked me to do the division of

24   these numbers.

25   Q.  That's right.  And you calculated a relative difference,

1    correct, Doctor?  Between those two numbers?

2    A.  I calculated the difference between those two numbers, yes.

3    Q.  And the answer that you got when I was taking your

4    deposition was 35.7 percent, correct?

5    A.  That's what it says here.  I suppose that's correct.

6    Q.  All right, thank you.  Let's look at slide 73, can we, from

7    Dr. Gokel's -- Doctor, you remember this slide from your direct

8    examination yesterday?

9    A.  Yes, I do.

10   Q.  In this slide you identified the molar fractions for

11   Mylan's product, correct?

12   A.  Yes, that's correct.

13   Q.  And the molar fractions for tyrosine in Mylan's product is

14   .092, correct?

15   A.  That's correct.

16   Q.  And you also identified the molar fractions of the amino

17   acids in the composition with a molar ratio of exactly 6:2:5:1,

18   correct?

19   A.  That's correct.

20   Q.  And the tyrosine molar fraction is .07, correct?

21   A.  The molar fraction exactly 6:2:5:1 for tyrosine is .07,

22   that's correct.

23   Q.  All right.  And based on these tyrosine molar fractions, in

24   relative terms, Mylan's product contains about 30 percent more

25   tyrosine than the copolymer-1 composition with a molar ratio of

1    exactly 6:2:5:1, correct?

2    A.  Well, the numbers 0.7 and 0.9 differ by that amount, but I

3    would see it as 8 percent plus minus 1, not a major difference.

4    Q.  But the numbers, the relative difference between those two

5    numbers is about 30 percent, correct?

6    A.  Yes, no one could argue with the division.  The numbers say

7    what they say, but that's not what, how I think one would

8    analyze this.

9    Q.  And Doctor, those numbers, the .07 for exactly 6:2:5:1 and

10   the .092 for Mylan's GAM lot 00109, those were on the same

11   scale, correct?

12   A.  They are on the same scale, but they are not on the scale

13   compared to 6:2:5:1.  They are on the same scale in this

14   representation.

15   Q.  They are on a scale of 1, the same scale in this

16   representation, correct, Doctor?

17   A.  The scale --

18   Q.  Correct?  We were talking over one another --

19   A.  I was talking first.

20   Q.  That makes the court reporter's life harder.  But we can

21   agree that these molar fractions reported here are on the same

22   scale, correct?

23   A.  Yes, they are.

24   Q.  Now, Dr. Gokel, yesterday you looked at some pages from

25   Mylan's ANDA that shows some of the process steps used in

1  making Mylan's glatiramer acid product, correct?

2  A.  I'm sorry, I lost my focus for a second.

3  Q.  Sure.  Yesterday you looked at some pages from Mylan's ANDA

4  that showed some of the process steps used in making Mylan's

5  glatiramer acetate product, correct?

6  A.  Yes.

7  Q.  I want to shift directions now to your direct examination

8  binder and if you could look at PTX 321 of that binder.

9  A.  PTX 321?

10  Q.  Yes.

11  A.  I have it.

12  Q.  Please turn to the page Bates number Mylan 212?

13  A.  I have it.

14  Q.  This is one of the pages of Mylan's ANDA that you talked

15  about in your direct examination, correct?

16  A.  That's correct.

17  Q.  And this shows the first deprotection step in Mylan's

18  process for the manufacture of glatiramer acetate?

19  A.  That's correct.

20  Q.  And that step was also in the formation of TFA cop-1,

21  correct?

22  A.  Yes, trifluoroacetyl copolymer-1, yes.

23  Q.  And TFA cop-1 in the Mylan process is referred to as GAM

24  F2, correct?

25  A.  I believe that's correct.

1   Q.  Sure.  You looked at that table of abbreviations yesterday.

2   A.  Yes, I did, and that's correct.

3   Q.  Now, Doctor, please turn to page 262.

4        MR. ANSTAETT:  Your Honor, I guess most importantly if

5   we could just publish this page on private screens?

6   A.  All right.

7   Q.  And do you have that page?

8   A.  262?

9   Q.  Yes.

10  A.  Yes.

11  Q.  All right.  And you did not discuss this page from Mylan's

12  ANDA in your direct examination, correct?

13       MR. WIESEN:  Your Honor, I need to object to the form

14  of that question in that it was actually in the outline and we

15  stipulated away a part of the discussion, but I don't think it

16  goes to what --

17       MR. ANSTAETT:  And I'll withdraw the question.

18  Q.  Dr. Gokel, these are the manufacturing steps for

19  manufacturing TFA cop-1, correct?

20  A.  That's my understanding.

21  Q.  Do you see step 4?

22  A.  I do.

23  Q.  In that step the hydrobromic acid in acetic acid solution

24  is treated with phenol, correct?

25  A.  Step 4 simply says add phenol.

1   Q.  Well, do you see --

2   A.  Excuse me.  The step is hydrobromic acid acetic acid, yes.

3   Q.  So we can agree in that step hydrobromic acid and acetic

4   acid is treated with phenol?

5   A.  Phenol is included in the solution, yes.

6   Q.  You didn't discuss Mylan's use of phenol in the process of

7   forming TFA cop-1 yesterday, did you?

8   A.  No.

9   Q.  Doctor, are you familiar with a fifth amino acid called

10  bromotyrosine that could arise in copolymer-1 under certain

11  circumstances?

12  A.  I am aware that bromotyrosine is an impurity that is

13  occasionally found in copolymer-1.

14  Q.  And Dr. Kent discussed the formation of bromotyrosine in

15  copolymer-1 in his second expert report in this case.  Do you

16  remember that?

17  A.  Yes.

18  Q.  You reviewed that report?

19  A.  Yes.

20  Q.  Dr. Kent described in that report his belief that absent

21  the use of phenol to treat the HBr acetic acid solution used to

22  make cop-1 up to 30 percent of the tyrosine in cop-1 can be

23  converted to bromotyrosine, correct?

24       MR. WIESEN:  Objection, your Honor.  He's now

25  characterizing an expert report from an expert who has not yet

1   taken the stand.  I think that's hearsay and also not a quote

2   from the expert report.

3          MR. ANSTAETT:  Your Honor, he has reviewed these

4   opinions and responded to that.

5          THE COURT:  I'll see whether Dr. Gokel is familiar

6   with what you're talking about and whether he can answer the

7   question.

8   Q.  Sure.  Dr. Gokel, you have Dr. Kent's second expert report

9   in front of you, correct?

10  A.  Perhaps.

11  Q.  That's the one with the spiral binder, kind of spiral

12  bound?

13  A.  Yes.

14  Q.  And you reviewed that expert report in preparing your

15  opinions in this case, correct?

16  A.  Yes.

17  Q.  And you responded to Dr. Kent's opinions that he presented

18  in that report, correct?

19  A.  Yes.

20  Q.  And you reviewed Dr. Kent's report, correct?

21  A.  Yes.

22  Q.  And Dr. Kent in that report described his belief that

23  absent the use of phenol to treat the HBr acetic acid solution

24  used to make TFA cop-1 up to 30 percent of the tyrosine in

25  copolymer-1 could be converted to bromotyrosine, correct?

199FTEV3B                    Gokel - cross

1          THE COURT:  Could you refer me to where that is?

2          MR. ANSTAETT:  Of course, your Honor.  It's in the

3     second Kent report, page 17, if you look at paragraphs 54 to

4     55.

5          THE COURT:  Thank you.

6     Q.  Do you see that, Doctor?

7     A.  54 and 55.

8     Q.  Yes, sir.

9     A.  Mm-hmm.  Yes, I have the paragraphs.  If you could just

10    give me a moment to review.

11    Q.  All right.  Now, what I want to actually focus you on is

12    your own expert report, Doctor.

13         THE COURT:  Hold on a second.  I think we're both

14    trying to read the paragraphs you referred us to.

15    A.  I'm a little slow.

16         MR. ANSTAETT:  I apologize.

17         (Pause)

18    A.  I've read this.

19    Q.  Okay.  And you have responded to those paragraphs in your

20    reply expert report in this case, didn't you?

21    A.  I believe so.

22    Q.  All right, and I don't want to be unfair.  What I want to

23    ask you about is your reply expert report that's in the binder

24    under your expert reports, and it's at page 22, paragraph 56.

25    A.  Reply.

1   Q.  Reply, yes.  It might be the third report in there.

2   A.  And at page 26, you say?

3   Q.  It's page 22, paragraph 56.

4          MR. WIESEN:  Your Honor, I'm going to object to this

5   line of questions.  He can impeach with the expert report if

6   there's contradictory testimony, but simply making him read

7   paragraphs is improper.

8          MR. ANSTAETT:  I just want him to look at the

9   paragraph in which he responded.

10         THE COURT:  Well, it's just this one paragraph, 22?

11         MR. ANSTAETT:  Page 22, it's actually paragraph 56,

12  your Honor.

13         THE COURT:  Why don't you ask your question?

14         MR. WIESEN:  Thank you, your Honor.

15         MR. ANSTAETT:  Okay.

16  Q.  Now, Dr. Gokel, in your expert report you said that you

17  were aware of no support for the proposition that --

18         THE COURT:  No.  You have to ask a question.

19  Q.  Dr. Gokel, are you aware of any evidence that copolymer-1

20  prepared without the use of phenol has 30 percent of its

21  tyrosine content converted to bromotyrosine?  Would you agree

22  with that?

23  A.  I'm sorry, I didn't understand the question, I guess.

24  Q.  Well, would you agree in your opinion that copolymer-1

25  prepared without the use of phenol to pretreat the HBr in

1   acetic acid solution can have up to 30 percent of its tyrosine

2   content converted to bromotyrosine?

3   A.   Would I agree that if it is, if something is pretreated

4   with phenol -- I must not be understanding your question.

5   Q.   All right.  In your opinion, could copolymer-1 that was

6   synthesized without pretreating the HBr in acetic acid solution

7   used in the second step to make TFA cop-1 --

8   A.   May I clarify here?  So you're using HBr, acetic acid but

9   no phenol.

10  Q.   No phenol.

11  A.   Is that the question?

12  Q.   Yes.

13  A.   Go ahead.

14  Q.   Would you agree that up to 30 percent, under those

15  circumstances that up to 30 percent of the tyrosine content in

16  that copolymer-1 could be converted to bromotyrosine?

17  A.   No.

18  Q.   All right.  Doctor, please turn to DTX 1167 in your binder.

19  A.   DTX 116?

20  Q.   1167.  This is -- I'm sorry, let me know when you're there.

21  Are you there?

22  A.   No.  DTX 116?

23  Q.   1167 in your cross-examination binder.

24  A.   Yes, I have it.

25  Q.   Do you see this is a Teva document, Doctor?

1    A.  It appears to be.

2    Q.  If you look at the first page, it's dated August 13, 1989.

3    A.  That's the date.

4    Q.  I'm sorry, I missed that.

5    A.  That is the date.

6    Q.  Thank you, sir.  And if you would turn to the page with the

7    Bates number TEV1048032, please, and would you please read the

8    first sentence of subparagraph B.

9    A.  Traces of free bromine in the recent batches of HBr used at

10   Natanya were found to induce tyrosine bromination.  Up to

11   30 percent of the tyrosine residues were brominated.

12   Q.  So according to this Teva document copolymer-1 could have

13   up to 30 percent of its tyrosine content converted to

14   bromotyrosine, correct?

15   A.  What this document says here is not what I answered in your

16   question.  Because I don't know the quality of their HBr.

17   Q.  But you would agree with me that this document says that up

18   to 30 percent of the tyrosine residues were brominated,

19   correct?

20   A.  I would agree with you that that's what Teva says here and

21   I don't know what their reaction conditions were.  This is all

22   I know about it.

23   Q.  And the document also states that this tyrosine bromination

24   resulted in a decreased tyrosine content in the copolymer-1,

25   correct?

1   A.  Yes.

2   Q.  And this document also says that the tyrosine bromination

3   resulted in increased amino acid ratios, correct?

4   A.  Those would be natural consequences of reducing one of the

5   amino acids.

6   Q.  Now, do you see in DTX 1167 where it says Teva developed

7   chemical methods to treat every HBr batch in order to prevent

8   this reaction?

9           MR. WIESEN:  Your Honor, I'm going to object.  He

10  seems to be crossing the line from the infringement issue into

11  the best mode and validity issue which we intentionally did not

12  discuss in Dr. Gokel's testimony.

13          THE COURT:  I'm not sure that's what he's doing.

14          MR. ANSTAETT:  I'm absolutely not crossing that line

15  this has everything to do with the molar ratio and

16  copolymer-1 --

17          THE COURT:  Well, right or wrong that's what I thought

18  he was doing, too.  We'll see.  However, I don't know where you

19  are in this document right now.

20          THE WITNESS:  Me, too.

21  Q.  I'm still under and it's highlighted on the screen now, Dr.

22  Gokel, do you see in the document where it says we developed

23  chemical methods to treat every HBr batch in order to prevent

24  this reaction?

25  A.  I see the statement that's partly highlighted.

1   Q.  All right.  And the chemical method that was developed to

2   prevent the formation of bromotyrosine in Teva's product was

3   the pretreatment of the HBr acetic acid solution with the

4   phenol, correct?

5   A.  I believe that that's one of the methods that they used.

6   Q.  All right.

7            MR. ANSTAETT:  And your Honor I move admission of DTX

8   1167.

9            MR. WIESEN:  No objection.

10           THE COURT:  All right, admitted.

11           (Defendant's Exhibit DTX 1167 received in evidence)

12           THE COURT:  I think I would like to take a break now

13  and come back, sit until one and then take lunch.  Do you want

14  to ask another few questions in this area or are you going to

15  move?

16           MR. ANSTAETT:  We can take a break now.

17           THE COURT:  Then we'll take our regular ten-minute

18  break.

19           (Recess)

20  BY MR. ANSTAETT:

21  Q.  Dr. Gokel, we were talking about Teva's use of phenol to

22  prevent formation of bromination in copolymer-1, correct?

23  A.  Yes.

24  Q.  Please look at DTX 87 that's in your binder and if you look

25  at the page with the Bates number 1145249 you see that this is

1   a memo from Dr. Ilan Schwartz the analytical project

2   coordinator for copolymer-1 at Teva?

3   A.  I see his name at the bottom of the page.

4   Q.  Would you turn back to the page before that, please?

5   A.  Do you mean 248?

6   Q.  248, yes.  Would you read the last paragraph on that page

7   for me?

8   A.  To eliminate the possibility for bromination of cop-1,

9   phenol was added into the reagent used in the debenzylation

10  step.  Using this procedure, the level of bromotyrosine seen

11  fell dramatically below the specifications.

12  Q.  So according to this document, by using phenol to pretreat

13  the HBr acetic acid solution the level of bromotyrosine in

14  Teva's copolymer-1 fell dramatically below Teva's

15  specifications, correct?

16  A.  That's what it says here.

17          MR. ANSTAETT:  Your Honor I move admission of DTX

18  1187.

19          MR. WIESEN:  No objection.

20          THE COURT:  Admitted.

21          (Defendant's Exhibit DTX 1187 received in evidence)

22  Q.  Doctor, in your direct examination you discussed what I

23  will call the Crabb paper, do you recall that?

24  A.  I do.

25  Q.  That's PTX 558.  For that document I'm going to ask you to

1    look in your direct examination binder, please.

2    A.  Yes, I have it.

3    Q.  If I understood you correctly yesterday, you reviewed this

4    paper because you believe it supports the opinion that a 1989

5    amino acid analysis -- I'm sorry, a 1989 amino acid analysis

6    that generally resulted in a precision of 10 to 20 percent, is

7    that correct?

8    A.  Yes, that's correct.

9    Q.  Now, Dr. Gokel, the samples that were analyzed in the Crabb

10   paper were of a purified protein, correct?

11   A.  Yes.

12          THE COURT:  Pure what?

13          MR. ANSTAETT:  Purified protein.

14          THE COURT:  Purified.

15   Q.  And the protein analyzed --

16   A.  No, actually, we needed to clarify that.  In one case the

17   samples were the purified protein and in the other case they

18   were the prehydrolized.  So the prehydrolized wasn't actually a

19   protein.

20   Q.  I'm going to ask you to look at table 2.

21   A.  Okay.

22   Q.  This is one of the tables you referred to in your testimony

23   yesterday?

24   A.  Yes, I believe I referred to tables 2 and 3.

25   Q.  All right, and let me step back and ask you this.  The

1    sample that was analyzed in the Crabb paper was not a copolymer

2    peptide mixture consisting of only four amino acids, correct?

3    A.  That's correct.

4    Q.  And if we look at table 2, the protein analyzed in this

5    paper contains 17 different amino acids, correct?

6    A.  I haven't counted them.  I take your word for it.

7    Q.  And that's in the first column that's on your screen.

8    Doctor let me ask you this:  Do you know of any comparable data

9    for evaluating the precision of the amino acid analysis of a

10   copolymer peptide mixture for a copolymer like copolymer-1 that

11   has only four amino acids?

12   A.  So you mean a comparable analysis where it was sent to many

13   different laboratories and had many different analyses done, is

14   that what you mean by comparable?

15   Q.  No.  What I mean is have you seen any data that would give

16   you what kind of precision you could expect from amino acid

17   analysis of a copolymer-1-like composition?

18   A.  I guess I'm still not understanding the question.  If it's

19   a broad-based analysis such as this one, are you asking is it

20   that broad-based analysis of a copolymer or a more limited

21   polymer, is that the question?

22   Q.  The question is have you seen any documents that would

23   suggest to you what kind of precision you could expect in doing

24   amino acid analysis of a copolymer-1-like composition with four

25   amino acids?

1    A.  I don't recall one.

2    Q.  All right.  Would you look at DTX 2047 in your binder,

3    please?

4    A.  The other binder?

5    Q.  The cross-examination binder, please.  Are you there?

6    A.  Yes, I am.

7    Q.  Okay.  If you would look at page with the Bates number

8    TEV3370, please.

9    A.  Just a moment.  I'm trying to calibrate myself on what this

10   is.

11   Q.  Of course, Doctor.

12   A.  Is there a date on this document?

13   Q.  Doctor, I'll represent to you that this is an excerpt from

14   Teva's NDA which was filed in 1995.

15   A.  Okay, and what page do you want me to turn to?

16   Q.  3370, please, Doctor.

17   A.  I'm there.

18   Q.  Do you see the title of the document is copolymer-1

19   determination of amino acid content method validation?

20   A.  Yes, I see it.

21   Q.  Do you see the section number 5.2 labeled precision?

22   A.  Yes.

23   Q.  And do you see where it describes the repeatability

24   finding?

25   A.  Yes.

1   Q.  Would you please read that section?

2   A.  Repeatability.  Several amino acid standard solutions as

3   well as samples of copolymer-1 B.N. 03494 were analyzed as

4   described in the method.  The results of the amino acid molar

5   fractions showed good reproducibility with a relative standard

6   deviation of less than 2 percent.

7   Q.  All right.  And this document also discusses

8   reproducibility.  Do you see that?

9   A.  Yes, I do.

10  Q.  And that's in a laboratory, correct, in other words that's

11  two different laboratory looking at a copolymer-1 sample doing

12  an amino acid study?

13  A.  Reproducibility means to a scientist that the reaction has

14  been run more than once.  This says that it was done in two

15  different laboratory, but I don't know what laboratory or any

16  information about them.

17  Q.  Would you read the two sentences under reproducibility,

18  please?

19  A.  Certainly.  Four copolymer-1 batches were analyzed in two

20  different laboratories.  The difference in the results obtained

21  in the two laboratories was less than 5 percent.

22  Q.  Doctor, please turn to DTX 1685 in your cross-examination

23  binder.  Doctor, you've reviewed this patent, correct?

24  A.  Yes.

25            MR. ANSTAETT:  Your Honor, I move admission of DTX

199FTEV3B                    Gokel - cross

1     1685.

2              MR. WIESEN:  No objection.

3              THE COURT:  All right.

4              (Defendant's Exhibit DTX 1685 received in evidence)

5     Q.  Doctor, who is the patent assigned to?

6     A.  The assignee is listed as Yeda Research and Development

7     Company, Limited.

8     Q.  What's the title of the patent?

9     A.  The title is copolymer-1 related polypeptides for use as

10    molecular weight markers and for therapeutic use.

11    Q.  Who is the inventor?

12    A.  Alexander Gad.

13    Q.  Do you recognize Dr. Gad as a Teva employee?

14    A.  I can't be sure.

15    Q.  I ask only because the list of materials that we were given

16    in your expert report says that you reviewed Dr. Gad's

17    deposition transcript.

18    A.  If I did and he's an employee, fine.

19    Q.  Please look at column 2, lines 46 to 55.

20    A.  Column 2, line 54?

21    Q.  Column 2, lines 46 to 55.

22    A.  I have it.

23    Q.  All right.  This section of the patent describes both molar

24    fractions and a molar ratio for glatiramer acetate, correct?

25    A.  Just a moment.  Would you repeat the question?

1    Q.  Sure.  This section of the patent describes both molar

2    fractions and the molar ratio for glatiramer acetate, correct?

3    A.  Yes, it does.

4    Q.  And the molar fractions are 0.427 for alanine, 0.141 for

5    glutamic acid, 0.37 for lysine and 0.093 for tyrosine, correct?

6    A.  That's correct.

7    Q.  And, Doctor, molar fractions can be used to calculate a

8    molar ratio, correct?

9    A.  That's correct.

10   Q.  And the Gad patent reports a corresponding molar ratio for

11   glatiramer acetate of approximately 4.6 to 1.5 to 3.6 to 1.0,

12   correct?

13   A.  4.6, yes, those are the numbers that are written here.

14   Q.  And that molar ratio is very similar to the molar ratio

15   Mylan's Dr. Kent calculated for Copaxone, correct?  I'll

16   represent to you that Dr. Kent's calculation was 4.5 to 1.5 to

17   3.6 to 1.0.

18   A.  Then the numbers are close to each other.

19   Q.  All right.  Now, the molar ratio reported in the Gad patent

20   was calculated by dividing each of the molar fractions by the

21   molar fraction for tyrosine, which is the least abundant amino

22   acid here, correct?

23   A.  I don't know where it says that in the patent.  It simply

24   says that this is an approximate ratio.  If you could direct me

25   to where it says that that's the molar ratio, that that was

1    calculated based on tyrosine.

2    Q.  I'm going to ask you to do the calculations yourself,

3    Doctor, and if I may approach and give Dr. Gokel a calculator?

4              THE COURT:  All right.

5    Q.  Now, Dr. Gokel, first let me ask you, do you know how to

6    calculate a molar ratio normalized to tyrosine from molar

7    fractions?

8    A.  Do I know how to calculate the molar ratio based on -- I'm

9    sorry, what was the question?

10   Q.  Using these molar fractions would you know how to calculate

11   a molar ratio based on tyrosine, normalized to tyrosine?

12   A.  Well, if it's -- I'm sorry, the molar ratio is given here.

13   Q.  Would you know how to calculate a normalized to tyrosine

14   molar ratio --

15   A.  You mean use the numbers at the bottom and multiply .93

16   make it equivalent to 1, is that what you're asking and then go

17   through?

18   Q.  Why don't I walk you through it, Doctor, if you're having

19   difficulty?

20   A.  I'm having difficulty understanding the question, I'm

21   afraid.

22   Q.  Okay.  Let's do this:  The molar fraction, those are the

23   numbers at the bottom, correct?

24   A.  Yes.

25   Q.  0.427, correct?

1    A.   Yes.

2    Q.   And if you divide that number by the fraction for tyrosine,

3    .093, what do you get?

4    A.   4.59.

5    Q.   All right, so if we were going to talk about two

6    significant figures, could we say 4.6?

7    A.   Certainly.

8    Q.   Now, if you take the molar fraction for glutamic acid,

9    0.141, and you divide that by the fraction for tyrosine, .093,

10   what do you get?

11   A.   1.52., 1.5.

12   Q.   Could we call that 1.5?

13   A.   Mm-hmm.

14   Q.   And if you take the molar fraction for lysine, .337, and

15   you divide that by the molar fraction for tyrosine, .093, what

16   do you get?

17   A.   3.6.

18   Q.   All right.  Then of course we can agree if you divide .093

19   by .093, you're going to get 1.0, correct?

20   A.   Yes, that's correct.

21   Q.   All right, so you would agree with me that the molar ratio

22   for glatiramer acetate reported in Dr. Gad's patent is

23   normalized to tyrosine, wouldn't you?

24   A.   The way we've done it.

25   Q.   All right.  Dr. Gad didn't get from those molar fractions

1    to that molar ratio by multiplying molar fractions by 14, did

2    he?

3    A.  No, but you could.

4    Q.  You could -- well, let me ask you this.  Let me give you as

5    an example.  0.427, if you multiply that by 14, what do you

6    get?

7    A.  Sorry, which number?

8    Q.  The fraction for alanine.

9    A.  .427?

10   Q.  Yes, if you multiply that by 14, what would you get?

11   A.  5.978.

12   Q.  All right.  Not 4.6, though?

13   A.  No.

14        MR. ANSTAETT:  Your Honor, I have no further

15   questions.

16        THE COURT:  Mr. Doyle?

17        MR. DOYLE:  Yes.  With any luck I can conclude close

18   to 1:00.

19        THE COURT:  Okay.  Anything after 1 and people can

20   blame you.

21   CROSS-EXAMINATION

22   BY MR. DOYLE:

23   Q.  Good afternoon, Dr. Gokel.

24   A.  Good afternoon.

25   Q.  I'd like to discuss with you starting with the topic the

1    requirement of six of the claims that are asserted against

2    Sandoz that the step 2 reaction takes place for a time

3    predetermined by a test reaction and I'd like to focus on the

4    Sandoz viscometer method.  Now, at the very beginning of step

5    2, step 2 reaction in the Sandoz method involving the

6    viscometer, has Sandoz fixed a specific target molecular weight

7    for the copolymer-1 it is making?

8    A.   Sandoz according to their documents has a specific target

9    molecular weight.

10   Q.   And that's 7300, right?

11   A.   Yes.

12   Q.   And at the very beginning of the step 2 reaction Sandoz in

13   its viscometer method, it has a specific table of target

14   temperatures for the step 2 reaction, right?

15   A.   They have such a table.

16   Q.   Yes, they have it at the very beginning --

17   A.   They have it right now.

18   Q.   Beginning of step 2.  And at the very beginning of step 2

19   in the reaction involving the Sandoz viscometer method, does

20   Sandoz include in that table with the temperatures a step of

21   viscosity, a set of viscosity levels corresponding with the

22   temperatures?

23   A.   Table 1 that we talked about earlier is a table of

24   temperatures and viscosity readings over a four degree range.

25   Yes.  Over a four degree range.

1    Q.  And that's available at the very beginning of the step 2

2    reaction, correct?

3    A.  Yes.

4    Q.  Now, the purpose of the selected viscosity level is to

5    judge when to stop the step 2 reaction, correct?

6    A.  Yes.

7    Q.  And the time it takes to reach that viscosity level at the

8    preset temperature in the step 2 reaction, that's the time that

9    the reaction will run, correct, when that viscosity level is

10   reached?

11   A.  Yes.  The viscosity records the time at which to stop the

12   reaction.

13   Q.  Now, at the very beginning of step 2, Sandoz has not fixed

14   a specific time period for the step 2 reaction that shall not

15   be increased or decreased regardless of the viscosity level,

16   has it?

17   A.  I don't understand the question.  They've not fixed -- I'm

18   sorry, could you please restate it?

19   Q.  My question is, at the very beginning of that reaction,

20   Sandoz has not fixed a particular time, let's say 30 hours,

21   just as an example, Sandoz has not set at the beginning of the

22   step 2 reaction in its viscometer method that that step 2

23   reaction shall run 30 hours no matter what the viscosity level

24   is?

25   A.  They have fixed the temperature?

1   Q.  They fixed the temperature.

2   A.  Then I believe they have.

3   Q.  Pardon?

4   A.  Then I believe they have.

5   Q.  You believe that no matter what happens in a viscosity

6   reading, they will stop the reaction at exactly 30 hours in my

7   example?

8   A.  The viscosity reflects the time point at which the reaction

9   should be stopped because they have calibrated their systems so

10  that that viscosity correlates.  Now, if you're asking me the

11  question has something terribly wrong occurred, then perhaps

12  something different would be done, but under routine

13  circumstances the viscosity just reflects the time point.  It's

14  just like an alarm clock, because those ratios are

15  predetermined.

16  Q.  Again, if you could answer my question.  The operator is

17  operating the step 2 reaction, okay?  And the operator will not

18  stop the reaction until the viscosity level is reached,

19  correct?

20  A.  I think the operator will be directed not to stop and

21  follow the viscometer.  If that's your question, yes, I agree

22  with that.

23  Q.  Right.  And there is nothing in the instructions to the

24  operator to stop the step 2 reaction at a specific time set in

25  advance, say, 30 hours later, regardless of the viscosity

1    level, is there?

2    A.  Well, the operator will stop when the viscosity reaches a

3    certain point, but if there's some variance that's because the

4    viscosity is a problem, then there's the backup system of the

5    time to correlate.

6    Q.  I didn't ask you about the backup.  I'm asking you about

7    the viscometer method standing alone.  Would you answer my

8    question?

9    A.  I'll certainly try to.

10   Q.  And that question is, the operator has not been provided a

11   specific time to stop the step 2 reaction regardless of the

12   viscosity level at the beginning of the reaction, has it?

13   A.  If the operator has been told do not stop this reaction

14   until a certain viscosity is reached, then that's the

15   instruction.

16   Q.  And that is your understanding of the instruction for the

17   Sandoz viscometer method, correct?

18   A.  That's my understanding of the instructions to the

19   operator.

20   Q.  Now, we're in agreement, Dr. Gokel, that a viscometer does

21   not measure time per se, does it?

22   A.  A viscometer does not measure time per se.

23   Q.  Now, what does a viscometer measure per se?

24   A.  A viscometer measures what we can call the fluidity of a

25   mixture or solution.

1    Q.  Now, you would agree with me, wouldn't you, a viscometer is

2    a fundamentally different kind of apparatus than a clock,

3    right?

4    A.  A viscometer is different from a clock.

5    Q.  A viscometer has different parameters that it's measuring,

6    correct?

7    A.  A viscometer is different from a clock.

8    Q.  And you described what the viscometer measures, which is

9    whether it's like gasoline or whether it's like honey, right?

10   A.  I said that.

11   Q.  Now, you mentioned an alarm clock.  Does an alarm clock

12   measure any parameter of sleep that goes to the quality of the

13   sleep?

14   A.  Does an alarm clock measure any quality of sleep?

15   Q.  That goes to the quality of the sleep?

16   A.  To my knowledge, no.

17   Q.  Right.  As a matter of fact, it doesn't even tell you

18   whether the person was asleep or awake, right?

19   A.  I'll agree with that.

20   Q.  Okay.  And a clock couldn't measure any physical parameter

21   of the step 2 reaction, could it?  You know, other than how

22   long the reaction in fact ran, correct?

23   A.  A clock would measure duration.

24   Q.  And no physical property, right?

25   A.  No property of the chemical solution.

1   Q.  Now, a viscometer, on the other hand, does directly measure

2   a physical property of the copolymer-1 solution as it's being

3   made, correct?

4   A.  That's correct.

5   Q.  Now, as I understand your opinions, Dr. Gokel, you place a

6   great deal of emphasis on the historical data collected by

7   Sandoz in its product development relating to time and

8   temperature for the step 2 reaction, correct?

9   A.  Yes.

10  Q.  But you agree that Sandoz in the viscometer method is not

11  using a specific time period at the beginning of the reaction

12  to establish an absolute end point for the step 2 reaction, is

13  it?

14  A.  My understanding is that the end point for the viscosity

15  measurement corresponds to the time the reaction needs to run

16  at a specified temperature so that the desired molecular weight

17  structure will be obtained.

18  Q.  What you're saying is there is some sort of general

19  correlation that Sandoz has developed as part of the

20  development of its viscometry method in which there is some

21  general correlation between the amount of time, the viscometry

22  level and the temperature, correct?

23  A.  There is a time viscometry temperature correlation, yes.

24  Q.  Yes.  But that correlation in general doesn't set the

25  specific absolute end point of the step 2 reaction in the

1  viscometry method, does it?

2  A.  All I can say is that the time, the temperature and the

3  viscosity are all correlated.

4  Q.  And what I'm asking you, sir, is about the step 2 reaction

5  of Sandoz using the viscometer method, and when that reaction

6  ends.  And that reaction ends when the specific viscosity level

7  is reached that correlates with a specific preset temperature,

8  correct?

9  A.  The way the batch records are set up, the operator is told

10  to end at a particular viscosity that correlates with a

11  particular temperature.

12  Q.  Yes.  And the operator cannot know with certainty that at a

13  particular temperature and a particular viscosity level that

14  that will be, for instance, precisely 30 hours after the

15  reaction starts, can she?

16  A.  If the person also has the time correlation, then he or she

17  could know when that, what that time correlates to in terms of

18  the viscosity.

19  Q.  Yes, but my question is, talking about the operator,

20  running the reaction, and you agree with me that the operator

21  cannot just set this alarm clock that you mentioned and leave

22  for 30 hours and come back with complete certainty that the

23  viscosity level associated with a particular temperature has

24  been reached, can she?

25  A.  Not with complete certainty.

1   Q.  I'd like to turn to a different topic.  That is the

2   composition of copolymer-1.

3   A.  Yes.

4   Q.  And by the way, have you done a study, is there anything in

5   your report that describes the nature of the correlations

6   between, with any specificity, the nature of the correlations

7   between time, temperature and viscosity and the certainty of

8   those?  Have you done any analysis of that nature?

9   A.  No, I relied on the analyses that were done by Sandoz.

10  Q.  Thank you.  Now, turning to the amino acid composition of

11  copolymer-1, Dr. Gokel, would you agree that each batch of

12  copolymer-1 can be described as an ensemble of closely related

13  but different molecules?

14  A.  That copolymer-1 is an ensemble of related but different

15  molecules.

16  Q.  Yes.

17  A.  I think that's a fair representation.

18  Q.  And those molecules are not identical in molecular weight,

19  are they?

20  A.  Not all of them.

21  Q.  And why is that?

22  A.  Why are they not the same molecular weight?

23  Q.  Is it in all of this ensemble of all these molecules which

24  I think you said something could be in the millions of

25  billions, why is it that there are so many differences in

1    molecular weights of those molecules?

2    A.   It's because the reaction that yields those many molecules

3    is a polymerization, and that reaction occurs on many, many

4    different shapes and may have many different starting points

5    and after we do additional reactions to it that cleave it, we

6    have different chains being cleaved in different ways.  So

7    there are a number of mechanisms by which the overall size and

8    sequence of each system could be established.  And that

9    accounts for the variation.

10   Q.   And that variation also applies to the length of the chains

11   as well to their molecular weights because those two are

12   related, correct?

13   A.   I believe I just said that.

14   Q.   And so we have non-identical amino acid sequences of great

15   variety of molecular weights, correct?

16   A.   Yes.

17   Q.   Do you consider this ensemble to be a complex mixture?

18   A.   It is certainly a mixture.  I don't know of any formal

19   definition of complex.

20   Q.   Do you recall describing it as such in your deposition?

21   A.   I probably did.

22   Q.   And the number of different chain links that would be

23   included in this complex mixture, would the different chain

24   links, would there just be millions of different variations in

25   this mixture?

1    A.   Likely.

2    Q.   And one final question in this area, sir.  Due to the

3    complexity of copolymer-1, would you say it's essentially

4    impossible to show that one batch of copolymer-1 is

5    structurally identical to another batch of copolymer-1?  With

6    today's technology.

7              MR. WIESEN:  Objection, your Honor.  I think he's

8    going into the enablement and definiteness, but I'm not

9    entirely sure at this point.  Certainly beyond the scope of the

10   issues that came up on direct.

11             MR. DOYLE:  With just one question, I don't know, is

12   he coming back?  They won't tell us who is coming, your Honor,

13   so just my one question about this area.

14             THE COURT:  You're afraid you won't see Dr. Gokel

15   again?

16             MR. DOYLE:  I don't know for sure.  I hope so.

17             MR. WIESEN:  We believe he's likely to be called in

18   rebuttal assuming they present all the defenses they told us

19   they're going to, your Honor.

20             MR. DOYLE:  Then we'll wait on that.

21             THE COURT:  All right.

22   Q.   The literature approach that you described that Momenta

23   used to develop its generic product, I'll just ask a few

24   questions about that and I'll be finished, okay?  Do you recall

25   testifying on direct you were shown a Momenta document and you

1   said, ah, the literature approach.  Do you recall that?

2   A.  Yes.

3   Q.  Now, does the literature concerning copolymer-1 include the

4   Weizmann Institute's '550 patent?

5   A.  The '550 patent relates to polymers of that type, but I

6   don't think copolymer-1 is named in the '550 patent.

7   Q.  There's no reference -- could you turn to document 26 in

8   your -- and you may well be right, so perhaps the better

9   question, sir, is copolymer-1 one of the copolymers that is

10  included in the '550 Weizmann Institute patent?

11  A.  The patent describes polymers that have alanine, glutamic

12  acid, lysine and tyrosine, and they claim weights, molecular

13  weights between 15,000 and 25,000.

14  Q.  And when was that patent issued, sir?

15  A.  November 19, 1974.

16  Q.  Now, that patent, it also describes a synthesis method for

17  making such copolymers, correct?

18  A.  Well, it describes that they were synthesized.

19  Q.  Specifically, could you look at column 2, lines 53 to 63?

20  A.  Yes, I have it.

21  Q.  Okay.  And does it describe there the synthesis of a

22  protected copolymer using diethylamine as an initiator in the

23  presence of dioxane?

24  A.  It doesn't give any experimental details, but it gives a

25  general approach.

199FTEV3B                    Gokel - cross

1    Q.   Yes and it includes diethylamine as an initiator in the

2    presence of dioxane?

3    A.   Yes, it does.

4    Q.   Does it also describe using N carboxyanhydrides to

5    tyrosine, alanine, glutamic acid and lysine?

6    A.   Yes, it does.

7    Q.   Does it describe using a benzyl protecting group on the

8    glutamic acid?

9    A.   Yes it does.

10   Q.   Does it describe using trifluoroacetyl as a protecting

11   group for the lysine?

12   A.   Yes.

13   Q.   Does the '550 patent describe deprotecting the glutamic

14   acid by using hydrogen bromide in acetic acid?

15   A.   It describes only deprotecting with hydrogen bromide.

16   Q.   That was my question, sir.  Does the '550 patent describe

17   deprotecting the lysine by using piperdine?

18   A.   Yes.  I'm sorry, I misunderstood.  I pronounce it

19   piperdine.  Yes.

20   Q.   And you testified at length about the '808 patent I think

21   on your direct testimony.  You gave a lot of testimony

22   concerning the '808 patent, correct?

23   A.   I testified about the '808 patent.

24   Q.   Are you aware that it specifically says that the

25   copolymer-1 according to the present invention of the '808

1    patent may be prepared by methods known in the art, for example

2    the process disclosed in U.S. Patent No. 3849550?

3    A.  Yes.

4    Q.  And that literature also includes the Teitelbaum article

5    that we discussed so much yesterday and today, is that right,

6    Exhibit 499?

7    A.  That's correct.

8    Q.  And that article, which is also back in the 1970's, of

9    course, it has the same disclosure about how to synthesize

10   copolymer, correct?

11   A.  The same disclosure as what?

12   Q.  As in the '550 patent.

13   A.  It discloses a synthetic method.  I don't know if it has

14   the same details in it.

15   Q.  Do you recall that in fact it has even more details, that

16   the Teitelbaum article describes the quantities of the amino

17   acids that are used in the starting material, correct?

18   A.  That may be so.

19   Q.  Now, in your direct, as I understood it, you relied on

20   Exhibit 499 in providing your opinion on how a molar ratio

21   approximately 6:2:5:1 should be understood in the meaning of

22   copolymer-1, correct?

23   A.  Yes, I did.

24   Q.  Would you please look at page 244 of Exhibit 499?  That's

25   the Teitelbaum article.

1   A.  Where?

2   Q.  It's 499.

3   A.  I have that, yes.

4   Q.  Good, then if you would go to page 244.

5   A.  244.

6   Q.  Mm-hmm.  And specifically, if you would look at paragraph

7   3.7, molecular weight determinants?

8   A.  Yes, I see it.

9   Q.  Doesn't that identify ultracentrifugation as the method

10  used for determining molecular weight?

11          MR. WIESEN:  Objection, your Honor, this is well

12  beyond the scope of the testimony that Dr. Gokel gave.  He

13  didn't talk about molecular weight at all except for relying on

14  Dr. Grant.

15          MR. DOYLE:  He spoke about this article to define

16  copolymer-1.  That's all I'm using it for.

17          THE COURT:  How many more questions Mr. Doyle.

18          MR. DOYLE:  One.

19          THE COURT:  Okay.

20  Q.  Does it identify ultracentrifugation as the method used for

21  the molecular weight determination of this article?

22  A.  It states here that an ultracentrifuge and sedimentation

23  measurements were used.

24  Q.  And you'd agree with me that that's a different technique

25  than SEC, correct?

199FTEV3B                    Gokel - cross

1   A.   Yes.

2            MR. DOYLE:  Nothing further, your Honor, thank you.

3            THE COURT:  Okay.

4            MR. ANSTAETT:  Your Honor, one housekeeping matter.  I

5   neglected to move DTX 2047, which I spoke to Dr. Gokel about,

6   into evidence.  I would like to do that now.

7            MR. WIESEN:  No objection your Honor.

8            THE COURT:  Yes, there was testimony about that.  It's

9   admitted.

10            (Defendant's Exhibit DTX 2047 received in evidence)

11            THE COURT:  Do you have a redirect?

12            MR. WIESEN:  I will probably have a short redirect, so

13   we should probably take lunch.

14            THE COURT:  All right.  I'll see everybody at 2:00.

15            (Luncheon recess)

16            (Continued next page)

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2              2:00 p.m.

3              THE LAW CLERK:  All rise.

4              THE COURT:  Please be seated.

5              All right, Mr. Wiesen.

6              MR. WIESEN:  Thank you, your Honor, just a short

7    redirect.

8    REDIRECT EXAMINATION

9    BY MR. WIESEN:

10   Q.  Dr. Gokel, do you have the cross-examination binder from

11   Mylan from Mr. Anstaett in front of you?

12   A.  I believe.

13   Q.  If you could turn to DTX-1109.

14   A.  I'm sorry, DTX?

15   Q.  1109.

16   A.  I think it is a small chance I'm tired.

17   Q.  Do you have it, sir?

18   A.  I do, yes.

19   Q.  Do you recall, if you turn to page eight under the heading:

20   Expressive activity of the synthetic copolymers" that -- if we

21   could blow up that paragraph?

22   A.  Yes, at the bottom.

23   Q.  Do you recall Mr. Anstaett on cross asked you about the

24   molar ratio on the fourth line of this paragraph?

25   A.  Yes, I do.

1   Q.  And then he asked you whether there was any other molar

2   ratio reported for any other batch in this paragraph in this

3   paper?

4   A.  I believe he asked me then.

5   Q.  And if we could pull up, Mr. Chase, the next page as well

6   and the top of the next sentence under the figure one, just two

7   lines this time.

8            Do you see this carryover paragraph states, "On the

9   other hand, several preparations of cop-1 showed identical

10  effect?"

11  A.  Yes, I do.

12  Q.  So, sir, does this paper reference multiple batches of

13  copolymer-1?

14  A.  Yes, it does.

15  Q.  And what paper does it cite for referring to the several

16  preparations of co-polymer-1?

17  A.  Titelbaum 1971.

18  Q.  And do you recall whether there were different molar ratios

19  reported in the two different batches in Teitelbaum 1971?

20  A.  Yes, I do.  They were two different molar ratios reported

21  for batches one and two.

22  Q.  Thank you, sir.  If you could go to PTX-597 in your cross,

23  I think it was in your cross-examination binder?

24  A.  P?

25  Q.  PTX-597 and P's are behind the D's so that's where you find

1    it?

2    A.  Yes, I have it.

3    Q.  If you could turn to the page 1269 on the bottom?

4    A.  Yes, I have it.

5    Q.  And the first full paragraph, I think Mr. Anstaett took you

6    to the molar ratio reported there.  Do you see that?

7    A.  Yes.

8    Q.  And I believe on your cross-examination you said that this

9    is numerically different than 6:2:5:1?

10   A.  Yes.

11   Q.  Could you explain what you meant by that?

12   A.  Yes.  I believe that if you put it on the same scale as the

13   6:2:5:1 molar ratio, it will correspond.

14   Q.  When you said numerically different, did you just mean

15   there are actually different numbers reported here?

16   A.  Yes, that's exactly what I said.

17   Q.  All right, I want to look at a couple of the other molar

18   ratios and molar fractions, Mr. Anstaett took you through.

19           If you could go to your Mylan reply expert report that

20   he asked you about?  On page 21 he asked about table seven.  Do

21   you recall that?

22   A.  Sorry, I'm in the wrong thing.  Table seven?

23   Q.  Table seven on page 21?

24   A.  Yes, I have it.

25   Q.  And I want to look at the exactly 6:2:5:1 column in the

1   Copaxone column that he asked you about.  Do you recall some

2   questions about that?

3   A.  Yes.

4   Q.  Sir, in your opinion, is the molar fraction for Copaxone

5   approximately the same as the molar fraction for 6:2:5:1, if

6   you put them on a scale of one?

7   A.  Yes.

8   Q.  And, sir, if you put them on a scale of 100, so you're

9   doing percent, do you have an opinion whether the percentage of

10  each of the amino acids in Copaxone is approximately the same

11  with the overall ratio as in exactly 6:2:5:1?

12  A.  Yes, I believe it is.

13  Q.  And if we look at table eight right below that in your

14  report on page 21?

15  A.  I have it.

16  Q.  Have you converted the Copaxone molar fraction to a scale

17  of 14 in the last column?

18  A.  Yes, I have.

19  Q.  And if you could just read into the record what's the

20  result you report for Copaxone?

21  A.  Excuse me.  For alanine, it's 5.98, for glutamic acid 1.97,

22  for lysine it's 4.73, and for tyrosine it's 1.33.

23  Q.  And in your opinion, sir, is that molar ratio approximately

24  6:2:5:1?

25  A.  Yes, it is.

1    Q.  I just want to look at one other set of numbers that Mr.

2    Anstaett ran you through.  DTX-1685, if you could turn to that?

3    A.  DTX-12?

4    Q.  1685?

5    A.  1685?  Yes, sir, I have it.

6    Q.  If we could go to column two, molar fractions that are on

7    lines 50 -- looks like 52 to 55?

8    A.  Column two, yes.

9    Q.  And you see those molar fractions there?

10   A.  I see the molar -- are we referring to the molar ratios

11   that are present on line 49?

12   Q.  No.  I want to go to the molar fraction that's on line 53

13   and 54?

14   A.  I'm sorry.  Yes, I have those now.

15   Q.  And on this one, do you recall Mr. Anstaett gave you a

16   calculator and asked to you to do some calculations?

17   A.  Yes.

18           MR. WIESEN:  Your Honor, may I approach and ask him to

19   do one other set of calculations?

20           THE COURT:  Sure.

21   A.  Do I get to keep his calculator?

22   Q.  You can keep his calculator.  I'll keep mine.  And you're

23   welcome come to it, Doctor.

24           If you could, sir, what scale are the molar fractions

25   reported on in the 287 patent, DTX-1685?

1    A.   4.6 plus 1.5, plus 3.6.1 is the total of 10.7.

2    Q.   I want to focus on the molar fractions, not the molar

3    ratio.

4    A.   I beg your pardon.

5    Q.   Sorry.  What scale are the molar fractions on?

6    A.   Unity one.

7    Q.   And so if you -- how would you convert from a scale of one

8    to a scale of 14?

9    A.   I would multiply by 14.

10   Q.   Can you multiply each of the molar ratios reported here by

11   14?

12   A.   I can try.

13            (Pause)

14   A.   I have done.

15   Q.   What numbers do you get, sir, if you multiply the molar

16   fraction by 14?

17   A.   5.99, 1.97, 4.72 and 1.3.

18   Q.   Sir, do you have an opinion whether that's approximately

19   6:2:5:1?

20   A.   Yes, I believe it's approximately 6:2:5:1.

21   Q.   If you converted the molar ratio that's reported here

22   that's on the scale you said of 10.7 to a scale of 14, would

23   that be approximately 6:2:5:1?

24   A.   I will confirm.  I don't do well with calculators.  It will

25   take me a second.  I think he sabotaged this one.

1          (Pause)

2     A.   The numbers that I get doing that are 6.026, 1.95, 4.71,

3     and 1.31.

4     Q.   And is that approximately 6:2:5:1?

5     A.   Yes.  In my opinion, it is.

6               MR. WIESEN:  I have nothing further, your Honor.

7               THE COURT:  All right.

8               MR. ANSTAETT:  Nothing further from us, your Honor.

9               THE COURT:  Okay.

10              MR. DOYLE:  Nothing, your Honor.

11              THE COURT:  Thank you very much, Dr. Gokel.  You're

12    excused.

13              THE WITNESS:  Thank you.

14              (Witness excused)

15              THE COURT:  Next witness.

16              MS. HOLLAND:  Yes.  Plaintiffs call Dr. Nicole

17    Sampson.

18              MR. JONES:  Your Honor, as Dr. Sampson approaches

19    Mylan opposes and objects to her testimony.  It is going to be

20    cumulative of what Dr. Gokel just testified to.  She's going to

21    talk about multiply by 14 and 1.3, we've already heard plenty

22    of that.  So we would move for this witness be stricken to be

23    heard on the equivalent issue.

24              MS. HOLLAND:  Your Honor --

25              THE COURT:  Well --

1           MS. HOLLAND:  I'm sorry.

2           THE COURT:  Go ahead.

3           MS. HOLLAND:  Yes, your Honor.  This is a separate

4    issue.  It's infringement under the doctrine of equivalence on

5    the molar ratio issue.  So there may be some overlap, but

6    basically it's a separate issue that Dr. Sampson is going to be

7    addressing.  Its related to what Dr. Gokel addressed.  And

8    defendants had asked us ahead of time which witnesses is going

9    to be addressing doctrine of equivalence and we gave them that

10   information so they could prepare separate examination for

11   that.

12          THE COURT:  All right, I'm going to overrule your

13   objection and hear the witness.

14          Dr. Sampson, would you raise your right hand.

15    NICOLE SAMPSON,

16       called as a witness by the plaintiff,

17       having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. HOLLAND:

20          MS. HOLLAND:  I'm just going to hand up the binders

21   now, your Honor.

22          THE COURT:  Okay.  Is this Teva's last witness?

23          MS. HOLLAND:  We have depositions we will be

24   submitting, but the last witness.

25          THE COURT:  All right.

1    BY MR. SKILTON:

2    Q.  Where do you live, Dr. Sampson?

3    A.  I live in Setauket, New York.

4    Q.  Are you currently employed?

5    A.  Yes, I am.

6    Q.  And where are you employed?

7    A.  I'm employed at the Stony Brook University.

8    Q.  What is your current position?

9    A.  I'm a Professor of chemistry and also associate Dean for

10   curriculum.

11   Q.  What is your area of expertise?

12   A.  I'm an expert in organic chemistry and chemical biology.

13   Q.  What is organic chemistry?

14   A.  Organic chemistry is the study of molecules which contain

15   carbon atoms.

16   Q.  Is copolymer-1 an organic compound?

17   A.  Yes, it is copolymer-1 contains carbon atoms amongst other

18   types of atoms.

19   Q.  And what is chemical biology?

20   A.  Chemical biology is using molecules to study the function

21   of biological systems.

22   Q.  What are some of the applications of chemical biology?

23   A.  Often times these molecules when they perturbed biological

24   function, they can be developed into either drugs or they can

25   be developed as diagnostic agents.

1  Q.  Would you summarize for the Court your educational

2  background, starting with college?

3  A.  Yes.  I obtained my Bachelors of Science in chemistry at

4  Harvey Mudd College, and from there I obtained a Ph.D. in

5  chemistry at UC Berkeley, and that was in 1990.

6  Q.  What was the subject of your Ph.D. work?

7  A.  Primary focus of my Ph.D. work was synthesis and testing of

8  peptides.

9  Q.  What did you do after receiving your Ph.D.?

10  A.  I went to Harvard University where I undertook a

11  post-doctoral fellowship.

12  Q.  What was the subject of that post-doctoral fellowship?

13  A.  I made proteins to investigate their function.

14  Q.  Are proteins a form of polypeptides?

15  A.  Yes, proteins are polypeptides.

16  Q.  What did you do after your post doc?

17  A.  When I finished my post-doc, I took up a faculty position

18  at Stony Brook.

19  Q.  What are your responsibilities at Stony Brook?

20  A.  I do research, I run a research group, I teach and I also

21  have administrative duties responsibilities.

22  Q.  What is your area of research?

23  A.  I have several research areas in my lab.  One of the main

24  research areas in my laboratory is making, synthesizing

25  polypeptides and polymers and testing them.

1    Q.  Is your research funded?

2    A.  Yes, it is.

3    Q.  By whom?

4    A.  My primary funding is from the National Institutes of

5    Health and the National Science Foundation.

6    Q.  As part of your research, do you conduct and review the

7    results of biological testing of compounds?

8    A.  Yes, I do.  We perform many different types of assays in my

9    laboratory.

10   Q.  How long have you been working with biological tests?

11   A.  I've been performing biological assays since the late

12   1980's in my graduate work.

13   Q.  Can you give the Court some examples of the types of

14   biological tests that you conduct in your laboratory?

15   A.  Yes.  We test both peptides and polymers as to how they can

16   interrupt cells from binding to each other.

17          We test peptides in terms of how they can inhibit

18   cells from migrating or moving in animal models, as well as in

19   in vitro systems, that's just in the laboratory.  And we also

20   test steroids as well as peptides, polymers as anti-bacterial

21   agents.

22   Q.  And these are tests that you conducted in your laboratory?

23   A.  Yes.  These tests are conducted in my laboratory by my

24   graduate students, and sometimes they do it in collaborator's

25   laboratories.

199ztev4                    Sampson - direct

1    Q.  You mentioned you also teach courses.  What courses do you

2    teach?

3    A.  I teach a wide range of courses from both undergraduate and

4    the graduate level.  At the graduate level I've taught organic

5    reaction mechanisms, physical organic chemistry, chemical

6    biology.  At the undergraduate level I've taught thousands of

7    students, undergraduate sophomore organic chemistry.

8    Q.  You said you teach a graduate level course in organic

9    reaction mechanisms.  What does that mean?

10   A.  So in synthetic organic chemistry, what we're doing is

11   we're making molecules, and making a molecule requires changing

12   the connectivity of the atoms, making new bonds and breaking

13   bonds.  So, for example, yesterday in Dr. Gokel's testimony, he

14   showed us how a peptide bond is formed.

15            An organic reaction mechanism is simply a motion

16   picture that depicts how those atom's connectivity change.

17   Q.  Are you author of any peer-reviewed publications?

18   A.  Yes, I am.  I have somewhere on the order of 70

19   publications.

20   Q.  Do any of those publications discuss the synthesis of

21   peptides?

22   A.  Yes they do.  Probably about half of them cover peptides.

23   Q.  And do any of the papers record the results of biological

24   testing of the compounds?

25   A.  Yes.  Half or more cover biological testing of compound.

540

1    Q.  Have you supervised graduate students since you've been

2    working at Stony Brook?

3    A.  Yes.  I've graduated about 20 Ph.D. students from my

4    laboratory, and I currently have research group on the order of

5    ten Ph.D. students.

6    Q.  Have you worked with any pharmaceutical companies?

7    A.  Yes.  I spent a sabbatical year at Biogen in Cambridge,

8    Massachusetts.

9    Q.  What were you doing at Biogen?

10   A.  At Biogen I was studying the role of the function of

11   proteins in kidney disease and how those proteins interact with

12   immune system.

13   Q.  Have you served as a peer reviewer for any journals?

14   A.  Yes, I have.  I've peer reviewed for many different

15   journals.  Some of those journals are Journal of Organic

16   Chemistry, Journal of American Chemistry -- the American

17   Chemical Society, ACS Chemical Biology, Chemistry and Biology,

18   Molecular microbiology and many others on top of that.

19   Q.  Do you review articles as a peer reviewer on the synthesis

20   of peptides?

21   A.  Yes, I do.

22   Q.  And do you review articles that contain results of

23   biological testing?

24   A.  Yes, I do.

25   Q.  Are the biological testing that you review in these

1  articles always the same ones that you actually conducted in

2  your laboratory?

3  A.  No.  Quite often they're different than the assays that we,

4  or the tests that we use in my own laboratory.

5  Q.  How are you able to review these biological tests if

6  they're not ones that you actually are conducting in your

7  laboratory?

8  A.  In order to look at the effect of a molecule or compound of

9  biological function, what one needs is a test with a measurable

10 and well defined end point or end product.  So once that test

11 is in hand, what you're looking for is simply to compare the

12 effect of the molecule at hand with appropriate controls.  And

13 so regardless of the type of test that's being done, what

14 you're looking for is pretty much the same, a change in

15 outcome.

16 Q.  Have you given any invited lectures?

17 A.  Yes.  I've given somewhere on the order of 100 invited

18 lectures at various academic institution, internationally and

19 nationally, at conferences nationally and internationally, as

20 well as at companies.

21 Q.  Have you received any awards during your professional

22 career?

23 A.  Yes.  I've received several wards.  Most notably, I've

24 received the Pfizer Award in enzyme chemistry from the American

25 Chemical Society, and that was for a fundamental study of

1    enzyme function.  I also received American Chemical Society's

2    Co-scholar award in organic chemistry, which was for the study

3    using peptides to look at biological function.

4    Q.  Now, are you an inventor on any patent applications?

5    A.  Yes, I've submitted three patent applications.

6    Q.  What is the general subject matter of those applications?

7    A.  Two of those patent applications are on methods to prepare

8    polymers, polymer chemistry, and one of them is on the use of

9    compounds to treat tuberculosis.

10   Q.  Would you look at PTX-436 in your binder?  What is this

11   document?

12   A.  This document is my CV, my curriculum vitae.

13   Q.  Does it accurately summarize your qualifications and

14   experience?

15   A.  Yes, it does.

16           MS. HOLLAND:  Plaintiffs offer PTX-436 into evidence?

17           MR. JONES:  No objection, your Honor.

18           THE COURT:  Admitted.

19           (Plaintiff's Exhibit 436 received in evidence)

20           MS. HOLLAND:  And, your Honor, plaintiffs offer Dr.

21   Nicole Sampson as an expert in peptide and polymer chemistry.

22           MR. JONES:  No objection.

23           MR. DOYLE:  None, your Honor.

24           THE COURT:  Then I accept the Doctor as such.  Go

25   ahead.

543

1    Q.  Dr. Sampson, I'm going to put up on the screen the Court's

2    construction of the term copolymer-1, and I really want to

3    focus on the requirement that the four amino acids, alanine,

4    glutamic acid, lysine and tyrosine be in a molar ratio of

5    approximately 6:2:5:1.

6            Were you here for Dr. Gokel's testimony on that

7    subject?

8    A.  Yes, I was.

9    Q.  Did you hear him testify that the Sandoz and Mylan products

10   literally meet that claim limitation?

11   A.  Yes, I did.

12   Q.  Do you agree with that opinion?

13   A.  I agree with Dr. Gokel's opinion.

14   Q.  Now, if the Court were to determine that the Mylan and

15   Sandoz products don't literally meet the requirement of

16   approximately 6:2:5:1, do you have an opinion as to whether the

17   molar ratio in Mylan and Sandoz product is equivalent to

18   approximately 6:2:5:1?

19   A.  Yes, I do.

20   Q.  What is that opinion?

21   A.  My opinion is, is that they are equivalent.

22   Q.  Why is that?

23   A.  If I could have the next slide, please to show my -- how I

24   formed my opinion.

25           This is data that we've seen before from Mylan's

submission to FDA.  And these are the four amino acids that

we've been discussing at length; alanine -- or you have been

discussing at length -- alanine, glutamic acid, lysine, and

tyrosine.  And if we look at the ratios 6:2:5:1, exactly

6:2:5:1, I've simply represented that in molar fractions on a

scale of one.  And if you move the decimal point over to, we

could look at that as a percent.  So this second column here is

exactly 6:2:5:1 in percent, so 42.9 percent alanine,

14.3 percent glutamic acid, 35.7 percent lysine, and

7.1 percent tyrosine.

These are the Mylan's molar fraction data that they

submitted.  And if we again simply move the decimal point over

to express it as a percent, you can see that Mylan's batch one

is 42.7 percent alanine, 14.4 percent glutamic acid,

33.6 percent lysine, and 9.2 percent tyrosine.  So the total

difference in amino acid composition here 4.5 percent and, in

my opinion, those are equivalent.

Q.  Would you explain just for a moment ho you got to 4.5

percent?

A.  Right, thank you.  So I should have explained that.  I just

did the math in my head.  But if we look at the difference

between alanine for exactly 6:2:5:1, and Mylan's percentage,

that's a .2 percent difference in alanine, a .1 percent

difference in glutamic acid, a 2.1 percent difference in

lysine, and a 2.1 percent difference in tyrosine.  So if you

1    take the sum of those differences, it's a 4.5 percent total

2    amino acid difference.  And, again, that's equivalent -- I

3    believe that these mole percentages or molar fractions are

4    equivalent to exactly 6:2:5:1.

5    Q.  Dr. Sampson, I want to focus in on the tyrosine line for a

6    moment.  Did you hear Dr. Gokel asked about whether there was a

7    30 percent difference in tyrosine content between Mylan's molar

8    fraction on exactly 6:2:5:1?

9              MR. JONES:  Your Honor, this is outside the scope of

10    her report.  She did no analysis of tyrosine.

11              MS. HOLLAND:  Your Honor, Dr. Sampson's expert reports

12    do cover this, and they also incorporate by reference the Dr.

13    Gokel's report on this issue, and they were welcome to question

14    Dr. Sampson at deposition on this subject.

15              THE COURT:  Unfortunately, I'm not going to have the

16    time to stop now.  I'd like to get the testimony in.

17              MR. JONES:  Very well.

18              THE COURT:  I appreciate your objection.  I'll

19    consider it.

20              Go ahead.

21              MR. JONES:  Very good, your Honor.

22    A.  So could you please repeat the question?

23    Q.  Yes.  Did you hear Dr. Gokel asked whether there was a

24    30 percent difference of tyrosine between the seven point --

25    between the .071 and .092 molar fractions that are represented

1    here in this slide?

2    A.  Yes, I did.

3    Q.  Okay.  Do you disagree as a matter of mathematics that

4    there is a 30 percent difference between .071 and .092?

5    A.  I agree as a matter of arithmetic that there's a 30 percent

6    difference between .071 and .092.

7    Q.  Does that mean that the molar ratios differ from each other

8    by 30 percent?

9    A.  No, it does not.

10   Q.  Can you explain why?

11   A.  Because we're looking at the polypeptide and its

12   composition, one has to look at the composition in its

13   entirety.  And you can't simply look at the composition of a

14   single amino acid ignoring what happens to the other amino

15   acids.

16          So really what happens to the composition of

17   copolymer-1 in going from exactly 6:2:5:1 to Mylan's molar

18   percentages, is there's a 2 percent change 2.1 percent change

19   in the tyrosine content between those two batches of

20   copolymer-1, you will call it a match.

21   Q.  All right.  Do you have an opinion as to whether the molar

22   ratio in Sandoz's product is equivalent to approximately

23   6:2:5:1?

24   A.  Yes, I do.  And that -- how I arrived at that is shown on

25   this slide.  Again, we have alanine, glutamic acid, lysine and

1    tyrosine.  The first two columns are the same as on the

2    previous slide, but now the molar fraction data is coming from

3    Sandoz submission to the FDA.

4            Again, I simply moved the decimal point over two

5    places to look at it as a percent.  And what you can see is

6    that Sandoz lot is 42.7 percent alanine, which is a .2 percent

7    difference in alanine, 13.6 percent glutamic acid, which is a

8    .7 percent difference in glutamic acid, 34.4 percent lysine,

9    which is a 1.3 percent difference in lysine, and 9.3 percent

10   tyrosine, which is a 2.1 percent difference in tyrosine.

11           So taking that percent difference overall, the total

12   difference in amino acid content is 4.4 percent, and, in my

13   opinion, that's equivalent to -- this difference is

14   insubstantial, and this mole percentage is equivalent to this

15   mole percentage over.

16   Q.  When you said this.  Just for the record -- sorry.

17   A.  Sandoz mole percentage is equivalent to the mole percentage

18   in exactly 6:2:5:1.

19   Q.  And is it equivalent to the mole percentage of

20   approximately 6:2:5:1?

21   A.  And it's also equivalent in a mole percentage of

22   approximately 6:2:5:1.

23           (Continued on next page)

24

25

548

199FTEV5                    Sampson - direct

1   Q.  Now, what would this approximately 4 percent total

2   difference in amino acid molar ratio from exactly 6:2:5:1 mean

3   in terms of an actual copolymer-1 polypeptide?

4   A.  If I could have the next slide, please.  As I mentioned

5   before, one has to think about this in terms of the overall

6   composition and what's shown here is a 70 amino acid

7   copolymer-1.  Shows in as 70 amino acids because that

8   corresponds to a molecular weight of about 7-1/2 kilodaltons

9   and if we take the molar ratio of exactly 6:2:5:1 that means

10  that there are 30 alanines, 10 glutamic acids, 25 lysines and 5

11  tyrosines.  If there's a 4 percent different or a 4.4 percent

12  difference, what that amounts to is one amino acid changes and

13  now you have 30 alanines, 10 glutamic acids, 1 less lysine, so

14  24 lysines and 1 more tyrosine, so that's 6 tyrosines.

15       So a 4 percent total difference is simply a way of

16  representing how much does the overall composition of the

17  polypeptide copolymer-1 change and as I said it corresponds to

18  a one amino acid change.

19  Q.  Have you reviewed any literature that supports your opinion

20  that this type of difference in molar ratio for copolymer-1

21  would be insubstantial?

22  A.  Yes, I have.

23  Q.  What did you review?

24  A.  I reviewed a paper by Teitelbaum and co-workers which was

25  published in 1971.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  Would you turn to PTX 499 in your binder?

2   A.  Yes, I have it.

3   Q.  Is this the Teitelbaum reference you were referring to?

4   A.  Yes, it is.

5        MS. HOLLAND:  This document is already in evidence,

6   your Honor.

7        THE COURT:  Yes.

8   Q.  Is this article referred to in the specification of the

9   patents in suit in this case?

10  A.  Yes, it is.

11  Q.  All right.  Dr. Gokel discussed the molar ratio data here

12  in some detail, but I want to focus on one particular aspect of

13  the article.  Let's go to table 8 on page 247.  This is

14  entitled specificity of EAE supression.  Could you explain

15  what's being referred to here?

16  A.  So with this table the authors report their data on

17  biological testing in the EAE model for MS and EAE is

18  experimental allergen encephalomyelitis.  This is a model in

19  guinea pigs in which the disease is induced by injecting the

20  animals with EE or basic encephalitogen as shown under their

21  treatment conditions.  And what they're testing in the data

22  they're reporting here is whether various copolymers can

23  suppress the disease in these guinea pigs in this animal model

24  for MS.

25  Q.  And can you explain the results that are reported here?

1    A.   Yes.  So if we focus on the first three lines, control and

2    clinical incidence, actually, thank you, what is going on here

3    is these animals as I mentioned, the EAE has been induced, they

4    have a disease and now they're treated either with a control or

5    with batch one of copolymer-1 or with batch 2 of copolymer-1 so

6    they're two different synthesized batches of copolymer.  And

7    then they're treated three times at five days apart, and then

8    at the end of the experiment, the animals are analyzed for

9    whether they have the clinical symptoms of disease which happen

10   to be hind leg paralysis.

11            In the control 64 percent of the animals have EAE

12   whereas when they're treated with copolymer batch 1 only 22

13   percent of the animals have EAE at the end point of this assay,

14   which means that the EAE has been suppressed.  And if you look

15   at treatment with copolymer-1 batch 2, again, only 23 percent

16   of the animals have EAE, that is, the EAE has been suppressed

17   by treatment with batch 2 of copolymer-1.

18   Q.   What were the molar ratios amino acids in these two batches

19   of copolymer-1?

20   A.   So those molar ratios are in table 1, if we could go back

21   to table 1.  Page 243.  And so this table is simply a

22   composition of copolymer-1, I believe we've seen this before,

23   the four amino acids; alanine, glutamic acid, lysine and

24   tyrosine and batch 1 has a molar ratio of 6.0 alanines to 1.9

25   glutamic acids to 4.7 lysines to 1.0 tyrosines.  Batch 2 has

1   6.7 alanines to 2.1 glutamic acids to 4.2 lysines to 1.0

2   tyrosine.

3   Q.  Is there some variation molar ratio between these two

4   batches and exactly 6:2:5:1?

5   A.  Yes.  The molar ratios vary somewhat.  If we could go to

6   the next slide.  I've calculated that.  So again, alanine,

7   glutamic acid, lysine and tyrosine.  Here are the molar

8   percentages for exactly 6:2:5:1 and I've used two significant

9   figures, since that's what's used in the Teitelbaum 1971 paper.

10  Batch 1 is 44 percent alanine, so 1 percent more alanine;

11  14 percent glutamic acid, so the same as exactly 6:2:5:1;

12  35 percent lysine, so 1 percent less lysine than exactly

13  6:2:5:1 and 7 percent tyrosine, so the same amount of tyrosine.

14          Contrast batch 2 is 48 percent alanine, so 5 percent

15  more alanine, 15 percent glutamic acid, so 1 percent more

16  glutamic acid.  30 percent lysine, so 6 percent lysine, and

17  7 percent tyrosine.

18          So if we look at for batch 1 the total amino acid

19  difference between exactly 6:2:5:1 and batch 1 it's 2 percent,

20  and in the case of batch 2, the total amino acid difference is

21  12 percent.

22  Q.  How did these two batches of copolymer-1 compare to each

23  other in the results of the EAE test?

24  A.  If I could have the next slide.  What's shown on the left

25  here is exactly what was I just went through on the previous

1    slide, so we'll call that batch 1 differed by 2 percent amino

2    acid composition from exactly 6:2:5:1 and batch 2 differed by

3    12 percent amino acid composition from 6:2:5:1 and then this is

4    a repeat of the EAE supression data.  Just to point out to you

5    these percents are not amino acid composition percents, these

6    are percentages of clinical incidence of EAE.  So batch 1

7    suppressed, the clinical incidence is reduced from 64 percent

8    to 22 percent, and copolymer-1 batch 2 reduce the clinical

9    incidence from 64 percent to 23 percent, so the amount of

10   supression is very similar between these two batches of

11   copolymer-1.

12   Q.  Could we go to page 247 of the article, please, and the

13   discussion section?  Thank you.  The second paragraph in the

14   discussion.  Did Professor Arnon and the other authors here

15   indicate whether they believed the amino acid compositions of

16   batch 1 and batch 2 of copolymer-1 to be comparable?

17   A.  Yes, they did.  They said that the amino acid composition

18   was the same.

19   Q.  And did the authors characterize the results of the EAE

20   testing on the two batches of copolymer-1?

21   A.  Yes, they did.  In the same sentence they said they stated

22   that the biological activity was similar for both batches of

23   copolymer-1.

24   Q.  How did the amino acid molar ratios of Mylan's product and

25   copolymer-1 batch 2, the Teitelbaum reference, compare to

1    exactly 6:2:5:1?

2    A.  So I've pulled those data together on the next slide, going

3    to look at that side by side, and these are the same numbers

4    that we've seen before; alanine, glutamic acid, lysine,

5    tyrosine, exactly 6:2:5:1.  These are the percents for Mylan's

6    submission to the FDA and recall that the total percent

7    difference in amino acids was 4.5 percent and here are the

8    numbers from Teitelbaum 1971 batch 2 of copolymer-1 and recall

9    that percent total difference amino acid composition is

10   12 percent.  So in fact, in terms of total amino acid

11   differences, batch 2 is less alike exactly 6:2:5:1 than Mylan's

12   batch 1.

13          So in my opinion, the difference here between Mylan's

14   batch 1 and approximately 6:2:5:1 is insubstantial because

15   batch 2, Teitelbaum batch 2 activity is very similar.

16   Q.  Let's consider Sandoz' product now.  How did the amino acid

17   molar ratios of Sandoz' product in copolymer-1 batch 2 in the

18   Teitelbaum 1971 reference compare exactly to 6:2:5:1?

19   A.  So once again, we have the mole percent of exactly 6:2:5:1

20   for alanine, glutamic acid, lysine and tyrosine, and these are

21   the numbers pulled from a previous slide from Sandoz' lot

22   submission to the FDA that was 4.4 percent different in total

23   amino acid differences.  Again, Teitelbaum batch 2 had a

24   12 percent total difference.  So as you can see, Sandoz'

25   differences are smaller than those of Teitelbaum batch 2 and so

1    in my opinion the difference of Sandoz' batch from exactly or

2    approximately 6:2:5:1 is insubstantial.

3    Q.  And just to be clear, does the Teitelbaum paper call batch

4    1 and batch 2 both copolymer-1?

5    A.   In Teitelbaum these are batch 1 and batch 2.  They're two

6    different batches of copolymer-1, yes.

7    Q.  Are you aware that Mylan is taking a position that the

8    molar ratio in its lots should be normalized to tyrosine before

9    comparing to 6:2:5:1?

10   A.  Yes, I am.

11   Q.  Now, in your opinion, if Mylan's molar ratio were

12   normalized to tyrosine, would there be a substantial difference

13   between that normalized molar ratio and exactly or

14   approximately 6:2:5:1?

15   A.  No.

16   Q.  Why not?

17   A.  Because it doesn't matter what scale you normalize on.

18   What matters is the total amino acid percent difference.  So if

19   you could go to the next slide.  No, back one slide, I'm sorry,

20   this slide.  You're ahead of me.

21        Here are the percentages that, excuse me, the molar

22   fractions of Mylan's data that I normalize to one, a tyrosine

23   of one, so that molar ratio is 4.64 to 1.57 to 3.65 to 1.  The

24   total number of amino acids in that molar ratio is 10.86.  If

25   we express that as a percent, you see it's 43 percent alanine,

1    14 percent glutamic acid, 34 percent lysine and 9 percent

2    tyrosine.

3    Q.  Can I stop you there for a second?  Could you just explain

4    how you got those percentages from the normalized data?

5    A.  Sure.  So the way that I calculated a percent is simply by

6    summing up the total number of moles of alanine, glutamic acid,

7    lysine and tyrosine and that sum is 10.86.  So in order to

8    calculate the percent, one simply takes 4.64 alanines and

9    divides by 10.86, so 10.86 is the denominator and then to

10   convert it to a percent multiply it by 100.  So that would be

11   43 percent.

12           And likewise we can divide 1.57 by 10.86, multiply by

13   100 and get 14 percent.  3.65 divided by 10.86, multiply by

14   100, get 34 percent, and 1 divided by 10.86 times 100 is

15   9 percent.  So I've simply converted to a scale of 100 percent.

16           And if we look at Mylan's molar fraction data, convert

17   it to percent and I rounded just simply for clarity, 43 percent

18   is the same as 43 percent, 14 percent glutamic acid is the

19   same, whether it comes from normalized tyrosine or from the

20   molar fractions; 34 percent is the same as 34 percent and

21   9 percent tyrosine is the same as 9 percent tyrosine.  It

22   doesn't matter what scale you're on.  It's simply what percent

23   of the total mixture is that particular amino acid of interest.

24   Q.  Were you here when Dr. Gokel was shown some papers that had

25   molar ratios for Copaxone that were similar to these normalized

1  numbers?

2  A.  Yes, I was.

3  Q.  Can those normalized numbers be compared directly to

4  6:2:5:1?

5  A.  No.  One has to be on the same scale.  So again, you have

6  to either be on a scale of 10.86 for all of the numbers that

7  you're comparing, a scale of 14 for all of the numbers that

8  you're comparing, a scale of 1 for all the numbers you're

9  comparing or a scale of 100 percent for all the numbers you're

10  comparing.  You just have to be on the same scale before you

11  compare the identity of the numbers.

12  Q.  Dr. Sampson, you testified earlier that the overall percent

13  difference between Teitelbaum batch 2 of copolymer-1 and

14  exactly 6:2:5:1 was 12 percent.  Can you explain what that

15  would mean in terms of an actual copolymer-1 polypeptide?

16  A.  Yes.  So this total percent difference that we're talking

17  about is simply a mathematical representation that can scale to

18  whatever size polypeptide we're looking at.  So if we look at a

19  70 amino acid polypeptide, which I showed you earlier and on

20  the top, is exactly 6:2:5:1, 30 alanines, 10 glutamic acids, 25

21  lysines, 5 tyrosines, then this is what that 70 amino acid

22  copolymer-1 looks like.

23      If there's a 12 percent difference in amino acid

24  composition, what that means is that four amino acids will

25  change.  So I've drawn that out in the bottom here.  We go from

1   30 alanines to 33 alanines, that's plus 3 amino acids.  From 10

2   glutamic acids to 11 glutamic acids that's plus an additional

3   amino acid and 25 lysines is reduced by 4 to 21 lysines and 5

4   tyrosines stays 5 tyrosines.  So a 12 percent total amino acid

5   difference means that 4 amino acids will change.

6   Q.  Now, how did these four amino acids changing compare to how

7   Mylan and Sandoz' drug substances would change in an actual

8   copolymer-1 polypeptide?

9   A.  As I mentioned earlier their total amino acid percent

10  difference were on the order of 4 to 4-1/2 percent and that

11  corresponds to a 1 amino acid change.  So this is Teitelbaum

12  batch 2 of copolymer-1, it has the same biological activity, it

13  has -- excuse me, this is Teitelbaum 1971 batch 2 copolymer-1,

14  did I say that right?  It has the same biological activity as

15  batch 1.  It's 12 percent different, 4 amino acids different

16  than exactly 6:2:5:1.  The Sandoz and the Mylan drug substances

17  are within that amount of difference.  There's only a 1 amino

18  acid difference if you look at a 70 amino acids polypeptide, so

19  my opinion is that they're substantially different.

20  Q.  Dr. Sampson, does this sum up in your opinion is the molar

21  ratio in Mylan's products equivalent to approximately 6:2:5:1?

22  A.  Yes, it is my opinion that Mylan's product is equivalent to

23  approximately 6:2:5:1.

24  Q.  And in your opinion, is the molar ratio of Sandoz' product

25  equivalent to approximately 6:2:5:1?

1    A.  Yes, it is my opinion that the Sandoz product is equivalent

2    to approximately 6:2:5:1.

3           MS. HOLLAND:  Thank you, Dr. Sampson.

4           THE COURT:  You may proceed.

5           MR. JONES:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. JONES:

8    Q.  Dr. Sampson, my name is David Jones.  I represent Mylan.

9    I'll be talking to you for not too long this afternoon.  Do you

10   want some water?

11   A.  I have, thank you.

12   Q.  I appreciate what your lab does, but I want to be clear.

13   Your lab didn't do any bioassays on copolymer-1, is that

14   correct?

15   A.  That is correct.

16   Q.  You didn't do any bioassays on Mylan's proposed ANDA

17   product, correct?

18   A.  That is correct.

19   Q.  And you haven't done any bioassays on Copaxone, the drug

20   that's sold as Copaxone by Teva, correct?

21   A.  That's correct.

22   Q.  And you based your opinion basically on the Teitelbaum

23   paper, correct?

24   A.  I used the Teitelbaum analysis, yes.

25   Q.  That's the only bioassay analysis that you cite in your

1   paper, correct?

2   A.  I'm not sure what you mean by my paper.  I didn't write any

3   papers on copolymer-1.

4   Q.  I'm sorry, you didn't write any papers on copolymer-1, but

5   you have done an expert report in this case, correct, a

6   supplemental expert report?

7   A.  I've written several reports, yes.

8   Q.  Okay.  And of all those reports, the only bioassay that you

9   did, especially in the supplemental report is the bioassay

10  referred to in the Teitelbaum 1971 paper, correct?

11  A.  I'd have to go back and look through my reports, but that's

12  my recollection.

13  Q.  And that's the study on rabbits, right?

14  A.  Pardon me?

15  Q.  I'm sorry, not rabbits.  Guinea pigs, the '71 Teitelbaum is

16  an assay on guinea pigs, correct?

17  A.  As I just discussed in my direct testimony EAE suppression

18  was studied in guinea pigs.

19  Q.  So for your determination of equivalence you haven't relied

20  on any studies that look at Mylan's ANDA product how that

21  product might effect or have a bioeffect on humans, correct?

22  A.  If you're asking have I reviewed any of Mylan's clinical

23  human data, is that the question?

24  Q.  I guess it's a little simpler, it's just in reaching your

25  opinion on equivalence which you just gave you didn't rely on

1    any bioassay studies on the effect of Mylan's product on

2    humans, correct?

3    A.  No, I didn't use any Mylan studies.

4    Q.  And so the only bioassay you looked at was the bioassay

5    that assessed how copolymer-1 as it was made back in 1971

6    affected guinea pigs, correct?

7    A.  That's correct.

8    Q.  I do want to focus on what happens to tyrosine as

9    copolymer-1 has evolved over time.  Could I please have some

10   slides?  Dr. Sampson, what I did here, I have a table here of

11   tyrosine molar fractions, and I got the data from your slides 2

12   and 7, so a report that molar fraction for tyrosine for exactly

13   six-two-five-one molar fraction for Teitelbaum batch 1 and

14   Teitelbaum batch 2, you presented them as a percentage but we

15   have them here as molar fractions, and then the Mylan molar

16   fraction for tyrosine, .092, is that clear?

17   A.  Those look like molar fractions of tyrosine that we saw

18   before.

19   Q.  That we saw in your slides, correct?

20   A.  Mm-hmm.

21   Q.  I want to first, when we compare what happens to tyrosine

22   when we go from exactly six-two-five-one to Teitelbaum batch 1,

23   we see that the percentage difference and I showed my math, the

24   percentage difference here in the amount, the molar fraction

25   amounts is 1.4 percent, correct?

A.   I agree with your arithmetic.  .001 times .071 times 100 is

1.4 percent.  I don't agree with how you're doing molar

fractions.

Q.   When you compare what happens with tyrosine from batch 1 to

batch 2, I don't have to show the math that's a zero percent

increase, correct?

A.   Those two numbers are the same.

Q.   Right and when I look to see what happens from either

Teitelbaum batch 1 or Teitelbaum batch 2 because they showed

the same amount of tyrosine, what happens when you go to Mylan,

the product that's made using phenol, you see a tyrosine

increase of 31.4 percent, correct, in the molar fractions?

A.   Incorrect.

Q.   Did I divide wrong there, Doctor?

A.   No, your arithmetic is fine.

Q.   All right, and when you do the arithmetic, you see that

31.4 percent increase from batch 1 or batch 2 in Mylan's

product, correct?

A.   No.

Q.   Let's take a look now at what happens when you compare

Mylan -- what happens to the Mylan product when you compare it

to exactly six-two-five-one?  You see that the tyrosine molar

fraction has increased 29.5 percent correct?

A.   No.

Q.   Is my math incorrect?

562

199FTEV5                    Sampson - cross

1   A.  Your arithmetic is fine.

2   Q.  And does my arithmetic reflect the calculation one would

3   use to find percentage change in two numbers?

4   A.  It is how you can look at the percentage change in two

5   numbers.

6   Q.  All right.  Now, I'd like to have up your slide six.  And

7   again, what you're showing here is in Teitelbaum batch 1 and

8   batch 2.  You've got no percentage change in the tyrosine,

9   right?

10  A.  Teitelbaum batch 1 has 7 percent tyrosine and Teitelbaum

11  batch 2 has 7 percent tyrosine and exactly 6:2:5:1 has

12  7 percent tyrosine, yes.

13  Q.  And I want to, just so that we're clear because there's

14  been a lot of talk about the molar fraction, can I have in this

15  zeroing out PTX 4299, the Teitelbaum report you referred to in

16  your examination, and if we could go to page 243.  That's the

17  column with the batch 1 and the batch 2 in the molar ratios.

18  Pull that out.  We're talking about you have to put things on

19  the same scale correct?

20  A.  They have to be on the same scale in order to compare them

21  directly, yes.

22  Q.  So you agree with me that when the inventors of copolymer-1

23  were reporting their molar ratio and coming to the assessment

24  that they were the same product, you'd agree that they didn't

25  put these two molar ratios on the same scale, correct?  What

1  does batch 1 add up to?

2  A.  May I use the calculator that's sitting up here?

3  Q.  I'll tell you what, you can take my representation that it

4  adds up to 13.6.

5  A.  Thank you.  So I'll take it on your word that it's 13.6.

6  Q.  And then batch 2 adds up to 14, correct?

7  A.  That's my recollection, correct.

8  Q.  And that's not the exact same scale, correct?

9  A.  Those aren't the exact same scale.

10 Q.  No.  So the copolymer-1 inventors didn't see a need to

11 multiply things by 14 or put their molar ratios on the same

12 scale when they were calculating for molar ratio in

13 copolymer-1, correct?

14         MS. HOLLAND:  Objection, your Honor.

15         THE COURT:  Sustained.

16 A.  I don't know what the inventors did.

17         MS. HOLLAND:  No, don't --

18         THE COURT:  That's exactly the reason why.

19 Q.  That's why she sustained the objection.

20 A.  I've always had a hard time with the word "sustained."

21 Q.  If we go back to, well, actually, yes, let's go back to

22 your slide 6.  There were a couple of questions I had on that.

23         You were here when my colleague, Mr. Anstaett went

24 through the series of papers that the copolymer-1 inventors had

25 done since the 1971 paper and you heard that testimony about

1   how the inventors when they specified a molar ratio referred

2   specifically to the batch 1 molar ratio, correct?

3            MS. HOLLAND:  That wasn't the testimony.

4            THE COURT:  All right.  Do you want to rephrase that?

5   Q.  Sure.  When there was a specific reference, when the

6   inventors of copolymer-1 in their articles after the '71

7   Teitelbaum study, so when the inventors of copolymer-1 would

8   specify when they would actually write out in an article or a

9   publication a molar ratio, the molar ratio that they wrote out

10  was the batch 1 ratio, correct?

11           MS. HOLLAND:  Your Honor, I think the problem is that

12  Dr. Gokel was shown specific papers with specific numbers and I

13  think there's some sort of generalization on her testimony

14  based on that that was not on direct.

15           THE COURT:  Can you do it with the exhibits?

16           MR. JONES:  I could do it.  It would take a little

17  more time.  I'll try to ask a cleaner question see if we can

18  move along, not try anybody's patience.

19           THE COURT:  All right.

20  Q.  I'll ask it this way:  You were here for the testimony of

21  Dr. Gokel, correct?

22  A.  Yes, I was.

23  Q.  And you were here for the examination of Dr. Gokel by my

24  colleague, Mr. Anstaett, correct?

25  A.  Yes, I was.

1  Q.  As well as his redirect, you were here for that testimony,

2  correct?

3  A.  Yes, I was.

4  Q.  Do you recall, I'm just asking you what you recall, do you

5  recall seeing any reference after 1971, any specific time when

6  the inventors of copolymer-1 wrote down the molar ratio that's

7  reflected from batch 2, do you remember that at all?

8  A.  I don't recall.

9  Q.  And when I look at your table here, I see 2 percent, that

10  2 percent difference between Teitelbaum batch 1 and exactly

11  6:2:5:1, do you see that?

12  A.  Mm-hmm.

13  Q.  Right?

14  A.  Yes.

15  Q.  That 2 percent, that's in fact the experimental accuracy

16  range that was developed on the, that Teva had developed for

17  copolymer-1 as of 1995 when they were doing their amino acid

18  analysis.  Do you remember the exhibit on that?

19  A.  I'm not familiar with that.

20  Q.  Were you here in the courtroom when my colleague showed

21  Dr. Gokel the Teva document that specified that amino acid

22  analysis precision was at a level of 2 percent?

23  A.  I recall you putting that up, but I've not reviewed that

24  document.

25          (Continued next page)

1   BY MR. JONES:

2   Q.  And if you got precision level of 2 percent, that's a fair,

3   that's a fair assessment of approximately, right?  If you have

4   precision at 2 percent, then approximately will cover that

5   2 percent experimental accuracy range, right?

6   A.  I'm very unclear what you're referring to 2 percent of.

7   Q.  Is experimental accuracy, is that a fair concept to

8   incorporate when you're trying to figure what the term

9   approximately means?

10          THE COURT:  I'm confused as well, Mr. Jones.

11          MR. JONES:  All right.

12          THE COURT:  Are you talking about, I don't know,

13   reproducibility of results, margins of errors, what are we

14   talking about?

15   Q.  That's precisely it.  Reproducibility of results, margin of

16   error and calculation, are those fair types of concepts to

17   consider when you're determining whether something falls

18   approximately within a range?

19   A.  I'm not sure that they're related in this context, directly

20   related in this context.

21   Q.  Just so we are clear, if I could have up DTX-2047 at

22   TEV-3370?

23          MS. HOLLAND:  Your Honor, I'm going to object.  I

24   think Dr. Sampson already said she wasn't familiar with the

25   document.  The document was already read into the record, I

1    believe, during Dr. Gokel's testimony.  I'm not sure there's

2    anything else this witness can add to this document.

3              THE COURT:  Well, what's the question?

4    BY MR. JONES:

5    Q.  The question simply is is repeatability and producibility,

6    are those two concepts, do they have any relevance in your mind

7    when you're trying to determine the meaning of approximately

8    when you are reporting on a molar fraction?

9              THE COURT:  Can you answer that?  I think you may have

10   already.

11   A.  As I said before, approximately is, is not directly related

12   to repeatability or producibility.  It might include it, but

13   that's not all there is to it.

14   Q.  And you would include in your idea of approximately

15   includes though Teitelbaum 2, is that correct?

16   A.  One can perhaps look at it that way.  I include Teitelbaum

17   2 because it's equivalent.

18   Q.  Okay.  Now, as we showed earlier, you'd agree, if not on

19   the percentage change, you would agree that tyrosine or that

20   Mylan's ANDA product has more tyrosine than was reported in the

21   products that were the subject of Teitelbaum 1971, right?

22   A.  I would agree that if we look at 70 amino acids,

23   polypeptide, Mylan has one more tyrosine.

24   Q.  And if you look at millions of billions of polypeptides,

25   which is what you get when you're actually producing copolymer

1  or Copaxone or Mylan's ANDA product, millions and bills, you're

2  going to have millions and billions of more tyrosines, correct?

3  A.  No.

4  Q.  Doctor, do we know, is it your understanding -- or I'll ask

5  it this way.

6        It's true, isn't it, that we really don't fully

7  understand the way that glatiramer acetate exerts its effect on

8  patients with MS?

9  A.  I haven't reviewed papers to look at them.

10 Q.  Well, were you here for the first day of testimony?

11 A.  No, I was not here for the entire day.

12 Q.  Could I have PTX-697, page 4?  697 was -- is an exhibit

13 that was admitted under Mr. Congleton's examination.  And when

14 we look under mechanisms, I'll represent to you that PTX-697 is

15 the label for Copaxone, all right?

16 A.  Okay.

17 Q.  If we look under 12.1 one, mechanism of action, we see that

18 Teva says that the mechanism or mechanisms by which glatiramer

19 acetate exerts its effects in patients with MS are not fully

20 understood.

21       That's what Teva says.  Do you have a reason to

22 dispute that?

23 A.  I agree that the sentence up there says that the mechanism

24 by which glatiramer acetate works is not fully understood.

25 Q.  Do you fully understand the mechanism by which glatiramer

1    acetate works on humans?

2    A.  I have no comment.  I mean --

3    Q.  Do you understand what role tyrosine plays in the action of

4    glatiramer acetate on the human body?

5    A.  Tyrosine is one component of glatiramer acetate.

6    Q.  Exactly.  Do you know what role it plays in the treatment

7    of MS?

8    A.  I know that it's part of the drug substance.

9    Q.  You didn't cite any test that compared what happens when

10   you increase or decrease levels of tyrosine, glatiramer

11   acetate, did you?

12   A.  I cited the tests between batch one and batch two where the

13   molar amino acid composition changes between the two.

14   Q.  And the tyrosine remained the same, correct?

15   A.  Percent tyrosine there is the same.

16   Q.  So the answer to my question is, you didn't review or

17   didn't cite in your report any studies that analyzed how the

18   effectiveness of glatiramer acetate might change when you

19   increased the level of tyrosine, correct?

20   A.  No.

21   Q.  We really just don't know, do we?

22          THE COURT:  I think it's been answered.

23          MR. JONES:  Nothing further, your Honor.  Thank you.

24          THE COURT:  All right.

25          MS. HOLLAND:  No redirect, your Honor.

570

199ztev6                    Sampson - cross

1          MR. DOYLE:  No questions, your Honor.

2          THE COURT:  All right.

3          Thank you, Dr. Sampson, you may step down.  You're

4    excused.

5          (Witness excused)

6          THE WITNESS:  Okay.Ms. Holland.

7          MS. HOLLAND:  Yes, your Honor.  As we discussed this

8    is our last live witness, but we do have deposition

9    designations.  We plan to be to be able to submit those to the

10   court on Tuesday morning.  So what we were thinking is that we

11   would submit those to the Court, and then rest first thing

12   Tuesday morning, and then get on with the defendant's case.

13         THE COURT:  Let me ask you this.  These will be

14   destinations and counter designations in one?  Okay.

15         MS. HOLLAND:  Yes.

16         THE COURT:  And counter counter designations?

17         MS. HOLLAND:  No.  I think however many counters there

18   are will be in one place, your Honor.

19         THE COURT:  Very good.  As they're done, could you

20   submit them on a rolling basis, by any chance?

21         MS. HOLLAND:  Yes.

22         THE COURT:  If you have one --

23         MS. HOLLAND:  Today, your Honor, we'll deliver some to

24   chambers.

25         THE COURT:  Witness by witness deposition, that would

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  be great.

2          MS. HOLLAND:  We can do that.

3          THE COURT:  We appreciate that.  Okay.

4          Yes.

5          MS. BLOODWORTH:  Just for a housekeeping matter of the

6  redaction, I believe we usually in the July trial we submitted

7  the deposition designations, as well as the exhibits.  The

8  parties haven't had a chance to redact those exhibits yet, but

9  we'd be happy to provide replacement copies for the record once

10 those are complete.

11         THE COURT:  Okay.  Why don't we do it that way, then.

12         Anything else?  Great, all right.  So I guess –– I'm

13 not here Monday, but we'll start up Tuesday morning 9:30.

14         MS. BLOODWORTH:  Your Honor, if I, may one last thing.

15 We're still working with plaintiffs.  We do not have yet from

16 them the scope of their rebuttal testimony of witnesses.  We

17 had provided our rebuttal, scope of our witnesses as well as

18 our direct scope of our witnesses, and I hope we could reach

19 resolution on that this evening.  But as of right now we don't

20 have for planning purposes what their rebuttal case is going to

21 be.

22         MS. HOLLAND:  Your Honor, as we explained to

23 defendants, we can today give them the scope of what our, we

24 plan for our experts to state.  We actually don't know for sure

25 because we're going to be rebutting a case that hasn't been put

1    on yet.

2         THE COURT:  Right.

3         MS. HOLLAND:  So we will do it as expeditiously as

4    possible, and hopefully by Tuesday we'll have an agreement.

5         MS. BLOODWORTH:  Your Honor, if I may, just for

6    clarification.  Our case has been fully provided to plaintiffs

7    in pretrial brief, our pretrial disclosures, our expert

8    reports.  We've also provided them with a summary of the

9    expected testimony of our case in chief.  And we have planned,

10   for planning purposes, I need to know whether or not certain

11   experts that need to be here or need to go home.  And I think

12   it's, at this point in time a week away from trial, I just

13   don't see why plaintiffs don't have a guesstimate as to the

14   scope of their eight rebuttal witnesses, three of them are fact

15   witnesses who haven't put any expert disclosures in this case.

16        MS. HOLLAND:  Your Honor, fact witnesses we don't need

17   to put in expert disclosures, they're fact witnesses.  We have

18   them on the rebuttal list because we actually want to hear the

19   testimony that goes in rebuttal to see if we need any fact

20   witness to rebut any factual issue that comes up during the

21   defendants' case.  We told defendants that we could give them

22   scope of the expert testimony today if they wanted it.  The

23   fact witnesses we really literally don't know what they're

24   going to be saying until we hear defendants' case and see if

25   there's anything factually that needs to be rebutted.

1          MS. BLOODWORTH:  Your Honor, the fact witnesses on

2     their list are fact witnesses that are highly specialized, have

3     highly specialized knowledge, and I think that they are

4     appropriate.

5          THE COURT:  Who are we talking?

6          MR. DOYLE:  Your Honor, more fundamentally, there's a

7     disconnect here.  If that witness on their list tell a

8     development history back in the 70's, 60's, our fact witness is

9     Dr. Bishop who is involved in the development of our ANDA, our

10    processes in the late 2000s.  So, again, there's no

11    relationship here between -- there is a and seek going on here.

12    And it is very difficult for us to tell our witnesses anything,

13    prepare in any way.

14         Our rebuttal witnesses are completely disclosed, the

15    scope has been -- was disclosed.  It was disclosed well before

16    they started their or the time they started their case, so

17    again, there is --

18         THE COURT:  Are we only talking about the

19    disclosure -- you're obviously prepared to give them the

20    disclose on the experts.

21         MS. HOLLAND:  Yes, your Honor.

22         THE COURT:  Ms. Holland?

23         MS. HOLLAND:  Yes.

24         THE COURT:  So this issue is over three fact

25    witnesses.

1          MS. HOLLAND:  I believe that's correct.

2          THE COURT:  And these are developmental witnesses

3    about the development of the product.

4          MS. HOLLAND:  Well, for example, your Honor, I mean we

5    saw in the opening that Sandoz put on a lot of stuff about

6    Teva's development, and we don't know exactly what's going to

7    come in through their witnesses and whether there will be a

8    need to rebut something or not.  We just don't know.

9          So, yes, I think generally, yes, their witnesses who

10   have knowledge about things that occurred in the past, but that

11   seems to be part of defendants' case for now.  So we can't --

12   sorry.

13         MR. DOYLE:  We can't have fact witnesses of our own

14   about that because we weren't their.  We have the depositions

15   of their witnesses, which we have submitted to your Honor.

16   That's in the record.

17         THE COURT:  All right.  Look --

18         MS. BLOODWORTH:  Your Honor, I'm sorry to interrupt.

19   One point.  I would like sufficient information about what they

20   believe the scope of their fact witnesses would be so we can

21   make a determination whether or not we do have any issues to

22   raise.

23         THE COURT:  It sounds like at this moment Ms. Holland

24   doesn't know.  Is that fair?

25         MS. HOLLAND:  Yes, your Honor.  I told Ms. Bloodworth

1  that if she puts on her witnesses at the beginning of next

2  week, by Wednesday we should be able to tell them whether we're

3  going do have any fact witnesses that are going to be called in

4  rebuttal on Mylan's case.  So we're not talking about a --

5  　　　　THE COURT:  Based on what you know about their

6  witnesses testimony right now, you don't think you're going to

7  need your fact witnesses, but you're concerned, is that the --

8  　　　　MS. HOLLAND:  Yes.

9  　　　　THE COURT:  -- order?

10  　　　　MS. HOLLAND:  More or less, your Honor.

11  　　　　THE COURT:  So, all right.  I don't know what to tell

12  you.

13  　　　　MS. BLOODWORTH:  Your Honor, if it's not a plan; you

14  know, if it is just purely a rebuttal for maybe explaining a

15  document that was perhaps was shown during rebuttal, that would

16  be --

17  　　　　THE COURT:  If it goes beyond that and you're

18  prejudiced, you can ask me for a brief adjournment or something

19  else, okay?

20  　　　　MS. BLOODWORTH:  Thank you, your Honor.

21  　　　　MR. DOYLE:  Thank you, your Honor.  So but do I

22  understand we are going to get a disclosure of your expert

23  witness, rebuttal witnesses that you're planning we're going to

24  get that very soon?

25  　　　　MS. HOLLAND:  Yes.

1          MR. DOYLE:  When?

2          MS. HOLLAND:  We already discussed that.  We said

3     today.

4          MR. DOYLE:  That's perfect.  Thank you.

5          THE COURT:  Good.  All right.

6          So I'll watch for the deposition designations.  I

7     mean, to the extent that you can get them in on a rolling

8     basis, we appreciate it.

9          MS. HOLLAND:  We're going to do our best, your Honor.

10    It's just that we have to go back and forth between plaintiffs

11    and defendants because --

12         THE COURT:  I understand that.  And, you know, even if

13    you get me some of them or couple of them, whatever, it's

14    better than us just waiting until Tuesday.  I appreciate that.

15         Okay, so I'll see everybody 9:30 Tuesday.

16         MR. HASHMALL:  Thank you, your Honor.

17         MS. HOLLAND:  Thank you, your Honor.

18         (Adjourned to September 13, 2011 at 9:30 a.m.)

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Examination of:                        Page

3     GEORGE GOKEL

4     Direct By Mr. Wiesen . . . . . . . . . . . . 411

5     Cross By Mr. Anstaett  . . . . . . . . . . . 469

6     Cross By Mr. Doyle . . . . . . . . . . . . . 512

7     Redirect By Mr. Wiesen . . . . . . . . . . . 528

8     NICOLE SAMPSON

9     Direct By Ms. Holland . . . . . . . . . . . 535

10    Cross By Mr. Jones . . . . . . . . . . . . . 558

11                    PLAINTIFF EXHIBITS

12    Exhibit No.                          Received

13     PTX 300R, PTX 312R, PTX 313R, PTX 318R  . . . 410

14            and PTX 325R and PTX 330R

15     PTX 214    . . . . . . . . . . . . . . . . 424

16    PTX 219   . . . . . . . . . . . . . . . . . 416

17    PTX-321   . . . . . . . . . . . . . . . . . 445

18    436  . . . . . . . . . . . . . . . . . . . 542

19    PTX 913   . . . . . . . . . . . . . . . . . 420

20    PTX 914   . . . . . . . . . . . . . . . . . 430

21

22

23

24

25

```
 1    PTX 923  . . . . . . . . . . . . . . . . . 437

 2                        DEFENDANT EXHIBITS

 3    Exhibit No.                              Received

 4    1109   . . . . . . . . . . . . . . . . . 478

 5    1110   . . . . . . . . . . . . . . . . . 479

 6    1325   . . . . . . . . . . . . . . . . . 476

 7    1999   . . . . . . . . . . . . . . . . . 487

 8    DTX 1167  . . . . . . . . . . . . . . . 502

 9    DTX 1187  . . . . . . . . . . . . . . . 503

10    DTX 1335  . . . . . . . . . . . . . . . 474

11    DTX 1685  . . . . . . . . . . . . . . . 508

12    DTX 2047  . . . . . . . . . . . . . . . 527

13

14

15

16

17

18

19

20

21

22

23

24

25
```