19dztev1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TEVA PHARMACEUTICALS USA,
INC., TEVA PHARMACEUTICALS
INDUSTRIES LTD., TEVA
NEUROSCIENCE, INC. and YEDA
RESEARCH AND DEVELOPMENT CO.
LTD.,

          Plaintiffs,

      v.                  08-CV-7611 (BSJ)

SANDOZ, INC., SANDOZ
INTERNATIONAL GMBH, NOVARTIS
AG, and MOMENTA
PHARMACEUTICALS, INC.,

          Defendants.

------------------------------x
TEVA PHARMACEUTICALS USA,
INC., TEVA PHARMACEUTICALS
INDUSTRIES LTD., TEVA
NEUROSCIENCE, INC. and YEDA
RESEARCH AND DEVELOPMENT CO.
LTD.,

          Plaintiffs,

      v.                  09-CV-8824 (BSJ)

MYLAN PHARMACEUTICALS INC.,
MYLAN INC., NATCO PHARMA LTD.,

          Defendants.        Non-Jury Trial
------------------------------x

                            New York, N.Y.
                            September 13, 2011
                            9:30 a.m.

Before:

                 HON. BARBARA S. JONES,

                            District Judge

19dztev1

```
 1                            APPEARANCES

 2   KENYON & KENYON
          Attorneys for Plaintiffs
 3   BY:  ELIZABETH J. HOLLAND, ESQ.
          WILLIAM G. JAMES, II, ESQ.
 4        CAROLYN A. BLESSING, ESQ.

 5   GOODWIN PROCTER, LLP
          Attorneys for Plaintiffs
 6   BY:  DAVID M. HASHMALL, ESQ.
          JOHN T. BENNETT, ESQ.
 7        NICHOLAS K. MITROKOSTAS, ESQ.

 8

 9   MORRISON & FOERSTER LLP
          Attorneys for Defendants
10   BY:  DAVID C. DOYLE, ESQ.
          KAREN L. HAGBERG, ESQ.
          ERIC M. ACKER, ESQ.
11

12   PERKINS COIE LLP
          Attorneys for Defendants
13   BY:  JOHN S. SKILTON, ESQ.
          DAVID L. ANSTAETT, ESQ.
14        SHANNON M. BLOODWORTH, ESQ.
          DAVID JONES, ESQ.

15   ALSO PRESENT:  CORT CHASE, Litigation Support

16

17

18

19

20

21

22

23

24

25
```

19dztev1

|  |  |
|---|---|
| 1 | THE DEPUTY CLERK:  All rise. |
| 2 | THE COURT:  Please be seated. |
| 3 | All right.  I just wanted to say I did receive the |
| 4 | designations, so thank you. |
| 5 | And, Ms. Holland? |
| 6 | MS. HOLLAND:  Yes, your Honor.  I think what we're |
| 7 | going to do is just formally move those into evidence before we |
| 8 | rest. |
| 9 | THE COURT:  Okay. |
| 10 | MS. HOLLAND:  Mr. Bennett will explain there's some |
| 11 | issues with a couple of the exhibits that we're still working |
| 12 | out. |
| 13 | THE COURT:  All right, Mr. Bennett.  Good morning |
| 14 | again. |
| 15 | MR. BENNETT:  Good morning, your Honor.  So, first of |
| 16 | all, we're going to move formally into evidence the clip |
| 17 | reports form the depositions that we provided yesterday.  First |
| 18 | would be the Court Reporter -- |
| 19 | THE COURT:  You know, I have an idea.  Are they all |
| 20 | listed their? |
| 21 | MR. BENNETT:  We do have a list, your Honor, that we |
| 22 | could cleanup and give -- hand up. |
| 23 | THE COURT:  Why don't we mark that as an exhibit, give |
| 24 | it to the Reporter. |
| 25 | MR. BENNETT:  That's fine. |

1            THE COURT:  Then we don't have to put it on the

2     record.

3            MR. BENNETT:  Okay.

4            THE COURT:  That's, I assume, agreeable to defendants?

5            MR. DOYLE:  It is, your Honor with the proviso, as Mr.

6     Bennett said, there is a couple of exhibits to the depositions

7     that are still being worked out as far as whether there's a

8     foundation for them.

9            THE COURT:  Okay, all right.  Well, I'm admitting

10    whatever ends up on that list, and if there are disputes,

11    you'll bring them to me, I'm sure.  Okay?

12            MR. DOYLE:  Yes, your Honor.  Thank you.

13            THE COURT:  Great.

14            MS. BLOODWORTH:  Then, your Honor --

15            THE COURT:  We'll, they'll be listed as an exhibit and

16    that way we're done.

17            MS. BLOODWORTH:  Your Honor, if I may suggest.  We

18    should -- can we break out the exhibits we're going to move

19    into your Honor as well as next to that list, the public --

20            THE COURT:  I'm sorry, I didn't hear the first part,

21    Ms. Bloodworth.

22            MS. BLOODWORTH:  Should we also break out the exhibits

23    that we'll move into evidence, and then also whether or not it

24    has a publicly available version to it?

25            THE COURT:  You mean with respect to the designations?

1          MS. BLOODWORTH:  Yes, your Honor.

2          THE COURT:  You're giving me unredacted, correct?

3          MS. BLOODWORTH:  Correct.

4          THE COURT:  And I think the list should just indicate

5     that there's also a redacted version, that's all.

6          MS. BLOODWORTH:  Yes, your Honor.

7          THE COURT:  Okay.  Anything else?  Why don't we give

8     it a number so I can admit it.

9          MR. BENNETT:  Okay.  I think there will be two lists,

10    your Honor.

11         THE COURT:  Okay.

12         MR. BENNETT:  One will be the list of designations and

13    associated video, and that will be PTX-977.

14         THE COURT:  All right.

15         MR. BENNETT:  And then also together a list of all the

16    exhibits that are associated with the designation, that would

17    be PTX-978.

18         THE COURT:  All right, they're both admitted.

19         (Plaintiff's Exhibits 977 and 978 received in

20    evidence)

21         THE COURT:  And while I'm thinking of it, I believe in

22    the first trial on inequitable conduct, we instituted the

23    practice that counsel would review the transcripts as they were

24    received and forward agreed upon corrections to our court

25    reporters.  So I'm hoping that that same practice is being

1  followed in this case.

2          MR. BENNETT:  Yes, it is.

3          THE COURT:  Okay, great.

4          All right, anything else?

5          MS. HOLLAND:  No, your Honor.  So with those

6  deposition clips and exhibits, associated exhibits coming into

7  evidence, plaintiffs rest their case.

8          THE COURT:  All right.  Who goes -- who is going

9  first, Ms. Bloodworth?

10         MS. BLOODWORTH:  Yes, your Honor.

11         THE COURT:  For Mylan?

12         MS. BLOODWORTH:  Yes, your Honor.  Mylan would like to

13  call Dr. Walter Owens.

14         THE COURT:  Mr. Bennett?

15         MR. BENNETT:  I suppose I should have mentioned this a

16  few seconds ago, but Mylan identified a couple of documents

17  that they may use with Dr. Owens that were produced recently,

18  and were produced after the close of discovery; specifically,

19  an FDA submission, your Honor, as well as a slide show.  And I

20  I'm not sure if counsel is still planning on using those with

21  Dr. Owens.  But if Mylan is going to use those with Dr. Owens,

22  we would object, given that they were produced after the close

23  of discovery.  We've had no opportunity to depose any of the

24  fact witnesses about those documents, and we received no notice

25  from Mylan as to the relevance of those documents to any issue

19dztev1

1    in the case.

2              THE COURT:  Ms. Bloodworth -- well, can you identify

3    the documents we're talking about?

4              MS. BLOODWORTH:  I think, your Honor, what, and Mr.

5    Bennett will correct me if I'm wrong, is discussing our --

6    Mylan submitted amendments to its ANDA in April of 2011.  We

7    actually submitted it on April 19th.  We provided that

8    amendment to plaintiffs on April 21st.  Plaintiff's last expert

9    report in this case was served on I believe May 29th, 2011, and

10   plaintiffs never asked for any additional discovery from Mylan

11   on these amendments.

12             THE COURT:  Mr. Bennett?

13             MR. BENNETT:  Well, the expert reports that Ms.

14   Bloodworth is referring to were the reports that were put in

15   with respect to Sandoz's supplemental claim construction, your

16   Honor.  And she's -- Ms. Bloodworth is right, that we have --

17   those were the last reports that were submitted in the case.

18             That being said, there's been pending contention

19   interrogatories upon Mylan throughout the entire case.  These

20   documents were produced to us -- in one case this presentation

21   that was made to the FDA was done in August, just this past

22   August, was produced to us just a few weeks ago.

23             THE COURT:  So there's a presentation to the FDA that

24   relates to the April 19 ANDA?

25             MS. BLOODWORTH:  Yes, your Honor.

19dztev1

1          THE COURT:  And that was done in August?

2          MS. BLOODWORTH:  Yes, your Honor.  And we provided

3   that under the parties' agreement to produce that information.

4          MR. BENNETT:  The problem here, your Honor, is that

5   despite the contention interrogatories that have been pending

6   upon Mylan throughout the case, there's been no identification

7   whatsoever that these document are relevant to an issue in the

8   case.  And they were produced to us after the close of

9   discovery, so we had no opportunity to depose a fact witness.

10  There's been no mention of these documents in their expert

11  reports either, which were --

12         THE COURT:  Well --

13         MS. BLOODWORTH:  Your Honor --

14         THE COURT:  -- the ANDA itself you've had since

15  April 19, right.  But you didn't -- there was no indication

16  from Ms. Bloodworth for Mylan that their was anything in it

17  that was relevant, is that what you're saying?

18         MR. BENNETT:  Correct.

19         MS. BLOODWORTH:  Your Honor, if I may also add.  After

20  the call with your Honor on the Sandoz extra discovery issue, I

21  believe we had that in late August.  I was surprised to hear

22  plaintiffs asking for additional fact discovery from Sandoz

23  based on a major amendment in the Sandoz case.  So I actually

24  called Ms. Holland and asked her whether or not they were going

25  to be seeking any additional discovery of Mylan based on our

19dztev1

1    amendments.  And we had an e-mail, you know, e-mail exchange,

2    whereby plaintiffs said they were going to rest on their expert

3    reports that they put in as of, you know, on the ANDA as it was

4    without the amendment.  Those reports aren't our current

5    amendment.

6              THE COURT:  I'm sorry?

7              MS. BLOODWORTH:  Those expert reports are not our

8    current ANDA.  That major amendments to our ANDA was our

9    changes to our entire, you now, most of our characterizations

10   of our drug product and drug substance sections.

11             THE COURT:  So now you're telling me that like Sandoz,

12   you've made a major amendment to your ANDA?

13             MS. BLOODWORTH:  We made an amendment to the ANDA in

14   April of 2011, yes, your Honor.  And that amendment --

15   particularly, we actually briefed this amendment in the Gad

16   case, the second case.  We filed a supplemental motion to

17   dismiss based on this amendment.  Plaintiffs briefed it.

18   Plaintiffs relied on the amendments in their reply expert

19   report for Dr. Dubin that was served on May 29th, 2011, under

20   the Sandoz claim construction infringement report that they

21   served on Mylan.  And then I called and asked Ms. Holland if

22   they were planning on seeking any additional discovery, and the

23   answer was no.

24             It's, you know, I think I provided every opportunity

25   and did everything I could to make sure that plaintiffs had the

19dztev1

1    information to determine what case they would like to put on

2    against Mylan.

3         MS. HOLLAND:  If I may, your Honor.  We did Ms.

4    Bloodworth and I did have an e-mail correspondence on this.

5         As far as we can tell from the amendment, what was

6    briefed in Dr. Dubin's report or, I'm sorry, Dr. Dubin gave

7    opinions on his report was what seemed to us to be relevant to

8    the case at hand.

9         If Ms. Bloodworth now is saying that there is a whole

10   bunch of other stuff that's relevant to this case, we just

11   didn't have notice of that.  We can't take a deposition now at

12   the 11th hour on what might be issues related to the case if we

13   can't tell that they are based on the submission.  We didn't

14   get any indication from Ms. Bloodworth that she was using a

15   particular document to support a particular position in this

16   litigation.

17        MS. BLOODWORTH:  Your Honor, what Dr. Owens is here to

18   testify to about today is what is currently in Mylan's ANDA,

19   what is currently in Mylan's ANDA and what Mylan uses to

20   characterize its product in its UC markers.  Plaintiffs have

21   known about that, we informed your Honor about that.  In the

22   Gad case, we briefed it.  Plaintiffs relied upon it in their

23   reply expert report of Dr. Dubin, and I don't see how there

24   possibly would be any surprise that the issue here is whether

25   Mylan ANDA versus the asserted claims.

1          MS. HOLLAND:  The issue, your Honor, is something that

2     Mr. Owens is going to say on the stand.  Is that going to be

3     about this new amendment?  Is that going to be used in some way

4     to support a defense in a way that we don't have notice of?

5     That's the real issue.

6          THE COURT:  Why don't you tell us, Ms. Bloodworth.  I

7     guess no one can object to is it Dr. Owens or Mr --

8          MS. BLOODWORTH:  It's Dr. Owens.

9          THE COURT:  Dr. Owens telling us what's in the ANDA,

10    but what are you going to argue from it, just tell us.

11         MS. BLOODWORTH:  I think we would argue that

12    plaintiff's evidence on the 2 to 20 claims based on Dr. Grant's

13    testing, which he said was based on evidence and documents,

14    specifically data that was generated from Mylan's data, he said

15    it was accurate and correct because of what Mylan did for it.

16    And the fact of the matter is first of all that's not how Mylan

17    used that data, and second of all, it's no longer data that's

18    part of our ANDA.

19         MS. HOLLAND:  Your Honor, this is the first we are

20    hearing about this, literally the first time we're hearing

21    about this.  Dr. Grant put in expert reports, he got on the

22    stand.  He testified about the data that Mylan provided to the

23    FDA.  That was the basis of his opinions on those molar

24    fraction claims, and now we're hearing basically that Mylan is

25    saying oh forget about all that, because we have some new data

1   they we gave the FDA you.

2           MS. BLOODWORTH:  Your Honor, that's why I e-mailed Ms.

3   Holland.

4           MS. HOLLAND:  No expert --

5           THE COURT:  One at a time, please.

6           MS. BLOODWORTH:  I was so surprised that Teva was

7   seeking additional discovery based on a Sandoz amendment on a

8   key issue in the case and they didn't seek any corresponding

9   discovery from Mylan, when they had our information for months

10  and we're actually still in phase where we were performing

11  expert discovery.

12          There is no doubt that Dr. Grant, through Teva's

13  counsel, could have had access to this amendment.  We provided

14  it on April 19th to the FDA.  We immediately provided it on

15  Monday, April 21st, to Teva.  Dr. Grant submitted his last

16  report months later.  Actually, Teva asked us for underlying

17  factual information, SEC data, which we provided to them.  And

18  I can't make them file an expert report against me.  All I can

19  do is call and ensure that they're going to rest on the

20  opinions that they had in their expert reports, and they're not

21  going to amend and they only want to seek any additional

22  discovery based on all the information that we had given them.

23  And I specifically referenced to Ms. Holland the fact that we

24  had submitted this amendment and provided it to them in April.

25          MS. HOLLAND:  Your Honor --

1          THE COURT:  All right.

2          MS. HOLLAND:  -- is Ms. Bloodworth now saying that the

3    information that Mylan gave to the FDA in this ANDA is no

4    longer accurate, is that what you're saying, Ms. Bloodworth?

5          MS. BLOODWORTH:  I'm saying it's completely different.

6          MS. HOLLAND:  Is it accurate or not accurate?

7          THE COURT:  I'm.  The current ANDA --

8          MS. BLOODWORTH:  The current --

9          THE COURT:  -- is what we're talking about --

10         MS. BLOODWORTH:  The current ANDA --

11         THE COURT:  -- from April 19th.

12         MS. BLOODWORTH:  -- from April 19th has a series of

13   markers in its ANDA to characterize its distribution.  Those

14   markers range from 420 to 77,750.  The old markers ranged from

15   3,000 to 9,000.  Mylan didn't feel that was sufficient.  They

16   had been continuing and had -- Teva took a lot of information

17   and discovery on Mylan's attempt to change between universal

18   calibration system.  For this reason they deposed Dr. Owens on

19   it, they deposed many of our witnesses on it.  They knew it was

20   coming.  And they knew why we were doing it.  And then we did

21   it in April.  And we provided them with the information.  They

22   asked for additional underlying data, we provided them with

23   that, and they still never supplemented their expert report.

24         MS. HOLLAND:  We had no idea that there was a

25   contention that Dr. Grant's opinions would be insufficient

1    because he didn't rely on the molar fraction data from this new

2    submission in April.  In order for Ms. Bloodworth to be making

3    that argument, she has to be saying that they submitted, what

4    Mylan submitted to the FDA in its original ANDA was not

5    accurate data, because if it was accurate data, then Dr.

6    Grant's opinions are fine no matter what the later calibration

7    shows.

8              MS. BLOODWORTH:  What Mylan -- and Dr. Owens is

9    obviously in a better position to explain this than I am.  But

10   my understanding is Mylan did not rely on that data to do what

11   Dr. Grant did with it, first of all.

12             I took Dr. Winter's deposition.  This was made very

13   clear that he didn't look at the calibration data, he was told

14   not to look at the calibration data.  I questioned Dr. Grant on

15   the calibration data and that was -- it was never the purpose

16   that Mylan was going use it for.  But they did want to do it,

17   they did want to have a full characterization of the

18   distribution, and that's why they were working on this

19   universal calibration system.  They worked on it from 2009, all

20   the way up to 2011 when they submitted the amendment.  They

21   asked for the data underlying it.  We gave them the data.

22   That's a discovery request, your Honor.  We provided that data

23   underlying universal calibration amendment.  And plaintiffs,

24   despite raising a big fuss against Sandoz, never made any

25   request of us.  So I called and said --

19dztev1

1          THE COURT:  Okay.

2          MS. BLOODWORTH:  -- I mean --

3          THE COURT:  Okay.  We'll hear Dr. Owens' direct

4    testimony, and then if Teva wants an adjournment to take his

5    deposition and the opportunity to do rebuttal, I'll grant it.

6          MS. HOLLAND:  Thank you, your Honor.

7          MS. BLOODWORTH:  Thank you, your Honor.

8          THE COURT:  Are there other witnesses today besides

9    Dr. Owens?

10          MS. BLOODWORTH:  There are other witnesses, but

11    just -- I think Doctor -- I think Mr. Bennett raised a second

12    document which was an FDA presentation that --

13          THE COURT:  Yes.

14          MS. BLOODWORTH:  -- goes to this amendment.  Again,

15    Dr. Owens --

16          THE COURT:  Might as well see it.

17          MS. BLOODWORTH:  He's just going to say what he said

18    at the FDA.

19          THE COURT:  Okay.

20          MS. BLOODWORTH:  Thank you, your Honor.

21          THE COURT:  Very good.  Come on up, Doctor.

22     WALTER H. OWENS,

23        called as a witness by the defendant,

24        having been duly sworn, testified as follows:

25    DIRECT EXAMINATION

1    BY MS. BLOODWORTH:

2    Q.   Good morning, Dr. Owens.

3    A.   Good morning.

4    Q.   Can you please state your full name for the record?

5    A.   Walter H. Owens.

6    Q.   And where do you currently reside?

7    A.   I currently reside in Morgantown, West Virginia.

8    Q.   And where are you currently employed?

9    A.   I am currently employed with Mylan, Incorporated.

10   Q.   And what is your current position with Mylan, Incorporated?

11   A.   I currently hold the position of vice-president of Global

12   R&D for finished dosage form development.

13   Q.   Can you briefly describe your duties as vice-president of

14   global R&D?

15   A.   I can.  The responsibilities include oversight of all of

16   our global R&D centers for the development of finished dosage

17   forms that ultimately get administered to patients.

18   Q.   What is a finished dosage form?

19   A.   It's actually a pharmaceutical product.  It's the final

20   product that you or I would receive as a patient from either a

21   doctor or an institution.

22   Q.   And where are the R&D located in?

23   A.   We have multiple R&D centers.  We have an R&D center in

24   Morgantown, West Virginia, we also have a R&D center in Hataba,

25   India, Tokyo, Japan, we have two centers in Ireland, one in New

1   Jersey, and then two tech transfer centers, one's in Australia

2   and one in Ireland as well.

3   Q.  When did you join Mylan?

4   A.  I joined Mylan in May of 1994.

5   Q.  And have you been employed at Mylan throughout this time?

6   A.  I have.

7   Q.  Can you please briefly describe the nature of Mylan's

8   business?

9   A.  Mylan is a leading generic and specially pharmaceutical

10  company serving approximately 150 countries worldwide.

11  Q.  And when you joined Mylan in 1994, was it known as Mylan,

12  Inc.?

13  A.  When I joined Mylan in 1994, it was not.

14  Q.  What was it then known as?

15  A.  It was Mylan Laboratories, Incorporated.

16  Q.  And did you work for Mylan Laboratories, Incorporated?

17  A.  I did not.  I actually worked for Mylan Pharmaceuticals,

18  Incorporated at that time.

19  Q.  And what is Mylan Pharmaceuticals?

20  A.  Mylan Pharmaceuticals is a subsidiary of Mylan,

21  Incorporated.  It's responsible for the U.S. commercial and

22  manufacturing business.

23  Q.  And in your role as vice-president for global R&D, how many

24  people do you supervise?

25  A.  There are approximately 1,000 employees in our global R&D

1    organization.

2    Q.  Does Mylan have any subsidiary that produces branded

3    pharmaceutical products?

4    A.  We do.  Dey Pharma is a branded pharmaceutical group that

5    specializes in asthma and allergy treatments, most notably the

6    epinephrine injector pen.

7    Q.  And, approximately, how many products does Mylan and its

8    subsidiary manufacture?

9    A.  We have approximately a thousand products, separate

10   products worldwide.

11   Q.  And how long have you been the president or, excuse me, the

12   vice-president for global R&D?

13   A.  At this point in time, about two and a half years.

14   Q.  And could you briefly describe your positions prior to

15   becoming the vice-president of global R&D?

16   A.  I can.  Prior to becoming vice-president for global R&D, I

17   held the position for vice-president for R&D of North America,

18   focusing on the development of solid oral dosage forms for that

19   particular marketplace.

20            Prior to that position, I was the vice-president for

21   R&D chemistry, which had oversight for analytical chemistry

22   development, as well as bio-analytical chemistry development,

23   and then I've held various R&D and quality positions within the

24   Mylan organization since May of '94.

25   Q.  Can you briefly describe your educational background?

1    A.  I can.  I received a bachelor of science degree in

2    chemistry in Purdue University in 1987; subsequently attended

3    West Virginia University and received a Ph.D. in physical

4    organic chemistry, and then attended Rice University where I

5    performed post doctoral research on the area of chemical

6    physics and physical organic chemistry.

7    Q.  And, Dr. Owens, you're aware that Mylan has filed an

8    Abbreviated New Drug Application for FDA approval for

9    glatiramer acetate, correct?

10   A.  I am.

11   Q.  Does my Mylan have a partner for this project?

12   A.  Mylan does have a partner for the program.

13   Q.  Who is that partner?

14   A.  That partner would be Natco Pharma, Limited.

15   Q.  And what is the relationship currently between Natco Pharma

16   and Mylan?

17   A.  It is a partnership that developed glatiramer acetate for

18   the United States market, Natco Pharma being responsible for

19   supply of the active pharmaceutical ingredient, and Mylan being

20   responsible for characterization of that active pharmaceutical

21   ingredient compared to the reference drug Copaxone.

22   Q.  And why did Mylan enter into this agreement with Natco to

23   develop glatiramer acetate product?

24   A.  It was a strategic move for Mylan.  This product gave us an

25   opportunity to broaden our dosage form platforms into

1    injectable products, it represented a complex molecule for us

2    to leverage our technology platform, and also learning to move

3    forward into the biologic products regime.

4    Q.  And when did you enter into the agreement with Natco?

5    A.  In 2008.

6    Q.  Did you know when the Mylan ANDA was originally filed?

7    A.  Mylan ANDA would have been filed in June of 2009.

8    Q.  And did you have any responsibilities with respect to the

9    glatiramer acetate project?

10   A.  I did.

11   Q.  And can you briefly describe those responsibilities?

12   A.  The groups that I have responsibility for would have been

13   associated with the characterization of the Natco material or

14   the Mylan glatiramer acetate in comparison to the Copaxone

15   finished product.

16   Q.  And what you have had received, what were they specifically

17   looking at with respect to the ANDA?

18   A.  There was real a very broad range of technology that those

19   groups would have been utilizing and examining.  That ranged

20   from typical analytical chemistry techniques, as well as

21   biological characterization, and even immunological

22   characterization.

23   Q.  When Mylan filed its ANDA in June of 2009, what was it

24   demonstrating scientifically to the FDA?

25   A.  What Mylan was demonstrating is that the Mylan glatiramer

1    acetate material was equivalent to the referenced product

2    Copaxone.

3    Q.  And how did Mylan go about this?

4    A.  Again, Mylan went about this by characterizing and

5    comparing the Mylan glatiramer acetate under that very broad

6    battery of tests that I mentioned, against Copaxone as a direct

7    comparison head to head.

8    Q.  And was molecular weight distribution one of the properties

9    that Mylan looked at to show the -- was molecular weight

10   distribution one of the properties that Mylan looked at to show

11   equivalence with Copaxone?

12   A.  Molecular weight and molecular weight distribution would

13   have been examined as part of this characterization.

14   Q.  Why?

15   A.  As a generic, our responsibility is to demonstrate sameness

16   to the referenced product Copaxone.  In this particular case

17   the Copaxone labeling requires that the molecular weight be

18   between 5,000 and 9,000 daltons.  So, therefore, molecular

19   weight becomes a critical parameter that we must assure falls

20   within that range as equivalent to that of Copaxone.

21   Q.  And, Dr. Owens, I believe you have a binder in front of

22   you.  Could you please turn to PTX-318R.  Do you recognize this

23   document?

24   A.  I do recognize this document.

25   Q.  And what is this document?

1   A.  This document is part of the Mylan ANDA.  It's States

2   actually the request for waiver of in vivo studies.

3          MS. BLOODWORTH:  And, your Honor, I believe PTX-318 is

4   already in evidence.  We move for its admission?

5          THE COURT:  Any objection?

6          MR. BENNETT:  No objection, your Honor.

7          THE COURT:  All right.

8          (Defendant's Exhibit 318 received in evidence)

9   Q.  If you can turn Honor to the page ending in 112?

10  A.  I have that page.

11  Q.  Can you please explain what is shown in table three?

12  A.  I can.  Table three is actually a listing of polypeptide

13  reference standards that were used in Mylan's original ANDA for

14  size exclusion chromatography calibration.

15         And what is provided in this particular table is

16  really three columns; the standard with these numbers that are

17  MWS, followed by numerical value.  That's merely a designation

18  of a standard.  That's a bit of a nomenclature to keep track of

19  the standard.

20         Followed by that is the actual amino acid sequence of

21  those particular peptide standards.

22         And then finally the last column represents the

23  molecular weight in daltons for each of the individual peptide

24  standards.  And as you can see here, it ranges from 3,757

25  daltons up to the last MWS-86, standard which is 9220 daltons.

1   Q.  Thank you, Doctor.  If you could please turn in your binder

2   to PTX-325-R?

3   A.  Could you give me the number again, please?

4   Q.  Sure.  It's 325-R.

5   A.  I have it.

6   Q.  Do you recognize this document?

7   A.  I do.

8   Q.  Can you please turn to the page ending in 1057.  Can you

9   please explain what's on this page?

10  A.  I can.  Actually the numbers are a little hard to see on

11  the bottom of that screen, but for the --

12          THE COURT:  Excuse me.  This was also admitted

13  previously?

14          MS. BLOODWORTH:  Yes, your Honor.

15          THE COURT:  Okay.  Go ahead.  Sorry, Doctor.

16  A.  Thank you, your Honor.

17          The graph in the center of the page is important.

18  What this is is the calibration curve utilizing the polypeptide

19  standards that we had just previously referenced in the prior

20  exhibit, and the squares that you see in the center of that

21  graph are each of those individual polypeptide reference

22  standards.  That is a function of retention time, the size

23  exclusion chromatography.

24  Q.  And why were these standards chosen?

25  A.  These particular standards were chosen at the time because

19dztev1                    Owens - direct

1  they bracketed the labeled range of molecular weight,

2  especially peak molecular weight that we were trying to achieve

3  to meet that labeling requirement that we have for the

4  referenced product Copaxone.  So the standards actually fall

5  between approximately 3,700 daltons up to 9,220 daltons

6  compared with the label range of 5,000 to 9,000 daltons.

7  Q.  Were these standard, or were these markers or standards

8  relied upon to generate any data to meet a release

9  specification, other than the Mp molecular weight

10 specification?

11 A.  These particular set of reference standards would have only

12 be used to generate the Mp molecular weight value and were not

13 relied upon for any other release specifications.

14 Q.  Mylan also reported MW and MN values using these standards,

15 is that correct?

16 A.  That's correct.

17 Q.  Did you rely on your MW and MN determinations when

18 releasing your -- when setting your specifications?

19 A.  Again, those values were not proposed as a release

20 specification within the original ANDA.

21 Q.  And does Mylan still rely on these narrow polypeptide

22 standards today?

23 A.  Mylan does not.

24 Q.  What does Mylan rely upon today?

25 A.  Mylan has updated this methodology to utilize a universal

1    calibration that relies upon PEG and PEO reference standards.

2    Q.  And why did Mylan make this switch?

3    A.  The switch is fundamentally made for two reasons.  The

4    first being that these particular polypeptide reference

5    standards -- and I believe you saw on the last exhibit were

6    sourced from China, from a third party, we felt that utilizing

7    that particular source in the long term fashion would be

8    difficult.  And, in addition, the narrow range in the

9    polypeptide reference standards that were used here originally

10   did not provide us broad coverage or broad evaluation of the

11   entire glatiramer acetate molecular weight distribution.  So we

12   wanted to more fully characterize that distribution in a more

13   accurate fashion.  So, therefore, work was done to move towards

14   a universal calibration.

15   Q.  When did Mylan begin working on a method to develop the

16   universal calibration system?

17   A.  That work would have been initiated in late 2009.

18   Q.  And when did Mylan amend the ANDA to include the universal

19   calibration method?

20   A.  That amendment was made to FDA in April of 2011.

21   Q.  If you could please turn in your binder to DTX-1411.  Do

22   you recognize this document?

23   A.  You do.

24   Q.  If I can draw your attention to the third page of the

25   document ending in 467.  What is this document?

A.   This would be the eCTD transmission of the amendments that

Mylan had made to FDA.

Q.   And what type of submission was this?

A.   As indicated in the right-hand corner of this eCTD header

it says submission type, and it was considered an amendment.

Q.   And can you please explain what sections of the ANDA were

revised in this amendment?

A.   The section of the ANDA that were revised were associated

with drug substance, as well as drug product specifications and

test methodology related to universal calibration use.

Q.   And if you could, please, turn to the Bates, the number

ending in 491.  What is shown on this page?

A.   On this particular page, focusing on the upper half of the

page, what you have is a data set comparing three lots of

Mylan's product to that of Copaxone, with all the molecular

weight premise shown.  This was performed by universal

calibration.  And then in the middle of the page you can see

all of the areas of the ANDA that would be impacted by this

particular analytical methodology change.  So the drug

substance specifications would have been changed, the drug

substance molecular weight by SEC with the universal

calibration test procedure has now been included, new

certificates of analysis, as well as finished products

specifications, the finished product drug test procedure for

SEC, and even the post prestability protocols that were called

1    for this SEC test to be utilized.

2              So, fundamentally, the universal calibration has been

3    incorporated now as the regulatory method of record throughout

4    the entire ANDA.

5    Q.  And that methodology replaces the narrow polypeptides

6    standards that were in the original ANDA?

7    A.  That methodology does indeed replace the narrow range of

8    polypeptide standards that were in the original ANDA.

9    Q.  And did you have any meetings with the FDA to discuss this

10   amendment?

11   A.  We did have a meeting with FDA.

12   Q.  Did you attend that meeting?

13   A.  I did attend that meeting.

14   Q.  Did you prepare any materials to show to the FDA during

15   that meeting?

16   A.  We did prepare a presentation for FDA.

17   Q.  If you could turn in your binder to DTX-2046.  Do you

18   recognize this document?

19   A.  I do.

20   Q.  And did you make this presentation to the FDA?

21   A.  I did make this presentation to FDA.

22   Q.  If you could, please, turn to the page ending in Bates

23   number 521.  Do you have an understanding as to what is shown

24   in these figures?

25   A.  I do.

1   Q.  What is shown in the top figure labeled original SEC level?

2   A.  This would be an example of the original size exclusion

3   chromatography method utilizing the polypeptide reference

4   standards that we originally discussed.

5           What you can see in the size exclusion chromatogram,

6   the dark black traces are representative of the narrow range of

7   polypeptide reference standards that were used in the original

8   ANDA.  Then this has been overlaid with this red molecular

9   weight distribution for WV-903, which is actually a finished

10  product, Mylan finished product lot.

11          What you can see from that is that these polypeptide

12  reference standards again provide a very narrow overlap with

13  WV-903 that actually leave a fairly large portion of the

14  molecular weight distribution untouched.  And those particular

15  reference standards don't do a good job of characterizing that

16  molecular weight distribution in that particular area.

17  Q.  And what is shown on the bottom graph?

18  A.  The bottom graph is an example of our now improved and

19  submitted to FDA size exclusion chromatography method utilizing

20  universal calibration.  And again these are PEGPEO reference

21  standards.  Again in black you see the reference standards

22  themselves.  They encompass a range of 420 daltons all the way

23  through 77,350 daltons.  And then these again are overlaid with

24  the same finished product lot from Mylan, which is WV-903.  And

25  what you can see from this is that the methodology now uses

1   reference standards that can encompass the entire molecular

2   weight distribution for Mylan's glatiramer acetate.

3   Q.  Are these calibration markers now in the ANDA appropriate

4   to calculate the MW. and MN values that go across the

5   distribution?

6           MR. BENNETT:  Objection, your Honor.  Now we're

7   veering into what seems like expert testimony from Dr. Owens.

8           THE COURT:  I haven't heard any foundation with

9   respect to this.

10          MS. BLOODWORTH:  Okay.

11  Q.  Dr. Owens, in your work with Mylan, do you routinely

12  oversee the characterization work that's shown on these slides?

13  A.  I have had oversight for the teams that perform the work

14  that is represented in these slides.

15  Q.  And was it a concern at Mylan or are you personally aware

16  that there was a concern at Mylan that the full distribution

17  was not covered by the former narrow polypeptide standards?

18  A.  The narrow polypeptides standards did not cover that full

19  distribution of molecular weight.

20          MS. BLOODWORTH:  We can leave it that, your Honor.

21          THE COURT:  You know, I think the objection is that

22  this is expert testimony, correct?

23          MR. BENNETT:  Yes, your Honor.  Well, the previous

24  question I think was trying to elicit expert opinion testimony.

25          THE COURT:  Right.  And I guess the only thing I don't

1    know is anything about Dr. Owens' background.  I know what he

2    does at Mylan.  Maybe I missed it.

3              MS. BLOODWORTH:  Yeah.

4              THE COURT:  Early.

5              MS. BLOODWORTH:  We weren't qualifying Dr. Owens as an

6    expert, so we briefly just described his educational

7    background.

8              THE COURT:  Right.

9              MS. BLOODWORTH:  He is just testifying as to what

10   Mylan's impressions were and what Mylan's representations were

11   to the FDA on this.  I wasn't asking him to say what an

12   expert --

13             THE COURT:  So I'm not taking this for the truth, this

14   is just what Mylan's representing?

15             MS. BLOODWORTH:  I think this is the truth of what is

16   Mylan's opinion on whether or not there, you know, whether or

17   not their representations in their ANDA are complete and

18   accurate.

19             MR. BENNETT:  I think there is a problem there in

20   terms of the offering of any opinions here, your Honor.

21             THE COURT:  I mean I'll hear him out, but you have to

22   understand that without qualifying him as an expert in the

23   underlying methodology in what we're talking about here, okay,

24   that's what Mylan says.

25             MS. BLOODWORTH:  Yeah, your Honor, that's -- literally

1   the only point is that there is a narrow distribution that

2   Mylan did not rely upon outside of the peak molecular weight

3   and now there is a broader distribution that they do rely upon

4   for the distribution.

5           THE COURT:  All right, I'll listen.  Go ahead.

6           MS. BLOODWORTH:  Actually that was the last question

7   on that topic.

8   Q.  So let's turn to a new topic Dr. Owens.

9           THE COURT:  Okay, all right.

10  Q.  You're familiar with the process that's described in the

11  ANDA, is that correct?

12  A.  I am.

13  Q.  Now going back in time to 2008 when Mylan partnered with

14  Natco, was the glatiramer acetate synthetic process for the

15  ANDA already finalized?

16  A.  It was not.

17  Q.  And what was the Mylan's role with respect to that

18  synthetic process?

19  A.  Mylan's role regarding the synthetic process was to

20  actually provide characterization and analytical feedback to

21  Natco in order for the ultimate goal being to demonstrate

22  sameness and equivalence to the referenced product, Copaxone.

23  Q.  And were you personally involved in that process?

24  A.  Again, I had oversight for the teams at Mylan that were

25  conducting the characterization efforts.

19dztev1                    Owens - direct

1    Q.  And did you routinely participate in meetings and

2    discussions with the scientists involved in those efforts?

3    A.  I did.

4    Q.  Were there multiple processes still being considered in

5    2008?

6    A.  There would have been multiple synthetic processes under

7    consideration in 2008.

8    Q.  If we could please turn to PTX-262.  Do you recognize this

9    presentation?

10   A.  I do.

11   Q.  Did you prepare and present a portion of this presentation?

12   A.  I recall having prepared and presented portions of this

13   presentation.

14          MS. BLOODWORTH:  Your Honor, we move for admission of

15   PTX-262?

16          MR. BENNETT:  No objection, your Honor.

17          THE COURT:  Admitted.

18          (Plaintiff's Exhibit 262 received in evidence)

19   Q.  What was the purpose of this meeting?

20   A.  This meeting was update and overall summary presentation to

21   our executive management regarding the synthesis and the

22   preliminary characterization data that he had acquired

23   regarding our glatiramer acetate and the referenced product

24   Copaxone.

25   Q.  Were there different synthetic processes considered at this

1   meeting?

2   A.  I recall there being different synthetic processes under

3   consideration at this meeting.

4   Q.  Can you please turn to, in your binder, to page ending 891?

5   A.  Can I have the page again, please?

6   Q.  Sure.  Ending in 891.  Were these the three processes that

7   were discussed during this meeting?

8   A.  These were -- would be three processes that were under

9   discussion at this meeting.

10  Q.  And in point one it says, currently validated process.  Is

11  that the process that was considered to be the ANDA process in

12  the fall of 2008?

13  A.  That would not be the process that finally appears in the

14  ANDA.

15  Q.  Did that process change between the fall of 2008 and the

16  filing of Mylan's ANDA?

17  A.  It did.

18  Q.  In general, how did it change?

19  A.  Major change in this process was with regard to the

20  debenzylation stage in the synthetic process whereby phenol was

21  added.

22  Q.  And why was this change made?

23  A.  The change to add phenol to the synthesis in the

24  debenzylation step was intended to reduce, if not eliminate the

25  presence of bromotyrosine in the finished glatiramer acetate.

19dztev1                    Owens - direct

1    Q.  And why did Mylan want to reduce or limit the presence of

2    bromotyrosine?

3    A.  We conducted some characterization work at Mylan using some

4    original material that was provided by Natco, and compared that

5    to Copaxone.  And we identified that the Natco material

6    contained levels of bromotyrosine, whereby the Copaxone product

7    did not.  So we viewed that as a significant difference and,

8    therefore, made efforts to have this removed from the final

9    synthesis.

10   Q.  And how did you discover the bromotyrosine in the

11   composition?

12   A.  The bromotyrosine at this point in time was evaluated

13   through proton MR spectroscopy.

14   Q.  And if you could please turn in your binder to the pages

15   ending in 913 through 18.  Do you recognize these slides?

16   A.  I do.

17   Q.  Did you prepare these slides?

18   A.  I have.

19   Q.  And can you please explain to me the analysis that's shown

20   on these slides?

21   A.  I can.  I'll probably go through page by page, if that's

22   okay.

23   Q.  Sure.

24   A.  The first proton NMR spectrum that you see here is material

25   that was isolated from a commercial lot of Copaxone.  So it's

1   actually taken from the syringe as the title indicates.

2          And then we have a box that is drawn around the area,

3   seven parts per million and the NMR spectrum.  These two peaks

4   are indicative of the tyrosine portion of the polypeptide

5   composition.  Again, this would be an NMR spectrum of Copaxone.

6   So if you flip to the next slide.  Now what we show is an NMR

7   under the same set of conditions, material provided by Natco,

8   and this was isolated actually from the vial as indicated in

9   the header.  And if you look at the same area around seven

10  parts per million, you start to see the deviation, fairly

11  substantial deviation in the NRM behavior in that region.

12  Instead of seeing two distinct peaks, now you start to see

13  other peaks that are growing in to this particular region.  So

14  this indicated a difference to us between Natco's material

15  Copaxone at this time.

16  Q.  What does the next slide show?

17  A.  The next slide is actually computer simulation.  So what we

18  did is we have software available to us that allows NMR spectra

19  to be predicted.  And what we allow the computer to do is to

20  predict the NMR spectrum for pure tyrosine.  That's what this

21  particular slide shows.  So, again, when you're looking at

22  seven part per million region, what you see is that the

23  computer predicts two well defined peaks in that particular

24  region for tyrosine.

25          Then if we move to the next slide.

Q.  For the record you're on page ending 916, correct?

A.  Move to the next slide.  What we have now asked the

computer to do is to simulate the NMR spectrum for

mono-brominated tyrosine or bromotyrosine, and again examined

that important region around seven parts per million.  And what

you see now is that you have differentiation -- it's no longer

two peaks, but it's actually three peaks that show up on this

particular region of the spectrum.

Q.  And what did this conclude?

A.  Well, it actually helps us evaluate the fact that tyrosine

and bromotyrosine have a distinct NMR signature, and they can

be differentiated.  So if we were go to the next slide, I

believe.  What this particular slide -- again, a simulation --

shows is that if we take the two previous NMR spectrum, we

overlay them, what would a product that has a mixture of

tyrosine and bromotyrosine look like in the NMR in that region

of seven parts per million.  Now what you see is really the

evolution of four distinct peaks that would be present if you

had a mixture.  And in the case the computer simulates a

one-to-one mixture.

        Then if we can go to the last slide I think that you

mentioned

Q.  Yes.

A.  So now what we've done is we've taken the original Natco

material that was provided to Mylan for characterization, and

1    we've overlaid that what the computer simulated NMR spectrum,

2    now you can see start to see why the Natco material shows

3    differences in the NMR around seven parts per million.  It's

4    actually demonstrating, you can even lineup the peaks and the

5    small side peaks line for line with the computer simulation

6    that actually shows a mixture of tyrosine and bromotyrosine

7    being incorporated into the polymer.

8    Q.  Now, what did this presence of bromotyrosine in the

9    composition prompt Mylan to do?

10   A.  Again, it prompted us to have Natco remove bromotyrosine

11   from the molecule through its synthetic strategy.

12   Q.  And was that accomplished?

13   A.  That was ultimately accomplished.

14   Q.  And how is that accomplished?

15   A.  Natco utilized phenol in the debenzylation stage of its

16   manufacturing process for the active pharmaceutical ingredient.

17   Q.  Is that the process that's currently in the ANDA?

18   A.  The process that contains phenol is currently in the ANDA.

19   Q.  And if we can look at that synthetic process.  You can turn

20   to PTX-321R.  Do you recognize this document?

21   A.  I do.

22        MS. BLOODWORTH:  Your Honor, this was previously

23   admitted.

24        THE COURT:  Thank you.

25   Q.  What is 321, PTX321, Dr. Owens?

616

A.   PTX 321 represents the schematic overview of the synthetic

strategy that leads to the formation of the glatiramer acetate

copolymer.

Q.   And if you could turn to the page ending in 247.  What is

GMAF2 on the upper left-hand corner?

A.   GMAF2 is a designation for the material that is the output

of this debenzylation stage process, and so it would be the

glatiramer acetate copolymer that contains a trifluoracetyl

acetic acid protecting group, but it hasn't been debenzylated

and depolymerized.

Q.   And can you walk through this -- well, first let me ask

you, is this sometimes referred to as the debenzylation step?

A.   This particular stage of the process has been referenced to

debenzylation step in the past.

Q.   And how is it shown that the benzyl protecting group of the

glutamic acid is removed?

A.   What's shown here again this is schematically is that

hydrobromic acid in a solvent or mixture of acetic acid is

added to a reactor, phenol is then introduced, followed by the

addition of GMAF1, which is the fully benzo protected polymer

from the previous stage of synthesis, and then the reaction is

carried for to yield a GMAF2 dibenzylated product.

Q.   And so the current process does not contain the

bromotyrosine in the composition, is that correct?

A.   The output from the current process that's in the ANDA does

19dztev1                         Owens - direct

1    not contain bromotyrosine.

2    Q.  Thank you, Dr. Owens.

3              MS. BLOODWORTH:  I have no further questions.

4              THE COURT:  All right.  You want a few minutes, Ms.

5    Holland?

6              MS. HOLLAND:  Mr. Bennett is going to be doing the

7    cross-examination.

8              THE COURT:  I'm sorry.  Mr. Bennett?

9              MR. BENNETT:  Sorry, your Honor?

10             THE COURT:  Did you want a few minutes?

11             MR. BENNETT:  That would be great, your Honor.  Thank

12   you.

13             THE COURT:  All right, you'll let me know if you want

14   to -- take a ten minute break.

15             MR. BENNETT:  Thank you.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1            THE COURT:  Ms. Holland?

2            MS. HOLLAND:  Yes, your Honor.  We don't believe that

3    the switch that Dr. Owens talked about to universal calibration

4    makes any difference to the infringement of those molar

5    fraction claims and what we'd like, your Honor, is a

6    representation on the record from Mylan that they actually

7    think they have a good faith basis to believe there is a reason

8    to contest infringement of the molar fraction claims based on

9    this data or else this whole thing is just a really futile

10   exercise.

11           THE COURT:  Is that what you're doing, Ms. Bloodworth?

12           MS. BLOODWORTH:  Your Honor, all we were pointing out

13   is that Dr. Grant testified that he used data relied upon by

14   Mylan for the purpose that he relied upon it for.  First of

15   all, that premise is factually incorrect.  Dr. Grant had no

16   representations from Mylan at the time he put that data to that

17   use.  Second point is that that data, even in Mylan's opinion

18   that he says wasn't used for Mylan for that purpose, Mylan

19   never believed that would be sufficient to do with it what Dr.

20   Grant proposed to do.  It's a failure of proof on plaintiff's

21   part that they have checked that box that they have shown that

22   there was an accurate, suitable method for those molar

23   fractions.  That's specifically why I wrote to Ms. Holland at

24   the end of August and asked whether she was going to be resting

25   on the infringement reports that she put in December in light

1    of our major amendment.  If those representations had never

2    been made to Dr. Grant, that was the basis of his opinion for

3    using that data.

4           MS. HOLLAND:  The concern here, your Honor, is Mylan

5    never put in an expert report on that issue.  What Ms.

6    Bloodworth is talking about now, checking the box, I think what

7    she was saying is she's just going to put us through our proofs

8    even though Mylan didn't have any reason to believe they didn't

9    infringe those claims.  I believe what she's talking about now

10   is to have yet another round at looking at this empower data.

11          THE COURT:  What data?

12          MS. HOLLAND:  The underlying data, the empower data,

13   which is what Dr. Grant looked at for his original molar

14   fraction claims.  I still haven't heard any representation from

15   counsel that they really have any recent to contest they

16   infringed those claims.  Seems to me they just want to find a

17   reason to put us to our proofs.

18          MS. BLOODWORTH:  Your Honor, what I'm getting at is

19   the fact that Dr. Grant's methodology for claiming that Mylan

20   did this slice method and calibrated this curve and determined

21   that we had over 75 percent between 2 to 20, first of all

22   didn't happen, it's factually incorrect.  Second of all, we

23   gave Teva the empower data for the UC amendment that they

24   requested in June.

25          MS. HOLLAND:  No.

1          MS. BLOODWORTH:  They requested the underlying

2     information.  I can produce the cover letters, I can produce

3     the thousands of pages of data that we provided to them and

4     when we were on the phone with your Honor about Sandoz'

5     supplemental discovery and I can provide the e-mail to your

6     Honor as well when I asked in light of Mylan's major amendment

7     is Teva planning on putting on additional information than what

8     they provided in their expert reports and the answer was no, we

9     don't intend to.  So that's the basic flaw in Dr. Grant's

10    analysis.  Mylan has never used this --

11         THE COURT:  You're going to argue from this testimony

12    that Dr. Grant's analysis was flawed and that therefore Teva

13    has not proven infringement.

14         MS. BLOODWORTH:  Not necessarily a scientific

15    analysis, but his belief that Mylan calibrated, that Mylan

16    generated a calibration curve for the purpose that he put it

17    to, which is what I asked him on his cross-examination --

18         THE COURT:  I'm just trying to figure out what the

19    goal of all of this is, that if you're going to argue that they

20    failed in their burden in proving infringement because of this

21    impeachment of Dr. Grant?

22         MS. BLOODWORTH:  Yes, your Honor.

23         MS. HOLLAND:  Your Honor, I think that confirms what I

24    said, which is that there is no good-faith basis on Mylan's

25    part to think they don't meet the limitations.  This wasn't an

1   expert report saying we don't meet those molar fraction

2   limitations.  We think this is just an exercise of futility at

3   this point.

4           MS. BLOODWORTH:  Teva has not submitted an expert

5   report so that Mylan can rebut it.  I gave Teva every

6   opportunity.  Here this morning is the first time I ever heard

7   from Teva on this issue.  We produced Dr. Owens' documents he

8   was going to be relying upon.  I went affirmatively to Ms.

9   Holland and asked her --

10          THE COURT:  I'm not going to get involved now with

11  this.  I don't doubt what either of you told me.  Ms. Holland,

12  what do you want to do?

13          MS. HOLLAND:  So, your Honor, at this point, I mean,

14  as we said, we don't really believe there's any difference in

15  the data, but what we could do is if Mylan produces this

16  empower data which we don't have yet, this is electronic data,

17  underlying electronic data, data that has not been produced to

18  us, if we can get that from Mylan by tomorrow, we're not

19  positive, but we're hopeful that Dr. Grant can address this

20  issue in his rebuttal case.  He's coming back with rebuttal.

21          THE COURT:  I think you believe you have turned it

22  over, Ms. Bloodworth.

23          MS. BLOODWORTH:  Your Honor, we provided it in the

24  format that was required by the parties in their e-discovery

25  stipulations.  Now she's asking for the underlying raw data

19DFTEV2                    Owens - cross

1    from the machine.  So that's different.  We provided the data

2    in June.  I have not heard any objection about the format of

3    the data that was provided.  We have had -- I don't believe

4    that Teva has any right at this point in time to go in and do

5    new infringement discovery when they have had every opportunity

6    and every piece of paper that they needed to do that back in

7    April when we were still in infringement discovery, your Honor,

8    I might add.

9         Teva came to us, they asked us to do supplemental

10   infringement discovery under the supplemental Sandoz claim

11   construction.  We said okay.  We said you should have done it

12   during the expert phase, it was well known to you, but okay, do

13   that extra discovery.  They asked for extra data.  We gave them

14   extra data.  Then we had --

15            THE COURT:  Turn it over, Ms. Bloodworth.

16            MS. BLOODWORTH:  Your Honor, it's actually I think in

17   a machine in India, so I don't think I can physically do it by

18   tomorrow.

19            THE COURT:  Okay.

20            MS. BLOODWORTH:  And, your Honor, are we going to be

21   allowed to evaluate or have any discovery on what Teva is now

22   planning on doing or --

23            THE COURT:  Fair enough.  I'll see what Teva is going

24   to do.

25            MS. BLOODWORTH:  Okay, your Honor, so I will work with

1    Ms. Holland and let you know when I can provide them with that

2    data.

3              THE COURT:  Did you want to do any cross of Dr. Owens

4    today?

5              MS. HOLLAND:  I think we will proceed with the cross,

6    your Honor.

7              THE COURT:  Okay.

8              MS. BLOODWORTH:  Your Honor, may I please provide

9    copies to the Court for the foundation of what we've been

10   discussing here today?

11             THE COURT:  Yes.  Look, I'm not finding fault because,

12   frankly, I don't know what's been going on.  As I said, I don't

13   doubt either of your sets of representations, but I'm not going

14   to get involved in the minute discovery process here about who

15   said what to whom and what possibly the right result should be

16   if I were to find some fault.  Let's figure out what the truth

17   is here, and, not about your interactions, but about what's

18   going on with this product and this ANDA so you're going to

19   turn over whatever data you may need and we'll have another

20   discussion about whether you're entitled to do something more

21   with their rebuttal.  But this does have to come in and again,

22   I'm not finding fault with anybody today.  It's not good seeing

23   this going on; first Sandoz and now Mylan.

24             MS. BLOODWORTH:  Your Honor, I regret it, but I did --

25             THE COURT:  All right.  Well, we're going to catch up

624

19DFTEV2                    Owens - cross

1    and fix it.  I gather you don't anticipate having Dr. Owens

2    back after his cross.

3              MS. HOLLAND:  We don't anticipate that, your Honor.

4              THE COURT:  All right, then we can finish with Dr.

5    Owens.  Go ahead, Mr. Bennett.

6    CROSS-EXAMINATION

7    BY MR. BENNETT:

8    Q.  Good morning, Dr. Owens.

9    A.  Good morning.

10   Q.  Dr. Owens, we can agree that you are not an expert with

11   respect to molecular weight characterization, right?

12   A.  I would agree I'm not an expert on exclusion

13   chromatography.

14   Q.  In fact, you've never even performed size exclusion

15   chromatography yourself, right?

16   A.  I have not done that myself, that is correct.

17   Q.  And before your work with this product, you had no

18   experience working with complex polypeptides, right?

19   A.  That would also be correct.

20   Q.  So you have no expertise as to the determination of the

21   molecular weight of copolymer-1, right?

22   A.  I would not be an expert in peptide chemistry.  As far as

23   the molecular weight determination is concerned, I understand

24   the output of the experiments that have been performed.

25   Q.  But in terms of having sufficient experience to call

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  yourself an expert in determining molecular weight of

2  copolymer-1, you just don't have it, right?

3  A.  I would not consider myself an expert in copolymer-1.

4  Q.  Now, I'd like to turn to the amendment that you were

5  discussing with Ms. Bloodworth, and if you pull that binder

6  that I have for you, it's the document that's been marked DTX

7  1411.  I have a tab marked for you in your binder.  If you

8  could turn to page ending in Bates number 150489.  Are you with

9  me, sir?

10  A.  I see that.

11  Q.  Now, the bottom of this page, the table of molecular weight

12  data, right?

13  A.  The bottom of this page does include a series of molecular

14  weight data, yes.

15  Q.  And if we look at the left hand column of this table,

16  there's a reference to some lots of glatiramer acetate

17  products, right?

18  A.  There are.

19  Q.  And the first three lots that are mentioned there are the

20  pivotal batches of Mylan's glatiramer acetate active

21  ingredient, right?

22  A.  Those are the active ingredient lots, yes.

23  Q.  And if we look a few rows below there's three rows there

24  that begin with the letters WV, do you see that, sir?

25  A.  I do.

1    Q.  And those are the pivotal batches of Mylan's finished drug

2    product, right?

3    A.  Those are batches of a finished drug product, correct.

4    Q.  And all of the molecular weight data that is represented on

5    this table, sir, was calculated using the peptide standards

6    that you discussed earlier today, right?

7    A.  This particular set of molecular weight data, the Mn and Mw

8    and Mp would come from the original ANDA data that was

9    presented so that would be the against the peptide standards.

10   Q.  And you put it in the April amendment that you just filed

11   with the FDA, right?

12   A.  It was placed back into the April amendment as a

13   demonstration to calculate poly dispersity.

14   Q.  And you didn't tell the FDA in that April submission that

15   this data was somehow inaccurate, right?

16   A.  Actually, I believe if you were to look further in this

17   document in the next page, we discuss universal calibration and

18   that it's reliable and we provide a similar set of data.

19   Q.  Right, and you've said that that meant it was reliable, but

20   you didn't say this data was inaccurate, right?

21   A.  What we said about universal calibration is that it's more

22   reliable and that's why we're changing.

23   Q.  But you didn't tell the FDA, sir, that this data was

24   inaccurate, right?

25            THE COURT:  He's answered that.  They did not,

1  correct?

2  A.  No.  What we told the FDA --

3          THE COURT:  In those words you did not say it was

4  inaccurate.  I think that's all we're getting at here.

5          THE WITNESS:  Correct, your Honor.  What we told the

6  FDA is that the universal calibration that's presented on the

7  subsequent page relies more confidence in the Mn and Mw values.

8  Q.  So if we move to the next page of this document, sir, and

9  the very first paragraph you make reference to the universal

10 calibration method, right?

11 A.  That is correct.

12 Q.  And when you mentioned universal calibration you dropped a

13 footnote there, do you see that?

14 A.  I do see that.

15 Q.  And that footnote is to an article from 1967, right?

16 A.  That is correct.  That's the reference.

17 Q.  So Mylan's representing to the FDA here that this universal

18 calibration method they're using is something that was

19 described in literature from 1967, correct?

20 A.  The literature reference is intended to only reference the

21 universal calibration as a technique and not necessarily the

22 method that is actually being performed by Mylan.

23 Q.  The technique that you're describing here of universal

24 calibration is what Mylan is using to characterize its product,

25 right?

1    A.  It is a universal calibration, but it is a method that had

2    to be developed for the glatiramer acetate product.

3    Q.  Now, if you turn to the next page, sir, and we look at the

4    top of this page, the table, do you see that?

5    A.  I do.

6    Q.  And these are molecular weight data that Mylan generated

7    using universal calibration, correct?

8    A.  These would be data from universal calibration.

9    Q.  Again, we see reference on the left-hand side to the

10   pivotal batches of Mylan's product, right?

11   A.  We see the reference to the active pharmaceutical

12   ingredient in finished product lots, correct.

13   Q.  And those are the same batches of active ingredient that

14   were analyzed using the peptide standard we saw earlier in the

15   document, correct?

16   A.  Those would be the same.

17   Q.  They were made the same way, right?

18   A.  They are the same products.

19   Q.  And it's also true with respect to the WV lots in this

20   table, right?

21   A.  Again, those would be the finished products represented in

22   the ANDA, yes.

23   Q.  And the peak molecular weight values for all of these

24   batches fall between 5 to 9 kilodaltons, right?

25   A.  Yes.

19DFTEV2                    Walsh - cross

1    Q.  All right, we're going to pull that down.  Now, Dr. Owens,

2    the Mylan ANDA that you were involved in was seeking to market

3    a generic form of Copaxone, right?

4    A.  We are seeking to gain approval for a generic form of

5    Copaxone, correct.

6    Q.  And the active ingredient in Copaxone is glatiramer

7    acetate, correct?

8    A.  That is correct.

9    Q.  And the active ingredient in Mylan's proposed product is

10   also glatiramer acetate, right?

11   A.  It would be required to be identical and therefore

12   glatiramer acetate.

13   Q.  And glatiramer acetate is composed of four amino acids, are

14   you familiar with that, sir?

15   A.  I am.

16   Q.  And the glatiramer acetate has those four amino acids in a

17   certain relative proportion, right?

18   A.  Yes.

19   Q.  And Mylan typically expresses the relative proportion of

20   those four amino acids as a mole fraction, right?

21   A.  I believe that is the specification, correct.

22   Q.  Now, if you could, Dr. Owens, I'd like you turn to tab PTX

23   320 in your binder?  If you could highlight that information in

24   the top right, Mr. Chase.  Do you recognize this as module 3

25   from Mylan's ANDA, sir?

1  A.  That would be consistent with listing for module 3 from the

2  ANDA.

3       MR. BENNETT:  Plaintiffs move for admission of PTX

4  320, your Honor.

5       THE COURT:  Any objection?

6       MS. BLOODWORTH:  Not at this time, I would just ask

7  Mr. Bennett if he would let me know the page number so it could

8  be published privately prior to showing it.

9       THE COURT:  Admitted with that understanding.

10      (Plaintiff's Exhibit PTX 320 received in evidence)

11 Q.  If you'd move to the page ending with the Bates number

12 Mylan 236, sir?

13 A.  Can you repeat the number, again?

14 Q.  Yes, it's the Bates number Mylan 236.

15 A.  Thank you.

16 Q.  Could you first focus on the top of the page, Mr. Chase?

17 This is a portion of Mylan's ANDA that's discussing the drug

18 substance of this product.

19 A.  That's correct, that's what the top of this page indicates.

20 Q.  And if we could move down, Mr. Chase.  Mylan's discussing

21 the nomenclature for its products in this portion of the ANDA,

22 right, Mr. Owens?

23 A.  This particular page indicates nomenclature, yes.

24 Q.  And this portion of the ANDA is describing, again, Mylan's

25 product as glatiramer acetate, right?

1    A.   That is what's listed as the recommended international

2    non-proprietary name.

3    Q.   And there's also a list of synonyms provided in this

4    document, right?

5    A.   It does list synonyms.

6    Q.   And one of the synonyms for glatiramer acetate that Mylan

7    is representing to the FDA is copolymer-1, right?

8    A.   I do see that listed on the document.

9    Q.   All right.  Dr. Owens, you talked a little bit on your

10   direct about some process work that Mylan was involved in, is

11   that right?

12   A.   When we discussed synthetic processes.

13   Q.   Correct.  And there was some characterization work that

14   Mylan performed with respect to a bromotyrosine purity,

15   correct?

16   A.   That is correct.

17   Q.   And there was a change made to the manufacturing process to

18   address this bromotyrosine impurity, correct?

19   A.   There was a change that was made to remove bromotyrosine

20   from the copolymer.

21   Q.   And Mylan has consistently referred to the bromotyrosine as

22   an impurity, right?

23   A.   It's an impurity, but it's actually integrated into the

24   polymer itself.

25   Q.   But it's an impurity, right?

1    A.   Again, the bromotyrosine would be incorporated into the

2    polymer and that would be an impurity within the polymer

3    system.

4    Q.   And Mylan has represented to the FDA that this

5    bromotyrosine is an impurity, right?

6    A.   We have characterized it as an impurity in our amendment.

7    Q.   And this is one of a number of impurities that Mylan

8    controls in the product, right?

9    A.   I don't recall the impurities that are controlled in the

10   product.

11   Q.   Dr. Owens, if you could turn to the page ending in Bates

12   Mylan 683?  Do you recognize this as the portion of the modular

13   discussing the impurities in the proposed Mylan product?

14   A.   This is the portion of the modular that would be relevant

15   to impurities.

16   Q.   If you turn to page Mylan 685?  Mylan 685, sir, are you

17   there?

18   A.   I'm on that page.

19   Q.   And this page lists seven different impurities of Mylan as

20   controlling in its glatiramer acetate product, right?

21   A.   On this particular page lists impurities that are

22   associated with solvent impurities of the copolymer.

23   Q.   And if we turn to the next page, Mylan 686, there's two

24   more impurities that are listed here, right?

25   A.   There are two additional impurities listed.

1    Q.  One of which is the bromotyrosine impurity that we've

2    discussed earlier, right?

3    A.  Bromotyrosine is listed here, yes.

4    Q.  So bromotyrosine is one of a number of impurities that

5    Mylan is seeking to control in the product, correct?

6    A.  Bromotyrosine again is listed as one of the impurities.

7    Q.  And that's standard practice in the pharmaceutical

8    industry, right, you control impurities in your pharmaceutical

9    product, right?

10   A.  You would control impurities in your pharmaceutical product

11   or if the levels were too high you could remove them or make

12   every attempt to remove them.

13   Q.  Mylan has not performed any testing that would show that

14   this bromotyrosine impurity has any impact upon the safety or

15   efficacy of its proposed product, right?

16   A.  I believe that would be unknown.

17   Q.  And in fact, the reason that Mylan was concerned about this

18   impurity was to just make sure that its product was the same as

19   Copaxone, correct?

20   A.  The reason that we were concerned about the presence of

21   bromotyrosine is that it is incorporated in the copolymer and

22   it did represent a difference from what we were observing in

23   Copaxone.  We viewed that as a regulatory risk and it is

24   present at substantial levels in the original Natco material.

25   Q.  Now, you never -- the process change that you implemented,

1    which was the use of phenol was meant to reduce this impurity,

2    right, this bromotyrosine impurity?

3    A.   The intent was to reduce the amount of bromotyrosine

4    present in the polymer.

5    Q.   And that change was not implemented to adjust the mole

6    fraction of your product, right?

7    A.   The intent was to remove bromotyrosine from the copolymer.

8    Q.   Right, so that had nothing to do with the mole fraction of

9    your product, right?

10   A.   I'm not aware of the impact it would have on the mole

11   fraction of the product.

12   Q.   And the mole fraction of the product had no input into the

13   decision to use phenol, right?

14   A.   Our focus was on removing bromotyrosine.

15   Q.   Now, the bromotyrosine issue was what you would

16   characterize as a scaleup issue, right, Dr. Owens?

17   A.   I would not characterize it as a scaleup issue.

18   Q.   Okay.  If you could turn in the same document to Mylan 614.

19   This is the section of the ANDA that discusses the

20   manufacturing process development, right, Dr. Owens?

21   A.   That is correct.

22   Q.   And if we turn forward to Mylan 641.  Hold on, Mr. Chase.

23             THE COURT:  I'm sorry, what document are you on?

24             MR. BENNETT:  PTX 320, your Honor.

25             THE COURT:  You're still on that?

1              MR. BENNETT:  Yes.

2              THE COURT:  All right.

3    Q.  If you look at the first paragraph of that page, sir, here

4    Mylan and Natco are representing to the FDA that the problem

5    with high bromotyrosine impurity was something that was

6    encountered during the scaleup of the process to make

7    glatiramer acetate, right?

8    A.  That's what this particular document states in this text.

9    Q.  And you have no reason to disagree with that, right, sir?

10   A.  I have no reason to disagree with that, although I don't

11   know what the process was that was being scaled up.

12   Q.  Okay.  So this bromotyrosine impurity issue was something

13   that was encountered during scaleup of the manufacturing

14   process, right?

15   A.  We observed bromotyrosine with the first materials that

16   were received from Natco.

17   Q.  And by that time Natco had begun to scale the process,

18   right?

19   A.  Natco had represented those materials as a currently

20   validated process which we subsequently asked for the process

21   to be altered.

22   Q.  So this portion of the document is referring to the

23   implementation of a process described as above, right, so

24   referring to some process described earlier in the document, is

25   that correct?

1  A.  It does have the sentence of glatiramer acetate process

2  described as above.

3  Q.  And if we could turn to Mylan 616, Dr. Owens.  And the

4  first paragraph, which is an overview of the process.

5  A.  I see that.

6  Q.  And here Mylan and Natco are describing glatiramer acetate

7  as a copolymer that's been described in the 1971 publication by

8  the Weizmann Institute, right?

9  A.  This particular document does have a reference to the

10  European Journal of Immunology, and the Weizmann Institute.

11  Q.  And if we look second to last sentence, Mylan and Natco are

12  representing to the FDA that glatiramer acetate has amino acid

13  ratios of 6:2:5:1, right?

14  A.  I see the sentence.  But I cannot tell if it's in reference

15  to the publication or not.

16  Q.  Now, if we move along within this manufacturing process

17  development report, sir, and specifically I'm looking at page

18  Mylan 622.

19          MR. BENNETT:  This just appears on the private

20  screens, your Honor.

21          THE COURT:  Okay.

22  Q.  And this is a representation of the process that Natco was

23  using to make glatiramer acetate before the implementation of

24  the use of phenol, right?

25  A.  This would be a schematic that has the process listed

1   without phenol, correct.

2   Q.   Okay.  And again, if we -- sorry, one last question on that

3   schematic, sir.  At the very bottom of that schematic, the end

4   product for that product is listed as glatiramer acetate,

5   right?

6   A.   That's what's listed on the page.

7   Q.   And if you could turn forward to page Mylan 637, sir?  And

8   again, this is a description of the debenzylation step of the

9   manufacturing process that does not contain any description of

10  the use of phenol, right?

11         MS. BLOODWORTH:  Objection, your Honor.  Misrepresents

12  the document.

13         THE COURT:  I'm sorry.  Why don't you reask the

14  question again.  What's your question?

15  Q.   The question, your Honor, is, Dr. Owens, this description

16  of the debenzylation reaction contains no mention of phenol,

17  right?

18  A.   Just give me a minute, if I could, just to read the

19  paragraph?

20         (Pause)

21  A.   This particular paragraph does not have phenol mentioned

22  within it.

23  Q.   If we move to the next page there's a table of experimental

24  data from batches made according to this process, correct?

25  A.   I can't necessarily tell if these were experiments from

1    that particular process.  It is the following page.

2    Q.   The batch numbers for these batches would indicate to you

3    that these were made in 2007, right?

4    A.   That's my understanding of the batch numbering system.

5    Q.   I think you testified on your direct, sir, that the

6    bromotyrosine issue that was resolved with the addition of

7    phenol was not until 2008, correct?

8    A.   It was under discussion in 2008.

9    Q.   It was not implemented until thereafter, right?

10   A.   That's my understanding.

11   Q.   If we look at the tyrosine amounts for these batches, they

12   are.'098, .091 and .094, right?

13   A.   I do see those values on the table.

14   Q.   And these were batches made without using phenol, right?

15   A.   Again, I can't tie this directly to the previous page, but

16   they're batches from 2007.

17   Q.   So it's reasonable to conclude that they would have been

18   made without using phenol, correct?

19   A.   I cannot say that with absolute certainty.

20   Q.   Now, if we could turn to the portion of the document that

21   discusses the use of phenol, which is Mylan, specifically Mylan

22   642.  And we see here a table of data for some samples that

23   were made using a debenzylation reaction with the addition of

24   phenol, right?

25   A.   The table indicates glatiramer acetate prepared using

1    phenol as a free growing scavenge and that's what's written on

2    the document.

3    Q.  If we look at the tyrosine values for those samples it's

4    .089, .086 and .085, correct?

5    A.  I see those values represented on this page.

6    Q.  Those values are lower than the values we just looked at on

7    the previous table, right?

8    A.  Those values would be lower.

9         MR. BENNETT:  One last line, your Honor.

10   Q.  You mentioned earlier, Dr. Owens, that in addition to some

11   molecular weight characterization Mylan also performed some

12   biological characterization of your proposed product, correct?

13   A.  That is correct.

14   Q.  And one of the biological characterization assays that you

15   have used is the EAE model, right?

16   A.  There is an EAE model, actually two EAE models represented

17   in the characterization document of the ANDA.

18   Q.  And those tests have established that both Mylan's products

19   and Copaxone are both effective on the EAE model, right?

20   A.  Those tests show the Copaxone and Mylan's glatiramer

21   acetate performed in an equivalent fashion in the EAE model.

22   Q.  And they're both reflected in that model, right?

23   A.  I would not relate it to effectiveness or efficacy of the

24   drug.  I would relate it only to comparability of the two

25   drugs.

1  Q.  All right, if you turn to tab PTX 318, sir?  And this is a

2  document that you used on direct, correct?

3  A.  That's correct.

4  Q.  This is the biowaiver portions of Mylan's ANDA, correct?

5  A.  This is would be the waiver portion of in vivo studies,

6  correct.

7  Q.  I'd like you to turn to page Mylan 124.  And here you see a

8  discussion of Mylan's biological characterization using the EAE

9  model, correct?

10  A.  I do see that.

11  Q.  And just to review, EAE is an animal model for multiple

12  sclerosis, is that right?

13  A.  It is an animal model.

14  Q.  If you look at the first sentence of the second paragraph

15  you see there that it states GMA, which is Mylan's proposed

16  product, and Copaxone were evaluated in an EAE assay to assess

17  the relative biological effect of the products on disease

18  progression, right?

19          MS. BLOODWORTH:  Objection, your Honor.  We're well

20  beyond Dr. Owens' scope of his original direct examination.

21          THE COURT:  I'll permit it.

22  A.  I do see the sentence, yes.

23  Q.  If we move forward in the document to Mylan 130.  This is

24  still a discussion of the biological characterization that

25  Mylan was performing with the EAE model, correct?

1    A.   This would still be a discussion of EAE.

2    Q.   And if you look at the second paragraph on this page, sir,

3    and the first sentence states that both GMA, which is Mylan's

4    products, and Copaxone treatments were demonstrated to have

5    significant effects on the onset and the early phase of disease

6    state progression, right?

7    A.   I see that sentence.  It basically states that both

8    compounds performed equivalently in this model.

9    Q.   And they both demonstrated significant effects on the onset

10   and early phase of disease state progression, right?

11   A.   In this particular model, that's what it's referencing.

12   Q.   And it goes on to state that both GMA and Mylan's products

13   with Copaxone treatments were demonstrated to have equivalent

14   reductions in EAE severity during the early phase of the

15   disease, right?

16   A.   That's what it states and that's the comparability that's

17   made with using the EAE between the two products.

18   Q.   According to Mylan's testing its products and Copaxone

19   produced similar results on the EAE model, right?

20   A.   The goal of this experimentation was to demonstrate that

21   Mylan's product and the Copaxone yield equivalent results in

22   this particular animal model.

23          MR. BENNETT:  Your Honor, with that, plaintiffs move

24   PTX 318 into evidence.

25          THE COURT:  Any objection?

1          MS. BLOODWORTH:  Just the confidentiality concern.

2          THE COURT:  Absolutely.  Thank you, Ms. Bloodworth.

3     Admitted.

4          (Plaintiff's Exhibit PTX 318 received in evidence)

5          MR. BENNETT:  Plaintiffs have no further questions,

6     your Honor.

7          THE COURT:  Okay.  Any redirect?

8          MS. BLOODWORTH:  No, your Honor.  Thank you.

9          MR. ACKER:  Your Honor, Sandoz has a couple of

10    questions, if I might.

11         THE COURT:  We haven't done this before, but --

12         MR. ACKER:  Four or five questions.

13         THE COURT:  All right, go ahead.

14         MR. ACKER:  Thank you.

15         THE COURT:  Perhaps we should talk about -- this is

16    unusual, to say the least.

17         MS. HOLLAND:  We would have an objection to it, your

18    Honor.  We don't see how Sandoz should be questioning Mylan, a

19    co-defendant in this case.  They haven't put Dr. Owens on the

20    witness list to question him.

21         THE COURT:  Let me ask you this.  Are you cross

22    examining to bring out -- well, what are you doing?

23         MR. ACKER:  I'm going to ask four questions to clarify

24    Dr. Owens' testimony on one specific issue.

25         MS. BLOODWORTH:  Your Honor, may we take a break?

19DFTEV2                    Walsh – cross

1          THE COURT:  Maybe you should discuss this with Ms.

2     Bloodworth.

3          MS. BLOODWORTH:  And before we take a break may I move

4     into evidence DTX 1411?

5          THE COURT:  Yes.  Admitted.

6          (Defendant's Exhibit DTX 1411 received in evidence)

7          THE COURT:  Let me know when you've got it all sorted

8     out.

9          (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19dztev3

| | |
|---|---|
| 1 | (In open court after the recess) |
| 2 | THE DEPUTY CLERK:  All rise. |
| 3 | THE COURT:  Please be seated. |
| 4 | Mr. Bennett. |
| 5 | MR. BENNETT:  Your Honor, the defense have conferred. |
| 6 | I guess if we get some sense of what the scope of this |
| 7 | examination would be -- |
| 8 | THE COURT:  I guess we'll know in four or five |
| 9 | questions, right. |
| 10 | MS. BLOODWORTH:  Your Honor, I was thought it was two. |
| 11 | THE COURT:  Ms. Bloodworth, you're not concerned? |
| 12 | MS. BLOODWORTH:  It's my understanding that it's |
| 13 | limited to Dr. Owens' cross-examination questions point of |
| 14 | clarification, so I'm not concerned, no. |
| 15 | THE COURT:  Okay.  Go ahead. |
| 16 | CROSS EXAMINATION |
| 17 | BY MR. ACKER: |
| 18 | Q.  Good morning, Dr. Owens. |
| 19 | A.  Good morning. |
| 20 | Q.  In response to questions from Mr. Bennett, you testified |
| 21 | that the universal calibration process that Mylan and Natco |
| 22 | switched to in 2011 had to be developed.  Was that testimony |
| 23 | accurate? |
| 24 | A.  It was something that we absolutely wanted to have |
| 25 | developed and placed into the ANDA. |

1    Q.   And that development was not done by Mylan or Natco, but

2    rather you had to hire a consultant to do that, to develop the

3    universal calibration, correct?

4    A.   There was a third party involved with the development of

5    the universal calibration, that is correct.

6    Q.   And as I understand your testimony, that process with the

7    third party to develop that universal calibration method took

8    over a year, is that right?

9    A.   The development program began in late 2009, with the

10   culmination of the submission in April of 2011.

11              MR. ACKER:   That's all I have.   Thank you, your Honor.

12              THE COURT:   Okay, Mr. Bennett, anything further?

13              MR. BENNETT:   Nothing further, your Honor.

14              THE COURT:   Anything else from anybody?

15              MS. BLOODWORTH:   Thank you, Dr. Owens.

16              Thank you, your Honor.

17              THE COURT:   All right.   Thank you, Dr. Owens, you're

18   excused.   You may step down.

19              (Witness excused)

20              THE COURT:   Next witness.

21              MR. ANSTAETT:   Your Honor, Mylan calls Dr. Stephen

22   Kent.

23              MS. BLOODWORTH:   Your Honor, if I may approach?   I

24   promised the Court Reporter a binder.

25              THE COURT:   Sure.   Thank you.

1    STEPHEN B. H. KENT,

2         called as a witness by the defendant,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. ANSTAETT:

6              MR. ANSTAETT:  And, your Honor, I want to make sure I

7    think we're still in the process of handing out the binders.

8              THE COURT:  When we get settled.

9              MR. ANSTAETT:  Sure.

10             THE COURT:  Dr. Kent, you can use the binders of

11   course, but looking at the documents on that screen and that

12   little screen, so if you're like me, it may be easier than to

13   try to move these things around.

14             THE WITNESS:  Thank you very much.

15             MR. ANSTAETT:  Your Honor, if I may approach and give

16   Dr. Kent a laser pointer?

17             THE COURT:  Sure.

18             MR. ANSTAETT:  I think we're all ready.

19             THE COURT:  I think you can proceed.  Go ahead.

20             MR. ANSTAETT:  All right.  Thank you, your Honor.

21   Q.  Good afternoon, Dr. Kent.

22   A.  Good morning.

23   Q.  Good morning.  Could you describe your educational

24   background for the Court, please?

25   A.  Yes, I have three university degrees, a bachelors degree in

chemistry and biochemistry, a double major, a Master's Degree

in a combined chemistry biochemistry program with a thesis on

the sequencing of peptides by mass spectrometry, and a Ph.D. in

chemistry at University of California Berkeley with a thesis on

nuclear magnetic resonance studies of chemically modified

proteins.

Q.  Dr. Kent, did you do any post doctoral work?

A.  Yes.  From 1974 through 1981, I worked with Bruce

Merrifield at the Rockefeller University here in New York,

first as a post doctoral fellow, then as assistant professor.

Q.  Who is Bruce Merrifield, please?

A.  Bruce Merrifield was the inventor of solid phase peptide

synthesis, the most commonly used way of making peptides by

chemistry, for which he received a Nobel Prize in chemistry in

1984.

Q.  All right.  Doctor, could you describe, generally, for me

the type of work you've done since completing your post

doctoral work?

A.  Yes.  Throughout my research career, then and subsequently,

my work has been focused on the chemical synthesis of peptides

and proteins.

Q.  All right.  And what positions have you held?

A.  I've held positions both in academia and in industry.  The

principal positions that I've held in academia were on the

senior research faculty at the California Institute of

1   Technology.  I was professor and member of the Scripps Research

2   Institute, and I'm currently at the University of Chicago.

3           In and industry the principal position that I held was

4   as president and chief scientific officer of Griffin Sciences.

5   Q.  And what was Griffin Sciences?

6   A.  Griffin Sciences was a start-up biotechnology company

7   focused on developing chemically synthesized proteins as human

8   therapeutics.

9   Q.  All right.  Now, you said you are at the University of

10  Chicago.  How long have you been there?

11  A.  I've been there exactly three days less than ten years.

12  Q.  All right.  And what is your position at the University of

13  Chicago?

14  A.  I'm professor of chemistry and professor of biochemistry

15  and molecular biology.

16  Q.  All right.  And in that position, what are your

17  responsibilities?

18  A.  Primary responsibilities are teaching and the training of

19  graduate students, and in addition I lead and direct the

20  activities of my own research group which typically consist of

21  about ten persons.

22  Q.  All right.  And what courses do you teach, please?

23  A.  I teach graduate courses in the synthesis of peptides and

24  proteins, and the coming year I'll be teaching a graduate

25  course in chemical biology.

1   Q.  Have you published any articles in scientific journals?

2   A.  I published approximately 225 articles in scientific

3   journals, about 185 of those were peer-reviewed articles.

4   Q.  All right.  And are you a peer reviewer for any journals?

5   A.  Yes.  I'm a peer reviewer for a number of journals,

6   including the top scientific journal such as Nature and

7   Science, and also the top chemistry journal such as Journal of

8   the American Chemical Society and the Journal of the German

9   Chemical Society.

10  Q.  All right.  And have you presented any scientific lectures?

11  A.  I'm sorry, could you repeat the question?

12  Q.  Sure.  Have you presented any scientific lectures?

13  A.  Yes.  For example, the last ten years since I joined the

14  faculty at the University of Chicago, I presented approximately

15  125 scientific lectures at international meetings and leading

16  academic institutions.  And, for example, at this time last

17  year I was keynote speaker at the Roche Peptide Symposium in

18  Colorado, and I gave around the same time last year, award

19  addresses to the European Peptide Symposium on the Japanese

20  Peptides Symposium.

21  Q.  All right.  Dr. Kent, are you the named inventor on any

22  United States patents?

23  A.  I'm the named inventor on 42 United States patents.

24  Q.  Have you received any awards related to your work with

25  peptides and proteins?

A.  Yeah.  I've received seven international awards for my

research activities.  The top four awards in peptide science

were wide, so those are from the -- well, it's the Rudinger

Medal from the European Peptide Society, the Akabori Medal from

the Japanese Peptide Society, and the du Vigneaud and

Merrifield awards from the American Peptide Society.

In addition, I received the Hirschmann award in

peptide chemistry from the American Chemical Society, if I

didn't already mention that.  And earlier this year I received

the Aider award in bioorganic chemistry.  That's only six, but

we'll probably stop there.

Q.  We'll call that close enough.

Doctor, could you describe, generally, your experience

in analyzing the amino acid content of peptides and proteins?

A.  Yes.  Actually as an undergraduate, I did summer research

on where I brought into action an amino acid analyzer, and then

performed amino acid analyses on proteins from various sources.

And for the 20 years or so after that, amino acid analysis was

the primary method for characterizing the peptides that I was

making by chemical synthesis, and also for characterizing the

proteins that I was working with.

Q.  How many amino acid analyses have you performed or overseen

during your career?

A.  It would have been many hundreds of amino acid analyses.

Q.  All right.  And Nick, could we please take a look at

19dztev3                    Kent - direct

1    DTX-1963.

2             Dr. Kent, is this an accurate copy of your curriculum

3    vitae?

4    A.  As of March 2011, yes.

5    Q.  All right.

6             MR. ANSTAETT:  And, your Honor, I would move admission

7    of DTX-1963.

8             THE COURT:  Admitted.

9             (Defendant's Exhibit 1963 received in evidence)

10            MR. ANSTAETT:  Your Honor, Mylan offers Dr. Kent as an

11   expert in the chemical synthesis and analysis of peptides and

12   proteins?

13            THE COURT:  Any objection.

14            MS. HOLLAND:  No objection.

15            THE COURT:  All right.  Then, Doctor, you're accepted

16   by the Court as an expert.

17            Go ahead.

18            THE WITNESS:  Thank you.

19   Q.  Doctor, you submitted three expert reports in this case?

20   A.  That's correct.

21   Q.  Did one of those reports consider whether Mylan's proposed

22   glatiramer acetate product infringes the patents in suit?

23   A.  It did.

24   Q.  All right.  And what was your conclusion?

25   A.  My conclusion was the Mylan glatiramer acetate proposed

1   product does not infringe the patents in suit.

2   Q.  All right.  Nick, could we take a look at the first slide,

3   please.

4           Is this the definition of a person of ordinary skill

5   in the art that you applied in reaching your opinions in this

6   case?

7   A.  It is.

8   Q.  And doctor, I'm going to just ask you if you would, please,

9   read the definition for the record?

10  A.  "In 1994, a person of ordinary skill in the art of the

11  patents in suit would have an advanced degree or equivalent in

12  a chemical or biological discipline and significant experience

13  in one or more of the following areas:  The synthesis,

14  fractionation or characterization of peptide polymers such as

15  their amino acid composition and/or hydro dynamic and

16  structural properties as applied to proteins, synthetic

17  peptides and/or poly disperse mixtures.

18  Q.  All right.  Doctor, have you reviewed the patents in suit?

19  A.  I have.

20  Q.  If we could see PTX-1, please.  Is this one of the patents

21  that you reviewed?

22  A.  Yes, it is.

23  Q.  Who are the inventors on this patent?

24  A.  The inventors are listed as Eliezer Konfino, Ramat Gan,

25  Michael Seta -- I'm sorry, that's a place -- Michael Seta,

1   Dvora Teitelbaum and Ruth Arnon.

2   Q.  Who is you understanding is Mr. Konfino?

3   A.  Mr. Konfino was a process research chemist at Teva, I

4   believe, from 1957, until he retired in 1991 at the end of

5   1991.

6   Q.  All right.  And what did you do to gain an understanding of

7   some of the work Mr. Konfino did while he was at Teva?

8   A.  I looked at Mr. Konfino lab books, and I also looked at

9   documents that he had authored while he was at Teva.

10  Q.  All right.  And did you review Mr. Konfino's deposition

11  transcripts?

12  A.  I did review his deposition transcripts, yes.

13  Q.  All right.  Now, Doctor, did you help prepare some

14  demonstrative exhibits to explain the basis for your opinions

15  in this case?

16  A.  I have.

17  Q.  And why don't we take a look at the first animation,

18  please.  And, Doctor, I'm going to ask you some questions about

19  this.

20          What are we looking at here, Doctor?

21  A.  This was the first page of the patent that we just remarked

22  on.  It's referred to usually as the '808 patent, and now we've

23  leafed through into the patent to look at example four.

24  Q.  And what do we see here?

25  A.  What's highlighted in example four here is the first step

1    in preparing copolymer-1 as described in this patent.  And that

2    consists of a random copolymerization process involving four

3    amino acids.

4    Q.  All right.  Proceed.

5    A.  And we'll go on to demonstrate that in an animation, yes.

6            So this reaction is carried out in water solution as

7    seen here.  These are the four amino acid, activated amino acid

8    building blocks that are used in the copolymerization process.

9    Q.  All right.  And what do we see on the -- well, first let me

10   ask you this, if you could identify the four amino acids here,

11   please?

12   A.  Yes.  From left to right alanine, glutamic acid, lysine and

13   tyrosine.

14   Q.  And what do we see on the glutamic acid and the lysine?

15   A.  Yes.  Glutamic acid and lysine both contain additional

16   reactive functionalities in order to avoid those interfering

17   with the formation of linear polypeptide chains in the

18   polymerization reaction.  These side chain functionalities are

19   blocked were, we usually call protected, and we've symbolized

20   here on the side the benzyl protecting group of glutamic acid,

21   with the gray hemispherical object and the trifluoracetyl group

22   of lysine as the rectangular metallic object.

23   Q.  All right.  Proceed, please.

24            Dr. Kent, what are we -- what do we see happening

25   here?

1    A.  On this initiator is added to start the polymerization

2    reaction.  And as you can see highlighted on the right, this

3    leads to the formation of linear polypeptide chains throughout

4    the reaction medium, throughout water solution, so many

5    millions of random sequence polypeptide chains are being

6    formed, until the supply of building blocks is exhausted or

7    until the reaction is terminated.

8    Q.  Then how many of the polypeptide chains have the same

9    sequence?

10   A.  The diversity that is possible in a reaction of this kind

11   is so great that essentially none of the product polypeptide

12   chains will have the same amino acid sequence.

13   Q.  All right.  And how many chains are being formed?

14   A.  Many millions, very very large number.

15   Q.  All right.

16   A.  So at this point we formed protected co-polymer-1.  And the

17   next step is referred to, as we've just heard, is either the

18   debenzylation step or the first deprotection step, in which

19   protected co-polymer-1 is treated with 33 percent HBr

20   hydrobromic acid and acetic acid.

21   Q.  Would you --

22   A.  This removes the benzyl protecting group just from the

23   glutamic acid residues throughout the copolymer mixture.

24   Q.  And what are we seeing here, Doctor?

25   A.  Well, now we're representing the reaction that happens with

1    treatment with HBr and acetic acid.  In A moment you'll see

2    this side chain protecting group and all the other glutamic

3    acid side chain protecting groups throughout the product

4    mixture are removed by the strong acid conditions, to give

5    trifluoracetyl co-polymer-1.

6    Q.  All right.  And what do we see here, Doctor?

7    A.  This is the second deprotection step, the removal of the

8    trifluoracetyl groups from the side chains of the lysine

9    residues and the copolymer.  This is done with a reagent called

10   piperidine or piperidine.

11   Q.  All right.

12   A.  And so the trifluoracetyl co-polymer-1, we've highlighted a

13   couple of the lysine residues, but this applies to all of them.

14   The piperidine removes the side chain protecting groups to give

15   the deprotected co-polymer-1 product mixture.

16   Q.  All right.  Now, is this the final copolymer-1 product at

17   this stage?

18   A.  It's the final copolymer-1 product as described or as

19   formed by the process described in the '808 patent.

20   Q.  All right.  And if we can continue, Nick.

21        Now, if you wanted to determine the amino acid content

22   of the copolymer-1 composition, how would you go about doing

23   that?

24   A.  Well, you would take a sample and you would first so you

25   could, for example, this sample the peptide chain, and in order

1    to determine the amino acid composition, you would heat in

2    aqueous acid to break it back up into its amino acid

3    components.  Those would then be separated, and the amount of

4    each amino acid would be measured as symbolically represented

5    here.

6    Q.  All right.  And what is that process called?

7    A.  Hydrolysis and amino acid analysis.

8    Q.  All right.  Okay.  And we can take that down.

9            Dr. Kent, is what you just described for the Court how

10   the Teva patents teach making co-polymer-1?

11   A.  Yes, it is.

12   Q.  All right.  Now, based on your review of Mr. Konfino's

13   documents and other Teva documents in this case, is what you

14   just described what actually happens if you follow the process

15   for making co-polymer-1, described in the Teva patents?

16   A.  No, it's not what actually happens.

17   Q.  All right.  Could you please explain?

18   A.  Yes.  The documents that I've reviewed make it clear that

19   Mr. Konfino and others at Teva were aware that a side reaction

20   occurred in the process that we've just described.

21   Q.  All right.  And what is that side reaction?

22   A.  That was a side reaction that occurred in the HBr acetic

23   acid first deprotection step, and it led to the formation of a

24   5th amino acid, bromotyrosine, present in the copolymer

25   product.

1   Q.  All right.  And you referred to bromotyrosine as a fifth

2   amino acid?

3   A.  Yes.  The English language is a little confusing on this

4   point, but bromotyrosine is a chemically distinct amino acid

5   different from the other four amino acids found in copolymer-1

6   as described in the '808 patent.

7   Q.  All right.  Nick, could we please see PTX-708T.  And if we

8   could, thank you, go to that page.

9        Dr. Kent, is this a document that you reviewed in

10  coming to your opinions in this case?

11  A.  Yes, it is.

12  Q.  All right.  And who is the author of this document, please?

13  A.  The author is Mr. Konfino, one of the named inventors on

14  the '808 patent.

15  Q.  All right.  And what is the date, please?

16  A.  The date is August, 1991 for this report that Mr. Konfino

17  prepared.

18       MR. ANSTAETT:  Your Honor, I move admission of

19  PTX-708T.

20       MS. HOLLAND:  No objection.

21       THE COURT:  Admitted.

22       (Plaintiff's Exhibit 708 received in evidence)

23  Q.  Dr. Kent, did Mr. Konfino address the issue of

24  bromotyrosine in this report?

25  A.  He did.

19dztev3                    Kent - direct

Q.  All right.  And, Nick, could we see the page with Bates

number TEV324554, please?  If we could look at section two.

        Dr. Kent, what is your understanding of what's being

reported in section two here?

A.  Well, this is a section which this report by Mr. Konfino

describes the problem and its solution, and I'll read the first

paragraph.

        "Still in an early stage of work, one of the

impurities of cop-1" -- that's co-polymer-1 -- "was identified

as bromotyrosine.  It was then proven that the presence of

small amounts of free bromine in the HBr acetic acid are to be

blamed for the formation of the said impurity."

Q.  All right.  Doctor, is that HBr acetic acid solution a

reagent used in the first deprotection step that you just

illustrated?

A.  Yes.  HBr acetic acid is the reagent used in the first

deprotection step.

Q.  All right.  Doctor, did you help prepare a demonstrative

exhibit to illustrate the problem described in Mr. Konfino's

August 1991 memo?

A.  I did.

Q.  All right.  Nick, if we could look at the second animation,

please.  And what are we -- what are we looking at here, Dr.

Kent?

A.  This is the cover page from Mr. Konfino's August 1991

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    report.  And we're leafing into the section that I just read

2    from in which Mr. Konfino describes, as shown on the

3    highlighted section, that bromotyrosine is formed in the

4    co-polymer-1.

5    Q.  All right.  And what are we looking at here, Dr. Kent?

6    A.  We're back looking at animation of the copolymerization

7    reaction with our four activated amino acid building blocks

8    this is carried out in water.  When an initiator is added, as

9    you can see highlighted on the right, we're starting to form a

10   random mixture of linear polymer chains, protected polymer

11   chains, and --

12   Q.  Now, at this stage is this the same protected copolymer-1

13   that we saw in the previous animation?

14   A.  It is.  This could, this protected co-polymer-1 product

15   mixture is the same as we saw in the first animation.

16   Q.  All right.  We can continue then.

17   A.  So now we're going to move into the step where he treat

18   with HBr and acetic acid.  And what I've tried to represent

19   here in the animation is the fact that bromine is an impurity

20   in the HBr acetic acid.  Bromine molecules themselves consist

21   of two bromine atoms joined to each other.  But under the

22   strongly acid conditions used in the first deprotection step,

23   some of those bromine molecules break up to form reactive

24   bromine ions, shown here as the red balls with the BRplus on

25   them.

1    Q.  And you use the word reactive.  What did you mean by that?

2    A.  Well, you refer to a chemical as reactive in terms of its

3    potential to seek out and find partners for it to react with

4    and join to.  And bromine itself is somewhat reactive.  One of

5    the things that it does is form these BRplus ions, but the

6    BRplus ions themselves are much more reactive.  They're very

7    very actively seeking out something to quench their thirst for

8    reaction.

9    Q.  All right.  Nick, we can continue, please.

10   A.  So now we go back to the HBr acetic acid step.  And as

11   before under the strong acid conditions, these side chain

12   protecting group of the glutamic acid, the benzyl was removed

13   from the glutamic acids throughout the protected copolymer.

14          However, in this case, because of the presence of the

15   bromine impurity and the consequent reactive bromine ions, as

16   shown here by the BRplus, something else happens.  So if we can

17   could go -- thank you.  These BRpluses react with the side

18   chains of the tyrosine residues throughout the copolymer

19   mixture and form a 5th amino acid component present in the

20   copolymer.

21   Q.  And does this side reaction happen to tyrosines in just one

22   of the polypeptide chains or throughout the mixture?

23   A.  No.  It happens randomly throughout the mixture to the

24   extent of about 30 percent of the tyrosines being converted to

25   the bromotyrosine.

1    Q.  All right.  And we can continue.

2    A.  So now we go to the second deprotection step, the treatment

3    with piperidine.  And this removes the trifluoracetyl groups

4    from the lysine side chains throughout the polymer giving us

5    the deprotected copolymer-1 that is actually made using the

6    process described in the '808 patent.

7    Q.  And, Doctor, I'm going to ask you just to describe the two

8    panels that we see here, please?

9    A.  Well, on the bottom panel we see the representation of the

10   copolymer-1 mixture as described in the '808 patent, and in the

11   upper panel we see the co-polymer-1 mixture that is actually

12   produced using the process described in the '808 patent, with

13   the polymer chains product polymer chains containing

14   bromotyrosine.

15   Q.  All right.  We can continue.

16   A.  And that just highlights the presence of the bromotyrosine

17   in the co-polymer-1 actually made in the process from the '808

18   patent.

19          So we go ahead and carry out the hydrolysis and

20   analysis as before, we get the four amino acids and their

21   relative amounts, as shown here.

22   Q.  Okay.  And if we could stop it here, please.  What's the

23   pulsating material up there over the tyrosine test tube?

24   A.  What you're only analyzing for alanine, glutamic acid,

25   lysine and tyrosine because bromotyrosine is a distinct

1    chemical compound, a distinct amino acid.  It's not counted in

2    any of the four amino acids that you're looking for.  So this

3    amount of bromotyrosine that's present in the polymer product

4    remains uncounted in the amino acid analysis.

5    Q.  All right.  And what are the numbers at the bottom of the

6    test tubes?

7    A.  Those are the molar ratios that result from the actual

8    process as described in the '808 patent.

9    Q.  All right.  And what does this molar ratio tell you about

10   this co-polymer-1 composition?

11   A.  It tells me that in the complex polymer mixture that, on

12   average, there are six alanines for every one tyrosine.  So

13   these are ratios, molar ratios.  So by definition we're talking

14   about the amount of one amino acid compared to another amino

15   acid.  So about six alanines on average to one tyrosine,

16   approximately two glutamic acids for every one tyrosine, and

17   approximately five lysines for every one tyrosine.

18   Q.  All right.  And, Doctor, has the uncounted bromotyrosine

19   affected this molar ratio?

20   A.  Yes, I have.

21   Q.  All right.  Could you explain?

22   A.  Yes.  Because of the formation of bromotyrosine, the amount

23   of tyrosine that shows up in the actual amino acid analysis is

24   reduced.  And this effects, of course, the ratios of all the

25   other amino acids since they're being compared to the amount of

1    tyrosine.

2            So I've tried to show illustrate that here.  So if we

3    look at the total tyrosine content of protected co-polymer-1 --

4    and this is before the first HBr acetic acid deprotection step.

5    And then if we look at the final tyrosine content for the

6    co-polymer-1 after the second deprotection step, we see that

7    because of the formation of the fifth amino acid,

8    bromotyrosine, we measure substantially less tyrosine;

9    consequently, the ratios of all the other amino acids with

10   respect to tyrosine are elevated.

11   Q.  All right.  And we can take that down.

12           And, Nick, can we please go back to PTX-708T, and

13   again I want to look at the page with the Bates number 324554.

14           Dr. Kent, did Mr. Konfino ever find a solution to the

15   bromotyrosine problem?

16   A.  Yes, he did.  So this is the same paragraph that we were

17   looking at before from Mr. Konfino's' August 1991 report.  And

18   what we see in the second paragraph, which I'll read, is that

19   Mr. Konfino said, "Among the many reagents tried for removing

20   the free bromine, a previous treatment of HBr acetic acid with

21   1 percent phenol for a few hours proved to be the most

22   convenient."

23   Q.  All right.  And what is phenol?

24   A.  Phenol is an aromatic alcohol.

25   Q.  Doctor, did you help prepare demonstrative to illustrate

1   how the use of phenol described in Mr. Konfino's August 1991

2   report, addressed the bromotyrosine problem?

3   A.  I did.

4   Q.  All right.  And, Nick, if we could take a look at the third

5   animation, please.

6          And what is it that we're seeing here, Dr. Kent?

7   A.  This again is the cover page of Mr. Konfino's August 1991

8   report.  And we'll leaf through that and go to the same section

9   that I've been reading from.  And here we'll see highlighted

10  the section that I should have read completely, including,

11  "thus the bromotyrosine content is reduced or eliminated."

12         And here we have our animation of the copolymerization

13  process, the four activated amino acid building blocks in water

14  solution, with the addition of an initiator.  We get the

15  formation of the linear protected polypeptide chains, very

16  complex mixture of millions of chains each of different amino

17  acid sequence.

18  Q.  And again, Doctor, at this point is this the same protected

19  copolymer-1 one that we've seen in the previous animations?

20  A.  This is the same protected co-polymer-1 that we've seen in

21  the previous animations.  So -- sorry.

22  Q.  I was just going to ask, what are we going to see next;

23  please proceed?

24  A.  The next step is to treat with HBr and acetic acid, but in

25  this case, it has been pretreated with phenol as Mr. Konfino

1    described in his August 1991 report.  And you'll remember that

2    we were getting these BRplus ions, and now the phenol reacts

3    with those, and consequently because it's what's called an

4    equillibrium reaction, eventually all the bromine that's

5    present becomes BRplus, ions reacts with the phenol to be

6    scavanged to form unreactive phenol derivatives.

7    Q.  All right, I've got two questions.  One, you used the word

8    scavanged there.  What did you mean by that?

9    A.  Scavanged is sort of a colloquial term that chemists use to

10   mean to remove an impurity, by mopping it up in a chemical

11   reaction.

12   Q.  And at this point, are the BRplus ions still reactive?

13   A.  Oh, no, no.  The reaction product here is inert under these

14   reaction conditions.

15   Q.  And if we can continue.

16   A.  So now we have HBr and acetic acid that has been treated

17   with phenol, so there's no bromine present, and now we go back

18   to the acid deprotection step that's ongoing.  It removes the

19   protecting groups, benzyl protecting groups from the glutamic

20   acids throughout the copolymer mixture.  We end up with the TFA

21   copolymer-1 trifluoracetyl co-polymer-1.  That's treated with

22   piperidine as before.  So the side chain TFA groups from the

23   lysine residues are removed, to give us co-polymer-1 free of

24   bromotyrosine.

25   Q.  If we wanted to characterize the co-polymer-1 composition

1    made with phenol, how would we go about doing that?

2    A.  You would use the same amino acid hydrolysis and amino acid

3    procedure as we've done, illustrated in the past.  So we take a

4    sample of the product mixture, we heat it with aqueous acid to

5    convert back to amino acids.  We then separate those and

6    determine the amount of each as represented here, giving the

7    different amounts of the four amino acids that are present in

8    this product co-polymer-1.

9    Q.  All right.  Now, Doctor, let me ask you, is there any

10   bromotyrosine here?

11   A.  There's little or no bromotyrosine because of the use of

12   phenol, the scavenger.

13   Q.  All right.  And what are the numbers beneath the test

14   tubes, please?

15   A.  Those are the molar ratios of the four amino acids as

16   determined by hydrolysis and amino acid analysis.

17   Q.  All right.  And, Dr. Kent, why is the molar ratio changed

18   here from the previous animation that we looked at?

19   A.  As we saw, previously up to 30 percent of the tyrosine can

20   be converted to bromotyrosine.  That, in the past, reduced the

21   amount of tyrosine that was determined in the amino acid

22   analysis.

23       Here the full amount of tyrosine is present.

24   Consequently, the ratios -- remember these are ratios.  If you

25   look at the amount of alanine relative to the tyrosine, there

1   are approximately 4.6 alanines for every tyrosine present in

2   the product copolymer mixture.

3            Similarly, there are approximately 1.5 glutamic acids

4   relative to tyrosine and approximately 3.6 lysines relative to

5   tyrosine.

6   Q.  All right.  Now, Doctor, have you prepared a slide

7   summarizing the effect of the use of phenol that we've just

8   seen in this animation?

9   A.  Yes, I have.

10  Q.  And if you could just describe what we're looking at here,

11  please, Doctor?

12  A.  Well, what I've tried to represent here is that if we start

13  with the protected copolymer-1 as described in the '808 patent,

14  and on the top arrow we use HBr acetic acid containing bromine,

15  then we end up with molar ratios of alanine, glutamic acid,

16  lysine with respect to tyrosine of 6:2:5:1.

17           However, if we take precautions to make sure there is

18  no bromine present in the HBr acetic acid reagent while

19  treating with phenol, then we end up with amino acid ratios as

20  shown on the bottom where there are 4.5 alanines, 1.5 glutamic

21  acids, 3.6 lysines with respect to every one tyrosine.

22  Q.  All right.  Nick, let's take a look at PTX-708T, again,

23  please, and I want to look at the Bates with the Bates number

24  324554 at the end.  If we could blow up section two.

25           Doctor, do you see the last sentence there, where Mr.

1    Konfino says "The bromotyrosine was later tested and proven

2    nontoxic?"

3    A.   I do.  This is the same section that Mr. Konfino's' report

4    that we've just been looking at and, yes, I do see that

5    sentence.

6    Q.   All right.  And what's your understanding of that sentence?

7    A.   Well, it's a little bit inexact in its terminology, but I

8    assume he's referring to bromotyrosine containing copolymer-1.

9    And what he's stating here that it was tested and proven

10   nontoxic.

11   Q.   All right.  Now, let me ask you -- and we can take that

12   down, Nick.  Doctor, do you know when Mr. Konfino began using

13   phenol to remove free bromine in the HBr acetic acid solution?

14   A.   Yes.  I believe it was in the second half of 1989.

15   Q.   All right.  And how did you gain your understanding?

16   A.   I looked at pages from Mr. Konfino's lab notebooks.

17   Q.   All right.  I'd like to look at some of Mr. Konfino's lab

18   notebooks.  And could we please put up DTX-1730, please.

19          All right.  And, Dr. Kent, is this one of Mr.

20   Konfino's lab notebooks that you reviewed in forming your

21   opinions in this case?

22          MS. HOLLAND:  Your Honor, before we go on, we had

23   identified to us yesterday pages from the exhibits that were

24   going to be shown publically, but there were no lab notebook

25   pages identified.  So we assumed they weren't going to be shown

1    publicly.

2              MR. ANSTAETT:  Your Honor, I will say that I had

3    conversation with Mr. Mitrokostas yesterday, who I told him

4    that, you know, as a courtesy we would provide pages to Teva

5    for many of the documents, but the lab notebooks we weren't

6    going to be able to do that.  He told me that it would be,

7    assuming that they were within the scope of the expert reports,

8    they could be shown publicly.  I will say these are lab

9    notebooks that are from 20 to 22 years old, so I'm not entirely

10   clear what the confidentiality concern is, but if it is a

11   problem, we could work with private screens.

12             MS. HOLLAND:  Well, I mean I would ask that you at

13   least tell me in advance when you're going to show, then we can

14   make a determination since we don't know what you're going to

15   put up yet.

16             MR. ANSTAETT:  I'm happy to work with that, and.

17             THE COURT:  Okay.  Any problem with this one?

18             MS. HOLLAND:  Front page, your Honor, no.

19   Q.  And, Doctor, let me ask you, is this one of the laboratory

20   notebooks you reviewed in forming your opinions in this case?

21   A.  It is.

22             MR. ANSTAETT:  Your Honor, I move admission of

23   DTX-1730.

24             MS. HOLLAND:  No objection.

25             THE COURT:  Admitted.

1        (Plaintiff's Exhibit 1730 received in evidence)

2   Q.  First page we're going to look at has the Bates number

3   TEV1178554.

4        MS. HOLLAND:  My suggestion would be to put these on

5   the private screen.

6        THE COURT:  All right.  We can do that rather than

7   delay things, I guess, and then will you get back to us and

8   indicate, Ms. Holland, whether they can be public.

9        MS. HOLLAND:  Yes, I will.

10        MR. ANSTAETT:  Just to be clear, I'm going to ask

11   obviously Dr. Kent questions about what appears on the page

12   and he's going to describe them.  I assume that's okay with Ms.

13   Holland.

14        MS. HOLLAND:  Do you mean that he's going to read in

15   what's in the lab notebook page?  That's kind of -- it defeats

16   the purpose of putting it on the private screen.

17        MR. ANSTAETT:  It is exactly the way we've handled

18   everything up to this point in the case they're on the private

19   screens, the witness are allowed to put testimony on.  He's

20   going to be making some --

21        THE COURT:  I'm not quite sure what the issue is here.

22   We have modified the testimony somewhat when it was necessary

23   to leave out specific numbers, et cetera.

24        MS. HOLLAND:  That's what I would ask, your Honor, if

25   the testimony goes in generally without specific numbers at

1    this point, and perhaps after, I don't know --

2              MR. ANSTAETT:  May I suggest Ms. Holland and I have a

3    one to two minute conversation, maybe we can alleviate this

4    concern?

5              THE COURT:  Okay, sure.

6              MR. ANSTAETT:  Thank you, your Honor.

7              THE COURT:  Am I allowed to leave or --

8              MR. ANSTAETT:  We'll try to do it quickly.

9              THE COURT:  Why don't you.

10             (Pause)

11             THE COURT:  Ready?

12             MR. ANSTAETT:  Yes.  Thank you, your Honor.

13   Q.  With the -- just give Dr. Kent the guidance that maybe

14   don't mention the specific concentration of a reagent, but

15   everything -- I think your testimony will be fine and we will

16   keep these on the private screens.

17   A.   That applies only to reagents?  I need to be clear on this,

18   before I mess up.

19   Q.  For instance, the bromotyrosine contents you would be free

20   to discuss, or the use of particular reagents, free to discuss.

21   So we can proceed and Ms. Holland will let us know if we're

22   crossing any boundaries.

23             MS. HOLLAND:  I don't anticipate any issues based on

24   what Mr. Anstaett just told me.

25             THE COURT:  Okay.

1    A.  I'm still not quite clear.  One more time, please?

2    Q.  You can just -- let's proceed and if an issue arises, Ms.

3    Holland will let us know.  I don't think it will be a problem.

4    A.  Okay.

5    Q.  All right.

6             Okay.  So these will be on the private screens.  Nick,

7    the first page I want to look is the one with the Bates page

8    1178554.

9             And, Dr. Kent, if you could describe for me what we

10   are looking at on this page?

11   A.  Yes.  This is an experiment from Mr. Konfino's' lab

12   notebook.  As you can see at the top, the initials R.E. San for

13   research, which is his first 1st name.  It's actually the

14   6,751st experiment he's performed at Teva, minus 2,000.  And

15   it's on May the 1st, 1989, and Mr. Konfino is preparing TFA

16   co-polymer-1 by treating blocked co-polymer-1 with HBr and

17   acetic acid from a commercial supplier.

18   Q.  All right.  Now, on this page has the HBr acetic acid

19   solution been treated with phenol?

20   A.  There is no mention of phenol on this page.

21   Q.  All right.  And does Mr. Konfino note anything about the

22   bromotyrosine content of this batch of TFA cop-1?

23   A.  Yes.  At the bottom he reports that his test for

24   bromotyrosine was positive.

25   Q.  All right.  Nick, I want to ask you to put up the page

1    1178582, please.

2            And, Dr. Kent, what do we see here on this lab

3    notebook page?

4    A.  This is another experiment from Mr. Konfino's lab notebook.

5    It's dated May the 18th, 1989.  It's titled HBr acetic acid

6    containing bromine.  And in this experiment, if we go down to

7    the third line, Mr. Konfino writes "HBr acetic acid

8    contaminated with," and then he's inserted .2 5 percent

9    bromine, left overnight at room temperature.

10   Q.  All right.  And Nick, if we could then turn to the page

11   with the Bates number 1178584.

12           And, Dr. Kent, what do we see on this page?

13   A.  This is another experiment from Mr. Konfino's notebook

14   dated May the 18th, 1989.  And here Mr. Konfino's preparing

15   blocked copolymer, excuse me, TFA copolymer-1 from blocked

16   copolymer-1.  So I should explain.  On some of these entries

17   you'll see that he refers to copolymer-1 as protected

18   copolymer-1, some as blocked copolymer-1.  It's the same thing.

19   And underneath the title of the experiment in parentheses he

20   says bromine contaminated.  So here he's using HBr and acetic

21   acid that he has previously contaminated as we just saw, with

22   bromine.  So it contains bromine.

23   Q.  All right.  And did Mr. Konfino treat the HBr and acetic

24   acid with phenol in this experiment?

25   A.  He did not.

1    Q.  All right.  And did he report anything about the

2    bromotyrosine content of this batch of TFA copolymer-1?

3    A.  Yes.  At the bottom we can see that his test for

4    bromotyrosine and the product TFA copolymer-1 was positive.

5    Q.  All right.  Nick, if we can take a look at the page with

6    the Bates number 1178586, please.

7            And what are we -- what are we looking at on this

8    page, Dr. Kent?

9    A.  Another experiment from Mr. Konfino's lab notebook.  The

10   date is May the 18th, 1989.  And here Mr. Konfino is preparing

11   TFA copolymer-1 from blocked copolymer-1, using HBr and acetic

12   acid from a commercial supplier.

13   Q.  All right.  And did Mr. Konfino treat the HBr and acetic

14   acid solution in this experiment with phenol?

15   A.  There is no mention of phenol anywhere on this page.

16   Q.  Did he report anything about the bromotyrosine content of

17   this batch?

18   A.  He did.  As we can see at the bottom, he reported

19   bromotyrosine as positive strong.

20   Q.  We can take that notebook down, and I'd like to turn to

21   another one, Mr. Konfino's lab notebooks.  This time DTX-1736.

22   And I think we can probably put up this page on the public

23   screen.

24           Dr. Kent, just let me ask you, is this one of the Mr.

25   Konfino's laboratory notebooks that you reviewed in preparing

1    your expert reports?

2    A.  It is.

3         MR. ANSTAETT:  And, your Honor, I move admission of

4    DTX-1736.

5         MS. HOLLAND:  No objection.

6         THE COURT:  Admitted.

7         (Plaintiff's Exhibit 1736 received in evidence)

8    Q.  Now, we should go back to the private screens.  I want to

9    look at the page with the Bates number 1176564.

10        And, Dr. Kent, what are we seeing on this page?

11   A.  This is an experiment from Mr. Konfino's lab notebook.

12   It's dated August the 20th or perhaps 21st, 1989.  Mr. Konfino

13   is preparing TFA copolymer-1 from blocked copolymer-1, and he's

14   using in this first deprotection step, HBr acetic acid from

15   commercial supplier Merck, and it says containing phenol.

16   Q.  So Mr. Konfino is using phenol in this batch from August of

17   1989?

18   A.  He is.

19   Q.  All right.  Nick, if we could turn to the page with the

20   Bates number 1176574, please.

21        And, Dr. Kent what do we see on this page of Mr.

22   Konfino's lab notebook?

23   A.  This is dated August the 23rd, 1989.  And here Mr. Konfino

24   has taken the TFA copolymer-1 formed in the first deprotection

25   step that we just looked at, and he's now doing a second

1  deprotection step removing the TFA groups with piperidine to

2  form copolymer-1.

3  Q.  All right.  And was, just to be clear, was this batch of

4  HBr acetic acid treated with phenol?

5  A.  Well, this is the second deprotection step with piperidine.

6  The TFA copolymer-1 that is being used here was formed from

7  protected copolymer-1 using HBr acetic that had been treated

8  with phenol.

9  Q.  All right.  And if we could turn to the next page of the

10  lab notebook, please, that is 1176575.  Did Mr. Konfino report

11  a bromotyrosine content of this batch of copolymer-1?

12  A.  Yes, he did.  If you look at the bottom of the page here,

13  he reports a bromotyrosine content of the product copolymer-1

14  as less than or equal using the mathematical symbol very low

15  content of .1 percent.

16  Q.  All right.  Let's turn to the page with the Bates number

17  TEV 1176730.

18        And, Doctor, what do we see on this page, please?

19  A.  This is an experiment from Mr. Konfino's lab notebook.

20  It's dated February the 14th, 1990.

21        Here Mr. Konfino is preparing TFA copolymer-1, excuse

22  me, from blocked copolymer-1 using HBr and acetic acid from

23  Merck, a commercial supplier, and it is the notation 1 percent

24  phenol.

25  Q.  All right.  And does he, does he report anything about the

1   bromotyrosine content of this batch of TFA copolymer-1?

2   A.   He does.   At the bottom of the page the bromotyrosine

3   content of the TFA copolymer-1 as reported is 0.1 percent.

4   Q.   Let's turn to the page with the Bates number TEV 1176738.

5   Doctor, what do we see on this page, please?

6   A.   This is an experiment from Mr. Konfino's lab notebook dated

7   February the 19th, 1990, in which he's preparing TFA

8   copolymer-1 from blocked copolymer-1 using HBr and acetic acid

9   supplied by Merck containing 1 percent phenol.

10  Q.   All right.   Does Mr. Konfino report anything about the

11  bromotyrosine content of this batch?

12  A.   He does.   At the bottom of the page he reports

13  bromotyrosine content as 0.1 percent.

14  Q.   All right.   We can put that lab notebook away.   And I want

15  to look at another of Mr. Konfino's lab notebooks.   If we could

16  see DTX-1679.

17          Dr. Kent, is this another one of Mr. Konfino's

18  laboratory notebooks you reviewed in preparing your reports?

19  A.   It is.

20          MR. ANSTAETT:   Your Honor, I move admission of

21  DTX-1679?

22          MS. HOLLAND:   No objection.

23          THE COURT:   Admitted.

24          (Plaintiff's Exhibit 1679 received in evidence)

25  Q.   Dr. Kent, if we look now at the page with the Bates number

1    1176791, please.  What do we see on this page?

2    A.  This is another experiment from Mr. Konfino's lab notebook

3    dated March the 6th, 1990, in which Mr. Konfino is preparing

4    TFA copolymer-1 from protected copolymer-1, using HBr acetic

5    acid from Merck, plus 1 percent phenol.

6    Q.  And what does he report about the bromotyrosine content of

7    this batch of TFA cop-1?

8    A.  At the bottom of the page it reports the bromotyrosine

9    content as less than 0.1 percent.

10   Q.  All right.  Let's look at the page with the Bates number

11   1176877, please.  Dr. Kent, what are we looking at on this

12   page?

13   A.  This is May the 6th, 1990, another experiment from Mr.

14   Konfino's lab notebook, in which he's preparing a TFA

15   copolymer-1 from protected copolymer-1.  He's using HBr acetic

16   acid, plus 1 percent weight volume phenol.

17   Q.  And does he report anything about the bromotyrosine content

18   of this batch?

19   A.  He does.  It says at the bottom, check for bromotyrosine,

20   and then the mathematical symbol for less than or equal to 0.1

21   percent.

22   Q.  All right.  Let's turn to the page with the Bates number

23   1176989, please.  Doctor, what do we see here?

24   A.  This is an experiment from Mr. Konfino's lab notebook dated

25   July the 16th, 1990, in which Mr. Konfino's preparing TFA

copolymer-1 from protected copolymer-1.  And as we can see in

the sub title he says, adhere to BY, that's Bio-Yeda, procedure

as close as possible.

Q.  All right.  And when he is making this batch, is he using

phenol to pre-treat the HBr acetic acid solution?

A.  No.  He says HBr acetic from BDH, which is the commercial

supplier.  There's no mention of phenol on this page.

Q.  What does Mr. Konfino report about the bromotyrosine

content of this batch?

A.  At the bottom of the page you can see that he has

bromotyrosine, and then mathematical symbol for much greater

than 0.5 percent.

Q.  All right.  And in your opinion, what is the much greater

than .05 percent of bromotyrosine result attributable to here?

A.  Well, apparently, the HBr acetic acid from the commercial

supplier BDH must have contained bromine as impurity.

Q.  And what does that result in?

A.  That led to the formation of bromotyrosine in the product

copolymer chains.

Q.  All right.  Let's turn to the page with the Bates number

1177179.  And what do we see here on this page of Mr. Konfino's

lab notebooks?

A.  This is November the 11th, 1990, at page from Mr. Konfino's

lab notebook in which he describes the preparation of TFA

co-polymer-1 from protected copolymer-1 using HBr acetic acid

1  containing 1 percent phenol.

2  Q.  So we're back to the use of phenol in the preparation of

3  the HBr acetic acid solution?

4  A.  That's correct.

5  Q.  What does Mr. Konfino report about the bromotyrosine

6  content, please?

7  A.  At the bottom of the page he describes the bromotyrosine

8  content of the polymer as less than 0.1 percent.

9  Q.  All right.  We can put that lab notebook away.

10          I want to look at one more of Mr. Konfino's lab

11  notebooks, PTX-52T.

12          And, Dr. Kent, is this another one of Mr. Konfino's

13  laboratory notebooks that you reviewed in preparing your

14  reports?

15  A.  It is.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          MR. ANSTAETT:  Your Honor, I would move admission of

2   DTX 52T.

3          MS. HOLLAND:  No objection.

4          THE COURT:  Admitted.

5          (Defendant's Exhibit DTX 52T received in evidence)

6   Q.  Turn to the page with the Bates number 1177256, please and

7   what do we see on this page, Dr. Kent?

8   A.  We see an experiment dated something January, I think, the

9   7, 1991, in which Mr. Konfino is comparing TFA copolymer-1 from

10  protected copolymer-1 using HBL acetic acid containing

11  1 percent white volume phenol.

12  Q.  Does he report a bromotyrosine content for this batch of

13  copolymer-1?

14  A.  Yes, at the bottom of the page he simply says bromotyrosine

15  less than .15 percent.

16  Q.  Thank you very much.  And we can take that down.

17         Doctor, have we discussed all the examples from Mr.

18  Konfino's laboratory notebooks in which he used phenol to treat

19  the HBr acetic acid solution and reported a low bromotyrosine

20  content?

21  A.  No.  There were many examples from Mr. Konfino's laboratory

22  notebooks.

23  Q.  Did you note a pattern in his laboratory notebooks?

24  A.  I did.  As I looked through his notebooks from starting

25  from about the middle of 1989 through to the early part of 1991

1   I noticed Mr. Konfino used the pretreatment of HBr acetic acid

2   with phenol with increasing frequency and the number of

3   experiments in which he just used commercial HBr with acetic

4   acid decreased in frequency.

5   Q.  Did Mr. Konfino always use phenol in his experiments?

6   A.  No, he did not.

7   Q.  If we could look at DTX 52T again on the private screens

8   and I want to look at the page with the Bates number 1177354.

9   What is your understanding of what's being reported on this

10  page, please?

11  A.  This is an experiment in Mr. Konfino's laboratory notebook

12  from March 10, 1991 in which Mr. Konfino is comparing TFA

13  copolymer-1 from protected copolymer-1 and he's using HBr

14  acetic acid from the commercial supplier Merck.

15  Q.  If we look at the next page ending in 75, did he achieve a

16  low bromotyrosine content?

17  A.  He did.  He reports at the bottom of the page the

18  bromotyrosine content is less than .5 percent.

19  Q.  Following this experiment on March 10, 1991, did Mr.

20  Konfino ever use phenol again in preparing TFA copolymer-1?

21  A.  Yes, he did.

22  Q.  If we could see the page with the Bates number 1177384,

23  please?  And what do we see here?

24  A.  This is an experiment from March 19, 1991 in which Mr.

25  Konfino is preparing TFA copolymer-1 from protected copolymer-1

1   using HBr acetic acid plus 1 percent phenol.

2   Q.  After March 1991 did Mr. Konfino author any reports in

3   which he mentioned the use of phenol?

4   A.  Yes.  As we've already seen the August 1991 report from Mr.

5   Konfino reports the use of phenol for treating the HBr acetic

6   acid for the first deprotection stage.

7   Q.  Just to be clear if we could bring up PTX 708T?  That could

8   be on the public screen.  Is this the August 1991 Konfino

9   report that you were referring to?

10  A.  Can we see the cover of it, please?

11  Q.  If we go to the second page?

12  A.  Yes.  That's the one.

13  Q.  Now, when did Mr. Konfino leave Teva?

14  A.  It's my understanding that he retired from Teva at the end

15  of 1991.

16  Q.  Have you ever seen any lab notebook or report after

17  August 1991 indicating that Mr. Konfino no longer believed that

18  phenol was the most convenient reagent for getting rid of

19  bromotyrosine in copolymer-1?

20  A.  I've not seen any documents from Mr. Konfino in that time

21  period that indicated that he changed his mind about the use of

22  phenol in pretreating the HBr acetic acid in the first

23  deprotection stage.

24  Q.  According to his lab notebooks, about when did Mr. Konfino

25  begin using phenol to beginning making low bromotyrosine

1    copolymer-1?

2    A.   The beginning of 1989.

3    Q.   Did you view any documents after 1989 that indicated that

4    Teva made low bromotyrosine copolymer-1 without using phenol

5    while Mr. Konfino was at Teva?

6    A.   Yes, I did.

7         MR. ANSTAETT:  Your Honor, this is a document I

8    believe you'll remember well from July, although we're talking

9    about different pages here and I believe these should be on the

10   private screen.

11        THE COURT:  All right, thank you.

12   Q.   I want to take a look at DTX 999A, please and if we can

13   look at the Bates number 1222365-RC.  Dr. Kent, what are we

14   looking at here?

15   A.   This is a Teva Pharmaceuticals internal document describing

16   the manufacturing procedure of cop-1, copolymer-1 for

17   injection.  It's dated December 1989.

18   Q.   And was Mr. Konfino still at Teva in December of 1989?

19   A.   He was.

20   Q.   And do you see the name D. Leonov in the top left-hand

21   corner?

22   A.   I do.

23   Q.   Who is that?

24   A.   Dr. Leonov was Mr. Konfino's boss.

25   Q.   I want to turn to the page, now, again on the private

1    screens with the Bates number TEV 1222382-RC.  Dr. Kent, what

2    do we see on this page?

3    A.  This is the stage of the production of copolymer-1 on which

4    trifluoroacetyl copolymer-1 is produced from protected

5    copolymer-1 and I'll read the first sentence.  "Hydrobromic

6    acid 33 percent in acetic acid 5 liters is treated with phenol

7    50 grams for 7 to 8 hours at 20 to 25 degrees celsius.  So

8    they're describing the use of HBr acetic pretreated with phenol

9    for the first deprotection stage.

10   Q.  Dr. Kent, I'm going to ask you to look at a document DTX

11   1271, please, and this I believe to be on the public screens.

12   And if we look at the first page of the document here, we have,

13   is this one of the documents you reviewed in preparing your

14   expert reports?

15   A.  It is.

16           MR. ANSTAETT:  Your Honor, I would move admission of

17   DTX 1271.

18           MS. HOLLAND:  No objection.

19           THE COURT:  Admitted.

20           (Defendant's Exhibit DTX 1271 received in evidence)

21   Q.  What are we looking at here, Dr. Kent?

22   A.  This is a validation report prepared or co-authored by Mr.

23   Konfino and it's dated June 1990.

24   Q.  If we could turn to the page with the Bates number 324714,

25   please?  If we can make that a little larger?  What do we see

687

1   on this page, please, Dr. Kent?

2   A.  Could we include the heading, please?  Thank you.  Yes,

3   what Mr. Konfino is describing and his co-author are describing

4   in this report is the conversion of protected copolymer-1 to

5   TFA copolymer-1 and in the first sentence, which I'll read, he

6   says, "Phenol AR" -- stands for analytical reagent --

7   "1.5 grams was added to 152 mils," should be HBI, there's a

8   typo -- "Acetic acid that is 33 percent HBr and stirred for

9   about two hours at room temperature to dissolve."

10          The next sentence says, "The solution was stored for a

11  total of 24 hours before use," and then they go ahead and use

12  it in the first deprotection step.

13  Q.  Does Mr. Konfino report anything about the bromotyrosine

14  content from this batch?

15  A.  Yes.  If we look at the bottom of the highlighted region we

16  see the bromotyrosine content was reported as less than

17  .1 percent.

18  Q.  Doctor, did you read Mr. Konfino's deposition transcripts?

19  A.  I did.

20  Q.  So you're aware that Mr. Konfino testified that phenol was

21  not used in Teva's manufacturing process?

22  A.  I am aware that Mr. Konfino testified at his deposition

23  that phenol was not used in Teva's manufacturing process.

24  Q.  Do you agree that Teva did not use phenol in its

25  manufacturing process?

1          MS. HOLLAND:  Your Honor, I'm sorry.  Mylan didn't

2     designate any of Mr. Konfino's deposition testimony and I don't

3     believe the representations about what he said were exactly

4     right.

5          MR. ANSTAETT:  Your Honor, there was obviously an

6     issue with bringing Mr. Konfino.  More importantly, Dr. Kent

7     made this exact observation in his expert reports that were

8     served ages ago.

9          THE COURT:  All right.  If the characterization was

10    incorrect, I'll certainly take a look at that, but go ahead,

11    give us your opinion, Doctor.

12    Q.  Thank you.  So the question, again, was did you agree that

13    Teva did not use phenol in its manufacturing process while Mr.

14    Konfino was at Teva?

15    A.  Teva did use phenol in its manufacturing process based on

16    the documents I've examined while Mr. Konfino was still at

17    Teva.

18    Q.  All right.  Doctor, I'm going to ask you to look at DTX

19    1270, and is this a document that you reviewed in preparing

20    your expert reports, please?

21    A.  This is one of the documents I reviewed, yes.

22          MR. ANSTAETT:  Your Honor, I would move admission of

23    DTX 1270.

24          MS. HOLLAND:  No objection.

25          THE COURT:  Admitted.

1        (Defendant's Exhibit 1270 received in evidence)

2    Q.   Doctor Kent, what are we looking at here?

3    A.   This is a Teva annual review report for the manufacture of

4    copolymer-1 in the period 1991 to 1992, and it's dated January,

5    1993.

6    Q.   All right.  Was Mr. Konfino at Teva in 1991?

7    A.   Mr. Konfino was at Teva through the end of 1991.

8    Q.   Let's look at the page with the Bates number TEV 3017396,

9    please.  And, Doctor, I'm going to ask you under "introduction"

10   to read the first two sentences.

11   A.   Yes.  The first two sentences of this introduction read as

12   follows:  "Cop-1, copolymer-1 has been manufactured in a

13   specially designed unit at Plantex starting from mid-1989.  In

14   the subsequent 18 months, several changes were made enabling

15   safer production, better and more efficient operating

16   conditions and better quality.

17   Q.   And does one of the changes relate to the use of phenol?

18   A.   Yes, it does.  If we look a little bit low, we see the

19   heading, "The major improvements are as follows: " And then one

20   says something about polymerization time, number two talks

21   about using water instead of diethylether and the third major

22   improvement, and I'll read the section is, "HBr acetic acid is

23   pretreated with phenol before use, thus preventing side

24   reaction of free residual bromine with a tyrosine moiety."

25   Q.   Is this the same pretreatment that you previously described

1   being used by Mr. Konfino?

2   A.   It is the same phenol pretreatment used by Mr. Konfino,

3   yes.

4   Q.   I'd like you to turn to the page with the Bates number

5   309792 and 793, please.

6   Q.   Let's focus first on 7972.  Doctor, what is the title of

7   this table?

8   A.   This table 10 is entitled TFA cop-1 manufacturing

9   performance 1991 to 1992 quality and quantity.

10  Q.   And what is shown in the left column, please?

11  A.   This is the first 30, or listed by number the first 30 of

12  the production batches of the 49 that are present in the entire

13  table.

14  Q.   And what does the table show with respect to bromotyrosine?

15  A.   Well, we can see if we go across towards the right that

16  there's a column that's titled bromotyrosine content and in

17  parenthesis is the specification they're trying to meet, less

18  than or equal to .5 percent, and then across from each of the

19  30 lots you see mostly we see passes.

20  Q.   All right, and are they all passes?

21  A.   No.  There's two down in the middle section, about 12 and

22  13, I think, where one says greater than 0.5 and the other says

23  greater than or equal to 0.5 and if we look over on the right

24  in the notes column, we see that these two batches were

25  rejected.

1    Q.  All right.  Now, Doctor, let me ask you, could Teva have

2    fixed those two batches of copolymer-1 by simply purifying out

3    the bromotyrosine?

4    A.  No.  The bromotyrosine that's formed is an integral part of

5    the copolymer chains, and there's no known fractionation

6    procedure that could remove the bromotyrosine from the

7    copolymer chain product.  It's built into it.

8    Q.  And would the same be true of bromotyrosine if it occurred

9    in Mylan's product, could it simply be purified out?

10   A.  If there were a bromotyrosine impurity in any preparation

11   of copolymer-1, clearly Mylan's product, then no, it could not

12   be purified out.

13   Q.  And, Dr. Kent, are there additional documents that you

14   reviewed that indicate that Teva continued to make low

15   bromotyrosine copolymer-1 using phenol even after Mr. Konfino

16   left Teva?

17   A.  Yes, there are.

18   Q.  And here I want to be mindful of the confidentiality

19   issues.  I want to look at just on the private screens DTX

20   1023, please.

21        MR. ANSTAETT:  And, your Honor, this document was

22   admitted during Dr. Pinchasi's testimony in July.

23        THE COURT:  All right.

24   Q.  Doctor, is this a document you reviewed in preparing your

25   expert report?

1  A.  Yes, it is.  It's part of Teva's NDA application.

2  Q.  When did Teva submit its NDA to the FDA?

3  A.  I think they submitted this NDA for Copaxone copolymer-1 in

4  1995.

5  Q.  Let's look at the page with the Bates number TEV 541,

6  please.  And, Doctor, what do we see on this page?

7  A.  This is a description of the step that's involved in

8  converting protected copolymer-1 to TFA copolymer-1, and I'll

9  read the first sentence:  It says, "Protected copolymer-1,

10  4 kilograms is dissolved in 108 kilograms of a solution of

11  33 percent hydrogen bromide in acetic acid (previously treated

12  with phenol to remove free bromine which may react with

13  tyrosine residues leading to bromotyrosine residue impurities)

14  and stirred at 26 plus or minus 1 degree celsius in a

15  glass-lined reactor for the amount of time determined by the

16  test reaction (note 1)."

17  Q.  So Teva told the FDA that it used phenol in its

18  manufacturing process for making Copaxone?

19  A.  It did.  That's what's in this document, yes.

20  Q.  Was the use of phenol disclosed in any of the patents in

21  suit?

22  A.  It is not disclosed in any of the patents in suit.

23  Q.  Doctor Kent, in your opinion is using phenol to reduce the

24  bromotyrosine in copolymer-1 a routine detail that would have

25  been apparent to anyone of skill in the art in 1994?

1   A.  No, in my opinion it would not have been a routine detail

2   for one of normal skill in the art for 1994.

3   Q.  Have you seen any documents indicating whether the Weizmann

4   Institute scientists recognized the problem of bromotyrosine

5   formation in copolymer-1?

6   A.  I've seen no document that suggested that the Weizmann

7   scientists had recognized the problem with bromotyrosine

8   copolymer-1.

9   Q.  Dr. Kent, did Teva obtain any patents on the process of

10  using phenol to eliminate bromotyrosine in copolymer-1?

11  A.  Yes, they did.

12  Q.  Could we see DTX 1925, please?  And, Dr. Kent, is this one

13  of the patents that you reviewed?

14  A.  Yes, it is.

15  Q.  And to be clear, is this one of the patents in suit?

16  A.  No, it is not one of the patents in suit.

17  Q.  And to whom is the patent assigned?

18  A.  It's assigned to Teva Pharmaceutical Industries, Ltd.

19  Q.  And what is the name of the inventor?

20  A.  The name of the inventor is Ben-Zion Dolitzky.

21  Q.  When is it applied for?

22  A.  It was applied, it was filed on September 9, 2005.  I think

23  it claims an earlier priority date.  Yes, 2004.

24  Q.  Do you see the provisional application down there?  What's

25  the date on that?

1    A.  I'm sorry?

2    Q.  What's the date, I think you just mentioned it.

3    A.  September 9, 2004.

4    Q.  Thank you.  And when did the patent issue?

5    A.  The patent issued February 24, 2009.

6    Q.  And what according to the title does it cover?

7    A.  The title reads a process for preparation of mixtures of

8    polypeptides using purified hydrobromic acid.

9          MR. ANSTAETT:  Your Honor, I move admission of DTX

10   1925.

11         MS. HOLLAND:  No objection.

12         THE COURT:  Admitted.

13         (Defendant's Exhibit DTX 1925 received in evidence)

14         MR. ANSTAETT:  Nick, if we could go into the

15   specification and look at column 1, lines 47 to 67 and column

16   2, lines 1 to 17.

17   Q.  And, Dr. Kent, what is being discussed in the sections that

18   we're looking at here?

19   A.  This part of the patent specification of the Dolitzky

20   patent in the first sentence, which I'll read, describes, "The

21   manufacturing process as detailed in the above patents involves

22   reacting protected polypeptides with 33 percent hydrobromic

23   acid in acetic acid," and then it cites U.S. Patent No. 5800808

24   issued September 1, 1998 to Konfino, et al.  It's the '808

25   patent.

1    Q.  Is that one of the patents in suit?

2    A.  It is one of the patents in suit.

3    Q.  If we look down at the bottom of the excerpt here how is

4    the invention disclosed in the Dolitzky patent that we're

5    looking at here described?

6    A.  The invention was, it says at the bottom, "this invention

7    provides an improved manufacturing process."

8    Q.  And, Nick, I'm going to ask you now to put up column 9,

9    lines 36 to 58 of the Dolitzky patent on one side of the

10   screen, and on the other side of the screen I'd like to see PTX

11   708T, which is Mr. Konfino's August 1998 memo.  What are we

12   looking at here, Doctor?

13   A.  On the left is part of the patent specification for the

14   Dolitzky patent, the phenol patents and on the right is part of

15   Mr. Konfino's August 1991 report.

16   Q.  All right, and what do we see in the two blue action boxes,

17   please, if you start on the left with Dolitsky patent?

18   A.  On the left in the Dolitsky patent we see the sentence

19   highlighted, "For example, during the development of the

20   production process for GA" -- GA is glatiramer acetate -- "it

21   was found that some of the tyrosine residues in trifluoroacetyl

22   GA and in the GA were brominated," and on the right in the blue

23   box from Mr. Konfino's report is stated, "Still in an early

24   stage of work.  One of the impurities of cop-1 was identified

25   as bromotyrosine."

1  Q.  All right, and I'll ask you to do the same thing for the

2  green boxes, please.

3  A.  Yes, in the Dolitzky patent on the left, we see the

4  sentence:  "After much investigation, the inventors discovered

5  that the brominated tyrosine impurity was introduced into the

6  GA through free bromine in HBr acetic acid," and in the

7  corresponding green box on the right in Mr. Konfino's report,

8  we see the presence of small amounts of -- we should actually

9  go a little bit above.  "It was then proven that the presence

10 of the small amounts of free bromine in the HBr acetic are to

11 be blamed for the small amount of impurities."

12 Q.  If we could do the same thing for the red boxes, please?

13 A.  Yes.  On the left in the Dolitzky patent we see

14 highlighted, "For example, pretreatment of HBr acetic acid with

15 a bromine scavenger was effective in removing some of the free

16 bromine from the HBr acetic acid solution.  One of the bromine

17 scavengers used in the HBr purification pros was phenol."

18         And in the corresponding red box on the right in Mr.

19 Konfino's report, we see, "Among the many reagents tried for

20 removing the free bromine, a previous treatment of HBr acetic

21 acid with 1 percent phenol for a few hours proved to be the

22 most convenient."

23 Q.  All right.  Now, Dr. Kent, in your opinion, how does the

24 process described in this portion of the Dolitzky patent relate

25 to what Mr. Konfino described in his August 1991 report?

1  A.  They're essentially identical.

2  Q.  I want to look at the claims of the Dolitzky patent now,

3  and if we could highlight claims 3 to 7, column 14, please.

4  Dr. Kent what is your understanding of what is being described

5  in claim 3?

6  A.  In claim 3, as I'll read, what is claimed is a process of

7  producing glatiramer acetate comprising the steps of, and then

8  in step one, treating a solution of hydrobromic acid in acetic

9  acid with a bromine scavenger so as to prepare a treated

10  hydrobromic acid in acetic acid solution.

11       Then in step two it describes the polymerization

12  reaction, step 2A, and step 2B I'll read that out,

13  "deprotecting protected polypeptides with the treated

14  hydrobromic acid in acetic acid solution prepared in part 1 to

15  form trifluoroacetyl glatiramer acetate."  And then what's

16  claimed, what's described in claim 3 is step C and D that are

17  the TFA removal with piperdine and then purifying the product

18  glatiramer acetate.

19  Q.  All right, and what is your understanding of what's being

20  described in claim 7, please?

21  A.  Claim 7 describes the process of claim 3, wherein the

22  bromine scavenger is phenol.

23  Q.  Dr. Kent, how does the process claimed here compare to what

24  Mr. Konfino reported in his August 1991 report?

25  A.  They're essentially identical.

1   Q.   This patent was not filed until 2004, is that correct?

2   A.   That's correct.

3            MR. ANSTAETT:  If we could take that down.  Your

4   Honor, I am at a transition point.  I don't know how you feel

5   about --

6            THE COURT:  All right.  It's almost 1:00 so we'll

7   adjourn for lunch.  I'll see everybody at 2.

8            (Luncheon recess)

9                              o0o

10                        AFTERNOON SESSION

11                           2:05 p.m.

12            THE COURT:  You may proceed.

13            MR. ANSTAETT:  Thank you, your Honor.

14   BY MR. ANSTAETT:

15   Q.   Look at DTX 1225.  Dr. Kent, before lunch we were talking

16   about the Dolitzky patent.  I just have one more question for

17   you on that.  If we could see column 1 of the patent, lines 12

18   through 33, starting with the background of the invention.  I'm

19   just going to ask you to read the first sentence of background

20   of the invention, please.

21   A.   A mixture of polypeptides which do not all have the same

22   amino acid sequence referred to as glatiramer acetate, GA, is

23   marketed under the trademark Copaxone, registered trademark,

24   and comprises the acetate salts of polypeptides containing

25   L-glutamic acid, L-alanine, L-tyrosine and L-lysine at average

1    molecular fractions of 0.141, 0.427, 0.095 and 0.338,

2    respectively.

3    Q.  And so the Dolitzky patent reports the molar fractions, the

4    average molar fractions for Copaxone?

5    A.  It does.

6    Q.  We can take that down.

7              Dr. Kent, I now want to talk about the claims of the

8    patents in suit.  Did your infringement analysis, your

9    non-infringement analysis focus on a particular claim term?

10   A.  Yes, it did.  I focused on the claim term copolymer-1 that

11   appears on all the claims of the patents in suit.

12   Q.  If we could look at the Court's claim construction, please.

13   Dr. Kent, what are we looking at here?

14   A.  I understand this is the Court's definition or agreed

15   definition of copolymer-1.

16   Q.  And in your opinion, is Mylan's proposed glatiramer acetate

17   product composed of alanine, glutamic acid, lysine and tyrosine

18   in a molar ratio of approximately 6:2:5:1 respectively?

19   A.  In my opinion, Mylan's proposed glatiramer acetate product

20   is not composed of alanine, glutamic acid, lysine and tyrosine

21   in a molar ratio of 6:2:5:1.

22   Q.  What would a molar ratio of 6:2:5:1 tell you about the

23   amino acids in copolymer?

24   A.  What you're talking about is six alanines for every one

25   tyrosine approximately; approximately two glutamic acids for

1   every one tyrosine, and approximately one lysine for every five

2   tyrosines.

3   Q.  Did you determine the molar rations for Mylan's proposed

4   product?

5   A.  I did.

6   Q.  How did you go about doing that?

7   A.  I looked at Mylan's ANDA, I believe.

8   Q.  All right, and does Mylan's ANDA report the molar fractions

9   for its product?

10  A.  It does.

11  Q.  And what are molar fractions?

12  A.  Molar fractions are the primary data that you get from

13  amino acid analysis so you hydrolize your sample, you determine

14  the amount of each amino acid and then that is usually reported

15  as molar fractions.  By definition they add up to one.

16  Q.  Let's look at PTX 294R, please.

17          MR. ANSTAETT:  And, your Honor, PTX 294R is in

18  evidence, I believe.  Out of an abundance of cause of action I

19  would move that into evidence.

20          THE COURT:  All right.

21          (Plaintiff's Exhibit PTX 249R received in evidence)

22  Q.  Dr. Kent, is this one of the certificates, the Mylan

23  certificates of analysis that you reviewed?

24  A.  Yes, I believe it is.

25  Q.  And if we could see, I want to direct your attention to

1    Section 8 of the certificate, please.  And what do we see here?

2    A.  Section 8 is a list of the amino acids that are glutamic

3    acid, alanine, tyrosine and lysine and on the right we see the

4    molar fractions of each amino acid.  In this case 0.144, 0.427,

5    0.092 and 0.336.

6    Q.  Dr. Kent, did you prepare a demonstrative exhibit to show

7    how you would convert the molar fractions to a molar ratio?

8    A.  I did.

9    Q.  Nick, if we could see the Mylan molar ratio demonstrative,

10   please?  Dr. Kent, what do we see here?

11   A.  We're looking at the page that we just saw a moment ago

12   with the same Section 8 highlighted.  So these are the molar

13   fractions that are reported for this batch of Mylan's proposed

14   product.  And what we'll do now is call out the molar fractions

15   into the tabular form below, so a molar fraction of glutamic

16   acid is 0.144; for alanine the molar fraction is 0.427, for

17   tyrosine the molar fraction is 0.092 and for lysine the molar

18   fraction is 0.336.

19        Now, to convert these into molar fractions by

20   definition they have to be a ratio to some amino acid and

21   commonly one uses the least abundant amino acid, in this case

22   tyrosine.  You divide by 0.092 all the way through and you end

23   up with the molar ratio shown on the bottom line.

24   Q.  And is this the molar ratio for this batch of Mylan's

25   proposed glatiramer acetate product?

1   A.  Yes, it is.

2   Q.  And what does this molar ratio tell you about the four

3   amino acids present in this batch of Mylan's proposed product?

4   A.  What it tells you, the molar ratio tells you that on

5   average there are about 4.6 alanines for every one tyrosine.

6   On average 1.6 glutamic acids for every 1 tyrosine and on

7   average 3.7 lysines for every one tyrosine.

8   Q.  Would a person of ordinary skill in the art reading the

9   patents in suit in 1994 believe that a molar ratio of 4.6 to

10  1.6 to 3.7 to 1.0 was approximately 6:2:5:1?

11  A.  A person of ordinary skill in the art would not think that

12  this molar ratio of 4.6 to 1.6 to 3.7 to 1.0 is approximately

13  6:2:5:1.

14  Q.  Dr., what about the fact that the patents use the term

15  approximately 6:2:5:1?  How does the use of the word

16  "approximately" affect your analysis?

17  A.  Well, I understand the use of the word "approximately" to

18  reflect the possibility of batch-to-batch variation and also

19  the uncertainty in determining the amino acid composition,

20  experimental uncertainty.

21  Q.  What do you mean by batch-to-batch uncertainty?

22  A.  When you carry out a process of random copolymerization

23  such as is used to make the glatiramer acetate or the

24  copolymer-1, you won't get exactly, even if you try to control

25  all the conditions, you won't get exactly the same product

1  composition, it's too complex of a product mixture.  So you'll

2  get some small batch-to-batch variation, and in addition, the

3  determination of how much of amino acids is in each batch will

4  also have an experimental uncertainty associated with it.

5  Q.  I want to talk about experimental uncertainty.  In 1994

6  what would a person of ordinary skill in the art conducting an

7  amino acid analysis have expected in terms of experimental

8  uncertainty?

9  A.  For amino acid analysis?

10  Q.  Yes.

11  A.  A person of ordinary skill in the art in the 1994 for amino

12  acid analysis for a copolymer polypeptide composition of this

13  type would have expected to get reproducibility of experimental

14  uncertainty of less than 5 percent for each amino acid.

15  Q.  And how would that experimental uncertainty affect your

16  comparison of two copolymer-1 compositions?

17  A.  Well, why that's commonly done to decide whether or not, if

18  you take two samples of two compositions and you want to know

19  based on the amino acid analysis whether they're reliably the

20  same or reliably different, you'll take into account the

21  experimental uncertainty in determining the amino acid

22  analysis, and then the math of the particulars of the

23  statistical treatment kind of complicate it, but if we regard

24  the experimental uncertainty as a standard deviation, the

25  common cutoff is twice the standard deviation.  So in this case

1   if each amino acid or any amino acid between the two

2   compositions differed by more than plus or minus 10 percent,

3   then you would think that they were different.  If the values

4   were within, for each amino acid were within plus or minus

5   10 percent, you would consider them probably the same.

6   Q.  And just to be clear, do you make that comparison for each

7   individual amino acid in a composition?

8   A.  We do.

9   Q.  Now, Dr. Kent, let me ask you, did you review certificates

10  of analysis for different lots of Mylan's glatiramer acetate

11  product?

12  A.  I did.

13  Q.  If we could get indict 325R, please, and we could turn to

14  the page with the Bates number MYL 1068.  Dr. Kent, is this one

15  of the certificates of analysis, Mylan certificates of analysis

16  that you reviewed?

17  A.  Yes, it's the 002, yes.

18          MR. ANSTAETT:  And, your Honor, I believe this is an

19  Exhibit 325R, this is also in evidence.

20          THE COURT:  Yes, thank you.

21  Q.  And I want to stay in the same document and ask us to look

22  at MYL 1079.  Dr. Kent, is this another one of the certificates

23  of analysis that you reviewed?

24  A.  Yes, this is for lot number 003.

25  Q.  Now, did you prepare an exhibit to show the molecular

19DFTEV4                    Kent - direct

1    ratios of these additional lots?

2    A.  I did.

3    Q.  If we could see the Mylan drug substance demonstrative.

4    And, Dr. Kent, what are we looking at in this exhibit, please?

5    A.  Well, listed down the left-hand side under the heading

6    Mylan lot number are the three lots that we've just seen the

7    certificates of analysis for, and listed across the molecular

8    ratios of the four amino acids comprising these different lots.

9    In the row at the bottom that's labeled mean (SD), these are

10   the mean or the average of the three numbers above.  So for the

11   alanine column the mean is 4.71 and the number in parenthesis

12   is the experimental uncertainty that we were talking about.  In

13   this case it's about 0.06.  The same applies to the other amino

14   acids here.

15   Q.  All right.  Doctor, would a person of ordinary skill in the

16   art reading the patents in suit in 1994 believe that any of

17   these molar ratios was approximately 6:2:5:1?

18   A.  No, they would not.  The way you would make the number by

19   number comparison is plus or minus 10 percent on, say, the

20   alanine ratio of six to one, six plus or minus 10 percent would

21   take it all the way down to 5.4, but if you looked at the

22   alanine here and take twice the standard deviation, that's only

23   going to take it up to 4.83, so these are significantly

24   different numbers.

25          The same type of analysis applies to the glutamic

1    acids and the lysines, and I should point out that the, even

2    though it looks as if tyrosine has no experimental uncertainty,

3    that's not the case.  Because these are ratios, experimental

4    uncertainty and the amount of tyrosine, the experimental

5    uncertainty of, say, alanine, are combined in the 0.06.

6    Q.  The experimental uncertainty for alanine?

7    A.  Exactly, yes.

8    Q.  Dr. Kent, did you also determine the molar ratio of the

9    injection batches described in Mylan's ANDA?

10   A.  Yes, I did.

11   Q.  If we could take a look at PTX 300R, please?

12          MR. ANSTAETT:  And your Honor, PTX 300R is another

13   document that is in evidence.

14   Q.  Doctor, is this one of the certificates of analysis for the

15   injection batches that you reviewed?

16   A.  Yes, it's WV901.

17   Q.  And we can take a look now at PTX 312-R, please?  And same

18   question, Dr. Kent, is this one of the certificates of analysis

19   for the injection batches that you reviewed?

20   A.  Yes, this was for batch number WV902.

21          MR. ANSTAETT:  Your Honor, I believe PTX 312R is also

22   in evidence.

23   Q.  Finally, if we look at PTX 313R, please, Doctor, is this

24   another one of the certificates of analysis for the Mylan

25   injection batches that you reviewed?

1   A.  Yes, it is.  It's batch number WV903.

2   Q.  All right.  And did you prepare an exhibit to show the

3   molar ratios of the Mylan injection batches?

4   A.  I did.

5           MR. ANSTAETT:  Nick, if we could see that?

6   Q.  What do we see here, Dr. Kent?

7   A.  This table is laid out exactly the same way as for the

8   super ingredient Mylan batches, the glatiramer acetate batches.

9   So down the left we have the code numbers for the three

10  different injection batches.  Across the top we have the four

11  amino acids and again at the bottom, we have the means, mean

12  values for each amino acid combined with the experimental

13  uncertainty.

14  Q.  All right.  And would a person of ordinary skill in the art

15  reading the patents in suit in 1994 believe that any of the

16  injection batch molar ratios was approximately 6:2:5:1?

17  A.  No, they would not, and this is most vividly demonstrated

18  if we focus in on the lysine value.  So at the bottom we see an

19  unusually low standard deviation, I prefer to call that .06 as

20  we did for some of the other amino acids, and if we take twice

21  the value of .06, that will give us 3.58 for the maximum ratio

22  of lysine to tyrosine.  This is significant, very significantly

23  different than the ratio of five to one.

24  Q.  Dr. Kent, we've been talking about Mylan product and I want

25  to shift gears here and talk about Teva's commercial product,

1  Copaxone.  Did you also calculate the amino acid molar ratio of

2  Teva's Copaxone?

3  A.  I did.

4  Q.  And how did you do that?

5  A.  I used the Copaxone package insert.

6  Q.  If we could take a look at PTX 697, please.

7        MR. ANSTAETT:  Your Honor, this was an exhibit that

8  was admitted in Mr. Congleton's examination.

9        THE COURT:  Thank you.

10 Q.  If we could turn to page 4 please, look at section 11.  And

11 what do we see here, please, Dr. Kent?  Well, actually let me

12 take a step back.  Is this the Copaxone package insert that you

13 reviewed?

14 A.  Yes, it is.  And what you see here in section 11 is the

15 description of the Copaxone product.  It outlines that that's

16 the brand name for glatiramer acetate formerly known as

17 copolymer-1, and then below that it gives the molar fractions

18 that are found in Copaxone for each of the four amino acids;

19 glutamic acid, alanine, tyrosine and lysine.  So it states that

20 the average molar fractions are 0.141 for glutamic acid, .427

21 for alanine, .095 for tyrosine and .338 for lysine.

22 Q.  Doctor, did you prepare an exhibit to show how you

23 calculate the molar ratios for Copaxone?

24 A.  I did.

25 Q.  If we could see the Copaxone demonstrative, please.

1    A.  So this is the Copaxone package insert and we're going

2    through to section 11 and we've highlighted here the same

3    section that I just read from.  And here we have the molar

4    ratios, average molar fractions, excuse me, of Copaxone, amino

5    acids in Copaxone and we'll call these out into the same format

6    as we were considering earlier.  So there is a glutamic acid

7    molar fraction of 0.141, an alanine molar fraction of 0.427, a

8    tyrosine molar fraction of 0.095, and a lysine molar fraction

9    of 0.338, and of course by definition fractions add up to one.

10       The molar ratios are calculated in the conventional

11   manner, dividing through by the molar fraction of the least

12   abundant amino acid, in this case tyrosine 0.095.  If you do

13   that for each molar fraction, you get the numbers shown on the

14   bottom line.  These are the molar ratios of the amino acids

15   found in Teva's Copaxone.

16   Q.  And what does this molar ratio tell you about the amino

17   acid composition of Copaxone?

18   A.  What it tells me is that the Copaxone product composition

19   contains on average 4.6 alanines for every one tyrosine, 1.5

20   glutamic acids for every one tyrosine and 3.6 lysines for every

21   one tyrosine.

22   Q.  And why aren't these whole numbers, Dr. Kent?

23   A.  Well, the copolymer-1 Copaxone polypeptide product mixture

24   is such a complex mixture of polypeptides of different amino

25   acid sequence, there's no expectation that these will

1    necessarily occur in whole number ratios.  The ratios are

2    determined by the molar fractions, determined by amino acid

3    analysis and they are what they are as shown here.

4    Q.  All right.  Now, Doctor, preparing your expert reports did

5    you come across any publications in which the molar ratio of

6    Teva's glatiramer acetate product had been calculated?

7    A.  I did.

8    Q.  If you could look at DTX 1685, please, and, your Honor,

9    this was admitted in Dr. Gokel's cross-examination.

10            THE COURT:  Thank you.

11   Q.  Dr. Kent, is this the patent you reviewed?

12   A.  It is.

13   Q.  And what is the title?

14   A.  And the title of the patent is copolymer-1 related

15   polypeptides for use as molecular weight markers and for

16   therapeutic use.

17   Q.  Who is it assigned to?

18   A.  It's assigned to Yeda Research and Development Company.

19   Q.  Do you recognize that as the name of one of the plaintiffs

20   in this case along with Teva?

21   A.  I do.

22   Q.  Does this patent describe both the mole fractions and the

23   mole ratio of the amino acids in glatiramer acetate?

24   A.  Yes.  This Gad patent does describe both the mole fractions

25   and the mole ratios for the glatiramer acetate.

1  Q.  Did you prepare a demonstrative exhibit showing how in your

2  calculation the calculation of the molar ratio in the '287

3  patent was performed?

4  A.  I have.

5  Q.  Could we have that, please?  What are we looking at here,

6  Doctor?

7  A.  That's the front page of the Gad '287 patent.  We're going

8  into the part of the specification that shows the molar ratio

9  and molar fractions.  As you can see highlighted here towards

10 the bottom of this section, it says the molar fractions are

11 approximately 0.427, etc., and we're going to call those out

12 into the same format as we've been using up till now.  So .427

13 for alanine, .141 molar fraction for glutamic acid, 0.337 for

14 lysine, and 0.093 for tyrosine.  So to convert these to molar

15 ratios, I would divide by the molar fraction of the least

16 abundant amino acid, namely tyrosine .093, so each of the molar

17 fractions are divided by that number to give me the molar

18 ratios shown on the bottom line and highlighted in yellow.  And

19 you can see, these numbers are identical to the ones that are

20 present in the patent specification and the section highlighted

21 on the paragraph shown.

22 Q.  So in this patent, the molar ratio has been calculated in

23 the same way that you have calculated the molar ratio for the

24 Mylan product, is it fair to say?

25 A.  That's correct.

1    Q.  Is the molar ratio that is reported in this patent

2    normalized to tyrosine?

3    A.  You could say normalized to tyrosine.  The phrase

4    normalized is shorthand for you're reporting a ratio, which

5    amino acid did you use as the basis for that ratio, and in my

6    calculations and in this patent they've used tyrosine and

7    ratioed everything else to that, including tyrosine, which is

8    why it turns out as 1.0.

9    Q.  If we could look again at DTX 1685, please, and I want to

10   look at column 2, lines 46 through 55.  Is there anything else

11   from the Gad 287 patent that relates to your analysis,

12   Dr. Kent?

13   A.  Yes.  If we look a little bit further down the same section

14   below the molar fractions, we see after the tyrosine value the

15   words, "and may vary by about plus or minus 10 percent."  And

16   this is in line with my analysis of one of normal skill in the

17   art would expect, including both batch-to-batch variation and

18   experimental uncertainty.

19   Q.  Dr. Kent, did Teva report specifications for the individual

20   molar fractions for its product in its NDA?

21   A.  It did.

22   Q.  We're going to use the private screens here now, Nick,

23   please.

24       I want to look again at DTX 1023, which we looked at

25   earlier, and which is now in evidence.  And this time I want to

1    look at page TEV 526.

2            And what do we see here, Dr. Kent?

3    A.  Well, this is part of Teva's NDA.  This is a certificate of

4    analysis for a particular batch of their copolymer-1 Copaxone,

5    and in section 7, we see listed the amino acid content, amino

6    acid molar fraction for four amino acids; glutamic acid,

7    alanine, tyrosine and lysine, and on the right under results,

8    we see the molar fractions determined for this particular

9    batch, .144, .431, .095.331.

10           (Continued next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  All right.  Now, what is the specification for the tyrosine

2   molar fraction?

3   A.  Well, if we look over to the left we can see that next to

4   tyrosine in parentheses is the Teva specification 0.086 to

5   0.100 for the tyrosine molar fraction in Copaxone.

6   Q.  All right.  And would a copolymer-1 composition with a

7   molar ratio of exactly 6:2:5:1 have a tyrosine molar fraction

8   that falls within the Teva specification for tyrosine?

9   A.  No, it would not.  As Dr. Gokel told us in his testimony, a

10  copolymer-1 of exact composition, excuse me, with molar ratios

11  of exactly 6:2:5:1 would have a tyrosine molar fraction of

12  .071, and that's well outside the lower end of the range shown

13  on the Teva specifications.

14  Q.  All right.  Now, we can take that down, Nick, and I want to

15  shift back to Mylan's product.

16          Dr. Gokel calculated a molar ratio for Mylan's product

17  of 5.98:2.02:4.70:1.29.  And if we can see the demonstrative

18  there.

19          Dr. Kent, would that molar ratio change your opinion

20  that Mylan's product is not inch fringing the co-polymer-1

21  limitation of the patents in suit?

22  A.  No.  This doesn't change the molar ratios.  It just changes

23  the way the numbers are represented.  What in tells me is there

24  are 5.98 alanines for every 1.29 tyrosines, 2.02 glutamic acids

25  for every 1.29 tyrosines, and 4.70 lysines for every 1.2

1   tyrosines, the ratios are unchanged.  In my opinion, it's

2   unchanged.

3   Q.  And what is the tyrosine molar fractions seen here reflect

4   in terms of the tyrosine content of Mylan's product as compared

5   to copolymer-1 composition of exactly 6:2:5:1?

6   A.  What it tells me is that there's approximately 30 percent

7   more tyrosine present in -- reflected in the numbers shown

8   here, and these are for Mylan's product, I believe.

9   Q.  Correct, Dr. Gokel's calculation, yes.

10          And Dr. Kent, can those numbers simply be rounded to

11  6:2:5:1 in your opinion

12  A.  No, there's no justification for rounding.  These are the

13  actual numbers for the molar ratio.

14  Q.  Now, do you have an opinion as to why the molar ratio of

15  both Mylan's proposed product and Teva's Copaxone vary so

16  significantly from approximately 6:2:5:1?

17  A.  Yes, I do.  It's, as we've seen in the number of the

18  documents, that I've referred to earlier in my testimony, the

19  batches of co-polymer-1 prepared with HBr and acetic acid may

20  contain up to 30 percent bromotyrosine, and consequently they,

21  the amount of tyrosine determined in those preparations will be

22  unexpectedly or unusually low leading to a high molar ratio.

23          If you used phenol to pretreat the HBr and acetic acid

24  used in the first deprotection step, then you get reflected in

25  the final amino acid analysis the full tyrosine content of the

1    protected co-polymer-1, and the ratios for the other amino

2    acids to tyrosine consequently are lowered.

3    Q.  All right.  Does Mylan use phenol in its manufacturing

4    process?

5    A.  It does.

6    Q.  Now, have you prepared an exhibit showing the molar

7    fractions and molar ratios for different co-polymer-1

8    compositions made using phenol?

9    A.  I have.

10   Q.  All right, can we see that, please?  And could you just

11   briefly explain what we see on this chart?

12   A.  Well, down the left we see the four amino acids present in

13   co-polymer-1, alanine, glutamic acid, lysine and tyrosine.

14   These are co-polymer-1 compositions made using phenols.  So the

15   fifth amino acid, bromotyrosine, is absent, is not present.

16        Then what I've shown is three different compositions

17   or co-polymer-1.  The first column shows the '072 phenol

18   patent, molar fractions for co-polymer-1.

19        The second shows the molar fractions in the Copaxone

20   label.  And the third shows the molar fractions in Mylan's

21   proposed glatiramer acetate product.

22        And if you look across the amino acid by amino acid

23   starting with alanine, you can see that the molar fractions

24   were identical .427.  For glutamic acid, they're identical for

25   the first two preparations and closely similar at .144  and

1  Mylan's product.  For lysine they're identical for the first

2  two preparations and closely similar at .336 for Mylan's

3  product.

4          And then if we look at the last line, the tyrosine

5  mole fractions, you can see it's .095 for the first two

6  preparations, and closely similar at .092 for Mylan's proposed

7  product.

8          On the right  I've shown the corresponding calculated

9  molar ratios for these three preparations.  And, once again,

10  you can see that these are very closely similar for all four

11  amino acids.

12          MR. ANSTAETT:  All right, your Honor, I would move

13  this slide into evidence under Federal Rule of Evidence 1006.

14          MS. HOLLAND:  I mean that rule, your Honor, is

15  reserved for voluminous data, I believe, and I think Dr. Kent

16  has read into the record what there is to be.

17          THE COURT:  I'm sorry, I can't hear you.

18          MS. HOLLAND:  I'm sorry, your Honor.  I think 1006 is

19  reserved for complex voluminous data and I don't believe this

20  fits under that rule.

21          THE COURT:  All right.  Well, to the extent it does

22  reflect the doctor's testimony, it would be easier for.  Me I'm

23  going to admit it.

24          MR. ANSTAETT:  Thank you, your Honor.

25          THE COURT:  I'll use it as a demonstrative aid as I

1    review the testimony.

2                MS. HOLLAND:  Yes, your Honor.

3                THE COURT:  Okay.

4    Q.  Dr. Kent, would a person of ordinary skill in the art

5    reading the patents in suit in 1994 believe that a molar ratio

6    of approximately 6:2:5:1 would encompass the molar ratio of the

7    Mylan proposed glatiramer acetate product?

8    A.  No, they would not.

9    Q.  Would a person of ordinary skill in the art reading patents

10   in suit in 1994, believe that a molar ratio of approximately

11   6:2:5:1 would encompass the molar ratio of Copaxone?

12   A.  No, they would not.

13   Q.  All right.  Briefly, Doctor, I want to switch gears here

14   and ask you just a few questions, few more questions, and I

15   want to talk about the issue of best mode.

16               Doctor, did one of your expert reports consider

17   whether Teva's patents in suit comply with the best mode

18   requirement of U.S. patent laws?

19   A.  I did express an opinion on that in one of my reports, yes.

20   Q.  All right.  And what was your conclusion?

21   A.  My conclusion was that the '808 patent did not comply with

22   the best mode requirement.

23   Q.  All right.  Does that go for all of the patents in suit?

24   A.  It does.

25   Q.  Dr. Kent, is the formation of bromotyrosine and copolymer-1

1    mentioned anywhere in the patents in suit?

2    A.   The formation of bromotyrosine is not mentioned anywhere in

3    the patents in suit.

4    Q.   Is the pretreatment of the HBr acetic acid solution with

5    phenol in order to avoid the formation of bromotyrosine and

6    co-polymer-1, is that mentioned anywhere in the patents in

7    suit?

8    A.   The pretreatment of HBr acetic acid with phenol is not

9    mentioned anywhere in the patents in suit.

10   Q.   All right.  Is in your opinion, was Mr. Konfino aware in

11   1991 of the bromotyrosine that could form as a result of making

12   copolymer-1 according to the methods described in the patents

13   in suit?

14          MS. HOLLAND:  Your Honor, I don't believe that the

15   witness is competent to form an opinion about what Mr. Konfino

16   was aware of.  We've already heard testimony from about what

17   the documents say.

18          THE COURT:  Yeah, I'll consider the documents.

19          MR. ANSTAETT:  Okay.  All right.  Thank you, your

20   Honor?

21          THE COURT:  That's sustained.

22   Q.   All right.  Let me ask you this, Doctor.  According to the

23   documents you've reviewed, did Mr. Konfino report in 1991 that

24   the use of phenol successfully reduced the bromotyrosine in

25   copolymer-1 below Teva's specifications?

1    A.  Yes.  Mr. Konfino did report that the use of phenol to

2    pretreat HBr acetic acid reduced the bromotyrosine content of

3    co-polymer-1 below Teva's specifications.

4    Q.  All right.  And based on documents you've reviewed, how did

5    Mr. Konfino regard the use of phenol for producing low

6    bromotyrosine co-polymer-1?

7    A.  I'm sorry, I lost my concentration.  Please repeat.

8            MS. HOLLAND:  I have an objection here, your Honor.

9    It's the same objection about this witness is forming opinion

10   about what Mr. Konfino thought about the use of --

11           THE COURT:  All right, why don't you ask the question

12   again.

13   Q.  Sure.  Let me do it this way.  Can we see PTX 708T, please?

14   And page number here in a second.  If we could look at the page

15   with the Bates number 324554, please.  And let's look at

16   section two.

17           In this document, Dr. Kent, did Mr. Konfino describe

18   how he regarded the use of phenol for producing low

19   bromotyrosine co-polymer-1?

20   A.  Yes, he did describe how to use phenol to bring the amount

21   of bromotyrosine within Teva's specification.

22   Q.  And if could just ask you to read the sentence that starts,

23   among the many?

24   A.  "Among the many reagents tried for removing the free

25   bromine previous treatment with HBr acetic acid with 1 percent

1   phenol for a few hours proved to be the most convenient."

2   Q.  All right.  And if we could look at the second page of this

3   exhibit, please?

4   A.  I'm sorry, I couldn't hear you.

5   Q.  I'm sorry.  If we could look at the second page of the

6   exhibit, please.  And when was this document dated?

7   A.  Oh, this is Mr. Konfino's August 1991 report.

8   Q.  All right.  And have you seen any documents authorized by

9   Mr. Konfino between August 1991 and end of 1991 when he retired

10  from Teva indicating that he had changed his mind about the use

11  of phenol being the most convenient method for producing low

12  bromotyrosine co-polymer-1?

13  A.  I did not see any such documents that indicated that

14  Mr. Konfino had changed his mind about the use of phenol for

15  pretreating HBr acetic acid in producing co-polymer-1 in the

16  time period from here till the end of 1991.

17          MR. ANSTAETT:  Thank you, your Honor.  I have no

18  further questions.

19          THE COURT:  All right.  Cross-examination.

20          MS. HOLLAND:  Yes, your Honor, thank you.

21  CROSS EXAMINATION

22  BY MS. HOLLAND:

23  Q.  Good afternoon, Dr. Kent.

24  A.  Good afternoon.

25  Q.  Elizabeth Holland.  We met at your deposition?

1   A.  I'm sorry having, I'm having trouble hearing you so my

2   hearing --

3   Q.  Sure.

4   A.  Go ahead, please.

5   Q.  Yes, I'm Elizabeth Holland we met at your deposition?

6   A.  We did.

7   Q.  During your direct testimony you provided an opinion about

8   the meaning of approximately 6:2:5:1?

9   A.  I did.

10  Q.  Do you recall that?  And you said that approximately

11  6:2:5:1 would include experimental uncertainty, right?

12  A.  That's the batch variation and experimental uncertainty,

13  yes.

14  Q.  And the number you gave was plus or minus 10 percent, is

15  that right?

16  A.  For two standard deviations encompassing both

17  batch-to-batch variability and experimental uncertainty, yes,

18  that's correct.

19  Q.  All right.  So in your opinion if a copolymer-1 differed in

20  any single amino acid by more than 10 percent from 6:2:5:1, it

21  would be different than co-polymer-1, is that right?

22  A.  If any single amino acid differed by more than plus or

23  minus 10 percent, in 6:2:5:1, yes, I think that's essentially

24  correct, that's my opinion.

25  Q.  Now, when you were forming your opinions in this case about

 1    what approximately 6:2:5:1 meant, you considered the inventor's

 2    publications, right?

 3    A.   In considering what 6:2:5:1 meant, I read the inventor's

 4    publications, but in terms of what the approximately 6:2:5:1

 5    meant, I relied on my own extensive experience in amino acid

 6    analysis.

 7    Q.   Well, isn't it true, Dr. Kent, that in your view reviewing

 8    the molar ratios for co-polymer-1 disclosed in the inventor's

 9    publication would inform a person of ordinary skill in the art

10    as to the range of ratios covered by the claim term

11    approximately 6:2:5:1?

12    A.   I read the inventor's publications, yes.

13    Q.   Okay.  And, in fact, you believed that reviewing the molar

14    ratios in those publications would inform the person of

15    ordinary skill as to the range of ratios covered by

16    approximately 6:2:5:1; that's right, isn't it, Dr. Kent?

17    A.   I get the impression that you're quoting from something so.

18    Q.   Do you agree with that statement?

19    A.   I've read those publications.  And if you said the question

20    one more time, I'll answer directly.  I'm not quite clear on

21    what you're getting at.

22    Q.   I'm just asking you a direct question.  Dr. Kent, in your

23    view, would reviewing the molar ratios for copolymer-1

24    disclosed in the inventor's publications inform a person of

25    ordinary skill in the art as to the range of ratios covered by

1   the claim term, approximately 6:2:5:1?

2   A.  Then I would say it would be one of the factors, but not

3   the only factor that would inform their opinion.

4   Q.  Okay.  Now, one of the publications that you reviewed in

5   forming your opinion was the 1971 paper by Teitelbaum and the

6   other inventors in this case, right?

7   A.  I read that paper, yes.

8   Q.  All right.  Now, why don't you look at PTX-499 in your

9   binder, and that's the cross-examination binder I handed you.

10  A.  I'm sorry, what was the number?

11  Q.  499?

12  A.  499, thank you.

13          MS. HOLLAND:  This is already in evidence, your Honor.

14          THE COURT:  Thank you.

15  Q.  And this is the 1971 Teitelbaum article you reviewed,

16  correct?

17  A.  Yes, European General Immunology 1971, Teitelbaum, et al.,

18  yeah.

19  Q.  Okay.  And you understand that this 1971 Teitelbaum paper

20  is actually cited to in the specification of the patents in

21  suit, in this case, right?

22  A.  I believe that's correct.

23  Q.  All right.  Let's look at table one in the Teitelbaum

24  paper.  You can blow that up, thank you.  You see table one is

25  entitled composition of copolymer-1; do you see that?

1    A.  I see that the table was entitled composition of

2    co-polymer-1, yes.

3    Q.  All right.  And there are two batches of co-polymer-1

4    listed in the table, correct?

5    A.  On the right-hand side, molar ratio of amino acid and

6    copolymer batch one and batch two, yes.

7    Q.  Okay.  Those two batches of co-polymer-1, right?

8    A.  Yes.  The heading on the table says copolymer-1, so these

9    should be batches of co-polymer-1.  Absolutely.

10   Q.  Okay.  And you see that batch two has a molar ratio of

11   6.7:2.1:4.2:1.0; do you see that?

12   A.  I do.

13   Q.  And you agree that the authors defined these batches as

14   co-polymer-1, right?

15   A.  I'm sorry, could you repeat the question?

16   Q.  You agree that the authors of this paper, Dr. Arnon, Sela

17   Teitelbaum, they define these two batches as co-polymer-1?

18   A.  That's what the table here says.  I'm not sure the word

19   defined is the way I would use it or say it.

20   Q.  But you've testified before that they defined it as

21   co-polymer-1, correct?

22   A.  Are you referring to my deposition?

23   Q.  Well, why don't we look at the deposition at 119, nine to

24   14.

25   A.  119.

Q.  It should be in the front pocket of the binder?

A.  I'm sorry?

Q.  The deposition transcript should be in the front pocket of your binder?

A.  Oh the front pocket, this one.  Yes.

          MR. ANSTAETT:  Your Honor, before we look at it, can we have a chance to review the -- follow our procedure; could I have just a moment to get to the page?

          MS. HOLLAND:  Yeah, that's why I gave --

          MR. ANSTAETT:  Ms. Holland, could you give a page number again?

          MS. HOLLAND:  119, nine to 14.

          MR. ANSTAETT:  Your Honor, I object.  I don't know that I've heard his testimony impeached.

          THE COURT:  Overruled.  Go ahead.

Q.  Dr. Kent, at your deposition were you asked the following question and did you give the following answer:  "Question:  Do you understand those to be both batches of copolymer-1, referring to table one in Teitelbaum 1971?  Answer:  Composition of copolymer-1 is the title for the table, and these are batch one and batch two, so, yes, the authors essentially defined these as batches of co-polymer-1."

          Did you give that testimony?

A.  I did give that testimony at that time.

Q.  Thank you.

1    A.  Yes.

2    Q.  All right.  If you go to -- can we look at page 247 of the

3    Teitelbaum 1971 reference?

4    A.  Remind me, which is the Teitelbaum?

5    Q.  Sure, let's go back to PTX-499.

6    A.  Thank you.

7    Q.  Look at the last paragraph on page 247.  There's a

8    sentence, the first sentence has a -- starts with a second

9    batch in the middle of the page.  Can you highlight that?

10   Yeah.  Couple more lines through the words of the first line.

11   Thank you.  That's it, thank you very much.

12          Do you see in the 1971 Teitelbaum paper that the

13   authors themselves say that the two batches have the same amino

14   acid composition?

15   A.  Yes, I see that.  Yes.

16   Q.  All right.  So let's go back to table one now.  You see the

17   molar ratio of alanine is reported as 6.7?

18   A.  For batch two, yes, I see that.

19   Q.  Okay.  And the difference from exactly six, in the way you

20   were determining these differences, is about 12 percent,

21   correct?

22   A.  It's -- yes, that is absolutely correct, yes.

23   Q.  And if you look at the molar ratio for lysine, which is

24   given as 4.2 difference from exactly five in the way that

25   you've been determining these differences is about 16 percent,

1    right?

2    A.  I'm sorry, from exactly five -- why did you say, exactly

3    five?

4    Q.  6:2:5:1?

5    A.  We're not talking about 6:2:5:1.  We're talking about batch

6    two.  I'm sorry.

7    Q.  I'm asking you, Doctor, in your opinion --

8    A.  Oh, I thought you were comparing batch two and batch one

9    from your first question.

10   Q.  No, I'm sorry.  Let's compare batch two to exactly 6:2:5:1?

11   A.  Oh, okay.  Sure.

12   Q.  All right.  And if you look at the molar ratio of lysine,

13   you see it's 4.2?

14   A.  Yes.

15   Q.  And the difference from exactly five is about 16 percent,

16   right.  Is that correct?

17   A.  Yes.

18   Q.  So according to your definition of approximately 6:2:5:1,

19   which would include up to 10 percent variations, batch two of

20   copolymer-1 of the 1971 Teitelbaum paper, which is actually

21   defined as co-polymer-1, would not be copolymer-1; is that

22   right?

23   A.  That's correct.  As I said in my deposition, that's

24   probably why they never mentioned it again.

25   Q.  All right.  So it's your belief that the authors never

1   mentioned batch two of Teitelbaum 1971 again, is that right?

2   A.  I believe there may have been one paper in which they

3   mentioned it.  But in all the publications that I looked at,

4   with perhaps that one exception, they referred to the molar

5   ratio as shown for batch one in this paper.

6   Q.  All right.  At the time you formed your opinions in this

7   case, though, you believed that batch two of Teitelbaum was not

8   cited in any subsequent papers, right?

9   A.  I, at the time I formed my opinion -- I'm not sure of the

10  answer to that question.  It would require me to recreate my

11  state of mind back when I formed the opinion.

12  Q.  Well, let me see if I can refresh your recollection.  Why

13  don't you the look at your deposition again, page 119?

14  A.  Thank you.

15  Q.  And you can look at lines -- line 24 on page 119 through

16  line one on page 120?

17  A.  Yes.  From line 24 on 119 to?

18  Q.  Line 1 on 120.

19  A.  Yes.  Ah, so at that time I said to the best of my

20  knowledge at that time it was not cited in any of their

21  subsequent papers.

22  Q.  All right, I'd like you to take a look in your binder now

23  to PTX-976?

24  A.  PTX976.

25  Q.  Yes.  And do you see this is a paper by Ruth Arnon, one of

1    the inventors of the '808 patent, of the patents in suit?

2    A.  Yes, I see this is authored by R. Arnon, who I take to be

3    Ruth Arnon, yes.

4    Q.  All right.  And if you look at the previous page, this was

5    published in 1975?

6    A.  If you'll represent that the previous page is part of the

7    publication.  I don't see a date anywhere on the paper itself.

8    Q.  Look at the first page at the bottom if you like to satisfy

9    yourself that it says 1975?

10   A.  I have no way of telling if that's part -- I mean, if

11   you'll represent to me that it goes with this paper, I'll agree

12   that it says 1975 on the front page.

13   Q.  All right.  I'd like to go to page 274 of this article.  Do

14   you see there is a section titled suppression of EAE with a

15   synthetic material?

16   A.  I do.

17   Q.  All right.  Then if you look at table 16.1 on page 275, you

18   see that it refers to cop-1 batch two; do you see that?

19   A.  Oh, I'm sorry, I was distracted by the ratios for batch one

20   on the page you just directed me to.

21         Yes, it has two lines, one is cop-1 batch one and the

22   other is cop-1 batch two.

23   Q.  Okay.  So this is a subsequent paper that refers to batch

24   two from the 1971 Teitelbaum article?

25   A.  I believe that I was referring to the amino acid ratios

1    when I made that statement.

2    Q.  All right.  So why don't we look at PTX-508 in your binder.

3    A.  508, yes.

4    Q.  All right, sorry.  I'll catch up.  Are you on PTX-508?

5    A.  I am.

6    Q.  All right.  And you see this is a European Journal of

7    Immunology article from 1973?

8    A.  I do.

9    Q.  And if you look at the authors, you'll see that Teitelbaum,

10   Arnon and Sela are authors on this paper?

11   A.  I see Dvora Teitelbaum, Ruth Arnon, M. Sela along with

12   Cynthia Web are also on this paper, yes.

13   Q.  All right.  Now, I'd like you to go to table one on page

14   280 of the article.

15   A.  I see table one.  It's headed "Composition of synthetic

16   polypeptides."

17   Q.  Right.  And you would agree with me, would you not, Dr.

18   Kent, that this article shows the amino acid compositions of

19   both copolymer-1 batch one and copolymer-1 batch two?

20   A.  Yes.  They, the first two columns show the amino acid

21   composition for co-polymer-1 batch one and copolymer-1 batch

22   two, that's correct.

23            MS. HOLLAND:  Plaintiffs move PTX-508 in evidence.

24            MR. ANSTAETT:  No objection, your Honor.

25            THE COURT:  Admitted.

19dztev5                      Kent - cross

1            (Plaintiff's Exhibit 508 received in evidence)

2            MS. HOLLAND:  As well as PTX-976.

3            MR. ANSTAETT:  Again, no objection.

4            THE COURT:  Admitted.

5            (Plaintiff's Exhibit 976 received in evidence)

6    Q.  Now, I want to actually go back to PTX-976 just for one

7    minute.

8    A.  PTX-976, is that correct?

9    Q.  Yes.

10   A.  Yeah.

11   Q.  Now, you have said earlier that that paper didn't give you

12   the amino acid molar ratios for batch two; do you recall saying

13   that?

14   A.  I'm sorry, could you repeat that?

15   Q.  Yes.  Dr. Kent, do you recall testifying --

16   A.  You understand that I'm hard of hearing.  I have hearing

17   aids in both ears.

18   Q.  I'm doing my best to keep my voice up.

19   A.  Okay, great.  Thank you.  Please go on.

20   Q.  All right, I'd like you to look at page 285, table 16.8?

21   A.  287?

22   Q.  285?

23   A.  285.

24   Q.  In looking at table 16.8 -- can we blow that up, please?

25   You see that this article also has the amino acid ratios for

1   both batch one and batch two from Teitelbaum 1971?

2   A.  Yes, I see this table labeled 16:8, composition of

3   co-polymer-1 lists both batch one and batch two amino acid

4   compositions, yes.

5   Q.  All right.  Now, you would agree with me that in addition

6   to looking at the authors' publications to determine the scope

7   of approximately 6:2:5:1, the person of ordinary skill in the

8   art would look at the prosecution history of the patents in

9   suit in this case, right?

10  A.  I doubt whether a person -- this is one of ordinary skill

11  in the art as I defined it.  So this is a research chemist

12  working with copolymers of this type.  I doubt whether they'd

13  be looking at the prosecution histories.

14  Q.  Okay.  So I just want to make sure I understand your

15  opinion.  Is it your opinion that the prosecution history of

16  the patents in suit in this case is not relevant to determining

17  what approximately 6:2:5:1 means?

18  A.  No, I wouldn't go that far either.  That's not what you

19  asked me.  You asked whether one of normal skill would consider

20  the prosecution histories, and I don't think they would.

21  Q.  All right.  But you actually did look at some of the

22  prosecution history in this case, when you were forming your

23  opinions, right?

24  A.  To be honest, at this moment in time, I'm not sure whether

25  I did or not.

1    Q.  All right.  Well, maybe I can refresh your recollection

2    again.  Why don't you look at your rebuttal report.  You have

3    an attachment that has your materials considered?

4    A.  Rebuttal report, yes.

5    Q.  Yes?

6    A.  Which page?

7    Q.  Attachment F?

8    A.  Attachment F.  Yes.

9    Q.  If you go to page three, you'll see there is a reference --

10   I'll wait for you.  Are you there?

11   A.  On page three, yes, prosecution history excerpt.  I stand

12   corrected.

13   Q.  Okay.  So you did review page nine of a December 2nd, 2004

14   amendment from the prosecution history with '539 patent,

15   correct?

16   A.  Thank you for refreshing my memory, yes.

17   Q.  Okay.  Now, let's take a look at that amendment.  Why don't

18   we go to PTX-20, it's listed as 20A in your binder.

19           MS. HOLLAND:  Just for the record, your Honor, PTX-20

20   is the full prosecution history.  We took an excerpt.

21           THE COURT:  Okay.

22           MS. HOLLAND:  Which is the amendments referred to and

23   just marked as 20A for convenience.

24           THE COURT:  All right.  Thank you.

25           MS. HOLLAND:  I understand PTX20 is already in

1   evidence.

2              THE COURT:  I believe it is.

3              MR. ANSTAETT:  Your Honor, we have no objection to

4   using 20A as an excerpt.

5              THE COURT: All right.  Thank you.

6   Q.  All right.  So I'd like to go to page nine, which is the

7   page you said you referred -- you reviewed in forming your

8   opinions.  If we blow up the third paragraph, please.

9              Now, do you understand that this amendment was Teva's

10  representation to the patent office of what the term

11  co-polymer-1 means in this case?

12  A.  That's my understanding, yes.

13  Q.  Okay.  And you understand that somebody who wanted to

14  understand what Teva thought co-polymer-1 means in the patent

15  could go to the prosecution history and look it up right there,

16  right?

17             MR. ANSTAETT:  Your Honor, I'm going to object to

18  these line of questions.  This is -- he is not here as a

19  lawyer.  This is a one of the patents.

20             THE COURT:  I know, I understand.  Just keep moving.

21             MR. SKILTON:  I just want to make sure he understood

22  what he was reviewing when he reviewed it.

23             THE COURT:  All right.

24  Q.  So in the first sentence of this amendment, it's the first

25  sentence of the third paragraph on page nine of the amendment,

1    Teva stated to the patent office "In addition, the term

2    co-polymer-1 is not limited to the specific molar ratio of

3    amino acids."  Do you see that?

4    A.  I do.

5    Q.  And do you also see, if you go a couple of lines down, do

6    you see -- maybe you can highlight -- the two amino acid ratios

7    on the line above there -- do you see that Teva specifically

8    points out to the patent examiner the amino acid ratios of both

9    batch one and batch two from the 1971 Teitelbaum paper?

10   A.  I'd like to take a moment to read the entire paragraph if I

11   may.

12            THE COURT:  Sure.

13   Q.  Please, go ahead.

14            (Pause)

15   A.  Yes, I've read the entire paragraph.  Could you repeat the

16   question, please?

17   Q.  Yeah.  My question was, do you see that Teva referred the

18   patent office to the amino acid molar ratios of batch one and

19   batch two from Teitelbaum 1971?

20   A.  No, I do not see that.  I see that they said that after

21   amino acid hydrolysis, these were determined to contain

22   glutamic acid, lysine, alanine, tyrosine, and a molar ratio of

23   either 1.9, 4.7 to 6.0 to 1, or 2.1, to 4.2 to 6.7 to 1.

24            If you're asking me whether these match, these values

25   match the values of co-polymer-1 batch one and co-polymer-1

1    batch two in the 1971 Teitelbaum paper, I would agree that they

2    do.

3    Q.  And actually if you look in the previous paragraph, there

4    is a reference to that 1971 paper; do you see that?

5    A.  Yes, you're quite correct.

6    Q.  Okay.  Then in the sentence you were reading it says in

7    Teitelbaum; you see that?

8    A.  I do see that.

9    Q.  Okay.  So now you understand it is a reference to 1971?

10   A.  Yes, it's a direct reference.  You're quite correct.

11   Q.  All right.  I'd like to now focus on the next part of the

12   paragraph where it begins, in Bornstein, et al.  And I'd like

13   to focus in on the amino acid molar ratios that appear on the

14   second-to-last sentence of that paragraph.

15   A.  That sentence, which one are we talking about?  The one

16   starting however?

17   Q.  There is sentence on the bottom that says "However, when

18   these batches were retested using total amino acid analysis, a

19   molar ratio of 1.9 to 4.0 to 6.0 to 1.0 or 1.8 to 3.9 to 5.7 to

20   1.0 or 1.9 to 4.0 to 6.3 to 1.0 respectively was obtained."  Do

21   you see that?

22   A.  I do see that.

23   Q.  Okay.  And then what Teva says to the patent office is

24   "Thus, co-polymer-1 does not refer to a specific molar ratio of

25   amino acids."  Do you see that?

1  A.  I see written here it says, thus, copolymer-1 one does not

2  refer to a specific molar ratio of amino acids.

3  Q.  Okay.  Now, I put together a slide with these three

4  different amino acid molar ratios that appear in the

5  prosecution history of the patents in suit in this case.  So

6  why don't we go to slide one.

7        Feel free to check the numbers.  But what I did here

8  was I put in the molar ratios for those three batches that are

9  listed in the prosecution history?

10  A.  There's one point I would like clarification on here.

11  It --

12  Q.  I'm sorry, Dr. Kent, I'm sorry, let me ask the questions,

13  then if there's something you don't understand about one of my

14  questions, we can deal with it then.

15        Right now I just ask you whether you agree that I put

16  up on the slide the molar ratios set forth in the prosecution

17  history

18        MR. ANSTAETT:  Your Honor, I object to this line of

19  questioning.  This is not in any expert report that's been

20  filed in this case.  She's asking him to compare a bunch of

21  things.  When he's asking for clarification, she's cutting him

22  off.

23        THE COURT:  I'm going to let him ask for clarification

24  or answer the question.

25        Go ahead, Dr. Kent.

1  A.  Yes, those are the numbers.  But in the sentence that you

2  take the numbers from, it says that it retested using total

3  amino acid analysis.

4  Q.  Doctor, I'm sorry.  For right now I just want you to answer

5  my question.  The only question on the table was, are those the

6  numbers that -- are those the right numbers from the three

7  molar ratios I just read from in the prosecution history?

8          MR. ANSTAETT:  Your Honor, I think he's entitled to

9  ask for some clarification on this.

10          THE COURT:  You're going to have every opportunity to

11  get up again.

12          MR. ANSTAETT:  Thank you, your Honor.

13          THE COURT:  Doctor, at the moment -- I mean, if you

14  like I can sit here and compare the numbers.

15          Are those the same numbers?

16          MS. HOLLAND:  I was hoping don't to have to do that,

17  your Honor.

18          THE COURT:  Are those the same numbers that were just

19  referred to?

20          THE WITNESS:  Those are the same numbers, yes.

21          THE COURT:  Okay, next question.

22  Q.  Thank you.  So I want to look at the differences from

23  exactly 6:2:5:1, according to the way you were calculating, all

24  right, which is to look at each of the amino acids separately

25  and to figure out the relative difference.

19dztev5                    Kent - cross

1              So why don't we -- can we have the next -- thank you.

2     So you can feel free to check my math, but the difference from

3     lysine between batch 320 with a molar ratio of 4.0 zero, the

4     difference from exactly 6:2:5:1 is 20 percent, correct?

5     A.  Using those numbers there, using the number for the same

6     batch in the previous sentence, no.

7     Q.  Now, let's go to batch 340.  Can you put in the numbers,

8     please?  You agree with me there that the difference in lysine

9     between 3.9 and five exactly the way you tell the Court it

10    should be calculated, is 22 percent, correct?

11    A.  Yes.

12    Q.  All right.  Then can we do the same for batch 400, please.

13    And again here the difference in lysine from 4.0 in batch 400

14    to exactly 6:2:5:1 calculated the way you say it should be

15    calculated, is 20 percent, right?

16    A.  That's what it says on this table, yes.

17    Q.  Okay.  And according to your analysis in this case, these

18    batches with these molar ratios would not be co-polymer-1,

19    right?

20    A.  I would need to understand the question I haven't had an

21    answer to before I could answer that question.

22    Q.  Would batches, with these molar ratios as shown on this

23    slide, in your view, be co-polymer-1?

24    A.  I need to know what total amino acid analysis means.

25    Q.  You testified about amino acid analysis on your direct

1   examination, correct?

2   A.  Yes, I did.

3   Q.  Assuming these are molar ratios calculated in the way you

4   just talked about calculating them in your direct examination,

5   these three batches that Teva told the patent office explicitly

6   were copolymer-1, would not be copolymer-1 under your

7   definition, right?

8   A.  The lysine differs by more than 10 percent, which I would

9   regard as an indicator of difference from exactly 6:2:5:1.

10  Q.  And these batches, in your view, would not be co-polymer-1?

11  A.  In point of fact, my opinion was not about differing from

12  exactly 6:2:5:1.  It was about differing from 6:2:5:1 plus or

13  minus 10 percent for each ratio.

14  Q.  I'll ask you one more time.  Would these batches be

15  co-polymer-1, in your opinion?

16  A.  I would have to do the calculations.  But I believe that I

17  would consider these to be different than copolymer-1 of

18  approximately 6:2:5:1 .

19  Q.  All right, we can take that down.

20          Okay, I want to change topics now and talk about how a

21  person of ordinary skill would go about determining a molar

22  ratio for a polypeptide sample.

23          So I think you testified in your direct that you would

24  take -- the person with ordinary skill would take the sample,

25  divide it up into the different amino acids, and then determine

1    the number of moles for each amino acid; is that right?

2    A.   Essentially, yes.

3    Q.   Okay.  And once you have determined the number of moles,

4    you could determine the molar fraction, right?

5    A.   Yes, that's the way you do it.  You determine the amount of

6     each amino acid, then you determine the molar fractions for

7    each amino acid, that's correct.

8    Q.   Okay.  And I think you referred to that molar fraction data

9    in your direct examination as the primary data, right?

10   A.   It's primary in the sense that it's the first thing you

11   normally calculate from the experimental values for each amino

12   acid.

13   Q.   And as we saw in your direct, the numbers that Mylan

14   reports for its product in its ANDA are molar fractions, right?

15   A.   That's correct.

16   Q.   Mylan does have molar ratios?

17   A.   Mylan reports molar fractions in its ANDA.

18   Q.   Okay.  Now, in your view, it is correct, isn't it, that

19   molar fractions are more useful to a scientist than molar

20   ratios?

21   A.   Yes, that is my view.

22   Q.   Okay.  And as a scientist, you would prefer to compare

23   molar fractions versus molar ratios, right?

24   A.   I've, I've never really thought of it in terms of a

25   preference, so I'm not sure what you mean.

1    Q.  All right.  Why don't we you look at your deposition, page

2    132, line 25.  Page 132, line 25 to 133, line four.

3    A.  It's my reading of this is the -- you said that I would

4    prefer, and I agreed with you.

5            MS. HOLLAND:  Can I put it up on the screen, your

6    Honor?

7            THE COURT:  I think he just said he agreed with you.

8    You can keep moving.

9            MR. SKILTON:  Okay, thank you.

10   Q.  And in your view, Dr. Kent, the best way to compare samples

11   is by comparing their molar fractions rather than their molar

12   ratios, right?

13   A.  I think based on the documents I've read, that that is the

14   way that the specifications are based, and so I guess that

15   would be considered the best way.

16   Q.  And if you wanted to determine whether a sample had a molar

17   ratio of 6:2:5:1, you should really be doing the comparison at

18   the mole fraction level, right?

19   A.  Well, obviously as has been demonstrated in the testimony

20   we've heard so far, not only my own, you can use both molar

21   fractions and molar ratios.

22            (Continued on next page)

23

24

25

1    Q.  So it would be completely appropriate in your view to

2    compare molar fractions?

3    A.  Between two batches of copolymer-1 to decide whether

4    they're the same or different?

5    Q.  Yes.

6    A.  Yes, that would be one way of doing it.

7    Q.  It wouldn't only be one way of doing it, Doctor; that in

8    your view would be the best way of doing it, right?

9    A.  I believe I already answered that question.  I think from

10   what I've seen in the specifications for copolymer-1s from

11   various sources, that these are usually given as molar

12   fractions, so I would assume that that is the best way of doing

13   it.

14   Q.  Now, in all the slides and all the molar ratio data that we

15   saw from you today, we didn't see the molar fraction for

16   6:2:5:1, right?  That wasn't in any of your slides.

17   A.  To be honest, I'm not sure.  I'd have to look back through

18   at this point, but if you say so, sure.

19   Q.  Right.  And in fact, you never compared the molar fraction

20   of Mylan's product to the molar fraction of 6:2:5:1, right?

21   A.  Molar fraction of Mylan's product to the molar fraction of

22   exactly 6:2:5:1?

23   Q.  Yes.

24   A.  I would need to look at the slides.  But again, if you say

25   so.

1          MR. ANSTAETT:  Your Honor, I object because I believe

2     it misstates the testimony.  In his direct examination he gave

3     the molar fraction for exactly 6:2:5:1, the tyrosine.

4          THE COURT:  You can take it up on redirect.  Go ahead,

5     Ms. Holland.

6          MS. HOLLAND:  Thank you, your Honor.  Could we put up

7     my slide 5, Mr. Chase?  Thank you.

8     Q.  So this is just looking at one batch of Mylan's drug

9     substance.  You agree that exactly 6:2:5:1 has the molar

10    fractions that are shown in the first column here, right, .429

11    alanine, .143 glutamic acid, .357 lysine and .071 tyrosine?

12    A.  Yes, I do.

13    Q.  Okay.  And Mylan's molar fraction data is exactly what you

14    put up in your direct testimony, right?

15    A.  I believe it is, yes.  That's in the third column.

16    Q.  So a sample that was exactly 6:2:5:1 would have 7.1 percent

17    tyrosine in it, right?

18    A.  I thought we were talking about molar fractions.

19    Q.  Well, can't .071 be expressed as 7.1 percent?

20    A.  Not if we're talking about molar fractions.

21    Q.  Can .071 be expressed as 7.1 percent?

22          THE COURT:  I think he's answered that.

23    A.  Molar fractions by definition add up to one.

24    Q.  Now, Dr. Kent, you would agree that the difference in terms

25    of total percentage of tyrosine in a batch of Mylan's product

1    versus exactly 6:2:5:1 would be the difference between .092 and

2    .071, right?

3    A.   The difference between exactly 6:2:5:1 molar fraction for

4    tyrosine of .071 and Mylan's molar fraction of .092 would be

5    .021.

6    Q.   And that would be about 2 percent, right?

7    A.   No, it would be about a 30 percent difference in the

8    tyrosine content.

9    Q.   If you look at -- I'm asking you about the percentage of

10   tyrosine in the mixture.  The percentage of tyrosine in the

11   mixture, in Mylan's product is about 9.2 percent, isn't that

12   right?

13   A.   I thought we were talking about molar fractions.

14   Q.   I'd like to talk about percentages for a minute if you

15   don't mind?

16   A.   Would you start from the beginning and let's do it as

17   percents, please.

18   Q.   Dr. Kent, I'm just asking you one question, now.  If you

19   look at Mylan's molar fraction, that gives you the fraction of

20   each of these four amino acids in the mixture as a whole,

21   right?

22   A.   It does.

23   Q.   And the tyrosine is .092, right?

24   A.   That's correct.

25   Q.   And the tyrosine in the mixture as a whole for exactly

1    6:2:5:1 would be .071?

2    A.   The molar fraction of tyrosine in exactly 6:2:5:1 is .071.

3    Q.   Okay.  You can take that down.  All right.  Now, you

4    testified in your direct examination -- I wrote it down to be

5    sure I got it right -- I'm sorry, let me start over again.  You

6    testified on direct examination that you converted the molar

7    fractions of Mylan's product by dividing it by the molar

8    fraction of the least abundant amino acid, right?

9    A.   Yes.  The conventional way of calculating molar ratios is

10   to take the molar fractions and divide through by the molar

11   fraction of the least abundant amino acid.

12   Q.   But in your personal experience working with polypeptides,

13   you did not typically normalize to the least abundant species,

14   right?

15   A.   Could you repeat the question?

16   Q.   Yes.  In your personal experience working with

17   polypeptides, you did not typically normalize to the least

18   abundant species, right?

19   A.   I think we established in my deposition that I had never

20   had any direct experience in doing the amino acid analysis of a

21   copolymer of this type.

22   Q.   We did establish that.  In the copolymer-1s that you worked

23   with, you did not typically normalize to the least abundant

24   species, right?

25   A.   I didn't work with copolymer-1.

1   Q.  My question is a little different.  In the polypeptides

2   that you worked with --

3   A.  Yes.

4   Q.  You did not typically normalize to the least abundant

5   species, right?

6   A.  These were homogenous polypeptides of a single peptide

7   sequence and therefore would be expected to have integral

8   numbers of each amino acid, and when I was making polypeptides

9   I knew what that integral number was expected to be, so when I

10  got the amino acid analysis, I would adjust the molar ratios to

11  bring those numbers as close as possible to the expected number

12  and then look at the outliers.

13  Q.  I think that means the answer to my question is correct,

14  you did not normalize to the least abundant species.

15  A.  There's absolutely no reason to normalize for that type of

16  analysis, no.  You're quite correct, yes.

17  Q.  You testified on direct that you performed hundreds of

18  amino acid analyses, correct?

19  A.  That's correct.

20  Q.  But those were not for materials like copolymer-1, correct?

21  A.  I have had no experience, no direct experimental experience

22  with a copolymer-1 like composition.

23  Q.  Now, the patent doesn't explicitly state that molar ratios

24  should be normalized to tyrosine, right?

25  A.  I'm sorry, I didn't catch the first part.

1    Q.  Let me focus you, in the patents in suit in this case --

2    A.  Yes?

3    Q.  There's nowhere in the patents that says that the molar

4    ratios should be normalized to tyrosine, right?

5    A.  I don't believe that it says normalized to tyrosine

6    anywhere in the patents in suit.

7    Q.  And you are aware that Professors Arnon and the other

8    inventors on the patents didn't always normalize to the least

9    abundant amino acid when they reported molar ratios, right?

10   A.  I had the impression from most of the publications of

11   theirs that I looked at that they reported tyrosine as 1.0 in

12   their molar ratios.

13   Q.  My question was a little different, Doctor.  Professor

14   Arnon and the other inventors here generally when they reported

15   amino acid molar ratios in their publications, they did not

16   always normalize to the least abundant species?

17   A.  I think I answered that question.  My impression from what

18   I've read of their publications is that they usually reported

19   the tyrosine as 1.0.

20   Q.  All right, let's go back to your deposition, then, page

21   118, line 20.  Lines 20 to 25 on page 118.

22            MR. ANSTAETT:  Your Honor, I object to this.

23            THE COURT:  Ask your question again.

24            MS. HOLLAND:  Yes, your Honor.

25   Q.  Professor Arnon and the other inventors in this case did

19DFTEV6           Kent - cross

not always normalize to the least abundant amino acid when they

provided molar ratios, correct?

A.   And my answer is the same.  In most of the publications

that I read they report the value of tyrosine as 1.0, which

implies that they have done the ratios of the other amino acids

to that, to tyrosine and that is what we call colloquially

normalization.

          MS. HOLLAND:  Your Honor, I believe there's an

inconsistent statement in the deposition.

          THE COURT:  I don't.  If you want to ask a very

specific question --

          MS. HOLLAND:  I think I asked exactly what was in the

deposition.

          THE COURT:  I must have been on a different part of

it.  I thought you were referring to 118 line 20.

          THE WITNESS:  She did.

          THE COURT:  Did I get the wrong page and line?

          MS. HOLLAND:  That's correct, your Honor.  I believe I

asked the witness exactly what his answer was at pages 24 to

25.

          THE COURT:  No, the question you put wasn't exactly

the same.  That's all I'm saying.  I don't -- you know, this is

not -- ask it exactly as you asked it in the deposition and

we'll see what happens.

Q.   Is it correct from the '550 patent and from the 971

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Teitelbaum paper that Drs. Sela, Arnon and Teitelbaum didn't

2    always normalize to the least abundant amino acid?

3    A.  I have no idea.  Can we look at that, please?

4    Q.  Yes, sure.  Why don't we look at DTX 1219.  Are you there,

5    Dr. Kent?  And I'd like to focus in on column 2, line 30.  Do

6    you see that there's a molar ratio there of 1.5 to 5 to 3.5?

7    A.  I'm sorry, which molar ratio am I looking at?  Oh, the one

8    that's highlighted.  1 to 1--

9             MS. HOLLAND:  The bottom one?  Yes, thank you.

10   A.  Oh, the one underneath.  Yes, I do see that.

11   Q.  And you agree that that molar ratio of 1.5 to .5 to 3.5 is

12   not normalized in the least abundant species?

13   A.  I think we need to look at the whole sentence here.  If I

14   have -- it says that similar results were obtained with a

15   soluble copolymer comprising tyrosine, aspartic acid, alanine

16   and lysine in a molar ratio of 1:1.5:5:3.5 and with another

17   such copolymer comprising glutamic acid, alanine and lysine in

18   a molar ratio of about 1.5 to 5 to 3.5.  I think they made an

19   exception here in order to compare the last three amino acids

20   in a copolymer that does not contain the first amino acid.

21   Q.  And the exception being that they didn't normalize to the

22   least abundant species?

23   A.  That's quite correct, yes.

24            MS. HOLLAND:  Your Honor, would this be a good time to

25   break?

1          THE COURT:  How much longer?  Just approximately.  I'm

2     not going to hold you to it.

3          MS. HOLLAND:  I would say less than an hour.

4          THE COURT:  All right, we'll take a ten-minute break.

5          (Recess)

6          THE COURT:  All right, Ms. Holland.

7          MS. HOLLAND:  Thank you, your Honor.  I'd like to put

8     up the head slide, please.  Thank you.

9     Q.  Dr. Kent, this is a slide you used in your direct

10    examination, right?

11    A.  Yes, that's correct.

12    Q.  And what you have, you have three columns showing molar

13    fractions and then three columns showing molar ratios.  Right?

14    A.  Yes, that's correct.

15    Q.  Now, I'd like to focus in first on the row that says

16    "lysine" on it.  Do you see that?

17    A.  I'm sorry, I didn't hear that.

18    Q.  I'd like to focus in on the row that says "lysine".

19    A.  Yes.

20    Q.  So you say '072 phenol patent molar fraction for

21    copolymer-1 the lysine is .338?

22    A.  That's what it says in the table, yes.

23    Q.  For the fraction in Copaxone label it says .338, right?

24    A.  That's what it says on this table yes.

25    Q.  And the fraction in Mylan's product it says .336, right?

1    A.  That's right.

2    Q.  So when you look at the molar fractions, the Mylan product

3    has a lower lysine molar fraction than the other two lots.

4    A.  1.002 well within the experimental uncertainty.

5    Q.  If you look at the molar ratios for lysine you'll see that

6    the molar ratio of lysine in Mylan's product is actually higher

7    than in the '072 patent of Copaxone products, right?

8    A.  That's right.

9    Q.  So when you switch from molar fraction to molar ratio the

10   relative difference in lysine among the three lots flip.

11   A.  Molar ratios are always compared to another amino acid.

12   Here the tyrosine is reported as 1.0, so it's a ratio of .336

13   to .092.  Which is 3.7, which is reported in the lysine in the

14   third column.

15   Q.  All right, let's change topics.  I want to talk about the

16   bromotyrosine impurity you testified about in your direct

17   examination.  I think we saw in that animation that that

18   bromotyrosine impurity is performed during the debenzylation

19   step?

20   A.  Yes, the first deprotection step with HBr acetic, yes.

21   Q.  And what happens if the HBr contains free bromine some of

22   the tyrosine can become brominated, right?

23   A.  Yes, if there's a bromine impurity in the HBr that's been

24   used then you get bromotyrosine, yes.

25   Q.  That means that the bromines that are swimming around can

1   attach themselves to tyrosine, is that right?

2   A.   While they react to the plus species, that's correct.

3   Q.   If you had HBr that was very pure and didn't contain any

4   free bromine, then you wouldn't have bromotyrosine formation,

5   right?

6   A.   That's correct.

7   Q.   So one way of controlling the formation of bromotyrosine

8   would be to use high quality HBr that didn't have free bromine,

9   right?

10  A.   Yes, that's absolutely correct.

11  Q.   Okay.  Now, in your opinion was the use of high quality HBr

12  one way that Mr. Konfino found to control the level of the

13  bromotyrosine impurity?

14  A.   I never saw anything in Mr. Konfino's lab notebooks that I

15  remarked on that said anything about the purity of the HBr,

16  except for the one exhibit that I showed where he deliberately

17  added bromine.

18  Q.   So in your opinion, the source of the HBr that Mr. Konfino

19  used would not be considered his best mode?

20  A.   I'm sorry would not be?

21  Q.   Considered his best mode.

22  A.   His best -- I'm not catching --

23  Q.   His best mode.

24  A.   Oh, his best mode.  So the question as I understand it is

25  would I consider the source of the HBr acetic as a best mode,

1    is that correct?

2    Q.   That's the question.

3    A.   It would be unusual to see that in the patent specifying a

4    source.

5    Q.   So you wouldn't consider that to be a best mode?

6    A.   Well, best mode as I understand it is the inventor is

7    supposed to describe their best way of doing the invention at

8    the time the patent is filed and if there was a reagent from a

9    particular source, then yes, they'd be obligated to put it in

10   as part of their best mode.

11   Q.   So was the source, I'm asking you a specific question.  Was

12   the source of Mr. Konfino's HBr --

13   A.   Yes.

14   Q.   In your view, was that Mr. Konfino's best mode?

15   A.   I don't understand the question.  I'm sorry.

16   Q.   All right.  As you testified, one way of minimizing the

17   bromotyrosine impurity would be to use high quality HBr, right?

18   A.   HBr acetic acid you knew to contain no bromine, yes.

19   Q.   And that would be a perfectly good way of controlling

20   bromotyrosine, correct?

21   A.   That would be one way of controlling the bromotyrosine

22   formation yes.

23   Q.   And another way would be the use of phenol, is that right?

24   A.   Another way of insuring that there's no bromine in the HBr

25   acetic acid is to treat with a scavenger such as phenol.

1   Q.  And a person of ordinary skill in 1994 would know that

2   phenol was a bromine scavenger?

3   A.  In the context of bromotyrosine formation in copolymer-1 or

4   another context?

5   Q.  I'm asking you in general.  Was it known generally in the

6   art that phenol could be used as a bromine scavenger?

7   A.  A person of ordinary skill in the art in 1994 would know

8   that phenol would react with bromine.

9   Q.  Now, I want to put back up your slide Kent 4.  That's going

10  to go up on the screen in a second.  It says effective phenol

11  on cop-1 molar ratio.  That was the title.  Thank you.

12          So what I understand you saying here is that if you

13  use HBr acetic acid containing free bromine, you're going to

14  get a molar ratio of approximately 6:2:5:1?

15  A.  Starting from the protected copolymer-1, if you have

16  bromine as an impurity in the HBr acetic acid step for the -- I

17  should specify that the protected copolymer-1 has to be as made

18  in the '808 patent, then, yes, you'll get approximately a

19  6:2:5:1 molar ratio.

20  Q.  And in your view that's because the copolymer-1 would

21  contain a bromotyrosine impurity, right?

22  A.  My view is that a large significant fraction of the

23  tyrosines in the product fully deprotected copolymer-1 will

24  have been converted to bromotyrosine.

25  Q.  So in your opinion, in order for a sample to be copolymer-1

1   within the meaning of the patent, it would have to have a

2   bromotyrosine impurity, right?

3   A.  I don't think that I can -- say the question again, just so

4   I can focus on the exact wording.

5   Q.  Just let me make sure I understand your opinion.  You're

6   saying in order to get the molar ratio of approximately

7   6:2:5:1, you need to have a bromotyrosine impurity, right?

8   A.  If you used the exact procedure shown in example 4 of the

9   '808 patent, which is what we're talking about, then the way

10  you get 6:2:5:1 is by having bromotyrosine formed.

11  Q.  So in your opinion, pure copolymer-1 that didn't have a

12  bromotyrosine impurity would not be copolymer-1 within the

13  meaning of the patent, right?

14  A.  I'm offering my opinion for example 4 and in example 4 in

15  order to get 6:2:5:1 you'll have to have bromine in the HBr

16  acetic acid.  Speaking generally, there are other ways of

17  getting a copolymer of this type with that amino acid ratio,

18  but not using the procedures shown in example 4.

19  Q.  Now, I want to ask you about the bottom arrow.  You say the

20  way to get to that molar ratio that you have there

21  4:5:1:5:3:6:1 is to use HBr acetic acid with phenol, right?

22  A.  That's correct.

23  Q.  But as we just discussed, there's another way to do that,

24  right, which is to use high quality HBr acetic acid?

25  A.  If you can be sure that your HBr acetic acid does not

1   contain bromine and you take the protected copolymer-1 in

2   example 4 from the '808 patent then you will get the ratio

3   shown on the bottom without phenol, that's correct.

4   Q.  So if a person of ordinary skill in the art performed the

5   exact procedure for making copolymer-1 set forth in the '808

6   patent, and used high quality HBr without any free bromine in

7   it, in your opinion would that product be copolymer-1?

8   A.  I think that calls for a legal conclusion.  I can tell you

9   about the ratios and so on.  I don't know about --

10  Q.  In your view, if somebody of ordinary skill in the art

11  followed the exact procedure for making copolymer-1 described

12  in the patents and used high quality HBr acetic acid with no

13  free bromine in it, would they come out with a product that was

14  approximately 6:2:5:1?

15  A.  I think that's slightly different than the question you

16  just asked.  If you used HBr acetic with no bromine in it and

17  carried out the first deprotection step on the protected

18  copolymer-1 as described in the '808 patent, then you'll get

19  the molar ratio shown on the bottom line which I think is

20  significantly different, which in my opinion significantly

21  different from 6:2:5:1.

22        As I understand the Court's definition of copolymer-1

23  includes approximately 6:2:5:1, then I would not consider that

24  to be copolymer-1.

25  Q.  I just want to spend one minute looking at what this

1   bromotyrosine impurity is.  Could we look at my slide 6,

2   please?  All right.  Dr. Kent, you agree that on the left what

3   you have is tyrosine, right?

4   A.   That's a representation of the amino acid tyrosine, yes.

5   Q.   And on the right is a representation of bromotyrosine,

6   correct?

7   A.   That's a bromotyrosine.  I'm not sure if it's the correct

8   one.

9   Q.   Are you talking about the position of the bromine?

10  A.   Indeed.

11  Q.   Were you here this morning when Dr. Owens put up a slide

12  that showed the bromotyrosine with the bromine in the position

13  as shown on this slide?

14  A.   That could be.  I wasn't paying attention.

15  Q.   Okay.  In any event, bromotyrosine is the tyrosine molecule

16  exactly the same except one position on the molecule has a

17  bromine added, correct?

18  A.   It is exactly the same.  If you take the compound on the

19  left and replace one proton with a bromine on the aromatic rim,

20  then you have bromotyrosine, that's correct.

21  Q.   So what happens in the debenzylation step is that you have

22  the protected copolymer-1 chain that has glutamic acid,

23  alanine, lysine and tyrosine, and that protected copolymer-1

24  chain stays the same whether or not you use phenol, but if you

25  don't use phenol you're going to have some of these little

1    bromine additives attaching on to the tyrosine, right?

2    A.   That's not correct.  The bromine atom is not little.  It's

3    almost the same size as the aromatic rim shown here.  These are

4    all different chemical compounds.  All amino acids share common

5    structures.  What gives them the different properties is the

6    atoms that change.

7    Q.   But you would agree with me that whether or not you use

8    phenol you're going to have the same number of tyrosines in the

9    chain, but if you don't use phenol some of the tyrosines in the

10   chain will be brominated?

11   A.   Some of the tyrosines will be in a different amino acid

12   that we call bromotyrosine and you'll remember in my direct

13   when I spoke about the confusion that the English language

14   causes on this point.

15             MS. HOLLAND:  I'm sorry, your Honor, I'm trying to

16   move on.

17   Q.   Now, I wanted to talk about your opinions about Mr.

18   Konfino's work.  You reviewed Mr. Konfino's deposition

19   transcript, right?

20   A.   I did.

21   Q.   And you understand that Mr. Konfino testified that phenol

22   was not part of his process, right?

23   A.   Could you -- you said that it was not the part of his

24   process.

25   Q.   Yes.

A.  I'm not sure that that was my interpretation of what I

heard Mr. Konfino say in his deposition.  I believe he said

that it was not used in the Teva manufacturing process.

          THE COURT:  Ms. Holland, I'm going to get

designations, right, from this deposition?

          MS. HOLLAND:  Yes.  I was going to put it up, your

Honor, but --

          THE COURT:  I don't know that it helps to have your

interpretation and his interpretation.

          MS. HOLLAND:  I wasn't going to put the

interpretation, your Honor.  I wanted to show the actual

testimony because I think there may have been some testimony

this morning that wasn't exactly accurate in terms of

characterizing the deposition.  If you prefer to just look at

it in chambers, your Honor, we'll do that.

          THE COURT:  I think you'll argue and I'll look at the

deposition.  I don't think this is productive.

          MS. HOLLAND:  Okay, your Honor.

          THE COURT:  Thank you.

Q.  Let's talk about your testimony about Mr. Konfino's lab

records, then.  You agree that Mr. Konfino did not always use

phenol in his experiments to make TFA copolymer-1, right?

A.  Yes.

Q.  And in some of his experiments he was able to obtain low

bromotyrosine copolymer-1 without pretreating the HBr with

1    phenol, right?

2    A.  Yes, that is absolutely correct.

3    Q.  Now, in fact, up until the time he left Teva in 1991, he

4    continued to make TFA copolymer-1 without pretreating the HBr

5    with phenol, right?

6    A.  Yes.  I showed an experiment to that effect, one of the

7    last entries in the lab books that were available to me, that's

8    correct.

9    Q.  You showed one example of that in your direct testimony.  I

10   would like to look at some others.

11   A.  Oh, yes, there are others.  That's absolutely true.

12   Q.  So maybe we can cut this short.  You would agree with me,

13   Dr. Kent, that there were several experiments in the months

14   leading up to Mr. Konfino leaving Teva where he made TFA

15   copolymer-1 with low bromotyrosine content without using

16   phenol?

17   A.  I would need to refresh my recollection on the low

18   bromotyrosine.  I remember at least one example of that and

19   there were several experiments in which he made TFA copolymer-1

20   from protected copolymer-1 using HBr acetic acid and without

21   phenol along with a greater number of experiments where he did

22   use phenol.

23   Q.  Maybe we can quickly look at his lab notebook what it

24   actually looked like, the last lab notebook that you saw before

25   he left Teva.  So why don't we go to PTX 52T.  Page TEV, the

1    last three digits are 220.  1177220.

2    A.  220.  Yes, I have that page.

3    Q.  Okay, and you see this is a December 1990 experiment, is

4    that right?

5    A.  I do.

6    Q.  And Mr. Konfino is making TFA cop-1?

7    A.  Yes, from protected copolymer-1.

8    Q.  And he does not add phenol to the HBr acetic acid, right?

9    A.  There's no mention of phenol in my records and skimming of

10   this, that's correct.

11   Q.  And the bromotyrosine content is less than .5 percent, is

12   that correct?

13   A.  That's quite correct, yes.

14   Q.  Then if we move on to the page that's 226.  Again, Mr.

15   Konfino is making TFA copolymer-1, is that right?

16   A.  Mr. Konfino is making TFA copolymer-1 from protected

17   copolymer-1, that's correct.

18   Q.  And there is no phenol added to the HBr acetic acid,

19   correct?

20   A.  I see no mention of phenol on this page.

21   Q.  All right, and the bromotyrosine content is again less than

22   .5 percent, right?

23   A.  That's on 227, and the bromotyrosine content is reported as

24   less than .5 percent.

25   Q.  So now let's go to another experiment on page 352.

1  A.  I'm sorry was that 252 or 352?

2  Q.  352.

3  A.  352.  Thank you.  Yes.

4  Q.  So this is another experiment where Mr. Konfino is making

5  TFA cop-1 from protected cop-1 with HBr acetic acid that had

6  not been pretreated with phenol, right?

7  A.  There's no mention of phenol in this page so that's

8  correct, yes.

9  Q.  And then if you go to the next page 353 on the bottom, do

10  you agree that the bromotyrosine content, again, less than

11  .5 percent?

12  A.  Yes, indeed.  It's less than .5 percent, so I guess the HBr

13  acetic had no bromine in it.

14  Q.  Okay, now, page 354, that was one of the experiments you

15  pointed to this morning, right?

16  A.  I would have to double check that, but if you represent

17  that, yes, I'll agree.

18  Q.  Okay, and do you see there that Mr. Konfino is using HBr

19  from Merck batch 391?

20  A.  390/1, yes, I see that.

21  Q.  In that experiment no phenol is added, right?

22  A.  There's no mention of phenol in this page.

23  Q.  And the bromotyrosine is less than .5 percent if you go to

24  the next page?

25  A.  Yes, it's less than .5 percent.

1    Q.  Now if you look at the next experiment in the lab notebook

2    page 356.

3    A.  Yes.

4    Q.  Do you see Mr. Konfino is again making TFA cop-1 with the

5    Merck 390/1 HBr, do you see that?

6    A.  I do.

7    Q.  And at this time there is phenol added?

8    A.  He did.

9    Q.  And do you see on the next page the result is exactly the

10   same, whether or not he used phenol, less than .5 percent?

11   A.  He says it's less than .5 percent.  You can't tell if it's

12   exactly the same.  That appears to be his detection.

13   Q.  So with that batch made with that Merck HBr Mr. Konfino got

14   the lowest detection level whether or not he used phenol?

15   A.  He has a bromotyrosine of less than .5 percent whether or

16   not he used phenol, that's quite correct.

17   Q.  And you agree that Mr. Konfino actually found more than one

18   way to lower the bromotyrosine content, right?

19   A.  Yes, he explored different ways of achieving reliably low

20   bromotyrosine content, that's correct.

21   Q.  And there are ways that worked in addition to phenol,

22   right?

23   A.  I believe there were, yes.

24   Q.  Now, let me go back to a document you testified about on

25   direct, DTX 999A, and you looked at manufacturing procedure

1    contained in that document, I think it was on page 365RC?  This

2    is a manufacturing procedure, right?

3    A.  This is Teva Pharmaceutical Industries Ltd. manufacturing

4    procedure cop-1 for injection in December 1989.

5    Q.  Okay, and Mr. Konfino's name doesn't appear anywhere on

6    this document, right?

7    A.  I would have to check the document, but to the best of my

8    recollection that's correct.

9    Q.  And Mr. Konfino didn't actually work in manufacturing, did

10   he?

11   A.  Mr. Konfino was a process development chemist to the best

12   of my understanding.

13   Q.  That means he did not work in manufacturing, he worked at a

14   bench, right?

15   A.  In reading his deposition, I got the impression that there

16   were times when he did work with the manufacturing people.  So

17   I don't know whether or not he worked in manufacturing.

18   Q.  All right, I want to look at another document you were

19   showed earlier, DTX 1270.  This is a January 1993 document,

20   right?

21   A.  Yes, this is the annual review published internally in

22   January 1993, looking at the lots from 1991 through 1992,

23   that's correct.

24   Q.  And again just to be clear, Mr. Konfino is not named as an

25   author on this document, right?

1    A.  No, it appears to be authored by Drs. Leonov and Gad.

2    Q.  And it's actually dated two years after Mr. Konfino retired

3    from Teva?

4    A.  No, it's dated twelve or thirteen months after he retired

5    from Teva.  Retired at the end of 1991.  This is January 1993.

6              (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  All right, and the page you pointed out in your direct

2  testimony was 312175, it's numbered five on top.  Do you recall

3  testifying about this on your direct testimony?

4  A.  I do.

5  Q.  First line said cop-1 has been manufactured in a specially

6  designed unit at Plantex; do you see that?

7  A.  I do.

8  Q.  You don't know what Plantex is, do you?

9  A.  I have no direct knowledge of what Plantex is.  Since one

10  of the documents came as part of the discovery from Teva, I see

11  somehow affiliated with Teva.

12  Q.  You don't know whether Confino worked for the Plantex

13  division, do you?

14  A.  I have no knowledge of whether Mr. Konfino had anything to

15  do with Plantex.

16  Q.  And you also cited a section of the NDA in your direct

17  testimony, DTX-1023; do you recall that?

18  A.  Perhaps when I see it.  Yes.

19  Q.  Okay.  And the NDA was filed years after Mr. Konfino

20  retired from Teva, right?

21  A.  It was filed -- my understanding is it was filed in 1995,

22  and Mr. Konfino retired from Teva at the end of 1991, so, yes

23  that's correct.

24  Q.  All right.  You also discussed the '072 patent on your

25  direct examination, DTX-1925.  The inventor on this patent is

1    not Mr. Konfino, right?

2    A.   No.  The inventor is Ben Zion Dolitzky.

3    Q.   Do you know who that is?

4    A.   I beg your pardon?

5    Q.   Do you know who Mr. Dolitzky?

6    A.   I have no idea who Mr. Dolitzky.  The inventor know on this

7    patent.  I'm sorry?

8    Q.   Did you try to find out who Mr. Dolitzky was?

9    A.   No, I didn't.  I read this patent on which he's listed and

10   named as the inventor.

11   Q.   Okay.  Now this patent refers to a manufacturing process,

12   right, I think you pointed had that out in your direct

13   testimony.

14   A.   The invention is, I would need the exact wording in front

15   of me, but the invention is an unproven process.

16   Q.   So, let's put it up in front of you then.  Let's go to

17   column two of the patent, line 16?

18   A.   Yeah, some tension provides an improved manufacturing

19   process, yes.

20   Q.   And you just testified that you don't know one way or the

21   other whether Mr. Konfino even worked in manufacturing?

22   A.   Could you repeat that, please?

23   Q.   Yes.  You don't know whether one way or the other whether

24   Mr. Konfino even worked in the manufacturing department?

25   A.   I do not know one way or the other whether Mr. Konfino

1    worked in the manufacturing process, that's quite correct.

2    Q.  Okay, let's go to PTX708T.  This is another exhibit you

3    testified about on direct, right?

4    A.  Yes.  This is Mr. Konfino's August 1991 report.

5    Q.  All right, and let's go to page 324554.  You testified

6    about that page several times on your direct.  And I'd like to

7    look at the 2nd, I'm sorry, in the second section, the second

8    paragraph?

9    A.  Second paragraph.

10   Q.  Yes.  It's highlighted up on the screen?

11   A.  Yes.

12   Q.  Can you see that?

13   A.  I've got it.

14   Q.  And you pointed to the sentence where it says phenol was

15   most convenient, right?

16   A.  Yes, yes.  Yes, Mr. Konfino.

17   Q.  Okay.  You don't know in what sense phenol was most

18   convenient, right?

19   A.  I have no direct knowledge of Mr. Konfino's state of mind,

20   but I take from the patent of experimentation reported in his

21   lab book that he found that the most reliable way of avoiding

22   bromine in the HBr acetic convenient way was to pretreat with

23   phenol.

24   Q.  Okay.  But you don't know whether when he said most

25   convenient, he meant it was the least expensive way to do it,

1   right?

2   A.   There are a variety of English language meanings to the

3   word convenient, but I think in the context of looking through

4   the patent of experimentation in his lab book, I would

5   conclude, personally, that he thought that that, you know, if

6   you wanted to be sure that it was done, this was the easiest

7   way of making sure of that.  And that's my sense of word

8   convenient in this context.

9   Q.   But you also know that phenol was something that was

10  readily available at any peptide lab; is that right?

11  A.   Absolutely.  Phenol was widely used in peptide chemistry at

12  that period.

13  Q.   All right.  And in that sense it was a convenient reagent

14  to use?

15  A.   It could well have been the nearest model when he put his

16  hand out to the lab bench, yes.

17  Q.   All right.  Let's turn back to bromotyrosine for just a

18  minute and then I'll be concluding.

19       You agree that bromotyrosine is an impurity in

20  copolymer-1, right?

21  A.   Bromotyrosine, if formed, according to what we've heard, is

22  found throughout the polypeptide chains in the copolymer-1

23  composition, yes, that's correct.

24  Q.   Okay.  But it's defined in Mylan's ANDA as an impurity,

25  right; you saw that this morning?

1    A.  Yes.  But I'm not sure that I understand the ANDA

2    definition of impurity -- I mean the FDA's definition of

3    impurity.  I know what I understand by it.

4    Q.  And bromotyrosine you understand is not the only impurity

5    in copolymer-1?

6    A.  I imagine there are a variety of low molecular weight

7    impurities, some of which I think we saw this morning.

8    Q.  Right.

9    A.  And probably other impurities in the unpurified

10   copolymer-1.

11   Q.  And you understand, for example, that in the process for

12   making copolymer-1, the lysine is protected with TFA, right?

13   A.  Yes, that's correct.  There's a trifluoracetyl group on the

14   side chains of lysine.

15   Q.  Right.  So there might be, for example, some lysine with

16   TFAs still attached to it in the final product?

17   A.  Yes.  I believe that they tested for fluorine in the final

18   product.

19   Q.  And the glutamic acid is presented with a gamma benzyl

20   group, right?

21   A.  That's correct.

22   Q.  Right.  And so there might be some glutamic acid with gamma

23   benzyl still attached to it in the final product, right?

24   A.  There might be, but -- yes, there could be small amounts of

25   that sure.

1    Q.  And there are other impurities, right?

2    A.  Yes, absolutely.

3    Q.  And minimizing impurities is a regular part of what's done

4    at a pharmaceutical company when a product is being scaled up

5    for manufacture, right?

6    A.  Once again, I missed the first few words.  Sorry.

7    Q.  Okay.  Minimizing impurities --

8    A.  Yes.

9    Q.  -- is a regular part of what is done when a product is

10   being scaled up for manufacture?

11   A.  Yes.  Yes.  The idea is to have a reproducable method of

12   manufacture with a defined impurity profile, and those

13   impurities should be below the limits set by negotiation with

14   the FDA.

15   Q.  Now, Dr. Kent, you have no reason to believe that

16   bromotyrosine is toxic in any way, right?

17   A.  I believe that I've seen a paper, although I couldn't cite

18   the exact reference, where there were rat studies carried out

19   in very high levels of bromotyrosine copolymer-1 showed

20   toxicity.

21   Q.  Well, let me -- is this something you recently read,

22   Doctor?

23   A.  I'm sorry?

24   Q.  Is this something you recently read?

25   A.  Is that something that I've recently read?

1    Q.  Yes.

2    A.  Yes, it is something that I've recently read.

3    Q.  All right.  Are you, you are aware that Teva found that

4    bromotyrosine was nontoxic right; you saw that this morning?

5    A.  Bromotyrosine copolymer-1?

6    Q.  Yes.

7    A.  Or bromotyrosine?

8    Q.  You testified this morning that Teva found that

9    bromotyrosine copolymer-1 was proven nontoxic, right?

10   A.  I think what I said this morning is that the sentence in

11   Mr. Konfino's report was unclear, but that if he meant

12   bromotyrosine copolymer-1, then he was saying that Teva had

13   found it to be nontoxic, that's correct.

14   Q.  All right.  You're not offering an opinion that copolymer-1

15   made using HBr acetic acid that had been pretreated with phenol

16   is any less toxic than copolymer-1 sample that had not been

17   pretreated with phenol, right?

18   A.  That's outside my expertise.  I'm not offering such an

19   opinion.  I'm responding to your questions.

20   Q.  And you have no opinion on whether bromotyrosine and

21   copolymer-1 has any affect on any biological property, right?

22   A.  In the legal sense of opinion, no, I have no such opinion.

23   Q.  That's outside of your area of expertise?

24   A.  That's outside my area of expertise.

25           MS. HOLLAND:  Thank you.

1            THE COURT:  Redirect?

2            MR. ANSTAETT:  Just a little bit your, Honor, please.

3            THE COURT:  Sure.

4    REDIRECT EXAMINATION

5    BY MR. ANSTAETT:

6    Q.  Dr. Kent, Ms. Holland showed you an exhibit, it was a

7    slide, had a representation of a tyrosine and bromotyrosine; do

8    you recall that?

9    A.  I do.

10   Q.  Nick, could we see the --let's go back -- keep going.

11   There we go, that's good.

12           Dr. Kent, what we are we looking at here, please?

13   A.  This actually shows in the upper panel a representation of

14   a one particular sequence out of a random copolymer consisting

15   of the alanine glutamic acid, lysine, tyrosine and

16   bromotyrosine.  On the bottom panel I've shown space filling

17   representations of the tyrosine side chain that's on the left.

18   This is the standard color used for oxygen.  So this is the

19   hydroxyl group, the tyrosine side chain, and on the right I've

20   shown two bromotyrosine side chain, and as you can see the

21   bromine atom is gigantic.

22   Q.  All right.  We can take that down.

23           Doctor, I want to look at PTX-52.  We'll do a private

24   screen because these -- I'm going to ask us to look, Nick, if

25   we can get the last page please of PTX-52T, and let's go back a

1    couple pages to the last page that Mr. Konfino has any writing

2    on.  That's good.  Actually, back one more so we can see the

3    date.

4              Do you have that on your screen Dr. Kent?

5    A.  I'm sorry, what was the question?

6    Q.  Do you have that on your screen up there?

7    A.  I do.

8    Q.  All right.  And what is the date of that experiment?

9    A.  March the 21st, 1991.  It's a page from Mr. Konfino's lab

10   notebook.

11   Q.  And this is the last lab book we looked at chronologically.

12   You recall -- Nick, could we see PTX-708T, please?

13             And what was the date on this document, Dr. Kent?

14   A.  I'm sorry?

15   Q.  What was the date on this document, please, Dr. Kent?

16   A.  The date on this document is August 1991.

17   Q.  And was this the document in which Mr. Konfino reported

18   that the most convenient method of ridding bromotyrosine from

19   copolymer-1 was the use of phenol?

20   A.  It is.

21   Q.  Can we see slide five from Ms. Holland's -- maybe it is

22   the -- oh this is the right one.  I apologize.

23             Ms. Holland asked you, I believe if molar fractions

24   were one of the primary ways of comparing data about amino acid

25   ratios, is that correct?

1   A.  Yes.  You get the amino acid amounts, and one of the first

2   steps is usually to convert them for this type of copolymer

3   analysis to convert them to molar fractions.

4   Q.  All right.  And what is the -- what is the molar fraction

5   for tyrosine in a copolymer-1 composition of exactly 6:2:5:1?

6   A.  As shown here is .071.

7   Q.  And what is the molar fraction for tyrosine for Mylan's

8   product?

9   A.  It is as shown on here is .092.

10  Q.  And what's the relative difference in terms of tyrosine

11  reflected by those molar fractions?

12  A.  Mylan's product contains -- taking the data from this

13  table, .022 molar fraction more tyrosine composition of exactly

14  6:2:5:1.  And doing the math in my head, I think that's about

15  30 percent.

16  Q.  All right, thank you.  Ms. Holland also asked you about

17  PTX-20A, and I wonder if we can see that.  That's PTX-20.  Do

18  we -- can I ask some indulgence here maybe use the excerpt that

19  Ms. Holland used?

20          And this was a bit of the prosecution history of the

21  '539 patent Ms. Holland asked you about, I believe, is that

22  correct?

23  A.  That's correct.  Page nine, I believe.

24  Q.  All right.  And she asked you, I think she asked you

25  questions, would prosecution history have informed somebody of

1    skill in the art in 1994 about the meaning of approximately

2    6:2:5:1, is that correct?

3    A.  She did ask me that, yes.

4    Q.  Could we go to the last page of PTX-20A, please.

5         Dr. Kent, do you see a date on this document?

6    A.  I do.  And the date appears to be 12, is that '04 or '07?

7    '04, I think.

8    Q.  All right.  At the risk of asking the obvious, would that

9    document from December of 2004 have informed somebody of the

10   skill in the art in 1994?

11   A.  I'm sorry?

12   Q.  That was a question for you.  Sorry.  At the risk of

13   stating the obvious, would a document --

14        THE COURT:  It is too obvious.

15        MR. ANSTAETT:  Okay.  I'll move on.  Could I have just

16   one second, your Honor?

17        THE COURT:  Of course.

18        MR. ANSTAETT:  I'm almost finished, your Honor.

19   Q.  Let's look at PTX-20.  And we can just use the original

20   PTX-20.  And if we go to page one with the Bates number 304802.

21        All right, I believe this is the prosecution history

22   that Ms. Holland asked you about, if we could just highlight

23   the bottom paragraph there, please.  And here Teva is

24   discussing three batches of copolymer-1 obtained from the

25   Weizmann Institute.  Do you see that, Doctor?

1    A.  I do.

2    Q.  The sentence?  Okay.  And do you see some -- oh, if we

3    could keep that up, please.  We'll get it back up.  I think we

4    lost the signal.  All right, there we go.

5          And do you see that there's some batch numbers

6    associated there with those Weizmann batches?

7    A.  It says Weizmann batch numbers 320, 340 and 400.

8    Q.  All right.  And it is those batches that Teva has reported

9    molar ratios there for, correct; the molar ratios at the

10   bottom?

11   A.  That --

12   Q.  It's those batches 320, 340 and 400 that Teva has retested

13   using total amino acid analysis and gotten those molar ratios,

14   at the bottom?

15   A.  That's what it says here, yes.

16   Q.  All right.  Now, the reported ratio for each of those

17   batches has a tyrosine content of 1.0, is that correct?

18   A.  That's correct.  All three have tyrosine 1.0.

19   Q.  All right.  New, let's look at DTX-1704, please.  And I

20   want to turn to page TEV3004350, please.  And if we could blow

21   up everything that's under number three there, please.

22          Now, you see on the left-hand column there are a list

23   of batch numbers?

24   A.  Yes, WIS320, 340 and 400, I assume WI stands for Weizmann

25   Institute of Science.

1  Q.  Are those the same batch numbers that we just saw listed in

2  the prosecution history?

3  A.  The 320, 340 and 400 are the same, yes.

4  Q.  All right.  Now, the final column in this chart, what does

5  that reflect there?

6  A.  Here they've done amino acid analysis that includes a

7  separate test for the determining the bromotyrosine content.

8  Q.  All right.  And then I want to ask you if you'll read the,

9  where it says table three right under the table.  That's rather

10  small.

11  A.  Yes.  So what it says there is table three, amino acid

12  content of BR1 batches.  Since the tyrosine content was

13  significantly lower than expected, an HPLC determination of the

14  contents of brominated tyrosine, Br-Tyr, residues was also

15  performed.

16  Q.  All right.  And then let me ask you this.  Do you see the

17  bottom row?

18  A.  Yes, I do.

19  Q.  And if you would read the sentence top of the table that

20  starts with table three?

21  A.  I'm sorry, I'm not sure -- oh, up the top?

22  Q.  Yes, please.

23  A.  Yeah.  Table three presents the results of analysis in

24  comparison to Teva's current specifications, and those of the

25  reference standard batch, 03494, which is the one at the bottom

1   of the table.

2   Q.  All right.  Now, do you see the molar fraction for tyrosine

3   in the Teva reference batch there at the bottom of the table?

4   A.  I do.  It's in the Teva reference.  It's 0.095 for the

5   molar fraction of tyrosine.

6   Q.  And what is that report in terms of bromotyrosine in the

7   Teva reference batch, if we look the final column?

8   A.  It reports it as less than 0.2 percent.

9   Q.  And what about for the Weizmann batches, what was the

10  report of the bromotyrosine content for the Weizmann batches?

11  A.  Reported respectively as 1.12 percent, 1.09 percent and

12  1.23 percent.

13  Q.  All right, now, I'm almost done, Dr. Kent.  We've got molar

14  fractions in this table, correct, for each of the three

15  Weizmann batches?

16  A.  For glutamic acid, alanine, tyrosine and lysine we have

17  molar fractions.  For bromotyrosine we have a percent.

18  Q.  All right.  And focusing on the molar fractions for

19  glutamic acid, alanine, tyrosine and lysine, using those molar

20  fractions, could we calculate molar ratios from those

21  fractions?

22  A.  Yes, we could, for the three Weizmann batches and for the

23  Teva standard batch.

24  Q.  All right.  Now, I'm going to -- I'm going to ask you to

25  briefly do just a little math for me and I'll bring you a

1  calculator.  And what I want you to do is using the Weizmann

2  Institute 320 batch --

3  A.   Yeah.

4  Q.   -- I'd like you to calculate a molar ratio for that batch

5  normalized to tyrosine?

6  A.   All right.  So the tyrosine mole fraction is .078.  So we

7  divide all four numbers in the highlighted top row by .078.  So

8  we'll start with .145 divided by .078 equals 1.86, 1.858, 1.86.

9  Q.   All right.  And 1.86 if we're looking at two significant

10  figures it would 1.9?

11  A.   Yes, that would be 1.9.

12  Q.   All right.

13  A.   So for alanine -- figure out how to clear this thing --

14  there.  .468 divided by .078, and that's six point as many

15  zeros as you want.

16  Q.   So can we call that 6.0?

17  A.   Yes.

18  Q.   All right.

19  A.   So tyrosine obviously is 1.0.

20  Q.   Right.

21  A.   And for lysine .312 divided by .078 equals 4.0.

22  Q.   All right, 4.0.  Now, if we could go back please to the

23  '539 prosecution history page we were looking at before.  It is

24  PTX-20 at 304802.

25          And, Nick, if could you highlight the molar ratios at

1    the bottom of the page, please.

2            I think we established earlier that starting at 1.9

3    down there.

4            I think we established earlier that that was one of

5    the Weizmann batches, the batch number 320?

6    A.  Yes.

7    Q.  All right.  And did we just calculate a molar ratio for

8    that batch based on the molar fractions reported for that

9    batch?

10   A.  We did.

11   Q.  And did we just come up with a molar ratio of 1.9 to 4.0 to

12   6.0 to 1.0?

13   A.  We did.

14   Q.  And was that molar ratio normalized to tyrosine?

15   A.  In the conventional sense of normalized.  All ratios are

16   with respect to tyrosine, which is reported as 1.0.

17   Q.  So when Teva wanted to compare batches of copolymer-1 and

18   tell the patent office about them, they calculated molar ratios

19   normalized to tyrosine; is that fair to say?

20   A.  They did.

21           MR. ANSTAETT:  Nothing further.

22           THE COURT:  All right.  Is there anything else?

23           MS. HOLLAND:  No, your Honor.

24           THE COURT:  All right, thank, you Dr. Kent.  You may

25   step down.

1          (Witness excused)

2               THE WITNESS:  Thank you.

3               THE COURT:  Mr. Skilton?

4               MR. SKILTON:  Yes, your Honor.  Our next witness is

5     about two and a half to three hours, so I'll leave it to the

6     Court's discretion as to whether you would like us to start or

7     call the witness or go home.

8               THE COURT:  Why don't we get started, take few

9     minutes.

10              MR. SKILTON:  Your Honor, the Mylan defendants call

11    Doctor Allen Zeiger.

12     ALLEN ZEIGER,

13         called as a witness by the defendant,

14         having been affirmed, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. SKILTON:

17              MR. SKILTON:  Your Honor, can we have a moment to hand

18    out the binders?

19              THE COURT:  Yeah, sure.

20              MR. SKILTON:  Your Honor, would it be okay for my

21    colleague Melony Glaser to sit in the jury?

22              THE COURT:  Sure, that would be fine.

23              MR. SKILTON:  She can evaluate my performance that

24    way.

25    Q.  Would you please state your full name for the record?

1   A.  Allen Zeiger.

2   Q.  Are you currently employed?

3   A.  No.  I'm retired.

4   Q.  You're retired.  When did you retire?

5   A.  In 2008.

6   Q.  Where did you retire from?

7   A.  I retired from Jefferson Medical College Thomas Jefferson

8   University in Philadelphia.

9   Q.  What position did you hold at Jefferson Medical College, on

10  your retirement?

11  A.  On my retirement, I was a professor of biochemistry and

12  molecular biology.

13  Q.  Where do you live, Dr. Zieger?

14  A.  I live part-time in Silver Spring, Maryland and part-time

15  in Beth Shemes, Israel.

16  Q.  Doctor, have you ever testified before in court?

17  A.  No.

18  Q.  Are you familiar with a composition called copolymer-1?

19  A.  Yes, I am.

20  Q.  And how so?

21  A.  I've been asked by Perkins Coie to review the copolymer-1

22  patents, particularly the '550, '808 and the patents in suit,

23  and to render opinions on matters in the patent in the

24  literature and on obviousness in the various claims.

25  Q.  All right.  Now, you have, I would assume, a C.V?

1    A.   I do.

2    Q.   And, Nick, would you kindly pull up DTX-1966.  That should

3    be in your book as such?

4    A.   It is.

5    Q.   Doctor?

6    A.   I am.

7    Q.   Would you identify this document, please, for the Court, if

8    you get it?

9    A.   This.  This is my CV, yes.

10   Q.   And is it accurate, to the best of your knowledge?

11   A.   Yes, it is.

12           MR. SKILTON:  Your Honor, I move into evidence

13   DTX-1966.

14           MR. JAMES:  No objection.

15           THE COURT:  Admitted.

16           (Defendant's Exhibit DTX-1966 received in evidence)

17   Q.   Thank you, your Honor.

18           I would now ask you to turn to some slides I think

19   that are essentially summaries of portions of that.

20           And, Nick, if you could pull up slide one of Doctor --

21   all right.

22           Doctor, I'll represent to you that this is a summary

23   of some aspects of your C.V.  And would you take the Court

24   through that slide in terms of, particularly focusing on your

25   experience as it relates to the matters that you'll be talking

1    about today and tomorrow, and let's start with your Ph.D.?

2    A.   My Ph.D. was in biology in the McCallum Pratt Institute of

3    Biochemistry in Baltimore Maryland, which I received a 1967.

4    The thesis focus was on the interactions of cancer causing

5    chemicals with DNA the genetic material.

6    Q.   Let me stop you right there.  That's a mouth full.  How

7    does that experience relate, if at all, to the kinds of issues

8    you're going to be talking about?

9    A.   Well, the nucleic acid is a polymer with a great degree of

10   charge and the particular kind of DNA I was looking at was poly

11   disperse.  In that respect, I was looking at some of their

12   hydrogenatic properties, and the interactions with these

13   chemicals with biological activity.

14   Q.   And you successfully obtained that Ph.D.?

15   A.   Yes, I did.

16   Q.   And where did you go after that?

17   A.   From there I became a post doctoral student at National

18   Institutes of Health in the laboratory of Christian B. Anfinsen

19   for a two year period.

20   Q.   And who was Dr. Anfinsen at that time?

21   A.   Dr. Anfinsen was a world renowned protein chemist who

22   received the Nobel Prize in chemistry in 1972.

23   Q.   Now, describe, would you, please, the nature of the work

24   that you did during this post doc two year period at NIH?

25   A.   At this time Dr. Anfinsen's lab was focused on the

1    activity, the mechanism of action of an enzyme that broke down

2    nucleic acid materials, in this case RAN, and this enzyme was

3    able to be cleaved by another enzyme into three fragments.  I

4    was asked to do a solution peptide synthesis of one of these

5    three fragments.

6    Q.  Can you translate that to work, at least roughly into the

7    kind of chemistry biochemistry that you're analyzing for the

8    Court in the next few days?

9    A.  Yes.  I was extensively involved in peptide synthesis, and

10   this included such as areas as protection which we've heard

11   about, and deprotection and step-by-step characterization and

12   purification of protected peptide intermediates.

13   Q.  And as to the molecules or the composition, how does that

14   compare, for example, copolymer-1?

15   A.  Well, these were more related to the building blocks

16   because at this point in my career I was mainly concerned with

17   synthesizing peptides that were although long peptides, not

18   polypeptides.

19   Q.  I'll get into your definitions of some of these terms a

20   little later, but take us, then, to your next employment as per

21   the resume.  You next were at the Jefferson Medical College?

22   A.  Yes.  I joined the Biochemistry Department of Jefferson

23   Medical College, Thomas Jefferson University, in Philadelphia,

24   in 1969, as assistant professor.  I was asked to use my

25   background in peptide chemistry to study the means of

 1    recognition of the immune system of polypeptides, both random

 2    polypeptides as well as polypeptides of known sequence.  In

 3    particular, I was asked to develop methods of synthesis of

 4    peptides, polypeptides of known sequence.

 5    Q.  And again I'm going to return you to the subject of

 6    relating that work to the kind of analysis and opinions that

 7    you're developing in this case.

 8    A.  I understand.

 9    Q.  And what is the relationship, how would you describe it?

10    A.  Well, the random polypeptides are very much like the

11    copolymer-1 gamish, if I may use a mixture, in the sense that

12    they were poly disperse, they were often times charged, and

13    they were composed of many of the same amino acids that are

14    found in copolymer-1.

15    Q.  And you remained as assistant professor from 1969 to '76?

16    A.  I did.

17    Q.  Dr. Zeiger, describe up to '76, I'm going to say your

18    laboratory work, white coat work that you did up to that time?

19    A.  We were interested in the way elements of the immune system

20    would recognize peptides, in particularly we wanted to remove

21    one the variables of the polypeptides that were used up to

22    then, namely, the random sequence, and consequently we used

23    those of random sequence as a model system to compare with the

24    sequences of known sequence that we prepared.

25    Q.  Okay.  And we'll return I think on occasion to this portion

1   of your career, but take us then to the next step along the

2   way; associate professor 1976 through 1984?

3   A.   Well, very much the way -- I'm sorry -- the way that

4   Michael Sela and Ruth Arnon took their polypeptide work towards

5   multiple sclerosis, I began to take my work more towards the

6   bacterial cell wall envelope, which I thought I still feel was

7   the battle ground between a pathogen and the host.

8   Q.   And one of the bullet points here, I'm going to get to the

9   full professor in a moment, but one of the bullet points

10   describes the research focus on synthesis and characterization.

11   Would you fill in a little bit what is there described in terms

12   of your research and your work?

13   A.   Yes.   I was interested in developing methods for the

14   synthesis of polypeptides of known sequence of high molecular

15   weight that were to be used as immunogens in laboratory

16   animals, rabbits, guinea pigs, mice, in order to study the way

17   that their sequence and their hydrodynamic properties

18   interrelate with immune recognition both at the molecular

19   level, meaning anti-bodies and also at the genetic level.

20   Q.   All right.   Now, let's focus on the immune recognition of

21   your last answer.   Were you looking at immunological properties

22   during this period and, if so, in what context?

23   A.   In context of cross reactions, as one example.   In context

24   with genetic control of the immune response as another example.

25   Q.   Were you working with amino acids?

1    A.  Yes, I was.

2    Q.  And would you describe that, please?

3    A.  Well, if you take a look at some of the references, the

4    bibliography, you'll see the use of peptide synthesis, in the

5    production of peptides of known sequence, as well as their

6    characterization.  And also you'll see some papers in which we

7    used random polymers containing such amino acids as glutamic

8    acid, lysine, tyrosine and alanine.

9    Q.  And you named those amino acids.  Are those common to the

10   copolymer-1 molecule?

11   A.  They are.

12   Q.  And were there molecular weights or rate molecular weight

13   ranges that you were working on during this period?

14   A.  Especially of interest to me was the molecular weight

15   ranges of the polypeptides that I synthesized of known

16   sequence.

17   Q.  And give the Court a little sense of what you mean when you

18   said that you synthesized, how it relates to that the synthesis

19   that we've been hearing about so far of copolymer-1?

20   A.  This, the specifics of the synthesis, there are a number of

21   aspects of the synthesis of the polypeptides which were in

22   common with the synthesis of copolymer-1, such as the need to

23   protect certain groups and the need to then deprotect them in

24   order to study them.

25   Q.  All right.  And you're describing work then that you did in

1    the lab during this period that we've just covered, correct?

2    A.   I am.

3    Q.   All right.  Now, let's go, if we could, to slide two,

4    another summary slide relating to your C.V.  And why don't you

5    go down the bullet points as therein stated?

6    A.   I was the author of more than 40 research articles, the

7    sole inventor on three patents.  I've been a member of a number

8    of professional societies, including an elected member of the

9    American Society of immunologists, and an elected member of the

10   American Society of Biological Chemists, but in addition I've

11   been a member at some period of the American Peptide Society

12   and the American Society for microbiology.

13   Q.   And you'll note that we've pulled out of your resume two

14   sabbaticals.  Would you describe those sabbaticals for the

15   Court and how, if at all, they relate to some of the inventors

16   in this case?

17   A.   I spent two sabbaticals, two years at the Weizmann

18   Institute of Science in Rehovot, Israel in the biophysics

19   department, which is where both doctors Arnon and Sela started

20   off.  The first time was with Dr. David Mirelman, who was an

21   expert in the bacterial cell wall.  I was just beginning to get

22   involved in that, and in a big way, and I looked to him as

23   somebody who would take me from a person of perhaps a little

24   bit more than ordinary skill to an expert, somebody with

25   expertise.

1          The second sabbatical in the same department was with

2     Doctor Mayer Wilchek, who is a world renowned authority on

3     chromatography.  He's published over 500 papers, I believe, and

4     has over 100,000 citations to those papers.

5     Q.  I'm going to return here just for a minute then to the

6     synthesis work that you were doing on polypeptides as you

7     described.  Was there an ultimate goal of that work that you

8     were doing in the lab?

9     A.  Yes.  The ultimate goal was to try to eliminate as much as

10    possible the variability of amino acid sequence, however, the

11    variability of poly dispersity remained.

12    Q.  Now, you've been in the courtroom, and I know you've

13    studied the work of Doctors Arnon and Sela.  How would you

14    compare the work you were doing during this period with the

15    work that you knew of the scientists Doctor Arnon and Sela,

16    during this period?

17    A.  The group at Jefferson that I was working with were

18    interested in the same sorts of questions that Doctors Sela and

19    Arnon were interested in, in terms of utilizing these random

20    polypeptides as models for studying the finer points of the

21    immune system.

22    Q.  Would you return to slide one and let's complete the

23    resume, chronologically.  Have we covered, more or less, the

24    period of associate professor in terms of relevant activities

25    to the issues you're studying?

1    A.  Yes.

2    Q.  Then you became a full professor in 1984 and remained as

3    such according to this, until you retired in 2008.  How would

4    you relate that period to the work that you're doing at the

5    request of Perkins Coie in this case?

6    A.  Just as Dr. Sela and Arnon, although they didn't completely

7    leave the previous studies, just as they moved into an area of

8    great medical relevance and excitement such as multiple

9    sclerosis, I moved more into the area of the bacterial cell

10   wall and the effects of antibiotics on the bacterial cell wall.

11   Q.  And you mentioned it was simultaneously, your lab was

12   working simultaneously with the work that was being done by

13   their lab?

14   A.  Yes.

15   Q.  Did Dr. Sela at any time ever recognize your work in any

16   article that he published?

17   A.  Yes, he did.

18   Q.  And, Nick, would you pull up DTX-1901, please.

19              Do you have 1901 in your collection of documents?

20   A.  I'm looking at it on the screen.

21   Q.  All right.  Well, let me first ask you to identify it for

22   the record.  What is the Court looking at now?

23   A.  This is a review article that Michael Sela published, in

24   the federation of European Biological Society Letters, and in

25   March of 1974.

1    Q.  And were you able at sometime thereafter to read this

2    article?

3    A.  Yes, I was very interested in it, and the title has

4    selected highlights in immunological research in the last

5    decade.

6    Q.  And was it published in a reputable publication?

7    A.  Yes.

8           MR. SKILTON:  Your Honor, I move into evidence

9    DTX-1901.

10          MR. JAMES:  No objection.

11          THE COURT:  All right.  Admitted.

12          (Defendant's Exhibit 1901 received in evidence)

13   Q.  And would you take a minute, Dr. Zeiger, and point the

14   Court to those portions of that article that refer to your

15   work?

16   A.  Yes, Nick, could you please --

17   Q.  Why don't we return to S90 in terms of getting that

18   reference point here.

19          Dr. Zeiger, what is this paragraph in this article

20   referring to?

21   A.  I believe that Nick pulled off -- pulled up the wrong

22   paragraph.

23   Q.  That was my fault.

24   A.  If you look at the second paragraph, yes, that one over

25   there.  I don't seem to have a laser pointer, which --

1           MR. SKILTON:  Which would be helpful.

2    Q.  We'll get one for you tomorrow.  What are you pointing out

3    to the Court here?

4    A.  The paragraph is discussing cross reactivity between

5    totally synthetic materials and biological materials, and in

6    particular, if I may read the first sentence.  There synthetic

7    antigens have been described capable of provoking anti-bodies

8    cross reacting with a bacterial cell wall, and with a basic

9    protein of the myelin sheath, such polymers may suppress the

10   permittal disease allergic encephamyilitis, and there are two

11   references there.  It also mentions collagen.

12   Q.  And the references to the first clause 118, are you aware

13   of what that reference is?

14   A.  Yes.  That's to my work.

15   Q.  And 119 and 120?

16   A.  That's a reference to the work that we've been discussing

17   dealing with copolymer-1.

18   Q.  And, Nick, would you pull up 118 and 119, and 120.  All

19   right.  And 118 says Zeiger, 119 is Teitelbaum, and 120 is

20   Teitelbaum, et al.  Am I reading that correctly?

21   A.  It is the way Cynthia Web and -- who is, I believe, a

22   post -- I'm sorry -- a graduate student at that time.

23   Q.  And as you read that, why are these three articles

24   mentioned, if you will, in the same sentence?

25   A.  Well, they're mentioned as selected highlights.  This was a

1    period of time in chemistry in which chemists and biochemists

2    were making an attempt to kind of fool mother nature by taking

3    something, making something totally synthetically chemically in

4    a test tube and injecting animals with the hope that the

5    anti-bodies and cells that are elicited that are provoked from

6    this, these immunizations would be able to cross react with

7    natural materials.

8    Q.  And did Dr. Sela, more or less, state his purpose as you

9    understood it, in this article?

10   A.  His purpose was to try to mimic the reaction to the myelin

11   basic sheath.

12   Q.  What did you understand?

13   A.  I'm sorry.

14   Q.  I'm sorry?

15   A.  The myelin basic sheath protein.

16   Q.  All right.  And what did you understand his purpose was in

17   writing this article?

18   A.  To highlight those areas of greatest potential and greatest

19   interest in the field at that time.

20   Q.  And, Nick, would you pull up S.85, please.  And does he

21   state that purpose, as you understood it in the first sentence

22   of the article?

23   A.  Yes, he does.  Could I read it?

24   Q.  Please.

25   A.  This is an impressionistic and therefore undoubtedly

1    subjective view of one immunologist on what seemed to him is

2    most interesting developments in the broad realm of immunology

3    in the last ten years.

4    Q.  Doctor, do you consider yourself to be an expert in the

5    field of biochemistry?

6    A.  I do.

7    Q.  First of all, tell me what immuno chemistry is because then

8    I am going to ask you whether you think you're an expert in it?

9    A.  Immuno chemistry is a study of recognition by different

10   materials or systems in the immune system of both foreign and

11   native materials in a host.

12   Q.  And do you consider yourself to be an expert in this area?

13   A.  I do.

14   Q.  And this case relates to peptides and polymers.  Do you

15   consider yourself to be an expert in synthetic peptide

16   chemistry?

17   A.  I do.

18   Q.  Do you consider yourself to be an expert in peptide polymer

19   chemistry?

20   A.  Yes, I do.

21   Q.  Do you consider yourself an expert in the characterization

22   of the properties of peptide polymers?

23   A.  Yes, I do.

24           MR. SKILTON:  Your Honor, I tender Dr. Zeiger as an

25   expert on all of those topics.

1          MR. JAMES:  Your Honor, we have no objection.  I'm not

2     sure I understand the last parts about characterization of

3     peptide polymers, but with that caveat, no objection.

4          THE COURT:  Okay.  Well, I -- do you want to go into

5     what you mean by characterization of peptide polymers?

6          MR. SKILTON:  Yes, your Honor, I will.

7          THE COURT:  Obviously, I accept Dr. Zeiger with

8     respect to the first four categories.

9          MR. SKILTON:  Thank you, your Honor.

10    Q.  Would you explain to the Court what you mean to convey when

11    you state that you consider yourself to be an expert in the

12    characterization of the properties of peptide polymers?

13    A.  Yes, I, in the publications that I published, among other

14    things I have used ultracentrifugation, I've used viscosity,

15    and I've used circular dichroism as a means of studying both

16    poly dispersity, molecular weight ranges, and the -- well, I'll

17    stick with those.  The -- and also possible secondary

18    structures of these polymers.

19    Q.  And this relates to work you've done in the lab?

20    A.  Yes.

21    Q.  And professional articles that you've written?

22    A.  Yes, as well as teaching many of these areas in the, to

23    graduate students and to medical students.

24         MR. JAMES:  Your Honor, I didn't hear any mention of

25    size exclusion chromatography.  So long as we're not agreeing

1    that he is being admitted as an expert on size exclusion

2    chromatography, we don't have an objection.

3              MR. SKILTON:  Your Honor, may I ask the witness --

4              THE COURT:  Is there going to be any expert testimony

5    on size exclusion chromatography?

6              MR. SKILTON:  My belief is that that subject will come

7    up in his testimony.  I'm not sure that any of the it will be

8    tendered as an expert, but since issue is raised at least I

9    like to have him give the Court his background.

10             THE COURT:  Why don't we do that when the testimony

11   about SEC comes up.

12             MR. SKILTON:  Thank you, your Honor.

13             THE COURT:  Give us a warning and then we can --

14             MR. SKILTON:  Will do.

15             THE COURT:  We can have a voir dire with respect to

16   that, okay, if that's requested.

17             MR. SKILTON:  Thank you.

18             THE COURT:  And now I'm going to adjourn, Mr. Skilton.

19   Thank you for beginning.  Dr. Zeiger, thanks for starting out

20   this evening.  See everybody at 9:30 in the morning.

21             MR. SKILTON:  Thank you, your Honor.

22             MR. JAMES:  Thank you.

23             (Adjourned to September 14th, 2011 at 9:30 a.m.)

24

25

1                      INDEX OF EXAMINATION

2    Examination of:                              Page

3    WALTER H. OWENS

4    Direct By Ms. Bloodworth . . . . . . . . . . 594

5    Cross By Mr. Bennett . . . . . . . . . . . . 624

6    Cross By Mr. Acker . . . . . . . . . . . . . 644

7    STEPHEN B. H. KENT

8    Direct By Mr. Anstaett . . . . . . . . . . . 646

9    Cross By Ms. Holland . . . . . . . . . . . . 721

10   Redirect By Mr. Anstaett . . . . . . . . . . 775

11   ALLEN ZEIGER

12   Direct By Mr. Skilton . . . . . . . . . . . . 784

13                     PLAINTIFF EXHIBITS

14   Exhibit No.                               Received

15    PTX 249R   . . . . . . . . . . . . . . . . 700

16    262   . . . . . . . . . . . . . . . . . . . 610

17    PTX 318   . . . . . . . . . . . . . . . . . 642

18    PTX 320   . . . . . . . . . . . . . . . . . 630

19    508   . . . . . . . . . . . . . . . . . . . 732

20    708   . . . . . . . . . . . . . . . . . . . 658

21    976   . . . . . . . . . . . . . . . . . . . 732

22    977 and 978   . . . . . . . . . . . . . . . 583

23    1679   . . . . . . . . . . . . . . . . . . . 678

24    1730   . . . . . . . . . . . . . . . . . . . 671

25

1    1736  . . . . . . . . . . . . . . . . . . 676

2                    DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4    1270  . . . . . . . . . . . . . . . . . 689

5    1901  . . . . . . . . . . . . . . . . . 795

6    1963  . . . . . . . . . . . . . . . . . 651

7    318  . . . . . . . . . . . . . . . . . . 600

8    DTX 1271  . . . . . . . . . . . . . . . 686

9    DTX 1411  . . . . . . . . . . . . . . . 643

10   DTX 1925  . . . . . . . . . . . . . . . 694

11   DTX 52T  . . . . . . . . . . . . . . . . 682

12   DTX-1966  . . . . . . . . . . . . . . . 786

13

14

15

16

17

18

19

20

21

22

23

24

25