19EFTEV1                    Trial

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ------------------------------x
3
    TEVA PHARMACEUTICALS USA,
4   INC., TEVA PHARMACEUTICALS
    INDUSTRIES LTD., TEVA
5   NEUROSCIENCE, INC. and YEDA
    RESEARCH AND DEVELOPMENT CO.
6   LTD.,

7                Plaintiffs,

8        v.                              08-CV-7611 (BSJ)

9   SANDOZ, INC., SANDOZ
    INTERNATIONAL GMBH, NOVARTIS
10  AG, and MOMENTA
    PHARMACEUTICALS, INC.,
11
                Defendants.
12
    ------------------------------x
13  TEVA PHARMACEUTICALS USA,
    INC., TEVA PHARMACEUTICALS
14  INDUSTRIES LTD., TEVA
    NEUROSCIENCE, INC. and YEDA
15  RESEARCH AND DEVELOPMENT CO.
    LTD.,
16
                Plaintiffs,
17
         v.                              09-CV-8824 (BSJ)
18
    MYLAN PHARMACEUTICALS INC.,
19  MYLAN INC., NATCO PHARMA LTD.,

20              Defendants.            Non-Jury Trial
    ------------------------------x
21
                                       New York, N.Y.
22                                     September 14, 2011
                                       9:40 a.m.
23
    Before:
24
                    HON. BARBARA S. JONES,
25
                                       District Judge

19EFTEV1                    Trial

                           APPEARANCES

KENYON & KENYON
        Attorneys for Plaintiffs
BY:  ELIZABETH J. HOLLAND, ESQ.
        WILLIAM G. JAMES, II, ESQ.
        CAROLYN A. BLESSING, ESQ.

GOODWIN PROCTER, LLP
        Attorneys for Plaintiffs
BY:  DAVID M. HASHMALL, ESQ.
        JOHN T. BENNETT, ESQ.
        NICHOLAS K. MITROKOSTAS, ESQ.


MORRISON & FOERSTER LLP
        Attorneys for Defendants
BY:  DAVID C. DOYLE, ESQ.
        KAREN L. HAGBERG, ESQ.
        ERIC M. ACKER, ESQ.

PERKINS COIE LLP
        Attorneys for Defendants
BY:  JOHN S. SKILTON, ESQ.
        DAVID L. ANSTAETT, ESQ.
        SHANNON M. BLOODWORTH, ESQ.
        DAVID JONES, ESQ.

ALSO PRESENT:  CORT CHASE, Litigation Support

19EFTEV1                    Trial

1          (Trial resumed)

2          MR. SKILTON:  Good morning, your Honor.

3          THE COURT:  Good morning, Mr. Skilton, Dr. Zeigler.

4          MR. ANSTAETT:  Your Honor, just one housekeeping

5   matter from yesterday.  Your Honor there was a demonstrative

6   exhibit that was admitted for Rule 1006 purposes, and we have a

7   copy of that demonstrative exhibits for the parties.  For the

8   record, the exhibit number is DTX 4015.

9          THE COURT:  All right.  Mr. Skilton, you may proceed.

10   ALLEN ZEIGLER,

11   called as a witness by Defendant, having been previously duly

12   affirmed, testified as follows:

13          MR. SKILTON:  Good morning, Dr. Zeigler.

14          THE WITNESS:  Good morning, Mr. Skilton.  Mr. Skilton,

15   there's an object here that's in the middle of the screen.

16   Does it have to be here?

17          MR. SKILTON:  I don't think we can remove it.

18          THE COURT:  I'm not removing Bobby.

19          THE WITNESS:  Whatever this is.  I'm sorry.  I would

20   never refer to him as a thing.  That's much better, thank you.

21          THE COURT:  It's better for you.  Now we'll see what

22   it does for everything else.

23          THE WITNESS:  I'm sorry.

24          THE COURT:  No, no.

25   DIRECT EXAMINATION

1   BY MR. SKILTON:

2   Q.  Dr. Zeigler, let me to pick up where we left off, establish

3   a couple of things.  You described I think generally your

4   Jefferson lab work from the period of December 1969 through the

5   mid-'80s yesterday, so I'll not go back there, but during that

6   period, did you do any work in characterization as you used

7   that term yesterday?

8   A.  Yes.  I did some gel chromatography studies of some of my

9   polypeptide products, and I did some molecular weight studies.

10  I didn't do the molecular weight studies by SEC, but by

11  untracentrifugation and by viscosity.  I also characterized the

12  materials in terms of secondary structure by circular

13  dichroism.

14  Q.  When you were dealing with your compositions, what were the

15  molecular weight ranges that those compositions were in?

16  A.  Well, with the method of polymerization that I developed,

17  they ranged between an average molecular weight of 5,000,

18  50,000 approximately.

19  Q.  And yesterday you mentioned that you were working with

20  random copolymers with various constituent elements and that

21  you were synthesizing them.  Just briefly describe what you

22  meant by that term.

23  A.  Yes, instead of polymerizing the monomers as the single

24  amino acid, I would synthesize typically tetrapeptide and use

25  the entire tetrapeptide, that is four amino acids, three

1   peptide bonds, as the monomer to polymerize products of great

2   diversity and different molecular weight sizes.

3   Q.  And you allude to the purpose of your research or goals, so

4   to speak, of that research.  Why don't you again if you haven't

5   said it to the detail that I would request, why don't you state

6   the purpose of that research in reference to the kinds of

7   synthetic chemistry that you were working on?

8   A.  Well, these are parameters of a polydispersed system that

9   would be of interest to the readers, obviously, who would want

10  to know a little bit more about such things as the degree of

11  polydiversity, perhaps something about the secondary structures

12  as they relate to secondary structures that are found in

13  proteins.

14  Q.  And you were looking for potential consequences in the

15  immune system, did I understand that correctly?

16  A.  Yes, that was the ultimate goal of the particular group

17  that I was associated with initially at Jefferson.

18  Q.  Now, take that rather general and generic description of

19  your work and compare it to your understanding of the work that

20  the Arnon-Sela group were doing contemporaneously.

21  A.  Their goals were rather similar.  Both Drs. Sela and Arnon

22  were top-notch biochemists as well as immunologists.  Our

23  interests were quite similar.

24  Q.  By the way, did you know these two scientists?

25  A.  Yes, I did.

1    Q.  And give the Court an example of situations in which you

2    got to know them.

3    A.  Well, Dr. Sela, for example, was a post-doctoral student in

4    Dr. Christian Anfinsen's lab a number of years before I

5    arrived.  He would come occasionally to the lab to see what's

6    happening, particularly -- this was, I should say, in my

7    post-doc at MIH, I would see Dr. Sela from time to time and

8    when I joined the faculty at Thomas Jefferson we were invited

9    to international meetings in particular, there's one

10   international meeting in Israel, I believe, it was at a place

11   called Curiata Novim in 1972, again, it may have been 1973 in

12   which the organizers were Drs. Sela, Katchalski and Arnon.

13   Q.  And you mentioned your sabbaticals.  Did you see or become

14   acquainted with them in the context of those sabbaticals?

15          THE COURT:  Mr. Skilton, I think I have enough

16   background now, if you want to move forward.

17          MR. SKILTON:  Thank you, your Honor.

18   Q.  What were you asked to do in this case?

19   A.  I was asked to review the copolymer-1 literature,

20   particularly patents '550 as well as '808 and the other patents

21   in suit with regards to the literature, with regards to the

22   claims and offer, render my opinions particularly with regard

23   to obviousness, as I understand it.

24   Q.  Were you asked to make your evaluations and give your

25   opinions from a particular perspective?

1   A.  Yes, from the perspective of a person of ordinary skill in

2   the art.

3   Q.  And are the determinations that you have reached, were they

4   reached from that perspective?

5   A.  I made every attempt to do so.

6   Q.  In the process of your work, did you attempt to define for

7   the Court what you viewed to be the qualifications or the

8   credentials of a person of ordinary skill in the art?

9   A.  Yes, I did.

10  Q.  And would you put slide 4 on, please?  What are we looking

11  at here, Doctor?

12  A.  This is the definition of a person of ordinary skill in the

13  art that was certainly in my first expert report and if it

14  wasn't in my second or third, this was certainly referred back

15  to at that point.

16  Q.  Now, would you read it with the context being that you're

17  pointing the Court to particular experiences or qualifications

18  of that person, so read it, please, to the Court?

19  A.  Yes.  A person of ordinary skill in fields of biochemistry

20  and immunology in 1994 would have had an advanced degree in a

21  chemical or biological discipline and extensive experience in

22  the synthesis, fractionation and characterization of polymers,

23  such as their hydrodynamic and structural properties as applied

24  to proteins, sympathetic peptides and/or polydispersed peptide

25  mixtures, as well as experience in the determination of the

1    molecular weight distribution and average molecular weights of

2    such polymers by methods such as size exclusion chromatography

3    and an understanding of how the standards and the conditions

4    used in the molecular weight determination affect the results

5    obtained.

6    Q.  That's a mouthful, but let me see if I can give the Court a

7    little perspective on the issue by asking you to use the

8    definition of person of ordinary skill in the art as Dr. Grant

9    articulated it, and we have on the board his definition.  The

10   Court has seen this need not read it, but would you explain to

11   the Court what if any material differences as you see it, there

12   are in these two definitions?

13   A.  They're quite similar.  I guess perhaps I expect a little

14   bit more of somebody of the ordinary skill in the art than Dr.

15   Grant, but that's a matter of degree.  In essence, you should

16   pardon the expression, there's a great amount of overlap

17   between the two definitions.

18   Q.  All right, now, Dr. Grant indicated specifically that in

19   his definition he would afford access to and the ability to

20   consult with other scientists having related and/or

21   complementary knowledge.  How do you describe your statement in

22   reference to that particular qualification?

23   A.  Well, all scientists, research scientists take advantage of

24   colleagues in areas that can complement their own area and it

25   appears that Dr. Grant, as I, would do so.

1    Q.  In other words, let me ask you the bottom line.  Do you

2    consider there to be from your point of view any material

3    difference between these two definitions?

4    A.  Well, as I mentioned, it's one of degree.  I myself would

5    probably have to consult less with others in areas of polymer

6    chemistry and biochemistry and what I think he means by

7    analytical chemistry than such a person of skill in the art,

8    but again we're talking here of a person of ordinary skill.

9    And in terms of somebody perhaps coming into my laboratory of

10   ordinary skill, I guess perhaps I would expect perhaps a little

11   bit stronger background in these areas, particularly since

12   those are areas that were part of my research interest.

13   Q.  And with that nuance, could you live with Dr. Grant's

14   definition?

15   A.  I have no problem with Dr. Grant, yes.

16         MR. SKILTON:  With the Court's indulgence and your

17   Honor when you've had enough of this, just I'll move on, but I

18   would like to ask Dr. Zeigler to do a little teaching here on

19   the biochemistry involved, so when the Court has enough, I

20   assume you'll ask me to move on.

21         THE COURT:  Okay.

22   Q.  Dr. Zeigler, what is a peptide?

23   A.  A peptide is a combination of two or more amino acids that

24   are linked via a peptide bond or linkage.

25   Q.  And then what is a polypeptide?

1   A.  A polypeptide is a molecule that consists of many, many

2   amino acids.  Would you like me to give the classical

3   definition of a polypeptide?

4   Q.  Would you, please?

5   A.  Originally a polypeptide was a peptide which would be

6   retained in a dialysis sack in some sort of an aqueous

7   solution.

8   Q.  All right.

9   A.  If it went through the dialysis sack, it was not a

10  polypeptide.  If it stayed there, it was.

11  Q.  Thank you.  And what is a polymer?

12  A.  A polymer is a molecule made up of many building block

13  units of some sort.

14  Q.  And what is a copolymer?

15  A.  A copolymer is a polymer made up of more than one different

16  type of building block.

17  Q.  What is a polydispersed mixture of polypeptides?

18  A.  A polydispersed mixture of polypeptides is a mixture

19  containing a range of sizes of polypeptides.  It's

20  polydispersed in that respect.

21  Q.  Is a copolymer -- let me be even more specific.  Is

22  copolymer-1 as you understand that term has been used in this

23  case a polydispersed mixture of polypeptides?

24  A.  Yes, it is.

25  Q.  And how, if at all, do polydispersed mixtures of

1  polypeptides differ from a protein?

2  A.  A protein is either a single or a few related molecules.

3  Let me explain that.  Sometimes a protein will be bound to a

4  substrate or something else, but in general, a protein is a

5  single chemical entity.

6  Q.  Dr. Zeigler, as we go through some of the relatively

7  complex chemistry in your examination, where you feel it is

8  necessary to differentiate as between these terms, please let

9  me know and I'll ask you a proper question in that regard.

10 Would you do that?

11 A.  Fair enough.

12 Q.  Let's turn, then, to your opinions.  Have you reviewed the

13 patents in suit?

14 A.  Yes, I have.

15 Q.  And have you reached opinions as to whether or not the

16 asserted claims by Teva of the patents in suit are obvious?

17 A.  Yes, I have.

18 Q.  What is that opinion?

19 A.  All of the claims in all of the patents in suit are obvious

20 to one of ordinary skill in the art.

21 Q.  And have you used in that analysis a date?

22 A.  Yes, I have.  That is the date of priority of the '808

23 patent, I believe it's April or May of 1994.

24 Q.  Now, Doctor, as has been stated in this Court at various

25 contexts, I think the lawyers certainly understand that issues

1   of obviousness are fixed questions of fact and law and for the

2   Court.  Have you in your opinions attempted to consider the law

3   as it relates to obviousness?

4   A.  Yes, I have.  To a large extent, of course, I've depended

5   on counsel because I make no claims for expertise in the law.

6   But I've done the best that I can.

7   Q.  And was that law that you were relying on in attempting to

8   follow as a scientist part of your reports in this case?

9   A.  Yes.

10          MR. SKILTON:  Nick, would you pull up DTX 1954,

11  please?

12  Q.  This was data taken from one of the reports.  The law you

13  were following as indicated in this report is model patent jury

14  instructions, I take it?

15  A.  Yes.

16          MR. SKILTON:  Nick, would you publish those portions

17  that are in his report?  More generally, Nick, could you

18  publish it from the report itself, I believe it's DTX 1954,

19  sorry.  Your Honor, the Court is more than well aware of the

20  law, so may I refer him to a specific part that he was

21  following?

22          THE COURT:  Sure.

23          MR. SKILTON:  I have made a slide of a part of that

24  and, Nick, now would you go to that slide, please?  And it's

25  now on this screen and the Court will note it's one of the

1    paragraphs from the model of jury selections.

2    Q.  Dr. Zeigler, would you read that portion of law for the

3    Court and into the record?

4    A.  Surely.  "Keep in mind that the existence of each and every

5    element of the claimed invention in the prior art does not

6    necessarily prove obviousness.  Most if not all inventions rely

7    on building blocks of prior art.  In considering whether a

8    claimed invention is obvious you may but are not required to

9    find obviousness if you find that at the time of the claimed

10   invention or the critical date there was a reason that would

11   have prompted a person having ordinary skill in the field of

12   the invention to combine the known elements in a way the

13   claimed invention does, taking into account such factors as, 1,

14   whether the claimed invention was merely the predictable result

15   of using prior art elements according to the known function

16   and, 2, whether the claimed invention provides an obvious

17   solution to a known problem in the relevant field."

18   Q.  And have you attempted to the best of your ability as a

19   scientist to follow that construct in forming the opinions in

20   this case?

21   A.  I have.

22   Q.  Now, I asked you about your assignment.  Let me drill down

23   a little more specifically.  Have you prepared a slide that

24   frames your assignment and the opinions that you're going to

25   render in order to assist the Court to understand what you're

1   attempting to do?

2   A.  Yes.

3       MR. SKILTON:  Nick, would you please put the slide

4   related to that issue up?  Slide 7.

5   Q.  Dr. Zeigler, would you go through this with the Court to

6   frame the opinions that you're about to give?

7   A.  Yes.  From the perspective of a person of ordinary skill in

8   the art as of the date of May 1994, I was requested to evaluate

9   the following issues:  One, whether the processes to make

10  copolymer-1 claimed in the asserted claims in suit were taught

11  by or obvious in view of U.S. patent No. 3849550, which will be

12  referred to as the '550 patent, in combination with prior art.

13  Two, whether the copolymer-1 products made by the processes

14  claimed in the asserted claims were obvious.  And, three,

15  whether the uses of the copolymer-1 products in the asserted

16  claims were obvious.

17  Q.  All right.  Dr. Zeigler, I want to take you to a particular

18  construct and hypothetical, and for the next portion of your

19  examination, to keep you within that hypothetical.  So I will

20  focus you on the date of May, 1994, and I think the Court

21  recognizes the date of May 24, 1994 as the operative date for

22  prior art questions.  That's the date I'm asking you to use as

23  the construct as a person of ordinary skill in the art and the

24  knowledge that that person would have had as of that date.

25          And I want you in addition to that in answering these

1   questions and in developing your opinions to talk about art

2   that would have been known to that person of ordinary skill in

3   the art as of that date.  Do you follow my request at this

4   point?

5   A.  I do.  I would certainly think that the first place that,

6   or the major, the primary place to look at would be the

7   previous patent, which would have been patent '550.

8   Q.  All right, now, let me finish the last tenet of my

9   hypothetical.  I want you in answering these questions to not

10  refer to and disregard as a matter of the knowledge of that

11  person of ordinary skill in the art whatever is taught or

12  claimed in the patents in suit.  Do you understand that as the

13  framework of the hypothetical?

14  A.  Yes.

15  Q.  And so I want you then to take the Court through the art as

16  of that date outside of the four corners of those patents.

17  Where would you start if your goal was to make a copolymer-1

18  product?

19  A.  Well, I would begin to look at the references at the end of

20  the patents in suit.  I'm sorry --

21  Q.  Let me frame it, because I want you to answer the question

22  without regard to the patents in suit.

23  A.  Oh, without regard to the '808 patent, okay.

24  Q.  I'm asking you hypothetically, you want to make copolymer-1

25  as of that date and the patents in suit are not tacked on the

1    board over your desk.

2    A.  A-ha.

3    Q.  Where would you start the process?

4    A.  I would start the process in the literature, certainly in

5    terms of polymerization of polypeptides.

6    Q.  Is there any document in particular you would look to if

7    you were attempting to develop a product for the treatment of

8    multiple sclerosis?

9    A.  Yes.  I would look to the patentees and the laboratories in

10   terms of seeing what they had done previously.

11   Q.  And is there a patent that you would look to get to by that

12   route?

13   A.  Yes.

14   Q.  And so what would you start with?

15   A.  Well, I would start with the patents to see to what extent

16   the literature and the prior knowledge was in terms of this

17   particular group of patentees.

18   Q.  Now, you mentioned the patent earlier, the patent that, for

19   example, appears in one of your assignments is the '550 patent.

20   Is that the patent that you were alluding to?

21   A.  Yes.

22          MR. SKILTON:  And Nick, may we have that PTX 26

23   published?  Your Honor, this is, of course, in evidence

24   already.

25          THE COURT:  Yes.

1   Q.  How would one read this patent in terms of the assignment

2   of making copolymer-1?

3   A.  One would first want to know to what extent the polymer had

4   been made and described in patent '550.

5          MR. SKILTON:  And turn, Nick, if you would, to column

6   2, lines 53 through 63.

7   Q.  How does this inform that person of ordinary skill in the

8   art in terms of how to make the copolymer-1?

9   A.  The copolymer and its synthesis is discussed in this

10  paragraph.

11  Q.  And let's go through this paragraph sentence by sentence.

12  The first sentence reads, "Copolymers according to the present

13  invention are easily prepared by conventional procedures."

14          First of all, Doctor, does that sentence have meaning

15  to you as a person of ordinary skill in the art?

16  A.  Yes.  It would mean that there basically is nothing new in

17  terms of the present invention.  That's essentially what I

18  believe conventional procedures implies, indicates.

19  Q.  And do you agree that copolymers described in the '550

20  patent are, quote, "easily prepared by conventional

21  procedures," end quote?

22  A.  Yes.  We used and prepared and bought commercially some of

23  these kinds of polymers, related polymers well before this

24  patent was issued.  That's obviously not from the position of

25  somebody of ordinary skill, but the point was that some of them

1    were available commercially at the time and that could have

2    been well known to somebody of ordinary skill.

3    Q.  All right, now, let's continue through the paragraph and

4    the procedures therein described and I'll point you to the next

5    sentence which reads:  "The first of the above copolymers was

6    prepared from the N-carboxyanhydrides of tyrosine, alanine,

7    gamma benzyl glutamate and EN" -- and you pronounce the word

8    for me.

9    A.  Epsilon N-trifluralinacetyllysine.

10   Q.  Was this a procedure known in the art at the time?

11   A.  Yes, it was.

12   Q.  Is there any reference in particular that you might refer

13   the Court to to illustrate that point?

14   A.  Yes, there's a long review article that was published in

15   Advances in Protein Chemistry a number of years before by

16   Katchalski and Sela.

17   Q.  Nick, would you pull up DTX 1783?  Is this the reference

18   that you're referring to?

19   A.  Yes, I am.

20   Q.  Nick, follow please to the first page of the text.  Doctor,

21   does this in fact describe such a synthesis this article?

22   A.  This is a review article which discusses what has been done

23   previously in the synthesis and chemical properties of poly a

24   amino acids.

25   Q.  What is the title of the article?

1    A.  I just read it, essentially.  Synthesis and Chemical

2    Properties of Poly a amino acids.

3    Q.  The two authors?

4    A.  Ephraim Katchalski and Michael Sela.

5    Q.  Is this a source known to persons of ordinary skill in the

6    art at the time?

7    A.  Yes, it was one of the most through review articles that

8    was available at the present time?

9          MR. SKILTON:  Your Honor, I move into evidence DTX

10   1783.

11         MR. JAMES:  No objection.

12         THE COURT:  Admitted.

13         (Defendant's Exhibit 1783 received in evidence)

14   Q.  Let's go to some particular parts of this, Doctor.  Go, if

15   you would, to the table of contents.  I'm going to refer you to

16   II.  How if at all does this inform that person in terms of the

17   step that we were just addressing?

18   A.  Well, the very first discussion of the review article after

19   the introduction is the synthesis of poly a amino acids from N

20   carboxy a amino acid anhydrides or NCA's.

21   Q.  Does this follow the index, so to speak?  It's page 248?

22   A.  Yes.

23   Q.  Nick, would you turn to that page in this publication?  And

24   highlight, if you will, the II Section.  I'm going to point

25   you, Doctor, to get through this examination quickly to a

1   paragraph I want you to look at and comment for the Court.  It

2   begins with "although" on the second paragraph.

3   A.   "Although a number of different derivatives of alpha amino

4   acids and peptides have been used as monomers for the

5   preparation of poly a amino acids, the most suitable and

6   commonly used are the N carboxy a amino acid anhydrides."

7   Q.   How does this teach a person in reference to the step you

8   just looked at?

9   A.   That it's a pretty conventional procedure.

10  Q.   Nick, please return to PTX 26, the '550 patent and again,

11  to column 2, lines 53 to 62.  All right, we're on the process

12  as disclosed and Dr. Zeigler, had you prepared a video to

13  illustrate the process that is disclosed in the '550 patent?

14  A.   Yes, I have.

15       MR. SKILTON:  With the Court's permission I'd like him

16  to play video 1.

17  Q.   Doctor, I'm going to ask you and perhaps you can help me

18  here.  First of all, we're looking, are we not, to the '550

19  patent on the screen?

20  A.   Yes, we are.

21  Q.   And description of that patent.  Take us in, Nick to the

22  video and, Doctor, I'm going to ask you to stop me or point to

23  the Court -- again, we're seeing the procedure that you just

24  identified.  This is a step, the steps that we're talking about

25  now highlighted, including the sentence of depolymerization.

1   Nick, would you go back to the last slide?  Sorry, your Honor.

2   I want the -- read the sentence into the record, the

3   polymerization?

4   A.  Yes.  "The first of the above copolymers was prepared by

5   the N carboxyanhydrides of tyrosine, alanine, gamma benzyl

6   glutamate and Epsilon N-trifluralinacetyllysine.  The

7   polymerization was carried out at ambient temperature in

8   anhydrous dioxane with diethylamine as initiator."

9   Q.  Proceed, if you would, to the demonstrative?

10  A.  The beginning of the demonstrative was the same as Dr. Kent

11  showed, but as we'll see the emphasis here is quite different

12  and it will diverge shortly.

13          So this is a solution representing the solution of

14  polymerization.  Again, Nick, if you can hold this for a second

15  please.  This part here again was shown yesterday so I'm not

16  going to dwell too much on it.  But alanine is represented in

17  the red; glutamic acid, which has got this side chain of gamma

18  benzyl group by the coral color; lysine, which is protected by

19  the Epsilon N trifluoroacetyl group is in the purple and

20  tyrosine here is in the green.  The reason for the shape is to

21  show the head-to-tail polymerization via the peptide bond.

22  Q.  Now, as we were looking at the '550, I'm going to review

23  the steps disclosed and as you narrate this video, if you would

24  point the Court to how any or all of these steps are

25  illustrated.

1          The first reads as follows:  The first of the above

2     copolymers was prepared from the N carboxy, etc.  We've been

3     through that step several times.  Is that step illustrated in

4     what we've seen so far?

5     A.  Yes.  These are all represented as the N carboxyanhydrides

6     of each of these four amino acids.

7     Q.  And the next clause of that same description reads, "The

8     polymerization was carried out at ambient temperatures in

9     anhydrous dioxane with diethylamine as an initiator."  However

10    you say it.  What assumptions are you making in reference to

11    those subjects?

12    A.  Well, for one thing, one needs a trigger to begin the

13    polymerization and that's what the role of the initiator is.

14    And for another thing, as Dr. Kent mentioned, one wants to

15    avoid reactions from the side chains and therefore two of these

16    amino acids have got reactive side chains and must be

17    protected.

18    Q.  And the next clause reads, "The deblocking of the gamma

19    carboxyl group of the glutamic acid was affected with hydrogen

20    bromide in glacial acetic acid."  Doctor, keep going through

21    the video and illustrate or point out to the Court how we're

22    attempting to show that.

23    A.  First we're going to go through the polymerization.  Again,

24    this is in common with what Dr. Kent showed yesterday and I'm

25    not going to repeat what he said in detail, but this is the

1   polymerization reaction, and one can see, once one adds

2   initiator to start, that there's a section in which the first

3   beginning chain is going to start to be polymerized.  This is

4   supposed to represent a random polymerization, but at the same

5   time that that group was forming and was fairly large, a new

6   chain is beginning to start, and one could see here is that as

7   the N carboxyanhydrides are beginning to be used up different

8   chains are beginning to start through the solution and this is

9   going to be at least partly or mainly the basis of the

10  polydiversity that one gets at the end of the reaction.

11         Again, one can see that the peptides that is the

12  glutamics have got the gamma benzyl group and the lysines have

13  got the trifluoroacetyl groups on them.  So this is the fully

14  protected copolymer-1.

15  Q.  Now, the last clause of that portion reads, "And was

16  followed by the removal of the trifluoroacetyl groups from the

17  lysine residues by one millimeter piperidine"?

18  A.  First of all, we didn't talk about the next step.  The next

19  step is actually treatment with HBr and acetic acid.  The gamma

20  benzyl groups are removed first and that's going to be shown

21  here in this inset which comes from this section of the slide

22  and focus in on the glycines.  The glycine is going to have the

23  gamma benzyl group removed once this treatment occurs, and this

24  is going to occur throughout the treatment of this solution,

25  and result in the trifluoroacetyl protected copolymer-1.

1           Nick, could you hold this for us to continue?

2           So now to answer the question, yes, this was followed

3    by the removal of the trifluoroacetyl groups from the lysine

4    residues by 1 molar piperidine in order to give the copolymer-1

5    itself and this is going to be the last part of the

6    demonstrative.

7    Q.  Could you follow?  Thanks.  All right, now take us through

8    this slowly.

9    A.  Yes.  Again, here is the section that's being magnified and

10   we're going to add this piperidine which is going to be

11   removed -- I'm sorry, which is going to result in the removal

12   of the epsilon N trifluoroacetyl groups.  And at this point

13   here we have copolymer-1 produced.

14   Q.  Pursuant to the method disclosed?

15   A.  Yes.

16           MR. SKILTON:  Your Honor, I'm sorry to have a lozenge

17   in my mouth.  I'm doing it for my throat.

18           THE COURT:  That's okay.

19   Q.  Now, does the recitation in that portion of the '550 patent

20   that we've now gone over provide that person of ordinary skill

21   in the art with the experimental details that he would need

22   specifically?

23   A.  No.  The experimental details for the most part are left

24   out.

25   Q.  Now, is there anything in that '550 patent to refer the

1  person to a source or specifics as they may relate to the

2  experimental details?

3  A.  Yes, there's a reference at the end of the patent to the

4  patentees.

5          MR. SKILTON:  Nick, would you turn again to PTX 26 and

6  column 4, lines 30 through 32.

7  Q.  What are we looking at here?

8  A.  We're looking at a reference to Teitelbaum, et al, European

9  Journal of Immunology, 1971.

10 Q.  And so would that person of ordinary skill follow the trail

11 to that reference?

12 A.  Yes.

13         MR. SKILTON:  Nick, would you please pull up PTX 499?

14 And, your Honor, I believe this is also in evidence.

15 Q.  What are we looking at here, Doctor?

16 A.  We're looking here at an article by Drs. Teitelbaum,

17 Meshorer, Hirshfeld, Arnon and Sela.  The title is Suppression

18 of Experimental Allergic Encephalomyelitis, or EAE, by a

19 Synthetic Polypeptide.

20 Q.  Is this the 1971 Teitelbaum article that was specifically

21 referenced in the '550 patent?

22 A.  It is.

23 Q.  And of course Teitelbaum along with Drs. Arnon and Sela

24 were amongst the inventors of the '550 patent, is that correct?

25 A.  That is correct.

1  Q.  Now, where in that article are additional experimental

2  details disclosed to that person of ordinary skill in the art?

3          MR. SKILTON:  Nick, would you look at page 243?  All

4  right.

5  Q.  What are we looking at here?

6  A.  This is in the experimental methods section, and the 2.3

7  discusses the Katchalski and Sela article, and 2.3.1 --

8  Q.  That's the one you earlier reviewed?

9  A.  Yes.  2.3.1 discusses copolymer-1 particularly and gives a

10  little bit more detail than the patent itself.

11  Q.  Do you know whether this is the same procedure that's

12  described in 2.3.1, the same procedure as described in the '550

13  patent?

14  A.  Yes.  It must be because that's what they refer to in

15  patent '550.

16  Q.  Now, have you prepared a demonstrative to aid on discussion

17  of this procedure?

18  A.  Yes.

19          MR. SKILTON:  Nick, would you turn to slide 8, please?

20  Thank you.

21  Q.  What is it that we're looking at here in slide 8?

22  A.  We're looking at a comparison of the language of the '550

23  patent to the language that you had pointed us to in the method

24  section of the Teitelbaum 1971 paper.

25  Q.  And it's a side-by-side comparison of the processes as

1   described respectively?

2   A.  Yes.

3   Q.  Are there additional references or citations in the

4   Teitelbaum 1971 description that would be significant to the

5   person of ordinary skill in the art?

6   A.  Yes.  In particular, one would like to see the conditions

7   of deblocking of the gamma carboxy group and conditions for the

8   removal of the trifluoroacetyl groups from the lysine residues.

9   Q.  Why would this particular portion of the experiment be of

10  particular interest to that person of ordinary skill in the

11  art?

12  A.  Because one has to know the conditions under which they're

13  applied.

14  Q.  Is there a reference cited by the Teitelbaum article?

15  A.  For which one, Mr. Skilton?

16  Q.  Let's be as specific as I can be.

17          MR. SKILTON:  Nick, would you call up page PTX -- I'm

18  sorry, let me start again.

19  Q.  Is the Ben-Ishai Berger reference a part of that

20  description in the Teitelbaum article?

21  A.  Yes.  If you look at the references, reference 16 refers to

22  the Ben-Ishai and Berger article.

23          MR. SKILTON:  Nick, would you pull up, please, the

24  footnote 16 so the Court can follow the trail here?  Where is

25  that shown in 16?

1    Q.  There's the reference.  And how does that question then

2    relate to the questions you were addressing in terms of that

3    step?

4    A.  That reference is going to give the conditions for hydrogen

5    bromide deprotection of the gamma benzyl glutamate.

6    Q.  And so would the person of ordinary skill in the art then

7    look to this article to try to ascertain the conditions?

8    A.  Yes, absolutely.

9           MR. SKILTON:  Nick, would you pull up PTX 499, please?

10   Q.  We're looking at what here, Doctor?

11   A.  The Journal of Organic Chemistry.  1952.

12   Q.  1952.  Is there a particular article in there, then, that

13   you're looking for?

14   A.  I assume it's the Ben-Ishai and Berger.

15   Q.  Would you turn to that article, Nick?  Is this the article

16   that's referenced in the Teitelbaum 1971 paper?

17   A.  Yes, it is.

18   Q.  Where does it appear, what's the journal it's in?

19   A.  Journal of Organic Chemistry.

20   Q.  Is this a journal you relied on in forming your opinions in

21   this case?

22   A.  It is.

23   Q.  And you're familiar with the content?

24   A.  I am.

25   Q.  And the journal is a reputable journal?

1  A.  It's one of the premier journals in the field.

2          MR. SKILTON:  Your Honor, I move into evidence Exhibit

3  499.

4          MR. JAMES:  I think you misspoke.  I don't think

5  that's what you intended to say.  499 is in evidence.

6          MR. SKILTON:  I'm not following my notes correctly,

7  I'm sorry.  Is this Exhibit 1799 that we're looking at?  Excuse

8  me, your Honor.

9          THE COURT:  That's all right.

10         MR. SKILTON:  Is this Exhibit 1759 that we're looking

11 at?

12         MR. JAMES:  We have no objection, your Honor.

13         MR. SKILTON:  Thank you.

14         THE COURT:  All right, admitted.

15         (Defendant's Exhibit DTX 1759 received in evidence)

16         MR. SKILTON:  Forgive the incompetence of the

17 examiner.

18 Q.  Doctor, as you look at Exhibit 1759 in particular the

19 article by Ben-Ishai and Berger.  How would a person make use

20 of the information in this article here doing the experiment

21 recited in the 1971 Teitelbaum article?

22 A.  He would look inside to find where the description of

23 gammic benzyl, gamma benzyl deprotection is described.

24 Q.  We started that process.  Let's go, if you would, to the

25 exhibit specifically, and I want to direct your attention to

1    page 1566.  And there is a statement in the article on that

2    page concerning benzyl esters.  Would you read that, please,

3    into the record?

4    A.  Yes.  Let me first explain the word "also."  This article

5    covered the deprotection, the deprotection of two groups

6    simultaneously, and it focused on the other group which has no

7    relevance to the case.  I just want to explain the word "also."

8           "Since benzyl esters are also cleaved by hydrogen

9    bromide in glacial acetic acid, but under more stringent

10   conditions than N carbobenzoxy groups.  Benzyl hippurate

11   prepared by benzoylation of glycine benzyl ester gave hippuric

12   acid a treatment with hydrogen bromide in glacial acetic acid

13   for 12 hours."

14   Q.  Do Ben-Ishai and Berger and in particular in the portion

15   that you're looking at describe deblocking glutamic acid with

16   hydrogen bromide in glacial acetic acid?

17   A.  Yes, they do.

18   Q.  And I see that benzyl ester is used in the experiment and

19   in this one.  What is benzyl ester?

20   A.  Well, benzyl ester is a group that's utilized by peptide

21   chemists to protect, that is to deactivate reactive groups, by

22   peptide chemists on peptides.

23   Q.  Are benzyl esters used in the process of preparing

24   copolymer-1 that is described in the '550 patent?

25   A.  Yes.

1  Q.  Now, the word protecting group has come up in your

2  descriptions.  Is that a form of the reaction that we're

3  looking at, is that relating to protecting groups at all?

4  A.  Yes, it is.  It's essentially the same thing and in these

5  particular cases are also cleaved.

6  Q.  Is this the same protecting group used in the patents in

7  suit for glutamic acid?

8  A.  Yes, it is.

9  Q.  Do Ben-Ishai and Berger describe the experimental

10  conditions under which this deblocking or deprotection

11  occurred?

12  A.  Yes, there's a section at which they describe it in more

13  detail.

14  Q.  Nick, would you turn to page 1566?  And I'll ask you, are

15  experimental conditions for deprotection of glutamic acid

16  described on this page?

17  A.  Yes, it is.

18  Q.  And show the Court what you're referring to and explain to

19  the Court how this section relates to that question.

20  A.  Right.  Now benzyl hippurate is related to amino acid not

21  to a peptide.  This is the very first paper in the field of HBr

22  in glacial acetic acid being used to block or deprotect or

23  cleave benzyl esters, and so this is a relatively simple

24  system.  It reads, "To benzyl hippurate there was added

25  hydrogen bromide in glacial acetic acid and the mixture was

1    left overnight at room temperature."  Which was interesting,

2    because in the text it said 12 hours at room temperature.

3    Q.  All right.  And let me elaborate a little bit on what you

4    said.  Move on in the paragraph.  Is there any reference to the

5    time here of the reaction?

6    A.  Yes.  The time here is overnight.  Earlier it said 12

7    hours.

8    Q.  And how do you interpret overnight as a person of ordinary

9    skill in the art?  What is being denoted there?

10   A.  It denotes how hard you work in the laboratory.  If you

11   leave at 6:00, so it's 16 hours, 17 hours.  If you leave at

12   10:00 or 9:00, say, it would then be twelve hours.

13   Q.  So what is disclosed here with respect to this element of

14   time with respect to the deprotection of glutamic acid in this

15   experiment?

16   A.  Time and temperature are important parameters dealing with

17   chemical reaction in general, and in particular, that's what's

18   reported here for this particular material.

19   Q.  And show specifically where temperature in that condition

20   is reported in this reference.

21   A.  At the very end it says "at room temperature".

22   Q.  What does that mean?

23   A.  I've been in Israel and I know that the laboratories can be

24   as cold as 12 degrees -- I'm sorry, as 20 degrees centigrade

25   and as warm at 28 degrees centigrade.  I assume what that meant

1   it was done at the lab, it depends on the time of day and

2   depends on the temperature in the laboratory.

3   Q.  Following the trail, then, that the '550 put you on --

4           THE COURT:  Mr. Skilton, I'm sorry to interrupt you.

5   I have a matter that's going to require about ten minutes of my

6   time, so we'll have to adjourn.

7           MR. SKILTON:  Yes, your Honor.  Thank you.

8           THE COURT:  Be back in ten.

9           (Recess)

1          (In open court after the recess)

2          THE DEPUTY CLERK:  All rise.

3          THE COURT:  Please be seated.

4          All right, Mr. Skilton, you may proceed.

5          MR. SKILTON:  Thank you, your Honor.

6    Q.  Dr. Zeiger, we've been going through fairly complex, some

7    might call it dense, others boring, articles on chemistry here,

8    but let me see if I can focus on the point.  And we've been

9    through the '550 patent up to the last sentence.

10          So, Nick, would you please put slide eight back on the

11   board for the Court, and I'm going to ask you right up to the

12   last sentence, the sentence that relates to the lysine

13   residues.  What have you, as a person of ordinary skill in the

14   art, seen as a result of whether or not the procedures

15   disclosed up to that point were conventional procedures as

16   stated in the '550 patent?

17   A.  They're conventional, though certainly routine to a person

18   of ordinary skill in a peptide chemistry laboratory.

19   Q.  And what you've done, essentially, is to, if you will,

20   trace the patent through some of the resources that would be

21   available to that person of ordinary skill, is that correct?

22   A.  That is correct.

23   Q.  And showing where those steps essentially are reported in

24   the art?

25   A.  Yes.

1    Q.  Now, let me take you to the last sentence of that, and it

2    may be the place, and it says "What's followed by the removal

3    of the, and would you --

4    A.  Trifluoracetyl groups.

5    Q.  Thank you -- from the lysine residues by 1 millimeter

6    piperidine?

7    A.  1 molar, I'm sorry.

8    Q.  Molar?

9    A.  1 molar, piperidine.

10   Q.  You will continually remind me I'm a history major.

11   A.  I don't mean to correct you.

12   Q.  Is that a step that was a conventional procedure as well?

13   A.  It was, especially Anfinsen's laboratory.

14   Q.  And what do you mean by that?

15   A.  The authors of the original treatment included Chris

16   Anfinsen.

17   Q.  And are you referring here to DTX-1711?

18   A.  Yes, I believe so.  That's the also reference 17 of the

19   Teitelbaum paper.

20   Q.  All right.  And, Nick, if you pulled that -- yes, you have

21   up on the board.

22           Are we now looking at an article, and its title is

23   what, please?

24   A.  Reversible masking of amino groups in ribonuclease and its

25   possible usefulness in the synthesis of the protein.

1    Q.   And the authors are?

2    A.   Robert Goldberger and Christian Anfinsen.

3    Q.   And the date of receipt is?

4    A.   February 7th, 1962.

5    Q.   And the publication is?

6    A.   I believe the Journal of American Chemical Society, but --

7    Q.   Is that --

8    A.   Oh, I'm sorry, it's Biochemistry.

9    Q.   Is this a reputable source?

10   A.   Yes, it is.

11   Q.   Is this an article that you relied on in forming your

12   opinions in this case?

13   A.   Yes.

14            MR. SKILTON:  Your Honor, I move into evidence

15   DTX-1711.

16            MR. JAMES:  No objection.

17            THE COURT:  Admitted.

18            (Defendant's Exhibit 1711 received in evidence)

19   Q.   Now, does this reference teach the step that we just

20   described, to wit, stopping the reaction in the presence of

21   acetic acid?

22   A.   It does.

23   Q.   And without going into the detail of it, that information

24   would be found by a person of ordinary skill in the art reading

25   the article, correct?

1  A.  Yes.

2  Q.  I'll take you back to the slide, Nick, please, comparing

3  '550 to Teitelbaum, thank you.

4       Is it your opinion that a person of ordinary skill

5  would find the process for preparing copolymer-1, as that

6  process is described in Teitelbaum 1971, to be well known?

7  A.  Would you please repeat the question?

8  Q.  Yes, I will.  Is it your opinion that a person of ordinary

9  skill would find the process for preparing copolymer-1, as that

10 process is described in Teitelbaum 1971, to be well known?

11 A.  Yes.

12 Q.  Is it also your opinion that a person of ordinary skill

13 would find the process for preparing copolymer-1, as that

14 process is described, is also described in the '550 patent, to

15 be well known?

16 A.  Yes.  Assuming that one follows the literature trail that

17 we have gone through.

18 Q.  Now, Nick, would you please put back on the board PTX-26.

19      And I now want to focus your attention and the Court's

20 attention on the nature of the product that are produced by the

21 process disclosed in the '550 patent.  And let me direct you to

22 lines 57 through 68 of the '550 patent.  And would you read the

23 sentence beginning -- let me read it and make this quicker.

24 I'm going to refer you to that portion of this paragraph that

25 reads as follows from line 61.  "The molecular weight of the

1  copolymer being in excess of 10,000 and preferably above about

2  18,000, and the copolymer being characterized by a net positive

3  electrical charge and by a content of a lesser quantity of a

4  negative electrical charge."

5          What does this paragraph, this sentence tell the

6  person of ordinary skill in the art about the nature of the

7  products that are produced by this process?

8  A.   Certainly, there's a poly dispersity that's disclosed, in

9  other words, an excess of 10,000 would at one point, and

10 preferably above about 18,000 and at another point, this would

11 support the whole idea of poly dispersity in terms of

12 expectations on the part of a person of ordinary skill.  And

13 the latter part there indicates that there is a wealth of

14 positive charged side chains and lesser wealth of negative

15 negatively charged side chains.

16 Q.   And does the '550 patent direct that person of ordinary

17 skill in the art to a preferred range?

18 A.   It says above 18,000 daltons.

19 Q.   Are there other ranges or molecular weights disclosed in

20 the four corners of the '550 patent?

21 A.   Yes, there are other numbers that are mentioned either in

22 the specifications or the claims.

23 Q.   Let's see if we can spot some of them.

24 A.   Okay.

25 Q.   Nick, would you turn to column three, line 28, please?

1   A.  Could I just -- should I wait for that to be highlighted

2   or --

3   Q.  Well, it probably will make it go faster because I think

4   we've talked about this before.

5   A.  At 15,000 and 25,000 molecular weights are also indicated,

6   that is a claim.

7   Q.  And how about column two, line 22?  Let's highlight that

8   and explain it to the Court?

9   A.  Again, this is the beginning specifications.  It talks

10  about a molecular weight of about 20,000 to 25,000.  So there

11  are a host of different molecular weights that are referred to

12  in the patent '550.

13  Q.  Now, what do these disclosures in combination say about the

14  molecular weight of the copolymer-1 product as taught by the

15  '550 patent?

16  A.  That there is batch-to-batch variation in terms of the

17  molecular weight distribution, that is different size range of

18  the products, namely, copolymer-1.

19  Q.  And with respect to molecular weight, does it teach the

20  weight ranges that one could expect to get by following this

21  process?

22  A.  Well, the lower range that it mentioned is in excess of

23  10,000, and the upper range it mentions is 25,000.  As I just

24  pointed out, there are several numbers in between as well.

25  Q.  All right.  Now, I'm asking you here to apply your

19eztevs2                    Zeiger - direct

1    knowledge and the experience of a person of ordinary skill in

2    the art to the disclosures that are therein made as you now

3    described.

4              Is it fair to say that the '550 patent teaches a range

5    of molecular weights from in excess of 10,000 to 25,000?

6    A.  I think that's fair.

7    Q.  And I'm going to take you outside now of your hypothetical

8    to the '808 patent; for example, one of the patents in suit.

9    How do these ranges, those ranges that are expressly disclosed

10   in the '550 patent, compare to the ranges disclosed in the '808

11   patent?

12   A.  The ranges in the '808 and patent and patents in suit are

13   lower than 10,000.

14   Q.  All right, so let's take that as a framework, and as you

15   read the '550, take you out of the '808 back to the

16   hypothetical, where you're not considering disclosures of the

17   '808, does the '550 patent teach the production of copolymer-1

18   in the range of 15 to 20?

19   A.  Yes, it does.

20   Q.  And does it teach the production of copolymer-1 in the

21   range of ten to 15?

22   A.  Yes.

23   Q.  And as we established, it teaches a preferred range,

24   correct?

25   A.  That's what it says, yes.

19eztevs2              Zeiger - direct

1   Q.  And from your reading of the patent, that preferred range

2   is what?

3   A.  About or above 18,000.

4   Q.  Now, let's assume that the person of ordinary skill in the

5   art, realizing the range variations that are disclosed in the

6   '550 patent, wants to produce within the preferred range, the

7   copolymer-1 product.  Do you have that assumption?

8   A.  Yes.

9   Q.  How does that person of ordinary skill in the art approach

10  the disclosures of the process in the '550 patent to produce to

11  the preferred range, what are the factors -- what does he look

12  at?

13  A.  Well, the polymerization, as I mentioned, is going to give

14  some batch-to-batch variability in terms of the molecular

15  weight.  The fact that the preferred range is above 18,000

16  would indicate that that's what the patentees are shooting for,

17  but, nonetheless, they fully acknowledge that they may get

18  something as low as in excess of 10,000.

19  Q.  And so if your goal was to produce within the preferred

20  range, what are the experimental condition variabilities, if

21  any, that you would look to as that person of ordinary skill in

22  the ordinary?

23  A.  One would try to eliminate any kinds of cleavage or of

24  termination of the polymerization.

25  Q.  And is there a particular step of the patent that you would

19eztevs2                    Zeiger - direct

1    look to in terms of elimination of cleavage, as you've just

2    stated?

3    A.  Well, elimination of cleavage, as I mentioned, there's some

4    aspects in terms of the synthesis of the copolymer.  But, in

5    addition, one might suspect that acid can cause peptide bond

6    cleavage as well.

7              And the reason I believe Dr. Kent mentioned that amino

8    acid yesterday, that amino acid analysis was done under

9    conditions of strong acid.  And this is not only my opinion,

10   but we'll see in the literature, perhaps later on this morning,

11   that this opinion is shared by others in the field.

12   Q.  All right.  Now, you mentioned a step in the patent and you

13   mentioned acid.  In this disclosure, the '550 patent, what step

14   are you referring to in giving the answer you just gave?

15   A.  Well, the acetic step is HBr and glacial acetic acid in

16   terms of the potential for peptide bond cleavage.

17   Q.  And why, in trying to ascertain how to, if you will, work

18   the experiment to come to the preferred range, why would the

19   person of ordinary skill in the art look to that step?

20   A.  Well, as I mentioned, that's a step which involves strong

21   acid, and the classical conditions utilized strong acid, in

22   fact a weaker acid, if you will, with HBr would, for the most

23   part, HCL, HBr certainly could do it.

24   Q.  Now, explain the chemical mechanism that that person of

25   ordinary skill in the art would be looking at as he looked at

1    this HBr step, what is it that he's looking for here, Doctor?

2    A.  He would be looking for evidence of cleavage of the

3    peptides to a lower molecular weight range.

4    Q.  All right.  And here you have to tell the Court what you

5    mean by cleavage of the peptide bond.  What are you referring

6    to and why are you pointing to this as part of the '550 process

7    as disclosed?

8    A.  If I can answer the latter part first.  The latter

9    discloses a broad range of expected sizes and distributions of

10   peptides.

11           As for the first part of it, if I'm understanding

12   correctly, I can illustrate it by, for example, thinking of a

13   single poly -- a single polypeptide molecule of 20,000.  If it

14   should happen to have been broken exactly inbetween, it would

15   result in two molecules of 10,000 molecular weight.  In other

16   words, cleavage breaks materials into at least two fragments

17   and lowers the size of the molecular weight of the products.

18   Q.  Now, have you prepared and worked on a video to try to

19   illustrate the chemistry and the reaction that you have

20   described in words?

21   A.  I have.

22   Q.  And, Nick, would you go to that video, please.  And,

23   Doctor, here rather than me interrupting you on occasion

24   erroneously, would you narrate this for the Court to maximize

25   the demonstration of the point you're trying to make and work

19eztevs2                    Zeiger - direct

1    with Nick in the process?

2    A.   Yes.  This is where, at least one place where the

3    demonstrative, the animation differs from that of Dr. Kent,

4    yes.  This is going to discuss the deprotection of peptide

5    cleavage by HBr.

6            Could you run the demonstrative?  So this is -- you'll

7    recognizes the fully protected copolymer-1.  And now we're

8    going to have HBr treatment acetic acid.  Again, we're going to

9    illustrate a small fraction of this.

10           And over here is the removal of the benzyl group, but

11   now occasionally what's going to happen, potentially, is acid

12   cleavage at the glutamic acid residues.  So this is going to

13   happen on occasion if, in fact, there is a cleavage of the

14   peptide chains.  And one can see this happening throughout the

15   solution, larger peptides breaking up into smaller peptides.

16   Q.   Now, how does this cleavage phenomenon that you've

17   described in this illustration affect this issue of molecular

18   weight variation as the person of ordinary skill in the art

19   would understand it?

20   A.   It would take a material, a relatively higher molecular

21   weight to a product of relatively lower molecular weight.

22   Q.   And why is that?

23   A.   As I mentioned, any time you break up a fragment or peptide

24   into fragments, the fragments are lower molecular weight in

25   fact add up to the original fragment size.

1    Q.  Now, is this word "cleavage" expressly discussed in the

2    '550 patent?

3    A.  No, it is not.

4    Q.  Is the term "peptide bond cleavage" expressly discussed in

5    the '550 patent?

6    A.  No, it is not.

7    Q.  And explain to the Court, if you would, how would a person

8    of ordinary skill in the art circa May 24th, 1994, with the

9    knowledge then available to that person, know that HBr cleavage

10   was responsible for this reduction in molecular weight?

11   A.  As I mentioned, he would, he would suspect this is a

12   possibility for some of the or all of the variation.  And he

13   would, as we say, he followed the paper trail, the paper trail

14   leading to the people publishing HBr deprotection, namely, Ben

15   Shine & Berger.

16   Q.  This is the same paper trail that we were already on,

17   correct?

18   A.  Well, this was reference 16 of the Teitelbaum paper

19   discussing the conditions for HBr cleavage of gamma

20   benzyl-esters.  Now, that was not done with peptides, that was

21   done only with amino acids.  And, consequently, one might

22   expect that a laboratory interested in HBr cleavage might go to

23   a more complex mixture.

24   Q.  All right.  And take the Court through what you are

25   positing is the thought process of that person of ordinary

1    skill in the art as he evaluates the molecular weight range

2    variation of the '550 and looks for an explanation of it?

3    A.   A person of ordinary skill coming into my laboratory would

4    be expected to go back to the areas, the laboratories that were

5    interested in the subject, and to be able to follow what they

6    have done subsequently with that reaction.

7    Q.   All right.  And earlier in your testimony following the

8    trail, you mentioned -- and we have put into evidence, the

9    Ben-Ishai and Berger publication.

10           State, if you will, how that publication leads --

11   where and how that publication leads to a person of ordinary

12   skill in the art to other art in the field?

13   A.   Well, Arieh Berger was the head of the laboratory at that

14   laboratory at the Weizmann Institute, and I would look to

15   subsequent publications from that, that laboratory first.  It

16   doesn't mean it has to be there, but, again, the interest was

17   there.  And that would be the way I would expect a person of

18   ordinary skill to pursue the question.

19   Q.   And following that lead, so to speak, Doctor, is there a

20   reference that you want to now point out to the Court and

21   describe to the Court?

22   A.   Yes, there is, from the same laboratory.

23   Q.   All right.  And, Nick, would you pull up DTX-1934.

24           Doctor, first would you state what is the title of

25   this article?

1    A.  Multi chain poly amino acids containing glutamic acid,

2    aspartic acid and proline.

3    Q.  And the authors?

4    A.  Arieh Yaron and Arieh Berger.

5    Q.  And the department that they're working with?

6    A.  The Department of Biophysics where I spent two years on my

7    sabbatical.

8    Q.  And the date of the article?

9    A.  Received January 29th, 1965.

10   Q.  And where is it published?

11   A.  Biochemica at Biophysica Acda.

12   Q.  Is that a reputable source to scientists in the field?

13   A.  Yes, it is.

14   Q.  And is this an article that you relied on in forming the

15   opinions that you have arrived in this case?

16   A.  Yes, it is.

17           MR. SKILTON:  Your Honor, I move into evidence

18   DTX-1934?

19           MR. JAMES:  No objection.

20           THE COURT:  Admitted.

21           (Defendant's Exhibit 1934 received in evidence)

22   Q.  This is the same Berger as the Berger whose work was

23   referenced in the Teitelbaum article?

24   A.  Yes, it is.

25   Q.  Now, where in this article -- let's call this the Yaron and

1    Berger article -- is there any discussion of peptide cleavage

2    by HBr?

3            And to facilitate and speed up this, Nick, would you

4    turn to pages 317 through 318?

5            And, Doctor, I'm going to point your attention to

6    particular portion of this paragraph that have been

7    highlighted, and I want you to relate those portions to the

8    issue of what these sentences disclosed to that person of

9    ordinary skill in the art with reference to cleavage of the

10   peptide bond?

11   A.   This paper is concerned with peptides, and it's a later

12   paper, 13 years after the first one.  And as the sentences

13   read, as indicated by previous investigations, reference 21,

14   debenzylation by means of hydrogen bromide and in glacial

15   acetic acid may lead to some degradation of peptide bonds.

16   Conditions of debenzylation were, therefore, sought under which

17   this degradation is minimal.

18           In the case of multi chain polymers, such as multi

19   chain poly glutamic acid where side chains of poly glutamic

20   acid are attached to a poly lysine back bone, degradation of

21   the side chains can easily be detected by chemical analysis.

22   Q.   All right.  Now, let's focus on what's been stated.  First

23   of all, what is debenzylation?

24   A.   The removal of benzyl groups.

25   Q.   And is this a process also referred to as deprotecting or

1  deblocking by that person of ordinary skill in the art?

2  A.  Yes, it is.

3  Q.  And what would, what would the person of ordinary skill in

4  the art be able to take out of this paragraph?

5  A.  They, the authors Yaron and Berger, are clearly convinced

6  that there is some degradation of peptide bonds that could

7  occur by HBr and glacial acetic acid treatment, and they refer

8  to an earlier publication as their basis.

9  Q.  And what is the significance of this conclusion and/or

10  disclosure of Yaron and Berger as it relates to the process

11  described in the '550 patent for preparing copolymer-1?

12  A.  Yes.  If you want to avoid peptide cleavage, you better

13  find conditions in which peptide cleavage does not occur.

14  Q.  And so is it fair to say that in this particular

15  experiment, Yaron and Berger were seeking conditions to prevent

16  cleavage?

17  A.  Yes.  They say so directly.

18  Q.  And how does, if you will, that particular goal in that

19  experiment convert to information or knowledge that would be

20  relevant to that person of ordinary skill in the art working

21  the '550 experiment?

22  A.  Well, any person of ordinary skill that knows chemistry

23  knows that two of the main parameters of a chemical reaction

24  are temperature and time.

25  Q.  Now, how did Yaron and Berger, the article we're looking

1   at, go about determining the conditions in this case to prevent

2   cleavage from occurring?

3   A.  Well, there's a paragraph that's coming up, which discusses

4   this.

5   Q.  And do we have that, page 318?

6   A.  Yes, it's on the board.

7   Q.  It's the paragraph that starts, optimal conditions.

8           And, Nick, would you highlight that through the

9   sentence that begins the absence.

10          Now, Doctor, I don't think the Court needs to know the

11  particular chemistry of this portion, but would you explain how

12  this is relevant to the question of peptide bond cleavage and

13  the person of ordinary skill in the art worrying about the

14  ranges that are produced by the '550 process?

15  A.  Yes.  What they mean by optimal conditions is that they

16  mean conditions in which they get 100 percent deprotection, and

17  at the same time get zero peptide bond cleavage.  That's what

18  they're referring to there.

19          And at the end of the second sentence, it says that

20  they achieved this or at least they say that for glutamic acid

21  glatiramer derivatives, three days of treatment at 2 degrees

22  Centigrade was necessary.  And under these conditions, no

23  degradation of the side chains could be detected by

24  quantitative amino acid analysis after prolonged dialysis.

25          Now let me explain here about side chains.  The side

1   chains are peptides themselves, and therefore, we're not

2   talking about debenzylation.  We're talking about peptide bond

3   cleavage.  Is that clear?

4   Q.  Well, it is to you, but let me ask the question.  What

5   variables here are being adjusted to control in this case the

6   amount of cleavage, what are they looking in particular?

7   A.  They're looking at time and temperature in order to

8   differentiate benzyl-ester deprotection from peptide bond

9   cleavage.

10  Q.  And here I would like you to be a little bit specific for

11  the Court.  Where is the time variation noted in this paragraph

12  and where is the temperature?

13  A.  In the second sentence it talks about the glutamyl residues

14  in these so-called side, and that's what multi chain polymer

15  is, I don't want to get into this now if I don't have to,

16  but --

17  Q.  Don't.  Move on.

18  A.  But under these conditions, they were able to get

19  100 percent deprotection of benzyl groups and avoid peptide

20  bond cleavage by hydrogen bromide.

21  Q.  Now, are these experimental variables to control cleavage

22  amount, time and temperature, are these variables that you

23  would characterize as being variables that would be known in

24  terms of their manipulation to the person of ordinary skill in

25  the art?

1    A.  Certainly as I've defined it, yes.

2    Q.  And they are parameters that can be adjusted, is that a

3    fair characterization?

4    A.  Yes.  And I would expect somebody of ordinary skill in

5    terms of peptide chemistry, to realize this; that just as one

6    can lower the temperature to avoid something, one can utilize

7    this as a tool for his chemical tool box.  It's one of the

8    arrows in his arsenal.

9    Q.  Would you go so far as to call them routine parameters?

10   A.  The parameters are routine.

11   Q.  And they would be in what you just characterized as that

12   person in the lab's tool box?

13   A.  Well, the tool box should be -- the temperature and time

14   can be varied.  In one case you can avoid something, and in the

15   other case you can accelerate it.

16   Q.  Now, what does the disclosure, as you're describing and

17   have characterized in this publication, Yaron and Berger

18   publication, indicate as to what would occur under the

19   conditions cited in Teitelbaum's 1971 for the HBr step?

20   A.  Well, it indicates that Yaron and Berger fully would have

21   expected such cleavage to occur.  And that's based on a

22   citation that was shown earlier.

23   Q.  All right.  Now, take it, if you could, to, I'm going to

24   say that step.  Was there a debenzylation and peptide cleavage

25   occurring under the conditions stated in the '550 patent?

1   A.  According to the statement in Yaron and Berger, I would

2   come to the conclusion as a person of ordinary skill that it

3   was most likely to have occurred.

4   Q.  And using that disclosure in combination to the steps

5   disclosed in the patent and the weight ranges given, would that

6   person of ordinary skill in the art, knowing the HBr cleavage

7   potential, be given information that would permit him or her in

8   that lab to control the production of copolymer-1 within the

9   various ranges that you've described?

10  A.  Mr. Skilton, I would expect him first to do a more thorough

11  investigation of the literature to be -- before coming to that

12  conclusion, but that would certainly be the beginning of the

13  start of the process of coming to a scientifically acceptable

14  conclusion that HBr cleavage under these conditions is likely.

15  Q.  All right.  Now, you indicated you expect that person to go

16  further.  Does the Yaron and Berger article give that person a

17  clue as to where to go?

18  A.  Yes.

19  Q.  And, Nick, would you turn to page 13 -- 331, sorry, 331.

20  And particularly refer you to footnote 21.

21          Doctor, what are we seeing here?

22  A.  This is a reference to a paper by Idleson and Blout in the

23  Journal of American Chemical Society, 1958.

24  Q.  And is that article one that you have also looked at in

25  conjunction with the work that you've done in this case?

1   A.  Yes it is.

2   Q.  And, is that article in fact what DTX-1855 is?

3            And, Nick, would you pull it up?

4   A.  That's certainly the journal, and that's the year, and

5   that's the article.

6   Q.  All right.  Well let's go back and mark it and get it in

7   the record first.  What is the journal that this is published

8   in?

9   A.  The Journal of the American Chemical Society.

10  Q.  And the date of publication?

11  A.  1958.

12  Q.  And is this a reputable society?

13  A.  Yes, it is.  It's probably the --

14  Q.  Is it --

15  A.  -- premier journal for chemists.

16  Q.  All right.  And does the article that was referenced in the

17  earlier publication appear within this journal?

18  A.  Yes.

19  Q.  And it is the Idleson and Blout.  And would you please read

20  in the title of the article that you're going to be commenting

21  on?

22  A.  High molecular weight, poly alpha L glutamic acid.  That

23  will be abbreviated in the article as PGA, so if we can just

24  keep that in mind -- preparation and optical rotation changes.

25  Q.  And the authors?

1    A.   Idleson and Blout?

2    Q.   And the date of publication?

3    A.   January 31st, 1958.

4    Q.   Is this an article that you have relied on in forming your

5    opinions in the case?

6    A.   Yes, it is.

7            MR. SKILTON:  Move it into evidence, your Honor.

8            MR. JAMES:  No objection.

9            THE COURT:  Admitted.

10           (Defendant's Exhibit 1855 received in evidence)

11   Q.   All right, now take the Court through this article in its

12   relevant disclosures, Doctor.

13           Would you, Nick, turn to page 4632.  And I'm

14   interested in the paragraph that begins, it was originally

15   thought.  Can you find that?

16   A.   It's at the lower, begins at the --

17   Q.   It's a split.

18   A.   Yes.

19   Q.   They are clever, aren't they.

20           Okay.  I've referred you here to a particular

21   paragraph.  Doctor, would you point to those portions of that

22   paragraph that have relevance to what you're going to explain

23   next?

24   A.   If you recall, I mentioned that strong acid was responsible

25   or was a classical means of hydrolyzing peptides to the amino

1    acids, and that was probably the basis for the statement.

2    Certainly the statement is very clear cut.

3              It was originally thought that in the presence of HBr,

4    traces of water would cause cleavage of peptide bonds.

5    Accordingly, considerable effort was expended to obtain

6    completely and hydrous conditions.  However, subsequent

7    experiments showed that small amounts of water did not decrease

8    the molecular weight of the final products.

9              But the key here is the next paragraph.  And again

10   Idelson and Blout's motivation is to avoid peptide cleavage in

11   their reaction.  And that's why they say that hydrogen bromide

12   in glacial acetic acid has not been found to be a useful

13   reagent solvent there for the preparation of LPGA, that is poly

14   el-glutamic acid -- because, and I want to emphasize the part

15   B, lower molecular weight LPBG's is a poly benzo glutamate --

16   show extensive peptide bond cleavage.

17   Q.  What does this paragraph or plural, paragraphs, teach the

18   person of ordinary skill in the art with respect to the use of

19   HBr in glacial acetic acid?

20   A.  HBr glacial acetic acid certainly has the capability of

21   causing peptide bond cleavage when benzyl glutamic acids are

22   treated with it.

23   Q.  Now, how does this article or these disclosures inform or

24   teach the person following the '550 patent as to conditions for

25   deprotection of glutamic acid?

A.  Well, certainly the idea of using temperature and time has

already been introduced by Yaron and Berger.  The conditions

are discussed in the methods.

        But the statement I think is pretty clear, that lower

molecular weight LPGs shows extensive peptide bond cleavage.

There's a whole table there, which I'm not going to go into.

Q.  Okay.  Well, without being too detailed, let me see if I

can get to the heart of it.

        Does this show cleavage of glutamic acids under

various time and temperature variations?

A.  In a number of different solvents and conditions were used

and the ability to, to avoid or lower the amount of cleavage

was determined.

Q.  And does it give information as to whether glutamic acids

will be cleaved under the various scenarios?

A.  Yes.

Q.  And how so?

A.  Well, even in other solvents, there is some peptide

cleavage.  It's just that glacial acetic acid is the, shall we

say, optimal solvent for cleavage or terrible solvent, if you

want to avoid it.

Q.  Now in our testimony, your earlier testimony, you indicated

the effect of deprotection that occurred as a result of the HBr

step disclosed in the '550 patent.  Does this art that you've

reviewed teach the person of ordinary skill in the art about

1    anything in addition to deprotection that would occur in that

2    step using HBr?

3    A.  Peptide cleavage, that there would be, as he says,

4    extensive peptide bond cleavage, one might be able to lower it

5    or eliminate by changing conditions of time and temperature.

6    Q.  And would you expect that person of ordinary skill in the

7    art performing the experiment to make a complex copolymer, in

8    this case copolymer-1, to have gotten to this art in the

9    natural course as a result of attempting to adjust the

10   molecular weight ranges disclosed in that patent, the '550?

11   A.  Yes, I would.

12   Q.  Now, in addition to the references you've already noted, is

13   there any other reference that you think the Court should see

14   that that person of ordinary skill in the art would have had

15   available to him?

16   A.  Yes.  If the person of ordinary skill would have continued

17   minding the literature, he would've found another paper in a

18   very reputable journal by Nylund and Miller, also referring to

19   it Idleson and Blout, that also discusses peptide bond cleavage

20   under these conditions.

21   Q.  Nick, would you pull up please DTX-1784.

22          And, Doctor, what are we looking at here?

23   A.  This is another article from the Journal of American

24   Chemical Society published in 1965.  It's States entitled

25   synthesis and potentiometric titration of random copolymers of

1   L. lysine and L. glutamic acid.

2   Q.   And the authors?

3   A.   Robert Nylund and Wilmer Miller.

4   Q.   Authors known to you?

5   A.   No.

6   Q.   Do you know where they were at that time?

7   A.   The University of Iowa Department of Chemistry.

8   Q.   Is this a reputable journal?

9   A.   I mentioned that it's the premier journal in the field,

10  yes.

11  Q.   And is this a document that, or article that you relied on

12  in forming the opinions that you have in this case?

13  A.   Yes.

14          MR. SKILTON:   Your Honor, I move into evidence

15  DTX-1784.

16          MR. JAMES:   No objection.

17          THE COURT:   Admitted.

18          (Defendant's Exhibit 1784 received in evidence)

19  Q.   What do Nylund and Miller say about the phenomenon of

20  peptide bond cleavage by HBr?

21          And, Nick, would you turn to page 3541?  And, Doctor,

22  help us here to find it is?

23  A.   Where it says, undoubtedly -- well, first of all, we can

24  say the degree of polymerization, that is the size, was always

25  lowered during the debenzylation.

1    Q.  And what significance does that sentence have?

2    A.  The next sentence after that; undoubtedly, peptide bond

3    cleavage by HBr occurred, thus broadening the molecular weight

4    distribution -- which is what I said, essentially, by breaking

5    peptides into smaller fragments.

6    Q.  All right.  And again relate that statement or disclosure

7    in that reference to the chemistry that you've been reviewing

8    for the Court as disclosed in the '550 patent in 1971

9    Teitelbaum article?

10   A.  Well, again, the degree of polymerization here refers to

11   the size molecular weight, and the peptide bond cleavage would

12   then lower this molecular weight, and to some extent broaden

13   the molecular weight distribution by virtue of producing more

14   lower molecular weight materials.

15   Q.  Dr. Zeiger, from the perspective of a person of ordinary

16   skill in the art, would that person have understood HBr

17   cleavage to have occurred in the HBr treatment under the

18   conditions described in the '550 patent?

19   A.  Yes.

20   Q.  Based on what you just described as the teachings of

21   cleavage by HBr, would a person of ordinary skill understand

22   that the '550 patent permits the production of copolymer-1

23   composition in the molecular weight of five to ten kilodaltons?

24        MR. JAMES:  Objection, your Honor.  I think that

25   yesterday we have we had some discussion about difference

1    between size exclusion chromatography and other kinds of

2    molecular weight measurements.  I think that question is

3    unclear as to what kind of molecular weight he's referring to.

4                MR. SKILTON:  Your Honor, I could ask a question, if

5    that's permissible.

6                THE COURT:  Sure, go ahead.

7    Q.  What kind of weight are you herein going to respond to my

8    question using, what's your calculation?

9    A.  Yes.  Are we talking about molecular weights that I used in

10   my publications and molecular weight profiles that I've

11   published?

12   Q.  Why don't we start with that as a foundation, and then I'll

13   be more clear in terms of the reference point of the question.

14   So with the Court's permission, would you add that information

15   to the record?

16                THE COURT:  Go ahead.

17   A.  Yes.  I've published the gel chromatography profiles of

18   some of the sequential polypeptides that I have made, and I

19   measure molecular weight by ultracentrifugation.  I've never

20   used size exclusion chromatography.

21   Q.  All right.  And when I asked you then --

22   A.  For that purpose, I've used size exclusion chromatography

23   but gel chromatography in terms of.

24   Q.  Okay.  So when I ask you the question in a range, explain

25   to the Court what your understanding of the molecular weight is

1  of that range?

2  A.   Well I've measured molecular weights by the two different

3  ultracentrifugation methods, as well as by viscosity.  And

4  those are methods that are direct methods for measuring

5  molecular weight, and those methods I'm -- I have been

6  comfortable using in publishing.

7  Q.   So when I am using this range, you're using measurements by

8  either of those methods to as a reference point?

9  A.   Mainly ultracentrifugation.

10  Q.   Okay.  With that as a qualifier, let me ask you the

11  question again.

12          Based on what you just described as the teachings of

13  cleavage by HBr, would a person of ordinary skill understand

14  that the '550 patent permits the production of a copolymer-1

15  composition in the molecular weight of five to ten kilodaltons?

16  A.   It is within the purview of a person of ordinary skill in

17  the art to use time and temperature with this HBr and glacial

18  acetic acid deprotection to obtain by manipulation a product in

19  that range, yes.

20  Q.   And what time and temperature variations would a person of

21  ordinary skill in the art look to use?

22  A.   Well, he would, he would vary them, and eventually come up

23  with an optimal set of conditions for determining the molecular

24  weight in the predetermined region that he wanted to go to.

25  Q.   And I think we covered earlier, I'm not going to have you

1  do it again, but there are time and temperature variables

2  disclosed in the 1971 Teitelbaum article, are there not?

3  A.  There are references to -- that are given.

4  Q.  That's the question I should have asked, be more specific.

5  Are there references given to time and temperature?

6  A.  The initial one is, is to Ben-Ishai and Berger, who used I

7  believe 12 hours to overnight, and room temperature.

8  Q.  Okay.  Then would a person of ordinary skill in the art

9  know that he or she could change the molecular weight ranges by

10  optimizing the time and temperature variables in the process?

11  A.  Yes.

12  Q.  And why is that?

13  A.  This is, as I mentioned, something that is taught in

14  general chemistry, as well as peptide chemistry.

15  Q.  Now, returning you, if you will, to the '550 patent text.

16  Therein I think we'll find, if we look, that the copolymer

17  therein reported was reported to be effective in the EAE model.

18  First of all, do you understand what an EAE model is, Doctor?

19  A.  I understand that it's a model from multiple sclerosis in

20  laboratory animals.

21  Q.  And have you worked with this model in your own work?

22  A.  No I've not.

23  Q.  Now, the model, did you have an understanding of it?

24  A.  I believe I do, yes.

25  Q.  And give the Court what the basis is of your understanding

1   of the EAE model is?

2   A.   This is a situation in which demyelination of nerve sheath

3   fibers occurs and, presumably, some sort of an immune

4   consequence follows, which results in hind foot paralysis.

5   Q.   And is this model that's used in animals?

6   A.   The EAE model is used in animals.

7   Q.   Now, would a person of ordinary skill in the art consider

8   any additional steps in the process for preparing copolymer-1,

9   prior to using the copolymer-1 in animal experiments?

10  A.   Would you repeat that, please?

11  Q.   Sure.  Would a person of ordinary skill in the art consider

12  any additional steps in the process for preparing copolymer-1

13  prior to using the copolymer-1 in animal experiments?

14  A.   Yes, he would.

15  Q.   And what step would he consider?

16  A.   Some sort of purification or fractionation procedure to try

17  to get rid of perhaps materials that are not peptide, for

18  example.

19  Q.   Is this purification, so to speak, a routine step?

20  A.   Yes, it is.  It's the bread and butter of a biochemist.

21  Q.   And with respect to this particular purification, let me

22  ask you about exhibit DTX-1783.  What are we looking at here,

23  Doctor?

24  A.   This is the Katchulski and Sela paper that we cited -- we

25  talked about earlier.

1        MR. SKILTON:  And it is in evidence, I believe, your

2    Honor.

3    Q.  Let me turn here particularly to page 362, please, Nick.

4    And highlight, if you would, the sentence beginning before, and

5    through ensured.  Thank you.

6        Doctor, would you read this sentence into the record,

7    please?

8    A.  Yes.  In this review article on poly-amino acid synthesis,

9    it says, before making use of the purified poly-amino acids in

10   physicochemical or biological studies, the absence of low

11   molecular weight impurities mentioned should be ensured.

12   Q.  And what does this article in this sentence teach that

13   person of ordinary skill in the art?

14   A.  That one should try to purify or fractionate the

15   polypeptide product before doing various physical chemical or

16   biological studies.

17   Q.  Now, I want to shift topics on you a little bit.  I want to

18   go to the question of ranges and first start the conversation

19   by asking you a general question.

20       As of 1994, what would a person of ordinary skill in

21   the art have expected about the distribution of sizes of the

22   molecules in copolymer-1 batches prepared by the '550 patent

23   process?

24   A.  You would have expected an extremely polydisperse system.

25   Q.  And when you say a poly dispersed system, give that a

1   little bit more content for the Court; what are you saying?

2   A.  A wide range of size distributions of molecules in the

3   product.

4   Q.  And give us a little bit more of the, if you will, the

5   physical chemistry of this; why is this -- what are we looking

6   at, what are you describing?

7   A.  Well, we're describing the results of a polymerization

8   reaction.  And the polymerization reaction itself certainly

9   doesn't result in a single entity, and the degree to which it's

10  not a single entity.  Is a measure of the, or is a function of

11  the dispersity.  Polydisperse system just means that there is a

12  tremendous variety in terms of the different sizes that are

13  found.

14  Q.  All right.  And we've heard use of the word gamish by you,

15  and descriptions of millions of billions and the like.  Give

16  the Court a little sense of copolymer-1 in terms of its

17  polydispersity?

18  A.  Well, I would expect from my own studies that one would

19  expect a distribution over many kilodaltons in the product.

20  Q.  All right.  And I'll ask some more general questions, and

21  then we'll get into some demonstratives.  If one of ordinary

22  skill in the art were to prepare two batches of copolymer-1

23  according to the '550 patent, what would that person have

24  expected to see in terms of molecular weight distributions if

25  the molecular weights were near each other?

1    A.  One would have expected extensive overlap in these two

2    batches in terms of the percent of size of molecules that are

3    in common.

4    Q.  And you'll have to define now another term for us, in the

5    context of this mixture.  What is overlap; what are you

6    connoting?

7    A.  Well, I think I just alluded to that.  We're talking here

8    about a percent of a given size of molecule in the two batches

9    in common.

10   Q.  Again, continuing at the more general plain that we're on,

11   what would the person of ordinary skill have expected in 1994

12   concerning the chemical and biological properties of two

13   batches of copolymer-1 that had substantial overlap in their

14   molecular weight profiles?

15            MR. JAMES:  Objection, your Honor.  I think we're

16   talking about size exclusion chromatography without saying the

17   words size exclusion chromatography.  He's talking about

18   overlap and distributions, and I don't think he's laid any

19   foundation for the fact that the techniques he was using and

20   that he is testifying about today actually show a distribution

21   from which you can determine whether there's overlap.

22            THE COURT:  Do you want to explain that?

23   A.  Yes.  I did use size exclusion chromatography in my work

24   and looked at molecular weights.

25            And in that respect whereas I did not use the size

1  exclusion for the purpose of utilizing standards, calibration

2  standards, I certainly used other methodologies that were

3  available.

4  Q.  And as you approach these questions, as in the context of a

5  person of ordinary skill in the art, do you believe you have

6  that level of understanding of the various technologies

7  involved in order to give the Court a helpful answer?

8  A.  I believe so.

9       MR. SKILTON:  Your Honor, I would approach this as a

10  person of ordinary skill in the art and lay further foundation

11  as requested by the Court.

12       MR. JAMES:  Your Honor, if I may, could I ask a few

13  questions of the witness on voir dire on the point of size

14  exclusion chromatography experience?

15       THE COURT:  I think it would be better left for cross,

16  honestly.

17       MR. JAMES:  Thank you.

18       THE COURT:  I understand your point, but why don't we

19  just wait and do cross.

20       MR. JAMES:  Thank you, your Honor.

21       THE COURT:  All right, go ahead.

22       MR. SKILTON:  Thank you, your Honor.

23  Q.  Let me repeat the question.  By the way, did you teach gel

24  filtration chromatography in your work at Jefferson?

25  A.  Yes.  I taught purification methods to medical students,

1   Ph.D. and master students.

2   Q.  For how many years?

3   A.  35.

4   Q.  All right, let's return to the question.

5        What would the person of ordinary skill have expected

6   in 1994 concerning the chemical and biological properties of

7   two batches of copolymer-1 that had substantial overlap in

8   their molecular weight profiles?

9        MR. JAMES:  Objection, your Honor.  I don't think this

10  witness has been qualified to give testimony on expectations

11  with respect to biological properties.

12       MR. SKILTON:  Your Honor, I think he was qualified in

13  that word I stumbled over, immuno chemistry, and I'd be happy

14  to pursue that right now if the Court requests.

15       THE COURT:  I'm going to hear it, and I expect I'll

16  hear more on cross, okay.

17       MR. JAMES:  Thank you.

18       THE COURT:  I just think it'll be easier, and probably

19  more helpful to me.  Thank you.

20       MR. JAMES:  Thank you, your Honor.

21       THE COURT:  Okay, go ahead.

22       MR. SKILTON:  Should I read the question again, your

23  Honor, or have it in mind?

24       THE COURT:  Not unless Dr. Zeiger doesn't remember it.

25       THE WITNESS:  I do remember it I believe, your Honor.

1            THE COURT:  Okay, go ahead.

2    A.   I have used immunogens extensively.  In the course of my

3    work, I mentioned that I immunized rabbits, guinea pigs, mice.

4    And in particular, I have looked at such things as delayed

5    hypersensitivity, immediate hypersensitivity, these are

6    biological phenomena.  Obviously I've not looked at every

7    biological phenomenon in the, in the whole field, but

8    nonetheless, nonetheless, I have some experience with study of

9    biological properties and size.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  I probably should have read the question, your Honor, so I

2    will again.  And what would the person of ordinary skill have

3    expected in 1994 concerning the chemical and biological

4    properties of two batches of copolymer-1 that had substantial

5    overlap in their molecular weight profiles?

6    A.  I would have expected him to perhaps anticipate that with

7    an overwhelming or an extremely large percent of sizes in

8    common, that there would be similar biological properties.

9    This is clearly not a one-on-one absolute kind of level, but I

10   would have expected him to anticipate this.

11   Q.  Now, I'm going to switch you to the patents in suit, so

12   keep the reference now, I guess new to what you've been

13   answering.  Do the patents in suit discuss this overlap you

14   have been discussing concerning the molecular weight profiles

15   of two copolymer-1 batches?

16   A.  Yes, it does.

17   Q.  And, Nick, please turn to PTX 1 already in evidence.  And

18   the Court has it all identified.  So let's go to Figure 1 of

19   the '808 patent, please, Nick.

20            In reference to what we've been talking about, Doctor,

21   what is shown here?

22   A.  Well, what's shown here is not the way that one would get

23   the data from a size exclusion column, but one would, from a

24   size exclusion column one would get some sort of detection of

25   material, and the volume in which the material would come off

1    the column.  What we see here is molecular weight profiles of

2    three batches, according to the percent of total mass, which is

3    calculated versus molecular weight as determined by some sort

4    of calibration standard.

5    Q.  And on the question of overlap that you've been discussing,

6    is there anything shown that's of interest?

7    A.  Well, the parties in common would be under the curves that

8    you can see following the green line.

9    Q.  And reading this graph, can you in light of the columns, or

10   excuse me, the descriptions under molecular weight, what are

11   the molecular weights, and we're using it as the Court, what

12   are the peak molecular weights disclosed?

13   A.  Well, there are two 7.7 batches and one 12.0 batch.

14   Q.  All right, let's go, then, to Figure 2.  First of all, more

15   generally, what is the difference in what's being charted or

16   graphed here between Figure 1 and Figure 2?

17   A.  It's the same data from the same experiment, experiments,

18   but the profile is plotted somewhat differently.  Instead of

19   percent of mass we're talking here about percent molar

20   fraction.  Percent mass kind of has a bias towards weight.  The

21   molar fraction kind of biases the numbers, the values towards

22   the number of molecules in solution.

23   Q.  All right, and we've heard a lot about molar fraction, but

24   for purposes of this record, would you define molar fraction as

25   you understand it?

1    A.  Yes.  If you take all the moles of the materials, moles

2    meaning the number of molecules in solution and take a percent,

3    you know, of them.  In other words, the percent of the moles in

4    the solution are then plotted against them like the weights.

5    Q.  Again, relate this chart or graph to the question of

6    overlap.  What do we see here?

7    A.  Again, following the green laser and you'll see that there

8    is a considerable amount of overlap that's seen in this figure.

9    Q.  Now, you've prepared a demonstrative to illustrate this?

10   A.  Yes, I have.

11   Q.  Nick, would you turn to the slide I think it's PTX 1,

12   Figure 2 slide?  Thank you.  What is this, what are we looking

13   at here?

14   A.  So this is merely the overlap portion of the two profiles

15   that were seen in the last Figure 2.  You have the 7.7 batches

16   and then the 12.0 kilodalton batch and the area in pink are

17   those areas that have similar percentage of sizes based on

18   molar fraction.

19   Q.  And it would be a little more specific as to what's shown

20   in the area of pink.  What's the nature, if you will, of the

21   mixture or the gamish that's illustrated by the pink color?

22   What are you suggesting here?

23   A.  So the moles of the sizes of the material are the same in

24   terms of size under the two curves that are present in pink.

25   Q.  Now, just looking at this disclosure from the '808 patent

1    Figure 2, when would a person of ordinary skill expect a batch

2    of copolymer-1 having a molecular weight of 12 to have similar

3    properties to a batch of 7.7?

4    A.   Again, this is something that I would expect because the

5    overwhelming number of molecules are in common.  I would expect

6    the molecules that are really there in common to kind of

7    determine the overall, at least anticipate that they would

8    determine the overall properties, biological properties in a

9    solution.

10   Q.  Again staying, if you will, with a constituency of what's

11   illustrated in pink, what is the nature of the distributions;

12   continuous?

13   A.   Yes.  The products of the polymerization as shown here are

14   continuous products in terms of size distribution.

15   Q.  And you said that you would expect within that pink area

16   those products to have similar properties.  Would you fill that

17   out a little bit?  What do you mean similar properties?

18   A.   Well, it obviously depends what kind of properties we're

19   talking about.  But again, there are a lot of molecules that

20   are in common.  One would expect that the molecules in common

21   would be the main determinant in terms of the biological

22   properties.

23   Q.  All right, now, have you in considering your evaluation of

24   similar properties, similar constituency, looked at any other

25   evidence in this case?  In addition to Figure 2.

1    A.   Yes, I have.

2    Q.   And in particular, have you looked at what has already been

3    admitted in evidence as the Alexander Gad report?

4    A.   I have.

5         MR. SKILTON:  Nick, would you pull up DTX 1704,

6    please?  Thank you.  Your Honor, we provided here a redacted

7    version that will be used.  We have the original, of course,

8    but for use in questioning.

9         THE COURT:  All right.

10   Q.   Let me point you to specific parts.  Again to refresh the

11   Court, this is a report by Alexander Gad from the analytical

12   R&D department, and it is entitled, "Establishing an Analytical

13   Link Between Early Clinical Trial Batches of Copolymer-1 and

14   Current Production Batches."  Do you have an understanding of

15   who Dr. Gad was in reference to this time and this report,

16   Doctor?

17   A.   Only insofar as it says on the front page.  I've never met

18   Dr. Gad.

19   Q.   Did you rely on this document or any information in it in

20   forming any of the opinions in this case?

21   A.   Yes, I did.

22   Q.   Let's turn to page 4345, and particularly the introduction.

23   Thank you.  Let me see if I can get there fast.  Nick, would

24   you highlight the sentence in the first paragraph that begins

25   "the indication claimed," and, Dr. Zeigler, would you state how

1  this information was used by you in coming to your analysis?

2  A.  There were three batches that were obtained from the BR 1

3  clinical trials that I believe Dr. Bornstein conducted, and

4  these batches were compared with a later batch that was

5  synthesized by Teva.

6  Q.  All right, and let me take you to another sentence here

7  that begins "this report."  Again, tell the Court how this

8  information was important to you in forming your opinions.

9  A.  Well, what Dr. Gad was interested in was comparing these

10  earlier preparations from Weizmann and possibly Bio Yeda with a

11  Teva batch later on in a variety of different ways, both

12  chemical and immunological and biological.

13  Q.  And Nick, take us to page 4346 under the methods section.

14  Thank you.  And at my request, will you highlight the first two

15  sentences all the way through "standard"?  All right, Doctor,

16  what information was here used by you?

17  A.  So there are three batches from the Weizmann Institute, and

18  then number 320, 340 and 400, and these were compared with a

19  Teva batch that was labeled 3494.  The Weizmann batches were

20  all prepared in the early '80s and the Teva batch in '94.

21  Q.  All right, now, Nick, take us to 4349, please?  And there

22  are two diagrams here, Doctor.  Did you rely on either one for

23  your work in this case?

24  A.  Yes.  These are molecular weight profiles of the four

25  batches that we just mentioned.

1    Q.  Look to Figure B, please.  Thank you, Nick.  What is

2    depicted in Figure B?

3    A.  Again, these are the four molecular weight profiles of the

4    batches under discussion.

5    Q.  And is there any information on overlapping here compared

6    from Figure B?

7    A.  Yes, there's considerable overlap.

8    Q.  Have you prepared slides here to demonstrate this concept

9    of overlap that you've been discussing?

10   A.  Yes, I have.

11   Q.  Nick, would you go to slide 12 for us, please?  All right,

12   first on slide 12, Doctor, what information have you added to

13   Figure B?

14   A.  Yes.  The three Weizmann batches, the 320 is 10.35

15   kilodaltons, the 340 batch was 13.45 kilodaltons and the 400 is

16   14.35 kilodaltons, and these are going to be compared to the

17   Teva batch 03494 which was 7.15 kilodaltons.

18   Q.  And anticipating a question or possibly a voir dire, what

19   was your assumption of molecular weight measurement in

20   kilodaltons in terms of how they were measured?

21   A.  Well, they measured both in terms of size exclusion

22   chromatography and ultracentrifugation.  In this particular

23   case, this was done by gel chromatography.

24   Q.  Let's go to slide 13, please.  And what information here

25   have you highlighted in this next slide?

1   A.  Yes, this is the degree of overlap by molar fraction in

2   terms of the three Weizmann batches compared to the Teva batch.

3   Q.  All right, now, in terms of the insert in the right hand

4   upper corner which shows those numbers, Doctor, what's the

5   source of that information?

6   A.  Dr. Gad himself.  This is a Teva calculated number.

7   Q.  Is it taken from the report that we're looking at?

8   A.  It is.

9   Q.  And the title of this slide is, "Teva Calculated the

10  Overlap of Polypeptides on a Molar Fraction Base as Between

11  Teva and BR Batches."  The answer you just gave explains that

12  title, is that correct?

13  A.  I hope so.

14  Q.  So do I.  Now, what is depicted here?  What are you showing

15  or what is being shown, better question, by that slide, on the

16  question of overlap?

17  A.  Specifically, that there is a tremendous amount of overlap

18  in these three Weizmann batches to the Teva batch, ranging from

19  about 75 percent to about 90 percent.

20  Q.  And with your highlighter or the laser pointer, why don't

21  we just show the Court the WIS 320 curve which has the

22  90 percent, 89.3 percent overlap.

23  A.  That would be the one that is closest to the Teva batch.

24  Q.  Okay, and again we established molecular weights for these

25  curves?

1    A.  That they were in the report.

2    Q.  Let's go to the next slide.  Slide 14, please.

3    A.  Right.

4    Q.  So what are we seeing here?

5    A.  What we're seeing here are two of the curves here, the 7.15

6    kilodalton Teva batch compared to the 14.35 kilodalton Weizmann

7    400 batch.  This is the one which if you take a look at the

8    pink overlap area, you get close to 75 percent.

9    Q.  And that's as, if you will, calculated by Dr. Gad himself,

10   correct?

11   A.  It is.

12   Q.  And what would a person of ordinary skill understand from

13   this amount or percent of overlap?

14   A.  Well, the two curves differ in peak height by about

15   twofold, about 7 kilodaltons, yet they're still 75 percent

16   overlap.  This really supports the whole idea of polydispersity

17   of these products.

18   Q.  How so?

19   A.  Well, as I mentioned, again, the peak molecular weights are

20   relatively far apart, that is, twofold, 7 kilodaltons apart,

21   and yet one still has three quarters of the molecules that are

22   in common.

23   Q.  Okay.  And then take us then to the next slide, 15, please?

24   And the title of that is, "Over 80 Percent Overlap of

25   Polypeptides on Molar Fraction Basis Between 7.15 and 13.45."

1   A.  Yes.  This is essentially --

2   Q.  Would you for a moment narrate the slide?

3   A.  I'm sorry.  This is essentially the same treatment as we

4   did in the slide earlier except instead of comparison to the

5   14.35, this is now comparison to the 13.45 batch, and you can

6   see that we've gone by shifting one kilodalton over, so a 6

7   kilodalton difference and now we're up over 80 percent in

8   common.

9           MR. SKILTON:  Excuse me, your Honor.

10  Q.  Would you turn to slide 16.

11  A.  And this is just doing the same thing for the third set.

12  This is the 10.35, the 7.15, and the two differ about three

13  kilodaltons and yet the amount of overlap is approaching

14  90 percent.

15  Q.  And what would a person of ordinary skill take from or

16  understand from this amount of overlap?

17  A.  Basically, that three kilodaltons isn't a whole heck of a

18  lot in terms of distinguishing two different batches.

19  Q.  All right, let's go back, if we could, Nick, to Exhibit

20  1704.  And I refer you, please, to page 4356.  And the sentence

21  that begins, "The similar MW profiles," and that sentence

22  through table 3.

23          Doctor, what's the significance of this sentence to

24  you in forming your opinions in this case?

25  A.  Well, the chromatographic profiles, namely, the, in

1    particular the molecular weight profiles of the three BR

2    batches were compared to the Teva batch, and all four batches

3    conform to the current specifications.  The rest of the

4    paragraph discusses some of the chemical and physical chemical

5    comparisons of the batches.

6    Q.  All right, and Nick, take us to page 4356, if you would,

7    and the paragraph that reads "the most relevant."  All right,

8    Doctor, again, tell us how this paragraph, then, fits into your

9    conclusions.

10   A.  Yes, this is Dr. Gad's conclusion that the most relevant

11   biological active tested, which is blocking of EAE in mice,

12   again revealed that all batches are similarly active.

13   Q.  It said highly active?

14   A.  I'm sorry, highly active.

15   Q.  Any other information you wish to point the Court to on

16   this?

17   A.  Yes, the fact that EAE is considered the best available

18   model for multiple sclerosis, so this finding shows that

19   batches used in the two well-controlled studies have similar

20   structural, conformational characteristics that are relevant to

21   their pharmacodynamic activity.

22   Q.  And is this statement consistent with your opinions as a

23   person of ordinary skill in the art in terms of what you would

24   expect?

25   A.  I think it supports what my expectations would have been.

1    Q.  Now, Doctor, in your review -- we're done with this

2    section, your Honor.

3          In your review of the prior art available to a person

4    of ordinary skill in the art, did you have occasion to run into

5    EP620, the 620 European patent application?

6    A.  I have read it, yes.

7    Q.  And Nick, would you please pull up DTX 1970?  And, your

8    Honor, this is not yet in evidence, so I'm going to do some

9    formal --

10          THE COURT:  Is there any objection?

11          MR. JAMES:  We have no objection, your Honor.

12          MR. SKILTON:  All right, your Honor, I'll go right to

13    it then.

14          (Defendant's Exhibit DTX 1970 received in evidence)

15    Q.  You have reviewed this document?

16    A.  Yes, I have.

17    Q.  And may I, for everybody's reference but particularly for

18    yours refer to it as EP 620?

19    A.  Yes.

20    Q.  And did you rely on this document in coming to your

21    opinions?

22    A.  Yes, I did.

23    Q.  Let's go to page 2 of DTX 1970 and beginning at line 50,

24    please, Nick, and the paragraph that says "the synthesis," if

25    you would, and highlight that.  Doctor, what is being described

1    in this paragraph in Exhibit 1970?

2    A.  Well, the idea here is to try to obtain a copolymer-1 like

3    material, not via chemical synthesis, but via molecular

4    biological means and methods.

5    Q.  And does the last sentence of that paragraph explain what

6    this experiment is all about?

7    A.  Well, the patent hopes to improve upon the previous

8    methodologies by incorporating each of the different

9    polypeptides produced into a separate vector that can be

10   isolated and immortalized.

11   Q.  For the record, the sentence reads:  "To generate a mixture

12   of cop-1 polypeptides analogous to the chemically synthesized

13   product, we produced cop-1 polypeptides from a pool of

14   recombinant bacterial colonies containing cop-1 gene sequences,

15   e.g. 1,000 colonies."

16            That's a mouthful.  Could you convert this into why

17   this was of interest to you, Dr. Zeigler?

18   A.  Well, I was trying to follow clearly what was the intention

19   of the patent, and the patent's intent was to be able to bring

20   the disease of multiple sclerosis to a single or a few

21   etiologies in terms of the polypeptides that are active.

22   Q.  And, Nick, would you take us to page 3, please, of DTX

23   1970?  And particularly, would you go to the paragraph I think

24   beginning on line 8, which begins "the subject invention."

25   And, Doctor, quickly, what is being disclosed that was

1    significant to you in this paragraph?

2    A.   Again, the idea here of the molecular biology is that one

3    would produce specific polynucleotides that would result in

4    polypeptides that I guess hopefully should you like

5    copolymer-1.

6    Q.   And does it say, "Advantageously, the procedures of the

7    subject invention can be used to produce polypeptides which may

8    be useful in preventing, arresting or controlling demyelinating

9    disorders such as multiple sclerosis"?

10   A.   That's the goal of the patent.

11   Q.   Incidentally, what is the date of this patent?

12   A.   Could we have the original?

13   Q.   If we could go back to the first page?  The date of the

14   application?  I misspoke.  Publication date appears to be

15   22.8.90.  Do I read that correctly?

16   A.   That's what it says, yes.

17   Q.   As you read that, using the European system, what's the

18   date?

19   A.   August 22, 1990.

20   Q.   Now go back, please, Nick, to that paragraph we were

21   looking on on page 3?  And, Doctor, read in the last sentence,

22   that which begins, "more specifically"?

23   A.   "More specifically, a preferred copolymer may consist of

24   alanine, lysine, glutamic acid and tyrosine and have a

25   molecular weight between about 5,000 and 50,000 daltons."

1  Q.  Tell us how that sentence has relevance to you as a person

2  of ordinary skill in the art in evaluating the work that you

3  were asked to do in this case?

4  A.  I would take away from this that the idea that Dr. Cook,

5  from reading and knowing some of the previous studies with

6  copolymer-1, thought that an active; biologically, medically

7  active polypeptide could be anywhere between 5,000 and 50,000

8  daltons.  There's no discrimination in terms of anywhere within

9  this range.

10 Q.  Now, Nick, please take us back to page 2, background of the

11 invention.  And here I would ask you to highlight the paragraph

12 that begins at 11 and continues through 16.  And, Doctor, the

13 paragraph refers to work at the Weizmann Institute, refers to

14 an article in the European Journal of Immunology, and an

15 article in the New England Journal of Medicine.  Would you fill

16 out a little bit what is here being referred to, as well as, I

17 might add, the '550 patent.  What's being referred to?

18 A.  Three of the works that we've discussed previously this

19 morning.  The European Journal of Immunology is the same as the

20 Teitelbaum article.  U.S. patent '550 we've gone through quite

21 a bit, and the new England Journal of Medicine was a paper

22 dealing with a clinical study by Dr. Murray Bornstein.

23 Q.  What does that tell you as a person of ordinary skill in

24 the art reading this particular patent application?

25 A.  That the interest of the patentee is to not only duplicate

1    the advantages, the medical advantages of copolymer-1, but

2    hopefully to first of all explain and understand the basis for

3    it, and perhaps to result in perhaps complete removal of the

4    exacerbation of the disease.

5    Q.  Now, one of the articles you indicated was the Bornstein

6    1987 article?

7    A.  Yes.

8           MR. SKILTON:  And, Nick, would you turn to PTX 31,

9    please?  Your Honor, this is already in evidence.

10          THE COURT:  Thank you.

11   Q.  Doctor, first of all, this is an article that was published

12   in what year?

13   A.  In 1987.

14   Q.  And we've been referring to it as the Bornstein 1987

15   article.  Are you familiar with it by that term?

16   A.  Yes, I am.

17   Q.  You've reviewed this document?

18   A.  I have.

19   Q.  Did you rely on this document in formulating your opinion?

20   A.  Yes, I did.

21   Q.  And this is the document that is referred to in the '620

22   patent?

23   A.  Yes.

24   Q.  What does, from your point of view, what does Dr. Bornstein

25   report at PTX 31?

1   A.  Well, he used some, several different batches of

2   copolymer-1 from the, from Israel, and these batches ranged in

3   molecular weight from 14,000 to 23,000.

4   Q.  And what does this, what information or, if you will,

5   material considerations, what does this add to your opinion?

6   A.  Certainly Dr. Bornstein felt that a 14,000 something

7   molecular weight copolymer-1 batch was perfectly fine with

8   regard to his clinical studies.

9   Q.  Now, does the fact that the EP 620 patent application cites

10  Bornstein's 1987 report of his clinical trial, the '550 patent

11  and Teitelbaum 1971 suggest anything to you as a person of

12  ordinary skill in the art performing the assignment that you

13  were asked to perform?

14  A.  Yes.  That a variety of batch sizes are acceptable in terms

15  of production of a copolymer-1.

16  Q.  Now, I want to turn here to the '808 patent itself.  And

17  that would be, I believe, PTX 1.  And here I want to point your

18  specific attention to column 2, lines 14 through 27, and I'll

19  read the sentence into the record that I want you to comment

20  on.  "Copolymer-1 according to the present invention may be

21  prepared by methods known in the art, for example, the process

22  disclosed in U.S. patent No. 3849550," and then it goes on to

23  describe the chemistry.

24          Do you agree as a person of ordinary skill in the art

25  that copolymer-1, according to the present invention, may be

1    prepared by methods known in the art?

2    A.  Yes, I do.

3    Q.  And what is the basis of that opinion?

4    A.  Well, we've gone through the process step by step, and the

5    steps appear conventional.

6    Q.  Nick, would you slow slide 10, please?  Now, what is the

7    Court looking at here?

8    A.  This is a comparison between the process as described in

9    the '808 patent with the processes described in the '550

10   patent.

11   Q.  And the left column of course as stated is the '808 and the

12   right is the '550?

13   A.  Yes.

14   Q.  Taking you down to the word piperidine -- I'm not sure I

15   pronounced that correctly -- in the '550 and to that 1

16   millimeter piperidine in the '808.  Nick, could you highlight

17   both portions?  Down to that as ending points, how does the

18   text of the two respectively compare to each other with

19   reference to the procedures described?

20   A.  They're extremely similar.  The '808, of course, cites the

21   '550 patent.

22   Q.  And you said they're extremely similar.  Are there

23   differences in the recitations up to that point as between the

24   two patents?

25   A.  I just mentioned the '550.  It's not word-for-word.  For

1    all intents and purposes it's the same process.

2    Q.  And what about temperature?  How are the two comparisons,

3    how are the two terms or patent descriptions comparable in

4    reference to temperature?

5    A.  Well, that the '808 patent process utilizes room

6    temperature and discusses that as meaning 20 to 26 degrees

7    centigrade.

8    Q.  Now, does the '550 patent as read by you as a person of

9    ordinary skill in the art describe the simultaneous cleavage

10   step during the HBr in glacial acetic acid?

11   A.  It does.

12   Q.  Moving to the next paragraph, here, column 2, please, Nick,

13   lines 28 through 45.  Here, Doctor, I'll ask that the portion

14   that is highlighted down to ultrafiltration be highlighted, and

15   as a first step ask you to read the first sentence beginning at

16   column 2, line 28 into the record.

17   A.  "The copolymer-1 with the required molecular weight profile

18   can be obtained either by methods known per se.  Such methods

19   include chromatography of copolymer-1 containing high molecular

20   weight species and collecting the fractions without the

21   undesired species or by partial acid or enzymatic hydrolysis to

22   remove the high molecular weight species with subsequent

23   purification by dialysis or ultrafiltration."

24   Q.  First of all, do you agree with this, with these

25   statements?

1   A.  Well, I don't know whether I would call cleavage a

2   purification, so I would have that -- that's a personal

3   feeling, and I suppose that the patentees have got a right to

4   define words the way that they wish.

5   Q.  And as we get into the claims we're going to more

6   specifically address your comment, but generally do you agree

7   with respect to what you've read that these can be described as

8   methods known per se.

9   A.  Yes, I agree with the description of the second sentence by

10  the end of the first sentence, methods known per se.

11  Q.  Let me break it down a little bit more.  First of all, what

12  is chromatography?

13  A.  Chromatography is the separation or fractionation of

14  molecules.

15  Q.  Do you have an example from the literature, for example,

16  that was available circa May 23, 1994, to illustrate this

17  method?

18  A.  Yes.  This method was applied certainly well before the

19  '808 patent day.

20  Q.  Nick, would you call out DTX 1806, please.  Thank you.

21  What are we looking at here, Doctor?

22  A.  This is an article discussing the approach to the

23  production of clinical grade dextrans.

24  Q.  And the authors?

25  A.  Barker, Ginetsos and Ajongren.

19EFTEV3                    Zeigler - direct

1    Q.   The publication and date?

2    A.   The publication is Journal of Chemical and Technologcal

3    Biotechnology.  The date is 1993

4    Q.   And the accepted date is?

5    A.   December 11, 1992.

6    Q.   Is this publication a reputable publication?

7    A.   I'm not familiar with it, but I have no reason to doubt it.

8    Q.   Is this an article you relied on in forming your opinions

9    in this case?

10   A.   Yes, it is.

11              MR. SKILTON:  Move into evidence DTX 1806?

12              MR. JAMES:  No objection.

13              THE COURT:  Admitted.

14              (Defendant's Exhibit DTX 1806 received in evidence)

15   Q.   How does this Barker reference, if I may call it that, how

16   does this Barker reference relate to the issue of

17   polymerization?

18   A.   Dextrans, of course, are polymers, but they're

19   polysaccharides, and in that respect there are similarities and

20   differences in terms of their synthesis.  The dextrans can be

21   polymerized again to very polydiverse mixtures to molecular

22   weights even higher for that obtained for polypeptides and in

23   particular dextrans have a role as blood volume expanders and

24   are used in treatment of anemia.  As a result it's very

25   important for them to reach a clinical grade in which they can

1    be utilized in man.

2    Q.  And Nick, would you go to page 21, please, and highlight

3    the sentence that begins "before the".

4         All right, Doctor, what's being communicated by this

5    sentence?

6    A.  For this particular polymerization, it's discussing a

7    desired range between 12 and 98 kilodaltons with an average

8    that they would like to get of 40 kilodaltons.

9    Q.  And go to page 25, please, Nick, part 5 of this same

10   article, DTX 1806.  And to the section that begins

11   "fractionation of the native dextran product."  What is herein

12   being described, and relate it particularly to fractionation as

13   you understand that term to be used in the '808 et seq patents?

14   A.  The dextran products of polymerization can go into the

15   millions.  As I just mentioned, they want to get down to

16   between 12 and 98,000, and consequently, they have to purify or

17   fractionate the material.  They use chromatography to

18   fractionate, and they remove the high molecular weight stuff

19   and incidentally acids treat the cleave into the 12 to 98 range

20   so they don't lose all that material, and once they get rid of

21   the high molecular weight, then they remove the lower molecular

22   weight material fraction by filtration, ultrafiltration.

23   Q.  So what's being described is what you understand to be and

24   a person of ordinary skill would understand to be

25   fractionation, is that correct?

1   A.  Yes.

2   Q.  For similar purposes?

3   A.  Yes.

4   Q.  And is this for purification to clinical standards of

5   another polydispersed polymer?

6   A.  It is, yes.

7   Q.  Was this process as disclosed in this a process that was

8   within the knowledge of a person of ordinary skill in the art

9   circa May 24, 1994?

10  A.  Yes.

11  Q.  And were these methods that were known to you and taught to

12  you, to students, graduate students at the Jefferson Medical

13  College?

14  A.  I have taught these methods, yes.

15  Q.  All right, let's turn back to PTX 1, column 2, the patent

16  in suit.  And to that paragraph, Nick, if you would, that we

17  were just highlighting.  I want to go with the second method

18  that was described in the same paragraph.  All right.  The

19  second method now refers to partial acid hydrolysis.  Do you

20  see that?

21  A.  I'm sorry.

22  Q.  Maybe I've got the wrong sentence.  So let's be sure to

23  read it.  It's the method that's mentioned in column 2.  Are we

24  at column 2?  Are you following with me?

25  A.  You're at the compositions?

1   Q.  It says or by partial acids or enzymatic hydrolysis?

2   A.  I do see that, yes.

3   Q.  And what is this referring to?

4   A.  Well, the partial acid hydrolysis I assume is discussing

5   HBr in glacial acetic acid.

6   Q.  To put a point on that, is peptide cleavage by HBr in

7   glacial acetic acid an example of such a method?

8   A.  I believe that's what they referring to, yes.

9   Q.  And are there others?

10  A.  I talked about enzymatic hydrolysis, which is a possible

11  way of also treating the --

12  Q.  Would you agree that partial acid hydrolysis is a method

13  known per se in the art as of May of 1994?

14  A.  Yes, I mentioned that earlier, yes.

15          MR. SKILTON:  Your Honor, I'm at a point where I think

16  I'm ready to go to the claims, and I project it's probably

17  about 45 minutes.  There are 23 claims involved.

18          THE COURT:  All right.  Why don't we take our

19  afternoon break.  I'll see everybody at 1:30.

20          (Luncheon recess)

21                          o0o

22                  AFTERNOON SESSION

23                      1:35 p.m.

24          THE COURT:  All right, Mr. Skilton.

25          MR. SKILTON:  Thank you, your Honor.

1   BY MR. SKILTON:

2   Q.  Dr. Zeigler, we're going to now turn to the claims of the

3   patents at suit and I will be asking your separate opinions as

4   they relate to the claims separately.

5          Have you prepared some demonstratives to assist you

6   and the Court following your testimony?

7   A.  Yes, I have.

8          MR. SKILTON:  Nick, I'd ask you to put the first

9   demonstrative up on the board, that relating to the '808

10  patent.

11  Q.  Doctor, let's first establish some parameters here.  I will

12  represent to you there are as I recall three slides that relate

13  to the '808 and the asserted claim portion of that relates to

14  the claim as written.  I will be asking you in the first

15  instance your opinion on obviousness as it relates to the claim

16  as a whole, and then I'm going to be retracing a little bit to

17  the elements of the claim so as to give the Court the benefit

18  of your full opinion as it relates to each and every element of

19  the claim.

20         So right now, Nick, would you scroll through, please,

21  the three slides that relate to the '808 patent.  Slide 2,

22  then, separates out a purifying said copolymer-1 in the terms,

23  your Honor, and the third slide, and would you go to the next

24  slide with about 5 to 9, so please go back to slide one.

25         Doctor, looking at the language and the limitations

1    and terms of the claim as a whole, claim number 1 that we just

2    reviewed, do you have an opinion as to whether that claim is

3    obvious in your opinion to a person of ordinary skill in the

4    art when considered on the date of May 24, 1994?

5    A.  Yes, I do.

6    Q.  And what is that opinion?

7    A.  My opinion is that the entire claim is obvious.

8    Q.  Now, we've looked at the portion of it, you see we've

9    carved it out, and as to the portion that is on screen and ends

10   with "aqueous piperidine solution to form copolymer-1," this

11   chart also states, does it not a basis for that?

12   A.  Yes.  It does.  This is, so far as I could see, completely

13   covered by patent '550.

14   Q.  And the red, then, need not be separately discussed.  Your

15   opinion, as I understand it, it says that all aspects of that

16   are covered by the '550 disclosure, correct?

17   A.  That is correct.

18   Q.  Let's go to the second element that we've separated out for

19   purposes of this discussion.  "And purifying said copolymer-1."

20   I think you earlier indicated that you saw two potential

21   disclosures or methods of purifying in the '808 patent, and is

22   that why you've broken this down into two sections?

23   A.  Yes, it is.  If you recall, we went through a sentence

24   which ended "methods known per se," or also known per se or

25   either known per se, I'm not quite sure, but following that,

1    there were two main examples, one dealing with chromatography,

2    and one dealing with acid hydrolysis, and I'm assuming that

3    this is what they were referring to when they used the word

4    purifying.

5    Q.  And with respect to the chromatography aspect or

6    disclosure, do you have an opinion whether that adds anything

7    new or novel to the claim as a whole?

8    A.  No, it utilizes methodologies that were well known to

9    people of ordinary skill in the art and the example that we

10   discussed was Barker, et al, in terms of getting a clinical

11   distribution of polypeptides with regard to dextran.

12   Q.  And with respect to that second portion of the definition

13   that at least as you read it, purifying equals acid hydrolysis

14   HBr cleavage, in your opinion to a person of ordinary skill in

15   the art was there any disclosure that added novel material or

16   something within the claim as a whole?

17   A.  No.  Acid hydrolysis by HBr peptide cleavage as I mentioned

18   was known for decades in the art.

19   Q.  Would you go through the bases as stated, how do you reach

20   that opinion based on the '550 patent?

21   A.  The conditions of the '550 patent as followed by a trail

22   through Ben-Ishai and Berger, Yaron and Berger, Edelstein and

23   Blout, Yaron and Miller.

24   Q.  That's essentially the basis that you have for that

25   element.  And then the third slide please, Nick.  To result in

1    copolymer-1 having a molecular weight of about five to nine

2    kilodaltons.  Does that disclosure or element or limitation add

3    anything novel to the claim as a whole?

4    A.  Yes.  I'm sorry.  No.  This is a claim that would have been

5    obvious to somebody of ordinary skill in the art.  For example,

6    somebody that read some of my earlier papers which had been

7    published by then, before then, that there is a great

8    polydispersity in the products.  To the extent that there would

9    be a large amount of material in a product, copolymer-1

10   product, in excess of 10,000, which would be found in the 5 to

11   9 kilodalton range, and in support of this is the European

12   patent 620 that disclosed copolymer-1 like compositions from

13   their molecular biology techniques, technology, which was in a

14   range that started as low as 5 kilodaltons.

15   Q.  And you list as another basis, and I want to be specific in

16   terms of what it says here, the overlap.  Would you tell the

17   Court how that basis relates to your opinion?

18   A.  Well, it was not released to the public, so in that respect

19   a person of ordinary skill would not have been exposed to that,

20   but by the same token the results more than support the

21   material that had been previously published that I referred to

22   just above.

23   Q.  All right, now, Nick, would you go to the slide that

24   relates to the 589 patent, please?  And here again we followed

25   the same format?

1   A.   Yes.

2   Q.   Is it your opinion that the claim as a whole in all of its

3   constituent elements or limitations would be obvious to a

4   person of ordinary skill in the art?

5   A.   Yes.   This is a claim that still basically is covered by

6   the patent '808 for the reasons state therein.

7   Q.   All right, and when you say basis same as claim 1 of the

8   '808, what are you trying to tell the Court with that entry?

9   A.   Well, I'm not an expert in terms of the legality.   I

10  certainly don't want to make any -- you should pardon the

11  expression -- claim towards that, but the counsel has mentioned

12  that a claim, in this claim he cites a product made by a

13  process as opposed to a product itself, the subtleties I'm

14  afraid are beyond me, but nonetheless, this is what I've been

15  taught to understand.

16  Q.   All right, well, I will try to direct a question to you

17  that notes the difference in the way the question is put rather

18  than to ask you to understand the patent law distinction.   But

19  in any event, let me take the Court to what we're indicating,

20  what you're indicating as saying for claim 1 of the '808

21  patent.   Nick, would you take us back to the '808 slide?   All

22  right, and there you have stated and you go down the three

23  charts bases for obviousness and is it your intent in stating

24  it that way on the next slide to incorporate the bases that you

25  recited for the '808 patent in explaining your opinion for the

1    589 patent?

2    A.  Yes, I think that that will get us through the claims in a

3    reasonable time period.

4    Q.  All right.  So let's pursue the note that is put there for

5    your reference purposes.  Claim recites a product made by a

6    process.  Focusing on the terms of the product described, is

7    there anything novel about the product produced by that process

8    in your opinion?

9    A.  Not from our discussions previously, not from this process

10   or product.

11   Q.  And we can break that apart by first pointing your

12   attention to the about 5 to 9 kilodaltons.  Is there anything

13   novel about that product?

14   A.  No.  Materials in that product would be present in a batch

15   in excess of 10,000 kilodaltons.

16   Q.  And made by a process comprising the steps of, again,

17   that's as per what you explained in reference to the earlier

18   patent, the '808 patent, is that correct?

19   A.  That is correct, yes.

20   Q.  And then may we go to the slide as it relates to the next

21   set of claims asserted against Mylan and that is relating to

22   the '847 patent.  Nick, will you kindly go to that, please?

23   There the claim recites the process, that's the second half of

24   claim 1, and your basis for an opinion that the recitation in

25   that element is the same as claim 1 of the '808?

1    A.  Yes, it is.  Just as it would contain 5 to 9 so it would

2    contain about 4 to about 9 kilodaltons.

3    Q.  All right, so let me ask you the overarching question.  Is

4    the claim as a whole and all its constituent elements in your

5    opinion obvious to one of ordinary skill in the art as of the

6    date?

7    A.  Yes, Mr. Skilton, it would be.

8    Q.  Here you see the element under copolymer-1 is not expressed

9    in 5 to 9 terms but in 4 to 9 terms.  Does that limitation or

10   element add anything novel to the claim as a whole as it

11   relates to this patent?

12   A.  No, it would not.

13   Q.  And why is that your opinion?

14   A.  Because the process itself produces a polydispersed mixture

15   and therefore would produce a product which certainly would

16   contain a great deal of material below the in excess of 10,000,

17   as I mentioned before.

18   Q.  Okay.  And so you relate back to the basis that you stated

19   in the '808 opinion, correct?

20   A.  That is correct.

21   Q.  All right, let's go to the next claim asserted.  It is also

22   from the '847 patent.  It reads:  "Copolymer-1 made by the

23   process of claim 1, wherein the process further comprises

24   adding acetic acid subsequent to the treating step."  Do you

25   have an opinion as to whether that claim is obvious?

 1          MR. JAMES:  Objection, your Honor.  This is not in Dr.

 2   Zeigler's expert reports.

 3          MR. SKILTON:  Your Honor, certainly the basis of it is

 4   and it's been covered in this record.  May I rephrase it to

 5   indicate does he have a basis for an opinion?

 6          THE COURT:  I think you're asking the same question.

 7   I don't know whether I'll consider the testimony ultimately,

 8   but why don't you just get it out and then I'll take a look at

 9   your objection.

10          MR. SKILTON:  All right, your Honor.

11   Q.  Do you have an opinion as to whether or not that claim is

12   obvious?

13   A.  I do.

14   Q.  And what is the basis for that?

15   A.  The basis for that is reading the Goldberger and Anfinsen

16   1962 paper on one-molar piperidine in which they use acetic

17   acid to change the pH and stop the reaction.  That's a routine,

18   trivial aspect of a biochemist.

19   Q.  All right, let's go to the next patent in suit asserted

20   against Mylan, and that is the '430 patent, please, nick.  And

21   first I believe there's only one slide relating to this, and so

22   the claim as a whole appears on that slide.  Do you have an

23   opinion as to whether or not that claim as a whole would have

24   been obvious to a person of ordinary skill in the art as of the

25   operative date?

1    A.  Yes, I have such an opinion.

2    Q.  And what is that opinion?

3    A.  My opinion is the polydiversity of the process producing

4    such a copolymer-1 would indeed lead to over 75 percent of its

5    molar fraction within the molecular range from about 2

6    kilodaltons to about 20 kilodaltons.

7    Q.  What is the basis for your opinion that that element that

8    you've recited, that that element is obvious?

9    A.  Well, first of all, the kinds of experiments that have been

10   published including by me dealing with polydispersity, and the

11   degrees of overlap that are likely to result as a result of

12   this dispersity, polydispersity.

13   Q.  And you here list some additional bases for your

14   obviousness opinion, first as it relates to the claim as a

15   whole and with respect to this particular element.  Would you

16   take the Court through those bases as listed?

17   A.  Yes.  These offer support for the conclusion that I just

18   gave that the Weizmann basis, 320, 340 and 400 all fall within

19   this limitation, and in addition, one would expect the

20   continuity, the contiguousness of these products to produce a

21   composition of having similar properties.

22   Q.  Similar properties as you earlier described in your

23   testimony?

24   A.  Yes.

25   Q.  Now, this patent has additional claims asserted, if I'm

1    correct, so let's go to claims 2 and 3 of the '430 patent.

2    These are also claims, your Honor, that are asserted by Teva

3    against Mylan.  And, Dr. Zeigler, let me focus your attention

4    on claim 2.  The copolymer-1 of claim 1, wherein said protected

5    copolymer-1 is reacted with hydrobromic acid for about 10 to 50

6    hours at a temperature of about 20 to 28 degrees centigrade.

7    Do you have an opinion as to whether that claim as a whole

8    would have been obvious to and is obvious to one of ordinary

9    skill in the art when analyzed on the operative date?

10   A.  Yes.  As I mentioned, somebody of ordinary skill that would

11   come into my laboratory would be expected to know that one can

12   vary and use temperature and time to control a chemical

13   reaction.

14   Q.  And here the note reminder to you and to me that this claim

15   recites a product made by a process.  Is the product therein

16   recited novel in your opinion or would it have been so to a

17   person of ordinary skill in the art?

18   A.  In my opinion, yes, it would have been obvious.

19   Q.  And let's go, then, to the next claim asserted against

20   Mylan, 3.  The copolymer-1 of claim 1, wherein said protected

21   copolymer-1 is reacted with hydrobromic acid for about 17 hours

22   at a temperature of about 26 degrees.  Does that limitation, if

23   you will, the new limitation added to that claim in any way

24   change your opinion as to whether or not that claim as a whole

25   as recited is obvious to one of ordinary skill in the art?

1    A.  It doesn't change my opinion of obviousness.  It just uses

2    two specific parameters, 17 hours and 26 degrees, but it's

3    still time and temperature.

4    Q.  And why do those parameters or the manipulation of those

5    parameters not add any novel limitation in your opinion as one

6    of ordinary skill in the art?

7    A.  Because someone would have been trained to understand that

8    these parameters affect the reaction and in any case is shown

9    explicitly in Yaron and Berger.

10   Q.  So is it your opinion then that the claim as a whole as

11   recited is obvious to one of ordinary skill in the art as of

12   the operative date?

13   A.  Yes, Mr. Skilton, it is.

14   Q.  Let's go to the next set of claims asserted against Mylan.

15   And here I refer to, Nick, patent '476.  6342476.  Doctor, we

16   have put that claim and its terms on the board for you to

17   analyze for the Court.  First of all, reading the claim as a

18   whole and all of its limitations as recited therein, do you

19   have an opinion as to whether or not that claim is or would

20   have been obvious to a person of ordinary skill in the art

21   circa May 24, 1994?

22   A.  Yes.  I have an opinion.

23   Q.  What is that opinion?

24   A.  My opinion is that the entire claim, meaning all of the

25   individual limitations or parts of the claim, are obvious.

1    Q.  And why don't you take the Court through some of the

2    highlighted elements as shown in this slide and explain why

3    none or any of these elements add novel material such as to

4    take this claim out of obviousness.

5    A.  Yes, let's start with treating multiple sclerosis.  In

6    terms of one of ordinary skill in the art who is not an expert

7    per se in multiple sclerosis, he would have been told in the

8    '550 patent that EAE is a model system for multiple sclerosis

9    and on any account would have known from Bornstein in 1987 that

10   copolymer-1 could be efficacious, could be used in terms of

11   treating multiple sclerosis.

12   Q.  The amount of copolymer-1 fraction wherein said fraction

13   contains less than 5 percent, is that a novel limitation?

14   A.  Of material of over 40 kilodaltons.  Those two phrases I

15   believe go together and this again would have been obvious,

16   that is, especially as one went to lower molecular weights,

17   that is, we talked about batches moving close together.  If a

18   batch moved towards in excess of ten, as it approached in

19   excess of ten in my opinion less than 5% of the species of

20   copolymer-1 would be over 40 kilodaltons and this again is

21   supported by the internal Teva document by Dr. Gad.

22   Q.  And that basis that you're alluding to is more fully

23   stated, is it not, under the basis for obvious column on this

24   slide?

25   A.  Would you repeat that, please?

1    Q.  Yes, the base that you're alluding to and described

2    generally is more fully stated on the portion of the slide

3    under basis for obviousness, correct?

4    A.  Yes.  I'm trying to streamline a little bit.

5    Q.  I know you are.  Thank you.  And let's look at the over

6    75 percent of said copolymer-1 in said fraction is within a

7    molecular weight range of about 2 kilodaltons to about 20

8    kilodaltons.  Do you have an opinion as to whether or not this

9    limitation adds new matter or is, would have been obvious to

10   the person of ordinary skill in the art, and I'm going to

11   rephrase the question to strike new matter so let me say it

12   again, your Honor.  It's a patent term I get confused on.  Let

13   me rephrase the question.

14        Does this limitation add any novel information or

15   disclosure to the claim so as to render the claim non-obvious?

16   A.  No, it doesn't.  I talked a little bit about two

17   kilodaltons to about 20 kilodaltons in a previous claim, and so

18   far as I can see, the same reasoning would apply here as well.

19   Q.  Because it's a wordy claim, state here the reasoning that

20   you're employing for the Court's information.  What is the

21   reasoning that you are applying here to this set of

22   limitations?

23   A.  The size of the batch that's mentioned, at least within the

24   molecular weight that Bornstein cites, plus the -- and the

25   likelihood of this kind of a size distribution, as well as the

1    support that one can see by examining the Teva document by

2    Dr. Gad.

3    Q.  All right.  Now, the last aspect or element of this claim

4    says, "Wherein said copolymer-1 fraction is prepared by a

5    process comprising the steps of," and there's a recital.  What

6    is your opinion as it relates to that element of the claim?

7    A.  My opinion is that this has been previously disclosed as

8    conventional.

9    Q.  All right, let's turn, if we may, to patent '161.  Doctor,

10   you prepared a slide on '161?

11   A.  Yes.

12   Q.  And first looking at the claim as a whole as asserted, do

13   you have an opinion as to whether or not that claim as a whole

14   would have been and is obvious to one of ordinary skill in the

15   art as circa the operative date?

16   A.  In my opinion, it would be obvious as of May 1994 to a

17   person of ordinary skill in the art.

18   Q.  And here you list as a basis the same basis as claim 1 of

19   the '476 and '430 patents.  They are the patents we just

20   reviewed?

21   A.  Yes.  From my scientific point of view, it seems that less

22   than 5 percent over 40 kilodaltons and over 75 percent of about

23   2 kilodaltons to about 20 kilodaltons is obvious for the same

24   reasons that I previously discussed.

25   Q.  All right, and Nick, turn with us, please, to the slide on

1    U.S. patent number 7199098, the '098 patent.  Doctor, here,

2    would you state whether or not it is your opinion as to whether

3    or not the claim as asserted, claim 1 in its entirety is and

4    would have been obvious to a person of ordinary skill in the

5    art circa the operative date?

6    A.   To me, yes.  It appears obvious.  It contains the same

7    elements that we had discussed in some of the earlier claims.

8    Q.   And in addition you'll see an element that's been added,

9    "The composition is suitable for treating multiple sclerosis."

10   What is your opinion as to whether that element adds anything

11   novel to the claim as a whole?

12   A.   I believe that the article by Dr. Murray Bornstein covers

13   the compositions of copolymer-1 that are suitable for treating

14   multiple sclerosis, and I would rely on that as a person of

15   ordinary skill.

16   Q.   Now, claim 8 is a composition of claim 1, wherein less than

17   2.5 percent of the copolymers in the mixture have a molecular

18   weight above 40 kilodaltons.  What is your opinion as to

19   whether or not that claim is obvious?

20   A.   In my opinion, the claim is obvious for the same reasons

21   given previously, that as one gets closer to an average

22   molecular weight in excess of 10,000, one would indeed find

23   less than 2-1/2 percent of the copolymers on a molecular weight

24   range of about 40 KDA, kilodaltons.

25   Q.   All right, now I'm going to turn to a little more

1    complicated claim, and that is the claims asserted under the

2    patent number 6939539 by Teva as against Mylan.  The claim 1

3    reads, "As a copolymer," etc. and you'll see there it has the

4    feature of a molecular weight of about 4 to about 9 kilodaltons

5    with the composition being suitable for treating multiple

6    sclerosis.  I'm paraphrasing.

7            Looking at the words as written in the context of the

8    claim as a whole, do you have an opinion as to whether or not

9    that claim is and would have been obvious to a person of

10   ordinary skill in the art circa the operative date?

11   A.  Yes, I do.

12           (Continue next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SKILTON:

2   Q.  And what is that opinion?

3   A.  My opinion is that this would have been obvious to a person

4   of ordinary skill in the art.

5   Q.  Now, you'll note that the range limitations here are four

6   to about nine kilodaltons.  Tell the Court how that range

7   enters into your analysis?

8   A.  I discussed the polydispersity, and that the polydispersity

9   doesn't stop at five.  It would continue down to four, and even

10  past four kilodaltons in terms of a batch that's polymerized by

11  this technique.  And, again, this conclusion is just reinforced

12  by the data that Dr. Gad assembled.

13          As for the composition pock suitable for treating

14  Multiple sclerosis, this is suggested in the '550 patent, and

15  again more strongly supported by the Bornstein paper.

16  Q.  All right.  Now, looking at claim eight, I will state to

17  you that that is stated as a dependent claim.  You see that by

18  its reference back to the composition of claim one, and wherein

19  less than 2.5 percent of the polypeptides of the mixture on a

20  molar fraction basis have a molecular weight of over 40

21  kilodaltons.

22          Is it -- do you have an opinion as to whether that

23  claim, claim eight, the dependent claim, in combination with

24  claim one, is or would have been obvious to a person of

25  ordinary skill in the art circa the operative date?

1   A.  Yes, I do.  My opinion is that it would have been obvious.

2   Q.  And explain that, please?

3   A.  Well, we talked a little bit -- first of all, we talked

4   about four to nine in discussing claim one.  We discussed the

5   composition suitable in claim one.  And this adds less than two

6   and a half percent the polypeptides molar fraction basis over

7   40 kilodaltons, and that is also a limitation claim that we

8   have discussed previously.

9   Q.  All right.  And another dependent claim is nine asserted

10  against us, and I will read that claim into the record.

11          The composition of claim eight, that which you just

12  described, wherein over 75 percent of the polypeptides of the

13  mixture on a molar fraction basis have a molecular weight in a

14  range of about two kilodaltons to about 20 kilodaltons.

15          Do you have an opinion as to whether that claim, in

16  combination with eight, and in combination with one, it

17  would -- is and would have been obvious to a person of ordinary

18  skill in the art circa the operative date?

19  A.  I do.

20  Q.  And what is that opinion?

21  A.  My opinion is that it would have been obvious that all of

22  the claim assertions in this patent would have been obvious to

23  a person of ordinary skill in the art as of May 1994.

24  Q.  All right, now let's go to the same patent claim ten.  And

25  here claim ten of the '539 patent reads:  The composition of

1    claim nine, wherein the mixture has an average molecular weight

2    of 6.25 to 8.4 kilodaltons.

3            First, with respect to that limitation on a stand

4    alone basis, is there anything in your opinion that is not

5    obvious about the molecular weight of 6.25 to 8.4 kilodaltons

6    limitation?

7    A.   None that I'm aware of, Mr. Skilton.   In fact, it seems to

8    me that that's encompassed by the claim of five to nine.

9    Q.   And explain that briefly for the Court?

10   A.   If I understand the claim correctly -- and obviously this

11   is all a bit legalese and, therefore, perhaps not my major

12   strength -- if I understand correctly, there's a previous claim

13   of five to nine kilodaltons, and 6.25 to 8.4 would be

14   encompassed within that claim, because the molecular diversity

15   should be also approximately the same.

16   Q.   All right.   Now, with that as a predicate to the question,

17   then I'll ask you whether the composition of claim nine -- and,

18   Nick, would you slide back a slide?   And remember you were

19   asked about claim nine, which in turn refers to the claim

20   eight, which in turn refers to claim one.   And I ask you, going

21   back to the slide that I'm looking at, is this series of

22   claims, including the dependent claims, as expressed in the

23   dependent claim ten, is that combination of claims obvious to

24   one of ordinary skill in the art circa the operative date?

25   A.   It would have been, yes.

1   Q.  And you state your basis for that?

2   A.  Yes, I have.  Oh, again?

3   Q.  Well, it's on the chart.

4   A.  It's on the chart, and I believe we've covered that and

5   I -- I don't want to burden the Court too much.

6   Q.  Thank you.  Okay.  And then let's look at the last claim of

7   '539 that's asserted.  And it starts with a pharmaceutical

8   composition, and we've highlighted aspects of the claim as

9   written in red that we want you to focus your comments on;

10  molecular weight of about four to nine to about nine

11  kilodaltons, and a pharmaceutically acceptable excipient.

12          First, go through those one by one with a question in

13  mind, do these elements of that claim add anything that would

14  take the claim as a whole out of your opinion as to

15  obviousness?

16  A.  The phrase "a pharmaceutical composition," I don't remember

17  if that's the exact phrase.  But in claim one of the '550

18  patent, there is a use of the word pharmaceutical, which seems

19  to indicate that all that is being done here is extending the

20  copolymer-1 chemical mixture into a suitably deliverable

21  pharmaceutical composition.  I have no problem with that.

22          The molecular weight of about --

23  Q.  When you say I have no problem with that, I'm not sure what

24  you're telling the Court; what do you mean?

25  A.  Oh.  What I mean is that whereas I have not been involved

in the pharmaceutical industry, I have not been involved in

dealing with the FDA, but I have been involved in preparing

polypeptides.  And it seems that the key to pharmaceutical

composition is whether there is any kind of other elements that

are in there that would affect the properties.  I, from my

understanding of '550, I don't see that.

Q.  All right.  Now let's go to the limitation molecular weight

of about four to about nine.  You covered that in your earlier

testimony?

A.  I did.

Q.  And then the last one, a pharmaceutically acceptable

excipient.  Do you have an understanding of what that clause

means?

A.  I guess something that passes FDA inspection.

Q.  All right.  Now, does the '550 patent itself make any

disclosures in the context of pharmaceutically acceptable?

A.  I believe it does.  May I read?

Q.  Would you, please?  It's stated, as you can see, as one of

the bases that you listed as it relates to that claim.  What

are you referring to there?

A.  Yes.  I'm referring to claim one of '550, and I'm not going

to read the entire claim one because the claim one itself is as

long as some of these other claims.  But if I may read the last

phrase, from a semicolon?  It says "In an amount effective for

treatment or prevention of the said disease dispersed in a

 1   pharmaceutically acceptable carrier for injectable

 2   administration."

 3           So, firstly, I don't believe I have any difficulty

 4   with that, even though I have not worked with a pharmaceutical

 5   company, but in any case, it's been also disclosed in the claim

 6   in '550.

 7   Q.  So in sum, is it your opinion that claim 12 would have been

 8   obvious to one of ordinary skill in the art circa the operative

 9   date?

10   A.  Yes.  It is my opinion that this would have been obvious to

11   a person of ordinary skill in the art.

12   Q.  Now, I'm reminded that there are three more claims asserted

13   against us from the '539 patent.

14           Would you show those claims?  Thank you, Nick.

15   A.  Well, 19 and 20 are not asserted, but are, nonetheless,

16   there are claims that depend upon them.

17           Again, I'm not quite sure exactly from a legal

18   position, but I can comment from a scientific position.

19   Q.  All right, let me take you through it so the record is

20   clear.  I have a continuing slide relating to U.S. patent

21   number 6,939,539 on the board, and I'm quoting -- we are

22   quoting the asserted claim that we are now dealing with.  There

23   is of portion above, but let's go to 23.

24           23 is stated as a method for treating a patient

25   suffering from multiple sclerosis comprising administering to a

1    patient in need thereof the pharmaceutical composition of claim

2    12.

3            Do you have an opinion as a person of ordinary skill

4    in the art as to whether or not that claim is obvious?

5    A.  Well, I think we'd have to go back to claim 12 again.  I

6    know that I have opined on claim 12, but I'm told that this is

7    not a memory test, so.

8    Q.  All right, there you are.  And we've gone back in slides to

9    came 12, and you see the claim is recited therein, and the

10   opinion as stated?

11   A.  I see it.  Could we now go to 23?

12   Q.  All right.  And my question then I think better put, and

13   thank you for helping me here, is is claim 23, in combination

14   with the claim 12, is that combination, in your opinion,

15   obvious to a person of ordinary skill in the art circa the

16   operative date?

17   A.  Yes, it is.  Again, I would cite Bornstein as a basis for

18   coming to this conclusion.

19   Q.  All right.  And 30 is -- states, a method for treating a

20   patient suffering from Multiple sclerosis comprising

21   administering to a patient in need thereof the pharmaceutical

22   composition of claim 19.

23            So this takes us to claim 19, which I'll read in the

24   record.  19, the pharmaceutical composition of claim 12,

25   wherein less than 2.5 percent of the polypeptides of the

mixture, on a molar fraction basis have a molecular weight of

over 40 kilodaltons.

          And then, Nick, could you take us back to claim 12, so

that he has the full context.

          And claim 12 you just looked at, it's a long claim.

You opined that it was obvious.  And so that's your reference

point, Doctor.  Are you with me so far?

A.  I am.

Q.  All right, so let's go back, if we may, Nick, thank you, to

the claim we're looking at.  And that is 30, correct?

A.  Yes.

Q.  Do you have an opinion as to whether or not that claim, in

combination with the other claims referenced is or is not

obvious to a person of ordinary skill in the art circa the

operative date?

A.  I have such an opinion, and it is that this is an obvious

claim.

Q.  And on the basis -- you have same basis as claim one of the

'476 and '430 patents.  What are you therein referring to?

A.  Some of the earlier patents that were issued that I have

discussed.

Q.  All right.  And let's then go to claim 31.  That claim, by

its terms, depends on the combination of claim 20, so I'll read

20 into the record.

          20, the pharmaceutical composition of claim 19,

1   wherein over 75 percent of the polypeptides of the mixture, on

2   a molar fraction basis have a molecular weight in the range of

3   about two kilodaltons to about 20 kilodaltons.

4          First, let me point your particular attention to those

5   limitations in that claim.  Have you already explained to the

6   Court your basis as to why you think those limitations are

7   obvious?

8   A.  I believe that I have with regard to the each part of this

9   claim.

10  Q.  All right.  And then take you to 31 again.  No, I have to

11  go back to 19, don't I.  So let's go back to 19.

12         And have you likewise explained why each element in

13  the claim as a whole of 19 would have been obvious to a person

14  of ordinary skill in the art circa the operative date?

15  A.  Yes.  Again, I have opined on the others, and these are

16  included in 31, and each of the parts to me appear to be

17  obvious.

18  Q.  All right.  And so the question I have for you first, as we

19  go down through this, do you have an opinion -- I don't think

20  we can get on claim 23 -- thank you very much -- I think you've

21  asserted it, your opinion is claim 23 in combination is

22  obvious, is that correct?

23  A.  That is, that is correct.

24  Q.  For the reasons you explained?

25  A.  Yes.  And I just want to emphasize again that this is from

1    the position of a person of ordinary skill in the art, but it's

2    my opinion.

3    Q.   And 30?

4    A.   The same.

5    Q.   Do you have an opinion?

6    A.   The same opinion, that this is obvious.

7    Q.   And that is obvious with respect to the?

8    A.   All the parts of the claim.

9    Q.   All parts?

10   A.   Up to there.

11   Q.   Thank you.  All parts of the claim as trailed through the

12   dependent to the independent, is that correct?

13   A.   That is correct.

14   Q.   And then 31, do you have an opinion?

15   A.   Yes.  Again, going from 31, excuse me, back through this

16   patent.  All of the different aspects I believe are obvious

17   and, therefore, asserted claim 31 is itself obvious.

18   Q.   Dr. Zeiger, I'm pleased to report that we have now arrived

19   to the last patent and set of claims asserted by Teva against

20   Mylan.

21        So, Nick, would you please turn to U.S. patent number

22   6,048,898 and the chart related thereto.

23        Doctor, you see the words of claim one of that patent

24   on the board?

25   A.   I do.

1    Q.  And you see there are certain limitations or elements of

2    the claim that have been underscored in red in that

3    demonstrative?

4    A.  Yes, I see that.

5    Q.  And would you take the Court through those in a very

6    succinct way, please?

7    A.  Yes.  Here the individual, I guess the patentees are

8    claiming to have a method of manufacturing copolymer-1 of a

9    predetermined molecular weight profile, which is not stated,

10   reacting the copolymer-1 with hydrobromic acid to form

11   trifluoracetyl copolymer-1 having the predetermined molecular

12   weight profile, wherein said reaction takes place for a time

13   and at a temperature predetermined by test reaction.

14   Q.  All right.  And the Court has defined test reaction.  And I

15   don't want you -- I don't know if you need to see it, fine.

16   But I'm asking you outside of the definition, and assuming the

17   Court's definition, but to concentrate on the simple

18   proposition of test reaction, and in particular predetermined

19   test reactions.  How, if at all, do these limitations or

20   elements add to or contribute to your opinion as to whether or

21   not this claim as written and as a whole is obvious to one or

22   of ordinary skill in the art?

23   A.  Mr. Skilton, I have an opinion at this point everywhere up

24   to predetermined by test reaction.  Because I would like to

25   see, if I may, how the Court defines test reaction just to make

1    sure that there's no conflict in terms of my understanding.

2    Q.  You've thrown a curve ball at me, Doctor.  I tried to frame

3    it so you didn't have to do it, but I think the question you

4    put to me is fair, and probably the Court would want to see it

5    too.  So is there anyone --

6            THE COURT:  I'm not going to answer it, that's for

7    sure.

8            MR. SKILTON:  Is there anyone who can help me in my

9    time of need?

10   A.  I'm sorry, but I'm a scientist and I want to make certain

11   that it's not my opinion, but that it's the Court's opinion.

12   Because ultimately the Court is the one that decides the issues

13   here, and which is obvious to everybody here, but.

14   Q.  We have the opinion.  We're going to permit you to read it

15   into the record or perhaps I will.  If I don't read the right

16   thing, I'm going to blame Ms. Glaser.

17   A.  Yeah, I don't mean to take the Court's time, but I do mean

18   to be as --

19   Q.  All right.

20   A.  -- specific as I can be.

21           MR. SKILTON:  With the Court's permission, I'll read

22   it?

23           THE COURT:  You can give it to --

24           MR. SKILTON:  I can give it to him, your Honor?

25           THE COURT:  Dr. Zeiger, if you want.

1    MR. SKILTON:  Thank you very much.

2    THE COURT:  Sure.

3  Q.  It's highlighted in green, the paragraph?

4  A.  Thank you.  Thank you, John, Mr. Skilton.

5  Q.  Thank you.  Okay, would you read what is highlighted,

6  please, into the record?

7  A.  Yes.  For the reasons provided above, the Court construes

8  predetermined by a test reaction to mean determined beforehand

9  by a reaction carried out to determine results of varying

10  reaction conditions.

11  Q.  All right.  Now then using that definition as the operative

12  definition of the terms you see, do you have an opinion as to

13  whether or not this claim as a whole as written, with all

14  limitations would have been obvious to a person of ordinary

15  skill in the art circa the operative date?

16  A.  I do have such an opinion.

17  Q.  And what is that opinion, Dr. Zeiger?

18  A.  The opinion is that this claim, as well as all the

19  others -- I'm sorry, it's only one claim -- this opinion, this

20  claim is obvious.

21  Q.  And what about this phrase or concept of predetermined in

22  testing, how does that fit into your opinion that the claim is

23  obvious?

24  A.  The definition, as the Court defined it, is very clear, and

25  I believe does not change my opinion with regard to the entire

1   claim.

2   Q.  And can you explain what you mean by that last statement;

3   why does it not change your opinion?

4   A.  Because, presumably, by changing time and temperature, one

5   can reach a lower molecular weight of any size and range --

6   well, I shouldn't say any size and range, but certainly

7   molecular weight average that one predetermines that one wants.

8   Q.  And once you predetermine it, how, if at all, does the

9   testing step relate to that?

10  A.  One can utilize this testing step as a teaching tool in

11  order to achieve it in future experiments.

12  Q.  All right.  And is it your opinion that those elements or

13  limitations of the claim add nothing now or to the claim as a

14  whole?

15  A.  Yes, that's correct.

16  Q.  To one of ordinary skill in the art, circa the operative

17  date, is that correct?

18  A.  Yes, that's the conditions, the situation as which I am

19  opining under.

20  Q.  And are the other bases for that obviousness opinion

21  summarized in the basis for obviousness on this chart?

22  A.  Yes.  We have the Bornstein paper, the '550 patent and, of

23  course very importantly, the Yaron Berger paper, which state in

24  a certain aspect the obvious use of time and temperature to

25  affect reaction results.

1    Q.  Okay.  Now, there are claims two and three of this patent

2    that are also asserted.  Let's look separately at claim two,

3    which I'll read into the record.

4           The method of claim one, wherein said protected

5    copolymer reacted with hydrobromic acid for about ten to 50

6    hours at a temperature of about 20 to 28 degrees centigrade.

7           Do you find that element, in combination with the

8    asserted claim one, which you've just been through, to be

9    obvious to a person of ordinary skill in the art circa the

10   operative date?

11   A.  I would, Mr. Skilton, and I would fine it to be obvious.

12   Q.  And, again, the basis is stated as the same as 898.  Can

13   you fill it out a little bit?  These are specific experimental

14   conditions that are recited.  How, why do you find those to be

15   obvious?

16   A.  Because time and temperature, excuse me, are the variables

17   by which one can manipulate the degree of cleavage by the HBr

18   and glacial acetic acid reaction.

19   Q.  All right.  And then take you to claim three?

20   A.  Pretty much the same thing.  These are specific, a specific

21   time, a specific temperature, which are covered within the

22   ranges that are mentioned in claim two.  So I don't see

23   anything more usual or different than merely utilizing one

24   specific time and one specific temperature.

25   Q.  All right, sir, do you have an opinion as to whether the

1    dependent claim two, which reads through claim, excuse me, the

2    dependent claim three, which reads through claim two, and

3    includes claim one, that combination in whole, as a whole would

4    have been obvious to a person of ordinary skill in the art

5    circa the operative date?

6    A.  Yes, I have such an opinion, and my opinion is that this

7    claim three, as you just cited, would have been obvious to a

8    person of ordinary skill in the art as of May, 1994.

9            MR. SKILTON:  Thank you, your Honor.

10           Thank you, Dr. Zeiger.  That concludes the direct

11   examination.

12           THE COURT:  All right.  Thanks, Mr. Skilton.

13   Cross-examination.

14   CROSS EXAMINATION

15   BY MR. JAMES:

16   Q.  Good afternoon, Dr. Zeiger.

17   A.  Hello, Mr. James, how are you?

18   Q.  I'm very well.

19           MR. JAMES:  Based on that exchange, your Honor will

20   understand we met before when I took Dr. Zeiger's deposition?

21           THE COURT:  All right.

22   Q.  Now, Dr. Zeiger, you never measured the molecular weight of

23   a copolymer using size exclusion chromatography, have you?

24   A.  Would you just repeat that one more time?

25   Q.  You have never measured the molecular weight of a copolymer

1    using size exclusion chromatography?

2    A.   That is correct.

3    Q.   And you don't recall having ever generated a molecular

4    weight distribution curve, correct?

5    A.   That was correct at the time of the deposition, that I

6    didn't recall it.  But in fact I have since had the opportunity

7    to redo or at least, I'm sorry, to look at my earlier papers,

8    and I do have a size exclusion chromatography.  That is a gel

9    chromatography in which the materials or at least fractionated

10   materials were examined for molecular weight.  So, I'm sorry,

11   but at that time my memory was a little faulty.

12   Q.   And you've never designed any calibration standards for

13   size exclusion chromatography, have you?

14   A.   That is correct.

15   Q.   You never have done research into the fundamental

16   underpinnings of size exclusion chromatography, right?

17   A.   That is correct.

18   Q.   And none of your publications disclose a -- I'll strike

19   that, come back.

20           I believe you said earlier today, Dr. Zeiger, that you

21   don't hold yourself out as an expert in size exclusion

22   chromatography, correct?

23   A.   Insofar as the use of calibrants is concerned, that's

24   correct.  But I have used size exclusion chromatography going

25   back to my post doc days with Chris Anfinsen.

1  Q.  All right.  Now Dr. Zeiger, let's put up slide -- you

2  testified extensively about the '550 patent today, correct?

3  A.  Yes, I did.

4  Q.  And you testified on your direct examination that the '550

5  patent discloses a copolymer-1 one with the molecular weight of

6  10,000 daltons correct?

7  A.  To be exact, in excess of 10,000 daltons.  I believe that's

8  the language.

9  Q.  And in support of that testimony, you pointed to column one

10  of the '550 patent, right?

11  A.  What word?  I'm sorry, I missed a word that you said.

12  Q.  In support of your testimony, you pointed the Court to

13  column one of the '550 patent?

14  A.  Yes.

15  Q.  If we could pull that up, Mr. Chase.  And in particular,

16  Mr. Chase -- yes, if you could pull up the paragraph beginning

17  at about lines 57 in column one of the '550 patent.  And could

18  you highlight the sentence -- let's just highlight the entirety

19  of the paragraph from the novel compositions down to electrical

20  charge, Mr. Chase.

21       Dr. Zeiger, the portion of column one of the '550

22  patent that I have highlighted, that's the portion of the '550

23  patent that you pointed the Court to today in your testimony,

24  that copolymer-1 -- there's a copolymer-1 in excess of 10,000

25  disclosed in the '550 patent, correct?

1    A.  That's one of I believe five numbers that are used

2    somewhere in the '550 patent.  But that is correct, we did talk

3    about that, yes.

4    Q.  But, in fact, that is not a specific description of

5    copolymer-1, is it?

6    A.  I'm not sure what a specific composition of copolymer-1 is.

7    I don't believe any one molecular weight was, you know, was

8    specified.  So if you can help me out there a little bit in

9    terms of the definition, I could answer that.

10   Q.  Well, that paragraph does not specifically describe

11   copolymer-1, correct, Dr. Zeiger?

12   A.  It doesn't use the word co-polymer-1, but that is certainly

13   one of the, if not the main product that the, that the patent

14   refers to.  But if you're asking does it actually use the word

15   copolymer-1, it does not.

16   Q.  I'm not asking you if it uses the words copolymer-1.  I'm

17   asking you, Dr. Zeiger, whether it's a specific description of

18   copolymer-1?

19   A.  It's not specific because it includes other, other

20   potential materials with positive electric charge and other

21   materials possibly with negative electrical charge.

22           So you're right, in that respect if that's what you're

23   referring to, it is not specific to copolymer-1.

24   Q.  It doesn't list the amino acids that are found in

25   co-polymer-1 in that paragraph, correct?

1    A.  That's essentially what I was saying in terms of net

2    positive electric charge, both that is net positive and

3    negative electrical charge, I think, I think that's what I

4    addressed, yes.

5    Q.  So the answer to my question is that it does not

6    specifically identify the amino acids found in copolymer-1,

7    correct?

8    A.  I was being wordy.  You're right.

9    Q.  And it doesn't describe the molar ratio of the amino acids

10   that are found in copolymer-1 in that paragraph, does it, Dr.

11   Zeiger?

12   A.  That is correct.

13   Q.  Now let's look at column two of the '550 patent, another --

14   and in particular, I'm sorry, lines 19 to 26.  And this was a

15   section of the patent specification you also directed the

16   Court's attention to.  And in this section it discusses a

17   preferred copolymer, correct?

18   A.  Yes.

19   Q.  And this copolymer is made of alanine, glutamic acid,

20   lysine and tyrosine; isn't that right?

21   A.  Yes, it is.

22   Q.  And at the bottom it says that they are found in a molar

23   ratio of 6 to 2 to 4.5 to 1, correct?

24   A.  Yes, it does say that, yes.

25   Q.  And that's copolymer-1, correct?

1   A.  Yes.

2   Q.  So that paragraph is a specific description of copolymer-1

3   isn't that right, Dr. Zeiger?

4   A.  I'm not quite certain, because the sentence right after

5   starts with similar results were obtained, and, therefore, I

6   wouldn't know exactly whether to stop it there or to continue

7   in terms of the definition.  My --

8   Q.  We can look at that sentence.  It says, similar results

9   were obtained with a soluble copolymer comprising tyrosine,

10  aspartic acid, alanine and lysine.  You see that?

11  A.  I do.

12  Q.  That's not copolymer-1, is it?

13  A.  That's correct.

14  Q.  So the specific portion of this patent that describes

15  copolymer-1 is a portion that I just went through with you from

16  lines 19 to 26 of column two, correct?

17  A.  Yes, but it doesn't -- again, it doesn't use the word

18  copolymer-1 and, therefore, I could well have read the, the

19  last sentence as being included in the beginning parts of the

20  paragraph.

21  Q.  But with respect to the molecular weight for the portion

22  that we've agreed is copolymer-1, the molecular weight stated

23  there is 20,000, 25,000, right?

24  A.  Yes.  But what I'm saying is that could also include

25  tyrosine, aspartic acid, alanine and lysine, and glutamic acid

1    lysine -- I'm sorry, alanine and lysine.

2            What you're saying is correct, but I'm stating that I

3    could understand that sentence to be more than a specific

4    reference to copolymer-1.

5    Q.  You also directed the Court's attention to the claim of the

6    '550 patent, right?

7    A.  Yes, I did.

8    Q.  Let's pull that up, please, Mr. Chase.  And the claim

9    discloses in part one in the middle, alanine, glutamic acid,

10   lysine and tyrosine in the molar ratio of about six parts

11   alanine to two parts glutamic acid to 4.5 parts lysine to one

12   part tyrosine; you see that?

13   A.  I do.

14   Q.  That is a specific description of copolymer-1, correct?

15   A.  Yes, that is.

16   Q.  And the molecular weights stated there in claim one is

17   15,000 to 25,000, right?

18   A.  Yes, it does.

19   Q.  And that would suggest to a person of skill in the art that

20   the molecular weight of copolymer-1 disclosed in the '550

21   patent is in the range of 15 to 25,000 daltons, right?

22   A.  Well, for the reasons I mentioned earlier, I think somebody

23   reading the patent would have seen all of the numbers.

24           But in terms of the claim what you're saying is

25   correct, but in terms of the entirety of the patent, one, I

1    believe, would have to look at the entire range that's

2    disclosed.

3    Q.  Well, the only specific disclosures of copolymer-1 that you

4    and I looked at so far list molecular weights from 15 to

5    25,000, correct?

6    A.  Well, that's what this particular claim says.

7    Q.  And that's what the portion of column two we looked at

8    said, right?

9    A.  Well, that's said 20 to 25,000, which is a different range.

10   Q.  It would be embraced within 15 to 25, correct?

11   A.  Of course.

12   Q.  Now, Dr. Zeiger, you're aware that Mylan submitted an

13   application to sell a generic version of copolymer-1, to the

14   FDA, correct?

15   A.  I am aware of that.

16   Q.  And have you reviewed that submission, or any part of it?

17   A.  Is it in my expert reports?

18   Q.  Did you ask to review it to see how Mylan characterized the

19   '550 patent before you offered your opinions in this case, Dr.

20   Zeiger?

21   A.  I don't -- this -- I've been involved in the case, as you

22   well know from my expert reports, for almost a year.  So my

23   memory specific with regard to some of the specifics may be a

24   little bit faulty.

25          I have looked at some documents from Mylan and from

1    Natco.  But in terms of what you're referring to, I don't have

2    any recollection that I have.

3              MR. JAMES:  Your Honor, with your permission, I'll

4    hand an exhibit to the witness and hand it up to the Court.

5              THE COURT:  Sure.  Just identify it.

6              THE WITNESS:  Thank you.

7              MR. SKILTON:  Mr. James -- your Honor, may I have a

8    minute to consult on this document?

9              THE COURT:  Sure.

10             MR. SKILTON:  Your Honor, may I consult with

11   Mr. James?

12             THE COURT:  Yes.

13             MR. SKILTON:  Thank you, your Honor.

14             MR. JAMES:  For the record, PTX-327 is a Mylan

15   production document.  It is a -- it's an excerpt from a

16   document that's already in evidence, which was PTX-320.

17             THE COURT:  Okay.

18   Q.  And Dr. Zeiger, I just want to direct your attention to one

19   page of the document, which is MYL16.

20   A.  Yes, I have that.

21   Q.  And the third paragraph of that on that page it says,

22   "Overview of the process."  Do you see that?

23   A.  I see that as the headline of that page.

24   Q.  Right.  And then in the third paragraph there's a

25   discussion of the '550 patent, correct?

19eztev4                    Zeiger - cross

1    A.  Yes.

2    Q.  And it says in the last sentence, describing the -- well,

3    let's just read it together, maybe that's better.  It says,

4    "Later U.S. patent 3,849,550, 1974, application dated 1971 by

5    Sela, Arnon and co-workers describes the preparation of

6    glatiramer acetate under the title therapeutic copolymer."

7             You see that?

8    A.  I do.

9    Q.  It says, "The procedure described here is the same as what

10   was described in European Journal of Immunology, 1971, 242 to

11   248."  You see that?

12   A.  I do, yes.

13   Q.  And that's saying that the, just as you testified earlier

14   today, that it's the same process in the European Journal of

15   Immunology as is disclosed in the '550 patent, correct?

16   A.  Yes, that is correct.

17   Q.  And the last sentence says, "The molecular weight of the

18   copolymer achieved was greater than 15,000 and less than 25,000

19   daltons."  You see that?

20   A.  I do.

21   Q.  You agree with that, right, Dr. Zeiger?

22   A.  I agree that that's the sentence there, yes.

23   Q.  You agree that the '550 patent describes copolymer-1 having

24   molecular weight between 15 and 25,000 daltons, correct?

25   A.  That was in the claim.  I'm not in a position legally to

19eztev4                    Zeiger - cross

1   decide the specifics of what the boundaries of copolymer-1 are.

2   I'm in a position of saying that I, as a person of ordinary

3   skill in the art, particularly somebody that has had experience

4   or at least some knowledge of polymerization synthesis, would

5   conclude.

6   Q.  You have no reason to disagree with Mylan's

7   characterization of the '550 patent to the United States Food

8   and Drug Administration, do you, Dr. Zeiger?

9            MR. SKILTON:  Your Honor, I object, mischaracterizes.

10           THE COURT:  I think he's answered the question.

11  Q.  Now, Dr. Zeiger, going back to the '550 patent.  You would

12  agree that there is no express reference to a copolymer-1

13  having an average molecular weight between five and nine

14  kilodaltons, correct?

15  A.  Yes, that is correct.

16  Q.  And you would agree that in the '550 patent, there is no

17  express reference to a copolymer-1 having an average molecular

18  weight between about four and about nine kilodaltons, right?

19  A.  Yes, that is correct.

20  Q.  And you would agree that there is no express reference in

21  the '550 patent to a copolymer-1 having an average molecular

22  weight between 6.25 and 8.4 kilodaltons?

23  A.  Yes, that's correct.

24  Q.  And, in fact, Dr. Zeiger, the '550 patent doesn't disclose

25  any measure molecular weight values for any batch of

1   copolymer-1, does it?

2   A.  All it does is refer to the Teitelbaum paper, in which

3   there are molecular weight that are discussed.  And,

4   interestingly, that molecular weight is not among the numbers

5   that are given in '550.

6   Q.  I think the answer was yes, but I'll ask it again.  There

7   are no measured molecular weight values for any batch of

8   copolymer-1 in the '550 patent itself, correct?

9   A.  Yeah, I'm not trying to avoid the answer to the question.

10  I'm trying to give the answer as best as I can.

11          I believe that disclosure, if I'm correct, also

12  includes references that are in the patent and, therefore, if

13  it includes the references, I would also add the 23,000

14  molecular weight that is obtained in the European Journal of

15  Immunology.  But if I'm wrong, I'm sure you'll tell me so.

16  Q.  So just to make sure we're clear, in the '550 patent itself

17  within the four corners of that document, there is no measured

18  molecular weight for a copolymer-1 batch?

19  A.  You're right, Mr. James.

20  Q.  But in, you're saying that in the Teitelbaum reference

21  there are some measured molecular weight values, correct?

22  A.  Yes.

23  Q.  Let's look at slide 19 from Dr. Zeiger's presentation.

24  And, Dr. Zeiger, it's your opinion and stated on this slide,

25  that claim one of the '808 patent is obvious over the '550

1  patent, correct?

2  A.  Yes, that is correct.

3  Q.  And in particular, it's your opinion that an average

4  molecular weight of about five to nine kilodaltons was obvious

5  over the '550 patent, right?

6  A.  Yes, that is correct.

7  Q.  And you understand that the Court has construed the term

8  average molecular weight in this case, correct?

9  A.  Yes.

10  Q.  And you've reviewed the Court's claim construction?

11  A.  I have.  But if you could remind me, if I can see it again.

12  I don't believe this is a memory examination.

13  Q.  I believe I can do that.

14  A.  Thank you.

15  Q.  I've put on the screen the Court's construction of average

16  molecular weight is a peak molecular weight detected using an

17  appropriately calibrated suitable gel filtration column.  You

18  see that?

19  A.  Yes, and I remember that.

20  Q.  And you understand that peak molecular weight is the

21  molecular weight that is read from the peak of a chromatogram,

22  correct?

23  A.  Yes, that is correct.

24  Q.  Now, it's your opinion that the disclosure in the '550

25  patent overlaps or is adjacent to the profile of about five to

1   nine kilodaltons, right?

2   A.  Well, that's what I say over here.  But, in fact, I believe

3   it goes to four to nine and even beyond that, and that's one

4   direction.

5        There's also -- well, in terms of overlap, that's

6   correct.  The answer to your question is yes, but its more than

7   that, at least.

8   Q.  But you're not suggesting that the overlap that you're

9   talking about in that bullet on the right-hand slide,

10  right-hand side of slide 19, that that is a peak molecular

11  weight between five and nine kilodaltons, are you?

12  A.  You're right, that is correct.

13  Q.  And, in fact, there is no overlap in peak molecular weights

14  between the claims, the asserted claims in the patents in suit

15  and the '550 patent, is there?

16  A.  That is correct.

17  Q.  Now, at the bottom of slide 19, you say "Because of the

18  substantial overlap in the molecular weight distributions of

19  copolymer-1 composition is known in the art."  You see that?

20  A.  I do.

21  Q.  And then you list three batches that are followed by the --

22  I mean that follow the prefix WIS; you see that?

23  A.  Yes, I do.

24  Q.  And those are batches that were used in the original

25  Bornstein clinical trial, correct?

1    A.  Yes, I believe so.  I've seen the numbers, and I'm quite

2    certain that those are included in them.

3    Q.  Those batches were not available to the public, correct?

4    A.  That is correct.

5    Q.  In fact, they were part of a clinical trial in which they

6    were experimenting on the use of copolymer-1 to treat multiple

7    sclerosis, right?

8    A.  That is correct, yes.

9    Q.  Those batches that you list on this slide, they were not

10   available to a person of skill in the art in 1994, correct?

11   A.  That is correct.  I wrote this as a scientist, rather than

12   as a patent attorney.  You're absolutely right.

13   Q.  And at the bottom of that bullet, you say "A person of

14   skill in the art would expect such compositions to have similar

15   properties."  Do you see that?

16   A.  Yes.

17   Q.  But those batches were not in the prior art so that a

18   person of skill in the art could form an expectation on their

19   basis, right?

20   A.  Well, you're talking about those particular batches.  And,

21   again, my experience and knowledge of the literature includes

22   the sorts of polymerizations and polymers and products that

23   we're talking about, but not copolymer-1.

24   Q.  Right.  Those copolymer-1 batches that you list on the

25   right-hand side of slide 19, those batches were not in the

1   prior art, and they couldn't form the basis for an expectation

2   for a person of skill in the art, could they?

3   A.   It's not that -- you're right, that I would depend on.  It

4   is more my -- not only experience, but also my reading of the

5   literature.

6        But you're right, I miswrote, I believe, if I

7   understand legally, I think you're quite right, that these

8   would not have been considered as prior art, because they were

9   not available to the public.

10  Q.   And the second part of your basis, your support for your

11  opinion in that parenthetical on the lower right-hand side is

12  figure two of the patents in suit, right?

13  A.   Would you say that again, please?

14  Q.   Yes.  In the lower right-hand side you say, you have your

15  statement about how the overlap in the molecular weight

16  distributions would give rise to an expectation of similar

17  properties.  And in the parenthetical you list two different

18  bases for that, right?  One is the batches of copolymer-1 used

19  in the Bornstein trial we already discussed, right?

20  A.   Yes.

21  Q.   And the second basis is figure two of the patents in suit,

22  correct?

23  A.   Yes, that's correct.

24  Q.   And figure two of the patents in suit, that wasn't in the

25  prior art either, was it?

1    A.  No, it was not.

2    Q.  But figure two was available to the patent examiner when he

3    examined these claims, correct?

4    A.  Yes.

5    Q.  And figure two was available for him to compare it to the

6    '550 patent, correct?

7    A.  It was.

8    Q.  And the patent examiner allowed these claims over the '550

9    patent in view of figure two, correct?

10   A.  Yes, that is correct.

11   Q.  Let's look for a moment at the 1987 Bornstein paper -- I'm

12   sorry, that's the wrong exhibit, Mr. Chase.  I believe it's

13   DTX-1228 in your binder, Dr. Zeiger?

14   A.  Do I have it in my binder?

15   Q.  I believe you do.  I'm going to put it on the screen, but

16   feel free to look at it in your binder as well.

17   A.  Oh, yes.  I know.  I didn't have those numbers memorized,

18   I'm afraid.

19   Q.  1987 Bornstein paper, that was something you disclosed or

20   discussed in your direct examination, right?

21   A.  Yes.

22   Q.  And it discloses co-polymer-1 having molecular weights

23   between 14,000 and 23,000 daltons, right?

24   A.  It does.

25   Q.  But there's no molecular weight distribution curve provided

19eztev4                    Zeiger - cross

1    for those batches, is there?

2    A.  No, there is not.

3    Q.  There are no peak molecular weights for those batches,

4    correct?

5    A.  Specifically no peak molecular weight batches.

6    Q.  The specific molecular weights of the batches that were

7    used in the 1987 Bornstein trial, they were not known to the

8    public in 1994, correct?

9    A.  I believe that that's correct.  I have not seen -- you

10   know, I've not looked for publication in perhaps the Arnon Sela

11   documents.  That is their publications.  I would assume that

12   you're correct.

13   Q.  If we can go back to slide 19, Mr. Chase.

14          Now, Dr. Zeiger, I want to make sure I understand your

15   position on the obviousness of the claims.  Your position is

16   that the person of skill in the art in 1994 would have looked

17   at the '550 patent and its description of copolymer-1, correct?

18   A.  That's certainly one of the places that would be foremost

19   in a POSITA trail, so to speak, of the '808 patent in suit,

20   yes.

21   Q.  And the second part of the trail would be that you would

22   look at the -- if we could look, Mr. Chase at the -- if we

23   could look at the '550 patent just for a moment.  I believe

24   it's PTX-26.  And if we look at the last page.

25          So the trail begins at the '550 patent, right, Dr.

1   Zeiger?

2   A.  In my opinion, yes.

3   Q.  And then you look at the '550 patent to the last page and

4   you see a reference to Teitelbaum 1971 under other references,

5   correct?

6   A.  Yes.

7   Q.  And it's your position then that you look at the Teitelbaum

8   1971 paper, that's PTX-499, you look at the Teitelbaum 1971

9   paper, Dr. Zeiger, and you see a description of how to make

10  copolymer-1, correct?

11  A.  Yes.

12  Q.  If we could pull up the left-hand side of page 243, please,

13  Mr. Chase.

14          And in this section, Dr. Zeiger, you pointed the Court

15  to the fact that the deblocking of the, is that a gamma?

16  A.  Yes, it is.

17  Q.  The deblocking of the gamma carboxyl groups of the glutamic

18  acid was carried out with hydrogen bromine in glacial acetic

19  acid, and then you go to footnote 16, correct?

20  A.  Yes.

21  Q.  And if we could pull up footnote 16.  Footnote 16 is a

22  reference to the Ben-Ishai article, correct?

23  A.  Yes.

24  Q.  And so we -- the next little part of the trail is that we,

25  now we go to 1759?

1    A.  Is that reference 17?

2    Q.  That's reference 16.

3    A.  Oh, I'm sorry.

4    Q.  We can show it on the screen, but, or you can look in your

5    binder there.  But I'll represent to you that footnote 16 was

6    the Ben-Ishai article, and we have that up, it's DTX-1759.

7           And DTX-1759, that's not about a peptide, correct?

8    A.  You're right.

9    Q.  But it is about the use of HBr and acetic acid?

10   A.  Yes, to deprotect benzyl-esters.

11   Q.  To deprotect benzyl-esters of?

12   A.  Of amino acid, on amino acid.

13   Q.  De-puric acid?

14   A.  Yes, specifically.

15   Q.  Right?  And there was no cleavage of any peptide bond

16   there, right?

17   A.  Yes, that is correct.

18   Q.  Because if there would have been clean of the peptide bond,

19   you wouldn't have had de-puric acid, right?

20   A.  Yes.

21   Q.  So the person of skill looks at the 1971 Teitelbaum paper,

22   finds the reference to Ben-Ishai, sees that the second author

23   is a person named Arieh Berger, and then I think you testified

24   that what they do next is they go and investigate all of the

25   papers written by Arieh Berger, right?

1    A.  That's what I would do if I were trying to follow a

2    literature trail.

3    Q.  And what they would do if they read all the Berger papers,

4    is they would find the Arnon Berger article that you

5    referenced, that's DTX-1994?

6    A.  In that particular case, they could have walked down the

7    hall and done that.

8    Q.  In 1994?

9    A.  I'm sorry.  You're talking about a person of ordinary

10   skill.  I was talking about the patentees.

11   Q.  Right.  The person of ordinary skill in 1994.

12          So far, I have your explanation of how you get to your

13   obviousness --

14   A.  Yes.

15   Q.  -- argument, right?

16   A.  Yes, that's correct.

17   Q.  So you find this paper DTX-1934, and it relates to

18   poly-amino acids by Yaron and Berger, correct?

19   A.  Yes.

20   Q.  And in that paper there is no cleavage reported of those

21   polymer chains, correct?

22   A.  There is no cleavage reported.  There's an acknowledgement

23   that cleavage would be expected.

24   Q.  There was an acknowledgement -- there was a citation,

25   actually, to --

19eztev4                    Zeiger - cross

1    A.   Yes.

2    Q.   -- another paper, right?

3    A.   Right, with the followup saying that because of this paper

4    here, we were concerned about -- I forgot the exact words.  If

5    you can take me to it, I can read it, or otherwise we can just

6    accept the testimony that I gave earlier, whatever you prefer.

7    Q.   Well, I think what you said was that you would look at

8    Yaron and Berger article and then you would find footnote 21 or

9    end note 21.

10        If you could pull that up, Mr. Chase.  And that's a

11   reference to Idelson and Blout, correct?

12   A.   Yes, yes.

13   Q.   And Idelson and Blout, you put into evidence today as

14   defendant's trial exhibit 1855, if we could pull that up.

15        And Idleson and Blout refers to polymers of one amino

16   acid, correct?

17   A.   Yeah.  You mean homopolymer.

18   Q.   Homopolymer?

19   A.   Yes, you're correct.

20   Q.   Not a copolymer?

21   A.   You're correct.

22   Q.   And Idleson and Blout say that cleavage is something to be

23   avoided?

24   A.   Yes.

25   Q.   Correct?

19eztev4                    Zeiger - cross

1    A.   In essence, they wanted the size distribution that they got

2    on synthesis itself.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  And then I think what you said was after you find the

2  Idelson and Blout reference then you keep mining the literature

3  and you find the Nylund reference which was DTX 1965, right?

4  A.  Yes.

5  Q.  And after you look at the Nylund reference, then you're

6  saying that a person of skill in the art then would have been

7  motivated to use the HBr acetic acid step to alter the

8  molecular weight of copolymer-1?

9  A.  What I said, if I may be a little bit more specific, I

10  believe that I did state this in this way, was that by looking

11  at the attempt to avoid cleavage, a person would also, a person

12  of ordinary skill, a person trained in chemistry or peptide

13  chemistry specifically would have understood that one could

14  utilize this as a tool to control the degree of cleavage.

15  Essentially, what I meant was that one needn't come away from

16  an article with a single conclusion.  A good scientist, a

17  person with an advanced degree that has the skills that one

18  trains such a person, would come away from reading an article

19  with more than one conclusion.  And in this particular case,

20  the conclusion is just as one could go to low temperature, for

21  example, to avoid cleavage, one could go to high temperature to

22  assure cleavage.

23  Q.  Thank you, Dr. Zeigler.  So in order to find the claim, the

24  use of -- let me strike that.  In order to find the use of HBr

25  acetic acid obvious to controllably cleave copolymer-1 in order

1   to achieve a molecular weight required the '550 patent,

2   Teitelbaum, Ben-Ishai, Yaron Berger, Idelson & Blout, Nylund

3   and Miller; six different references, correct?

4          MR. SKILTON:  Objection.  Misstates the evidence.

5          THE COURT:  Did you follow that, Dr. Zeigler?

6          THE WITNESS:  I believe I did, your Honor.

7          THE COURT:  Can you answer the question?

8          THE WITNESS:  I didn't know whether I was supposed to

9   answer it because of counsel.

10  A.  The answer is yes, this is what our training is, Mr. James.

11  Our training is to look at the prior art and the literature.

12  It's not only patent lawyers that are interested in prior art.

13  Scientists are also interested in it.  And therefore, coming up

14  with six papers would not be that unusual for a person that was

15  looking to study and understand what is going on chemically.

16  Q.  Now, let's look at slide 12, please, Mr. Chase.  And Dr.

17  Zeigler, slide 12 is a slide that you created based on the

18  internal Teva document that was offered by Mr. Gad, correct?

19  A.  Well, I wouldn't say that we created it.  What we did was

20  we, if I may, we just took part of a table and we put it as an

21  inset to another figure that was also included in that

22  document, so we didn't -- in this one, at least, we didn't

23  create anything.

24  Q.  That's fair.  All I meant was that you took these, the

25  table and the graph, you took those from an internal Teva

1  document, correct?

2  A.  That is correct, yes.

3  Q.  And on the lower left, there is a molecular weight

4  distribution curve for four batches of copolymer-1, correct?

5  A.  Yes, that is correct.

6  Q.  And you have never created a molecular weight distribution

7  curve like this using size exclusion chromatography, correct?

8  A.  Using size exclusion chromatography to determine molecular

9  weight?

10  Q.  Yes.

11  A.  You're right.

12  Q.  And these molecular weight distributions, they were

13  generated in 1995, correct?

14  A.  That is the date of the report.  I don't know whether or

15  not the experiments were done in 1995.  I assume they were done

16  close to 1995, if not 1995.

17  Q.  The report was generated in 1995, correct?

18  A.  You mean the written report?

19  Q.  Yes.

20  A.  Yes, that's correct.

21  Q.  Which is a year after the patent application was filed,

22  correct?

23  A.  I don't know if it's a whole year, but it's, it's a

24  calendar year.  Yes.

25  Q.  And just I want to look at the document for a moment, but

1   just looking at the table in the upper right-hand corner, there

2   are average molecular weights stated for those four batches,

3   correct?

4   A.  I'm not sure whether that's, that has standard deviation

5   results.  I'm not sure what "specific" refers to, because the

6   entire table that this came from also discusses standard

7   deviation of the results.

8   Q.  So you don't know what those numbers are in that table you

9   put on the slide, Dr. Zeigler?

10  A.  I didn't say that.  I said merely in the row labeled

11  specific, it's a little unclear to me as to what those average

12  molecular weight ranges refer to.

13  Q.  Well, "specific" means specification, right?

14  A.  I guess so.  There's a period after it, so -- I suppose.  I

15  was not concentrating on that, and perhaps I should have, but

16  I'm not certain as to what that word refers to.

17  Q.  And the average molecular weights that are stated for those

18  four batches, those are peak molecular weights, correct?

19  A.  Yes, that is correct.

20  Q.  So the batches 320, 340, 400 all have peak molecular

21  weights in excess of 10,000 daltons, correct?

22  A.  Are you saying that 320, 340 and 400?

23  Q.  Yes.

24  A.  Yes.

25  Q.  And Teva 03494 has a molecular weight 7,150 daltons, right?

1   A.  Yes.

2   Q.  Let's look at 1704 for a moment.  And I just want to look

3   at the introduction, Mr. Chase.  And as you understand it, Dr.

4   Zeigler, this paper was written in order to compare batches

5   that were used in the BR 1 trial which was performed between

6   1980 and 1985, with batches used in a later trial, the 01-9001

7   trial, correct?

8   A.  That's my understanding.

9   Q.  And if we look at the last sentence of the last paragraph,

10  it says the latter -- and by that it means, current Teva batch,

11  do you see that?

12  A.  Yes.

13  Q.  "The latter was produced according to the up-to-date

14  manufacturing process under GMP conditions and conforms to the

15  same specifications as the drug used in clinical trial 019001

16  and the drug intended for marketing."  Do you see that?

17  A.  I do.

18  Q.  So this paper was really comparing an older set of batches

19  used in the Bornstein trial with a new batch which had a

20  different molecular weight that was used in the 9001 trial

21  correct?

22  A.  Yes.  I think we stated that in earlier testimony.  I

23  agree.

24  Q.  Let's look at slide 22.  And slide 22, Dr. Zeigler,

25  contains your opinions with respect to the '430 patent,

1    correct?

2    A.  Yes.

3    Q.  And the '430 patent claim 1 has a limitation to over

4    75 percent of the molar fraction within the molecular weight

5    range from about 2 kilodaltons to about 20 kilodaltons, right?

6    A.  Yes, it does say that.

7    Q.  And that's a description of the molecular weight

8    distribution, correct?

9    A.  Yes.

10   Q.  And the '550 patent does not disclose a molecular weight

11   distribution for any copolymer, correct?

12   A.  Yes, that's correct.

13   Q.  And there's no reference in the '550 patent to any

14   percentage of molecules on a molar fraction basis, correct?

15   A.  Yes, that is correct.

16   Q.  And there's no data in the '550 patent from which you could

17   calculate the molar fraction of a copolymer-1 sample, correct?

18   A.  Yes, that is also correct.

19   Q.  The '430 patent also contains a limitation to a

20   trifluoroacetyl copolymer-1 having over 75 percent of its molar

21   fraction within the molecular weight range from about 2

22   kilodaltons to about 20 kilodaltons, do you see that?

23   A.  I do, yes.

24   Q.  Now, you didn't talk about that in your direct examination,

25   did you?

1    A.   That's correct.

2    Q.   But there's nothing in the '550 patent about the percentage

3    of molecules of the trifluoroacetyl copolymer-1 molecules in

4    the '550 patent, right?

5    A.   Just as there is nothing as we mentioned just previously

6    with regard to the fully deprotected product.

7    Q.   In fact, there's nothing in the prior art to the patents in

8    suit that would provide you with data from which you could

9    calculate the molar fraction of the copolymer-1 molecules

10   claimed in the '430 patent, correct?

11   A.   In terms of calculations, that is correct.  I was referring

12   to the expectations of somebody that had some knowledge of the

13   polypeptide synthesis field, but what you're saying is correct.

14   Q.   Okay, let's talk about the expectation that you set forth

15   in this slide.  Again, it's in the lower right-hand corner.

16   And you discuss the fact that your expectation is based on the

17   substantial overlap in the molecular weight distributions,

18   right?

19   A.   Yes, but not entirely.  In other words, the statement here,

20   basis for obviousness, is apparently restricted to the 320, 340

21   and 400 and to some extent I miswrote, because I was using that

22   more to support the expectation that somebody who has read the

23   publications in the field would have come to.

24   Q.   Well, the publications that were available in the field,

25   they didn't provide a molecular weight distribution for

1  copolymer-1, correct?

2  A.  Yes.  The distinction I'm making is not copolymer-1, but a

3  polypeptide produced by polymerization of N carboxyanhydrides.

4  It's a distinction.  I'm not disagreeing with you.

5  Q.  So it's your opinion, Dr. Zeigler, that a person of skill

6  in the art could have made copolymer-1 using the prior art

7  methods and have measured its molecular weight distribution, is

8  that your testimony?

9  A.  Could you go through that one more time?

10  Q.  Yes.

11  A.  I mean, I understood the words, but I just want to make

12  sure that I'm very clear in terms of how you phrase it.

13  Q.  I think we've established that there were no data in the

14  prior art to the patents in suit from which you could calculate

15  a molar fraction for copolymer-1 molecules, correct?

16  A.  That's my understanding.

17  Q.  And so your only basis for an expectation that there would

18  be a substantial overlap as stated on this slide are the

19  batches that were used in the Bornstein trial and Figure 2,

20  which were not available to the public, correct?

21  A.  Figure 2 is not available to the public, and Bornstein did

22  not have a specific distribution as part of the paper.

23  Q.  So there was no basis for a person of skill in 1994 to have

24  calculated the percentage of molecules on a molar fraction

25  basis between 2 kilodaltons and 20 kilodaltons, right?

1   A.  Calculation, that is correct.

2   Q.  Well, the claims are related to calculations, right?

3   A.  Yes.

4   Q.  If you look at slide 23, Dr. Zeigler, you have your

5   opinions there with respect to claims 2 and 3, right?

6   A.  Yes.

7   Q.  And they have specific time and temperature limitations for

8   the HBr debenzylation step, right?

9   A.  Yes.

10  Q.  But those specific times and temperatures, they're not

11  found in the '550 patent, correct?

12  A.  That is correct.

13  Q.  If we could, I'd like to go back just for a moment to the

14  Teitelbaum paper and I believe you testified that the time and

15  temperature for the Teitelbaum reaction was provided by the

16  Yaron and Berger reference.

17  A.  First of all, that's for the HBr deprotection of benzyl

18  esters.

19  Q.  Yes, I misspoke.

20  A.  You didn't misspoke.  I just wanted to focus on being

21  specific and a correct answer.

22  Q.  We could look at that together just for a moment.

23  A.  Surely.

24  Q.  Let's pull up 1934.  Before we do that, Mr. Chase, let's

25  leave that up, just for a second.  So the Teitelbaum 1971

1  paper, Doctor, describes the deblocking of the carboxy groups

2  of the glutamic acid with the hydrogen bromide in glacial

3  acetic acid, right?

4  A.  Yes.

5  Q.  Then I think we went through a moment ago that you looked

6  through Ben-Ishai, a cite cited there, cite 16 and you find the

7  Yaron and Berger reference, which is DTX 1934 and you said that

8  gives the time and temperature, correct?

9  A.  The Yaron and Berger?

10  Q.  Yes.

11  A.  As I mentioned, they wanted to avoid peptide cleavage, and

12  they report that what they did was vary the time and

13  temperature.

14  Q.  Right, and you said that the time and temperature stated

15  there was room temperature overnight, right?

16  A.  That was the Ben-Ishai and Berger paper.  I'm not sure

17  whether you're talking about the Yaron and Berger paper or the

18  Ben-Ishai and Berger paper.  Yes, to the best of my

19  recollection, the Ben-Ishai and Berger paper was in one place

20  it said 12 hours, in another place it said overnight, and room

21  temperature.

22  Q.  Okay.  Just give me one moment to look at this, because I

23  don't want to mislead you.

24          (Pause)

25  Q.  I apologize, I have it now.  Could you pull up 1759,

1    Mr. Chase?  1759 is the Ben-Ishai article, correct?

2    A.  Yes.

3    Q.  And let's look at the last, next to the last page,

4    Mr. Chase, where it talks about the hippuric acid in the middle

5    of the page right there.  It says, "To benzyl hippurate there

6    was added hydrogen bromide in glacial acetic acid and the

7    mixture was left overnight at room temperature."  Do you see

8    that?

9    A.  I do.

10   Q.  And you testified that that would provide you with the time

11   and temperature for the Teitelbaum 1971 HBr debenzylation step,

12   correct?

13   A.  Yes, that's the reference that I, I don't know if I stated

14   it exactly in that way.  What I said, though, was that if one

15   wanted the details for debenzylation, one would have gone to

16   Ben-Ishai and Berger.

17   Q.  And these are the details for the debenzylation in

18   Ben-Ishai and Berger, right?

19   A.  Yes, they are, right.

20   Q.  When you carry out the debenzylation as set forth in the

21   1971 Teitelbaum paper, you get a molecular weight for

22   copolymer-1 of 23,000, correct?

23   A.  That is correct, yes.

24   Q.  So when you follow the directions in the 1971 Teitelbaum

25   paper with respect to time and temperature of the HBr

1  debenzylation step you get a molecular weight of 23,000, right?

2  A.  Well, Teitelbaum, et al, did.  Again, there could be

3  batch-to-batch variation.  I talked a lot about that.  But in

4  terms of that particular paper, and in terms of the '550 patent

5  citing that, that's correct, that leads to a molecular weight

6  at least of those two batches of approximately 23,000.

7  Q.  Thank you.  So let's look at slide 24 now, Mr. Chase.

8  Slide 24, Dr. Zeigler, is your analysis of the '476 claims,

9  right?

10  A.  Yes.

11  Q.  And in the '476 claims, you have the molecular weight

12  limitation for the molar fraction between 2 and 20 kilodaltons

13  and you also have a limitation that it contains less than

14  5 percent of species of copolymer-1 having molecular weight

15  over 40 kilodaltons.  Do you see that?

16  A.  I do.

17  Q.  And on the right, you say "Cop-1 made by the '550 patent,

18  e.g., 10 to 15 kilodaltons, will have only a small molar

19  fraction, if any, above 40 KDa."  Do you see that?

20  A.  I do.

21  Q.  But in fact, the evidence in this case shows that that is

22  not the inevitable result if you have a copolymer-1 batch with

23  a molecular weight between 10 and 15, right?

24  A.  Yes, it depends how you look at the glass being half empty

25  and half full.

1   Q.  So in fact, you're aware that there are batches in evidence

2   right now between 10 and 15 kilodaltons that have greater than

3   5 percent species over 40 kilodaltons, right?

4   A.  Could you give me specific examples?

5   Q.  Well, they're in the patents, right?  They're in the

6   patents in suit?

7   A.  Oh.  The 5 to 9 kilodaltons talks about having no material

8   above 40 kilodaltons --

9   Q.  You're talking about --

10  A.  -- so I'm a little confused.

11  Q.  -- material between 12 and 14 kilodaltons here, correct,

12  Dr. Zeigler?

13  A.  Yes.

14          THE COURT:  Mr. Skilton, you have an objection?

15          MR. SKILTON:  Yes, he's interrupting the witness.

16          THE COURT:  If you can --

17          MR. JAMES:  I apologize, your Honor.

18          THE COURT:  Yes, let him finish.  It's a little

19  difficult with both of you going back and forth.

20  Q.  Dr. Zeigler, do you have the '808 patent there?

21  A.  That would be number 1?

22  Q.  Yes, and Mr. Chase, could we look at column 3?  Just before

23  the heading example 2?

24  A.  And where are we?

25  Q.  I have it on the screen.  Column 3 lines 14 through 18.  Do

1    you see that?

2    A.  Yes, I do.

3    Q.  It says the other batch of copolymer-1 which was not

4    subjected to chromatography had an average molecular weight of

5    12 KDa.  Do you see that?

6    A.  I do.

7    Q.  And that would be between 10 and 15 as listed on your

8    slide, the one we were just looking at, right?

9    A.  Yes.

10   Q.  And this says that 2.5 of the batch had a molecular weight

11   above 42 kilodaltons, do you see that?

12   A.  Mm-hmm.

13   Q.  And 5 percent of the total copolymer-1 species in the batch

14   had a molecular weight over 40 kilodaltons.  Do you see that?

15   A.  I do.

16   Q.  So you would agree with me, Doctor, that is not a necessary

17   result, that if you have a molecular weight of between 10 and

18   15 kilodaltons that you will have less than 2.5 percent or less

19   than 5 percent species over 40, correct?

20   A.  No, Mr. James.  This is talking about specifically 12

21   kilodaltons and we're talking about in excess of 10,000

22   daltons, and therefore your statement is not absolutely

23   correct.

24   Q.  But you would agree with me that a batch that had a

25   molecular weight of 12 kilodaltons as shown here has greater

1  than 5 percent species over 40 kilodaltons, correct?

2  A.  This particular batch, yes, but not necessarily, but again,

3  I would not go down to in excess of 10 because I haven't seen

4  such data.

5  Q.  But we -- strike that.

6  A.  I'm trying to be specific.  Not difficult.

7  Q.  Let's look at slide 27, please, Mr. Chase.  Slide 27, Dr.

8  Zeigler, relates to your analysis of the '539 claims, right?

9  A.  Yes, it does.

10  Q.  And claim 1 of the '539 patent claims a copolymer-1

11  composition that has a molecular weight of about 4 to about 9

12  kilodaltons, right?

13  A.  Yes.

14  Q.  And that's a peak molecular weight measured using size

15  exclusion chromatography, right?

16  A.  Yes.

17  Q.  Then it says that the composition is suitable for treating

18  multiple sclerosis.  Do you see that?

19  A.  I do.

20  Q.  Now, Dr. Zeigler, you offered an opinion that that claim

21  was obvious over to the '550 patent, right?

22  A.  I did, yes.

23  Q.  The '550 patent does not disclose a copolymer-1 batch

24  having an average molecular weight of about 4 to about 9

25  kilodaltons, right?

1    A.  Would you please just repeat that question?  I lost my
2    concentration for a moment.
3    Q.  The '550 patent does not disclose a batch of copolymer
4    having a molecular weight of about 4 to about 9 kilodaltons as
5    the Court has construed that term, right?
6    A.  That is correct.
7    Q.  But you offered the opinion that it would be obvious to use
8    that copolymer-1 having those molecular weight characteristics
9    to treat a patient who had multiple sclerosis, right?
10   A.  That is my opinion.
11   Q.  But you're not a medical doctor, correct?
12   A.  That is correct.
13   Q.  And you have no experience treating people for multiple
14   sclerosis, right?
15   A.  Yes.  I thought that this was about somebody of ordinary
16   skill in the art, and I answered this according to that.
17   Q.  Well, you have no basis to testify as to what a person who
18   was treating multiple sclerosis would have believed about
19   batches of copolymer-1 in 1994, correct?
20   A.  If I was relying strictly on my own abilities, that might
21   be correct, but I was relying on the Bornstein paper
22   specifically.
23   Q.  You were relying on the 1987 Bornstein paper that reports a
24   clinical trial for copolymer-1 having molecular weights between
25   14 and 23,000 daltons, right?

1  A.   That is correct, yes.

2  Q.   And on the basis of that paper, you offered the opinion

3  that you thought it would be obvious to treat a patient with a

4  copolymer-1 batch that had a much lower molecular weight,

5  correct?

6  A.   I think that we have to understand here that I am not

7  advocating how a physician would treat a patient.  I am looking

8  the patents of a person of ordinary skill in the art as I

9  defined it, and therefore, I made an attempt to answer it from

10 that perspective.  I'm not a physician, I have no intention of

11 injecting any people with copolymer-1 or anything else.  But

12 nonetheless, I feel that a person of ordinary skill in the art

13 could offer an opinion on that.

14 Q.   A person of ordinary skill in the art as a biochemist?

15 A.   And polymer chemist.

16 Q.   And polymer chemist, you believe it would be appropriate to

17 offer the opinion about whether or not it would have been

18 obvious to treat people with multiple sclerosis with a new

19 copolymer-1 composition?

20 A.   That was what I was asked to do.  I felt confident doing it

21 then.  I feel confident doing it now.  I'm sure that the Court

22 is going to make a decision on that.

23 Q.   And you're aware that after the Bornstein trial on the

24 copolymer-1 having molecular weight between 14,000 and 23,000,

25 that Teva had to carry out another clinical trial on the low

1   molecular weight copolymer-1, right?

2   A.  I know that there were other clinical trials.  Again, the

3   specifics of it, you know, are not ingrained in my memory, but

4   I know that there were other trials.  I believe three, four

5   years later, something of that sort.  I think probably the

6   '91-'92 trials are what you're referring to.

7           THE COURT:  Mr. James, how much longer, approximately?

8   And/or is this a good time to break?

9           MR. JAMES:  This would be a good time to break.  I

10  would say 30 minutes at the most.

11          THE COURT:  We'll take a ten-minute break.

12          (Recess)

13          THE COURT:  All right, Mr. James.

14          MR. JAMES:  Thank you, your Honor.  Mr. Chase, could

15  we put up slide 19 again, please?

16  Q.  Dr. Zeigler, let me go back again to your opinion on

17  obviousness of the claims of the patents in suit and with

18  respect to the '808 patent, it's your opinion that the '550

19  patent renders obvious the claim to a copolymer-1 composition

20  that has a molecular weight of about 5 to 9 kilodaltons, right?

21  A.  Based on knowledge of the kinds of molecular weight

22  profiles that one would get with N carboxyanhydrides

23  polymerization, yes.  Not specifically necessarily for

24  copolymer-1, but just in general.

25  Q.  Well, you've offered an opinion that this claim directed to

copolymer-1 having that average molecular weight limitation is

obvious, right?

A.  Yes.

Q.  So it's your opinion that a person of skill in the art

could have followed the teachings of the '550 patent and the

other references and have made copolymer-1, correct?

A.  Yes.

Q.  And that they could have targeted this molecular weight

range of about 5 to 9 kilodaltons, right?

A.  Yes, by manipulating time and temperature.

Q.  And they could have adjusted the HBr debenzylation

conditions in order to achieve that molecular weight, right?

A.  That is my position.

Q.  And that they could have used the techniques known in the

art at the time to determine whether in fact the sample had a

peak molecular weight between 5 and 9 kilodaltons, right?

A.  Using SEC and calibrants?

Q.  Yes.

A.  No, that's not my position.  I don't believe that there

were suitable calibrants, you're talking about the '550 patent.

No, not by that SEC chromatography.

Q.  So it's your opinion that they could have made the product

but they could not have determined its molecular weight in

1994, correct?

A.  That's not -- no, that's not my opinion.  My opinion is

1    that there were many ways, particularly direct methods of

2    measuring molecular weight that were available by 1994.  I'm

3    sorry, I thought you were talking about the '550 patent in

4    terms of 1994.  I'm not nearly as certain about the calibrants

5    at 1994 as I am about the '550 patent.  So maybe I

6    misunderstood you, but there's certainly one thing I know

7    because it's true also at the time of the '550 patent is that

8    there were a number of ways of measuring molecular weight.

9    Q.  But the Court has construed the claim to require the peak

10   molecular weight measured using SEC, correct?

11   A.  Yes.  I'm not trying to cross the Court in any way, shape

12   or form, merely to state that there were and both in terms of

13   the '550 patent and the '808 patents and patents in suit, there

14   were methods that were available to measure molecular weight.

15   I myself would have been most comfortable using those because

16   of my own experience and because of my own preferences.

17   Q.  You've offered the opinion that this claim is obvious,

18   correct?

19   A.  I did, yes.  And I do.

20   Q.  So my question is, Dr. Zeigler, you believe that a person

21   of skill in the art after they made this copolymer-1

22   composition according to the method you said was obvious that

23   they could have measured its molecular weight in a way that

24   would have met the Court's claim limitation of average

25   molecular weight, right?

1   A.  Insofar as the direct measurements are related to the peak

2   average, in other words, they have to be related to some

3   degree.  That's what I'm counting on.  That's the basis on

4   which I am opining.  What you're saying is partially correct in

5   the sense that I am not opining in terms of SEC and calibrants,

6   that's beyond my area of expertise.  I've never done that.  But

7   I am opining on the general use of molecular weight

8   determination, which obviously the Court is not defining

9   copolymer-1 on.

10  Q.  Let's go back to slide 19.  Dr. Zeigler, in the middle of

11  the right hand column where you say basis for obviousness,

12  there is a reference to EP 620 and you say it discloses

13  copolymer-1 like compositions as low as 5 kilodaltons.  Do you

14  see that?

15  A.  I do.

16  Q.  Now, you understand that the '620 patent was considered by

17  the Patent Office during the prosecution of the patents in

18  suit, correct?

19  A.  I assume so.  I have no way of knowing, Mr. James.  Again,

20  this is beyond my expertise and ken.  I assume so, because it's

21  part of the prior art.

22  Q.  Well, I can show you the face of the patent.  The face of

23  the patent shows that the EP 620 application was considered by

24  the Patent Office.

25  A.  That's fine.

1   Q.  So you disagree with the Patent Office's issuing these

2   patent claims over the '620 in combination with the '550,

3   correct?

4           MR. SKILTON:  Object to relevance.

5           THE COURT:  True.  Next question.

6   Q.  Now, let's look at the Court's construction of the term

7   copolymer-1.  Have you looked at that, Dr. Zeigler?

8   A.  Yes, I've seen that.

9   Q.  And in particular, the Court has construed the term

10  copolymer-1 as a mixture of polypeptides having certain

11  characteristics and if we go down to the bottom it says, "which

12  is synthesized by polymerization of suitably protected amino

13  acid carboxyanhydrides."  Do you see that?

14  A.  I do.

15  Q.  Now the '620 patent application, EP 620, that does not

16  disclose polymerization using amino acid carboxyanhydrides,

17  correct?

18  A.  I was very careful not to mention EP 620 to indicate this

19  is a methodological biological approach to produce what they

20  hoped to be copolymer-1 like polypeptides.

21  Q.  Let's go back to slide 19.  In fact, Dr. Zeigler, the EP

22  620, it doesn't disclose copolymer-1 compositions with an

23  average molecular weight of 5 kilodaltons, does it?

24  A.  I'm not sure what section you're referring to, but if you

25  recall I was quoting a sentence on the front page to the effect

that this was the range that the patent was disclosing, so I'm

not quite sure the distinction that you're making, Mr. James.

Q.  Well, let's look at the 620.  It's DTX 1970.  Do you have

that, Dr. Zeigler?

A.  It's on my screen.  I haven't gotten a tab.

Q.  And in particular, I'd like to look at page 3, Mr. Chase.

The second full paragraph towards the end, I believe it's the

sentence you were referring to, right, Dr. Zeigler, it says,

"More specifically, a preferred copolymer may consist of

alanine, lysine, glutamic acid and tyrosine and have a

molecular weight between about 5,000 and 50,000 daltons."  Do

you see that?

A.  I do.

Q.  Those molecular weights, 5,000 and 50,000 daltons, those

are individual molecular weights, correct?

A.  One could understand it that way, but one can understand it

in a way that's very different.  Because the original

production of clones of bacteria include billions of clones of

bacteria with billions of different individual sequences and

sizes and therefore it really depends if you're talking about

the entire range of materials produced, or the final objective

of getting down to one or a few sizes.  So that's not clear at

all to me.  It could be either one, and certainly in one case I

would be right, and in one case you would be right.  It just,

it's in the eye of the beholder.

1    Q.  Dr. Zeigler, the reference to 5,000 and 50,000 daltons,

2    those are references to individual molecular weights of

3    polypeptides, correct?

4    A.  Not necessarily.  Molecular weight could be average

5    molecular weight as well.  I think that it's open to question,

6    since in the process one starts with a production of products

7    with a large range of molecular weights which would be average

8    molecular weights.  In the course of carrying out the patent,

9    one could reduce the diversity but one doesn't have to.

10   Therefore, it seems to me with an honest reading that it could

11   be individual single units or it could be the averages,

12   depending at what point in the process you were looking at.

13            MR. JAMES:  Your Honor, if I could hand up the

14   deposition transcript, please?

15            THE COURT:  Sure.

16   Q.  Dr. Zeigler, and, your Honor, I'm going to ask him about

17   the transcript page 26, lines 21 to 25.

18   A.  What pages did you say again, please?  26?

19   Q.  Yes, sir.

20   A.  Yes.

21   Q.  Lines 21 to 25.

22            THE COURT:  Go ahead.

23   Q.  Dr. Zeigler, at your deposition --

24   A.  Excuse me, I'm not sure, it says at one point page 101 and

25   another place at the bottom it says page 26.  So I'm not sure

1  which page you're referring to.

2  Q.  In, each of the pages has four quadrants, do you see that?

3  A.  I do.

4  Q.  And in the upper left hand quadrant there's one that says

5  page 26.

6  A.  Yes.

7  Q.  Do you see that?

8  A.  Yes.

9  Q.  And do you recall I took your deposition?  Dr. Zeigler, do

10  you recall that?

11  A.  Yes, I -- it certainly is familiar to me.

12  Q.  Do you remember that?  Okay.  And at your deposition I

13  asked you the question:

14  "Q.  And the reference to 5,000 and 50,000 daltons, those are

15  references to individual molecular weights of polypeptides,

16  correct?

17  "A.  Yes."

18        Is that your testimony, Dr. Zeigler?

19  A.  No, it seems to me that right after -- I'm on page 27, what

20  I did was, I expanded the answer there saying each copolymer,

21  that is, each vector that is used to get into the bacterium,

22  each one has got a particular molecular weight, and that's what

23  I'm saying right now.  In other words, if one starts off and

24  then clones the various sequences and sizes, one would get a

25  composition in bacteria of billions of different vectors and

1    clones, and again, one can understand the product of this

2    mixture of different bacteria as producing peptides,

3    polypeptides of an average molecular weight, but ultimately,

4    one could by virtue of cloning smaller and smaller numbers of

5    colonies get to smaller molecular weights.

6              If I didn't say that, that's certainly what I meant.

7              THE COURT:  Dr. Zeigler, do me a favor.  Going

8    forward, just answer his question.  And then when Mr. Skilton

9    gets up, he'll ask you some additional ones and you can respond

10   to that.  Okay?

11             THE WITNESS:  I'm sorry.

12             THE COURT:  No, that's all right.  Don't apologize.

13   Go ahead, Mr. James.

14             MR. JAMES:  Thank you.

15   Q.  Dr. Zeigler, still focusing on that sentence that we're

16   looking at in the 620 EP, there's no reference in that sentence

17   to average molecular weights, correct?

18   A.  That is correct.

19   Q.  So you would agree that -- well, strike that.

20             Dr. Zeigler, there's no disclosure in the '620 patent

21   of the measurement of an average molecular weight using size

22   exclusion chromatography, correct?

23   A.  Yes, that is correct.

24   Q.  And the authors of the '620 patent, they were focused on

25   polypeptides that had molecular weights of 15,000 to 23,000

1    daltons, correct?

2    A.  If I may correct a minor point.  There's one author.  I

3    believe it's just Dr. Cook.

4    Q.  Thank you.

5    A.  But with that minor adjustment, I believe that that is

6    stated somewhere at the beginning.  I would have to look to

7    find it.

8    Q.  It's stated in the application that the focus was

9    polypeptides between 15,000 and 23,000 daltons, correct?

10   A.  I remember reading that somewhere in the patent.

11   Q.  And in fact, the two molecules that are exemplified in the

12   620 EP, they have molecular weights that are 11600, and 16,900,

13   correct?

14   A.  I remember that.  I'll take your word for it as to the

15   exact molecular weights.  It certainly sounds like the results.

16   I'm sure you're right.

17   Q.  There is no example in the '620 application of a

18   polypeptide that had a molecular weight of 5,000 daltons,

19   right?

20   A.  Correct.

21   Q.  And you would agree, Dr. Zeigler, that you can't identify

22   an example in the prior art to the patents in suit to a

23   copolymer-1 having an average molecular weight of 5,000

24   daltons, correct?

25   A.  That is correct.  You're talking about average molecular

1   weight, I believe, in that last question, right?

2              MR. JAMES:  Yes.

3              I have no further questions.

4              THE COURT:  All right.  Redirect.

5              MR. SKILTON:  Thank you, your Honor.

6              THE WITNESS:  Thank you, Mr. James.

7              MR. JAMES:  Thank you.

8   REDIRECT EXAMINATION

9   BY MR. SKILTON:

10  Q.  Dr. Zeigler, it's been a long day for everybody, so I'll

11  try to direct you specifically to the subjects, and if you

12  could keep your answers relatively short.

13  A.  It's very difficult for a pedantic teacher.

14  Q.  Yes, indeed.  Nick, will you pull up the '550 patent?  And

15  I point you to column 1, line, I think it's 57.  All right,

16  now, Doctor, you were asked about this particular line.  Is

17  copolymer-1 as you read that paragraph one of the novel

18  compositions disclosed in the '550 patents?

19  A.  Yes, it is.

20  Q.  And the disclosure there includes the 10,000.  How did you

21  in your analysis as a person of ordinary skill in the art

22  regard the significance of that disclosure in terms of your

23  opinions, the 10,000.

24  A.  The way that I read it, and I was reading it I guess every

25  time as a person of ordinary skill in the art rather than as a

1    patent lawyer looking for claims versus specifications, was

2    that each of these molecular weights by virtue of being

3    mentioned could be applied to copolymer-1 batch.

4    Q.  Nick, would you pull up PTX 17 for me, please?  Your Honor,

5    it was admitted in the first case.  In particular page 304384

6    from that, and second full paragraph, if you would.  And, Dr.

7    Zeigler, I will represent to you that this comes from a part of

8    Teva's patent prosecution statements to the United States

9    Patent Office.  The one I want to point your attention to is

10   the first sentence, and would you highlight that?  And I will

11   read it.  "The '550 patent teaches a copolymer-1 with a minimum

12   molecular weight of 10 kilodaltons."  Doctor, how does that

13   statement to the United States Patent Office comport with your

14   opinions?

15   A.  It seems to support the way that I read it.  As I

16   mentioned, I'm reading it as a scientist.

17   Q.  Now, Doctor, we talked about the trail that you were

18   talking about in your direct, and Mr. James directed some

19   questions on the combination of articles that you referred the

20   Court to.  But I want to address you in that regard to a more

21   specific aspect as it relates to the HBr cleavage step.  What

22   is the chemistry taught to the person of ordinary skill in the

23   art should they have those articles or any one of them in

24   combination tacked to their board as they're doing the HBr

25   cleavage in this experiment, what is the chemistry taught?

1    A.  As I defined a person with ordinary skill in the art, an

2    advanced degree, I would expect them to understand that HBr

3    cleavage of peptides depends on the conditions that are being

4    employed.  And that one can employ conditions of lesser

5    stringency in order to avoid peptide cleavage or conditions of

6    greater stringency or harshness in which case one can

7    accelerate the amount of cleavage.

8    Q.  Now, in his lengthy cross as it relates to molecular weight

9    and the Figure 2 and the like that you used and cited in your

10   opinions as they relate to the patent claims in question,

11   Mr. James did not mention the concept of polydiversity --

12   poly -- help me on that, I'm getting tired too.

13   A.  Dispersity?

14   Q.  Thank you, throughout those questions, focusing on such

15   things as peak molecular weight and the like.  Would you take

16   the opportunity to relate your testimony earlier today on

17   polydispersity and as it relates to ranges and the question of

18   peak molecular weight, and I'll first ask you this question:

19   Does the determination of peak molecular weight in any given

20   sample as respect to the molecule, does that in any way affect

21   questions of polydispersity?

22   A.  Mr. Skilton, could you either repeat the question or

23   rephrase it?  I'm not sure I understand what --

24   Q.  I'll try again, because it was a terrible question.

25   A.  I'm sorry.

1    Q.  So bad that I don't understand it.

2            How does the question of polydispersity relate to this

3    issue of what you can expect with respect to adjacent ranges?

4    A.  Virtually every method of measuring molecular weight will

5    give somewhat different results, and consequently, one could

6    get an idea of the degree of polydispersity by employing

7    different ways of measuring molecular weight, but one would

8    hope that the peak molecular weight would not be, using

9    suitable calibrants would not be too far away from the other

10   molecular weight determinations that you use, and having said

11   that, understanding that there is such great diversity in the

12   sizes, they could be different, but one would hope that they

13   wouldn't be so different.

14   Q.  All right, then, how does your opinion that you developed

15   this morning on overlap relate to the question of expectable

16   performance with respect to the issue of poly dispersity?  Do

17   you understand what I'm asking you?

18   A.  Yes, I believe I do.  I think that again, without using the

19   Gad report as prior art, what I was using it was as just kind

20   of a general means of looking at differences in peak molecular

21   weight as related to the degree of the percent of molar

22   overlap, that the degree of overlap is really extensive and it

23   becomes more extensive, the overlap, as the peak molecular

24   weights become closer and closer between two batches.

25   Q.  Let's stay within the peak concept as was being framed by

1   Mr. James.  Does the molecular weight distributions of

2   copolymers within a peak of 9 versus a peak of 10 have overlap?

3   A.  I think that anybody with experience in poly disperse

4   solutions would feel that there would be a tremendous degree of

5   overlap.

6   Q.  Tell me, does your experience, how does your experience

7   with similar molecules to copolymer-1, and identify them,

8   please, for the Court in the answer, permit you to make the,

9   give the opinions you did with respect to obviousness, for

10  example, at a 5 to 9 range?

11  A.  The materials that I was making which was polymers of

12  sequential peptides, again, would have a considerable diversity

13  and 9 and 10 would have considerable overlap.

14          In fact, I'm not quite sure to what extent one would

15  be able to fractionate because there's an inherent error in the

16  measurement which also has to be taken into account.

17          (Continued next page)

18

19

20

21

22

23

24

25

1    BY MR. SKILTON:

2    Q.  Now, nobody wants me to go over any of the slides again,

3    including myself, but you were asked a lot of questions

4    specifically about certain limitations.

5            As a first general proposition, given the questions

6    that Mr. James was asking you, has your opinion on any of these

7    obviousness questions that we addressed in the slides changed

8    in any respect?

9    A.  No, Mr. Skilton.  Because I was looking at this not as a

10   patent lawyer.  I've been looking at that -- in fact, the

11   reason I was brought in was strictly in terms of my scientific

12   opinions, and I certainly hope not for my legal opinions.

13   That's not my --

14   Q.  Well, let me drill down a little bit to focus you and the

15   Court on what I'm trying to get at; and that is to say that you

16   mentioned in response to Mr. James that time and temperature

17   variations to you were obvious, and as a person of ordinary

18   skill in the art.

19           And so we talked about particular, if you will,

20   statements of time or temperature.  You opined that they were

21   obvious.  Could you fill that out?  What is the basis for you

22   to say to the Court as person of ordinary skill in the art,

23   that the specific kinds of time and temperature limitations

24   that are now claimed in the patents were, in your opinion,

25   obvious to one of ordinary skill in the art?

1    A.   Virtually any chemical reaction will have its rate depend

2    on time and temperature.

3    Q.   And?

4    A.   That's inherent in terms of chemistry.

5    Q.   And what is also, in your opinion, inherent in terms of

6    variations of that time and temperature condition when you're

7    talking about, for example, the HBr step?

8    A.   Certainly the amounts that are mentioned in '808 in the

9    patents in suit, but again I don't see any need to be confined

10   necessarily.  A priori as a scientist looking to study

11   cleavage, I wouldn't necessarily think that one is confined to

12   the particular range that's specified there.

13            A reasonably good scientist will have an open mind

14   about that, and, and test the variables.

15   Q.   All right.  And again without getting back to the specific

16   slides, we talked about limitations that talked about the

17   constituency in 5 percent and 2 percent and over 40, et cetera.

18   And I don't want to specifically identify the terms per se, but

19   you also opined that those limitations were obvious to you as

20   one of ordinary skill in the art.  Did I understand that

21   correctly?

22   A.   Yes.  I stand by those opinions.

23   Q.   And, again, at the high level, if you will, of 30,000 feet,

24   explain to the Court the basis for your opinion as a person of

25   ordinary skill in the art as to why these limitations, in terms

1    of constituency, were obvious?

2    A.   It was my expectation, it still is my expectation, that the

3    degree of overlap in such a polydisperse system as peptide

4    polymerization would be extensive as long as the molecular

5    weights, however determined, were reasonably close.

6    Q.   And from your experience with other like molecules, can you

7    tell the Court, a little more specifically, as to why you had

8    that opinion?

9    A.   In my experience, that kind of diversity occurred with the

10   polymers that I was studying, and just like any other person of

11   ordinary skill in the art, I would utilize that background and

12   experience to a system that I haven't studied specifically.

13   That's the nature of what research is all about.

14   Q.   And with respect to the polydispersity of the molecules you

15   were working with, did you consider them in contrast, for

16   example, to what you understood was the polydispersity of

17   co-polymer-1?

18   A.   Would you please repeat that?

19   Q.   Is there any similarity, in your opinion, between the

20   polydispersity of the molecules that you were working with and

21   the polydispersity of copolymer-1?

22   A.   There were some similarities in terms of wide distribution

23   of molecular weights, but the molecular weights of the monomers

24   were certainly different.

25   Q.   Now, I want to talk specifically, if I may, to the exhibit

1    that relates to the Weizmann batches.

2          MR. SKILTON:  Your Honor, may I consult with my

3    colleague for just a second, please?

4          THE COURT:  Yes.

5          MR. SKILTON:  Thank you.

6          Your Honor, I'm now referring the Court again and the

7    witness to DTX 1704R.

8          And, Nick, would you turn to the portion of the

9    document that the witness was earlier looking at, which relates

10   to the molecular weight batches from the Weizmann Center.

11   Q.  And, first of all, let me try, if I can, to understand what

12   your answers were to Mr. James.

13         You list this document, amongst others, as support for

14   your opinion; am I right?

15   A.  Yes.  It's pretty clear that it's not prior art per se.

16   You it was not available to the public.

17   Q.  Well, with respect to the Weizmann batches, you did

18   indicate, did you not, that they were produced, according to

19   your study, this document sometime in the early '80s?

20   A.  Yes.

21   Q.  Okay.  Now, was cop-1 of the molecular weights of 10,350,

22   13,000 and 14,000 kilodaltons known in the art as of the date

23   of May 24th, 1994?

24   A.  Well, certainly 14,000 was disclosed in the, excuse me, in

25   the Bornstein paper.

1    Q.  And is there anything, in your opinion, about these

2    profiles that are shown in the document that we're looking at,

3    that's unexpected about the molecular weight profiles therein

4    shown for those three batches?

5    A.  No.  They conform, and I believe that Dr. Gad concludes

6    that to the specification that, that were accepted at the time

7    of preparation.

8    Q.  And would you expect batches in the ten to 15 kilodalton

9    range to have a high percentage of its molar fraction within

10   the two to 20 kilodalton range?

11   A.  I would, based on my studies of poly dispersed solution of

12   polypeptides.

13   Q.  And would you expect batches in the ten to 15 kilodalton

14   range to have material over 40 kilodaltons?  Would you expect a

15   small amount of that material above 40 kilodaltons to be in the

16   range?  And that's a very bad question and I'm going to try

17   again.

18          What would you expect with respect to the amount of

19   material that would be over 40 kilodaltons?

20   A.  I can't say specifically, Mr. Skilton, because every batch

21   is going to produce a different distribution of molecular

22   weights, and so I'm not sure that I can really answer that

23   question, except to say that if it's in a molecular weight

24   range that you're talking about, it will be low.

25   Q.  All right.  Now, what about these three batches, the

1  Weizmann Center batches?

2              MR. SKILTON:  Nick, would you please pull up the slide

3  that relates to this question?

4              All right, Nick, would you go back to figure B.,

5  please, and expand the part around the 40,000?  Sorry, your

6  Honor, for the imprecision of this.

7              THE COURT:  That's okay.

8  Q.  All right.  Now, we're looking at that portion of this

9  expanded, you see that?  And, Doctor, comment on that 40

10 kilodalton range and how it meets your expectation based on

11 what you know about polydisperse?

12 A.  Yes.  I'm sorry.  Each of the hash marks here represents

13 10,000 daltons molecular weight.  So this hash mark would be

14 10,000, this would be 20,000, this would be 30,000, this hash

15 mark would be 40,000 molecular weight, and this hash mark would

16 be 50,000 molecular weight.

17 Q.  And as a person of ordinary skill in the art, does that

18 polydispersity as represented on these batches, in any way

19 surprise you?

20 A.  It doesn't surprise me.

21 Q.  Is it consistent with your expectations?

22 A.  In the sense that it would be low.

23             But, again, there's no way for me to know, Mr. Skilton

24 exactly what sort of distribution would be over 40,000 except

25 just to tell you that, that molecular weights in the ranges of

1   these four batches should have a very reasonably low, because

2   there's a wide distribution of molecular weights, but there's a

3   limit.

4           I'm not surprised, however, that we are dealing with

5   an extremely low percentage of molecular weights, multi

6   fractions in the 40,000 molecular weight.

7   Q.  All right.  So now convert the explanation you gave with

8   respect to those curves with respect to those batches?

9   A.  In this particular case, these four batches of Dr. Gad, all

10  have less than 40,000 molecular weights, that is in terms of

11  significance.

12          There's no significant amount of material.  There

13  could be a few molecules, but not a significant percentage of

14  the molar fraction.  In fact, it looks to me like all of them

15  hit zero before they hit 40,000.

16  Q.  And how did the observation you're making on this chart,

17  then, support the opinions that you gave with respect to the

18  obviousness of the claims, for example, identify the 40

19  kilodalton and above range, how does that analysis support your

20  opinion?

21  A.  Well, my opinion is that the amount of material that is in

22  that range is going to be extremely low, if in fact the

23  molecular weight, if you will, by peak average is in the low

24  range, say ten to 15,000 molecular weight.

25          MR. SKILTON:  Now, your Honor, I'm going to do

1    something, with the Court's indulgence, that I don't normally

2    do.  But since it's a trial to the Court, I'm going to ask the

3    witness, is there a question I should have asked you but

4    didn't, to clarify your testimony?

5              THE COURT:  Go ahead.  Is there?

6    Q.  Doctor, you were cross-examined for about two hours,

7    roughly.  In the course of that examination, Mr. James asked

8    you a number of questions.  I tried to follow up.

9              And my question that the Court has permitted me to ask

10   or perhaps ask you directly, is there a question that you would

11   like me to address to you that you think you would like to

12   clarify?

13   A.  What's for dinner?

14             THE COURT:  Okay.  Thank you, Dr. Zeiger.

15             Anything further from plaintiffs?

16             MR. JAMES:  No, your Honor.

17             THE COURT:  All right, thank you very much, Doctor,

18   you're excused.

19             THE WITNESS:  Thank you, your Honor.

20             (Witness excused)

21             THE COURT:  All right.  Who is our next witness?

22             THE WITNESS:  Your Honor, may I carry these back?

23             THE COURT:  You don't have to.  People will come and

24   get them.

25             THE WITNESS:  Can I leave the laser pointer?

1          THE COURT:  You can leaver whatever you want.  That

2    would be great.  Thank you.

3          MR. JONES:  Your Honor, the next witness is Doctor

4    Susan Rice.  I anticipate her testimony will go, especially if

5    I talk slow like I'm supposed to, about an hour to an hour and

6    15, hour 20.

7          With the Court's indulgence, I know it's been a long

8    day for everyone.  And, frankly, Dr. Rice has a bit of head

9    congestion.  If we could get here in, get her tendered as an

10   expert, and then call it a day and pick her up tomorrow

11   morning, if that's okay with the Court?

12         THE COURT:  You can do that.  Come on up.

13         MR. JONES:  Is that acceptable?

14         MR. WIESEN:  That's fine.  No problem.

15         MR. JONES:  Thank you, your Honor.

16         THE COURT:  Come on up, Doctor.

17         MR. JONES:  With that understanding then, Dr. Rice,

18   please.

19    SUSAN A. RICE,

20        called as a witness by the defendant,

21        having been duly sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. JONES:

24   Q.  Would you please provide the Court with your educational

25   background?

A.   I have a bachelors of science in biochemistry from the

University of California at Davis.  I received that in 1971.  I

have a Ph.D. in comparative pharmacology and toxicology, also

from the University of California at Davis.  I received that

degree in 1976.

Q.   Dr. Rice, I'm going to have you explain what pharmacology

is, briefly?

A.   Pharmacology is a science that studies the efficacious or

therapeutic effects of drugs.

Q.   And then can you tell us what toxicology is?

A.   Toxicology is a science that studies the adverse effects of

drugs, chemicals, physical agents, such as radiation.

Q.   Now, I believe you said your Ph.D. was in comparative

pharmacology and toxicology, correct?

A.   Yes, it is.

Q.   Why don't you tell me what the term comparative adds to

your degree; what is that denoting?

A.   Comparative in this case means comparative species.  Many

toxicology and pharmacology programs are centered completely

around the human experience.

       My program included all sorts of animal species, in

addition to humans.  So we studied the biochemistry, the

physiology, pharmacology, and toxicology of multiple species

from mice, rats, dogs, horses, and humans.

Q.   Did you prepare a thesis to obtain your Ph.D.?

1    A.  Yes, I did.

2    Q.  What did you do your thesis in?

3    A.  My thesis was on the pulmonary edema caused by the

4    thiocarbamide, which is also known as thiourea.

5    Q.  I've never understood any Ph.D.'s thesis, so I'm going to

6    ask you to translate that as well.  Could you tell me in lay

7    person's terms what you did, what you wrote your thesis on?

8    A.  Thiourea was used as a rodenticide.  It killed rodents,

9    primarily rats.  And my thesis involved looking at the

10   mechanism of action of that rodenticide and determining why it

11   caused pulmonary edema, which means essentially water in the

12   tissues of the lung.

13   Q.  Can you tell me what toxicity is and how it relates to

14   toxicology?

15   A.  Toxicity is actually the adverse effects that are seen.

16   And toxicology is the science that studies adverse effects.

17   And part of the science is involved in looking at the dosage,

18   dose response, absorption, distribution, metabolism, secretion

19   of drugs, chemicals and their metabolites and looking at their

20   effects in various organs in the body.

21   Q.  Dr. Rice, what did you do after you received your Ph.D. in

22   1976?

23   A.  I took a post doctoral position at Stanford University in

24   the School of Medicine, the Department of Anesthesia.

25   Q.  What was the focus of your post doctorate work?

1   A.   In my post doc, I studied the toxicity of the inhaled

2   anesthetic agents.  And by inhaled I mean such things ass ethyl

3   ether, which is only an example of a very old anesthetic, but

4   most people recognize it.

5   Q.   What did you do following your post doctorate work at

6   Stanford?

7   A.   I stayed at Stanford, and I was a research associate for a

8   period of two years.  And during this time I also studied

9   additional toxicity of the inhaled anesthetic agents.

10  Q.   Were you ever given an opportunity to join the faculty at

11  Stanford University?

12  A.   Yes.  In 1979 I joined the faculty as assistant professor,

13  in the Department of Anesthesia, School of Medicine.

14  Q.   Did you receive any promotions while on the faculty at

15  Stanford University?

16  A.   Yes.  I was promoted to associate professor.

17  Q.   During your time at Stanford University as assistant, then

18  an associate professor, what was the focus of your research

19  work?

20  A.   The focus of my research continued to be various aspects of

21  the toxicity of the inhaled anesthetic agents.  I worked both

22  with animal models and with in vitro systems to look at the

23  toxicity, and I participated and designed clinical studies with

24  my M.D. faculty colleagues to look at issues in humans.

25  Q.   You're going to talk about it a little more later, but

1  would you just briefly explain the difference between an in

2  vivo test and an in vitro test, at least as it related to the

3  research that you were doing at Stanford University?

4  A.  Well, a in vivo test is one that is performed in life or in

5  the whole body, if you will.  It's in an experiment that's

6  conducted in a living animal, such as mice or rats.  A in vetro

7  study is one that is performed on individual cells or fractions

8  of cells, and they're usually conducted in test tubes or petri

9  dishes.

10  Q.  Now, you say you left Stanford in about what time period,

11  do you recall?

12  A.  I left Stanford mid 1990.

13  Q.  What did you do after you left Stanford University, the

14  Medical School faculty of Stanford University?

15  A.  I joined a scientific and engineering consulting firm in

16  the San Francisco bay area.

17  Q.  And what kind of scientific consulting -- go ahead and

18  please make liberal use of the water up there.

19        What kind of scientific consulting did you do after

20  you left Stanford during your work?

21  A.  I consulted in the areas of pharmacology and toxicology,

22  but primarily in the area of toxicology.

23  Q.  You say that you were at this consulting firm for three

24  years.  What did you do after your three year stint with the

25  consulting firm?

1    A.   After I left the consulting firm, I formed my own

2    consulting firm, Susan A. Rice and Associates, Inc.

3    Q.   And are you still with Susan A. Rice and Associates, Inc.?

4    A.   Yes, I am.

5    Q.   Not are you still Susan Rice, but you're still with your

6    consulting --

7    A.   I still have the consulting firm, yes.

8    Q.   Very well.  And is that a full-time occupation for you, Dr.

9    Rice?

10   A.   Yes, it is.

11   Q.   Tell me the areas in which you and your firm consult and

12   the areas that you've worked in since 1993?

13   A.   Well, as I said, in the areas of pharmacology and

14   toxicology, but it is primarily directed toward the

15   pharmaceutical and medical device industries, where I help my

16   clients to negotiate the regulatory requirements of the FDA,

17   and sometimes other agencies.

18   Q.   Do you ever assist clients in the pharmaceutical industry

19   in performing toxicological studies for purposes of FDA review?

20   A.   Yes.  Much of what I do is helping clients to identify the

21   studies need to be performed, analyzing studies if they have

22   been performed previously.  And sometimes I would monitor in

23   person the studies.  And certainly I look over all studies that

24   are completed under my direction.

25            I also aid in compiling information, summarizing

1    information related to studies that are performed and conduct,

2    as needed, literature reviews, and summarize and evaluate that

3    information for the use of my clients, and the presentation to

4    the FDA.

5    Q.  And I think it was in there, but just so I'm clear, do you

6    assist clients, and if you don't perform the study yourself, do

7    you assist the clients in the pharmaceutical industry and other

8    industries in designing a toxicological test that would test

9    for the, or look for toxicity of various chemicals or agents?

10   A.  Yes.  But the majority of tests that are required by the

11   regulatory agencies are fairly prescribed, and so there are

12   standard test batteries, if you will.  The test batteries

13   depend on the particular indication and -- excuse me -- and the

14   particular part of the agency that you're dealing with.

15           So I would identify those tests, and then help to find

16   an appropriate contract research organization to perform the

17   work.

18           I do not perform any of the toxicology tests myself,

19   although, as I said before, I may monitor for my clients.

20   Q.  Dr. Rice, in the course of your work as a consultant in the

21   toxicological industry or art, approximately, how many

22   toxicological -- and I will continue to mispronounce that so I

23   apologize -- how many toxicological reports or studies would

24   you estimate you have reviewed in the course of your career?

25   A.  That's really hard, but it's thousands and thousands.

1   Q.  Dr. Rice, in the course of your career, have you prepared

2   any publications?

3   A.  Yes.

4   Q.  About how many publications have you prepared?

5   A.  I have a total of about 60 publications, which includes

6   about 50 peer-reviewed articles.  I have a number of book

7   chapters that I've written for anesthesiology texts and for

8   toxicologists in various areas, and then I've also prepared

9   some technical reports.

10  Q.  Doctor, do you have any credentials or certifications?

11  A.  Yes.  I am a Diplomat of the American Board of Toxicology.

12  Q.  So does that mean that you're board certified?

13  A.  Yes, I am board certified in Toxicology.

14  Q.  Dr. Rice, I want you to tell me what the primary focus of

15  your over 30 year career has been as it relates to toxicology?

16  A.  The primary focus of my career has been applied

17  pharmacology and toxicology.  And lately it's been more in the

18  applied toxicology arena.  And by that I mean that I am not so

19  much interested in the theoretical aspects of toxicology or

20  pharmacology, but I am interested in how the fundamentals of

21  toxicology apply to the real world; and that is, in helping

22  clients to perform appropriate tests and interpreting tests,

23  toxicology tests that have been performed, and then also in

24  evaluating individual exposures to chemicals or interactions

25  with drugs, which becomes a big problem in a lot of drugs that

1  are submitted for the FDA.

2  Q.  Mr. Russel, could you please pull up DTX1322?

3          Dr. Rice just so you can kind of get used to the

4  procedure, there is a binder at the witness stand with the

5  exhibits by number with tabs.  We will also put up and publish

6  exhibits on the screen, both small and large for you to review,

7  so whatever is easier for you, please feel free to do that.

8          Well, there will soon be a binder with your exhibits.

9  A.  Thank you.

10  Q.  Yes.  All right, let's proceed.  Thank you, Mr. Russell.

11  Dr. Rice is DTX-13 -- no, please keep it up, thank you.

12          Dr. Rice, is DTX-1322 a copy of your curriculum vitae?

13  A.  Yes, it is.

14  Q.  Does 1322 contain a list of some of the publications that

15  you spoke about in your direct?

16  A.  Yes, it does.

17  Q.  Does it indicate your board certification?

18  A.  Yes, it does.

19  Q.  Is 1322 a true and accurate representation of the

20  activities and tasks and positions you've held in the field of

21  toxicology during your career?

22  A.  Yes, it does.

23  Q.  And it is true and accurate, to the best of your knowledge,

24  and current?

25  A.  Yes, it is.

1      MR. JONES:  I move admission of DTX-1322, your Honor.

2      MR. WIESEN:  No objection, your Honor.

3      THE COURT:  Admitted.

4      (Defendant's Exhibit 1322 received in evidence)

5      MR. JONES:  Thank you, your Honor.  And with that,

6  Mylan tenders Dr. Rice as an expert in the field of toxicology.

7      THE COURT:  Any objection?

8      MR. WIESEN:  No objection, your Honor.

9      THE COURT:  All right, Doctor, thank you.  Then the

10  Court accepts you as an expert in toxicology.

11      And I believe that everyone would like to adjourn now.

12      MR. JONES:  That would be fine.

13      THE COURT:  There's one thing I'd like -- Dr. Rice,

14  you can step down.  I hope you feel better.

15      Can I get some idea of who the witnesses are, going

16  into the future after Dr. Rice?  I guess I can start with

17  Mylan.

18      MS. BLOODWORTH:  Your Honor, Dr. Rice is Mylan's last

19  witness before we start the --

20      THE COURT:  Before you what?

21      MS. BLOODWORTH:  After Dr. Rice, I believe Sandoz is

22  going to present a couple witnesses next, so maybe Mr. Doyle

23  can talk to that.

24      THE COURT:  Who will they be, Mr. Doyle?

25      MR. DOYLE:  They will be Dr. John Bishop from Momenta,

1   and then Dr. Carl Scandella.  Dr. Laird before Dr. Scandella.

2              THE COURT:  Okay.

3              MR. DOYLE:  Then Dr. Scandella.

4              THE COURT:  All right.  And then that would put us

5   at --

6              MS. BLOODWORTH:  And, your Honor, and then Mylan will

7   resume with -- currently we have scheduled for Dr. Mays,

8   although we're still working with Sandoz to see if that's going

9   to be duplicative.  So if it's duplicative of Dr. Scandella, we

10  will not call Dr. Mays.

11             THE COURT:  Okay.

12             MS. BLOODWORTH:  To try to streamline things.  And

13  then we ever Dr. Ari Green, who is our physician witness, who

14  cannot come in until Monday.

15             THE COURT:  What's his name?

16             MS. BLOODWORTH:  Dr. Green.

17             THE COURT:  Okay.

18             MS. BLOODWORTH:  And we will also be moving in our

19  depositions, et cetera, but that will be the conclusion.

20             THE COURT:  That will be it for live testimony?

21             MR. DOYLE:  Yes, your Honor.

22             MS. BLOODWORTH:  Except for possible rebuttal, your

23  Honor.

24             THE COURT:  All right.  And Ms. Holland?

25             MS. HOLLAND:  Yes, your Honor.  We will begin our

1  rebuttal case.  We anticipate on Monday with recalling Dr.

2  Grant, followed by Dr. Dubin, and I'm trying to remember the

3  list, but it was Dr. Gokel and Dr. Sampson.

4             THE COURT:  Okay.

5             MS. HOLLAND:  And then we have some maybes, your

6  Honor, but those are the ones that we believe will be called.

7             THE COURT:  You believe at this point you'll be

8  calling.

9             MS. HOLLAND:  Yes.

10            THE COURT:  Okay.  So tomorrow we will certainly

11 finish Dr. Rice, and then we'll have Dr. Bishop?

12            MR. DOYLE:  Yes, your Honor.

13            THE COURT:  And possibly --

14            MR. DOYLE:  And I believe we'll conclude Dr. Laird

15 tomorrow as well.

16            THE COURT:  Okay, good.  I'll see everybody at 9:30

17 then.

18            Is there anything you wanted to raise tonight?

19            MS. HOLLAND:  The only thing, your Honor, that our

20 understanding is that Doctor -- we will begin our rebuttal case

21 after Dr. Green on Monday, the 19th.  That's what we're

22 anticipating.  I'm not sure what that means about Friday and --

23 because I'm not sure whether defendants are going to take the

24 full day on Friday or not.

25            THE COURT:  All right.

1     MR. DOYLE:  I think we're likely to take most of

2  Friday, your Honor.

3     THE COURT:  Okay.  If you don't, everyone will leave

4  and be very happy.  We'll take it from there.

5     MS. HOLLAND:  Thank you.

6     THE COURT:  Okay, see you tomorrow at 9:30 --

7  including the Reporters.

8     (Adjourned to September 15th, 2011 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

ALLEN ZEIGLER

Direct By Mr. Skilton . . . . . . . . . . . 806

Cross By Mr. James . . . . . . . . . . . . . 928

Redirect By Mr. Skilton . . . . . . . . . . 978

SUSAN A. RICE

Direct By Mr. Jones . . . . . . . . . . . . 991

PLAINTIFF EXHIBITS

Exhibit No.                              Received

 DTX 1759    . . . . . . . . . . . . . . . . 831

DEFENDANT EXHIBITS

Exhibit No.                              Received

 1322    . . . . . . . . . . . . . . . . .1000

 1711    . . . . . . . . . . . . . . . . . 838

 1783    . . . . . . . . . . . . . . . . . 821

 1784    . . . . . . . . . . . . . . . . . 861

 1855    . . . . . . . . . . . . . . . . . 857

 1934    . . . . . . . . . . . . . . . . . 849

 DTX 1759    . . . . . . . . . . . . . . . . 831

 DTX 1806    . . . . . . . . . . . . . . . . 893

 DTX 1970    . . . . . . . . . . . . . . . . 884