19fztev1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TEVA PHARMACEUTICALS USA,
INC., TEVA PHARMACEUTICALS
INDUSTRIES LTD., TEVA
NEUROSCIENCE, INC. and YEDA
RESEARCH AND DEVELOPMENT CO.
LTD.,

                Plaintiffs,

          v.                        08-CV-7611 (BSJ)

SANDOZ, INC., SANDOZ
INTERNATIONAL GMBH, NOVARTIS
AG, and MOMENTA
PHARMACEUTICALS, INC.,

                Defendants.
------------------------------x
TEVA PHARMACEUTICALS USA,
INC., TEVA PHARMACEUTICALS
INDUSTRIES LTD., TEVA
NEUROSCIENCE, INC. and YEDA
RESEARCH AND DEVELOPMENT CO.
LTD.,

                Plaintiffs,

          v.                        09-CV-8824 (BSJ)

MYLAN PHARMACEUTICALS INC.,
MYLAN INC., NATCO PHARMA LTD.,

                Defendants.         Non-Jury Trial
------------------------------x

                                    New York, N.Y.
                                    September 15, 2011
                                    9:30 a.m.

Before:

              HON. BARBARA S. JONES,

                                    District Judge
```

19fztev1

                              APPEARANCES

KENYON & KENYON
        Attorneys for Plaintiffs
BY:  ELIZABETH J. HOLLAND, ESQ.
        WILLIAM G. JAMES, II, ESQ.
        CAROLYN A. BLESSING, ESQ.

GOODWIN PROCTER, LLP
        Attorneys for Plaintiffs
BY:  DAVID M. HASHMALL, ESQ.
        JOHN T. BENNETT, ESQ.
        NICHOLAS K. MITROKOSTAS, ESQ.


MORRISON & FOERSTER LLP
        Attorneys for Defendants
BY:  DAVID C. DOYLE, ESQ.
        KAREN L. HAGBERG, ESQ.
        ERIC M. ACKER, ESQ.

PERKINS COIE LLP
        Attorneys for Defendants
BY:  JOHN S. SKILTON, ESQ.
        DAVID L. ANSTAETT, ESQ.
        SHANNON M. BLOODWORTH, ESQ.
        DAVID JONES, ESQ.

ALSO PRESENT:  CORT CHASE, Litigation Support

19fztev1

|   |   |
|---|---|
| 1 | THE DEPUTY CLERK:  All rise. |
| 2 | THE COURT:  Good morning.  Please be seated. |
| 3 | Come on up, Dr. Rice. |
| 4 | MS. BLOODWORTH:  Before we start, I just have a couple |
| 5 | matters. |
| 6 | THE COURT:  Sure. |
| 7 | MS. BLOODWORTH:  Your Honor had ordered us to produce |
| 8 | the empower data to plaintiffs a couple days, and I just wanted |
| 9 | to provide you with a letter showing that we had done so. |
| 10 | THE COURT:  Okay, fine. |
| 11 | MS. BLOODWORTH:  We were able to provide it yesterday, |
| 12 | the underlying data for what we produced in June. |
| 13 | THE COURT:  Okay, great. |
| 14 | All right, Mr. Jones. |
| 15 | MR. JONES:  Thank your, your Honor. |
| 16 | SUSAN A. RICE, |
| 17 | called as a witness by the defendant, |
| 18 | having been previously sworn, testified as follows: |
| 19 | DIRECT EXAMINATION |
| 20 | BY MR. JONES: |
| 21 | Q.  All right, Dr. Rice, let's pick up.  Just for context, the |
| 22 | Court has accepted you as an expert in the field of toxicology, |
| 23 | so now we're going to get into the substance of your opinion, |
| 24 | all right, your work? |
| 25 | A.  All right. |

1    Q.  Dr. Rice, what's your understanding as to when the

2    applicants applied for the '808 patent?

3    A.  It was May, 1994.

4    Q.  And have you been asked to define a person of ordinary

5    skill in the field of toxicology as of May of 1994?

6    A.  Yes, I have.

7    Q.  And what is your definition of a person of ordinary skill

8    in the field of toxicology?

9    A.  A person of ordinary skill in the field of toxicology would

10   be one who has a Ph.D. in toxicology or a related field, and

11   has three to five years of experience, practical experience

12   after the Ph.D.

13   Q.  Now, Doctor, I know that from our discussion yesterday you

14   have some 30 years of practical experience in toxicology.  So

15   I'm going to ask you to keep in mind when I ask you questions

16   this morning, I want you answering from the perspective of a

17   person of ordinary skill in the art of toxicology, unless I ask

18   for something different.  All right?

19   A.  All right.

20   Q.  Very well.  Now, I understand you're not a lawyer, so.  You

21   were also asked to make some assumptions regarding patent law

22   principles as they apply to your work in this case, is that

23   right?

24   A.  That's correct.

25   Q.  All right.  And what were those assumptions that you were

1  asked to make?

2  A.  I was asked to make three assumptions, and the first is

3  that the '550 patent is prior art; the second that the 1987

4  clinical article by Bornstein, which was published in the New

5  England Journal of Medicine is prior art; and, third, in

6  determining whether unexpected results have been shown, the

7  legal test is whether there is a difference in kind, and not

8  just degree compared to the prior art.

9  Q.  Doctor, why don't you flesh out a little bit about what

10  you -- how you understand that difference in kind versus

11  difference in degree test, what that means to you from the

12  perspective of a person of ordinary skill in the art as you

13  reviewed the materials?

14  A.  To me a difference in kind is where there is significant,

15  very significant difference in the findings; in this case in

16  the toxicity of the agent.  And --

17          THE COURT:  Excuse me, Dr. Rice.

18          Mr. Jones, why don't we just get into the meat of the

19  testimony.

20          MR. JONES:  Sure.

21          MR. WIESEN:  Thank you.

22  Q.  In providing an opinion in this case, Doctor, have you

23  reviewed the '550 patent and the Bornstein study?

24  A.  Yes, I have.

25  Q.  And have you reviewed the toxicity study or analysis that's

1  contained in the specification, the common specification for

2  the '808 and other patents in suit in this matter?

3  A.  Yes, I have.

4  Q.  Now, have you been asked to render an opinion in this case

5  regarding whether a person of ordinary skill in the art of

6  toxicology would have found that the claimed copolymer-1 in any

7  form exhibit unexpectedly lower toxicity in the prior art?

8  A.  Yes, I have.

9  Q.  And what is your opinion on that issue?

10  A.  My opinion is that a person of ordinary skill in the art of

11  toxicology would not have found that the claimed copolymer-1

12  compositions in any form would have exhibited unexpectedly

13  lower toxicity compared to the prior art.

14  Q.  All right.  Now, for purposes of your work and your

15  opinion, did you perform your own independent experiments,

16  toxicological experiments or studies on copolymer-1?

17  A.  No, I did not.

18  Q.  What did you do to come to your opinion?

19  A.  To come to my opinion, I looked at the patents and the

20  references therein, I looked at the references, and then I also

21  looked at Teva Bio-Yeda, and the Weizmann Institute documents

22  and related documents.

23          MR. JONES:  Mr. Russell, may we see PTX-1, the '808

24  patent?

25  Q.  Doctor, you indicated that the '808 patent is one of the

19fztev1                    Rice - direct

1  patents that you reviewed in the course of coming to your

2  opinion in this case, is that correct?

3  A.  That's correct.

4  Q.  All right.  Now, the first reference, we talked about this,

5  mentioned it already.  The first reference that we're going to

6  talk about is the '550 patent, correct?  You see that on the

7  face of the patent?

8  A.  Yes, I see that.

9  Q.  All right.  If we could have up PTX-26, the '550 patent,

10  which has previously admitted in this case.

11           All right.  Now, Dr. Rice, you were here for Dr.

12  Zeiger's redirect testimony yesterday?

13  A.  Yes, I was.

14  Q.  And in that redirect you heard that he testified about

15  PTX-17 at TEV304384 in which Teva stated that the '550 patent

16  teaches a copolymer-1 with a minimum molecular weight of ten

17  kilodaltons?

18  A.  I understand that, yes.

19           MR. WIESEN:  Objection, your Honor.  I think the

20  transcript speaks for itself in terms of what the documents

21  say.  I'm not sure why we need to read them into the record.

22           THE COURT:  I assumed she needs a reference point for

23  her testimony.  But is that -- are you saying that's not

24  accurate?

25           MR. WIESEN:  I think it wasn't quite exactly what the

19fztev1                    Rice - direct

1   document reflected, but if it's just for the context for the

2   witness --

3           MR. JONES:  If you want, I can have the exhibit pulled

4   up so we have the precise wording if the Court would like?

5           MR. WIESEN:  If it's just for the reference, then we

6   can just move things along, then.

7           THE COURT:  Okay.

8           MR. JONES:  Very well.

9           THE COURT:  What are you referring to, though?

10          MR. JONES:  We're referring to the document from the

11  filed history that Dr. Zeiger talked about in his redirect

12  where, which had the statement from Teva that the '550 patent

13  teaches a copolymer-1 with a, I believe it was with a

14  minimum --

15          THE COURT:  Prosecution history?

16          MR. JONES:  Yes, ma'am.

17          THE COURT:  Okay, fine.

18          MR. JONES:  Yeah, with a minimum molecular weight.

19          THE COURT:  I just wasn't sure what you were talking

20  about.

21          MR. JONES:  Right, that history of minimum of ten

22  kilodaltons.

23          THE COURT:  Okay.

24  Q.  All right.  And, in fact, is that consistent with what you

25  were asked to again assume as part of your giving your opinion

1   that the '550 patent described a copolymer-1 that has at least

2   at the lower range starting about ten kilodaltons?

3   A.   Yes, that's what I understood.

4   Q.   Now, what is your understanding of the molecular weight

5   range claimed in the '808 patent?

6   A.   I understand that weight range to be five to nine

7   kilodaltons.

8   Q.   Now, I'm going to ask you -- I know you're not a copolymer

9   peptide chemist, so I'm asking you from the perspective of a

10  person of ordinary skill in toxicology.  What would you expect

11  to be the difference in the toxicity profile between the range

12  claimed in the '808 patent, and the low end of the range

13  described in the '550 patent?

14  A.   I would expect that the molecular weight ranges between the

15  two, the five to nine composition and the lower ten would

16  overlap probably considerably.  And where they didn't overlap,

17  I would expect them to essentially butt up one against the

18  other.  So I would not expect any significant difference in the

19  toxicity profile between the two compositions.

20  Q.   All right.

21          MR. WIESEN:  Your Honor, I have to -- that's outside

22  the scope of this expert's or this witness' expertise, so I I'm

23  going to move to strike.

24          THE COURT:  That is true.

25          MR. JONES:  We're just focusing on what you would

19fztev1                          Rice – direct

1    expect as to the toxicity profile between the two ranges.

2              THE COURT:  I didn't hear anything about toxicity.

3              MR. JONES:  Okay, let me make -- may I rephrase the

4    question, then, so it's clear?

5              THE COURT:  All right, let's hear it.

6              MR. WIESEN:  Your Honor, not to cut off Mr. Jones, but

7    even that, given the differences we've heard about the ways

8    that the average molecular weight are measured, and the fact

9    that that distinction can matter here, I think the ability of

10   this witness with her expertise couldn't even make this

11   comparison.

12             THE COURT:  I haven't heard why the witness believes

13   that either she would know why there would be a toxicity

14   difference or no difference in these ranges.  I mean, I'll hear

15   it, but so far I don't know how she can opine on this, okay.

16             MR. JONES:  Right.

17   Q.  From the perspective of a person of ordinary skill in

18   toxicology, I'm simply asking you -- I'm not asking you to

19   evaluate molecular weight range overlap.  But given a range of

20   five to nine and a low range that starts at ten, what's your

21   perspective as to whether there would be a change or whether

22   you would expect to see a change in the toxicity profile at

23   that point of --

24             THE COURT:  I don't know what the foundation is for

25   this.

19fztev1                    Rice - direct

1   Q.  Is it, as part of your work as a toxicologist is it, do you

2   evaluate toxicity profile of agents?

3   A.  Yes, I do.

4   Q.  And do you have experience in assessing the toxicity

5   profile of agents in different doses?

6   A.  Yes, I do.

7   Q.  In different compositions?

8   A.  Yes, including polymers.

9   Q.  And so in polymers in different weight ranges?

10  A.  Yes.

11  Q.  Given that experience, what would you expect to see as to

12  the -- in regard to the toxicity profile between the '808

13  patent and the low end of the '550 patent, what would you

14  expect to see?

15  A.  I would have no expectation that they would be -- that the

16  toxicity profile would be significantly different from one to

17  the other.

18  Q.  And have you reviewed any Teva documents that support this

19  understanding?

20  A.  Yes, I have.

21          MR. JONES:  Mr. Russell, please call up DTX-1250.

22  Q.  Dr. Rice, did you review DTX-1250 in the course of forming

23  your opinion in this case?

24  A.  Yes, I did.

25          MR. JONES:  Note for the Court that DTX-1250 was I

1  believe previously admitted in the testimony of Doctor,

2  Mr. Congleton.

3  Q.  Dr. Rice, what is DTX-1250?

4  A.  DTX-1250 is a Teva document, essentially, an open letter to

5  whom it may concern, and it was written or signed on

6  November 10th, 2005.

7  Q.  Please read into the record the portions of DTX-1250 that

8  you believe support your conclusion that you would -- that

9  there would not be -- that you would not expect to see a change

10 in the toxicity profile between the '808 nuclear weight range

11 and the low end of the '550?

12 A.  The first place is "In the marketing authorization

13 submission, the average molecular weight of the active

14 substance was in the range of 4,700 to 13,000 daltons.

15 However, upon request of some concerned EU member states, the

16 average molecular weight was brought down to the range of 5,000

17 to 9,000 daltons."

18 Q.  Okay, let me stop you.  And is that your understanding of

19 basically the range that's claimed in the '808 patent?

20 A.  Yes, that is my understanding.

21 Q.  All right.  Go ahead, please.

22 A.  "The change in the average molecular weight of the active

23 substance has no implications on the safety and chemical

24 characteristics of the concerned medicinal product."

25 Q.  Now, Doctor, what conclusion do you draw from this Teva

19fztev1                    Rice - direct

1    document?

2    A.   From this document, I would conclude that there was no

3    significant difference in toxicity profile of the compounds in

4    the range of 4,700 to 13,000 daltons, and those from in the

5    range of 5,000 to 9,000 daltons.

6    Q.   Now, Doctor, I note you mentioned toxicity.  The letter

7    talks about safety.  How are those two concepts related from

8    the perspective of a person of skill in the art in toxicology?

9    A.   Safety, in general, there isn't one definition.  But, in

10   general, to a regulatory body such as the FDA would mean the

11   balance of risk and benefit.

12           In this case, in the human condition, there would be

13   what I read here is that there is no expected difference

14   between the two, the two different ranges in the toxicity that

15   is seen in the human population.

16   Q.   All right.  Let's go back to the '550 patent.

17           Doctor, what does the '550 patent, what would that

18   tell a person of skill in the art of toxicology about toxicity

19   of compounds claimed in the '550 patent or described?

20   A.   I found no mention of toxicity in the patent, although one

21   might assume that there is no significant toxicity.  It's not

22   stated, however.

23           MR. WIESEN:  Objection, your Honor.  I move to strike

24   after the word "assume."

25           THE COURT:  All right.

1   Q.  Dr. Rice, let's go back to the '808 patent we saw earlier,

2   PTX-1.  Does it refer to any other studies that provided

3   information on toxicity of copolymer-1?

4   A.  Yes, it did.  It referred to the study by Bornstein

5   published in 1987 in the New England Journal of Medicine.

6   Q.  So we have a clear record, are you looking at column one of

7   the '808 patent, lines 26 through 31?

8   A.  Yes, I am.

9   Q.  All right.  Well, did you discuss the Bornstein 1987 study

10  in your report; is that a document that you reviewed for

11  purposes of giving your opinion?

12  A.  Yes, I did.

13  Q.  All right showing you PTX-31.  Is this the Bornstein study

14  that you discussed in your report?

15  A.  Well, this is actually the table of contents from the

16  Journal that contains the Bornstein study.  I believe on the

17  next page we have the start of the Bornstein study on page 408.

18  Q.  Very well.

19          MR. JONES:  I'll note for the Court that PTX-31 was

20  admitted during the direct testimony of Dr. Arnon.

21  Q.  Dr. Rice, where does the Bornstein study first discuss

22  toxicity information?

23  A.  Toxicity information is discussed on the first page, second

24  column.

25  Q.  All right.  And can you read into the record the language

19fztev1                    Rice - direct

1    from the Bornstein study from 408 that describes or discusses

2    toxicity information?

3    A.    "Cop-1 is also nontoxic during short-term and longer term,

4    three to six months, administration in mice, rabbits, and

5    dogs."

6    Q.    Now, Doctor, I understand that that's simply a single

7    sentence and you can't draw definitive conclusions from that.

8    But from the perspective of a person of skill in the art of

9    toxicology, what does that sentence from the Bornstein study

10   suggest to you about the toxicity of copolymer-1?

11   A.    To a person of ordinary skill, it suggests that, first of,

12   all studies in these various species have been conducted, and

13   no significant effects were found.

14         We know that before drugs are administered to

15   individual patients, that there is certain amount of

16   preclinical testing in animal species that is performed.

17         And so it would I would surmise that these were the

18   preclinical tests that they were talking about.

19   Q.    All right.  And if the description of short-term and longer

20   term -- again I know you can't draw definitive conclusions

21   because you're only discussing the actual findings, but what

22   type of -- what is described as a short-term and a longer term

23   study; what does that mean to a person of ordinary skill?

24   A.    A short-term study would be one where the agent is

25   administered one or several times over a short period of time,

1   maybe up to as long as a week.  And then the longer term

2   studies, as it says here, would be about three to six months.

3   And this is usually what is required to be administering drugs

4   to a patient for more than just a few days.

5   Q.  Finally, Doctor, with regard to this sentence, the fact

6   that cop-1 was shown to be nontoxic in mice and rabbits, and

7   dogs, would that suggest -- again without -- you won't be able

8   to draw firm conclusions, but what does that suggest about

9   repeatability of the non-toxicity determination for

10  copolymer-1?

11  A.  It suggests that we're finding or they are finding

12  non-toxicity in more than one species, and that is usually what

13  is required by the FDA and other agencies before, again, a drug

14  is administered to humans.

15  Q.  Dr. Rice, is toxicity information provided in any other

16  part of PTX-31, the Bornstein 1987 study?

17  A.  Yes, it is.  There's a section on laboratory studies and

18  side effects.

19  Q.  All right.  We're moving to four, page 412 of the Bornstein

20  1987 study; is that correct?

21  A.  Yes.

22  Q.  All right, Doctor, what part of 412 and what part of page

23  412 would we find information of interest to a toxicologist?

24  A.  A toxicologist would be interested in the blood and

25  urinalysis that was performed on these patients during the time

19fztev1                    Rice - direct

1   that they were administering or self administering the drug.

2   Q.  All right.  Just so again we have a clear record, are you

3   referring to information conveyed under the laboratory studies

4   and side effects section on page 412 of the 1987 Bornstein

5   study?

6   A.  Yes, I am.

7   Q.  Dr. Rice, what would a toxicologist conclude after reading

8   the urinalysis and blood examination information contained in

9   the Bornstein study?

10  A.  That there were no toxic effects manifest in the

11  copolymer-1 treated group, or in the placebo treated group.

12  There are no, essentially, no differences between the two

13  groups, and there was no effect that was noted on the various

14  tests of liver function and also blood parameters.

15  Q.  Dr. Rice, is there any further discussion about side

16  effects of copolymer-1 in the Bornstein study?

17  A.  Yes.  There were several side effects that were noted.  The

18  first is the injection site reaction, which was seen in a

19  number of the patients.  It was also seen in some placebo, but

20  primarily in the copolymer-1 administered patients.

21          And then there was there were other side effects that

22  were noted to various degrees such as nausea, headache, that

23  sort of thing.  But those side effects did not rise to the

24  level of toxic effect, because there was no significant

25  difference between the two groups.

19fztev1                        Rice - direct

1    Q.  The two groups, I'm sorry, just the two groups meaning the

2    placebo group and?

3    A.  The placebo group and the copolymer-1 treated group.

4    Q.  All right.

5    A.  In addition, there were two patients that were noted during

6    the course of study to exhibit what Dr. Bornstein has called

7    the vasomotor response.  And it is unclear what -- and this,

8    these were both copolymer-1 treated patients.  It is unclear as

9    to the exact mechanism for this.  We would call it, generally,

10   an idiosyncratic reaction, in that it is unclear what it is

11   related to.  Bornstein had mentioned that there might be some

12   allergic basis to it, but I don't think that was actually

13   determined.

14   Q.  So just so that we're clear, the injection site reactions

15   to these side effects of the vasomotor affects, how does that

16   affect a toxicologist's view as to whether copolymer-1 one is

17   toxic or nontoxic?

18   A.  I would not consider those to be toxic effects.  The

19   injection site reaction is a reaction of the drug at the site,

20   and it would not directly pertain to the systemic toxicity,

21   which is more what we're interested in.

22   Q.  Dr. Rice, does the Bornstein 1987 study tell you the

23   molecular weight of the copolymer-1 composition that was used

24   in the study?

25   A.  Yes, it does.

19fztev1                    Rice - direct

1   Q.  Could we go to 408 of PTX-31?

2   A.  On the first page, the first paragraph of the actual

3   article, we see that the molecular weight range is listed as

4   14,000 to 23,000 daltons.

5   Q.  All right.  So what would a person of skill in the art of

6   toxicology conclude about copolymer-1 and the range from 14,000

7   to 23,000 daltons, what would they conclude as to copolymer-1's

8   toxicity in this weight range?

9   A.  A toxicologist would conclude that there is no toxicity

10  that is evident in humans in this particular range.

11  Q.  All right, let's go back to the '808 patent, PTX-1.

12          Can you please turn with me to example two in the '808

13  patent specification.  And, again, this is the common

14  specification for the patents in suit.  We're at column three,

15  line 20.

16          Dr. Rice, what is being described in example 2A of the

17  '808 patent specification?

18  A.  Example 2A describes the in vivo toxicity analysis.

19  Q.  And what is meant by in vivo?

20  A.  In vivo, essentially, means in life or in the whole body.

21  Q.  Can you please describe for us the in vivo toxicity test as

22  it's explained or described in example 2A of the common

23  specification?

24  A.  Yes.  This particular test is conducted in mice, and

25  different batches of an agent -- in this case copolymer-1 --

19fztev1                              Rice - direct

1   are tested in five mice.  Each of those mice is injected

2   intravenously with 1 milligram of the copolymer-1 batch.  They

3   are subsequently monitored for a period of 48 hours, and

4   specific observations are made at ten minutes, 24 hours, and 48

5   hours, and they are looking for adverse effects, the worse of

6   course is death.

7   Q.  You mentioned that these animals were monitored for a 48

8   hour period, is that correct?

9   A.  That's correct.

10  Q.  Is that for a toxicologist, would that be considered a

11  short-term or longer-term study?

12  A.  This is a short-term study.

13  Q.  All right.  You indicated that the testers were looking for

14  adverse effects, the ultimate one of which of course is death.

15  But what would a toxicologist understand other adverse effects

16  to potentially be?

17  A.  In this particular test, one is limited to things that can

18  be observed by eye in the small animal amounts.  So the things

19  that might be observed would be convulsions, hyperactivity,

20  staggering gate, other things of that nature.

21  Q.  And I note that, Doctor, or you noted that the drug is

22  administered intravenously in this test, is that correct?

23  A.  Yes, it is.

24  Q.  Would an intravenous injection mechanism of administration,

25  is that going to allow the testers to determine, make any

19fztev1                    Rice - direct

1    determinations about injection site reactions?

2    A.  No, you would not be able to determine injection site

3    reactions, unless the compound might be very caustic.

4    Q.  And I should make clear, in the usual -- in your review of

5    the Bornstein study, what is the usual method of delivery of

6    copolymer-1 through an injection?

7    A.  Copolymer-1 in patients is administered subcutaneously.

8    Q.  All right.  Going back to the example 2A study, tell me how

9    the study defined toxicity?

10   A.  The study defined toxicity as any adverse effect, including

11   death, that occurred in any of the five mice tested for a

12   batch.  So if one mouse tested with the batch exhibited adverse

13   effects, including death, that particular batch would be

14   declared toxic.  And if no mice for a particular batch

15   exhibited adverse effects, then that batch would be designated

16   as nontoxic.

17   Q.  All right, let's take a look at the batches that are

18   described -- if we could have highlighted the first paragraph

19   of the example 2A.  Thank you.

20         Doctor, what are the molecular weights of the batches

21   that were tested or that are reported tested in example 2A?

22   A.  There are three batches of copolymer-1 that were tested,

23   and their molecular weights were 7.3, 8.4 and 22 kilodaltons.

24   Q.  And was there also a distinction between the batches in

25   regard to what's called species?

A.   Yes.   Two of the batches had less than 2.5 percent

copolymer-1 species greater than 40 kilodaltons.   Those are the

7.3 and the 8.4 batches.   The higher molecular weight batch 22

kilodaltons was described as having more than 5 percent

copolymer-1 species over 40 kilodaltons.

Q.   All right, now let's go to the last paragraph of example

2A, and please describe how the test reported the results of

the toxicity in vivo test?

A.   Two batches with the average molecular weight of 7.3 and

4.8 kilodaltons were designated as --

Q.   I'm going to stop you.   I think you said 4.8.   Did you

mean --

A.   Did I say 4.8?   It's 8.4, thank you.

Q.   Go ahead.

A.   Were both designated nontoxic, and the batch at 22

kilodaltons average molecular weight where three out of the

five mice died was designated as toxic.

Q.   So based on how the toxicity information or the in vivo

information is presented in the patent, what would a

toxicologist, what conclusions might a toxicologist draw

regarding the toxicity of copolymer-1 in the five to nine

molecular weight range versus an above five to nine range?

A.   From the information that's given here, it certainly looks

as if the five to nine molecular weight range would not be

considered toxic; whereas above ten would be considered toxic

1  because of the 22 kilodalton batch.

2  Q.  And what about again -- same question in regard to the

3  species, the less than 2.5 percent copolymer-1 species over 40

4  KDa versus the more than 5 percent copolymer-1 species over 40

5  KDa?

6  A.  From the information we have, it looks very much as if the

7  less than 2.5 copolymer species over 40 kilodaltons is

8  nontoxic; whereas the batch containing greater than 5 percent

9  of the -- greater than 5 percent of the copolymer-1 species

10  over 40 kilodaltons is toxic.

11  Q.  Doctor, what would a toxicologist assume about the

12  characteristics of the three batches that are analyzed in

13  example 2A?

14  A.  Because this is medical product that is being talked about,

15  a toxicologist would assume that all of the batches being

16  analyzed are the final product.

17  Q.  Now, are you personally or professionally experienced with

18  in vivo tests like that described in example 2A?

19  A.  Yes, I am.

20  Q.  And what's the general utility of such a test?

21  A.  The test is somewhat limited in the information that you

22  can gain, because there is only direct observation, and one of

23  the end points being death.  But, nevertheless, you can get

24  some information as, I mentioned before, if there were

25  convulsions or hyper activity, something of that nature, that

19fztev1                    Rice - direct

1    could be picked up.

2           But overall, it gives you little information in the

3    way that it's conducted.

4    Q.  All right.  Doctor, in reviewing the materials in this

5    case, including Teva documents, did you find a document that

6    augments your understanding of the toxicity analysis contained

7    in example 2A?

8    A.  Yes, I did.

9           MR. JONES:  I'd like Mr. Russell if you put up DTX-419

10   or 3149T.

11   Q.  And from 3149T, we're looking at Bates TEV122355-RC.

12          MR. JONES:  And I'll note for the Court that this

13   version of DTX-3149T, which represents a translation of 3149,

14   was admitted during the July testimony of Dr. Pinchasi.

15          THE COURT:  Thank you.

16   Q.  All right, Doctor, is this document, is 3149T a document

17   that you reviewed in the course of your work in this case?

18   A.  Yes, it is.

19   Q.  What is being depicted in 3949T, what is this?

20   A.  It is a table that contains 13 batches of copolymer-1 one

21   of various molecular weights, which average molecular weights

22   which we see in column two that range from 6,000 250 daltons to

23   22,000 daltons.  And then there is information regarding some

24   other parameters, and then the safety in vivo test.

25   Q.  Column five?

1  A.  Column five is the safety in vivo test, which is the same

2  test that we were previously talking about.

3         MR. JONES:  Would you, Mr. Russell, if you would,

4  please pull up a side-by-side of Exhibit 2 or of example 2A

5  from the '808 patent, and the first page of DTX-3149T?

6         THE COURT:  Mr. Wiesen.

7         MR. WIESEN:  Your Honor, I'm not sure exactly where

8  he's going here, but we had a trial on the inequitable conduct

9  issues in July, which seems to be where we're going.  The

10  defendants have rested on that issue.  Dr. Rice was initially

11  on their witness list for that trial.  They opted not to call

12  her.

13         So we're going to object, to the extent they're going

14  into testimony that's relevant to inequitable conduct, rather

15  than on unexpected results, which is where Mr. Jones appears to

16  be going.

17         MR. JONES:  And we accept that.  This is not about

18  blame or who should have or who would have.  Its just about

19  toxicity information.

20         THE COURT:  All right.  Well, I'll hear it.

21         MR. JONES:  Very well.

22  Q.  Now, Dr. Rice, is it your assessment after listening to the

23  testimony of Dr. Pinchasi and others, is it your assessment

24  that DTX-3149T, that the test described there are the tests

25  that's depicted in example 2A of the common specification?

1    A.  Yes, that is my understanding.

2    Q.  And do you see any batches from 3149T that are depicted in

3    example 2A?

4    A.  Example 2A has three batches that are also shown in the

5    April '94 data table.

6    Q.  All right, which ones are those?

7    A.  It is the second and third batch, and then the final batch.

8    Q.  So that's the 7300 molecular weight, the 8400 molecular

9    weight and the 22,000 dalton molecular weight are depicted in

10   3149T, as well as in example 2A?

11   A.  That is correct.

12   Q.  All right.  Now, Doctor, does 3149T depict any molecular

13   weights between 8400 and 22,000, any batches with molecular

14   weights?

15   A.  Yes, there are nine batches that are evidenced here between

16   8400 and 22,000 daltons.

17   Q.  And in those nine batches, how many of those batches report

18   that mice died in the safety in vivo test?

19   A.  Of these nine batches, none of them report any deaths in

20   the mouse in vivo safety test.

21   Q.  Would you please read into the record, or actually I

22   probably could do this quicker.  So I will simply read into the

23   record those weights, and you can confirm for me.

24          So zero mouse died are 9250?

25          THE COURT:  Mr. Jones, I know what they are.

19fztev1                         Rice - direct

1    MR. JONES:  Okay.  Very well.

2    THE COURT:  I can read.

3    MR. JONES:  That's super.

4    THE COURT:  You've identified where they are.

5    MR. JONES:  Thank you, your Honor.

6    THE COURT:  Thank you.

7  Q.  Now, Dr. Rice, is it your understanding of having again

8  reviewed materials outside in preparing your report, that some

9  of the batches in 3149T were rejected batches of copolymer-1?

10 A.  Yes, that's my understanding.

11 Q.  And which batches are those?

12 A.  Those are the ones that start at 04592.  There are three

13 batches.

14 Q.  So 04592, 04692, and 04492, those are -- those were

15 rejected batches of copolymer-1 one?

16 A.  Yes.  It is my understanding they were rejected on the

17 basis of their chromatographic profile in the select B column.

18 Q.  All right.  And as to -- do you have an understanding as to

19 whether some of the batches depicted on 3149T were marker

20 batches?

21 A.  Yes.  The last three batches were marker batches, starting

22 196/2, and then going through 186/1.

23 Q.  All right.  And do you see -- you can take off the green,

24 thank you -- do you see any batches with the prefix 123?

25 A.  Yes, I do.

1  Q.  And based on, again, your review of information provided in

2  this case, what's your understanding of what the 123 prefix

3  means in regard to a batch of copolymer-1?

4  A.  My understanding is all of these batches are a final

5  formulated product.

6  Q.  Now, Dr. Rice, does example 2A contain molecular weight

7  batches from identical product batches?

8         MR. WIESEN:  Your Honor, there is no doubt now we're

9  headed into inequitable conduct.  I object to this line of

10  questioning.

11         MR. JONES:  If you about give me conditional

12  relevance -- in fact, I'll ask the predicate relevance

13  question, then you'll see this is relevant to a toxicologist's

14  understanding of the reliability of the 2A example.

15         MR. WIESEN:  The reliability of the 2A data was part

16  of the issue in the inequitable conduct trial.  We're talking

17  now about unexpected results which, quite frankly, aren't just

18  limited to what's in the patent.

19         THE COURT:  No, I know.  I don't expect to see this

20  argument in the inequitable conduct.

21         MR. JONES:  Of course not.  Of course not.

22         THE COURT:  Go ahead.

23         MR. JONES:  Thank you, your Honor.

24  Q.  All right.  As a toxicologist, I think you mentioned it

25  earlier, but what a toxicologist has confidence in a study,

19fztev1                    Rice - direct

1    what does a toxicologist expect in regard to the

2    characteristics of tested batches?

3    A.   The only way that one can properly compare different

4    batches of molecular weights or anything else, is to have the

5    various batches controlled, so that the only variable being

6    tested is that of molecular weight and nothing else.

7              So I would want to see all of the batches prepared in,

8    essentially, the same way to essentially be prepared the same

9    way as the final formulated product is.

10   Q.   Now, when we look at example 2A, 2A reported the results of

11   the 7300 and the 8400 or dalton batches, correct?

12   A.   That's correct.

13   Q.   And were those, from your understanding, are those final

14   product batches?

15   A.   My understanding is that they are final product batches.

16   Q.   And then it's reported that 22 KDa result, correct?

17   A.   Yes.  And the 22 KDa result is from a batch that has been

18   found to be a marker batch.

19   Q.   Now, and I know that you're not an expert on the

20   composition of marker batches versus final product batches, but

21   what does that do to the confidence of a toxicologist's

22   understanding that final product batches were prepared with a

23   non-final product batch?

24             MR. WIESEN:  Objection, your Honor.  He just said

25   you're not an expert in this, but what does it mean.  There is

1    no foundation for this question.

2              THE COURT:  There isn't.

3    Q.  What does it do to your confidence as a toxicologist if

4    batches -- if non-final product batches are compared to final

5    product batches?

6              MR. WIESEN:  Same objection, your Honor.

7    A.  As a toxicologist --

8              THE COURT:  Just a minute.

9              THE WITNESS:  I'm sorry.

10             THE COURT:  That's okay.

11             If she doesn't know what a marker batch is, I don't

12   understand the question.

13             MR. JONES:  Well, if she understands that a marker

14   batch is not a final product batch --

15             THE COURT:  Well, do you?

16             THE WITNESS:  Oh, yes, I do.

17             THE COURT:  Okay.

18   Q.  All right, I'll get that on the record.  Do you understand,

19   from having read testimony and expert reports in this case,

20   that marker batches differ or are different from final product

21   batches?

22   A.  Yes, I do understand that.

23   Q.  So given that predicate, how does it affect the confidence

24   of a toxicologist to understand that final product batches were

25   compared with marker batches?

19fztev1                    Rice - direct

1    A.  It certainly gives me no confidence.  Because I expect the

2    batches to be prepared in the same manner so there might not be

3    any other factors introduced that could influence the toxicity.

4    Q.  Now, we've been talking about this need for comparing

5    directs to directs.

6            Dr. Rice, you indicated that there were four, four

7    copolymer-1 batches depicted on 3149T from final product

8    batches, correct?

9    A.  That is correct.

10   Q.  And what are the molecular -- we've already talked about

11   7300 and 8400.  What are the other two?

12   A.  The other two are 6,250, and 10,950 daltons.

13   Q.  And how many mice died in the 10,950 batch of copolymer-1?

14   A.  No mice died in this particular batch.

15   Q.  And so under the definition of toxicity that's provided in

16   example 2A, is the 10,950 batch of copolymer-1 toxic?

17   A.  It would be designated as nontoxic.

18   Q.  Well, is that -- and as a toxicologist, is that a batch of

19   10,950 being declared nontoxic or being found nontoxic, is that

20   consistent with the claim that copolymer-1 in a molecular

21   weight of five to nine kilodaltons exhibits lower toxicity in

22   the prior art?

23   A.  No, it --

24           MR. WIESEN:  Objection, your Honor.  This is now

25   clearly the inequitable conduct argument.  He's talking about

1    one batch and the consistency of statements between what's in

2    the patent and the results in the one batch in the April '94

3    data table.  It's hard to see how it's anything but.

4              THE COURT:  I think we'll be through this faster if we

5    just hear it.

6              MR. JONES:  Thank you, your Honor.

7    Q.  And, Dr. Rice, just -- I take it that you earlier described

8    the less than 2.5 percent copolymer-1 species associated with

9    the 7.3 and the 8.4; you remember that?

10   A.  Yes, I do.

11   Q.  Versus the in the higher -- the five, the greater than

12   5 percent copolymer-1 over 40 KDas species; you remember that?

13   A.  Yes, I do.

14   Q.  Now having a full understanding of the information provided

15   or at least of the testing that occurred, the in vivo testing,

16   what can you -- what would a toxicologist conclude about

17   whether it had been shown that less than 2.5 cop-1 had -- was

18   lower -- was unexpectedly lower than greater than 5 percent

19   cop-1?

20   A.  When I look at all of the information, and from actually

21   example 2B, I have additional information about the molecular

22   weight species of 13,000 and 14,500.  We can now see on this

23   table where the 13,000 and 14.5 batches were shown to have

24   greater than 5 percent of molecular weight species of

25   copolymer-1, with molecular weights over 40 kilodaltons.

19fztev1                          Rice - direct

1    Q.  And how many mice died in the 13,000 and 14,000 five

2    batches of copolymer-1?

3    A.  No mice died in either of those batches.

4    Q.  Now, looking further at DTX-1349, I note that the table

5    reports percent RBL release; do you see that?

6    A.  Yes, I do.

7    Q.  And what is percent RBL release?

8    A.  That, essentially, refers to release of serotonin or

9    histamin from this particular cell.

10   Q.  And what does the 1994 data tell you about the relative

11   utility of the RBL test in the in vivo test in assessing

12   toxicity?

13   A.  This particular RBL test compared to the in vivo tests

14   shows me that there is no correspondence between the two.  We

15   have various values for the RBL that are shown across the

16   molecular weights; whereas, we have zero out of five animals

17   died; batches were declared nontoxic from 6,250 all the way to

18   14,500, or I should more accurately say that these batches

19   would meet the criteria for being designated as nontoxic.

20   Q.  Now, you'd agree that the RBL percent release appears to be

21   getting bigger as the molecular weights get bigger, correct?

22   A.  I think -- there's quite a bit of variability here, so it

23   isn't a consistent increase, although at first glance it would

24   look as if there might be an increase.

25   Q.  But are you seeing any consistent results as linking

19fztev1                    Rice - direct

1  increase of RBL release and mice that died?

2  A.  No, I see no relationship there.

3  Q.  All right.  Now, have you reviewed any internal Teva

4  documents discussing the relative utility of the RBL and in

5  vivo safety tests?

6  A.  Yes, I have.

7           MR. JONES:  Mr. Russell, can I have DTX-1256.

8  Q.  Dr. Rice, is DTX-1256 a Teva document prepared by Dr.

9  Pinchasi that you relied on in your expert report?

10 A.  Yes, it is.

11          MR. WIESEN:  Objection, your Honor.

12          THE COURT:  Mr. Jones, I do have to say -- I mean I

13 would have been very happy to hear this during the inequitable

14 conduct trial.  What am I supposed to do with it now?

15          MR. JONES:  Your Honor, it's simply -- we're just

16 talking about the reliability.  What they have to show is

17 unexpectedly lower results.  They are predicating their

18 assertion of unexpected lower results on two studies, the in

19 vivo and the RBL.

20          The purpose of the testimony is to show that the

21 findings reported in example 2A do not, in fact -- when you

22 understand all the information, that information does not

23 support a determination of unexpectedly lower results.  In

24 fact, you've got no death, no mouse death above the five to

25 nine rage.  So the test, when understood in full, doesn't

1  support unexpectedly lower results.

2          To the extent the RBL test might be used to support

3  unexpectedly, this simply indicates that the RBL test is not

4  viewed as a reliable indicator of toxicity.

5          So on both counts, the in vivo tests, four results are

6  not in fact consistent of unexpected results.  And in the RBL

7  test, that test isn't a reliable indicator of toxicity that

8  there is a failure of proof of unexpected results.  That's the

9  purpose of the testimony, your Honor.

10         MR. WIESEN:  Your Honor, with that proffer, it's plain

11  that the testimony is actually not relevant to the question of

12  unexpected results, which, as a matter of law, are not limited

13  to the data that's contained within the patent.  Extensive data

14  was entered into evidence at the first trial beyond what's in

15  the patent, beyond what's in the April '94 data table.  And if

16  the testimony is going to be limited to only this subset, then

17  it's legally irrelevant to the question of unexpected results.

18         THE COURT:  He's not done yet.  What else are you

19  doing, Mr. Jones?

20         MR. JONES:  We are just about finished, your Honor.

21  She's going to talk about all that other data and whether that

22  would affect the confidence of a toxicologist in a finding of

23  unexpected results.

24         THE COURT:  She is going to talk about it?

25         MR. JONES:  Yes, of course.

1   THE COURT:  Okay.

2   MR. JONES:  Yes.

3   Q.  All right.  Going back to DTX-1256, this is a document

4   prepared by Dr. Pinchasi in 2003, that you discussed in your

5   expert report?

6   A.  Yes, I did.

7   MR. JONES:  I'll note for the Court that DTX-1256 has

8   been admitted during the testimony of Dr. Pinchasi.

9   Q.  Dr. Rice, would you please read into the record those parts

10  of DTX-1256 that discuss relative utility of the RBL and in

11  vivo tests as it pertains to toxicity?

12  MR. WIESEN:  Your Honor, what Dr. Pinchasi did or

13  didn't say is not relevant to the question of unexpected

14  results.  We've read this document many times before.

15  MR. JONES:  It's simply she offered an opinion that

16  the RBL did not show a good correlation with toxicity.  You

17  can't have confidence, you cannot have confidence in it in a

18  toxicity determination.  And this simply shows Teva agrees that

19  you cannot -- it's not a good test, it does not have predictive

20  clinical value and that the in vivo test, fully understood, is

21  what you need for toxicity.

22  THE COURT:  All right.  Well, you can -- it's in

23  evidence, you can argue it.

24  MR. JONES:  Very well.

25  Q.  Doctor, or Dr. Rice, given the issues that you've

1    identified with the tests used in the '808 patent, how would a

2    person of ordinary skill define a test that could credibly

3    analyze the relationship between molecular weight and toxicity?

4    A.   In order to properly define the relationship between

5    molecular weight and toxicity, a study would need to be

6    designed where, first of all, the batches of copolymer-1 were

7    controlled, such that the only difference in the batches was

8    due to the molecular weight.  This would eliminate the

9    possibility of other possibly unidentified factors contributing

10   to toxicity.

11          In addition, you would want to test all of the animals

12   at the same time and have a placebo control.  By doing that and

13   examining all of the animals in whatever test you decided was

14   appropriate, whatever toxicology battery you wanted to do, with

15   everything being held constant, but for the change in molecular

16   weight batches, you would be able to determine where

17   differences lie, if, in fact, there are any differences in

18   toxicity.

19   Q.   All right.  Given your definition or given the definition

20   of a test demonstrate unexpectedly lower results, Dr. Rice, did

21   you in fact as part of your work review a number of test values

22   related to toxicity that Teva had conducted?

23   A.   Yes, I did.

24   Q.   And in all those tests, did you see any test -- did you see

25   evidence of any test that met the criteria that you set forth

1  for the type of test that one could rely on to show

2  unexpectedly lower results?

3  A.  No, I did not identify any.  There were data scattered over

4  time and experiments where there were individual values shown

5  in the mouse in vivo test.  Maybe a couple of different batches

6  would have been tested on a particular day, with varied

7  results.  But I saw no consistent consistency in the batches

8  that were being tested in the formulations that were actually

9  being tested, and certainly nothing that was comparing at one

10 time batches below, in the five to nine range, and those

11 greater than around ten.

12 Q.  Dr. Rice, given the prior art that you discussed here

13 today, '550, and more particularly the Bornstein study, and

14 given your understanding of the two, the in vivo test that's

15 described in this patent specification as augmented by the

16 information about the in vivo test that's provided by 3149T,

17 given that information, does that information -- would that

18 information show a person of ordinary skill in toxicology that

19 co-polymer-1, in any form, exhibits unexpectedly lower

20 toxicity?

21 A.  No.

22 Q.  Why, why do you conclude that?

23 A.  I conclude that because there's, essentially, no difference

24 that has been shown in the toxicity of the batches or the

25 copolymer compositions between five to nine kilodaltons, and

19fztev1                    Rice – direct

1    compositions ten and above.

2            MR. JONES:  In fact, I have no further questions.

3    Thank you, Dr. Rice.

4            THE COURT:  All right, we're going to take a ten

5    minute break.

6            MR. WIESEN:  Thank you, your Honor.

7            (Recess)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION

2   BY MR. WIESEN:

3   Q.  Good morning, Dr. Rice.

4   A.  Good morning.

5   Q.  We've met before at your depositions, correct?

6   A.  Yes, we have.

7   Q.  Dr. Rice -- we'll hand out some binders, your Honor, before

8   we start.  Dr. Rice, during your direct we heard some

9   references to a trial we had in July.  Do you recall that?

10  A.  Yes, I do.

11  Q.  You weren't here for that trial, right?

12  A.  That's correct.

13  Q.  Have you reviewed the transcripts that were taken in that

14  trial?

15  A.  I reviewed a couple.

16  Q.  You're aware there was testimony in that trial concerning

17  toxicity issues with copolymer-1?

18  A.  Yes, primarily the RBL test.

19  Q.  You're aware there was testimony concerning some of the

20  documents that you put on during your direct today, correct?

21  A.  Yes.

22  Q.  Did you review the testimony from Dr. Pinchasi from Teva on

23  those issues?

24  A.  I believe I did.

25  Q.  Did you review the testimony of Dr. Arnon from the Weizmann

1    Institute on those issues?

2    A.  Yes, I did.

3    Q.  And did you review the testimony of Dr. Barbara Baird from

4    Cornell on those issues?

5    A.  Yes, I did.

6    Q.  Are you aware additional data in the RBL test was discussed

7    during that trial?

8    A.  I vaguely remember.

9    Q.  You didn't talk about that additional data specifically

10   today, right, Dr. Rice?

11   A.  No, I did not.

12   Q.  You talked briefly about or a little bit about the '550

13   patent.  Do you recall that testimony?

14   A.  Yes, I do.

15   Q.  If you need it I think it's PTX 26 in your binder.  You may

16   not need it for these questions.  We'll see if you do.

17          Now, you're not interpreting the molecular weight data

18   in that document, correct?

19   A.  No, not interpreting.

20   Q.  You're just reading the numbers off the page basically,

21   right?

22   A.  Basically, and what I've been instructed, yes.

23   Q.  And comparing the numbers in that document to the numbers

24   on the page in another document, correct?

25   A.  That's correct.

19FFTEV2                    Rice - cross

1   Q.  You're not an expert in measuring molecular weights, right?

2   A.  No, I'm not an expert.

3   Q.  You don't know what different results you may or may not

4   get depending on the methodology used to measure the molecular

5   weight, right?

6   A.  No, not specifically.  I do know that you could get

7   different numbers.

8   Q.  You don't know what method was used to measure the

9   molecular weight in the '550 patent, do you?

10  A.  No.

11  Q.  Do you know what method is used to measure the molecular

12  weight in the patents in dispute in the '808 patent?

13  A.  I don't remember if I did know.

14  Q.  And you agree, Dr. Rice, that there's no data in the '550

15  patent concerning toxicity one way or the other, correct?

16  A.  That is correct.

17  Q.  So the '550 doesn't teach anything to a person of ordinary

18  skill in the art about toxicity or lack of toxicity for

19  copolymer-1, right?

20  A.  That is correct.

21  Q.  Dr. Rice, you talked a little bit about what a person of

22  ordinary skill in the art would expect about toxicity in

23  polymers of different weights, do you recall that?

24  A.  That's correct.

25  Q.  Now, do you agree with me, Dr. Rice, that a person would

19FFTEV2                         Rice - cross

1  not expect that lowering the molecular weight of a polymer

2  would always decrease the toxicity, right?

3  A.  Of course, no.

4  Q.  They'd have no expectation one way or the other whether

5  lowering the molecular weight might increase toxicity, decrease

6  toxicity or leave it the same, right?

7  A.  That's correct.

8  Q.  So any change -- if there were a lowering of toxicity, if

9  there were, that would be unexpected, correct?  When you lower

10 the molecular weight?

11 A.  I don't -- I wouldn't characterize it as being unexpected

12 because it's known that changing various parameters can affect

13 toxicity profiles.  So no, I wouldn't be surprised.

14 Q.  Well, to be clear, what's known is that there can be a

15 change in the toxicity profile when there is a change in

16 molecular weight, right?

17 A.  That's correct.

18 Q.  But it's not known that there is always a relationship when

19 you decrease molecular weight you decrease toxicity, right?

20 A.  That's correct.

21 Q.  Sometimes you decrease molecular weight and you increase

22 toxicity, correct?

23 A.  That's correct.

24 Q.  And sometimes you decrease molecular weight and toxicity

25 doesn't change at all?

1    A.  That's correct.

2    Q.  So there's no expectation ahead of time that when you

3    decrease the molecular weight you will decrease the toxicity,

4    right?

5    A.  I have no expectation that a change would occur in a

6    specific direction, but I wouldn't be surprised if it happened.

7    Q.  Okay. Could you turn to DTX 1250, it's in your direct

8    binder, please.  It's also up on the screen, Dr. Rice.  It's a

9    short document, I think you'll recognize it.  It's in your

10   direct binder.

11   A.  In the direct, I'm sorry.  Yes, I see it.

12   Q.  You testified about this document on direct, correct?

13   A.  Yes, I did.

14   Q.  Now, this document talks about safety, right?  In the last

15   paragraph?

16   A.  Yes, the safety and chemical characteristics, yes.

17   Q.  And you agree that reference to safety, I think you talked

18   about it on direct, is in the context of regulatory agencies,

19   right?

20   A.  Yes.

21   Q.  Do you agree that for regulatory agencies like the FDA

22   safety is a risk benefit analysis, right?

23   A.  Yes, it is.

24   Q.  It's a balance between efficacy and side effects, correct?

25   A.  That's correct.

1  Q.  The FDA, for example, considers that balance between

2  efficacy and side effects in whether to approve a drug,

3  correct?

4  A.  That's correct.

5  Q.  And depending on the indication for a drug, some side

6  effects are allowed for approval, right?

7  A.  That's correct.

8  Q.  Now, in the patents here we're talking about specifically

9  toxicity, right?

10  A.  Yes.

11  Q.  And you agree there's a difference between how toxicity is

12  used in the patent and how the term safety is used at

13  regulatory agencies like the FDA, right?

14  A.  That's correct.

15  Q.  Let's talk about the RBL test for a minute.  You provided

16  some testimony concerning the RBL test in your direct, correct?

17  A.  Yes, I did.

18  Q.  You looked at that one column of RBL data on that

19  April 1994 data table?

20  A.  Yes.

21  Q.  Now, Dr. Rice, before you got involved in this case, you

22  thought you had heard of the RBL test, right?

23  A.  Yes.  I don't know specifically the RBL test, but I was

24  familiar with degranulation tests.

25  Q.  Right.  Degranulation tests have been around for a while?

1   A.  Yes, they have.

2   Q.  And you agree that degranulation of human mast cells can be

3   associated with certain adverse effects, right?

4   A.  Yes.

5   Q.  And in vitro degranulation tests are models for what might

6   happen in vivo, right?

7   A.  Yes.

8   Q.  But you yourself before this case had never actually

9   conducted an RBL degranulation assay, right?

10  A.  No, not that particular cell type.

11  Q.  You don't consider yourself to be an expert in the RBL

12  degranulation test, right?

13  A.  No, I do not.

14  Q.  In fact, when you first started working on this case, you

15  didn't even feel comfortable opining about the RBL test because

16  you didn't have time to investigate it, right?

17  A.  I didn't have time to investigate it, yes.

18  Q.  And even today outside of the context of copolymer-1,

19  outside the context of this case, you haven't looked at whether

20  the RBL degranulation test is a reasonable model to measure

21  potential undesirable local or systemic side effects, have you?

22  A.  Correct, I have not independently investigated that.

23  Q.  Did you read the testimony of Dr. Kimber from the July

24  trial?

25  A.  Yes, I did.

19FFTEV2                          Rice - cross

1   Q.  And you understand that he was a witness brought by the

2   defendants to testify about the RBL test?

3   A.  Yes, I do.

4   Q.  You think Dr. Kimber is more familiar with the RBL test

5   than you are, right?

6   A.  Yes.  He has spent more time working on it in the context

7   of his research and also copolymer-1.

8   Q.  So he knows more generally and more in the specifics of

9   this case about the RBL test than you do, right?

10  A.  I would say he does.

11  Q.  Now, you talked only about the RBL data that was in the

12  April '94 data table during your direct specifically, correct?

13  A.  That's correct.

14  Q.  You'd agree with me that to talk about the overall toxicity

15  in the RBL test, you need to look at all the data, right?

16  A.  Yes.

17  Q.  You can't just rely on some subset of data to reach a

18  conclusion, right?

19  A.  That's correct.

20  Q.  And you know that Teva generated, Teva and the Weizmann

21  Institute generated other data beyond what's in the April 1994

22  data table, correct?

23  A.  Yes, and I've seen considerable other data.

24  Q.  You don't know whether you've seen all of it, though,

25  right?

1    A.  No, I do not know for a fact I have seen all of it.

2    Q.  But you know that more than you talked about specifically

3    on direct was discussed during the April -- during the July

4    trial, right?

5    A.  Yes, it was.

6              MR. WIESEN:  Mr. Chase, if we could have slide 44 from

7    Dr. Baird's testimony in the July trial.  And I believe this

8    was actually marked as part of PTX 887, your Honor.

9              THE COURT:  All right.

10   Q.  Have you ever seen this slide before, Dr. Rice?

11   A.  It looks somewhat familiar, but I can't say for sure I've

12   seen it before.

13   Q.  Did you look at the exhibits that were used at the July

14   trial?

15   A.  No, I did not see the exhibits.

16   Q.  Did you look at the demonstratives that were used at the

17   July trial?

18   A.  No, I did not see them.

19   Q.  Well, let me represent to you that this was a demonstrative

20   that was used by Dr. Baird whose testimony I believe you said

21   you read, correct?

22   A.  I'm sorry, did you say Dr. Baird?

23   Q.  Yes.

24   A.  That's fine.

25   Q.  Do you see at the bottom here it says average molecular

1  weight in daltons?

2  A.  Yes, I do.

3  Q.  Up on the Y axis it says percent degranulation?

4  A.  Yes.

5  Q.  And there's three exhibits noted in the bottom left-hand

6  corner, PTX 1, DTX 3149T and PTX 34?

7  A.  Yes, I see those.

8  Q.  And you haven't reviewed the data that Dr. Baird has

9  graphed on this demonstrative, correct?

10 A.  Not knowing -- I would have to look at the individual --

11 Q.  I'll withdraw that.

12 A.  I did not specifically review these, no.  That was not my

13 intent.

14 Q.  And you didn't testify about all of this data during your

15 direct examination, correct?

16 A.  No, I did not.

17 Q.  Dr. Baird -- I'm sorry, Dr. Rice, you spent a little bit of

18 time talking about the different batches and the different ways

19 they were made?

20 A.  Yes.

21 Q.  How are the marker batches different than the final product

22 batches?

23 A.  I do not know for a fact how they are different.

24 Q.  You just understand there's some difference.

25 A.  From Dr. Gad's testimony, I understand that there is a

1  difference.

2  Q.  Was the type of difference important to you in your

3  analysis?

4  A.  It would be important for me to know what the difference

5  was, but as I mentioned earlier, to make a good comparison one

6  would need the batches to be prepared in the same way and then

7  the comparison in the animal test to be done at the same time

8  instead of at various times across years and years.

9  Q.  So it would be important for you to know what the

10  difference is between the marker batches and the final batches,

11  but you didn't investigate that question in giving your

12  testimony here today?

13  A.  I tried -- I tried to find out, but I could not, I did not

14  find out for sure what the differences were.

15  Q.  You talked a little bit about the Bornstein paper during

16  your direct examination.  Do you recall that?

17  A.  Yes, I did.

18  Q.  The Bornstein paper was before the Patent Office during the

19  prosecution of these patents, right?

20         MR. JONES:  Objection, foundation.

21         MR. WIESEN:  I'll rephrase.

22  Q.  The Bornstein patent is cited in the specification; we saw

23  that during your direct, right?

24         MR. JONES:  Your Honor, foundation.  This is actually

25  an area of patent law.  Because it's important how -- one

1    minute counsel, please.  When a paper is simply cited in the

2    specification the paper itself is not necessarily given to the

3    PTO.  The record here is fairly clear that the Bornstein '87

4    study was not actually given to the PTO until the 2004 IDS, ten

5    years after the patents were applied for in 1994.  So a stray

6    citation of a paper in the specification does not in fact mean

7    that that paper was physically in front of the PTO, and it's

8    apt here because the citation of Bornstein in the '808 spec

9    pertains to the effectiveness of the drug.  It does not appear

10   in the toxicity section.

11              THE COURT:  All right.  Mr. Jones, I'm going to allow

12   the question.  Go ahead, Mr. Wiesen.

13   Q.  You know the Bornstein paper is cited in the first column

14   of PTX 1, right?

15   A.  Yes.

16   Q.  You know at some point during the prosecution as your

17   counsel just represented that an actual copy was given to the

18   Patent Office, right?

19   A.  Yes, it sounds like.

20   Q.  And even with the Bornstein paper in front of the Patent

21   Office, they allowed these patents to issue, right?

22              MR. JONES:  Objection.  Relevance.

23              THE COURT:  It doesn't matter.  It's a matter of

24   record one way or the other.  You don't need to answer.  Next

25   question.

1  Q.  I want to turn just briefly to the in vivo toxicity results

2  you testified about.

3  A.  Yes.

4  Q.  All toxicologists generally should be familiar with this

5  test, right?

6  A.  Most are, yes.

7  Q.  It's a fairly standard test for acute toxicity?

8  A.  It's one of a number that are used, yes.

9  Q.  It's similar to a test that's in the United States

10  Pharmocopeia, right?

11  A.  Yes, it is.

12  Q.  Now, for this test as well you talked only about the data

13  specifically in the April '94 data table, right?

14  A.  That is correct.

15  Q.  And you're aware that Teva also generated additional data

16  in this in vivo toxicity test, right?

17  A.  Yes, I am aware there is additional data.

18  Q.  And like the RBL data, you don't know whether you've seen

19  all the data that was generated by Teva and the Weizmann

20  Institute, right?

21  A.  I believe I have seen all of the data that was available.

22  I've sat down with counsel and searched a database of the Teva

23  documents provided to actually look at those and to identify

24  them.

25  Q.  You've done that since your deposition, Dr. Rice?

19FFTEV2                              Rice - cross

1    A.  No, actually, it was before my deposition.

2    Q.  So before your deposition you had reviewed the documents

3    and you were sure you'd seen all of the data?

4              MR. JONES:  Objection.

5    A.  At the time of my deposition I wasn't sure that there

6    wasn't more information that was out there and available and

7    that we hadn't seen.  Since my deposition, I've been told that

8    everything that was available -- that essentially there wasn't

9    anything more available for me to look at, so I had seen

10   everything that was available.

11   Q.  And the --

12             MS. BLOODWORTH:  If I could object, your Honor.  This

13   is the same issue we had with Dr. Baird in the July trial about

14   whether or not Teva provided all the data underlying example 2.

15   We had apparently a miscommunication or a misinterpretation of

16   the magistrate judge's order and I think we came to the

17   resolution with Dr. Baird that the witness was under the

18   impression that we had produced all the data that Teva provided

19   to us.

20             THE COURT:  I'm still confused.  Why don't we finish

21   with the witness, then we can discuss it.

22             MS. BLOODWORTH:  Thank you, your Honor.

23   Q.  During your direct examination you didn't talk about all

24   the data in the in vivo toxicity tests that you had seen,

25   right?

1   A.  No, I did not talk about all the data.

2   Q.  And you agree that in Teva and Weizmann Institute's data

3   there are batches between 10 and 15,000 daltons that were toxic

4   in the in vivo toxicity test right?

5   A.  There were some that were toxic, and there were some that

6   were toxic at lower ranges.

7   Q.  If you could turn to page PTX 34T in your exhibit binder.

8   You reviewed this document in rendering your opinions in this

9   case?

10  A.  Yes, I did.

11  Q.  If we look at the first table on this page the second batch

12  down, 24P1, do you see that?

13  A.  Yes I do.

14  Q.  It reports a molecular weight of 14,000 daltons, correct?

15  A.  That's correct.

16  Q.  And that's toxic in the in vivo test, right?

17  A.  Yes, it is.

18  Q.  If we go down to the next table, you see batch 54019?

19  Fourth line down?

20  A.  Yes, I see it.

21  Q.  That reports a molecular weight of 15,600 daltons, right?

22  A.  That's correct.

23  Q.  And that's toxic in the in vivo test, right?

24  A.  That's correct.

25  Q.  Could you turn to the next page, the second table down, the

1   fifth entry, batch 27I8, do you see that?

2   A.  Yes, I do.

3   Q.  That reports a molecular weight of 12,400 daltons, right?

4   A.  Yes, it does.

5   Q.  And that's toxic in the in vivo test, correct?

6   A.  Yes, it is.

7   Q.  Turn to the next page.  We're almost done with this

8   document.  If you highlight that table at the top.  Here the

9   second line down has a molecular weight of 9,000 daltons,

10  right?

11  A.  That's correct.

12  Q.  And that's one that's toxic in the in vivo test, correct?

13  A.  Yes.

14  Q.  And then right below that are two batches that are 11,000

15  daltons, correct?

16  A.  That's correct.

17  Q.  And those are both toxic in the in vivo test, correct?

18  A.  Yes.

19  Q.  You haven't done any statistical comparison at all of the

20  toxicity of batches above 10,000 and between 5 and 9,000

21  daltons in the in vivo toxicity test, have you?

22  A.  No, and I wouldn't do it because it's inappropriate to do

23  so.  The batches are not prepared in the same way, they were

24  not examined at the same time, so it is inappropriate to do any

25  kind of statistical analysis.

1   Q.  Dr. Rice, you haven't even counted the number of batches

2   above 10,000 that are toxic in the in vivo test, have you, in

3   the Teva data and the Weizmann data?

4   A.  I didn't specifically count it, but I certainly did look at

5   the information.

6   Q.  And you didn't calculate the percentage even above 10,000

7   that are toxic versus the percentage between 5 and 9,000

8   daltons that are toxic, right?

9   A.  No, because I view it as being irrelevant.

10              MR. WIESEN:  I have no further questions, your Honor.

11              THE COURT:  All right.

12              MR. JONES:  Very brief redirect, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. JONES:

15  Q.  Dr. Rice, is Dr. Pinchasi a toxicologist, a person of skill

16  in the art in toxicology?

17  A.  Not that I remember.

18  Q.  Is Dr. Baird a toxicologist?

19  A.  No.

20  Q.  Is Dr. Arnon a toxicologist?

21  A.  No.

22  Q.  Would any of those three people, would they qualify as a

23  person of ordinary skill in the art of toxicology, with a PhD

24  in toxicology or related field and three to four years

25  practical experience?

1   A.  No, they would not.

2   Q.  So the Baird chart that you were shown is prepared by

3   someone who is not a person of ordinary skill in the art, is

4   that your understanding?

5   A.  Yes, that's my understanding.

6   Q.  Doctor, you understand that the issue that you were asked

7   to talk about, to testify about was unexpectedly lower results,

8   correct?

9   A.  That's correct.

10  Q.  You testified about the Bornstein 1987 study, correct?

11  A.  That's correct.

12  Q.  And just so we're clear, that Bornstein study had

13  copolymer-1 of 14,000 to 23,000 daltons, correct?

14  A.  That's correct.

15  Q.  Now, what was the toxicity of that batch, of those batches

16  of copolymer-1 used over a two-year period?

17  A.  There was no evidence in the patients administered the

18  copolymer-1 that there was any significant toxicity.

19  Q.  No toxicity in 14,000 to 23,000?

20  A.  That's correct.

21  Q.  As a toxicologist, can you show unexpectedly lower results

22  than no toxicity?

23  A.  No, you can't.

24          MR. JONES:  No further questions.

25          THE COURT:  All right.  Anything else?

19FFTEV2                    Rice - redirect

1    MR. WIESEN:  Nothing, your Honor.

2    THE COURT:  All right, thank you, Dr. Rice, you may

3  step down.

4    (Witness excused)

5    THE COURT:  Next witness?

6    MS. HAGBERG:  Your Honor I believe it's our turn now

7  on behalf of Sandoz, Momenta, and we will call Dr. John Bishop.

8  He's out in the hall.  May we have a moment?

9    THE COURT:  Yes.

10    (Pause)

11  JOHN BISHOP,

12    called as a witness by the Defendant,

13    having been duly sworn, testified as follows:

14    THE COURT:  Please take your seat.  Tell us your full

15  name and spell your last name.

16    THE WITNESS:  Yes.  My name is John Edward Bishop,

17  B-i-s-h-o-p.

18  DIRECT EXAMINATION

19  BY MS. HAGBERG:

20  Q.  Good morning, Dr. Bishop.

21  A.  Good morning.

22  Q.  Would you like a bottle of water?  It's going to be a

23  little while this morning.

24  A.  That would be helpful, please.

25  Q.  May I ask by whom you are employed?

1    A.   Yes.  I'm employed by Momenta Pharmaceuticals.

2    Q.   Where is Momenta located?

3    A.   In Cambridge, Massachusetts.

4    Q.   And what is your current position?

5    A.   Senior vice president pharmaceutical sciences.

6    Q.   And in that position what are your responsibilities?

7    A.   My responsibilities are broadly for the what we call the

8    CMC, or chemistry manufacturing and controls section of our

9    drug development programs.

10   Q.   And can you just tell the Court generally what falls within

11   the CME organization?

12   A.   CMC.

13   Q.   CMC, excuse me.

14   A.   It consists of process development for the active

15   ingredient or the drug substance, process development for the

16   drug product, quality control and quality assurance.

17   Q.   And what is your educational background, Dr. Bishop?

18   A.   I have a bachelor's degree from Tufts University in

19   chemistry and a PhD in organic chemistry from the University of

20   California Berkeley.

21   Q.   So turning to Momenta, what is Momenta's business?

22   A.   We are a biotechnology company.  We were an outgrowth of

23   several professors' laboratories from MIT where we took some

24   proprietary technology from those professors' laboratories and

25   formed a company based on that.

1  Q.  And when was the company founded?

2  A.  Approximately ten years ago.  The early 2000's.

3  Q.  And does it have a particular business plan as a small

4  company, market plan?

5  A.  Yes, our business plan is to apply these analytical

6  technologies from the MIT labs originally to drug development

7  programs.

8  Q.  Just generally what kind of analytic technologies are you

9  referring to?

10  A.  These are analytical technologies, again, proprietary

11  technologies that are designed to give a high level of

12  resolution, high level of analytical resolution to the class of

13  drugs that we call complex mixture drugs.

14  Q.  And how many employees does Momenta currently have?

15  A.  We currently have about 190 employees.

16  Q.  So when did you first join Momenta?  And I apologize if I

17  asked you that already.

18  A.  I joined in I believe it was the fourth quarter of 2004.

19  Q.  And what was your position at the time that you joined

20  Momenta?

21  A.  My title was vice president pharmaceutical sciences.

22  Q.  And what were your duties and responsibilities at that

23  time?

24  A.  Pretty much the same as they are now, however, with a much

25  smaller group at the time.  I was really charged with

1   responsibility of starting up the chemical development program

2   at Momenta.  It was a very young company at the time and

3   primarily had been oriented to research.  So when I was hired,

4   I was hired to start up the development aspect of the

5   pharmaceutical development programs.

6   Q.  Who do you report to in your current position as vice

7   president for pharmaceutical sciences?

8   A.  I report to our chief executive officer, Craig Wheeler.

9   Q.  And other than your title as senior vice president, do you

10  hold any other positions at Momenta?

11  A.  Yes.  I'm also a member of the executive committee of the

12  company.

13  Q.  And what does the executive committee do within Momenta?

14  A.  We manage the company.  It's basically the corporate

15  functions within the company.

16  Q.  You mentioned that Momenta's business was focused on

17  complex drugs.  Could you explain for the Court what you mean?

18  A.  Yes.  Most drugs consist of one active ingredient.  Just a

19  simple example would be aspirin, where the active ingredient is

20  one molecule, acetylsalicylic acid.  Most drugs similarly have

21  just one active ingredient.  We've chosen at Momenta not to be

22  in that realm of what's called small molecule drugs, but to

23  apply our proprietary technologies to these complex drugs and

24  that is drugs that have more than one active ingredient

25  associated with them.  Generally speaking, many, a collection

1  of many active ingredients.

2  Q.  And what challenges, if any, do complex drugs pose in

3  comparison to drugs with a single active compound in terms of

4  developing and manufacturing them?

5  A.  I would say what distinguishes the complex drugs is the

6  ability to properly characterize them, certainly for the

7  purposes of getting approval by the FDA.  Small molecule drugs

8  or single active ingredient drugs are relatively easy to

9  characterize and control using modern analytical technologies.

10  That's because they just have one type of molecule associated

11  with it.  A complex mixture drug can have hundreds, if not

12  thousands of active ingredients or molecules associated with

13  the active ingredient and therefore pose very difficult

14  chemical analytical challenges.

15  Q.  Has Momenta since its founding successfully developed any

16  what you've been referring to as a complex drug?

17  A.  Yes, we have.

18  Q.  Can you give me an example?

19  A.  Yes.  About a year ago we received approval for a drug

20  called the Enoxaparin sodium, which is very much so a complex

21  drug.

22  Q.  And was there a team working on developing that drug in

23  addition to you?

24  A.  On which drug?

25  Q.  Enoxaparin.

1   A.   Yes.

2   Q.   Can you tell the Court very briefly the kind of development

3   you went through in developing Enoxaparin?

4   A.   Yes, we would go through -- the early stages preceded my

5   employment at Momenta, but the very early phase was a research

6   phase which was really geared towards further developing and

7   implementing those analytical technologies in order to

8   understand the drug that was on the market.  The parent drug is

9   called Lovenox and taking that information and reverse

10  engineering the manufacturing process in order to make a drug

11  that we could prove to the FDA's satisfaction is equivalent in

12  all of those chemical components to what the marketed drug is.

13  Q.   Are you familiar with the drug Copaxone?

14  A.   Yes, I am.

15  Q.   And you understand that this trial today relates to that

16  drug and patents relating to that drug?

17  A.   Yes, I do.

18  Q.   Do you consider Copaxone to be a complex drug?

19  A.   Yes, I do.

20  Q.   Why is that?

21  A.   Because it consists of more than one active ingredient, in

22  this case many more than one molecule constitute this mixture.

23  Q.   And what is glatiramer acetate?

24  A.   Glatiramer acetate as I understand it is the name that's

25  given to the active ingredient in what is called Copaxone.

1  Q.  Did there come a time when Momenta became interested in

2  developing a form of drug with glatiramer acetate?

3  A.  Yes.

4  Q.  And when did Momenta first become interested in that drug?

5  A.  I would say the initial interest was in the late 2004,

6  early 2005 time frame.

7  Q.  And was there any particular reason why that drug was of

8  interest to Momenta?

9  A.  Yes.  It was brought to our attention by a couple of

10  members of our board of directors and our founders from the MIT

11  faculty with a feeling that the complexity of this drug fit

12  very nicely into the niche of complex drugs in which we were

13  working, and therefore would be a logical second program for us

14  to work on in addition to the program I mentioned earlier,

15  Enoxaparin.

16  Q.  Were you involved in the decision of whether to pursue

17  development of a generic glatiramer acetate?

18  A.  Yes, I was.

19  Q.  And what steps did the company take as part of its

20  assessment, preliminary assessment of whether to proceed?

21  A.  Well, the first steps were to form just a small I think we

22  called it an ad hoc team at the beginning of scientists to

23  evaluate what was known about this drug, and from that

24  evaluation make a recommendation as to whether to proceed with

25  a program or not.

1    Q.  And just very briefly, do you recall who the team members

2    were at the time?

3    A.  Roughly I do, yes.

4    Q.  And who were they?

5    A.  It would be myself, my counterpart in research, Ganesh

6    Venkataraman and several members from our analytical group,

7    Zach Schreiber and Corrine Bauer.  I think there may have been

8    a couple of other scientists involved, but that was the core of

9    the team.

10   Q.  And do each of those team members have an advanced degree

11   in the relevant technology for the development of Copaxone or

12   relating to Copaxone?

13   A.  Yes, very much so.

14   Q.  So what was the first step that this team did in order to

15   make an assessment of whether to proceed with a generic form of

16   glatiramer acetate?

17   A.  Well, I think the members of the team had not heard of this

18   drug before, and so the first thing we wanted to do was

19   acquaint ourselves with what we could find in the literature

20   related to this drug.

21   Q.  And is that typically what you would do or is that what you

22   did with Enoxaparin?

23   A.  Yes.

24   Q.  What did the team find as a result of its literature study?

25   A.  Well, we found some things in the literature related to

1  this drug.  We requested and received a literature search and

2  got several publications, articles, etc., related to this drug.

3  Q.  Can I -- just because you've not been here since the trial

4  began, the way we are proceeding is that there is a binder with

5  copies of exhibits that I intend to ask you about at least some

6  of those in front of you, and could I ask you, please, to turn

7  to Defendant's Exhibit, it's marked DTX 1074, please.

8            THE COURT:  And as we go along, you'll also find it on

9  the screen.

10           THE WITNESS:  I just saw it.  Thank you.

11 Q.  You could look either place if it's easier to focus.

12 A.  Okay.

13 Q.  Have you seen this document before?

14 A.  Yes, I have.

15 Q.  What do you understand it to be?

16 A.  I understand this to be the package insert for Copaxone.

17 Q.  And was this one of the documents that came up as a result

18 of this search that you had initiated, your team had initiated

19 at Momenta?

20 A.  Yes.  It's one of the hits from our literature search.

21 Q.  Can I ask you now to look at DTX 3563 in your binder?  And

22 again, it's up on the screen, Dr. Bishop.

23 A.  Yes, I see this.

24 Q.  And do you know what that document is?

25 A.  Yes, I do.

1  Q.  And what is that document?

2  A.  I recognize this as the label of Copaxone.

3  Q.  And was this one of the documents that was turned over as

4  part of the study that you had performed?

5  A.  Yes.

6         MS. HAGBERG:  Your Honor, I'd like to move for

7  admission Defendant's Trial Exhibit 1074, the package insert

8  and also the Copaxone original label, DTX 3563.

9         THE COURT:  First one might be in evidence already,

10 but in any event, is there any objection?

11        MR. HASHMALL:  It's a different version, but no

12 objection, your Honor.

13        THE COURT:  All right.  They are both admitted.

14        (Defendant's Exhibits DTX 1074 and DTX 3563 received

15 in evidence)

16 Q.  If I could ask you to turn back now to Defendant's Exhibit

17 1074, Dr. Bishop, what if anything did your team learn from

18 Exhibit 1074, which is a package insert from the marketed drug

19 Copaxone?

20 A.  Well, we learned basic information about the drug.  We

21 learned what the four amino acids were that comprise the

22 copolymer.  We learned the average mole fraction of those four

23 amino acids, and we learned the average molecular weight of

24 glatiramer acetate, that's also indicated on this label.

25 Q.  And just so there's no confusion, did you at some point

1    later in time become aware of a revised or a different version

2    of the Copaxone product insert?

3    A.  Yes, we did.

4    Q.  And was there -- and let me highlight and show that

5    document, which I believe was put into evidence as Plaintiff's

6    Trial Exhibit 697.  Is Plaintiff's Trial Exhibit 697 a document

7    you've seen before?

8    A.  Yes, it is.

9    Q.  What if anything further did your team learn from

10   Plaintiff's Exhibit 697?

11   A.  Well, we learned that this is a revised package insert for

12   the drug and in this revised package insert there was a change

13   to the molecular weight range indicated for the product.

14   Q.  So in addition to package insert and the drug label, were

15   there any other materials that were identified to you and your

16   team that were -- that you considered in your early stages of

17   your development of generic glatiramer acetate?

18   A.  Yes, there were other sources.

19   Q.  And what kinds of documents did you look at?

20   A.  Well, in general this first class that we just looked at I

21   would say fell into the class of regulatory documents that we

22   looked at.  Two additional classes of documents would be

23   literature, literature articles and a second class would be

24   generally patents, and patent applications.

25   Q.  And in terms of, let's deal first with literature articles,

1    is there anything that you recall from your early study that

2    gave you any information about Copaxone?

3    A.  Yes.  There was.

4    Q.  And what was that?

5    A.  I remember some articles from the very early 1970's related

6    to this drug.

7    Q.  And I'd like to ask you to turn in your binder to

8    Plaintiff's Trial Exhibit 499, and I'm sorry, your Honor, to

9    put this up one more time.

10            THE COURT:  Okay.

11   Q.  Mr. Bishop -- well, once you've gotten to that page -- that

12   was 499.

13   A.  I could just follow it on screen.  That might be easier.

14   Q.  All right.  Is that the article that you were referring to,

15   Mr. Bishop?

16   A.  Yes.  This is a 1971 article from the European Journal of

17   Immunology.

18   Q.  And we've been -- this is not the first that the Court is

19   seeing this exhibit and it's being referred to as the

20   Teitelbaum article.  Is it okay with you if I refer to it that

21   way?

22   A.  Yes.

23   Q.  What disclosure did the Teitelbaum journal make to you and

24   your team with respect to copolymer-1, if any?

25   A.  If we can flip, or just stay on -- yes.

1  Q.  Go ahead.

2  A.  So in Section 2.3.1 it disclosed a basic synthetic root for

3  the drug, namely of three reaction steps; polymerization,

4  depolymerization and deprotection.

5  Q.  And was there anything else in this article that you

6  considered relevant to your study?  And may I refer you to

7  table 1, just to --

8  A.  Yes, in table 1 it disclosed I believe it was two, yes, two

9  batches of material that were made by that synthetic

10  methodology described earlier.  It basically gives results.

11  This table gives results for two different batches indicating

12  the amount of the amino acids charged or added into the first

13  step as well as the amino acid ratios of the product produced

14  at the end.

15  Q.  And just, can you explain to the Court when you say

16  "charged," what's the difference between the charged amount and

17  the end amount?

18          MR. HASHMALL:  Your Honor, just an objection.  I mean,

19  this is a fact witness, obviously.  To the extent that the

20  testimony is sort of leaning towards what information would be

21  disclosed in these prior art disclosures, I'm concerned we're

22  getting into expert testimony rather than fact testimony.

23          THE COURT:  All right.  I'll be sure to take note of

24  that.

25          THE WITNESS:  I'm sorry, what was the question again?

1          THE COURT:  I don't suppose there's a lot more of

2     this.

3          MS. HAGBERG:  There's not, your Honor.

4     Q.  The question was, you referred to a charged amount and then

5     an amount in the product.  What did you mean by that?

6     A.  By the amount charged I'm looking at the column amount used

7     in the reaction and to me that means the amount of the amino

8     acids that are added into what we call step 1 of the process or

9     the polymerization reaction in the process.

10    Q.  And then what were you referring to in the batch 1 and

11    batch 2 columns?

12    A.  So the last two columns indicate to me the amino acid ratio

13    of two batches of this copolymer-1 which were produced by this

14    process.

15    Q.  Thank you, Mr. Bishop.  And I think you mentioned a third

16    class of materials.  What was the other group of materials that

17    you looked at?

18    A.  That would be patents and patent applications.

19    Q.  And which patents if any did your team find during this

20    time period?  Just to be clear, roughly what time period are we

21    talking about?

22    A.  This would be in the early 2005 time period.

23    Q.  And so my question was what patents, if any, did you find

24    that related to your study of Copaxone?

25    A.  I recall several patents that basically gave similar

1    information to what was described in this article that we just

2    saw.

3    Q.  And do you remember anything specifically from -- well, let

4    me back up and ask you a more basic question.  Do you remember

5    seeing the '808 patent which is one of the patents in suit in

6    this case?

7    A.  I haven't memorized the patent numbers.

8    Q.  You're welcome to look at it.  It's PTX 1, and maybe I will

9    ask -- it's in your binder, so we don't -- it's up on the

10   screen, too, and ask you, that is one of the patents that you

11   saw?

12   A.  Yes, I recognize this.

13   Q.  What if anything -- you can take that down, please.  What

14   if anything did you learn from the '808 patent about

15   copolymer-1?

16   A.  I recall this reiterated much of the same basic information

17   that was given in that earlier journal article that we just

18   saw, and I recall that the molecular weight, the reported

19   molecular weight for the material had changed.

20   Q.  And do you remember what the molecular weight is that is

21   reported in the patent?  If we put the patent back up on the

22   screen, maybe we can help you.

23   A.  Yes.  What's indicated in this patent is a -- I believe it

24   shows a molecular weight of 7,000 plus or minus 2,000 daltons.

25   Q.  And just so we can see that on the screen, could you put up

column 4, line 55 to 65?  And was there any other information

that you observed in the '808 patent about copolymer-1 that you

believe was relevant?

A.  Again, it reiterated what was reported in the earlier

literature for this compound.

Q.  Did it tell you how the molecular distribution of the two

batches was determined?

          MR. HASHMALL:  Your Honor, I'm going to object to

this.  I don't understand the relevance of this testimony.

Obviously, Mr. Bishop is a fact witness, he's not being

qualified as a person of ordinary skill in the art, which is I

think the issue to be resolved in this phase of the trial, so

I'm not -- what Mr. Bishop learned or deduced from these

patents, I don't understand it.

          THE COURT:  What is the purpose of this testimony?

          MS. HAGBERG:  Actually, your Honor, I submit that Dr.

Anderson and his group do qualify as one of ordinary skill in

the art, and he fits Teva's definition of ordinary skill in the

art, he will fit into the definition of ordinary skill in the

art that our witnesses are going to describe, and yes, he is

here as a fact witness, he is not here as an expert, but his

testimony regarding how Momenta developed the product and what

their product is and incorporates and the issues that they

raise we believe is relevant both to our invalidity and our

non-infringement defenses.

1          MR. HASHMALL:  I think I just heard Ms. Hagberg

2     suggest that he is an expert he's going to give what the Court

3     should consider as expert testimony.  As I understand the

4     Federal Rules, we should have been given an expert report.  If

5     he's not been qualified as an expert, the Court can't accept

6     him as an expert, I have heard no testimony about his knowledge

7     of SEC, measurements, molecular weights, all the questions that

8     other experts have been asked.  He's a fact witness.  We have

9     lots of experts we're going to be hearing from on this issue, I

10    don't understand how this testimony could be admitted.

11         THE COURT:  I really don't mind if Dr. Bishop wants to

12    talk about his background with Sandoz in general strokes, but

13    he shouldn't be testifying about the chemistry and what it

14    means.

15         MS. HAGBERG:  Your Honor, he's not going to be giving

16    expert testimony.  I'm not going to ask him any legal

17    conclusions based on any of the work that was done by Sandoz

18    and Momenta.  It's only the factual story of what Momenta did

19    and what its product, what its resulting product, the

20    characteristics of its resulting product, and if you'll allow

21    me, your Honor, to continue, and Mr. Hashmall has -- I can take

22    this down, he said what he wanted to say about this patent, I

23    have nothing further on this.

24         MR. HASHMALL:  I have no objections to hearing about

25    the characteristics of the product, but as to what he was

1    learning about the prior art, I do have an objection.

2              THE COURT:  Are you done with this?

3              MS. HAGBERG:  I'm done with this, your Honor.  I tried

4    not to put it up here, if I could.

5    Q.  So after you had done the art study, what did you do next?

6    A.  Well, the next step was, we realized that this body of

7    literature didn't really give us the kind of information, it

8    gave us some very basic information about the drug, but it

9    didn't give us anywhere near enough information in order to

10   produce a package that we would eventually be able to take to

11   the FDA.

12             MR. HASHMALL:  Your Honor, I'm reluctant to stand up,

13   but I move to strike the testimony.

14             MS. HAGBERG:  Your Honor, this is the story of what

15   they did and what they encountered in getting to their product.

16             THE COURT:  Move it along.  I understand the inference

17   you're concerned that one might draw from the last statement,

18   but let's keep moving.  Okay.

19   Q.  Did you do any work with the actual product?

20   A.  Well, that became the center point of our overall

21   development effort.  We realized that the information that we

22   could get from this was rather limited with respect to the

23   package that we would eventually need to file, and so we turned

24   our attention to extensive analysis of the marketed drug, that

25   is, the drug that we could purchase from the market and subject

1  to our methods of analytical chemistry.

2  Q.  And just so the record is clear, you said the package that

3  you would need to file.  What do you mean by that?

4  A.  The package that we would need to file eventually for

5  registration and hopefully eventual approval with the FDA.

6  Q.  And about again, just to keep this in a time frame, what

7  time are we speaking about now that you were referring to?

8  A.  This would be early in 2005.

9  Q.  Did there come a time when Momenta began looking for a

10  partner to partner with to develop generic glatiramer acetate?

11  A.  Yes.

12  Q.  And what potential partners did you speak to?

13  A.  We spoke to really two types of companies.  One would be

14  companies in the generic drug space and the other would be

15  pharmaceutical companies or novel pharmaceutical companies that

16  had experience in the multiple sclerosis area.

17          MS. HAGBERG:  Could you hold on just a moment, please?

18          (Pause)

19  Q.  Who did Momenta eventually partner with?

20  A.  We eventually partnered with Sandoz.

21  Q.  And why did you choose Sandoz?

22  A.  Well, primarily because we had an excellent existing

23  relationship with Sandoz on our other program, Enoxaparin.

24  Q.  And did Sandoz perform any due diligence on Momenta before

25  it decided to partner with you?

19FFTEV2                    Bishop – direct

1   A.  Yes, they did.

2   Q.  And were you involved with the due diligence in any way?

3   A.  Yes, I was.

4   Q.  As a result of your involvement, did you have any

5   understanding regarding Sandoz' previous efforts to develop

6   glatiramer acetate?

7           MS. HAGBERG:  One question.

8           MR. HASHMALL:  One question all right.

9   A.  Yes, I learned that Sandoz had a prior effort in this area

10  and had abandoned it.

11  Q.  So when did Momenta begin collaborating with Sandoz to

12  develop a generic version of Copaxone?

13  A.  I would estimate the middle of 2006.

14  Q.  Does Sandoz Momenta have a name for the product that is

15  under development?

16  A.  Yes, we do.  That's a code name M356.

17  Q.  So is it okay with you if I refer to that?  It's a little

18  easier for me to say than glatiramer acetate.

19  A.  Yes, please.

20  Q.  And how does Sandoz and Momenta divide responsibilities and

21  oversight for the development of M356?  And I'm primarily

22  interested in who is doing the development work right now.

23  A.  Momenta has responsibility for all of the research and

24  development activities, and Sandoz has responsibility for

25  commercial activities associate with the drug.

1    Q.  And to date, how long has Momenta been working on

2    development of M356?

3    A.  This is about six years, now.

4    Q.  And what's the team look like that is working on it today?

5    A.  It's a group of about 40 to 50 scientists at Momenta.

6    Q.  And to date, approximately how much has Momenta spent on

7    development?

8    A.  We've spent in excess of $50 million so far.

9    Q.  And in your experience, is this a long time and a

10   significant expense in the developing of a generic product?

11             MR. HASHMALL:  Objection, your Honor.  I don't see any

12   relevance to this question.

13             MS. HAGBERG:  I'll move on, your Honor, it's not --

14             THE COURT:  Okay.

15   Q.  What are some of the problems that you've encountered that

16   has taken the time that it's taken?

17   A.  Well, it's the inherent problem of characterizing a complex

18   drug.  It takes time, sophisticated methods and putting a

19   package of that complexity together for the FDA is very

20   challenging.

21   Q.  And what in particular do you have to match that was

22   causing problems with you?

23   A.  We have to match every aspect of the marketed drug and we

24   have to prove that match to the satisfaction of the FDA.

25   Q.  So turning to the molecular weight, I'd like to talk about

1    Momenta's efforts to determine the molecular weight of

2    Copaxone.  Can you explain generally what, or walk us through

3    Momenta's efforts to measure the molecular weight of Copaxone?

4    Does -- I think we have a demonstrative that you assisted in

5    preparing regarding the evolution of their methods.  Could I

6    ask that Bishop 5 be put on the screen?

7            So what was the first method that Momenta or effort

8    that Momenta made in trying to determine molecular weight?  And

9    first tell me, could you just describe what it was you were

10   trying to determine and why.

11   A.  Well, we were trying to determine the molecular weight of

12   the marketed drug.  The information that we had read from the

13   various points of literature appeared to give conflicting

14   information and ambiguous information with respect to what the

15   molecular weight of the drug actually is.  So we elected to

16   charge through that simply by measuring the molecular weight in

17   our laboratories.  And we started with the methodology that's

18   shown on this demonstrative, a technique called SEC MALS.

19   Q.  Why did Momenta choose SEC MALS?  First of all what is SEC

20   MALS what does that stand for?

21   A.  Size exclusion chromatography multi-angle light scattering.

22   Q.  Why did Momenta choose SEC MALS as the first method to

23   measure molecular weight?

24   A.  We selected this method because it was an existing method

25   within our company.  We in our area of complex drugs we have

1    occasion to measure the molecular weight of all of our polymer

2    drugs, so this is an existing standard 21st century method for

3    measuring molecular weight.  We used it for one of our other

4    drug development programs successfully, and so we started with

5    this methodology.

6    Q.  And what is DNDC and 1 and 2?

7    A.  So DNDC is one of the components that go into the output of

8    the SEC MALS measurement, and we were at the beginning deriving

9    or DNDC value for this technique from literature values.

10   Q.  And what were the results of your use of SEC MALS trying to

11   determine, and you were working from marketed Copaxone in

12   trying to determine molecular weight, is that correct?

13   A.  Yes.  So for marketed Copaxone using this technique, we

14   observed molecular weights, much to our surprise, that were far

15   greater than what was on the package insert of the drug.

16   Q.  Did Momenta keep records of its effort to use SEC MALS to

17   measure molecular weight?

18   A.  Yes, we did.

19   Q.  And were those records kept in the ordinary course of its

20   development work on M356?

21   A.  Yes.

22   Q.  Would you turn to PTX 198R in your binder, Mr. Bishop?

23            MS. HAGBERG:  And, your Honor, this is a redacted

24   document, I believe counsel has provided your Honor with the

25   full non-redacted version.

1    THE COURT:  Yes.

2    A.  Yes, I see this document.

3    Q.  And have you seen this document before?

4    A.  Yes, I have.

5    Q.  And what is it?

6    A.  This is a technical report or an analytical method

7    development report from our analytical development group.

8    MS. HAGBERG:  Your Honor, we offer PTX 198 into

9    evidence and, again, the public version is the redacted 198R.

10    MR. HASHMALL:  No objection, your Honor.

11    THE COURT:  Okay.  Admitted.

12    (Plaintiff's Exhibit PTX 198 received in evidence)

13    Q.  And what does PTX 198 show about the results of Momenta's

14    2005 SEC MALS measurement?  I'd like to refer you to Section

15    6.2 on the first page.

16    A.  Well, it's shown by this first DNDC measurement that the

17    molecular weight of the marketed Copaxone samples that we

18    measured was greater than what we expected it to be.  And

19    that's further shown on table 2.  A couple of pages later.

20    MS. HAGBERG:  Mr. Gueverra, could you please put up

21    table 2 on the screen?

22    Q.  And when you say it was higher, could you explain what you

23    mean with reference to this chart?

24    A.  Yes.  So looking at table 2 in the first column this

25    shows -- and we analyze 10, 15 lots of the reference listed

drug, that's commercial Copaxone that we bought from the market

and the 1, 2, 3 columns that follow are the three columns that

show the observed molecular weight using this SEC MALS methods.

Q.  By RLD lot number, what does that refer to?

A.  That refers to the lot number that's on the sample of

material that we purchased.

Q.  And RLD would be what?

A.  Reference listed drug.

Q.  And is that Copaxone?

A.  That is marketed Copaxone, yes.

Q.  And you show three different -- well, let me ask this in a

different way.  What does the Mn, Mw and Mp columns show?

A.  These are the three sort of standard outputs of molecular

weight measurement, Mn is number average molecular weight, Mw

is weight average molecular weight and Mp peak average

molecular weight.  The following column, PD, is polydiversity.

          (Continued next page)

19fztev3                    Bishop - direct

1  BY MS. HAGBERG:

2  Q.  And were you -- why were you using three different methods

3  to measure?

4          MR. HASHMALL:  Your Honor, I object.  Again, I thought

5  the understanding was we were just going to go a summary of the

6  development

7          THE COURT:  This doesn't sound like a summary.  And if

8  you're offering this for the truth of the results, this is not

9  going -- I mean, are we having a summary of, in general terms?

10 This isn't general to me.

11 Q.  Could you summarize, in general, what you found as a result

12 of the tests that are shown in plaintiff's trial Exhibit 198?

13 A.  Yes.  We found that by whatever method of measurement,

14 whether it's Mm, Mw, Mp, that we were getting values for

15 molecular weight that were greater than the label claim that we

16 saw in the drug.

17 Q.  And why was that a problem?

18 A.  Well, it was a problem because we needed to try to

19 reconcile that body of knowledge with, and explain that

20 eventually, that discrepancy to the FDA.

21         MS. HAGBERG:  Could you go back to slide five.

22 Q.  What was the next -- so what did you do next?

23 A.  Next, we tried to further optimize the SEC MALLS method by,

24 instead of using some literature values for this DNDC value, we

25 did some work to try to derive an actual DNDC value, and to

1   further refine the SEC MALLS methodology based on that.

2   Q.  And what were the results of your use of GPCRI methods?

3   A.  The results are given in that same table two that we saw

4   earlier and, in general, the results were closer to the stated

5   label range, but still high.

6   Q.  And so what did you do as your next step in trying to match

7   the Copaxone molecular weight?

8   A.  The next step was to try to implement a methodology that we

9   used for another one of our products, for the enoxaparin

10  product, and that is to use GPC.

11          In the case of enoxaparin, we use heparin standards.

12          In the case of this drug, we wanted to look at protein

13  standards.

14  Q.  Would you please turn to defendant's trial exhibit 1685 in

15  your binder.

16          MS. HAGBERG:  And I believe, your Honor, this is

17  already in evidence.

18  Q.  Was there a -- excuse me.

19  A.  Okay, I see that.

20  Q.  And did you become -- could you tell tell me what this

21  document is?

22  A.  Yes.  So this is a patent that we became aware of, I'd

23  estimate in the, somewhere maybe in 2005, maybe early 2006

24  timeframe.

25  Q.  And did that inform your decision of what type of method to

1    use to measure molecular weight?

2    A.  Well, this described a methodology somewhat similar to that

3    GPC protein standard methodology, except instead of using

4    protein standards, using polypeptide standards.

5    Q.  And do you know this as the Gad patent, Mr. Bishop?

6    A.  Yes, I do.

7    Q.  And did you attempt to make measurements using the

8    polypeptide standards at some point in time?

9    A.  Yes, we did.

10   Q.  And what was the results of using those standards?

11   A.  When we implemented the standards as described in this

12   patent, we were able to get values for the drug only by looking

13   at Np.  That made sense with respect to that label claim of the

14   drug.

15   Q.  And could you please look at plaintiff's trial Exhibit 236

16   in your binder, please?

17   A.  Yes.

18   Q.  And have you seen this document before?

19   A.  Yes, I have.

20   Q.  And what is plaintiff's trial Exhibit 236?

21   A.  This is a technical report, an analytical method of

22   development report from our laboratories.

23   Q.  Would that report be part of the development records that

24   Momenta would keep as in the course of its development of M356?

25   A.  Yes.

19fztev3                    Bishop - direct

1          MS. HAGBERG:  Your Honor, we offer PTX-236 into

2    evidence.

3          MR. HASHMALL:  I object, your Honor.

4          THE COURT:  I mean, it's a business record, but other

5    than the fact that it exists, I can't do anything with it.

6          MS. HAGBERG:  Your Honor, it's relevant to the

7    question of what the progress of the product and how the

8    product that is currently reflected in the ANDA.

9          THE COURT:  I'm just saying that no one -- I don't

10   know whether I -- they're probably not going to get up on and

11   cross on any of this, because he's not an expert, right, in

12   terms of results.  That's all I'm talking about.  If all this

13   is to tell me their efforts and what they think they found and

14   the next step, fine.

15         MS. HAGBERG:  That's exactly what --

16         THE COURT:  Is someone else going get up and testify

17   as an expert in this case?

18         MS. HAGBERG:  Yes, your Honor.  We're not trying to

19   make him an expert witness.

20         MR. HASHMALL:  I don't think there is an expert that's

21   relying on these documents to offer an expert opinion in this

22   case unless -- correct me if I'm wrong, but I'm not aware of

23   it.

24         MS. HAGBERG:  Your Honor, this is just their

25   development story.  I'm going to ask him one question on this

1    document and then I will move on.

2            THE COURT:  All right, well, I don't really need the

3    document, I mean, except to --

4            MS. HAGBERG:  That's fine?

5            THE COURT:  Okay, let's go.

6            MS. HAGBERG:  We can ask him the question?

7            THE COURT:  Let's just hear the story.

8            MS. HAGBERG:  For the ease of his testimony?

9            THE COURT:  Okay, fine.

10   BY MS. HAGBERG:

11   Q.  So what did Momenta determine from its study using

12   polypeptide standards?

13   A.  Well, we determined that, first of all, the only thing that

14   we could measure using the poly, I believe it's seven

15   polypeptide standards in this patent would give us an Mp value

16   for molecular weight that made sense with respect to the label

17   claim of the drug.  The other aspects of molecular weight,

18   namely, Mw, I recall was outside of that range.

19   Q.  So was knowing that the measurement was Mp important for

20   your progress with being able to report on development to the

21   FDA?

22   A.  Yes, it was.  It was very important.  Because for the first

23   time we learned how to report a result for this attribute of

24   the material.

25   Q.  And using Mp, that is peak measurement, were you able to

1  come within the range that is reported in the marketed Copaxone

2  materials?

3  A.  Yes, we were.

4  Q.  How does Momenta typically report molecular weight for its

5  products?

6  A.  Normally, we report the weight average molecular weight or

7  Mw.

8  Q.  And why is that?

9      MR. HASHMALL:  Objection, your Honor.

10     THE COURT:  Yes, this isn't part of the development

11 story.

12     MS. HAGBERG:  All right, your Honor.  I'll move on.

13     I'd like to turn to the issue of, another issue that

14 is relevant.  And, your Honor, I just want to call to your

15 attention I'm going to have Dr. Bishop talk about molar ratio

16 now.  And before I start, this is the issue that was addressed

17 at the pretrial conference.  Your Honor, I believe, said that

18 Mr. Bishop could testify about the product standards that are

19 currently the product characteristics that are currently in the

20 ANDA application, because they've been revised.  I was planning

21 to go through how it changed.

22     THE COURT:  Well, I'm sorry, why don't you finish, and

23 then I'll hear from you, Mr. Hashmall.  I meant finish what

24 you're saying now.  I think there's an objection.

25     MS. HAGBERG:  Or I can just limit him to what is

19fztev3                    Bishop – direct

1    currently in the ANDA.  It's just to put it in context, your

2    Honor, and explain some of the terms.  But if that's not

3    necessary, I can go directly to what the current ANDA states.

4              THE COURT:  Mr. Hashmall?

5              MR. HASHMALL:  Your Honor, at the pretrial conference,

6    I could read it into the record, but there was a representation

7    made by Mr. Doyle when we discussed this that all that Mr.

8    Bishop would do would read what's the current specification.  I

9    think your Honor said do we really need a witness to do that.

10   And Mr. Doyle said we're just going to have him read and

11   nothing more, and I would say let's limit it to what's --

12             THE COURT:  All right, so let's just do that, put on

13   the record the change.

14             MS. HAGBERG:  Okay.  And I think he doesn't have to

15   read it.  He knows, he knows the information, so.

16   BY MS. HAGBERG:

17   Q.  Turning to the issue of molar ratio, Dr. Bishop.  Since

18   filing the original ANDA, has Momenta made any changes in the

19   molar ratios that it is listing for what will be its commercial

20   product?

21   A.  Yes, we have made two changes.

22   Q.  And let's focus on the most recent change.  Does the most

23   recent change reflect the information that is currently before

24   the FDA?

25   A.  Yes, it does.

1  Q.  And does it also reflect the characteristics of the product

2  that is now under development at Momenta?

3  A.  Yes, it does.

4          MS. HAGBERG:  Could I put Bishop slide three on the

5  screen?

6  Q.  Is this the information that is before the FDA relating

7  to -- is this -- let me -- withdrawn.

8          Is this the current information reflecting molar ratio

9  for that is reflected in Momenta's ANDA?

10  A.  Yes, it is.

11  Q.  And can you just tell the Court what the current molar

12  ratio is of Momenta's M356, and point out on the chart where

13  that information is?

14  A.  Yes.  The information on our current specification is in

15  the last column of table six.  Would you like me to read?

16  Q.  Yes, please.

17  A.  It shows a specification range for alanine of 0.392 to

18  0.462.  For lysine, 0.300 to 0.374; glutamic acid, 0.129 to

19  0.153, and tyrosine, 0.086 to 0.100.

20  Q.  And in terms of the processes that are reflected on this

21  table six of plaintiff's trial exhibit 913-R, which of those,

22  if any, is the current process that Momenta is using?

23  A.  The current process that we're using to manufacture our

24  glatiramer acetate is called process 1.1.0.

25  Q.  And what do the numbers under 1.10 reflect?

A.   Those numbers in that column reflect one lot or one batch

of material that we have made using this process, and it

gives -- these are the observed values for those four amino

acids.

          THE COURT:  And that's 1.1.0?

          THE WITNESS:  That's correct.

Q.   And could you read into the record what those values are?

A.   Yes.  Alanine shows 0.427; lysine 0.344; glutamic acid

0.136, and tyrosine 0.093.

Q.   And have you informed the FDA of these new figures?

A.   Yes.  We have submitted this information to the FDA.

Q.   And if you look at plaintiff's trial exhibit 913R.  Just

for the record, can you tell us what that exhibit is?  And

it's -- again, this is a redacted version, but I believe you

have the full document in your binder.

A.   Yes.  This is a communication to the FDA.

Q.   And it was the information that was -- could you put that

slide back up?

          And that information is contained in the communication

to the FDA that you just referred to that is the plaintiff's

exhibit 913R?

A.   Yes, the information on this slide is contained in this

communication to FDA.

Q.   And are those the amino acid content specification that

Momenta intends to use in its final glatiramer acetate product?

1    A.  Yes, they are.

2    Q.  And how confident are you in Momenta's ability to meet the

3    current amino acid content specification?

4    A.  Very confident.

5    Q.  I'd like to turn to another topic, Mr. Bishop.  Are you

6    familiar with the steps that Momenta uses to manufacture M356?

7    A.  Yes, I am.

8    Q.  I'd like to focus on step two.  What is your understanding

9    of step two or just a general summary of what step two is?

10   A.  Step two is generally known as the depolymerization and

11   deprotection reaction.

12   Q.  And what was the first method that Momenta used when it

13   began to development of M356?

14   A.  I would call it a hit or miss method.  We would, basically,

15   run the reaction, this did depolymerization reaction and

16   isolate product at the end, and determine the molecular weight.

17   And if it happened to be in the targeted molecular weight, we

18   were happy.

19           If it wasn't within the targeted molecular weight, we

20   would make adjustments and produce the next small batch of

21   material.  So this it was all in a laboratory scale, using a

22   modified procedure.

23   Q.  Does Momenta still use the hit or miss method?

24   A.  No, we don't.

25   Q.  By the way, what happened if it was a miss?

A.  Well, we wouldn't -- this was all on a laboratory scale, so
it was not a matter of accepting or rejecting product, in a
sort of quality control type of way.  But we would basically go
back and retry.

Q.  And what was the next step that you test, that you used for
determining the end point step two?

A.  We had, we had read I think it was a line in one of, one of
those patents that -- looking at earlier, a line that referred
to a test reaction, wherein a batch of material would be used,
a test reaction would be run on a batch of material in order to
determine the right parameters to carry out that reaction.

Q.  And is that a reaction that is determined in the laboratory
or in a plant?

A.  In a laboratory.

Q.  And did Momenta implement -- and what would you refer to
that as?

A.  A test reaction.

Q.  And did Momenta implement a test reaction method?

A.  When we were running our early studies in the laboratory,
we would run this test reaction, yes.

Q.  And when you say "early studies," what time period are you
talking about?

A.  This is the 2005, 2006 time period.

Q.  And how successful were these small -- is it okay to call
it a -- how successful were the test reactions for Momenta?

A.   The small scale reaction was successful in determining the

right parameters for another small scale reaction, and at that

time we were only doing small scale reactions.

Q.   And so did you try to implement it on a larger scale basis?

A.   Yes.  Eventually we tried to implement that concept using a

small scale reaction to predict what a large scale reaction

would be.

Q.   And what happened?

A.   We were not successful with that.

Q.   So what did you do next?

A.   So we abandoned the approach of using that small scale test

reaction to determine what a large scale reaction should be,

and we reverted to another methodology, basically, running a

full scale profile run in order to determine the parameters for

that reaction.

Q.   And what is a large scale profile run?

A.   Well, we would take a batch of materials, this is a batch

from step one which we call intermediate one, and we would

basically divide it into two.  So this is a large batch of

material divided into two.  We would take the first half of

that batch and run it in the plant as a profile run in order to

determine the correct parameters for the depolymerization.  We

would then take the knowledge from that profile run and apply

it to the other half of the material and execute that, that

half of material in that manner.

1   Q.  So you'd be using the testing of one-half of a batch to

2   determine the character, the method for the second half of the

3   batch, is that correct?

4   A.  That's correct.

5   Q.  Did using the large scale profile runs work for Momenta?

6   A.  Yes, it did.

7   Q.  Were there any disadvantages to it?

8   A.  There were many disadvantages to it, yes.

9   Q.  Can you just name a couple; what were the problems?

10  A.  Well, it was very wasteful both of plant time, because

11  plant time is relatively precious and expensive, so it was a

12  waste of plant time, and it was also a waste of material.

13  Q.  Are you still using the large scale batch?

14  A.  No, we are not.

15  Q.  When did you abandon the large scale profile testing?

16  A.  In 2010.

17  Q.  And by the way, what process did Momenta use for its

18  original ANDA?

19  A.  We used the large, the profile run that I mentioned

20  earlier.

21  Q.  So after abandoning the large scale profile test, what test

22  did you turn to next?

23  A.  We implemented viscometry.

24  Q.  And what is viscometry?

25  A.  Viscometry is the measurement of the viscosity of a

1    solution, in other words, the force that's required to move a

2    solution.

3    Q.   And what is viscosity measuring?

4    A.   Well, it's measuring the force that's required to move or

5    displace a solution.  So a more viscous solution like maple

6    syrup up is more viscous and has a higher viscometry reading

7    than something like water.

8    Q.   Did you consider anything else when you were moving, in the

9    process of moving to viscosity to determine any other --

10   consider any other types of processes?

11             MR. HASHMALL:  Objection.  Again, the issue is what

12   the current process is it either infringes or not.  Both sides

13   have experts on that issue.

14             THE COURT:  Well, I guess we're getting -- we're

15   moving along here.

16             I do know about viscosity now, but that's okay.  All

17   right, next.

18   Q.   Let me withdraw the question and ask this.  Why did you

19   move to viscosity; how would you characterize a viscoscity

20   measurement?

21             MR. HASHMALL:  Objection, your Honor.

22             THE COURT:  That wasn't actually my purpose in saying

23   that.  I'd just like to hear about where they went.

24             MS. HAGBERG:  I'm sorry, your Honor, I didn't --

25   Q.   So have you implemented viscosity?

1    A.  Yes, we have.

2    Q.  And is that the current test that Momenta uses?

3    A.  Yes, it is.

4    Q.  I think you helped prepare a slide that describes what a

5    viscometer is and how it works.  Can you --

6           MR. HASHMALL:  Objection, your Honor.  I mean this

7    would be expert testimony.  Obviously, I mean the process is

8    described in the documents and that's I think the process that

9    needs to be evaluated by this Court in determining the

10   infringement issue, and expert on both sides will be discussing

11   it.  I don't see how what Mr. Bishop adds to this.

12          THE COURT:  I agree.  I think this goes right over the

13   line.

14          MS. HAGBERG:  All right, your Honor, I'll move on.

15          THE COURT:  I understand the progression and now they

16   use, you know, this method.

17   Q.  What is the difference in using a viscometer from the

18   earlier methods that you used?

19          MR. HASHMALL:  Objection, your Honor.

20          THE COURT:  Sustained.

21   Q.  How does the viscometer work?

22          MS. HAGBERG:  Your Honor, it's relevant to our

23   non-infringement argument.  He's a fact witness.  He has direct

24   knowledge of why and how a viscometer works and how it operates

25   within Momenta.

1           THE COURT:  All right.  I don't doubt that.  And I

2    guess the question is, this would typically be something that

3    would be in a report and discovered, and there would be a

4    deposition.

5           When did all this come up?

6           MS. HAGBERG:  Your Honor, there was -- there has been

7    discovery on this point.  This is different from the molar

8    ratio issue.  This issue came up at the time of the revision.

9    It was --

10          THE COURT:  The time of what?  I'm sorry.

11          MS. HAGBERG:  At the time of the revised method that

12   was reported to the --

13          THE COURT:  So who is it that --

14          MS. HAGBERG:  We've had depositions and we've had

15   expert reports on this issue.

16          MR. HASHMALL:  That's right.  But Dr. Laird --

17          THE COURT:  Wasn't one of those experts.

18          MR. HASHMALL:  Is one of the experts for Momenta, and

19   Dr. Gokel on behalf of --

20          THE COURT:  And they're going to talk about it.

21          MR. HASHMALL:  Yes.

22          THE COURT:  Okay.

23          MS. HAGBERG:  I'm trying to get him to -- and they had

24   discovery.  They took Dr. Bishop's deposition on this issue.

25   So this isn't --

1    THE COURT:  Well, what's he going to say say that I'm

2    not going to hear from your expert where they'll have an

3    opportunity to cross?

4    MS. HAGBERG:  I guess I just wanted Mr. Bishop to tell

5    how and why Momenta is using the viscometer from the

6    perspective of a person in the manufacturing process overseeing

7    the development and what the advantages of the viscometer are,

8    which isn't something that an expert who is not working in

9    developing a product is able to testify about.

10    MR. HASHMALL:  Well, it's still an expert issue.  If

11    they're arguing that because of these advantages there's some

12    sort of impact on the infringement analysis, which is isn't

13    clear, it still would be the subject of expert testimony.  And

14    if they thought it was important or relevant to the

15    infringement analysis, then their expert should have given an

16    opinion on it.

17    I mean, the only issue that Mr. Bishop was deposed on

18    is what information have they given the FDA, what have they

19    told the FDA about the process.  You know the issue was what

20    are they actually going to be using or is it just tentative or

21    is this real?  But as to the details of the process itself, and

22    whether it infringes, that's certainly expert testimony.

23    THE COURT:  I agree.

24    Q.  Turning to what has been implemented.  Has Momenta

25    implemented the use of a viscoscity test in manufacturing M356?

19fztev3                    Bishop - direct

1    A.  Yes, we have.

2    Q.  And when did it implement that test?

3    A.  In 2010, 2011.

4    Q.  Will all subsequent, will work on M356 going forward be

5    done with the viscosity measurement for determining the end

6    point of step two?

7    A.  Yes, it will.

8    Q.  Is any additional work going to be done at small scale?

9    A.  No.

10            MS. HAGBERG:  Your Honor, just so the record is

11   complete.

12   Q.  Mr. Bishop, would you please look at PTX-913R, again in

13   your binder.

14            MS. HAGBERG:  And could we have on the screen PTX913R

15   Section 3.3.3.3?

16   Q.  And first can you just say what 913R is?

17   A.  Yes.  This is our communication to FDA from earlier this

18   year.

19   Q.  And what is 3.3.3.3 informing the FDA?

20   A.  This informs the FDA of our incorporation of viscosity

21   measurement as our means of in process control or IPC for this

22   step of chemistry.

23   Q.  And what is in process control?

24   A.  In process control is a means of measuring what's going on

25   in the reactor in order to determine when to end the reaction.

1   Q.  And did you also inform the FDA that you were no longer

2   going to be using 1.00 process or the process that was used of

3   1.0.0?

4   A.  Yes, we informed the FDA that we were moving to this

5   revised process designated 1.1.0.

6   Q.  And has Momenta abandoned the process that it used in 1.00

7   for determining the depolymerization end point?

8   A.  Yes, we have.

9   Q.  Mr. Bishop, which process will Momenta use in its final

10  glatiramer acetate product?

11  A.  That will be process 1.1.0.

12  Q.  Did Momenta develop any back-up method to measure the end

13  point of step two?

14  A.  Yes, we did.

15  Q.  And what is -- what was the back up?

16  A.  This was I believe referred to as the average temperature

17  methodology.

18  Q.  And what was the average temperature methodology?

19  A.  By measuring the average temperature in the reactor, we

20  would determine the optimal reaction time for that, for that

21  step of chemistry.

22  Q.  Does Momenta plan to use the back up based on average

23  temperature method in its final commercial glatiramer acetate

24  product?

25  A.  No, we don't.

1    Q.  And why not?

2    A.  Because we were successful in our implementation of

3    viscometry when we manufactured four process validation lots.

4    Q.  And is there another back up to the viscometer that you

5    have been talking about up till now?

6    A.  Yes.  We have a back up viscometer which now serves as the

7    back up to the main viscometer.

8    Q.  And how does the back up viscometer work?

9    A.  The back up viscometer is a smaller version of the large

10   viscometer which is inserted into the circulation loop of the

11   tank.

12   Q.  And does Momenta intend to use viscometer, I'll call it

13   viscometer number two, in its product going forward?

14   A.  That will be our back up to the main viscometer, yes.

15              MS. HAGBERG:  I have no further questions.

16              THE COURT:  All right.

17              MR. HASHMALL:  Just a few questions, your Honor.

18              THE COURT:  Mr. Hashmall.

19   CROSS EXAMINATION

20   BY MR. HASHMALL:

21   Q.  Good afternoon, Mr. Bishop.

22   A.  Hello.  Good afternoon.

23   Q.  Couple questions.  Do you have in front of you the binder

24   with PTX-914?

25   A.  Yes, I do.

19fztev3                    Bishop - cross

1   Q.  This is Momenta's internal technical report describing the

2   Momenta's in process viscosity control step, control step two

3   that you've been testifying about, right?

4   A.  Yes, it is.

5   Q.  And what's the date on that document?

6   A.  April 14th, 2011.

7   Q.  Are you familiar with this document?

8   A.  Yes, I am.

9          MR. HASHMALL:  Now, your Honor, I offer PTX-914 into

10  evidence.

11         THE COURT:  Okay, admitted.

12         (Plaintiff's Exhibit 914 received in evidence)

13  Q.  Now you can turn to page MMT0163094.

14         MS. HAGBERG:  Could I just ask that you use the

15  redacted version?

16         MR. HASHMALL:  All right.

17         MR. HASHMALL:  So, Mr. Chase, if you put on the

18  privacy screen, it's 954.

19  Q.  Just to be clear, Mr. Bishop, what we've marked is, this

20  document is the current in place process for the viscosity

21  method you've been testifying about, right; there's no later

22  version of this?

23  A.  I'm not sure if there is a later version of this document

24  or not.

25  Q.  You have that page I asked you about?

1   A.  Yes, I do.

2   Q.  All right.  And if you take a look under the graph --

3               MR. HASHMALL:  I guess, Ms. Hagberg, I can't ask the

4   witness to read this aloud?

5               Give me one minute, your Honor.

6   Q.  So I'm sorry, Mr. Bishop, if you could read the sentence

7   out loud that begins, in the event a failure, in the event

8   viscometer equipment failure?

9   A.  Yes.  "In the event of the viscometer equipment failure or

10  the inability to obtain accurate viscosity readings, the

11  reaction end point may be determined using the alternative

12  method described below."

13  Q.  And the alternative method described below is where the

14  time and temperature of the parameters in the determining when

15  the end reaction, is that right?

16  A.  Yes.  The average temperature time and point determination.

17  Q.  And this is the current protocol for the process that

18  Momenta's using, correct?

19  A.  Well, we are updating our records to -- we successfully

20  used viscosity during our process validation campaign earlier

21  this year, and so we have this back up in the event that

22  viscometry failed during those process validation runs, since

23  it didn't fail, and we have confidence now in our ability to

24  use viscometry as an in process control, we no longer need this

25  methodology as a back up, and we will be taking that out of our

19fztev3                     Bishop - cross

1    process henceforth.

2    Q.  But as management now currently stands as far as the Food

3    and Drug Administration is concerned, this is the protocol for

4    Momenta's process, correct?

5    A.  Well, from what we have communicated to the FDA, we have

6    communicated our intent to use viscometry as our in process

7    control for this step.

8    Q.  As things now currently stand, Mr. Bishop, as far as the

9    FDA understands it, the protocol described in PTX-914 is the

10   protocol for Momenta's in process control procedure, currently?

11   A.  Well, this is a research report.  This is not on file with

12   the FDA.

13   Q.  But you haven't filed anything with the FDA advising them

14   that you're going to change the back up plan some point in the

15   future, correct?

16   A.  Well, what we have communicated to the FDA is that we

17   planned that we have used and plan on using in process

18   viscometry as a means for this step.

19   Q.  You advised the FDA that in process viscometry is an

20   additional step, not a replacement step, correct?

21   A.  No.  We have advised the FDA that we have replaced our

22   profile run from our former process with viscometry for our

23   current process.

24   Q.  Do you have PTX-913A?  If you could turn to page 38 in that

25   document?

19fztev3                    Bishop - cross

1  A.  I'm sorry, page number, which page number, please?

2  Q.  I'm sorry 38 of 63.

3  A.  Yes.

4  Q.  Now in this section you see the first paragraph addressed

5  to incorporation viscosity as an IPC?

6  A.  Yes.

7  Q.  And this document has been delivered to the FDA, correct?

8  A.  Yes, it has.

9  Q.  All right.  And this is the section where Momenta's

10  referencing a revision to its synthetic process, correct?

11  A.  Yes, it is.

12  Q.  And if you look at the last sentence it says, "For process

13  1.10 and alternative, in process control method has been

14  added."  You see that sentence?

15  A.  No, I don't.

16  Q.  I'm sorry, it's the last sentence in the paragraph.

17  A.  The last part of which paragraph?

18          THE COURT:  Could you repeat that for me, Mr.

19  Hashmall?

20          MR. HASHMALL:  I'm sorry.  I was directing the witness

21  to the last sentence in the paragraph.

22          THE COURT:  Okay.

23          MR. HASHMALL:  And, Ms. Hagberg, is that all right we

24  place it on the screen?

25          MS. HAGBERG:  Yes.

19fztev3                    Bishop - cross

1   Q.  This refers to process 1.10.  It says "Alternate in process

2   control method for step two utilizing NC2 measurement of

3   solution has been added to monitor and determine the

4   depolymerization end point in step two, correct?

5   A.  Yes.

6   Q.  It doesn't say that it's replacing the prior process that

7   has the reference to the back up plan, correct?

8   A.  I'm sorry, could you repeat that, please?

9   Q.  It doesn't say that it's replacing the prior process that

10  has the back up plan that refers to time and temperature.  It

11  says it's been added, correct?

12  A.  Well, in this sentence it describes an alternate.  In table

13  16 on the next page it shows, under process 1.1.0, the word

14  viscosity as our in process control for this step.

15            MR. HASHMALL:  All right.  I have no further

16  questions, your Honor.

17            THE COURT:  Pardon me?

18            MR. HASHMALL:  I have no further questions.

19            THE COURT:  All right.  Anything further?

20            MS. HAGBERG:  Just one point, your Honor.

21  REDIRECT EXAMINATION

22            MS. HAGBERG:  Is alternate, by alternate does Momenta

23  mean replacement, it is going to be what they use as shown in

24  the table you referred to?

25  A.  Yes.  That clearly is our intent, as I indicated in table

1     16.

2              MS. HAGBERG:  No further questions.

3              THE COURT:  All right.  Thank you, Doctor, you may

4     step down.

5              THE WITNESS:  You're welcome.

6              THE COURT:  Who is the next witness?

7              MR. DOYLE:  Dr. Laird, your Honor.

8              THE COURT:  All right.  Why don't we start with Dr.

9     Laird after lunch then, and if you would, if everybody would be

10    back around, you know, take an hour 1:20, 1:25 -- 1:25, all

11    right?

12             (Luncheon recess)

13             A F T E R N O O N   S E S S I O N

14             1:30 p.m.

15             THE COURT:  Mr. Doyle.

16             MR. DOYLE:  Thank you, your Honor.  May I approach?

17             THE COURT:  Yes.

18             MR. DOYLE:  Sandoz calls Dr. Trevor Laird.

19             THE COURT:  All right, Dr. Laird.

20     TREVOR LAIRD,

21         called as a witness by the defendant,

22         having been duly sworn, testified as follows:

23    DIRECT EXAMINATION

24    BY MR. DOYLE:

25    Q.  Dr. Laird, where are you employed?

1  A.  I'm actually self-employed.  I have my own business which

2  is involved in training courses and consultancy, mostly for

3  pharmaceutical companies, but also we get involved with all

4  aspects of chemistry, chemicals, flavor, fragrances, you name

5  it, we do it.

6  Q.  And what's the name of your business?

7  A.  Scientific Update.

8  Q.  And at Scientific Update, what types of projects do you do?

9  A.  Mostly we do consultancy in the area of what I call organic

10  process chemistry, but that is a wide subject.  So it includes

11  not just organic synthesis, process development scale up, but

12  anything that to do with the finished product as well, which

13  might be related to crystallization, solid state forms, et

14  cetera, that are needed on the interface between the chemistry

15  and the formulation.

16  Q.  And do these projects sometimes involve synthesis, design

17  and optimization?

18  A.  Yes.  Synthesis design I really call process research.  And

19  the optimization, that goes with that and to all scape is

20  really more process development.  But it's a continuous --

21  there is no real defined interface.  But the terms are used

22  separately.

23  Q.  Can you describe a little bit more in detail what is

24  organic process chemistry and scale up?

25  A.  Well, the organic process chemistry is usually on the

1    design of the synthesis to a target drug.  So always in

2    developments we have a target, it's what the discovery chemists

3    have decided is maybe a development compound or if you've work

4    for generic you know what the end drug is.  So the target is

5    really to design the synthesis in the best way using

6    appropriate raw materials, low cost raw materials if possible;

7    whereas the scale up is really more the development of each

8    individual step of that synthesis, and then taking that from

9    the laboratory, laboratory, and then into the pilot plans, and

10   then finally to full scale manufacture.

11   Q.  And you mention that you do consulting services, provide

12   consulting services to different types of pharmaceutical

13   companies.  Would those include what are referred to as branded

14   companies and generic companies?

15   A.  Yes, they would include branded companies Pfizer, Merck, et

16   cetera, but also small biotechs, what I call emerging

17   pharmaceutical companies, and also generics as well.

18   Q.  Have you consulted for any of the companies involved in

19   this case?

20   A.  Yes, I have.  I've consulted for Teva, I can't you details,

21   but it was involving an urgent request of John, an urgent

22   problem to solve a problem, manufacturing problem.  And I've

23   consulted for Novartis, subsidiary called Ciba Vision, which is

24   actually involved in the manufacture of contact lenses.  And

25   the problem there was again manufacturing problem related to

1   polymerization and producing polymer that goes into the contact

2   lens.

3   Q.  Before 1994, were you teaching at companies on issues of

4   organic process chemistry?

5   A.  Yes, I was.  When I started the company in 1989, I wrote a

6   training course called chemical development and scale up, and

7   this is being taught to companies worldwide, I think about 25

8   different countries, thousands of people have attended the

9   course, and in before 1994 I was teaching this to Pfizer to

10  Glaxco, to smaller companies as well.

11  Q.  And did your courses include teaching regarding test

12  reactions?

13  A.  Yes.  I mean in the course definition of test reactions, we

14  teach people how to optimize processes either by looking at the

15  effects of changing parameter on the yield qualities,

16  impurities, et cetera of the product.  I also have this scale

17  up.  So this development work is mostly test reactions.  We're

18  looking at the particular chemical reaction and testing it out

19  to see what, if you change the temperature, concentration,

20  reagents, et cetera, what effect that has on the product and

21  the process.

22  Q.  And is there another term which would be a subset of test

23  reactions as has been defined by the Court that was part of

24  your course material back in 1994?

25  A.  Yes.  I mean, in my reports on this case, I used the word

1    test reaction originally as a synonym for use test.  And use

2    test is more of the term that I would normally use in industry.

3    And by use test, I mean testing a batch of a material usually

4    in a laboratory before you commit to the whole of that batch in

5    production, or maybe it could be a raw material as well.

6    Q.  Were both test reactions as amended by the Court and use

7    tests common in 1994?

8    A.  Yes, they were.

9    Q.  Now, what did you do before starting your company

10   scientific update?

11   A.  Well, when I left the University, I joined the company

12   called Imerial Chemical Industries, its ICI.  It was an

13   enormous company in 1973, when I joined 150,000 employees.  It

14   is about the size of DuPont.  It doesn't exist any more because

15   of fragmentation and all sorts of business deals, let's say.

16   So I spent seven years there, different divisions, not to do

17   with pharmaceuticals, though it, was all to do with

18   agrochemicals, color chemicals, electronics chemicals, et

19   cetera.

20   Q.  Then did you move to a pharmaceutical company?

21   A.  Yes.  I joined Smith Kline and French as it was then known

22   in 1979.  It's now, it's part of Glaxo Smith Kline.  And

23   eventually I became the head of development, their chemical

24   development where I had about 30 BSE scientists working for me.

25   And I was also in charge of the pilot facilities at the UK

1   site.  That was a very strategic position, because all of Smith

2   Kline's drugs which were in development came through that site,

3   because at that time they didn't have a pilot plan in the

4   U.S.A.  So I was effectively responsible for the small scale

5   manufacture of all Smith Kline's drugs prior to launch, prior

6   to transfer to manufacturing sites.

7   Q.  Was it from Smith Kline that you then moved to form your

8   own company, Scientific Update?

9   A.  Yes, it was.  I tried to improve my staff by getting

10  continuing education, because I felt that sometimes people with

11  a Ph.D. rely on information they got before that Ph.D. and

12  don't update it.  But I had not much success in getting people

13  come and do training.  So I felt, well, there is a gap in the

14  market here, why don't I do it myself.  And that's proved to be

15  an excellent decision.

16  Q.  Are you on any scientific advisory boards?

17  A.  Yes.  I have been on a lot of scientific advisory boards

18  for smaller companies.  But, again, they've got subsumed into

19  multi nationals and I've lost those positions.

20        But at the moment I've just recently taken on science

21  advisory board with a company Sand Chemicals in Switzerland

22  which is a peptide and polypeptide manufacturer.

23  Q.  Could you briefly describe your educational background

24  before you went into industry?

25  A.  Yes.  I studied chemistry at Imperial College, London

1   specializing in organic chemistry for the last year, and then I

2   did a Ph.D. at another college in London, John Cass College

3   where I got my Ph.D., and there were four publications that

4   came out of that.  Then I moved to Sheffield University in the

5   north of England and had a very productive period where working

6   for Professor Olis, and that was -- resulted in I think about

7   11 publications in the three years.

8   Q.  And in addition to those publications in your academic

9   career, have you written any other articles or book chapters?

10  A.  Yes.  I've written several book chapters once I've been in

11  industry.  Some of these have been just on general chemistry,

12  some have been to do with particular applied subjects, such as

13  amazingly solar energy, and those are being more focused on the

14  topics of discussions today, which is chemical development and

15  scale up.

16          At the time I wrote a chapter in comprehensive

17  medicinal chemistry in -- well, it started about 1988 and it

18  was published in 1990.  There weren't really many publications

19  that said anything at all about the subject of process research

20  development and the interface between the laboratory and

21  manufacture.  And so this review was one of the first sort of

22  set down the principles.  I suppose that then tempted me to

23  leave Smith Kline, because I felt, well, I've got the

24  principles, I can put that into a course and hopefully make

25  some money as well.

1   Q.  Do you serve on any editorial boards?

2   A.  Yes.  I'm actually chairman of the editorial board for the

3   Journal Organic Process Research and Development, which is an

4   American Chemical Society publication.  I was actually the

5   instigator of this particular journal in the mid 1990s.  I

6   persuaded the American Chemical Society and the Royal Society

7   of Chemistry in England to put up some money so that we could

8   start a new journal, focus much more on industrial aspects of

9   organic chemistry, but with some chemical engineering interface

10  as well.  I was appointed the editor in 1995.  The first issue

11  came out in 1997, and I'm still editor, and renewed until 2014.

12  Q.  How has the journal done?

13  A.  It's highly regarded.  There wasn't much there before, so

14  it didn't have any of competition, but it is well regarded in

15  the industry worldwide.  It has papers from all over the world,

16  from Japan, India, et cetera, as well as Western European, the

17  States.

18  Q.  Do you write editorials for the journal?

19  A.  Yes, I do.  I try and be a little bit controversial or

20  maybe a bit humorous.  And so I try and do an editorial on each

21  of the six issues every year.  So in the past 15 years I've

22  probably written 70 or 75 editorials, covering a wide range of

23  subjects.  I mean, the subjects are I've chosen are sort of

24  dear to my heart, the academic industry interface, generics

25  industry, crystallization issues, all sorts of things.  But one

1    of the things, a couple of editorials have to do with

2    reproduce-ability.

3    Q.  And why have you chosen that subject to speak on?

4    A.  Well, it was always an interesting subject to me when I was

5    at Smith Kline.  Because some of our colleagues in the U.S.

6    would give as a procedure that we had to scale up in the UK.

7    And sometimes we couldn't even reproduce it in the laboratory,

8    never mind scale it up.  So it was clearly some deficiency in

9    the way laborites were done.

10        And a lot of chemists find difficulty repeating

11   procedures in the literature, and in patents as well.  So

12   that's been a particular interest of mine.  It's been

13   reinforced by requests from lawyers for my company Scientific

14   Update to take a procedure and patent, and then try and get a

15   company to repeat that.  But what we have to do is to take,

16   let's say, the ten lines of the patent experimental procedure

17   and then write it out in a manner of the person of skill in the

18   art.  So it's almost like a set of instructions, almost like a

19   batch record for the company to actually repeat this procedure.

20   And what we have to do is to make the assumption that a person

21   of skill in the art would do, that if it says you heat it to

22   50 degrees, does he mean between 45 and 55, or how fast does he

23   heat it, and these sort of things which are not usually written

24   down, but a person of skill in the art probably can make a good

25   assumption as to what should be done.

19fztev3                         Laird - direct

1   Q.  From your last answer, it sounds like you've been involved

2   in some legal proceedings as an expert in the past?

3   A.  Yes.  I mean, those things I've talked about now are sort

4   of prelegal proceedings, I think deciding whether to litigate

5   or not.  But, yes, I've -- in my CV I've listed a number of

6   cases where I've been involved, testified at trial in the U.S.

7   I think three times.

8   Q.  Do you consider yourself to be an expert in the field of

9   organic process chemistry?

10  A.  Yes, I do.

11  Q.  And does that include expertise from both an academic and

12  an industry perspective?

13  A.  Yes, it does.

14  Q.  And does that include being an expert in manufacturing the

15  pharmaceuticals?

16  A.  Yes, partly because the interface I have is between organic

17  chemistry and mechanical engineering.  And a lot of chemical

18  engineering involves issues to do with, to do with scale up,

19  and scale up is really the essence of getting the problem

20  sorted out before you go into manufacture.

21  Q.  I'm going to have put on the screen now paragraph ten from

22  your expert report, which includes a definition of the person

23  of ordinary skill in the art from your perspective.  Do you see

24  that?

25  A.  Yes.  Thank you for expanding it.

1  Q.  And does this state your view as to the qualifications of a

2  person of ordinary skill in the art with regard to the issues

3  of organic chemistry and organic process chemistry that are

4  relevant to this case?

5  A.  Yes, it does.  I mean, I've mentioned a Ph.D. in organic

6  chemistry or equivalent, partly because I find that some BSCs

7  in organic chemistry can be very expertly in development in

8  scale up.  So not necessary it's the Ph.D. or the equivalent.

9  I think that's perhaps slightly different from some other

10 definitions.

11 Q.  And in 1994, were you a person of at least ordinary skill

12 in the art?

13 A.  Yes, I was.

14 Q.  And would that also apply to 1995?

15 A.  Yes.  I still am.

16 Q.  And were you here for the testimony of Dr. Gokel and Dr.

17 Sampson?

18 A.  Yes, I was.

19        MR. DOYLE:  Your Honor, Sandoz and Momenta offer Dr.

20 Laird as an expert witness in organic and process chemistry.

21        THE COURT:  Any objection?

22        MR. WIESEN:  No objection, your Honor.

23        THE COURT:  All right.  The Court accepts Dr. Laird as

24 an expert.  Go ahead.

25        MR. DOYLE:  Thank you, your Honor.

1    Q.  I'd like to start this afternoon, Dr. Laird, with the

2    topics of predetermined time and test reactions.  And, Dr.

3    Laird, do you understand that the Court construed the claim

4    term predetermined to mean determined beforehand?

5    A.  Yes, I did.

6    Q.  And do you understand the Court has construed the term

7    predetermined by test reaction as determined beforehand by a

8    reaction carried out to determine results of varying reaction

9    conditions?

10   A.  Yes, I understand that.

11   Q.  And are you applying the Court's claim constructions in

12   your testimony today?

13   A.  Yes, I am.

14   Q.  Were test reactions as construed by the Court commonly

15   known in 1995?

16   A.  Yes.  The test reactions defined by the Court are an

17   essential part of development chemistry.  So when you are

18   trying to optimize a process, you're looking at the way in

19   which the process variables have affect on the end product that

20   could be a quality or yield or sometimes the physical

21   properties of the solvent, everything to do with that material.

22   So these are all really done by test reactions designed to

23   experiment with the variables.

24   Q.  I'd like to just take a brief look at your course that

25   extends back into the 1990s.

1           MR. DOYLE:  Could we see PTX-0775, please?

2    Q.  What is PTX-0775?

3    A.  This is the first page of many to do with a particular

4    model that comes from the course that I wrote in 1989, to do

5    with development, chemical development and scale up of chemical

6    processes.  And this is probably a series of about, power point

7    slides.  The original version that I wrote wasn't in this

8    format, but the wording is the same.

9           MR. DOYLE:  Could we see page 16, please?

10   Q.  And does this make reference to what you were describing

11   earlier as use tests?

12   A.  Yes.  I mean obviously use test is a subdivision of test

13   reactions as explained by the Court.  And actually use test is

14   mentioned twice on there, that the one at the top and the fifth

15   bullet point which talks about analyzing all raw materials and

16   intermediates, except reactives and carry out use tests prior

17   to scale up.

18          So the idea of use test is that if you have a batch of

19   materials where there may be things that you can't analyze

20   for -- and this is often quite true with intermediates -- you

21   want to test it out in the laboratory before you commit

22   kilograms and tons of material to technique for might be a lot

23   of waste.  So you try that in the lab.  If it works, then you

24   scale it up and do the full batch.  If it doesn't, you find out

25   what the problem is.

1   Q.  Are you familiar with end process controls in the

2   manufacturing pharmaceuticals?

3   A.  Yes.

4   Q.  And have you discussed those in any of your articles or

5   have you included discussions of in process controls in your

6   courses that you teach?

7   A.  Yes.  It's discussed in articles and also in the courses.

8   We feel it's a very important aspect of process development

9   that people should be following reaction.  I mean, this occurs

10  in academia as well, that you follow reactions with an in

11  process monitoring.  And in the plants if you can put the

12  control aspect in the reactor, then it means you'd know when a

13  particular reaction is finished.

14  Q.  And can you elaborate a little bit more on just what is an

15  in process control as opposed to a control in the manufacturing

16  that's not in process?

17  A.  Yes.  I mean, in process control is monitoring the progress

18  of the reaction, so that at a certain time when you want to go

19  onto the next part of process, you can, you can decide what to

20  do.  Some in process controls have a feedback so that it

21  actually goes into the system.  So sometimes that happens with

22  even with temperature, for example, our feedback loops which I

23  put a monitoring into a control position.

24  Q.  And are you also familiar with using test reactions to

25  predetermine the time and temperature of reaction conditions?

1 | A.  Yes.  I mean, I would say that most of the projects that I

2 | worked on have used test reactions, because this is a standard

3 | part of chemical development.

4 | Q.  And in your teaching and consulting with companies, do you

5 | have a preference as between in process controls and test

6 | reactions?

7 | A.  Generally prefer in process controls, if you can do it.

8 | But test reaction, particularly use tests, certainly have their

9 | value in the sense that you don't always know what you're

10 | measuring on a batch.  So sometimes it is necessary to do those

11 | tests.

12 | Q.  And what is the basis for your preference of in process

13 | controls if you can develop one?

14 | A.  Well, it's usually instantaneous.  It tells you what you

15 | wanted me -- whereas, use testing you have to either do it

16 | beforehand, but there's always a problem if you do a use test

17 | that you're doing it in the laboratory; whereas, the actual

18 | materials being carried out in the plant.  And so sometimes the

19 | things vary.  And usually the thing that varies most is the

20 | time that it takes much longer to heat things up in the plant,

21 | cool them down.  So something that takes, you know, 24 hours in

22 | the lab will take maybe, maybe as much as 48 hours in the

23 | plant.  So you have to allow for these differences in times.

24 | Q.  Let's turn to the patents.  Could we have the 898 patent

25 | claim one, please?  And looking specifically at the inset in

1   the first paragraph, there is a claim limitation wherein said

2   reaction takes place for time and at a temperature

3   predetermined by test reaction.  Do you see that?

4   A.  Yes, I do.

5   Q.  And is it your understanding that this claim limitation is

6   not only in claim one, but also in dependent claim two of the

7   898, and in claims one and two of the '430 patent, claim one of

8   the '476 patent, and claim one of the '161 patent, all

9   contained the same limitation; is that your understanding?

10  A.  That's right, they all contain the same limitation.

11  Q.  And is your testimony here this afternoon with regard to

12  this claim limitation, applied to that claim limitation in all

13  of those claims?

14  A.  Yes, it does.

15  Q.  And did you prepare just a small demonstrative to

16  demonstrate where this is found in the patents?

17  A.  Yes, I did.

18  Q.  And is this the demonstrative that you prepared?

19  A.  Yes.  It, more or less, says what you just said.

20  Q.  Okay, thank you.  Now, are you familiar with Sandoz's

21  proposed manufacturing process as described in its recent

22  communication with the FDA?

23  A.  Yes, I am.

24  Q.  Please turn to PTX913R, which you will have the non-

25  redacted version, but on the public screen we will have a

19fztev3                    Laird - direct

1    redacted version.

2    A.  PTX-913 was it?

3    Q.  Yes, PTX-913.

4           THE COURT:  And, Doctor, everything will also be on

5    the screen.

6           THE WITNESS:  Thank you.

7    Q.  Have you seen this document before as it appears in your

8    binder as opposed to on the public screen?

9    A.  Yes, I have.

10   Q.  Please turn to page 24 in PTX-913.

11   A.  Okay, I have it.

12   Q.  And what does this depict regarding the Sandoz

13   manufacturing process?

14   A.  It depicts a four step process for making glatiramer

15   acetate, starting with N-carboxyanhydrides of four --

16   Q.  Dr. Laird, perhaps if you want to use your -- do you have

17   your laser pointer?

18   A.  Yes.

19   Q.  If you care to, it might help?

20   A.  Yeah, I don't know if will help with the writing.  So the

21   it's a four step process for manufacturing glatiramer acetate,

22   and it starts with the N-carboxyandhydrides of the four amino

23   acids were are labeled, here which is the R group.  And the

24   first step is the polymerization to give the isolated

25   intermediate one, which is the protected in two places.  The

1  second step is the conversion of that into the intermediate

2  two, using HBr acetic acid, including phenol and some extra

3  water as well.  Again, that's an isolated intermediate.  This

4  intermediate two is converted then with piperdine and water, to

5  give the intermediate three, and then finally that intermediate

6  three is purified by defiltration and to give the final

7  glatiramer acetate.

8  Q.  In your opinion, Dr. Laird, does Sandoz's process meet the

9  claim limitation wherein said reaction takes place for a time

10  and at a temperature predetermined by test reaction?

11  A.  No, it does not.

12  Q.  And why is that, if you could just summarily tell us at

13  this point, and we'll go into it in some detail?

14  A.  Yeah.  Well, basically, this is focusing on the step I

15  think we were discussing, that is the step here which is to do

16  with the HBr acetic acid process.  This is not -- the end point

17  of this process is not via a test reaction using viscometry.

18          (Continued on next page)

19

20

21

22

23

24

25

1  Q.  And could you briefly explain what a viscometer measures?

2  A.  Viscometer measures viscosity, which is as we've heard

3  before a sort of resistance to flow is the way I like to

4  describe.  It's anything that's viscous doesn't flow very well.

5  As soon as you heat it, it becomes more mobile and it flows.  A

6  bit like honey, really.

7  Q.  And again, can you indicate where it is in the process that

8  the viscometer is used in the Sandoz method?

9  A.  Yes, it's used in conversion of intermediate 1 into

10 intermediate 2.

11 Q.  And what is your understanding of how many viscometers

12 Sandoz uses in its process?

13 A.  Yes, I've seen the batch records the Momenta subcontractor

14 uses and there are two viscometers used in the process.  One is

15 a long reach viscometer, which goes into the large reaction

16 vessel, and the other one's on a recirculation loop as a

17 backup.

18 Q.  Do both of these viscometers work in the same way?

19 A.  Yes, they work by the way I've described, by making waves.

20 They don't move at all.  It's a static piece of equipment, it's

21 measuring a resistance to a wave and that is the function of

22 the energy, to make the wave that ends up being in proportion

23 to viscosity.

24 Q.  Have you prepared a demonstrative with regard to the Sandoz

25 process involving viscometers?

19FFTEV4                          Laird - direct

1   A.  Yes, I have.

2   Q.  Could we have slide 4, please?  And is this the

3   demonstrative that you participated in preparation of?

4   A.  Yes, it is.

5           MR. WIESEN:  Your Honor, I just need one moment,

6   because I don't think we've gotten this slide as part of

7   Dr. Laird's data.  Let me check and see.  Do we have this?

8           MR. DOYLE:  Perhaps not.  I think it may have --

9           THE COURT:  We've seen it with Dr. Bishop.

10          MR. DOYLE:  I think we sent it to you with Dr. Bishop.

11          MR. WIESEN:  No problem.

12          THE COURT:  Do you have a copy, though?

13          MR. WIESEN:  We do now.

14  Q.  Would you describe what is shown on slide 4?

15  A.  Yes.  It's a bit of a schematic.  It's not really like this

16  in practice in the sense that all I'm showing is the reaction

17  of the vessel here, but this is where the reaction takes place.

18  In practice there's an agitator, all sorts of other things

19  going into it, so what's shown is just the viscometer.  It's a

20  long tube and the business end of it is actually the tick here,

21  which is where the measurement takes place.  So it measures the

22  viscosity and also measures the temperature very accurately at

23  the same point at which the viscosity is measured.

24          And then the batch is recirculated around a loop and

25  the smaller viscometer goes into the recirculation loop so it's

1   actually measuring the viscosity at different places.  But they

2   both operate by the same system.  As far as I understand,

3   they're made by the same British manufacturer.

4   Q.  And does the viscometer shown on slide 4, do those

5   viscometers conduct a test reaction to measure viscosity?

6   A.  They do not.  There's no reaction here, they're just

7   measuring a physical property of the fluid in the tank, and

8   that property, the viscosity is related to the progress of the

9   action.

10  Q.  And in the Sandoz process for making copolymer-1, what's

11  the end point of the step 2 process?

12  A.  The end point is the viscosity at a particular temperature

13  and this viscosity in temperature has been previously

14  correlated with the molecular weight of the glatiramer acetate.

15  So the end point is the viscosity and temperature which would

16  give a molecular weight of about 7300.

17  Q.  And how in fact does the reaction, the step 2 reaction, how

18  is it stopped?

19  A.  Well, it's very important to stop the reaction once you

20  want to what we call work up and isolate the product.  So it is

21  stopped by adding the reaction mixture into water, in the lab

22  probably what chemists do is add water because that's the

23  convenient thing to do, but in the plant it's simply safest to

24  add it to water and that stops the reaction very quickly.

25  Q.  Is there a term of art in the industry for doing that?

1  A.  Quenching is usually what some people call it.  Drownout is

2  another one.

3  Q.  Now, you stated earlier your opinion that the Sandoz

4  process that you just described does not meet the claim

5  limitation wherein said reaction takes place for a time and at

6  a temperature predetermined by test reaction.  Now that we've

7  seen more about the viscometer process, can you describe in a

8  little bit more detail your opinion as to why that process, the

9  use of the viscometer, does not meet that limitation?

10  A.  Yes.  When this process is carried out, the instruction to

11  the process operator in batch records says maintain the

12  reaction at 22 plus or minus 2 degrees with the aim of

13  obtaining a temperature of 21 degrees.  That's a strange way of

14  doing it, I know.  But the aim is to get 21 degrees, and then

15  they measure the viscosity, so is process operator is

16  monitoring this viscosity -- sorry, is monitoring the

17  temperature and the viscosity, and he has a table of

18  correlations, different temperatures at points of about .2 a

19  degree apart.  So when he's measuring the batch temperature,

20  say, that's 20.3 or something like that, he looks on the chart

21  he knows exactly what the viscosity is that he has to stop the

22  reaction at to then go on eventually to in the next step to

23  give the glatiramer acetate of the desired 7300 molecular

24  weight.

25          So he's just looking at viscosity, he's not looking at

1   the time at all.  In fact, the time will vary quite a bit

2   depending on whether the temperature is at the top of the range

3   or at the bottom, so we saw in some of the, in some of the

4   batch records that the temperature in some batches was 20.9,

5   and on other batches it was 20.3.  The difference between those

6   in terms of the time for the reaction was from 38 hours to 50

7   hours, so it makes a big difference in the time.  So from this

8   point of view time is not really a very good measure of the end

9   point of the reaction, whereas the viscosity is measuring a

10  direct property of the correlates in the solution with the

11  desired properties that you'd want to have.  So it's a very

12  much better correlation and doesn't use time at all.

13  Q.  Are there any other parameters involved in this reaction in

14  addition to the temperature as you just described that can

15  affect the duration of step 2?

16  A.  Yes.  I mean, first of all, the quality of the materials

17  going in, so the intermediate 1, if there's any batch-to-batch

18  variability in the polymerization, then that's where -- maybe

19  effect the time taken in the process.  The concentration should

20  be fixed, but you never know what a process operator is going

21  to do.  Sometimes you get a bunch of viscosities that will more

22  or less give you a result in spite of the process operator,

23  whereas if you rely on time, if he's done something wrong,

24  you'll never detect it.

25  Q.  Now, in developing the chart that you described that

1    correlates the different temperature levels with the viscosity

2    levels, in the laboratory did Momenta utilize test reactions to

3    develop that chart for the correlation between the temperature

4    and the viscosity?

5    A.   In the Court's definition of test reaction yes, yes, they

6    have, because as I said, it's more standard process of

7    chemistry and, yes, they are correlating the properties with

8    the viscosity, so yes.

9    Q.   And what's your understanding of how they did that in the

10   laboratory at Momenta?

11   A.   They carried out the process in the lab monitoring the

12   viscosity, but also taking samples out and converting them

13   through to final glatiramer acetate and then measuring the

14   molecular weight.  And so as a result of all these samples that

15   they took out at various times, they would then build up a

16   correlation between the viscosity and the molecular weight of

17   the glatiramer acetate.

18   Q.   Now, what advantages, if any, does Sandoz achieve in your

19   opinion with its viscometer model as opposed to a time and

20   temperature model?

21   A.   I think it's the accuracy of knowing when that end point

22   is.  Because you're actually measuring the property of the

23   solution.  Viscosity is proportional to the species they have

24   in the solution, the concentration, and of course very

25   temperature dependent as well, so it is giving a very accurate

1   picture of the end point.  If you do the time, there's all

2   sorts of problems with having an end point with time.

3           In our courses we recommend that people do not use

4   time as an end point but try and have some sort of analytical

5   measurement that correlates with the process, because we've

6   seen people -- "come a cropper" I believe is the English

7   term -- using time as a measure of completion when the reaction

8   may not be finished.

9   Q.  Mr. Gueverra, can we have slide 5?  Is slide 5 a graph that

10  you prepared, sir?

11  A.  Yes, it is.

12  Q.  Is it a summary of your thoughts with regard to greater

13  accuracy from using the end process control of viscometer?

14  A.  Yes, it is.  One of the advantages of viscosity is that you

15  don't have to take samples out and analyze them or convert them

16  through.  You're continuously recording the data.  I think

17  Momenta's subcontractor detects records every five minutes, so

18  you get an instant and realtime data rather than relying on,

19  say, the test reactions that you may have done previously which

20  may not even be on the same batch of material.  Then you're not

21  going to get the accuracy that you need from that.

22          So the measurements on the reaction of the whole

23  batch, that means if the process operator has done something

24  silly or cleaned the reactor out and left a bit of water there,

25  you're still going to get an end point for the reaction.  So if

1  something goes wrong, you know exactly where you are.  But with

2  time, you know, you don't really know what's happening in the

3  batch.  It's the fact that it's measuring an intrinsic property

4  of the protected copolymer that is important that directly

5  correlates with the result that you want to get.

6  Q.  Dr. Laird, just a couple of wrapup questions with regard to

7  the viscometer model and this particular limitation in the

8  claims.  Do you have an opinion on whether the chart

9  correlating temperature and viscosity that is part of

10  viscometry method, was that developed by correlating time with

11  viscosity?

12  A.  No.  It was developed by correlating viscosity at a certain

13  temperature with the -- and then by taking samples out to

14  convert them through to the glatiramer acetate, so it was

15  really temperature, viscosity and molecular weight of the prime

16  product.

17  Q.  Dr. Gokel testified there is a general correlation between

18  time and termination of step 2 based upon viscosity.  Do you

19  have a response to that?

20  A.  I think he is just using in general terms that all

21  reactions have a time dependence and we always measure the time

22  of every operation, every batch record that I've ever seen,

23  it's almost compulsive, you have to know the time these

24  particular operations are carried out, but it's not a very

25  useful -- certainly from a scale point of view, because time

1   varies so much from manufacture to manufacture.

2   Q.  In your opinion, is time the end point of the Sandoz step 2

3   reaction?

4   A.  No, it is not.

5   Q.  And what is?

6   A.  It's the viscosity measurement in the correlation at a

7   certain particular temperature.

8   Q.  Dr. Laird, I'd like to move at this point to different

9   claim limitations involving using HBr to cleave polypeptides.

10  Are you familiar with those limitations that have already been

11  shown to the Court multiple times in this case?

12  A.  Yes, I am.

13  Q.  Were you here for Dr. Zeigler's testimony on the HBr acetic

14  acid?

15  A.  Yes, I was.

16  Q.  I want to obtain your independent opinion, hopefully

17  relatively briefly, on some of the issues that he addressed,

18  and the first issue is would a person of skill in the art in

19  1994 have known that the HBr acetic acid reaction could be used

20  to cleave peptide bonds in copolymer-1?

21  A.  Yes, there were a number of articles that expressed that

22  view and some had experimental verification.

23          MR. WIESEN:  Your Honor, we just have a general

24  objection to duplicative testimony from two experts of the

25  defendant.  I realize there are different defendants here, but

1   it sounds like we're going to go into exactly the same

2   arguments we heard from Dr. Zeigler.

3           MR. DOYLE:  We're going to do it very briefly to clear

4   up what we believe was a misimpression that we think was

5   created yesterday with regard to how these two references

6   relate to each other, but other than that we're going to move

7   on.

8           THE COURT:  All right, I'll let you do that.

9           MR. DOYLE:  Thank you.

10  Q.  Just briefly, DTX 3329.  Are you familiar with DTX 3329,

11  which is an article Idelson and Blout from 1958?

12  A.  Yes, I am.

13  Q.  And to you as a person of skill in the art does the Idelson

14  and Blout 1958 document disclose removing protective groups

15  with HBr acetic acid?

16  A.  Yes, it does.

17  Q.  As a person of skill in the art based on this article was

18  peptide cleavage observed and reported in this article?

19  A.  Yes, it was.  Idelson mentions that some of the substrates

20  show extensive peptide bond -- one of the substrates, I should

21  say, shows extensive peptide bond cleavage.

22  Q.  And is this the portion of the Idelson Blout 1958 article

23  that you're referring to?

24  A.  Yes.  He says that hydrogen bromine in glacial acetic acid

25  has not been found to be a useful reagent.  What he's referring

1  to is the debenzylation.  The reason it's not useful to him is

2  he wanted the debenzylation and he didn't want the peptide

3  cleavage, so he's saying, well, the problem is the peptide bond

4  cleavage and he shows in a table later, which is actually under

5  there, the extent of the cleavage.  So the first example, LPG's

6  going from depolymerization of 140 then to 50, and in fact, we

7  had an example that show peptide bond cleavage, but they're not

8  done in acetic acid.

9  Q.  Let's try to deal with the other references in a summary

10  way.  I first would refer you to DTX 1781, and are you familiar

11  with this reference?

12  A.  Yes, I am.  This is -- I'm looking at the degradation of

13  polymer amino acids, mostly biodegradations, but he doesn't

14  mention peptide bond cleavage in that degradation.

15  Q.  And DTX 1782, are you familiar with this reference?

16  A.  Yes, I am.

17  Q.  Is this often referred to in this case as the Applequist

18  1962 reference?

19  A.  It is.

20  Q.  And does it indicate peptide cleavage result of the HBr

21  acetic acid treatment?

22  A.  Yes.  He refers to the Ben-Ishai paper which we've heard

23  before from Dr. Zeigler, and using that method, then he says he

24  observed a small amount of peptide cleavage.  I think he's --

25  on peptide bond 1000 I think is mentioned in this particular

1  paper.

2  Q.  DTX 3328, are you familiar with this reference?  This is an

3  article by Dr. Blout from 1956.

4  A.  Yes, I'm familiar with the papers.  I'm not familiar with

5  the numbers.

6  Q.  And in particular, is this another article showing peptide

7  cleavage as a result of HBr acetic acid treatment?

8  A.  If you could put the paper up.

9  Q.  Yes.

10  A.  I'm sorry, what was it again, the number?

11  Q.  This is DTX 3328.  If we could go to the first indication

12  of where the hydrogen bromide treatment is referenced.

13  A.  Yes.  It's just in the question you said hydrogen bromide

14  acetic acid and in this, it identifies just hydrogen bromide

15  has been shown to affect cleavage, so actually in acetic acid.

16  It's just hydrogen bromide straight on.

17  Q.  Finally, these references showing peptide cleavage as a

18  result of HBr acetic acid treatment, do you -- are you aware of

19  any indications that this was accepted in the art by

20  knowledgeable people as something that would occur?

21  A.  Yes.  There's a mention in the excellent review by

22  Katchalski and Sela on page 410, if I remember correctly, and

23  there, I don't know if you're going to put that one out, but

24  from my memory, the key quotes, the last reference of Blout and

25  Idelson with hydrogen bromide, and mentions here that poly

1   benzyl glutamate was reduced in molecular weight from 680,000

2   down to 135,000, so it's a degradation there.

3   Q.  And is there a specific statement regarding degradation in

4   the Katchalski Sela article?

5   A.  Yes, he says it reports slight degradation.  Well, it's a

6   factor of about five, so it's a very important slight, but

7   significant, I would say degradation of a poly amino acid and

8   to me Sela is one of the authors of the patent, so it indicates

9   to me he certainly was aware of HBr causing degradation.

10  Q.  And was this article by Katchalski and Sela, was this an

11  influential article at the time?

12  A.  Yes, it's about 250 pages.  It's subtitle could be all you

13  need to know about poly amino acids.

14  Q.  And finally --

15          MR. WIESEN:  Your Honor, that one I'm going to object

16  to, in that I don't believe we have testimony that Dr. Laird

17  was around in 1958 when that article was published.

18          MS. BLOODWORTH:  I'll further go into this.

19  Q.  Dr. Laird --

20          THE COURT:  Okay.

21  Q.  When you were around, was this article seminal enough that

22  it was still highly regarded and important in the field?

23  A.  Yes.  I'll agree, I wasn't a child prodigy, yes.  Yes, it

24  was an important article.  The usual measure of that is the

25  number of people that refer to it on citation, etc.

1   Q.  My final question, I think it's my final question here,

2   close to my final question in this area.  Do you need to

3   combine the Idelson and Blout with the Appelquist with the

4   Hayashi and Blout and Katchalski and Sela, do you need to

5   combine these to reach your conclusion as to peptide cleaving

6   as a result of HBr acetic treatment would have been known to a

7   person of skill in the art in 1995?

8   A.  You don't have to combine because one reference

9   particularly, Idelson and Blout would give it to you straight

10  away.  All the others mention work done, and Hayashi mentions

11  it, so on their own you could see one, of course more is

12  better, but certainly that is mentioned in the literature in

13  more than one occasion.

14  Q.  And in your opinion if a person of skill in the art wanted

15  to make copolymer-1 of a smaller molecular weight, would that

16  person have been motivated in 1994-1995 to choose HBr acetic

17  acid to do that?

18  A.  Yes.  Because clearly if you're doing debenzylation the

19  literature shows debenzylation HBr acetic acid and if you want

20  to cleave the peptide, then it's obviously advantageous to use

21  the same mixture which you know doesn't cause any further

22  problem, so from a manufacturing point of view, it's like

23  putting two steps together.

24  Q.  And in your opinion in 1994, 1995, would a person of

25  ordinary skill in the art have expected HBr acetic acid

1    treatment at room temperature to result in partial cleavage of

2    peptide bonds in copolymer-1?

3    A.  Yes, they would.

4    Q.  And that partial cleavage would mean what in terms of the

5    molecular weight of the copolymer?

6    A.  Peptide bond cleavage is going to lead to reduction in

7    molecular weight, so you would expect that from reading the

8    literature that by treating with HBr acetic acid you could by

9    choosing the appropriate duration of the reaction to some

10   extent choose the end point of it in terms of reduction in

11   molecular weight.

12   Q.  I'd like to move on to a few of the other process

13   limitations which are included in the asserted claims.  Could

14   we have Dr. Laird's slide 3, please?  Do you have opinions,

15   sir, with regard to the claim limitation, reacting protected

16   copolymer-1 with hydrobromic acid to form trifluoroacetyl

17   copolymer-1?

18   A.  Yes, this limitation I think it's already known that this

19   would occur from what I've said earlier.

20   Q.  And there's been quite a bit of testimony on this, but

21   which references would one look to to find this particular

22   process limitation?

23   A.  I'd be looking at Idelson and Blout and the ones we've

24   mentioned.

25   Q.  And with regard to copolymer-1 specifically, are there any

1    indications in the synthesis of copolymer-1 that one should use

2    hydrobromic acid to form the trifluoroacetyl copolymer-1?

3    A.  Yes, we would be looking at the '550 patent and the

4    Teitelbaum paper in whatever it was, Journal of Immunology.

5    Q.  And in looking at the second limitation, selecting a

6    predetermined molecular weight profile.  Would that process

7    step be known to a person of ordinary skill in 1994, 1995 based

8    on the art relating to copolymer-1 that existed at that time?

9    A.  Yes.  The '550 patent and Teitelbaum both mention molecular

10   weights, and the process to carry out the chemistry that leads

11   to those molecular weights.

12   Q.  And does the Teitelbaum article also teach achieving a

13   desired molecular weight?

14   A.  Yes, it does.  The Teitelbaum article, as we've seen many

15   times on the screen, has two batches of copolymer mole and the

16   molecular weights are both around 23,000.

17   Q.  And was that the goal of the inventors, the authors of that

18   article, to achieve a molecular weight at around 23,000?

19   A.  Yes, I think it was, yes.

20   Q.  Now, turning to a couple of additional claim limitations

21   relating to process, the time and temperature process

22   limitations.  Could we have Laird slide 4, please?  And is it

23   your understanding that this limitation, wherein said protected

24   copolymer-1 reacted with hydrobromic acid for about 10 to 50

25   hours at a temperature of about 20 to 28 degrees centigrade, is

1  found in claims 2 of both the '898 and the '430 patents?

2  A.  Yes, it is.

3  Q.  And, sir, have you reached a conclusion as to whether the

4  time and temperature steps of these claims would have been

5  obvious in the 1994-1995 time period?

6  A.  Yes, it would have been obvious from some of the papers

7  that we have mentioned, and perhaps a couple of more that we're

8  going to mention.

9  Q.  Yes.  Let me just mention one reference that we haven't

10 seen yet and then we'll do a summary slide with regard to the

11 others.  Have you relied in reaching your opinion on the Yaron

12 1958 reference, which is DTX 3233, in reaching your

13 conclusions?

14 A.  Yes, I have.

15 Q.  And what is it about that article that you relied upon?

16 A.  It's in relation to the end of that article, that it's

17 using a time and a temperature HBr less than 2 degrees for

18 three days during the debenzylation and so that is amongst the

19 papers that describe the time and temperature.  Now, if you

20 take the normal chemistry rule that a rate changes by a factor

21 of two for every ten degrees, then that will take you into the

22 same sort of region as the limitation, so two degrees for three

23 days, 72 hours would equate to 18 hours at 22 degrees.  So it

24 would have been clear to a chemist skilled in the art that that

25 was within the region.

1  Q.  Could we have very briefly DTX 3233 on the screen?  Is this

2  the article you've just been discussing?

3  A.  It is, yes.

4  Q.  What page were you referring to where the time and

5  temperature is indicated?

6  A.  97 in the second paragraph.

7  Q.  And now if we could have slide 1.  Have you prepared a

8  summary slide of these various articles dealing with the HBr

9  acetic acid reaction with regard to time and temperature?

10 A.  Yes, I have.  Hopefully it's going to come up.

11 Q.  Is this the chart you prepared?

12 A.  Yes, it is.

13 Q.  And are the Idelson, the Ben-Ishai, Ben-Ishai and Yaron

14 articles all ones that you've discussed today?

15 A.  Yes, they are.

16 Q.  And what do they indicate with regard to time and

17 temperature for this reaction?

18 A.  That a person skilled in the art would carry out HBr acetic

19 acid reactions by extrapolation from these references.

20 Ben-Ishai overnight at room temperature comes directly within

21 the claim limitation, but by using the chemist that's skilled

22 in the art and the rate factor, the bottom three come within

23 that region of the limitation.

24        Unfortunately, Idelson is an example of what I call

25 about reproducibility, there's not really a temperature, so you

1    can't see the exact correlation, but clearly if you reduce the

2    temperature, the time is going to take longer, so it's obvious

3    to a person of skill in the art.

4    Q.  One final question.  To reach your conclusion as a person

5    of skill in the art that the time and temperature limitations

6    of the claims we've been addressing were obvious, do you need

7    to combine these references?

8    A.  No.  A chemist could look at some of those and extrapolate.

9    Clearly, it helps to have a few more to back that up.

10            MR. DOYLE:  Nothing further.  Thank you, your Honor.

11            THE COURT:  All right.  Mr. Wiesen.

12            MR. WIESEN:  Your Honor, we have some binders to hand

13   out.

14            (Pause)

15   CROSS-EXAMINATION

16   BY MR. WIESEN:

17   Q.  Good afternoon, Dr. Laird.

18   A.  Good afternoon.

19   Q.  Could we put up Dr. Laird's slide number 3, please?

20   Dr. Laird, I just want to make sure I understand the scope of

21   the opinions that you're giving here today.  You focused only

22   on the particular limitations that are on this slide number 3,

23   correct?

24   A.  That's correct, yes.

25   Q.  So for claim 1 of the '808 patent, the '589 patent, the

1    '898 patent, the '430 patent, the '476 and the '161 patent,

2    you're focused only on the reacting protected copolymer-1 with

3    hydrobromic acid to form trifluoroacetyl copolymer-1

4    limitation, correct?

5    A.  In that discussion I was, yes.

6    Q.  You're not giving an opinion that claim 1 itself is

7    obvious, right?

8    A.  I need to read the whole of the claim at first, but I --

9    Q.  During your direct you didn't offer an opinion that all of

10   claim 1 was obvious, correct?

11   A.  Could I just look at claim 1, just check it out before I

12   give an answer?

13   Q.  If you can answer my question --

14           THE COURT:  You haven't given that opinion in your

15   direct, right?

16           THE WITNESS:  No.

17           THE COURT:  Okay, fair enough.

18   Q.  And similarly for claim 1 of the '898 patent the only

19   opinion you gave on your direct is that in the prior art you

20   could find references to selecting a predetermined molecular

21   weight profile, correct?

22   A.  That's correct, yes.

23   Q.  You haven't given any opinions here today about what

24   molecular weight a person of ordinary skill would target for

25   copolymer-1 as of 1994, correct?

1   A.  No, I haven't.

2   Q.  And similarly, if we turn to slide 4.  Here you have the

3   time and temperature process limitations from claim 2 of the

4   '898 and '430, correct?

5   A.  Yes.

6   Q.  And again during your direct you only focused on this

7   limitation of these claims, correct?

8   A.  Yes.

9   Q.  And you found support for this limitation in the prior art,

10  right?

11  A.  That's correct.

12  Q.  But you didn't apply it, you didn't give an opinion during

13  your direct concerning the obviousness of claim 2 of the '898

14  or claim 2 of the '430, right?

15  A.  That's correct, yes.

16  Q.  If we could just turn briefly, sir, to some of the

17  references that you did talk about, and I also want to talk

18  about them very quickly, if we can.  If you can turn to DTX

19  1781 in your direct binder.  That was the Hayashi paper,

20  correct, sir?

21  A.  I never actually found that one.

22  Q.  I just want to confirm that -- it's up on the screen and I

23  think you confirmed with Mr. Doyle that this one actually --

24  well, this one doesn't mention acetic acid, correct, sir, it

25  just mentions HBr treatment?  If you could put up page 464, the

1   experimental section?  That paragraph there.  Do you see, sir,

2   about two-thirds of the way down there's a sentence that begins

3   the debenzylation of BLG residues?

4   A.  He says according to the method of Idelson and Blout.

5   Q.  But he doesn't specifically refer to acetic acid here, does

6   he?

7   A.  He doesn't there.  I think there's another mention of this

8   earlier in the text where he refers to the degradation.  If you

9   could pull that up so I can just check whether, it's on a later

10  page.

11  Q.  Here, sir, there's a reference to HBr but not acetic acid.

12  A.  That's correct.

13  Q.  If you could turn to DTX 1782, the Appelquist article as

14  Mr. Doyle referred to it.

15  A.  Sorry, I never got to these in direct, so -- 1782.

16  Q.  Again, it's up on the screen.

17  A.  Yes, probably the best way of doing it.

18  Q.  I think the questions I have are fairly simple.  This is

19  not a copolymer, correct, sir?

20  A.  No, that's true of some of the other papers, they're not

21  copolymers, but they are polymers with a single amino acid

22  protected, so they've all got peptide bonds.

23  Q.  Correct, but here this is all made up of lysines, correct?

24  A.  That's correct, but bonds, peptide bonds are closely

25  similar.

19FFTEV4                    Laird - cross

1  Q.  And, sir, in this paper -- because it's with lysines you're

2  not removing a protective group from glutamic acid with the HBr

3  acetic acid, correct?

4  A.  That's correct, but the degradation takes place with HBr

5  acetic acid and we don't know whether it takes place before or

6  after benzyl cleavage.

7  Q.  In fact, here the protecting group isn't even a benzyl as

8  it is in copolymer-1, correct?

9  A.  That's correct.  HBr takes the carbobenzoxy group off the

10 substrates.

11 Q.  If we could turn to DTX 3328, please?

12 A.  Just saying that the cleavage was accomplished by the

13 methods of Ben-Ishai and Berger.

14 Q.  Sir, we'll move more quickly through this if you could just

15 focus on the questions that I ask, please.  If you could turn

16 to DTX 3328, please.

17 A.  Okay.  Yes, I have it.

18 Q.  And this is the Blout and Idelson letter to the editor that

19 you focused on, that you discussed in your direct, correct?

20 A.  That's correct.

21 Q.  This is the one, I'm sorry, that you pointed out to

22 Mr. Doyle, that talks about HBr but doesn't actually mention

23 acetic acid, right?

24 A.  That's right, yes.  You've got -- the closest is

25 trifluoroacetic acid, but it's not the same.  All solvents are

1    different from acetic acid.

2    Q.  So this paper is not about hydrogen bromide in acetic acid?

3    A.  That's right.  You often can extrapolate from one solvent

4    to another in many reactions.

5    Q.  This is about a single amino acid, not a copolymer, right?

6    A.  I didn't reference that one, but I think it came up in Dr.

7    Zeigler's talk.

8    Q.  This indicates that poly --

9    A.  Which one are we talking about?  This one that's on the

10   screen?

11   Q.  I'm sorry, MYL29820 in my binder.  DTX 3328.

12   A.  Yes.  That's the paper before the one that you want to

13   show.  It's a page after.  It's the second page in from that.

14   That's it.

15   Q.  There you go.  This is not a copolymer either, right, sir?

16   A.  No, it's a single amino acid polymer of, well, it's gamma

17   benzyl and glutamate.

18   Q.  Dr. Laird, you'd agree with me that it's fair to say none

19   of the articles you've discussed on direct specifically

20   suggested using HBr in acetic acid to cleave peptide bonds,

21   right?

22   A.  The article suggests using HBr acetic acid to cleave

23   peptide bonds, but not necessarily in a polymer.

24   Q.  Well, to be clear, the articles you've cited observed that

25   peptide bond cleavage have sometimes occurred, right?

1   A.   Yes.

2   Q.   But that peptide bond cleavage is not the goal in any of

3   the papers that you've cited, right?

4   A.   No, but it still occurs, whether it's the goal or not.  I

5   mean, the important part of doing organic chemistry is not to

6   look at just the reactions themselves but the side reactions,

7   because that may lead to impurities or it may lead to something

8   you want or it may lead to an impurity, so you have to observe

9   those side effects.  It's one of the things I've criticized

10  some of the other papers for, that you don't follow up on what

11  some of the reactions are.  So people said you didn't get any

12  side reaction, well, you don't know if you don't look for it.

13  Q.   Sir, my question was much more narrow and much more

14  straightforward.  I think you agree with me, but let me make

15  sure.  You agree that none of the papers you've cited -- let me

16  start again.  You agree with me none of the papers you cited

17  intended or were hoping the goal was to have peptide bond

18  cleavage occur, correct?

19  A.   That's correct, but it doesn't mean it didn't occur, so the

20  prior art -- can I finish, please?  The prior art is what it

21  says in the literature.  It doesn't matter whether you intend

22  to do it or didn't intend to do it, you could see there's

23  peptide cleavage.

24          One of the important things in Idelson and Blout is he

25  talks about extensive peptide cleavage, so a person of skill in

the art would know if you treated something with HBr you would

get some peptide cleavage.  Doesn't matter what the substrate

is, you get peptide cleavage.

Q.  But in none of the papers you've cited, sir, was peptide

cleavage intentionally controlled based on the HBr acetic acid

step, correct?

A.  It was not -- I'm agreeing with you.  It wasn't the

intention that you get some, whether it was controlled or not

is not clear.  It was the, as you say byproduct, unintentional,

that you can use the knowledge of that peptide cleavage under

those conditions to control peptide cleavage if that's what you

wanted to do.

Q.  But none of the papers actually discuss controlling peptide

cleavage with an HBr acetic acid step, right?

A.  They do not, but that doesn't mean to say you can't control

peptide cleavage by a knowledge of conditions which were

brought out in those papers which lead to peptide cleavage.  A

person skilled in the art would know you could extrapolate

those conditions to get more peptide cleavage if that's what

you wanted and no peptide cleavage if that's what you didn't

want.  Some of the papers describe, and I've mentioned one of

them, Yaron and Berger, that by doing it at 2 degrees you don't

get any peptide cleaving.

Q.  Could we have slide 2, please from Dr. Laird's direct?

Dr. Laird, let's move on to the test reaction you discussed at

1    the beginning with Mr. Doyle.  You put up here a slide 2 about

2    the six claims that are asserted in this case that have the

3    test reaction limitation, correct?

4    A.  Correct.

5    Q.  And just to be clear, you understand there are 22 claims

6    asserted in this case?

7    A.  I don't know the number.  I knew it was a lot.

8    Q.  You gave an opinion concerning infringement of these six

9    claims, correct?

10   A.  That's correct, because I'm sort of focusing on the process

11   aspects because that's my expertise.

12   Q.  Now, Dr. Laird, you looked at PTX 913 or 913R in your

13   direct?  And you don't have to turn there yet.  Do you recall

14   that document?

15   A.  I don't.  The numbers don't mean anything, but I'm sure it

16   will when it comes up.

17   Q.  It was the recent submission to the FDA from Sandoz.  Do

18   you recall that?

19   A.  Okay.  Yes.

20   Q.  And that's the only process that you testified about today

21   concerning the -- well, actually let me withdraw that.  You

22   testified about the in-process viscosity control, correct?

23   A.  That's correct.

24   Q.  And if you turn to page 38 of the briefing book, PTX 913,

25   that describes that process, correct?

1    A.  What page is that?  Is that the one on the screen?

2    Q.  Page 38.

3    A.  I think we discussed some of the stuff in the page.  I'm

4    not sure it actually went on the screen.

5    Q.  Now, you also talked with Mr. Doyle about batch records,

6    correct?

7    A.  Yes.

8    Q.  And you're familiar with batch records from your work,

9    right, sir?

10   A.  Yes.  I've had a lot of experience with batch records.

11   Q.  And it's your understanding when amendments are provided to

12   the FDA, the batch records underlying the work are also

13   provided, correct?

14   A.  I think that's correct, yes.

15   Q.  Now, during your direct, you didn't talk about the actual

16   batch record, you talked about it, but we didn't look at it,

17   correct?

18   A.  That's correct, yes.

19   Q.  Could you turn to PTX 928 in your cross-examination binder?

20   Let's take a look at the batch record, please.  Mr. Chase, I

21   think we're going to need to put this one on the private

22   screens.  It may contain some materials.

23   A.  928, you said?

24   Q.  928, please.  And, Doctor Laird, let me just suggest that

25   although you have an unredacted version of that, if you could

1   avoid talking about some of the particular numbers especially

2   in the table, I think counsel for Sandoz Momenta will

3   appreciate it.

4   A.   Okay.

5   Q.   Do you recognize what we've marked as PTX 928?

6   A.   Yes, I do.  It's a batch record of a particular batch

7   assay.

8           MR. WIESEN:  Your Honor, plaintiffs offer PTX 928 into

9   evidence.

10          MR. DOYLE:  No objection, your Honor, if the public

11  record could have the redacted version.  We'll work that out.

12          THE COURT:  Thank you.  Admitted.

13          (Plaintiff's Exhibit PTX 928 received in evidence)

14  Q.   Now, you testified mostly about the viscometry model during

15  your direct.  Do you recall that testimony, sir?

16  A.   Yes, I do.

17  Q.   Are you aware the batch record has a second model, correct?

18  A.   That's correct.

19  Q.   Time and temperature model, right?

20  A.   Yes.

21  Q.   And you'd agree with me, sir, that while there are two

22  models in the batch record, they represent one manufacturing

23  process, right?

24  A.   Yes.  I mean, the models have been derived from slightly

25  different sets of experiments and they are meant to be, as you

1  said, a viscometry measurement is supposed to be the primary

2  method of controlling the batch, and in the event of viscometer

3  failure or two viscometer failures then there's a backup

4  methodology.

5  Q.  And that's all part of the one manufacturing process that's

6  embodied in this batch record that we've marked as PTX 928,

7  right?

8  A.  Yes.  It's a contingency plan and the batch records that

9  I've seen that the second 'mometer has never been used and in

10  this particular batch record it wasn't used.  It's got a line

11  through it saying "not applicable".

12  Q.  Again, Dr. Laird, I promise it will go more quickly if you

13  simply answer my question.  We'll get there, but if you could

14  just listen and answer my question.

15       Could you turn to MMP1707035, please?  Section 7.4.1?

16  A.  I have it.

17  Q.  Do you recognize this page, sir?

18  A.  Yes, I do.

19  Q.  And this is the viscometry model that you were discussing?

20  A.  It is, yes.

21  Q.  And if you look at the very first sentence, it indicates as

22  you discussed on direct, while maintaining the contents of the

23  reactor in a batch temperature of 22 plus or minus 2 degrees

24  celsius with a target of 21.0 degrees celsius, correct?

25  A.  That's right, yes.

1    Q.  So that's the temperature that the Sandoz Momenta process

2    is set at, correct?

3    A.  That's the set temperature, yes.

4    Q.  An your notes, sir, if you look at the table here under

5    7.4.4.2, I think you talked about this on direct, this table

6    was completed based on test reactions, correct, as the Court

7    has construed the term?

8    A.  That's correct, yes.

9              MR. WIESEN:  Give Mr. Chase one second.  MMP1707035.

10   Thank you.

11   Q.  So this table that's now highlighted on the screen,

12   Dr. Laird, and we're not going to read the numbers from it,

13   this was created by test reactions as the Court has construed

14   the term, correct?

15   A.  Yes.  I think it was created by experiments in a lab which

16   would affect the change of temperature with viscosity and

17   correlating that to molecular weight of the glatiramer acetate,

18   so it would all be what I call standard development chemistry,

19   but it's describing test reactions.

20   Q.  Now, if we go up to the second bullet point above the

21   table, and I think again this is consistent with what you

22   explained.  It reads, "In the event of the viscometer equipment

23   failure or the inability to obtain accurate viscosity readings

24   continue with step 7.4.5," correct?

25   A.  That's correct, yes.

1  Q.  That's contained in the current batch record, right?

2  A.  Yes.  It's this particular batch, so it may have changed

3  the batch record since then, but this is what it says there.

4  Q.  You haven't seen an updated batch record?

5  A.  I haven't.

6  Q.  If you turn to the next page, that's 7.4.5 correct?

7  A.  Yes.

8  Q.  This is what you were referring to before as the time

9  temperature model, correct?

10  A.  It is.

11  Q.  You refer -- this particular batch has a slash through it?

12  A.  That's correct.

13  Q.  But it's contained in the batch record as a backup process,

14  correct?

15  A.  It is -- it's sort of a backup of a backup, because they

16  have two viscometers and they are taking measures of two

17  viscometers, so it seems to me as somebody who has spent a lot

18  of time in manufacturing that it's very unusual to have a

19  backup of a backup.

20  Q.  And this time temperature model also has a temperature

21  setting of 22 degrees plus or minus 2 degrees with a target of

22  21 degrees, correct?

23  A.  That's correct.

24  Q.  And the table here has an average batch temperature column,

25  right?

A.  Yes, and just point out that average batch temperature is

different from the temperature we measure in the viscosity

model, so you can't just measure the temperature and look

across at the time.  You have to do a calculation of the

average batch temperature.

Q.  There's an average batch temperature column on this table?

A.  Yes.

Q.  And there's a depolymerization time column on this table,

correct?

A.  That's correct.

Q.  And if you go back one page again to 1707035.  You see the

sentence at the end of the first full paragraph says, "While

the contents of the 200 gallon reactor mixes, continue with the

sampling protocol in step 7.4.6," and complete some other

steps, correct?

A.  Yes, it says that.

Q.  And you've looked at that before, too, right?

A.  Yes.

Q.  And if we turn to 1707038, that's the sampling protocol,

correct, sir?

A.  Yes, that's correct.

Q.  And it shows that even during the manufacturing process,

samples are taken, right?

A.  That's correct, yes.  I think this was one of the

validation ones so you expect to take a lot of samples in

1   validation.

2   Q.  This is still the up-to-date batch record as you know it,

3   right?

4   A.  It is.

5   Q.  And so the current batch record includes continuing to take

6   samples, right?

7   A.  That's correct.  That doesn't surprise me, because on my

8   recommendation when I'm doing first phases in scaleup and early

9   manufacture is to take samples at every possible position,

10  because if something goes wrong later in the batch we want to

11  know why, so it's very important to take samples all the way

12  through production.

13  Q.  And this page refers to taking measurements with both

14  viscometers, correct, sir?

15  A.  It does.

16  Q.  And if we look at the, looks like sixth row, we see the 03

17  viscosity reading, correct?

18  A.  Yes.

19  Q.  And two rows below that is the 04 viscosity reading,

20  correct?

21  A.  That's correct.

22  Q.  And if we look back we'll see the 03 is the primary

23  viscometer, correct?

24  A.  Yes.  I think that's the long reach one and the 04 is the

25  in line one.

1 Q.  And the in line and the long reach viscometer don't give

2 the same readings, right?

3 A.  They don't, no, they're measured at different parts of the

4 process.

5 Q.  So you couldn't use the second viscometer as a backup for

6 the first because they get different results, right?

7 A.  You could if you knew what you were doing, because the in

8 line viscometer was used originally as the primary viscometer

9 in early batches, and so they did in fact correlate using that

10 viscometer before they brought the long reach viscometer, so

11 the knowledge would be there to understand that difference.

12 Q.  So some sort of conversion would need to be done from the

13 backup viscometer to the primary viscometer result to apply in

14 the model?

15 A.  I don't know exactly how we'd do it.  Clearly there was

16 data because they were using that in line, they're both in

17 line, but the one in the recirculation loop was originally

18 used, so there would be data around to correlate that.

19 Q.  Whatever correlation you have to do is not in the batch

20 record though, right, sir?

21 A.  It's definitely not in the batch records, no.

22 Q.  And if you go back to the viscosity model, the viscometry

23 model and you have that table that we looked at on 1707035, do

24 you see that?

25 A.  Yes.

1  Q.  You couldn't apply this table to the backup viscometer,

2  right, because it's got a different reading?

3  A.  I need to see what the difference is on the viscosity

4  towards the end of the process, because from my memory it was

5  quite a bit of discrepancy early on, but as you got towards the

6  end of the process, the viscosities were --

7  Q.  They get closer, right?

8  A.  Quite closer.

9  Q.  If you turn back to 1707035, I have one more question on

10  this, the viscometry model page.

11  A.  Yes.

12  Q.  If we look at that second bullet again?  Well, if we, I'm

13  sorry, if we look at 7.4.4.1.  Do you see that?

14  A.  Yes.

15  Q.  That has readings from the first viscometer, the 03

16  viscometer, right?

17  A.  Sorry, I'm not paying attention.  7.4.4.1?

18  Q.  You see the entries on that line?

19  A.  Yes.

20  Q.  And those are from the 03 viscometer, correct?

21  A.  On 7.4.4.1 where it says "end viscosity," is that what you

22  mean?

23  Q.  Yes, and it specifically references the part number and

24  that's the 03 viscometer, right?

25  A.  Yes.

1    Q.  And there's no reading from the 04 what you call the backup

2    viscometer in the batch record here, correct?

3    A.  Not on that page, but as you pointed out further on you are

4    taking measurements with the viscometer.  If I was a

5    manufacturer, I wouldn't pay for an expensive viscometer to put

6    in the process if I wasn't going to use the measurements that

7    it takes.  My guess is -- well, I won't guess.

8    Q.  I just want to turn very briefly back, sir, to the briefing

9    book, PTX 913.

10   A.  It's in the direct.

11   Q.  It is in the direct binder, sir.  If you could look at page

12   37, table 15, and I think we should put this on the private

13   monitor.  That's in the redacted version.  We can put that up.

14   Putting it up.  You've seen table 15 before, correct, sir?

15   A.  Yes, I have.  I haven't found it yet.

16   Q.  It's up on the screen.

17   A.  Let's use that.

18   Q.  And this is what's been filed with the FDA, correct, sir?

19   A.  As far as I know, yes.  Clarifying yes.

20   Q.  Were you here when Dr. Bishop testified that 1.1.0 is the

21   current process that Momenta intends to use, correct?

22   A.  I think that's what he said, yes.

23   Q.  If you look at the last column, there's a reference to the

24   batch record range for that process, correct?

25   A.  Yes.

19FFTEV4                         Laird - cross

1  Q.  One of the batch records we've just been looking at is for

2  process 1.1.0, correct?

3  A.  Yes, and the temperature is 22 plus or minus 2 degrees.

4          MR. WIESEN:  Nothing further.

5          THE COURT:  All right, Mr. Doyle.

6          MR. DOYLE:  Very briefly.

7  REDIRECT EXAMINATION

8  BY MR. DOYLE:

9  Q.  Dr. Laird, were you here this morning for the testimony of

10  Dr. Bishop?

11  A.  Yes, I was.

12  Q.  And did you hear his testimony that Sandoz Momenta do not

13  plan to use the time and temperature backup that's included in

14  the batch records going forward now that the viscometer method

15  has been validated?

16  A.  Yes, I did.

17  Q.  And in not testifying about the backup of time and

18  temperature that's included in the batch record, did you rely

19  upon that position of Sandoz and Momenta in terms of what its

20  future plans are?

21  A.  Yes, I did.

22  Q.  And also, did you hear Dr. Bishop testify that with regard

23  to revising the viscometer model further based on any sampling,

24  that they don't have any intention to do that going forward in

25  the future?

1    A.  I think that's what he said.  I'm sure it's in the record.

2    Q.  And did you rely on that in not discussing that in your

3    opinion and in your direct testimony?

4    A.  Yes.

5               MR. DOYLE:  Nothing further.

6               THE COURT:  Anything else?

7               MR. WIESEN:  No questions, your Honor.

8               THE COURT:  Thank you, Dr. Laird, you may step down.

9    Next witness.  Who is the next witness?

10               MR. AANNESTAD:  Your Honor if I may introduce myself

11   again, Anders Aannestad for Sanders Momenta.

12               THE COURT:  Yes.

13               MR. AANNESTAD:  Our next witness is Dr. Scandella, but

14   I was wondering if this is a good time to take our afternoon

15   break.

16               THE COURT:  Yes.  We'll take a ten-minute break.

17               (Recess)

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  Please be seated.

3          Doctor, you may continue to stand, if you raise your

4    right hand.

5     CARL JOHN SCANDELLA,

6          called as a witness by the defendant,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. AANNESTAD:

10         MR. AANNESTAD:  Before I proceed, your Honor, I have a

11   couple of binders.  May I approach?

12         THE COURT:  Okay.

13   Q.  Good afternoon, Dr. Scandella.

14   A.  Good afternoon.

15   Q.  What is your occupation?

16   A.  I own a consulting firm, and I provide consulting in the

17   areas of the manufacture of new biotechnology products and the

18   associated analytical methodology.

19   Q.  Have you ever testified in court before?

20   A.  No, I have not.

21   Q.  What are your academic credentials?

22   A.  I have a bachelors degree in chemistry from the California

23   Institute of Technology, and a doctorate in biochemistry from

24   Stanford University.

25   Q.  What year did you earn your bachelors degree?

1   A.  My bachelors degree was in 1966.

2   Q.  Did you receive any awards when you graduated from Cal

3   Tech?

4   A.  Yes.  I received an award as the outstanding senior

5   chemistry major at Cal Tech.

6   Q.  Okay.  Where did you apply to graduate school after

7   graduating your bachelors degree?

8   A.  I applied to graduate school to the three top institutions

9   in my field, Harvard University, the Rockefeller University

10  here in New York, and Stanford University.

11  Q.  And which of those institutions did you decide to go to?

12  A.  I decided to go to Stanford.

13  Q.  And why did you make that decision?

14  A.  Stanford, the Stanford Department of Biochemistry was

15  regarded at that time as the world's capital of DNA, and the

16  chairman of the Stanford biochemistry Department Dr. Arthur

17  Kornberg was a Nobel Laureate for his discoveries in the area

18  of DNA, excuse me, DNA synthesis, and he was -- he was a

19  dominant figure in the biochemistry field.

20  Q.  And who did you work with at Stanford for your Ph.D.?

21  A.  My thesis advisor was Dr. Arthur Kornberg.

22  Q.  What was the subject of your Ph.D.?

23  A.  The subject of my Ph.D. thesis was the purification and

24  characterization of a membrane-bound phospholipase A from

25  Escherichia coli.

1   Q.  Who did you receive funding from for your Ph.D. research?

2   A.  My thesis research was funded by a national science

3   foundation predoctoral fellowship.

4   Q.  And did that research involve the measurement of molecular

5   weight of protein?

6   A.  Yes, it did.

7   Q.  What did you do -- when did you finish your Ph.D.?

8   A.  I finished my Ph.D. in 1971.

9   Q.  What did you do next?

10  A.  Next I went to the Chemistry Department at Stanford to do a

11  post-doctoral fellowship with Professor Harden McConnell.

12  Q.  Did you receive -- who did you receive funding from for

13  that post-doc?

14  A.  I had a national science foundation post-doctoral

15  fellowship for that work.

16  Q.  What was the subject of that research?

17  A.  The subject of that research was the measurement of lateral

18  diffusion of phospholipids in rabbit sarcoplasmic reticulum, a

19  biological membrane.  That research was closely related to the

20  thesis research of Dr. Roger Kornberg, who was my contemporary

21  at Stanford, and we were both influenced by professor Arthur

22  Kornberg to do our thesis projects in the area of cell membrane

23  structure and molecular motions.

24  Q.  Dr. Roger Kornberg was Dr. Arthur Kornberg's son?

25  A.  That's right.  He was Dr. Kornberg's oldest son.  In a way,

1    the work that I did at stand in the Stanford Chemistry

2    Department was a continuation of Roger Kornberg's thesis.

3    Roger Kornberg won the Nobel Prize in chemistry in 2006.

4    Q.   So both father and son won the Nobel Prize?

5    A.   Two, two in the same family, yes.

6    Q.   How long did your post-doc at Stanford last?

7    A.   It was a little over a year.

8    Q.   What did you do next?

9    A.   After that I did a second and a third post-doc in Europe.

10   The second post-doc was at the bio-center at the University of

11   Basel in Switzerland, and the third post-doc was at the Pasteur

12   Institute in Paris.

13   Q.   What was the subject of your research at Basel?

14   A.   The subject of my research in Basel was the molecular

15   structure and motion of virus membrane and the cell membranes

16   of normal and virus transformed cultured cells.

17   Q.   Who did you receive funding from for that research?

18   A.   That post-doctoral work was supported by the National

19   Cystic Fibrosis Research Foundation.

20   Q.   Was that a particularly prestigious post-doctoral

21   fellowship?

22   A.   It was at the time.  There were only a few of them awarded,

23   and they had a higher monetary award than other fellowships, so

24   it was considered very prestigious.

25   Q.   And what was the subject of your research at the Pasteur

1  Institute?

2  A.  At the Pasteur Institute I worked with Professor John

3  Pierre Changeux, one of the most famous scientists in France.

4  Professor Changeux had developed a model for allosteric

5  interactions for the way that protein structure changes to

6  allow the activity of proteins to be regulated in the cell.

7          He was also interested in the structure and function

8  of the nerve junction with the cell.  And he was a world leader

9  in that area, and I worked with him on the, on that area.

10 Q.  How long did you do that research for?

11 A.  That was a summer research project.

12 Q.  And did your research, your post-doc at Basel, how long was

13 that?

14 A.  That was about two and a half years.

15 Q.  Okay.  And who funded your research at the Pasteur

16 institute?

17 A.  The French National Science Foundation, the acronym is

18 DGRST, but I can't reproduce for you what that stands for.

19 Q.  After completing your post-doctoral positions, what did you

20 do next?

21 A.  After my post-doctoral positions, I became an assistant

22 professor of biochemistry here at State University of New York

23 at Stony Brook.

24 Q.  How long were you in that position?

25 A.  I was there for seven years.

1   Q.  Did you teach courses?

2   A.  Yes, I taught a number of courses at Stony Brook, including

3   biochemistry for undergraduate, graduate and medical students.

4   I also taught the regulation of metabolism for graduate

5   students, physical biochemistry, and my special area of

6   interest was cell membranes.  I taught a course in cell

7   membranes.

8   Q.  Did you run a research laboratory at Stony Brook as well?

9   A.  Yes, I did.

10  Q.  What was the subject of that research?

11  A.  The subject of that research was an extension of the work

12  that I had done in Basel and Paris and my chemistry post-doc at

13  Stanford.  It was using magnetic resonance to study the

14  membranes of sea urchin eggs after they've been -- before and

15  after they've been fertilized to understand the changes that

16  take place in the egg's membrane when it's fertilized.

17  Q.  Was that research on the molecular level?

18  A.  Yes, that's correct.

19  Q.  Did you receive any funding for that research?

20  A.  Yes.  That research was funded by research grants from the

21  National Institutes of Health and the National Science

22  Foundation and other sources.

23  Q.  Have you served in any academic roles, more recently?

24  A.  Yes.  I've continued to be involved in academics.  Since I

25  moved to Seattle area, I've been active at the University of

1    Washington, where I've taught a course for about ten years in

2    pharmaceutical biotechnology, and also I've been active in a

3    major research institute in Basel called the Institute for

4    Systems Biology.

5    Q.  And does your teaching in the pharmaceutical biotechnology

6    course include size exclusion chromatography?

7    A.  Yes, it has.

8    Q.  And did your teaching at Stony Brook involve size exclusion

9    chromatography?

10   A.  It involved physical techniques for studying molecules.

11   Size exclusion was one of them, yes, but there were many

12   others.

13   Q.  After leaving Stony Brook, what year was that?

14   A.  That was in 1981.

15   Q.  Okay.  What did you do next?

16   A.  In 1981 I joined the biotechnology industry.  The industry

17   was just getting going at that time, and a number of my friends

18   and colleagues from graduate school had made the switch from

19   academia to the biotech industry, and there were very exciting

20   frontiers on that industry, in that industry, but not many

21   products had come out of it.  So I wanted to participate in the

22   creation of new products using biotechnology.

23   Q.  What is the first company you went to work for?

24   A.  The first company I went to work for was Genex Corporation

25   in Rockville, Maryland.

1   Q.  What did you do there?

2   A.  At Genex I was a principal scientist in protein chemistry,

3   and I worked on the solubilizing and refolding of recombinant

4   proteins.  At that time it was known that most proteins that

5   were expressed in ecoli were expressed in an insoluble inactive

6   form, and a fronter was finding ways to restore those proteins

7   to activity.  I discovered and patented one of the early

8   methods for doing that.

9   Q.  When did you leave Genex?

10  A.  I left Genex in 1983.

11  Q.  Where did you go?

12  A.  From Genex, I went across country industry to Emeryville,

13  California near Berkeley, and joined a company, start-up

14  company called Chiron Corporation.

15  Q.  How big was Chiron at the time you joined?

16  A.  Chiron had about 50 employees when I joined them in 1983.

17  Q.  If you could describe, generally, some of the projects that

18  you worked on at Chiron?

19  A.  I worked on four major products, projects at Chiron.  All

20  of them turned out successfully and all of them contributed to

21  Chiron's success.

22          The first project was insulin like growth factor 1, or

23  IGF-1 as it called.  That was the highest priority at Chiron

24  for much of -- the highest priority project at Chiron for much

25  of the time that I was there, because it was the initial

1   project in the collaboration with Ciba-Geigy, the large Swiss

2   pharmaceutical company, and Chiron wanted to use Ciba-Geigy as

3   a springboard to become a larger company.

4   Q.  And what was the next project you worked on?

5   A.  The next project I worked on was superoxide dismutase.

6   Superoxide dismutase is a protein that attacks or disintegrates

7   the superoxide and ion, and it was interest -- of interest to

8   Chiron for a couple of reasons.

9        For one reason, it was, it was the proof of concept

10  protein to prove Chiron's technology for making human proteins

11  in yeast cells.  Prior to that, most proteins were made in

12  ecoli.  And baker's yeast has considerable advantages as a

13  production organism over ecoli.

14       So the superoxide dismutase project was, on the one

15  hand, a demonstration of our technology and, on the other hand,

16  it was an interesting, interesting as a potential

17  pharmaceutical product in its own right.

18       Chiron was able to establish partnerships with two

19  major pharmaceutical companies to develop superoxide dismutase,

20  and it was also the basis of a partnership with Pharmacia that

21  we'll talk about later.

22  Q.  In addition to Pharmacia, what were the other companies

23  that Chiron partnered with?

24  A.  I, as I said, IGF-1 was partnered with Ciba-Geigy;

25  superoxide dismutase was partnered words with Gruenenthal in

1   Germany, and Pharmacia in Sweden.

2           The GP-120 project, HIV GP-120 project that I worked

3   on was a key project in developing diagnostic tests for AIDS,

4   and also in developing candidate vaccines for AIDS.  Ciba-Geigy

5   also became a partner with us for that project, and they

6   supported the development of a vaccine business by Chiron

7   called Chiron vaccines.

8           The fourth project, and probably the most important

9   project both for Chiron and this case was the Hepatitis C virus

10  project at Chiron.  Chiron discovered, discovered the Hepatitis

11  C virus, the agent that cause, that caused the disease that

12  previously had been known as Non A- Non B Hepatitis.  This is a

13  disease that spread through the blood supply.  Prior to

14  Chiron's work, anyone receiving a blood transfusion in the

15  United States or most of the civilized world, had a 15 percent

16  chance of contracting Hepatitis C.  There was, there was no

17  known no effective test for that.  Through Chiron's work, we

18  found an -- we were able to clone an antigen that contained

19  sequences from the Hepatitis C virus, and that antigen was used

20  at Chiron to create a diagnostic product.  The role of my group

21  in that project was to develop a size exclusion chromatography

22  step for that, for that antigen.  It was a very difficult

23  protein to analyze.  And the most effective step was size

24  exclusion chromatography.  And my group was the size exclusion

25  chromatography expert group in Chiron.  So the whole company

1  worked on that project, and the particular part that my group

2  played was to develop the size exclusion step as a preparative

3  step for the purification of the antigen, and also as an

4  analytical assay for use in the project.  My group spent more

5  than a year doing nothing but size exclusion chromatography for

6  that project.

7  Q.  And before we get more into size exclusion chromatography,

8  how successful were these projects at Chiron?

9  A.  Well, I would say they were extremely successful.  All four

10 of the projects that I worked on achieved their objectives.  As

11 I've said, the Hepatitis C diagnostic test was partnered with

12 the Ortho Division of Johnson & Johnson.  It had sales of a

13 billion dollar range, and that test, that product alone made

14 Chiron a profitable company.

15       Other products that were developed at Chiron included

16 the first recombinant vaccine, recombinax that was done in

17 collaboration with Merck.  And the betaseron product that we

18 heard about earlier, that we heard about last week was also a

19 Chiron product.  The (phonetic) Pearl Loopman product was also

20 a Chiron product, and the IGF project, and the superoxide

21 dismutase project were still continuing when I left Chiron.

22 Q.  Were you promoted during your time at Chiron?

23 A.  Excuse me.  Yes, I was promoted to the highest scientific

24 level at Chiron.

25 Q.  And when did you leave Chiron?

1  A.  I left Chiron in 1992.

2  Q.  How large is Chiron when you left?

3  A.  When I left, Chiron had 2,000 employees.

4  Q.  What was your experience with size exclusion chromatography

5  at Chiron?

6  A.  Well, size exclusion chromatography was used in every

7  project that I did at Chiron, and there were different ways.

8  As I've said, in the Hepatitis C project, it was it was the

9  main protein purification tool for purifying the antigen that

10  was used to make the diagnostic product.

11          I used, I used size exclusion chromatography in every

12  project that I did going back to my Genex work in recombinant

13  protein folding and refolding.

14          Size exclusion chromatography uniquely tells you

15  information about what a protein is doing in solution; if it's

16  folding or unfolding, if it's denaturing, if it's aggregating.

17  Size exclusion chromatography is used as a release test for

18  nearly all recombinant pharmaceuticals.  Because the FDA is

19  very concerned about the formation of aggregates in protein

20  products.  Aggregates tend to be more immunogenic.  So nearly

21  every protein product has a size exclusion step as part of the

22  stability indicating assay and as part of the release method

23  that's used for the product.

24  Q.  How many different size exclusion chromatography columns

25  did you use at Chiron in terms of category or brand?

1  A.  Well, I had a, I had a drawer full of size exclusion

2  chromatography columns and when I became a consultant for

3  Pharmacia, they supplied my laboratory with chromatography

4  columns.  So I had a large number of columns.  And in my

5  laboratory I had six analytical instruments that were going

6  pretty much constantly as ways to monitor our different

7  products.  And at least one of these was always set up for size

8  exclusion chromatography.  And in some cases it was three or

9  four of them were running.

10       So I had an analytical machine in my laboratory at

11  Chiron, and I could run thousands of samples very quickly.  I

12  would estimate that I ran at least 10,000 size exclusion runs,

13  although I never actually kept count of that.

14  Q.  During your time at Chiron, were you recognized by the

15  maker of the Superose 12 column as an expert in SEC?

16  A.  Yes, I was.  The Superose column, 12 column is made by

17  Pharmacia, a Swedish company based in Uppsala, Sweden.  And I

18  first became acquainted with Pharmacia because of our

19  partnership with on the superoxide dismutase project, and they

20  quickly recognized that I was a large scale user on high

21  profile projects with size exclusion chromatography.  So they

22  asked me to serve as a beta, my lab to serve as a beta test

23  site for their newest generation size exclusion chromatography,

24  which at that time was Superdex 200.

25  Q.  What does that mean to be a beta test site?

1   A.  Well, it means that I tested the size exclusion columns

2   from Pharmacia and compared them to the other columns that I

3   used in my laboratory.  I provided this information back to

4   Pharmacia, and it was used in promotional literature, and it

5   was also used as the basis for a course that I then taught with

6   Pharmacia.

7   Q.  Can you describe that course?

8   A.  Yes.  Pharmacia has been a leader in protein purification

9   technologies for many years.  They make the columns and the

10  instruments that are used for that purpose, but they also teach

11  a series of courses around column chromatography technology.

12  And at the time, at that time they wanted to add a course in

13  purification of recombinant proteins to there repertoire and

14  they asked me if I would help them design and teach the course.

15  Q.  And how many years did you do that?

16  A.  The course was first offered in Freiburg, Germany, I

17  believe it was in 1989, and I taught the course several times,

18  the last time being in Tokyo, which I believe was in 1991.

19  This was a lecture and laboratory course.  And the laboratory

20  portion of the course was based on purification of superoxide

21  dismutase.  My company, Chiron, provided the crude superoxide

22  dismutase, the starting material that we used for purification

23  in the lab course.

24  Q.  In what way does the Superdex 200 column that you were

25  talking about differ from the Superose 12 column?

1   A.  Well, the Superdex 200 column was a newer generation.  The

2   Superdex 200 column had beads that were more rigid.  They would

3   withstand higher pressures and higher flow rates, and it was

4   clearly superior as a preparative medium, and also had

5   advantages as an analytical medium.

6   Q.  Was that a usual practice at Chiron to allow its employees

7   to consult for other companies?

8   A.  No, it was not usual.  In fact, Chiron had a policy of not

9   allowing its employees to consult for for-profit companies.

10  They made an exception in this case, partly because Pharmacia

11  was their partner, and partly because they considered it was an

12  honor that a Chiron employee would be asked to consult in

13  purification for Pharmacia, which was considered a world leader

14  in purification at that time.

15  Q.  Why did you originally begin using size exclusion

16  chromatography in your research?

17  A.  Well, I recognize -- excuse me.  I recognized from my work

18  at Genex where I was working -- excuse me -- in my work at

19  Genex on refolding a recombinant protein, I recognized that

20  size exclusion chromatography had unique advantages in being

21  able to tell me about what the molecule was doing in solution.

22  There were other techniques for measuring molecular weight, but

23  size exclusion chromatography was unique in being a simple

24  technique for watching what the molecule I was working on was

25  doing in solution.  And I used that as a, routinely as a tool

1   in all of my projects afterwards.  And I believe it was one of

2   the keys for the success that I had.

3   Q.  Did you personally operate the SEC column during your time

4   at Chiron?

5   A.  Yes, I did.  I was a hands-on scientist.  I had

6   administrative responsibilities as the head of the process

7   development group, and the head of the protein manufacturing

8   group at Chiron.  But, frankly, I loved to work in the lab.

9   And size exclusion chromatography was my favorite thing because

10  it was an intellectual game.

11          As you I think you're going to see as we get into this

12  case, size exclusion chromatography experiment has to be

13  properly designed if it's going to give you the result that you

14  want.  And I enjoyed the intellectual game of designing the

15  size exclusion chromatography experiments.

16  Q.  Does your work today still involve size exclusion

17  chromatography?

18  A.  My work where?

19  Q.  Your work today?

20  A.  Yes.  I've used size exclusion chromatography throughout my

21  consulting career.  In some projects it's a major component, in

22  some projects it's a minor component, but it's always there for

23  the reasons that I outlined earlier.

24  Q.  In addition to Pharmacia, what companies have you consulted

25  for?

1   A.  Well, I think I've consulted for 44 companies at this

2   point, and they've covered a range.  They're not all the same.

3         Many of my consulting clients have been young

4   biotechnology companies that were trying to manufacture their

5   first product for clinical trials.  I've also worked for

6   analytical laboratory services, I've worked for law firms.

7   There's been a range, but that's what's most typical.

8   Q.  Did your use of size exclusion chromotography at Chiron

9   include the measurement of molecular weight?

10  A.  Oh, yes.  Size exclusion chromotography is interesting in

11  that regard.  When I use size exclusion chromotography, I would

12  always run standards, and I was always measured the molecular

13  weight of the substance that I was interested in.

14        But the size exclusion chromatogram contains more

15  information than just the molecular weight.  And recombinant

16  proteins tend to do strange things in solution, that's -- it's

17  kind of their habit.  And I use size exclusion chromotography

18  to stay on top of that.

19  Q.  Have you developed reference standards that have been

20  adopted by any government agencies?

21  A.  Yes, I have.  For each of the projects that I worked on at

22  Chiron, there was no reference standard available when I

23  started working in the project.  So, for example, in the IGF-1

24  project, we developed a reference standard and characterized

25  the reference standard, and it was accepted as a reference

1   material by the World Health Organization.

2   Q.  Has NIH adopted any of your standards?

3   A.  Yes.  Another of the standards that were created in my

4   group was adopted by the National Institutes of Health as an

5   AIDS reference reagent.

6        The GP-120 protein that I worked on, the protein

7   that's on the outer surface of the AIDS virus, was the focus of

8   a lot of work that's been done on developing diagnostic tests

9   for AIDS, and also vaccines for AIDS.  And we were able to

10  develop a superior version of the GP-120 protein at Chiron, and

11  we patented that material, and we also published on that

12  material.  And that, that protein was adopted as a standard by

13  the Institutes of Health in the United States and the PDRP in

14  Europe.

15  Q.  What year was that?

16  A.  That was around 1990.

17  Q.  Dr. Scandella, do you have experience characterizing the

18  molecular weight of proteins using analytical techniques, other

19  than SEC?

20  A.  Yes.  I've used a range of analytical techniques to

21  characterize protein molecular weights.  The molecular weight

22  of a protein is the most fundamental parameter that describes

23  that protein.  And for every project, it was necessary to

24  establish the molecular weight, and that was usually done by

25  applying multiple methods.

1    Q.   Which analytical techniques have you used for that?

2    A.   I've used analytical ultracentrifugation, I've used mass

3    spectrometry, maldi-tof spectrometry, electrospray mass

4    spectrometry, kutov mass spectrometry.  There have been a

5    number of them.

6    Q.   Have you used maldi-tof?

7    A.   Yes, I have.

8    Q.   Viscosity?

9    A.   I've used viscosity, but not for the measurement of

10   molecular weight.

11   Q.   Have you used light scattering?

12   A.   Yes, I've used light scattering also.

13   Q.   And are you familiar with the principles underlying

14   ionometry?

15   A.   Yes.

16   Q.   Do you have experience in characterizing the molecular

17   weight of polypeptides with analytical techniques other than

18   SEC?

19   A.   Well, proteins are polypeptides, so every protein that I

20   worked on has been a polypeptide.

21        In addition, I've worked on a number of polypeptides

22   that were created by recombinant DNA technology, but were not

23   proteins.  They were genetically engineered polypeptides.  And

24   I've also worked on insulin and insulin derivatives that were

25   not poly -- not naturally occurring.

1  Q.  Have you written articles published in peer-reviewed

2  journals that included the use of size exclusion

3  chromotography?

4  A.  Yes, I have.

5  Q.  And I want to make sure we covered this.  We'll be

6  discussing the 1987 to 1994 timeframe a lot during your

7  testimony.

8         Did you give any presentations regarding Pharmacia's

9  size exclusion chromotography columns during that time period?

10  A.  Yes, I did.  I gave a presentation in 1989 at a recombinant

11  protein meeting in Interlaken, Switzerland, at which I included

12  this information.

13  Q.  Okay.  Who asked you to present there?

14  A.  The organizer, organizer of the meeting were some Swiss

15  scientists from Basel, and I was asked by them to present this

16  information.

17  Q.  Are you active in any professional organizations?

18  A.  I'm a member of the American Chemical Society, and the

19  American Association of Pharmaceutical Chemists.  And I've

20  participated in, as I've said before, in activities at the

21  University of Washington and the Institute for Systems Biology

22  in Seattle.

23  Q.  What is the Institute for Systems Biology?

24  A.  The Institute for Systems Biology is interesting.  It's a

25  world leader in the development of new technology for solving

bio-medical problems.  It was founded by Dr. Leroy Hood who is
one of the leaders in the biotechnology industry.  Dr. Hood was
the founder of Amgen Applied Biosystems, a major instrument
manufacturer, and about 15 other companies.  And he was brought
to Seattle in 1993 by the University of Washington with the
help of a $13 million grant from Bill Gates.  He's been a
dominant figure in this field.  And in 2000 he founded the
Institute for Systems Biology in Seattle, and it's now a world
renowned institution.

Q.   Thank you.  And, Dr. Scandella, without forcing you to
cover the technology you've already described, are you the
inventor on any patents?

A.   Yes, I am.

Q.   Okay.  In which fields?

A.   All of my patents are in the field of protein technology
and in solubilization of refolding and purification.  And the
GP-120 patent includes protein purification technology, but
it's about how we developed this superior GP-120 antigen and
tested it in baboons, cats, different animals, to arrive at a
better antigen.

Q.   And, Dr. Scandella, you've already mentioned Dr, the
Doctors Kornberg before today.  But have you had the privilege
of learning from and working with any other Nobel Laureates
during your career?

A.   Yes, I have.  I've been very fortunate in my education and

1   career, in that I've had eight Nobel Laureates either as

2   teachers or collaborators, and I've also had a number of other

3   outstanding scientists who aren't Nobel Laureates, but are very

4   widely known also.

5   Q.  Dr. Scandella, could you please turn to DTX-3564 in your

6   binder?

7   A.  Yes, I have it.

8   Q.  Is this a current copy of your CV?

9   A.  Yes, it is.

10          MR. AANNESTAD:  Your Honor, we move for the admission

11  of DTX-3564.

12          MR. JAMES:  No objection.

13          THE COURT:  Admitted.

14          (Defendant's Exhibit 3564 received in evidence)

15          MR. AANNESTAD:  Could we please put on the screen

16  paragraph 47 from Dr. Scandella's report on the level of skill

17  in the art?

18  Q.  Dr. Scandella, is this the definition of a person of

19  ordinary skill in the art apply for your opinions in this case?

20  A.  Yes, it is.

21  Q.  Do you consider yourself as having been a person of at

22  least ordinary skill in the art in 1994?

23  A.  Yes, I do.

24  Q.  And do you consider yourself as having been at least a

25  person of ordinary skill in the art in 1995?

1    A.  Yes.

2    Q.  Were you present in court for Dr. Grant's testimony last

3    week?

4    A.  Yes, I was.

5    Q.  And have you reviewed the testimony of Dr. Owens?

6    A.  Yes, I have.

7    Q.  Were you here for the testimony of Dr. Bishop today?

8    A.  Yes.

9            MR. AANNESTAD:  Your Honor, we offer Dr. Scandella as

10   an expert in the use of size exclusion chromotography and the

11   characterization of molecular weight.

12           THE COURT:  Any objection?

13           MR. JAMES:  No objection.

14           THE COURT:  All right.  Court accepts you as an expert

15   in those fields.

16           Okay, go ahead.

17           MR. AANNESTAD:  Thank you, your Honor.

18           Put up slide one, please.

19   Q.  Dr. Scandella, is this a summary of the topics you would

20   like to cover?

21   A.  That's right.

22   Q.  Let's start with molecular weight, slide two.

23           What is your understanding of the term "molecular

24   weight"?

25   A.  Well, molecular weight is a basic concept in chemistry.  If

1   one has a chemical structure, the molecular weight is the sum

2   of the atomic weights of all of the atoms in that structure.

3   For a molecule like cop-1, that definition isn't useful because

4   we have -- first of all, we don't know the structure, and,

5   secondly, we have no way of measuring the molecular weight.

6   Q.   And is molecular weight calculated or measured?

7   A.   Well, if one knows the structure, it can be calculated and

8   measured.  If one doesn't know the structure, then it has to be

9   measured.

10  Q.   What is average molecular weight?

11  A.   Well, there are several kinds of average molecular weight.

12  But in every day terms, the most common type of molecular

13  weight number -- number average molecular weight has the same

14  meaning that any other parameter does.  If you were to say

15  what's the average weight of all of the people in this room, we

16  would ask each, ask each of the people to stand on the scale.

17          THE COURT:  I'm not joining that group.

18          MR. AANNESTAD:  Neither am I.

19  Q.   Okay.  Is there a difference between the meaning of average

20  molecular weight for a complex than for a simple molecule?

21  A.   Yes.  As an experiment, there's a big difference.  For a

22  simple molecule, there are a number of methods that could be

23  used to measure molecular weight, and they would probably all

24  give the right answer.

25          For a complex molecule, such as we're talking about in

1    this case of cop-1, there's actually no method known that, that

2    will definitely give the right answer.

3          There are a few methods that are called absolute

4    methods that will -- that can or are capable of giving the

5    right answer, but that doesn't mean they will give the right

6    answer in every case.

7          So for a large complicated molecule like cop-1, the

8    meaning of molecular weight becomes fuzzy.  One has to specify

9    what method one is going to use to measure molecular weight,

10   because different methods will give you different answer, as is

11   seen in the cop-1 case.

12   Q.  And you've mentioned cop-1 a couple of times.  In what

13   capacity are you familiar with copolymer-1?

14   A.  I'm familiar with copolymer-1 as an expert witness in this

15   case.  I was asked to review the Teva documents relating to

16   this, and that's what I've done.

17   Q.  Did you work with copolymer-1 before your work on this

18   case?

19   A.  No.  Copolymer-1 was not available commercially until after

20   1995, and neither I nor anyone else had, except Teva, had

21   experience with copolymer-1 at that time.

22   Q.  How long have you been working on this case?

23   A.  Almost two years.

24   Q.  Do you believe that the molecular weight of copolymer-1

25   should be treated as an average molecular weight?

1  A.  Yes, I believe it has to be treated as an average molecular

2  weight.

3  Q.  Why is that?

4  A.  For the reasons that I stated, that we don't know the

5  chemical structure of the individual atoms or the individual

6  molecules that make up cop-1, and so we can't simply calculate

7  based on the chemical structure.  And there is no way, even in

8  principle, to measure each of the -- to measure the molecular

9  weight of each of the molecules by mass spectrometry, for

10  example.  So we have to deal with the average with the

11  collection of cop-1 molecules.

12  Q.  Are you familiar with the number of possible different

13  sequences in a sample of copolymer-1?

14  A.  This is an interesting point, that the -- because of the

15  size of copolymer-1, and the fact that there are many possible,

16  possible monomers at each position of the chain, and there is

17  around 70 positions, the number of possible sequences of cop-1

18  is -- I've heard the number ten to the 29th, and that's an

19  incredible number.  None of us has any experience with a number

20  that big.  Chemists like to think in materials of a mole of

21  something, but a mole of something is about ten to the 23rd,

22  and that's still a million times smaller than ten to the 29th.

23  And I've heard that the number of stars in the universe is ten

24  to the 22nd, and that's ten million times smaller than the

25  number of cop-1 molecules calculated -- number of cop-1

1    structures calculated.

2            So we're dealing with an incredibly large number of.

3    And, for all practical purposes, it's an infinite number.

4    There's nothing we can do to make this, this large number of

5    molecules countable or measurable individually.

6    Q.  Are there different types of average molecular weight?

7    A.  Yes, there are.

8    Q.  What are they?

9    A.  The most commonly used types of average are number average,

10   weight average, Z-average, and sometimes people use viscosity

11   average, which is still another kind.

12   Q.  What about peak molecular weight?

13   A.  Well, in my opinion, the term peak molecular weight

14   describes a single point on the chromatogram, and not -- so

15   it's not a true average.  It's just where the peak occurs.  It

16   has been used as so-called peak average in the Teva literature,

17   and in the reports that have gone back and forth about this

18   molecule.  But, in my opinion, it is not a true, not a true

19   average.

20           MR. JAMES:  Your Honor, I think what we're talking

21   about here is claim construction again.  And as your Honor

22   knows, we've had two hearings on that and your Honor's rendered

23   a claim construction order.  So I would just object to

24   testimony that's just going back to rehash the claim

25   construction issues.

1    MR. AANNESTAD:  Your Honor, we're not trying to rehash

2    construction issues.  He's going to be talking about these

3    values during the day, and that's the only question on it and I

4    just want to be clear for the record.

5        THE COURT:  All right.  Go ahead.  That's fine.

6        MR. AANNESTAD:  If we could put up slide three,

7    please.

8    Q.  Is this a slide you helped prepare?

9    A.  Yes, it is.

10   Q.  What does this show?

11   A.  Well, the purpose of this slide is to illustrate that for a

12   particular sample of a copolymer -- we were calling it sample A

13   in this test tube -- there are several molecular weight

14   averages that can be associated with that polymer.  And on the

15   top I've shown the number average, the viscosity average, the

16   weight average, and the Z-average, and underneath I've

17   indicated the peak average for the reason that I explained.

18   Q.  For a given sample with a distribution of molecular

19   weights, are the different types of molecular weights typically

20   the same?

21   A.  Well, unless the molecule is a single species, the

22   different types of averages will be different, the numerical

23   value will be different.

24   Q.  What is the general relationship among the different types

25   of molecular weights for complex polymers?

1    A.  By their definition, the number average is the lowest, the

2    weight average is larger than the number average but smaller

3    than the Z-average, and the Z-average is the highest.

4         The viscosity average is somewhere -- it may be close

5    to the weight average or maybe not.  And the peak average

6    doesn't bear a definite relationship to these, but it's often

7    it's usually between the number average and the weight average.

8    Q.  Will different analytical techniques yield different types

9    of average molecular weight?

10   A.  Well, in principle, they would all yield the same value.

11   But when you get into this region of very complicated samples,

12   they often don't yield the same value.  And as we're going to

13   see later for cop-a, they don't yield the same value -- cop-1.

14   Excuse me.

15   Q.  What are the various types of molecular weights that you

16   can get from size exclusion chromatography?

17   A.  One can get number average, weight average, and Z-average

18   from -- and peak average from size exclusion chromotography.

19        MR. AANNESTAD:  Could we move to the next slide.

20   Q.  I like to talk to you about a little bit more about size

21   exclusion chromotography or SEC.

22        We've heard a lot about SEC in this trial.  Could you

23   please describe how it works in your own words?

24        MR. AANNESTAD:  And, your Honor, if I may approach the

25   witness, I have -- Dr. Scandella had requested for this he

1   could use the Superose 12 column that we have.

2           THE COURT:  Sure.

3   Q.  Could you please describe in your words, briefly -- we

4   don't need the full lecture -- but that you would be able to

5   describe it in your words, please?

6   A.  This is, this is a sample of the Superose 12 column

7   produced by Pharmacia that was used in the analyses that we're

8   discussing in this case.

9           It's an analytical column.  And at the top one injects

10  a sample of protein or copolymer-1.  And the sample might be in

11  a volume say of 100 microliters, 10th of a milliliter.  There's

12  a pump that pumps the mobil phase through the column, and it

13  sweeps the sample down this column.  The column is packed with

14  tiny beads that are the Superose 12 material, and the beads

15  have pores in them so that -- so that the small molecules can

16  penetrate into the pores and see a relatively large volume.

17  And the large molecules can't get into the pores.  So the large

18  molecules will come out this column first, and the small

19  molecules will trail behind.  And this is the basic principle

20  of size exclusion chromatography.

21  Q.  Thank you.

22          MR. AANNESTAD:  If we could have the next

23  demonstrative, please.

24  Q.  What are we looking at here, Dr. Scandella?

25  A.  This is a chromatogram for my work.  It depicts the size

 1   exclusion chromatogram of a large and complicated glyco

 2   protein, a protein called myeloperoxidase.  This is the one of

 3   the projects that I worked on.  And we use size exclusion

 4   chromotography, along with mass spectrometry and other

 5   techniques to characterize this protein.

 6   Q.  This is not copolymer-1, correct?

 7   A.  No, this is not copolymer-1.  Copolymer-1 would give a much

 8   broader peak than this.  This is, this is a broad peak compared

 9   to most proteins.  Because this molecule has carbohydrate

10   residues attached to the protein backbone, and the carbohydrate

11   residues are of a variable structure.  So this is a complicated

12   molecule too.  It has thousands or probably millions of

13   different forms, but it's not nearly as complicated as cop-1.

14   Q.  And what's shown along the bottom, the X axis on this

15   chromatogram?

16   A.  The X axis in this figure and in most size exclusion

17   chromotography figures is time.  We have zero minutes on the

18   left side, and 16 minutes on the right side, and there's two

19   minute increments along the X axis.

20   Q.  Is that referred to as retention time?

21   A.  This is referred to as retention time, that's correct.

22   Q.  What factors control the retention time of a material

23   passing through a SEC column?

24   A.  One factor is the molecular weight.  Another factor is the

25   molecular shape.  They both influence the retention time.

1    Q.  Are there other factors that influence the retention time?

2    A.  Yes.  If there are any interaction between the column

3    matrix and the sample, for example, ion exchange interactions,

4    then that will influence the retention time also.

5    Q.  What are the range of possible shapes that a protein or

6    polypeptide could have in an SEC column?

7    A.  Well, there's a wide range of possibilities.  My freshman

8    chemistry professor Linus Pauly taught me and the rest of the

9    world about the fact that polypeptides can form alpha helix

10   sheets, beta helix sheets, beta pleated sheets.  There are a

11   number of possible structures that a polypeptide chain can

12   form, and it's very difficult to predict what structure

13   polypeptide is going to have at any time.

14   Q.  In your opinion, are the copolymer-1 molecules in an SEC

15   column likely to adopt more than a single shape?

16   A.  Well, it's almost certain that they adopt more than a

17   single shape, because they have so many different

18   conformations.

19   Q.  How many potential different shapes are there?

20   A.  A large number.

21   Q.  There as many different potential shapes as there are

22   molecules?

23   A.  I should qualify that.  We're talking about the second,

24   here about what's called the secondary structure of a

25   polypeptide.  The tendency of the polypeptide backbone to form

1   helix sheets, pleated and beta pleated sheets and so forth is

2   called the secondary structure.  But there can also be tertiary

3   structure beyond the alpha helix beta sheet structure, where

4   the folding of the chain now takes a definite shape.  So that's

5   called tertiary structure.  And copolymer-1 can and apparently

6   does have tertiary structure, as well as secondary structure.

7   Q.  Have you reviewed data in this case regarding which shapes

8   copolymer-1 adopts in solution?

9   A.  Yes, I have.

10  Q.  If you could please turn to DTX-1113 in your binder.  Have

11  you seen this document before?  I'll give you a minute to get

12  there.  It's DTX-1113.

13  A.  I don't see that in my binder.  Am I missing --

14  Q.  I think it might be the first one?

15  A.  Oh, yes.  Sorry.  Okay.

16  Q.  Do you have an unredacted version of that there?

17  A.  My binder has a redacted version.

18  Q.  Behind the redacted one, you have an unredacted one?  Maybe

19  it has a colored sheet between it?

20  A.  Oh, yes.  Here it is.  Okay.

21  Q.  Have you seen this document before?

22  A.  Yes, I have.

23  Q.  What is it?

24  A.  It's a description of copolymer-1.  I believe it's from

25  Teva's NDA submitted to the FDA.  It's a description of the

1  drug substance.

2          In the pharmaceutical industry, one distinguishes the

3  active ingredient of a drug as the drug substance, and the

4  finished drug product that what's delivered to the patient is

5  called the drug product.

6  Q.  And this is from Teva's NDA for copolymer-1?

7  A.  Yes.  This is the description of the drug substance.

8  Q.  If you could turn to the page ending with the TEV number

9  ending 034, please?

10  A.  Yes.

11  Q.  Does this document contain information on the structure of

12  copolymer-1?

13  A.  Yes, it does.

14  Q.  Okay.  What information does it contain?

15  A.  It describes circular dichroism and fourier transform

16  infrared spectroscopy results, which are ways of detecting

17  secondary structure in a polypeptide.  And it says that a non-

18  random distribution of helicity was found, and the alpha

19  helical confirmation of cop-1 is a stable one.  And it says in

20  the first sentence, it says there is a relatively high alpha

21  helical conformation, in parentheses secondary structure of

22  cop-1.

23  Q.  What is an alpha helical conformation?

24  A.  Well, the alpha helical conformation is the ordered

25  structure of the polypeptide backbone.  It's not talking about

1  the side chains of the protein.  It's talking about the peptide

2  bond and how the peptide bond is ordered in for one amino acid

3  relative to the next amino acid in the chain.  And for an alpha

4  helix, that's a helical structure.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  What conclusion do you draw from this data that Teva

2  submitted to the FDA?

3  A.  I conclude that cop-1 has a relatively high alpha helical

4  conformation.  It is not a random coil.

5  Q.  Did you have a demonstrative prepared showing different

6  possible structures of copolymer-1?

7  A.  Yes, I did.

8  Q.  Slide 6, please.

9  A.  There are six panels in this slide.  The upper left panel

10  shows schematically what a random coil might look like, and

11  here we're not intending to imply any particular structure, but

12  just that the polypeptide backbone meanders with no particular

13  structure in solution.

14      The second panel in the middle shows the alpha helical

15  conformation.  The lower left hand panel shows the rod-like cop

16  formation.  The lower middle panel shows the beta pleated sheet

17  and if you look closely, it may be hard for you from where

18  you're sitting, but if you look closely the beta pleated sheet

19  on the left side has parallel arrows, that is, the chains are

20  moving in the same direction, whereas the beta pleated sheet on

21  the right side has antiparallel arrows, every other chain

22  reverses its sets.  So these are the main possibilities that

23  one would consider.

24      And if we combine this simple picture with the

25  information that we just discussed, we would say that the cop-1

1   molecule probably looks something like the cartoon shown in the

2   upper right-hand corner, that is, some parts of it are helical

3   and some parts are random coil.

4   Q.  Would a person of ordinary skill in the art in 1994 have

5   known which of these shapes copolymer-1 would assume in

6   solution?

7   A.  No, one can't predict, unfortunately, the shape of a

8   polypeptide chain.  One has to determine it experimentally.

9   Q.  And how would one do that?

10  A.  Well, there are different ways of doing that.  One way of

11  doing that is to run that on a calibrated size exclusion

12  column, and if one knows the molecular weight, then one can

13  tell whether the molecular weight corresponds to the molecular

14  weight expected from the calibration standards used.

15  Q.  How do the different possible shapes of copolymer-1 in

16  solution impact the determination of molecular weight with SEC?

17  A.  Well, they're absolutely critical for the determination of

18  molecular weight by SEC, because the SEC technique is so

19  sensitive to molecular shape.

20  Q.  Generally speaking, is molecular weight measured or

21  estimated with an SEC analysis?

22  A.  The SEC technique is not an absolute technique.  It never

23  gives an absolute number.  This is well known in the field.

24  Depending on how well it's calibrated, it could be close to the

25  absolute value if the absolute value is known, or it could be

1  quite far off.

2         Because of this shape problem, the molecular weight

3  measured for an unknown sample can be off by tenfold or more if

4  the shape of that sample doesn't agree with the shape of the

5  standards that were used to create the standard curve for the

6  column.  SEC is usually used in a relative mode, where one

7  selects a set of standards and measures the molecular weight

8  relative to those standards and states that the molecular

9  weight is relative to the standards.  The task of creating

10  standards that match a sample as complicated as cop-1 is quite

11  difficult and takes years.

12  Q.  Is it correct to say that when determining molecular weight

13  with SEC it's always an estimate?

14  A.  Yes.  Normally SEC values are referred to as estimates.

15  Q.  How does one determine the molecular weights of calibration

16  standards that are to be used with an SEC molecular weight

17  experiment?

18  A.  Well, that's an interesting question and a lot of work has

19  been devoted to that topic.  The short answer is there are a

20  number of possibilities and it's not clear which way to go.

21  One could adopt several different ways of calibrating the

22  column.

23  Q.  Is it necessary to know the molecular weights of your

24  standards before they can be used for SEC?

25  A.  Well, if you want to use the column to create a calibration

1  curve for the measure of molecular weight, yes, you need to

2  know the molecular weight of the standards.

3  Q.  What are some of the methods that can be used for that

4  purpose?

5  A.  A variety of methods could be used for that purpose and

6  have been used for that purpose.  In general, one can use

7  viscometry, light scattering mass spectrometry, any number of

8  things.  In this case, there are no easy ways to measure the

9  molecular weight of cop-1, so the creation of self standards is

10 a considerable task.

11         We have a chicken and egg problem here.  We want to

12 use the size exclusion column to measure the molecular weight

13 of cop-1, but if we don't have any characterized standards of

14 cop-1, you're out of luck, because SEC can't do that.  You then

15 have to go to another method, another molecular weight method.

16 Q.  And are all those techniques that you mentioned called

17 absolute methods?

18 A.  No.  There are only a few physical methods that are capable

19 of giving absolute molecular weights, and SEC is not one of

20 them.

21 Q.  But the other methods, the other analytical methods, are

22 those termed as absolute methods?

23 A.  Yes.  There are -- mass spectrometry is considered an

24 absolute method, osmometry is considered an absolute method,

25 sediment, ultracentrifugation is considered an absolute method.

1   Light scattering is considered an absolute method, but that

2   doesn't mean that every measurement by all of these techniques

3   gives you a true molecular weight.  All of these methods are

4   subject to limitations and complication, especially when

5   dealing with complex molecules.

6   Q.  Like copolymer-1?

7   A.  Like copolymer-1.

8   Q.  What do you base that opinion on?

9   A.  I base that opinion on my years of experience

10  characterizing proteins.

11  Q.  Do you base it on anything else?

12  A.  Could you state the question again?

13  Q.  Have you also reviewed Teva documents in this case?

14  A.  Yes, I have reviewed almost ten years worth of Teva

15  documents in this case, and of course, in a case like this, the

16  real experts are the scientists in the company where the

17  product is developed, and my opinion is guided to a large

18  extent by what happened and what the Teva scientists have

19  reported.

20         MR. JAMES:  Your Honor, if I could be heard on this

21  just for a moment?  As you know, early in this case the

22  defendants moved to strike the testimony or the declarations of

23  Dr. Dubin and Dr. Grant under Daubert, and they were in part,

24  the motion was based in part on the fact that Dr. Grant and

25  Dr. Dubin had not looked at what Teva actually did, at Teva's

1    actual work, the underlying work, and your Honor in denying

2    that motion said that what Teva actually did in order to

3    determine the molecular weight was not relevant to the opinions

4    of Dr. Dubin and Dr. Grant.  You said, "It is beyond dispute

5    that a person of ordinary skill in the art such as Dr. Grant

6    and Dr. Dubin, a point unchallenged by defendants, would not

7    have had access to Teva's internal documents and in fact

8    because neither expert refers back to what Teva actually did,

9    both opinions carry a greater degree of objectivity than they

10   would otherwise if they did refer to what Teva actually did."

11          And we believe, your Honor, that what we're talking

12   about here today is indefiniteness and enablement, again, the

13   same things your Honor was dealing with then and we don't think

14   that relying on what Teva did for the years it was developing

15   Copaxone is relevant to this analysis.

16          THE COURT:  You may be right, but I'm going to listen

17   to it.

18          MR. JAMES:  Thank you, your Honor.

19          THE COURT:  Okay.  I'm a little surprised at the way

20   this case has been presented from the beginning, frankly.

21          MR. AANNESTAD:  Your Honor, thank you for hearing the

22   testimony.  I'm a little bit surprised to hear this, they

23   haven't raised this suggestion before.  And Teva has put at

24   issue in this case what Momenta did to determine the molecular

25   weight, what Mylan did to determine the molecular weight,

1    so it's pretty surprising.

2              THE COURT:  You won, Mr. Aannestad, so keep going.

3              MR. AANNESTAD:  Thank you.

4    Q.  Dr. Scandella, why don't you use SEC to measure the

5    molecular weight of the calibration standards?

6    A.  For the reasons that I outlined a moment ago, that SEC is

7    not an absolute measurement of molecular weight.  It has to be

8    calibrated with something that has the same shape, the same

9    ratio of hydrodynamic volume to molecular weight as the sample

10   being analyzed, so one needs a calibration curve based on

11   molecules of cop-1 or something very much like cop-1 that has

12   the same shape to the molecular weight relationship and that

13   doesn't exist.  And the analytical methods that can be used to

14   measure the molecular weight of the cop-1 standards are not up

15   to the task.  Teva struggled with this.  Anyone of skill in the

16   art -- I've been involved in doing similar measurements to this

17   myself and I know that you run out of analytical capability.

18   Even though we have an enormous array of powerful analytical

19   techniques, there are samples that are beyond what can be

20   handled with the technology we have, and that's the case here.

21   Q.  I understand you prepared a couple of demonstratives

22   regarding how calibration curves are constructed and could

23   impact the molecular weight result attained.  Is this the first

24   one of those?

25   A.  Yes.  This slide after Dr. Grant's figure is an

1    illustration of how one makes a calibration curve for an SEC

2    column, and how one applies that calibration curve to obtain

3    molecular weight values for a polymer such as cop-1.

4         The sharp peaks in the middle of the figure represent

5    five different standards of different known molecular weights

6    that have been run on the SEC column, and each of them gives a

7    sharp peak and there's a retention time associated with each

8    peak and a known molecular weight associated with each peak.

9    And again, the molecular weights must come from some other

10   method.  They didn't come from an SEC measurement.

11        So one first runs the standards as we've indicated in

12   the middle figure, and then one plots the retention time for

13   each peak against the logarithm of the molecular weight known

14   for that peak.  So the bottom panel shows the calibration

15   curve, which is constructed from the elution times and the

16   known molecular weights for the standards.  So we have five

17   data points on this standard curve and we've drawn a straight

18   line through the data points.  So that's the calibration part

19   of SEC.

20        And then the way one uses that calibration is shown in

21   the top slide.

22   Q.  If you could use your laser pointer?  I want to remind you

23   of that, if that would be helpful.  Do you have your laser

24   pointer there?

25   A.  Yes.  So these are the samples of the known molecular

1   weight where we've gotten the molecular weight from some other

2   kind of measurement and each standard has a retention time

3   connected to it.  So one measures the retention time from the

4   chromatogram and in the bottom panel one plots that retention

5   time for each peak against the logarithm of the molecular

6   weight for that sample.

7               So this is how one constructs a calibration curve.

8   First --

9   Q.  Do you have -- go ahead, I'm sorry.

10  A.  First you run the samples, the standards on the column, and

11  second, you measure the elution time for each one of these

12  peaks and you plot the data points on the X axis, you plot the

13  retention time and on the Y axis you plot the molecular weight

14  of that sample.  So on the first peak it has a molecular weight

15  of 100,000 daltons, so you plot the retention time that's

16  measured versus 100,000 daltons on the Y axis and you use a log

17  scale because that's what works for this type of measurement.

18              So this is the calibration curve we're talking about

19  right here, and in order to create this curve, one needs

20  standards and then the way one uses this information is one

21  comes to the center of the peak, of the size exclusion peak for

22  copolymer-1, and measures the retention time at that peak and

23  then you come down to the calibration curve and you say the

24  retention time of that peak corresponds to a molecular weight

25  of 25,000 daltons.

1    I'll say this again if it's not clear, your Honor.

2    Q.  Maybe we should move on.  Do you have an additional slide

3    you'd like to show the Court?

4    A.  Yes.  Because this is important.  This is a fundamental

5    concept of size exclusion chromatography.  You calibrate the

6    column using something with known molecular weights and then

7    you use that calibration curve to get molecular weight

8    information out of the sample that you're interested in.

9         So in this panel we've now calibrated the column with

10   the second set of standards and the second set of standards

11   don't have the same relationship of molecular weight to

12   hydrodynamic volume.  So now, the second set of standards is

13   represented in green here, and this green point at 100,000

14   daltons has a retention time which is different from the

15   retention time of the 100,000 dalton standard in the first

16   case.

17        What does that mean?  Well, that means that we can

18   construct two sets, two calibration curves from the data from

19   these two standards and then when we take that and compare it

20   to our sample, the value of molecular weight that we get for

21   the sample then depends on which calibration curve we can use.

22   I think you can see that if you follow this exercise that the

23   molecular weight results depend on which set of sample

24   standards you use.

25   Q.  Is this a hypothetical demonstrative?

1  A.  It's a hypothetical demonstrative, but it parallels the

2  situation in cop-1.

3  Q.  Could you please turn to DTX 1930 in your binder?

4  A.  Yes.

5         THE COURT:  Mr. Aannestad, can you give me an idea of

6  how much longer the direct is?

7         MR. AANNESTAD:  We're definitely going to go into

8  tomorrow, your Honor.  I was reaching a logical stopping point

9  in three more questions.  I understand Dr. Mays is not going to

10 be called, which gives us plenty of time to finish up tomorrow

11 if you would like to stop now.

12        THE COURT:  Is there any other potential witness for

13 tomorrow?

14        MS. BLOODWORTH:  No, our understanding was

15 Dr. Scandella would provide the teaching that Dr. Mays would,

16 so we've removed him from the witness list.  We'll have Dr.

17 Green on Monday.

18        THE COURT:  All right.

19        MR. DOYLE:  And Sandoz will rest after Dr. Scandella.

20 Maybe some cleanup with regard to exhibits.

21        THE COURT:  Okay.  Mr. Aannestad, do you want to

22 finish the next section or do you want to stop?

23        MR. AANNESTAD:  I'd just like to finish up this

24 section.  It should take less than five minutes.

25        THE COURT:  All right, go ahead.

1    Q.  If you could turn to DTX 1930 in your binder?

2    A.  I have it.

3    Q.  Are you familiar with this document?

4    A.  Yes, I am.

5    Q.  What is this?

6    A.  This is a book written by Robert L. Cunico, Karen Gooding

7    and Tim Wehr on capillary electrophoresis of biomolecules.  It

8    includes a chapter on size exclusion chromatography.

9    Q.  Do you know Dr. Cunico?

10   A.  Yes.  I know him personally and I worked with him on

11   several projects.

12   Q.  If you could go to figure 6.6, which is on page 128?

13            MR. JAMES:  Your Honor, I just object to the

14   questioning on this document.  As you saw on the first page

15   it's a 1998 document so I don't think it's relevant to what a

16   person of skilled in the art would know in 1994.

17            MR. AANNESTAD:  It's just exemplary, your Honor.

18            THE COURT:  Do I need it?

19            MR. AANNESTAD:  You don't need it.  We'll see

20   something similar later on.

21            THE COURT:  Okay.

22            MR. AANNESTAD:  All right, thank you, your Honor.

23            THE COURT:  That's it?

24            MR. AANNESTAD:  We'll continue tomorrow.

25            THE COURT:  We're going to start tomorrow morning at

1   10.   That will be a luxurious extra half hour.  Good evening,

2   Doctor, see you in the morning.

3               (Adjourned)

1                    INDEX OF EXAMINATION

2    Examination of:                         Page

3    SUSAN A. RICE

4    Direct By Mr. Jones . . . . . . . . . . . .1007

5    Cross By Mr. Wiesen . . . . . . . . . . . .1044

6    Redirect By Mr. Jones . . . . . . . . . . .1060

7    JOHN BISHOP

8    Direct By Ms. Hagberg . . . . . . . . . . .1062

9    Cross By Mr. Hashmall . . . . . . . . . . .1106

10   Redirect Ms. Hagberg . . . . . . . . . . .1111

11   TREVOR LAIRD

12   Direct By Mr. Doyle . . . . . . . . . . . .1112

13   Cross By Mr. Wiesen . . . . . . . . . . . .1148

14   Redirect By Mr. Doyle . . . . . . . . . . .1167

15   CARL JOHN SCANDELLA

16   Direct By Mr. Aannestad . . . . . . . . . .1169

17                    PLAINTIFF EXHIBITS

18   Exhibit No.                          Received

19    PTX 198  . . . . . . . . . . . . . . . . .1085

20    914  . . . . . . . . . . . . . . . . . . .1107

21    PTX 928  . . . . . . . . . . . . . . . . .1158

22                    DEFENDANT EXHIBITS

23   Exhibit No.                          Received

24    DTX 1074 and DTX 3563  . . . . . . . . . .1071

25    3564  . . . . . . . . . . . . . . . . . . .1190